IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CIVIL ACTION NO: 3:12CV059 |
| v. | |
| COMMONWEALTH OF VIRGINIA, | COMPLAINT FOR VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. §§ 12131-12134 |
| Defendant. | |

## COMPLAINT

The Commonwealth of Virginia ("Commonwealth") discriminates against persons with disabilities, within the meaning of title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12134, and its implementing regulations by depriving persons with intellectual and developmental disabilities ("ID/DD") of the opportunity to receive services in the most integrated setting appropriate to their needs, placing such individuals at risk of unnecessary institutionalization, and unnecessarily institutionalizing many of them.

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this action under title II of the ADA, 42 U.S.C. §§ 12131-12132, and 28 U.S.C. §§ 1331 & 1345. This Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201-2202.

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391, as a substantial portion of the acts and omissions giving rise to this action occurred in the Eastern District of Virginia. 28 U.S.C. § 1391(b).

## PARTIES

3. Plaintiff is the United States of America.

4. Defendant, the Commonwealth of Virginia, is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1); 28 C.F.R. § 35.104, and is therefore subject to title II of the ADA, 42 U.S.C. § 12131 et seq., and its implementing regulations, 28 C.F.R. Part 35.

## STATUTORY AND REGULATORY BACKGROUND

5. Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[.]" 42 U.S.C. § 12101(b)(1). It found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]" 42 U.S.C. § 12101(a)(2).

6. For those reasons, Congress prohibited discrimination against individuals with disabilities by public entities: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

7. The Department of Justice has authority to enforce title II and to issue regulations implementing the statute. 42 U.S.C. §§ 12133-34. The title II regulations require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The preamble discussion of the "integration regulation" explains that "the most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible[.]" 28 C.F.R. § 35.130(d), App. B at 673 (2011).

8. Regulations implementing title II of the ADA further prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination or "that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]" 28 C.F.R. § 35.130(b)(3).

9. In *Olmstead v. L.C.*, 527 U.S. 581, 597 (1999), the Supreme Court held that title II prohibits the unjustified segregation of individuals with disabilities. The Court explained that its holding "reflects two evident judgments." *Id.* at 600. "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id.* "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id.* at 601.

10. Under *Olmstead*, public entities are required to provide community-based services when (a) such services are appropriate, (b) the affected persons do not oppose community-based treatment, and (c) community-based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of other persons with disabilities. *Id.* at 607.

## FACTUAL ALLEGATIONS

### The United States' Investigation of Virginia

11. On August 21, 2008, the United States notified the Commonwealth that it was commencing an investigation of the Central Virginia Training Center ("CVTC"), pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997.

12. On April 23, 2010, the United States notified the Commonwealth that it was expanding the investigation to focus on the Commonwealth's compliance with the ADA and *Olmstead* with respect to individuals at CVTC.

13. During the course of the expanded investigation, the United States determined that an examination of the Commonwealth's measures to address the rights of individuals at CVTC under the ADA and *Olmstead* implicated the statewide system and required a broader scope of review. Accordingly, the United States examined statewide policies and practices, and met with and collected information from individuals from throughout the Commonwealth, including persons in statewide leadership positions, providers of community services, and individuals with ID/DD receiving services in a variety of settings throughout Virginia.

14. On February 10, 2011, the U.S. Department of Justice sent a letter of findings notifying the Commonwealth that it was violating the ADA by unnecessarily institutionalizing, and placing at risk of unnecessary institutionalization, individuals with ID/DD throughout Virginia. The letter reported in detail the findings of the Department's investigation, provided the Commonwealth notice of its failure to comply with the ADA, and outlined the specific steps necessary for the Commonwealth to meet its obligations under the ADA.

15. The Commonwealth and the United States subsequently entered into negotiations to resolve the violations identified in the letter of findings. After months of negotiations, the

Parties have reached a settlement agreement to resolve these claims and simultaneously are filing a "Joint Motion for Entry of Settlement Agreement and Brief in Support Thereof."

### The Commonwealth's System for Serving Individuals with ID/DD

16. The Commonwealth is responsible for the administration, funding, planning, licensing, and delivery of services to its citizens with ID/DD. Specifically, the Commonwealth plans and designs the services offered, reviews the quality of care and safety across settings, and licenses and inspects ID/DD service providers, including the state-operated training centers. It also allocates within the system all funds appropriated from federal, state, and other sources, including Medicaid funding for the training centers, private Intermediate Care Facilities for the Mentally Retarded ("ICF-MR"), private nursing facilities, and Home and Community-Based Services ("HCBS") waivers. The Commonwealth also administers the waitlists for services provided through HCBS waivers and seeks approval from the U.S. Department of Health and Human Services to obtain new waivers.

17. The Commonwealth's system for serving individuals with ID/DD is comprised of five state-operated training centers for individuals with intellectual disabilities; 40 locally-run community services boards ("CSBs"); and multiple private providers of services and services in various settings, including group homes, sponsored placements, private nursing facilities, and private ICF-MRs.

18. The Commonwealth funds community-based services for individuals with ID/DD primarily through its HCBS waivers under the federal Medicaid waiver program, which permits the waiver of certain Medicaid statutory requirements to enable states to cover a broad array of community-based services for targeted populations as an alternative to institutionalization. The

Commonwealth's HCBS waiver services are delivered through CSBs and private providers that are approved by the Commonwealth.

19. Through the waiver and other funding and coordination, the Commonwealth provides treatment and support services to assist persons with ID/DD with integrating into, successfully living in, and contributing to the community. Among the services that the Commonwealth provides or contracts for are: assistive technology; companion services; crisis stabilization and crisis supervision; day support; environmental modifications; in-home residential support services; residential support services; respite services; personal assistance; personal emergency response system; prevocational services; skilled nursing; supported employment; therapeutic consultation; and transition services.

20. Approximately 7,000 individuals with ID/DD are on waitlists for HCBS services in the community.

21. The Commonwealth's five state-operated training centers are licensed ICF-MRs located throughout the Commonwealth: (1) CVTC in Madison Heights, (2) Northern Virginia Training Center in Fairfax, (3) Southeastern Virginia Training Center in Chesapeake, (4) Southside Virginia Training Center in Petersburg, and (5) Southwestern Virginia Training Center in Hillsville.

22. The training centers are large institutional settings in which people receive residential and treatment services. The facilities' populations range from approximately 120 individuals to approximately 400 individuals.

23. The Commonwealth institutionalizes approximately 1,100 individuals in its state-operated training centers. The average length of stay for individuals in the training centers

ranges from approximately 21 years at Southside Virginia Training Center, to almost 42 years at CVTC.

24. In addition to the approximately 1,100 individuals institutionalized in the Commonwealth's five training centers, hundreds of other individuals with ID/DD, including children, are institutionalized in private ICF-MRs located throughout the Commonwealth.

25. More than 1,000 additional individuals with intellectual or other developmental disabilities, including children, are institutionalized in nursing homes throughout the Commonwealth.

### Individuals in the Community Are at Risk of Unnecessary Institutionalization

26. The Commonwealth fails to provide services in the community of sufficient quality and in sufficient quantity to enable individuals with ID/DD to be served in the most integrated settings appropriate to their needs and prevent unnecessary institutionalization. As a result, individuals who want to remain in the community are forced to enter institutional settings, including the training centers, nursing homes, and private ICF-MRs.

27. The individuals with ID/DD on the HCBS waiver waitlists require community-based services and supports in order to avoid unnecessary institutional placements.

28. More than 3,000 of the nearly 6,000 individuals on the waitlist for the Intellectual Disability waiver have significant enough needs that the Commonwealth has designated them as "urgent." Without waiver services, these individuals are at particularly high risk of unnecessary institutionalization.

29. Approximately 1,000 individuals are on the waitlist for the Developmental Disability waiver, including many who qualify under "emergency" criteria due to the significance of their

needs. Without waiver services, these individuals are at particularly high risk of unnecessary institutionalization.

30. The Commonwealth adds hundreds of individuals to the waitlists, including the "urgent" list, each year, and allocates insufficient numbers of new waivers to keep up with growth of the waitlists.

31. Individuals typically are on the waitlists for years before they receive, through a waiver or otherwise, the services they need to remain in the community. Some individuals are forced into institutional settings while they wait for services.

32. The Commonwealth has acknowledged, and the United States' investigation found, that more waivers, and more flexible waivers, are necessary to prevent unnecessary institutionalization, particularly of individuals with complex needs; a lack of housing options pose a critical barrier to individuals successfully receiving services in integrated settings in the community; deficient crisis services result in unnecessary institutionalization, especially for individuals with complex needs; and employment and other day programs are too often in segregated workshops or otherwise do not provide meaningful employment opportunities.

33. Serving individuals in community placements instead of in institutional settings is generally a more cost-effective option for the Commonwealth. The Commonwealth spends approximately $215,000 to serve a person in the training Center. It costs, on average, approximately $75,000 to serve an individual with ID/DD in the community. Even individuals with the most complex needs can be served appropriately in the community for significantly less than the cost of serving them in a training center, with the average cost being approximately $135,000 per person.

## Individuals Are Unnecessarily Institutionalized

34. Individuals in the training centers and in other institutional settings remain segregated in institutions despite the requirements of the ADA that they have the opportunity to receive services in the most integrated settings appropriate to their needs.

35. The training centers are congregate facilities managed and staffed by the Commonwealth for individuals with ID/DD.

36. The training centers are institutions that segregate individuals with ID/DD and do not "enable individuals with disabilities to interact with nondisabled persons to the fullest extent possible[.]" 28 C.F.R. § 35.130(d).

37. The vast majority, and likely all, of the individuals at the training centers can benefit from community settings with appropriate community-based services and supports. Commonwealth officials have acknowledged that nearly all of the individuals in its training centers could be served in the community. Individuals at the training centers have needs that are similar to the needs of individuals who currently are being served in the community, including individuals who previously were institutionalized at the training centers.

38. Many individuals do not object to receiving services in a more integrated setting but remain in the training centers due to the lack of appropriate community services and supports, a flawed discharge planning process, and deficient coordination with community providers.

39. Additional individuals with ID/DD are institutionalized in nursing homes and private ICF-MRs that are funded, and part of the system administered, by the Commonwealth. Many of these individuals are unnecessarily institutionalized due to the lack of adequate community-based supports and services.

40. The Commonwealth lacks a comprehensive oversight and quality assurance system to ensure the safety and quality of services provided to individuals in the community. As a result, individuals and their families are often reluctant to seek community-based services.

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

41. The allegations of Paragraphs 1 through 40 are hereby re-alleged and incorporated by reference.

42. Defendant discriminates against "qualified individual[s] with a disability," within the meaning of the ADA, by administering the Commonwealth's system of delivering services to individuals with ID/DD in a manner that denies thousands of people the opportunity to receive services in the most integrated setting appropriate to their needs, places such individuals at risk of unnecessary institutionalization, and leads to the unnecessary institutionalization of many of them, including individuals who are qualified to receive services in a more integrated setting and do not oppose receiving services in a more integrated setting.

43. The Commonwealth's actions as alleged herein constitute discrimination in violation of title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that the Court:

44. Require Defendant to administer services for individuals with ID/DD in the most integrated settings appropriate to the needs of the individuals; and

45. Enjoin Defendant from administering services for individuals with ID/DD in a manner that unnecessarily isolates and segregates such individuals from the community; and

46. Order such other appropriate relief as the interests of justice require.

Dated: January 26, 2012

FOR THE UNITED STATES:

Respectfully submitted,

*[signature]*

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

NEIL H. MacBRIDE
United States Attorney
Eastern District of Virginia

EVE HILL
Senior Counselor

*[signature]*

ROBERT McINTOSH
Assistant United States Attorney
600 East Main St., Suite 1800
Richmond, VA 23219
(804) 819-5400
Fax: (804) 819-7417
Robert.McIntosh@usdoj.gov
VA Bar #66113

ALISON N. BARKOFF
Special Counsel for Olmstead Enforcement
Civil Rights Division

JONATHAN SMITH
Chief
Special Litigation Section

*[signature]*

BENJAMIN O. TAYLOE, JR.
Deputy Chief
AARON B. ZISSER
JACQUELINE K. CUNCANNAN
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, D.C. 20530
(202) 305-3355
Fax: (202) 514-4883
Aaron.Zisser@usdoj.gov