IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
|      ) | |
| Plaintiff,      ) | CIVIL ACTION NO: 3 : 12 CY059 |
|      ) | |
| v.      ) | |
|      ) | |
| COMMONWEALTH OF VIRGINIA,      ) | |
|      ) | |
| Defendant.      ) | |
|      ) | |
| _____ ) | |

## SETTLEMENT AGREEMENT

## I.  Introduction

A.  The Commonwealth of Virginia ("the Commonwealth") and the United States (together, "the Parties") are committed to full compliance with Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, as interpreted by *Olmstead v. L.C.*, 527 U.S. 581 (1999). This Agreement is intended to ensure the Commonwealth's compliance with the ADA and *Olmstead*, which require that, to the extent the Commonwealth offers services to individuals with intellectual and developmental disabilities, such services shall be provided in the most integrated setting appropriate to meet their needs. Accordingly, throughout this document, the Parties intend that the goals of community integration, self-determination, and quality services will be achieved.

B.  On August 21, 2008, the United States Department of Justice ("United States") initiated an investigation of Central Virginia Training Center ("CVTC"), the largest of Virginia's five state-operated intermediate care facilities for persons with intellectual and developmental disabilities ("ICFs"), pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997. On April 21, 2010, the United States notified the Commonwealth that it was expanding its investigation under the ADA to focus on the Commonwealth's compliance with the ADA's integration mandate and *Olmstead* with respect to individuals at CVTC. During the course of the expanded investigation, however, it became clear that an examination of the Commonwealth's measures to address the rights of individuals at CVTC under the ADA and *Olmstead* implicated the statewide system for serving individuals with intellectual and developmental disabilities and required a broader scope of review. Accordingly, the policies and practices that the United States examined in its expanded investigation were statewide in scope and application. On February 10, 2011, the United States issued its findings, concluding that the Commonwealth fails to provide services to individuals with intellectual and

developmental disabilities in the most integrated setting appropriate to their needs as required by the ADA and *Olmstead*.

C. The Commonwealth engaged with the United States in open dialogue about the allegations and worked with the United States to resolve the alleged violations of the ADA arising out of the Commonwealth's provision of services for individuals with intellectual and developmental disabilities.

D. In order to resolve all issues pending between the Parties without the expense, risks, delays, and uncertainties of litigation, the United States and the Commonwealth agree to the terms of this Settlement Agreement as stated below. This Agreement resolves the United States' investigation of CVTC, as well as its broader examination of the Commonwealth's compliance with the ADA and *Olmstead* with respect to individuals with intellectual and developmental disabilities.

E. By entering into this Settlement Agreement, the Commonwealth does not admit to the truth or validity of any claim made against it by the United States.

F. The Parties acknowledge that the Court has jurisdiction over this case and authority to enter this Settlement Agreement and to enforce its terms as set forth herein.

G. No person or entity is intended to be a third-party beneficiary of the provisions of this Settlement Agreement for purposes of any other civil, criminal, or administrative action, and, accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Settlement Agreement in any separate action. This Settlement Agreement is not intended to impair or expand the right of any person or organization to seek relief against the Commonwealth or their officials, employees, or agents.

H. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1345; and 42 U.S.C. §§ 12131-12132. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## II. Definitions

A. "Developmental disability" means a severe, chronic disability of an individual that: (1) is attributable to a mental or physical impairment or combination of mental and physical impairments; (2) is manifested before the individual attains age 22; (3) is likely to continue indefinitely; (4) results in substantial functional limitations in 3 or more of the following areas of major life activity: (a) self-care; (b) receptive and expressive language; (c) learning; (d) mobility; (e) self-direction; (f) capacity for independent living; (g) economic self-sufficiency; and (5) reflects the individual's need for a combination and sequence of special, interdisciplinary, or generic services, individualized supports, or other forms of assistance that are of lifelong or extended duration and are individually planned and coordinated. 42 U.S.C. § 15002.

B. "Intellectual disability" means a disability characterized by significant limitations both in intellectual functioning (reasoning, learning, problem solving) and in adaptive behavior, which covers a range of everyday social and practical skills. This disability originates before the age of 18. An intellectual disability is a type of developmental disability.

C. Home and Community-Based Services Waivers ("HCBS Waivers") means the program approved by the Centers for Medicare and Medicaid Services ("CMS") for the purpose of providing services in community settings for eligible persons with developmental disabilities who would otherwise be served in ICFs. For purposes of this Settlement Agreement, "HCBS Waivers" includes the Intellectual Disabilities Waiver ("ID Waiver") and the Individual and Family Developmental Disabilities Support Waiver ("DD Waiver"), or any other CMS approved waivers that are equivalent to the ID or DD Waivers that may be created after the execution of this Agreement.

D. Individual and family supports are defined as a comprehensive and coordinated set of strategies that are designed to ensure that families who are assisting family members with intellectual or developmental disabilities ("ID/DD") or individuals with ID/DD who live independently have access to person-centered and family-centered resources, supports, services and other assistance. Individual and family supports are targeted to individuals not already receiving services under HCBS waivers, as defined in Section II.C above. The family supports provided under this Agreement shall not supplant or in any way limit the availability of services provided through the Elderly or Disabled with Consumer Direction ("EDCD") waiver, Early and Periodic Screening, Diagnosis and Treatment ("EPSDT"), or similar programs.

## III. Serving Individuals with Developmental Disabilities In the Most Integrated Setting

A. To prevent the unnecessary institutionalization of individuals with ID/DD and to provide them opportunities to live in the most integrated settings appropriate to their needs consistent with their informed choice, the Commonwealth shall develop and provide the community services described in this Section.

B. Target Population:

1. The target population of this Agreement shall include individuals with ID/DD who meet any of the following additional criteria:

    a. are currently residing at any of the Training Centers;

    b. who (i) meet the criteria for the wait list for the ID waiver, or (ii) meet the criteria for the wait list for the DD waiver; or

    c. currently reside in a nursing home or ICF.

2. The Commonwealth shall not exclude any otherwise qualifying individual from the target population due to the existence of complex behavioral or medical needs or of co-occurring conditions, including but not limited to, mental illness, traumatic brain injuries, or other neurological conditions.

3. Individuals shall remain in the target population if they receive HCBS waiver services or individual and family supports under this Agreement.

4. Individuals who are otherwise in the target population and who have been released from forensic status or placed on conditional release by a court shall not be excluded

3

from the target population solely on the basis of their former forensic status or current conditional release status.

5. Inclusion in the target population does not guarantee or create a right to receipt of services.

C. Enhancement of Community Services

1. By June 30, 2021, the Commonwealth shall create 4,170 waiver slots for the target population, to be broken down as follows:

a. The Commonwealth shall create a minimum of 805 waiver slots to enable individuals in the target population in the Training Centers to transition to the community according to the following schedule:

i.    In State Fiscal Year 2012, 60 waiver slots

ii.   In State Fiscal Year 2013, 160 waiver slots

iii.  In State Fiscal Year 2014, 160 waiver slots

iv.   In State Fiscal Year 2015, 90 waiver slots

v.    In State Fiscal Year 2016, 85 waiver slots

vi.   In State Fiscal Year 2017, 90 waiver slots

vii.  In State Fiscal Year 2018, 90 waiver slots

viii. In State Fiscal Year 2019, 35 waiver slots

ix.   In State Fiscal Year 2020, 35 waiver slots

b. The Commonwealth shall create a minimum of 2,915 waiver slots to prevent the institutionalization of individuals with intellectual disabilities in the target population who are on the urgent waitlist for a waiver, or to transition to the community individuals with intellectual disabilities under 22 years of age from institutions other than the Training Centers (i.e., ICFs and nursing facilities), according to the following schedule:

i.    In State Fiscal Year 2012, 275 waiver slots

ii.   In State Fiscal Year 2013, 225 waiver slots, including 25 slots prioritized for individuals under 22 years of age residing in nursing homes and the largest ICFs

iii.  In State Fiscal Year 2014, 225 waiver slots, including 25 slots prioritized for individuals under 22 years of age residing in nursing homes and the largest ICFs

    iv.  In State Fiscal Year 2015, 250 waiver slots, including 25 slots prioritized for individuals under 22 years of age residing in nursing homes and the largest ICFs

    v.  In State Fiscal Year 2016, 275 waiver slots, including 25 slots prioritized for individuals under 22 years of age residing in nursing homes and the largest ICFs

    vi.  In State Fiscal Year 2017, 300 waiver slots

    vii.  In State Fiscal Year 2018, 325 waiver slots

    viii.  In State Fiscal Year 2019, 325 waiver slots

    ix.  In State Fiscal Year 2020, 355 waiver slots

    x.  In State Fiscal Year 2021, 360 waiver slots

c.  The Commonwealth shall create a minimum of 450 waiver slots to prevent the institutionalization of individuals with developmental disabilities other than intellectual disabilities in the target population who are on the waitlist for a waiver, or to transition to the community individuals with developmental disabilities other than intellectual disabilities under 22 years of age from institutions other than the Training Centers (i.e., ICFs and nursing facilities), according to the following schedule:

    i.  In State Fiscal Year 2012, 150 waiver slots

    ii.  In State Fiscal Year 2013, 25 waiver slots, including 15 prioritized for individuals under 22 years of age residing in nursing homes and the largest ICFs

    iii.  In State Fiscal Year 2014, 25 waiver slots, including 15 prioritized for individuals under 22 years of age residing in nursing homes and the largest ICFs

    iv.  In State Fiscal Year 2015, 25 waiver slots, including 15 prioritized for individuals under 22 years of age residing in nursing homes and the largest ICFs

    v.  In State Fiscal Year 2016, 25 waiver slots, including 15 prioritized for individuals under 22 years of age residing in nursing homes and the largest ICFs

    vi.  In State Fiscal Year 2017, 25 waiver slots, including 10 prioritized for individuals under 22 years of age residing in nursing homes and the largest ICFs

5

    vii.  In State Fiscal Year 2018, 25 waiver slots, including 10 prioritized for individuals under 22 years of age residing in nursing homes and the largest ICFs

    viii.  In State Fiscal Year 2019, 25 waiver slots

    ix.  In State Fiscal Year 2020, 50 waiver slots

    x.  In State Fiscal Year 2021, 75 waiver slots

  d.  If the Commonwealth creates more waiver slots than are required in Sections III.C.1.a, b, or c above for a particular fiscal year, the number of slots created above the requirement shall be counted towards the slots required to be created in the subsequent fiscal year in the relevant Section.

2.  The Commonwealth shall create an individual and family support program for individuals with ID/DD whom the Commonwealth determines to be most at risk of institutionalization, according to the following schedule:

  a.  In State Fiscal Year 2013, a minimum of 700 individuals supported

  b.  In State Fiscal Year 2014, a minimum of 1000 individuals supported

  c.  In State Fiscal Year 2015, a minimum of 1000 individuals supported

  d.  In State Fiscal Year 2016, a minimum of 1000 individuals supported

  e.  In State Fiscal Year 2017, a minimum of 1000 individuals supported

  f.  In State Fiscal Year 2018, a minimum of 1000 individuals supported

  g.  In State Fiscal Year 2019, a minimum of 1000 individuals supported

  h.  In State Fiscal Year 2020, a minimum of 1000 individuals supported

  i.  In State Fiscal Year 2021, a minimum of 1000 individuals supported

3.  If the Commonwealth substantially changes or amends its ID or DD waivers, the Parties shall meet within 15 days of final approval from CMS to determine if any provisions of this Agreement should be amended.  The Parties agree that under any new terms, at least as many individuals in each category in Sections III.C.1.a, b, and c and C.2 above shall receive HCBS waivers and individual and family supports under the Agreement.  If the Parties cannot reach agreement within 90 days, the Court shall resolve the dispute.

4.  With the consent of the United States and the Independent Reviewer, the Commonwealth may re-allocate any unused waiver slot from one category of III.C.1.a-c to another in any State Fiscal Year covered by this Agreement.

5.  Case Management

a. The Commonwealth shall ensure that individuals receiving HCBS waiver services under this Agreement receive case management.

b. For the purposes of this agreement, case management shall mean:

   i. Assembling professionals and nonprofessionals who provide individualized supports, as well as the individual being served and other persons important to the individual being served, who, through their combined expertise and involvement, develop Individual Support Plans ("ISP") that are individualized, person-centered, and meet the individual's needs;

   ii. Assisting the individual to gain access to needed medical, social, education, transportation, housing, nutritional, therapeutic, behavioral, psychiatric, nursing, personal care, respite, and other services identified in the ISP; and

   iii. Monitoring the ISP to make timely additional referrals, service changes, and amendments to the plans as needed.

c. Case management shall be provided to all individuals receiving HCBS waiver services under this Agreement by case managers who are not directly providing such services to the individual or supervising the provision of such services. The Commonwealth shall include a provision in the Community Services Board ("CSB") Performance Contract that requires CSB case managers to give individuals a choice of service providers from which the individual may receive approved waiver services and to present practicable options of service providers based on the preferences of the individual, including both CSB and non-CSB providers.

d. The Commonwealth shall establish a mechanism to monitor compliance with performance standards.

6. Crisis Services

a. The Commonwealth shall develop a statewide crisis system for individuals with intellectual and developmental disabilities. The crisis system shall:

   i. Provide timely and accessible support to individuals with intellectual and developmental disabilities who are experiencing crises, including crises due to behavioral or psychiatric issues, and to their families;

   ii. Provide services focused on crisis prevention and proactive planning to avoid potential crises; and

   iii. Provide in-home and community-based crisis services that are directed at resolving crises and preventing the removal of the individual from his or her current placement whenever practicable.

b. The crisis system shall include the following components:

   i. Crisis Point of Entry

7

A. The Commonwealth shall utilize existing CSB Emergency Services, including existing CSB hotlines, for individuals to access information about and referrals to local resources.  Such hotlines shall be operated 24 hours per day, 7 days per week and staffed with clinical professionals who are able to assess crises by phone and assist the caller in identifying and connecting with local services.  Where necessary, the crisis hotline will dispatch at least one mobile crisis team member who is adequately trained to address the crisis.

B. By June 30, 2012, the Commonwealth shall train CSB Emergency Services personnel in each Health Planning Region ("Region") on the new crisis response system it is establishing, how to make referrals, and the resources that are available.

ii.  Mobile crisis teams

A. Mobile crisis team members adequately trained to address the crisis shall respond to individuals at their homes and in other community settings and offer timely assessment, services, support, and treatment to de-escalate crises without removing individuals from their current placement whenever possible.

B. Mobile crisis teams shall assist with crisis planning and identifying strategies for preventing future crises and may also provide enhanced short-term capacity within an individual's home or other community setting.

C. Mobile crisis team members adequately trained to address the crisis also shall work with law enforcement personnel to respond if an individual with ID/DD comes into contact with law enforcement.

D. Mobile crisis teams shall be available 24 hours per day, 7 days per week and to respond on-site to crises.

E. Mobile crisis teams shall provide local and timely in-home crisis support for up to 3 days, with the possibility of an additional period of up to 3 days upon review by the Regional Mobile Crisis Team Coordinator.

F. By June 30, 2012, the Commonwealth shall have at least one mobile crisis team in each Region that shall respond to on-site crises within three hours.

G. By June 30, 2013, the Commonwealth shall have at least two mobile crisis teams in each Region that shall respond to on-site crises within two hours.

H. By June 30, 2014, the Commonwealth shall have a sufficient number of mobile crisis teams in each Region to respond on site to crises as follows: in urban areas, within one hour, and in rural areas, within two hours, as measured by the average annual response time.

iii. Crisis stabilization programs

    A. Crisis stabilization programs offer a short-term alternative to institutionalization or hospitalization for individuals who need inpatient stabilization services.

    B. Crisis stabilization programs shall be used as a last resort. The State shall ensure that, prior to transferring an individual to a crisis stabilization program, the mobile crisis team, in collaboration with the provider, has first attempted to resolve the crisis to avoid an out-of-home placement and if that is not possible, has then attempted to locate another community-based placement that could serve as a short-term placement.

    C. If an individual receives crisis stabilization services in a community-based placement instead of a crisis stabilization unit, the individual may be given the option of remaining in the placement if the provider is willing and has capacity to serve the individual and the provider can meet the needs of the individual as determined by the provider and the individual's case manager.

    D. Crisis stabilization programs shall have no more than six beds and lengths of stay shall not exceed 30 days.

    E. With the exception of the Pathways Program operated at Southwestern Virginia Training Center ("SWVTC"), crisis stabilization programs shall not be located on the grounds of the Training Centers or hospitals with inpatient psychiatric beds. By July 1, 2015, the Pathways Program at SWVTC will cease providing crisis stabilization services and shall be replaced by off-site crisis stabilization programs with sufficient capacity to meet the needs of the target population in that Region.

    F. By June 30, 2012, the Commonwealth shall develop one crisis stabilization program in each Region.

    G. By June 30, 2013, the Commonwealth shall develop an additional crisis stabilization program in each Region as determined necessary by the Commonwealth to meet the needs of the target population in that Region.

7. Integrated Day Activities and Supported Employment

    a. To the greatest extent practicable, the Commonwealth shall provide individuals in the target population receiving services under this Agreement with integrated day opportunities, including supported employment.

    b. The Commonwealth shall maintain its membership in the State Employment Leadership Network ("SELN") established by the National Association of State Developmental Disability Directors. The Commonwealth shall establish a state policy on Employment First for the target population and include a term in the CSB Performance Contract requiring application of this policy. The Employment

9

First policy shall, at a minimum, be based on the following principles: (1) individual supported employment in integrated work settings is the first and priority service option for individuals with intellectual or developmental disabilities receiving day program or employment services from or funded by the Commonwealth; (2) the goal of employment services is to support individuals in integrated work settings where they are paid minimum or competitive wages; and (3) employment services and goals must be developed and discussed at least annually through a person-centered planning process and included in ISPs. The Commonwealth shall have at least one employment service coordinator to monitor implementation of Employment First practices for individuals in the target population.

i.  Within 180 days of this Agreement, the Commonwealth shall develop, as part of its Employment First policy, an implementation plan to increase integrated day opportunities for individuals in the target population, including supported employment, community volunteer activities, community recreational opportunities, and other integrated day activities. The plan will be under the direct supervision of a dedicated employment service coordinator for the Commonwealth and shall:

A.  Provide regional training on the Employment First policy and strategies throughout the Commonwealth; and

B.  Establish, for individuals receiving services through the HCBS waivers:

1.  Annual baseline information regarding:

a.  The number of individuals who are receiving supported employment;

b.  The length of time people maintain employment in integrated work settings;

c.  Amount of earnings from supported employment;

d.  The number of individuals in pre-vocational services as defined in 12 VAC 30-120-211 in effect on the effective date of this Agreement; and

e.  The length of time individuals remain in pre-vocational services.

2.  Targets to meaningfully increase:

a.  The number of individuals who enroll in supported employment each year; and

b.  The number of individuals who remain employed in integrated work settings at least 12 months after the start of supported employment.

10

    c.  Regional Quality Councils, described in Section V.D.5 below, shall review data regarding the extent to which the targets identified in Section III.C.7.b.i.B.2 above are being met.  These data shall be provided quarterly to the Regional Quality Councils and the Quality Management system by the providers.  Regional Quality Councils shall consult with those providers and the SELN regarding the need to take additional measures to further enhance these services.

    d.  The Regional Quality Councils shall annually review the targets set pursuant to Section III.C.7.b.i.B.2 above and shall work with providers and the SELN in determining whether the targets should be adjusted upward.

  8.  Access and Availability of Services

    a.  The Commonwealth shall provide transportation to individuals receiving HCBS waiver services in the target population in accordance with the Commonwealth's HCBS Waivers.

    b.  The Commonwealth shall publish guidelines for families seeking intellectual and developmental disability services on how and where to apply for and obtain services.  The guidelines will be updated annually and will be provided to appropriate agencies for use in directing individuals in the target population to the correct point of entry to access services.

  9.  The Commonwealth has made public its long-standing goal and policy, independent of and adopted prior to this Agreement or the Department of Justice's findings, of transitioning from an institutional model of care to a community-based system that meets the needs of all individuals with ID/DD, including those with the most complex needs, and of using its limited resources to serve effectively the greatest number of individuals with ID/DD.  This goal and policy have resulted in a decline in the population of the state training centers from approximately 6000 individuals to approximately 1000 individuals.  The Commonwealth has determined that this significant and ongoing decline makes continued operation of residential services fiscally impractical.  Consequently, and in accordance with the Commonwealth's policy of transitioning its system of developmental services to a community-based system, the Commonwealth will provide to the General Assembly within one year of the effective date of this Agreement, a plan, developed in consultation with the Chairmen of Virginia's House of Delegates Appropriations and Senate Finance Committees, to cease residential operations at four of the five training centers by the end of State Fiscal Year 2021.

D.  Community Living Options

  1.  The Commonwealth shall serve individuals in the target population in the most integrated setting consistent with their informed choice and needs.

  2.  The Commonwealth shall facilitate individuals receiving HCBS waivers under this Agreement to live in their own home, leased apartment, or family's home, when such a placement is their informed choice and the most integrated setting appropriate to their needs.  To facilitate individuals living independently in their own home or

apartment, the Commonwealth shall provide information about and make appropriate referrals for individuals to apply for rental or housing assistance and bridge funding through all existing sources, including local, State, or federal affordable housing or rental assistance programs (tenant-based or project-based) and the fund described in Section III.D.4 below.

3. Within 365 days of this Agreement, the Commonwealth shall develop a plan to increase access to independent living options such as individuals' own homes or apartments. The Commonwealth undertakes this initiative recognizing that comparatively modest housing supports often can enable individuals to live successfully in the most integrated settings appropriate to their needs.

   a. The plan will be developed under the direct supervision of a dedicated housing service coordinator for the Department of Behavioral Health and Developmental Services ("DBHDS") and in coordination with representatives from the Department of Medical Assistance Services ("DMAS"), Virginia Board for People with Disabilities, Virginia Housing Development Authority, Virginia Department of Housing and Community Development, and other organizations as determined appropriate by DBHDS.

   b. The plan will establish, for individuals receiving or eligible to receive services through the HCBS waivers under this Agreement:

      i. Baseline information regarding the number of individuals who would choose the independent living options described above, if available; and

      ii. Recommendations to provide access to these settings during each year of this Agreement.

4. Within 365 days of this Agreement, the Commonwealth shall establish and begin distributing, from a one-time fund of $800,000 to provide and administer rental assistance in accordance with the recommendations described above in Section III.D.3.b.ii, to as many individuals as possible who receive HCBS waivers under this Agreement, express a desire for living in their own home or apartment, and for whom such a placement is the most integrated setting appropriate to their needs.

5. Individuals in the target population shall not be served in a sponsored home or any congregate setting, unless such placement is consistent with the individual's choice after receiving options for community placements, services, and supports consistent with the terms of Section IV.B.9 below.

6. No individual in the target population shall be placed in a nursing facility or congregate setting with five or more individuals unless such placement is consistent with the individual's needs and informed choice and has been reviewed by the Region's Community Resource Consultant and, under circumstances described in Section III.E below, by the Regional Support Team.

7. The Commonwealth shall include a term in the annual performance contract with the CSBs to require case managers to continue to offer education about less restrictive

community options on at least an annual basis to any individuals living outside their own home or family's home (and, if relevant, to their authorized representative or guardian).

E. Community Resource Consultants and Regional Support Teams

1. The Commonwealth shall utilize Community Resource Consultant ("CRC") positions located in each Region to provide oversight and guidance to CSBs and community providers, and serve as a liaison between the CSB case managers and DBHDS Central Office. The CRCs shall provide on-site, electronic, written, and telephonic technical assistance to CSB case managers and private providers regarding person-centered planning, the Supports Intensity Scale, and requirements of case management and HCBS Waivers. The CRC shall also provide ongoing technical assistance to CSBs and community providers during an individual's placement. The CRCs shall be a member of the Regional Support Team in the appropriate Region.

2. The CRC may consult at any time with the Regional Support Team. Upon referral to it, the Regional Support Team shall work with the Personal Support Team ("PST") and CRC to review the case, resolve identified barriers, and ensure that the placement is the most integrated setting appropriate to the individual's needs, consistent with the individual's informed choice. The Regional Support Team shall have the authority to recommend additional steps by the PST and/or CRC.

3. The CRC shall refer cases to the Regional Support Teams for review, assistance in resolving barriers, or recommendations whenever:

   a. The PST is having difficulty identifying or locating a particular community placement, services and supports for an individual within 3 months of the individual's receipt of HCBS waiver services.

   b. The PST recommends and, upon his/her review, the CRC also recommends that an individual residing in his or her own home, his or her family's home, or a sponsored residence be placed in a congregate setting with five or more individuals.

   c. The PST recommends and, upon his/her review, the CRC also recommends an individual residing in any setting be placed in a nursing home or ICF.

   d. There is a pattern of an individual repeatedly being removed from his or her current placement.

13

**IV. Discharge Planning and Transition from Training Center**

By July 2012, the Commonwealth will have implemented Discharge and Transition Planning processes at all Training Centers consistent with the terms of this Section, excluding other dates agreed upon, and listed separately in this Section.

A. To ensure that individuals are served in the most integrated setting appropriate to their needs, the Commonwealth shall develop and implement discharge planning and transition processes at all Training Centers consistent with the terms of this Section and person-centered principles.

B. Discharge Planning and Discharge Plans

1. Discharge planning shall begin upon admission.

2. Discharge planning shall drive treatment of individuals in any Training Center and shall adhere to the principles of person-centered planning.

3. Individuals in Training Centers shall participate in their treatment and discharge planning to the maximum extent practicable, regardless of whether they have authorized representatives. Individuals shall be provided the necessary support (including, but not limited to, communication supports) to ensure that they have a meaningful role in the process.

4. The goal of treatment and discharge planning shall be to assist the individual in achieving outcomes that promote the individual's growth, well being, and independence, based on the individual's strengths, needs, goals, and preferences, in the most integrated settings in all domains of the individual's life (including community living, activities, employment, education, recreation, healthcare, and relationships).

5. The Commonwealth shall ensure that discharge plans are developed for all individuals in its Training Centers through a documented person-centered planning and implementation process and consistent with the terms of this Section. The discharge plan shall be an individualized support plan for transition into the most integrated setting consistent with informed individual choice and needs and shall be implemented accordingly. The final discharge plan (developed within 30 days prior to discharge) will include:

   a. Provision of reliable information to the individual and, where applicable, the authorized representative, regarding community options in accordance with Section IV.B.9;

   b. Identification of the individual's strengths, preferences, needs (clinical and support), and desired outcomes;

14

   c.  Assessment of the specific supports and services that build on the individual's strengths and preferences to meet the individual's needs and achieve desired outcomes, regardless of whether those services and supports are currently available;

   d.  Listing of specific providers that can provide the identified supports and services that build on the individual's strengths and preferences to meet the individual's needs and achieve desired outcomes;

   e.  Documentation of barriers preventing the individual from transitioning to a more integrated setting and a plan for addressing those barriers.

      i.  Such barriers shall not include the individual's disability or the severity of the disability.

      ii.  For individuals with a history of re-admission or crises, the factors that led to re-admission or crises shall be identified and addressed.

6. Discharge planning will be done by the individual's PST. The PST includes the individual receiving services, the authorized representative (if any), CSB case manager, Training Center staff, and persons whom the individual has freely chosen or requested to participate (including but not limited to family members and close friends). Through a person-centered planning process, the PST will assess an individual's treatment, training, and habilitation needs and make recommendations for services, including recommendations of how the individual can be best served.

7. Discharge planning shall be based on the presumption that, with sufficient supports and services, all individuals (including individuals with complex behavioral and/or medical needs) can live in an integrated setting.

8. For individuals admitted to a Training Center after the date this Agreement is signed by both parties, the Commonwealth shall ensure that a discharge plan is developed as described herein within 30 days of admission. For all individuals residing in a Training Center on the date that this Agreement is signed by both parties, the Commonwealth shall ensure that a discharge plan is developed as described herein within six months of the effective date of this Agreement.

9. In developing discharge plans, PSTs, in collaboration with the CSB case manager, shall provide to individuals and, where applicable, their authorized representatives, specific options for types of community placements, services, and supports based on the discharge plan as described above, and the opportunity to discuss and meaningfully consider those options.

a.  The individual shall be offered a choice of providers consistent with the individual's identified needs and preferences.

b.  PSTs and the CSB case manager shall coordinate with the specific type of community providers identified in the discharge plan as providing appropriate community-based services for the individual, to provide individuals, their families, and, where applicable, their authorized representative with opportunities to speak with those providers, visit community placements (including, where feasible, for overnight visits) and programs, and facilitate conversations and meetings with individuals currently living in the community and their families, before being asked to make a choice regarding options. The Commonwealth shall develop family-to-family and peer programs to facilitate these opportunities.

c.  PSTs and the CSB case managers shall assist the individual and, where applicable, their authorized representative in choosing a provider after providing the opportunities described above and ensure that providers are timely identified and engaged in preparing for the individual's transition.

10. The Commonwealth shall ensure that Training Center PSTs have sufficient knowledge about community services and supports to:  propose appropriate options about how an individual's needs could be met in a more integrated setting; present individuals and their families with specific options for community placements, services, and supports; and, together with providers, answer individuals' and families' questions about community living.

a.  In collaboration with the CSBs and community providers, the Commonwealth shall develop and provide training and information for Training Center staff about the provisions of this Agreement, staff obligations under the Agreement, current community living options, the principles of person-centered planning, and any related departmental instructions. The training will be provided to all applicable disciplines and all PSTs.

b.  Person-centered thinking training will occur during initial orientation and through annual refresher courses. Competency will be determined through documented observation of PST meetings and through the use of person-centered thinking coaches and mentors. Each Training Center will have designated coaches who receive additional training. The coaches will provide guidance to PSTs to ensure implementation of the person-centered tools and skills. Coaches throughout the state will have regular and structured sessions with person-centered thinking mentors. These sessions will be designed to foster additional skill development and ensure implementation of person-centered thinking practices throughout all levels of the Training Centers.

11. In the event that an individual or, where applicable, authorized representative opposes the PST's proposed options for placement in a more integrated setting after being provided the information and opportunities described in Section IV.B.9, the Commonwealth shall ensure that PSTs:

    a. Identify and seek to resolve the concerns of individuals and/or their authorized representatives with regard to community placement;

    b. Develop and implement individualized strategies to address concerns and objections to community placement; and

    c. Document the steps taken to resolve the concerns of individuals and/or their authorized representatives and provide information about community placement.

12. All individuals in the Training Center shall be provided opportunities for engaging in community activities to the fullest extent practicable, consistent with their identified needs and preferences, even if the individual does not yet have a discharge plan for transitioning to the community.

13. The State shall ensure that information about barriers to discharge from involved providers, CSB case managers, Regional Support Teams, Community Integration Managers, and individuals' ISPs is collected from the Training Centers and is aggregated and analyzed for ongoing quality improvement, discharge planning, and development of community-based services.

14. In the event that a PST makes a recommendation to maintain placement at a Training Center or to place an individual in a nursing home or congregate setting with five or more individuals, the decision shall be documented, and the PST shall identify the barriers to placement in a more integrated setting and describe in the discharge plan the steps the team will take to address the barriers. The case shall be referred to the Community Integration Manager and Regional Support Team in accordance with Sections IV.D.2.a and f and IV.D.3 below, and such placements shall only occur as permitted by Section IV.C.6.

C. Transition to Community Setting

1. Once a specific provider is selected by an individual, the Commonwealth shall invite and encourage the provider to actively participate in the transition of the individual from the Training Center to the community placement.

2. Once trial visits are completed, the individual has selected a provider, and the provider agrees to serve the individual, discharge will occur within 6 weeks, absent conditions beyond the Commonwealth's control. If discharge does not occur within 6 weeks, the reasons it did not occur will be documented and a new time frame for

discharge will be developed by the PST. Where discharge does not occur within 3 months of selecting a provider, the PST shall identify the barriers to discharge and notify the Facility Director and Community Integration Manager in accordance with Section IV.D.2 below, and the case shall be referred to the Regional Support Teams in accordance with Section IV.D.3 below.

3. The Commonwealth shall develop and implement a system to follow up with individuals after discharge from the Training Centers to identify gaps in care and address proactively any such gaps to reduce the risk of re-admission, crises, or other negative outcomes. The Post Move Monitor, in coordination with the CSB, will conduct post-move monitoring visits within each of three (3) intervals (30, 60, and 90 days) following an individual's movement to the community setting. Documentation of the monitoring visit will be made using the Post Move Monitoring Checklist. The Commonwealth shall ensure those conducting Post Move Monitoring are adequately trained and a reasonable sample of look-behind Post Move Monitoring is completed to validate the reliability of the Post Move Monitoring process.

4. The Commonwealth shall ensure that each individual transitioning from a Training Center shall have a current discharge plan, updated within 30 days prior to the individual's discharge.

5. The Commonwealth shall ensure that the PST will identify all needed supports, protections, and services to ensure successful transition in the new living environment, including what is most important to the individual as it relates to community placement. The Commonwealth, in consultation with the PST, will determine the essential supports needed for successful and optimal community placement. The Commonwealth shall ensure that essential supports are in place at the individual's community placement prior to the individual's discharge from the Training Center. This determination will be documented. The absence of those services and supports identified as non-essential by the Commonwealth, in consultation with the PST, shall not be a barrier to transition.

6. No individual shall be transferred from a Training Center to a nursing home or congregate setting with five or more individuals unless placement in such a facility is in accordance with the individual's informed choice after receiving options for community placements, services, and supports and is reviewed by the Community Integration Manager to ensure such placement is consistent with the individual's informed choice.

7. The Commonwealth shall develop and implement quality assurance processes to ensure that discharge plans are developed and implemented, in a documented manner, consistent with the terms of this Agreement. These quality assurance processes shall be sufficient to show whether the objectives of this Agreement are being achieved. Whenever problems are identified, the Commonwealth shall develop and implement plans to remedy the problems.

18

D.  Community Integration Managers and Regional Support Teams

1.  The Commonwealth will create Community Integration Manager ("CIM") positions at each operating Training Center. The CIMs will be DBHDS Central Office staff members who will be physically located at each of the operating Training Centers. The CIMs will facilitate communication and planning with individuals residing in the Training Centers, their families, the PST, and private providers about all aspects of an individual's transition, and will address identified barriers to discharge. The CIMs will have professional experience working in the field of developmental disabilities, and an understanding of best practices for providing community services to individuals with developmental disabilities. The CIMs will have expertise in the areas of working with clinical and programmatic staff, facilitating large, diverse groups of professionals, and providing service coordination across organizational boundaries. The CIMs will serve as the primary connection between the Training Center and DBHDS Central Office. The CIMs will provide oversight, guidance, and technical assistance to the PSTs by identifying strategies for addressing or overcoming barriers to discharge, ensuring that PSTs follow the process described in Sections IV.B and C above, and identifying and developing corrective actions, including the need for any additional training or involvement of supervisory staff.

2.  CIMs shall be engaged in addressing barriers to discharge, including in all of the following circumstances:

    a.  The PST recommends that an individual be transferred from a Training Center to a nursing home or congregate setting with five or more individuals;

    b.  The PST is having difficulty identifying or locating a particular type of community placement, services and supports for an individual within 90 days of development of a discharge plan during the first year of the Agreement; within 60 days of development of a discharge plan during the second year of the Agreement; within 45 days of development of a discharge plan in the third year of the Agreement; and within 30 days of development of a discharge plan thereafter.

    c.  The PST cannot agree on a discharge plan outcome within 15 days of the annual PST meeting, or within 30 days after the admission to the Training Center.

    d.  The individual or his or her authorized representative opposes discharge after all the requirements described in Section IV.B.9 have been satisfied or refuses to participate in the discharge planning process;

    e.  The individual is not discharged within three months of selecting a provider, as described in Section IV.C.2 above. The PST shall identify the barriers to discharge and notify both the facility director and the CIM; or

f. The PST recommends that an individual remain in a Training Center. If the individual remains at the Training Center, an assessment by the PST and the CIM will be performed at 90-day intervals from the decision for the individual to remain at the Training Center, to ensure that the individual is in the most integrated setting appropriate to his or her needs.

3. The Commonwealth will create five Regional Support Teams, each coordinated by the CIM. The Regional Support Teams shall be composed of professionals with expertise in serving individuals with developmental disabilities in the community, including individuals with complex behavioral and medical needs. Upon referral to it, the Regional Support Team shall work with the PST and CIM to review the case and resolve identified barriers. The Regional Support Team shall have the authority to recommend additional steps by the PST and/or CIM. The CIM may consult at any time with the Regional Support Teams and will refer cases to the Regional Support Teams when:

a. The CIM is unable, within 2 weeks of the PST's referral to the CIM, to document attainable steps that will be taken to resolve any barriers to community placement enumerated in Section IV.D.2 above.

b. A PST continues to recommend placement in a Training Center at the second quarterly review following the PST's recommendation that an individual remain in a Training Center (Section IV.D.2.f), and at all subsequent quarterly reviews that maintain the same recommendation. This paragraph shall not take effect until two years after the effective date of this Agreement.

c. The CIM believes external review is needed to identify additional steps that can be taken to remove barriers to discharge.

4. The CIM shall provide monthly reports to DBHDS Central Office regarding the types of placements to which individuals have been placed, including recommendations that individuals remain at a Training Center.

## V. Quality and Risk Management System

A. To ensure that all services for individuals receiving services under this Agreement are of good quality, meet individuals' needs, and help individuals achieve positive outcomes, including avoidance of harms, stable community living, and increased integration, independence, and self-determination in all life domains (e.g., community living, employment, education, recreation, healthcare, and relationships), and to ensure that appropriate services are available and accessible for individuals in the target population, the Commonwealth shall develop and implement a quality and risk management system that is consistent with the terms of this Section.

B.  The Commonwealth's Quality Management System shall: identify and address risks of harm; ensure the sufficiency, accessibility, and quality of services to meet individuals' needs in integrated settings; and collect and evaluate data to identify and respond to trends to ensure continuous quality improvement.

C.  Risk Management

1.  The Commonwealth shall require that all Training Centers, CSBs, and other community providers of residential and day services implement risk management processes, including establishment of uniform risk triggers and thresholds, that enable them to adequately address harms and risks of harm. Harm includes any physical injury, whether caused by abuse, neglect, or accidental causes.

2.  The Commonwealth shall have and implement a real time, web-based incident reporting system and reporting protocol. The protocol shall require that any staff of a Training Center, CSB, or community provider aware of any suspected or alleged incident of abuse or neglect as defined by Virginia Code § 37.2-100 in effect on the effective date of this Agreement, serious injury as defined by 12 VAC 35-115-30 in effect on the effective date of this Agreement, or deaths directly report such information to the DBHDS Assistant Commissioner for Quality Improvement or his or her designee.

3.  The Commonwealth shall have and implement a process to investigate reports of suspected or alleged abuse, neglect, critical incidents, or deaths and identify remediation steps taken. The Commonwealth shall be required to implement the process for investigation and remediation detailed in the Virginia DBHDS Licensing Regulations (12 VAC 35-105-160 and 12 VAC 35-105-170 in effect on the effective date of this Agreement) and the Virginia Rules and Regulations to Assure the Rights of Individuals Receiving Services from Providers Licensed, Funded or Operated by the Department of Mental Health, Mental Retardation and Substance Abuse Services ("DBHDS Human Rights Regulations" (12 VAC 35-115-50(D)(3)) in effect on the effective date of this Agreement, and shall verify the implementation of corrective action plans required under these Rules and Regulations.

4.  The Commonwealth shall offer guidance and training to providers on proactively identifying and addressing risks of harm, conducting root cause analysis, and developing and monitoring corrective actions.

5.  The Commonwealth shall conduct monthly mortality reviews for unexplained or unexpected deaths reported through its incident reporting system. The Commissioner shall establish the monthly mortality review team, to include the DBHDS Medical Director, the Assistant Commissioner for Quality Improvement, and others as determined by the Department who possess appropriate experience, knowledge, and skills. The team shall have at least one member with the clinical experience to conduct mortality reviews who is otherwise independent of the State. Within ninety days of a death, the monthly mortality review team shall: (a) review, or document the unavailability of: (i) medical records, including physician case notes and nurses notes, and all incident reports, for the three months preceding the individual's death;

21

(ii) the most recent individualized program plan and physical examination records; (iii) the death certificate and autopsy report; and (iv) any evidence of maltreatment related to the death; (b) interview, as warranted, any persons having information regarding the individual's care; and (c) prepare and deliver to the DBHDS Commissioner a report of deliberations, findings, and recommendations, if any. The team also shall collect and analyze mortality data to identify trends, patterns, and problems at the individual service-delivery and systemic levels and develop and implement quality improvement initiatives to reduce mortality rates to the fullest extent practicable.

6. If the Training Center, CSBs, or other community provider fails to report harms and implement corrective actions, the Commonwealth shall take appropriate action with the provider pursuant to the DBHDS Human Rights Regulations (12 VAC 35-115-240), the DBHDS Licensing Regulations (12 VAC 35-105-170), Virginia Code § 37.2-419 in effect on the effective date of this Agreement, and other requirements in this Agreement.

D. Data to Assess and Improve Quality

1. The Commonwealth's HCBS waivers shall operate in accordance with the Commonwealth's CMS-approved waiver quality improvement plan to ensure the needs of individuals enrolled in a waiver are met, that individuals have choice in all aspects of their selection of goals and supports, and that there are effective processes in place to monitor participant health and safety. The plan shall include evaluation of level of care; development and monitoring of individual service plans; assurance of qualified providers; identification, response and prevention of occurrences of abuse, neglect and exploitation; administrative oversight of all waiver functions including contracting; and financial accountability. Review of data shall occur at the local and state levels by the CSBs and DBHDS/DMAS, respectively.

2. The Commonwealth shall collect and analyze consistent, reliable data to improve the availability and accessibility of services for individuals in the target population and the quality of services offered to individuals receiving services under this Agreement. The Commonwealth shall use data to:

   a. identify trends, patterns, strengths, and problems at the individual, service-delivery, and systemic levels, including, but not limited to, quality of services, service gaps, accessibility of services, serving individuals with complex needs, and the discharge and transition planning process;

   b. develop preventative, corrective, and improvement measures to address identified problems;

   c. track the efficacy of preventative, corrective, and improvement measures; and

   d. enhance outreach, education, and training.

3. The Commonwealth shall begin collecting and analyzing reliable data about individuals receiving services under this Agreement selected from the following areas

22

in State Fiscal Year 2012 and will ensure reliable data is collected and analyzed from each of these areas by June 30, 2014. Multiple types of sources (e.g., providers, case managers, licensing, risk management, Quality Service Reviews) can provide data in each area, though any individual type of source need not provide data in every area:

a. Safety and freedom from harm (e.g., neglect and abuse, injuries, use of seclusion or restraints, deaths, effectiveness of corrective actions, licensing violations);

b. Physical, mental, and behavioral health and well being (e.g., access to medical care (including preventative care), timeliness and adequacy of interventions (particularly in response to changes in status));

c. Avoiding crises (e.g., use of crisis services, admissions to emergency rooms or hospitals, admissions to Training Centers or other congregate settings, contact with criminal justice system);

d. Stability (e.g., maintenance of chosen living arrangement, change in providers, work/other day program stability);

e. Choice and self-determination (e.g., service plans developed through person-centered planning process, choice of services and providers, individualized goals, self-direction of services);

f. Community inclusion (e.g., community activities, integrated work opportunities, integrated living options, educational opportunities, relationships with non-paid individuals);

g. Access to services (e.g., waitlists, outreach efforts, identified barriers, service gaps and delays, adaptive equipment, transportation, availability of services geographically, cultural and linguistic competency); and

h. Provider capacity (e.g., caseloads, training, staff turnover, provider competency).

4. The Commonwealth shall collect and analyze data from available sources, including, the risk management system described in Section V.C. above, those sources described in Sections V.E-G and I below (e.g., providers, case managers, Quality Service Reviews, and licensing), Quality Management Reviews, the crisis system, service and discharge plans from the Training Centers, service plans for individuals receiving waiver services, Regional Support Teams, and CIMs.

5. The Commonwealth shall implement Regional Quality Councils that shall be responsible for assessing relevant data, identifying trends, and recommending responsive actions in their respective Regions of the Commonwealth.

a. The councils shall include individuals experienced in data analysis, residential and other providers, CSBs, individuals receiving services, and families, and may include other relevant stakeholders.

b. Each council shall meet on a quarterly basis to share regional data, trends, and monitoring efforts and plan and recommend regional quality improvement

23

initiatives. The work of the Regional Quality Councils shall be directed by a DBHDS quality improvement committee.

6. At least annually, the Commonwealth shall report publicly, through new or existing mechanisms, on the availability (including the number of people served in each type of service described in this Agreement) and quality of supports and services in the community and gaps in services, and shall make recommendations for improvement.

E. Providers

1. The Commonwealth shall require all providers (including Training Centers, CSBs, and other community providers) to develop and implement a quality improvement ("QI") program, including root cause analyses, that is sufficient to identify and address significant service issues and is consistent with the requirements of the DBHDS Licensing Regulations at 12 VAC 35-105-620 in effect on the effective date of this Agreement and the provisions of this Agreement.

2. Within 12 months of the effective date of this Agreement, the Commonwealth shall develop measures that CSBs and other community providers are required to report to DBHDS on a regular basis, either through their risk management/critical incident reporting requirements or through their QI program. Reported key indicators shall capture information regarding both positive and negative outcomes for both health and safety and community integration, and will be selected from the relevant domains listed in Section V.D.3. above. The measures will be monitored and reviewed by the DBHDS quality improvement committee, with input from Regional Quality Councils, described in Section V.D.5 above. The DBHDS quality improvement committee will assess the validity of each measure at least annually and update measures accordingly.

3. The Commonwealth shall use Quality Service Reviews and other mechanisms to assess the adequacy of providers' quality improvement strategies and shall provide technical assistance and other oversight to providers whose quality improvement strategies the Commonwealth determines to be inadequate.

F. Case Management

1. For individuals receiving case management services pursuant to this Agreement, the individual's case manager shall meet with the individual face-to-face on a regular basis and shall conduct regular visits to the individual's residence, as dictated by the individual's needs.

2. At these face-to-face meetings, the case manager shall: observe the individual and the individual's environment to assess for previously unidentified risks, injuries, needs, or other changes in status; assess the status of previously identified risks, injuries, needs, or other change in status; assess whether the individual's support plan is being implemented appropriately and remains appropriate for the individual; and ascertain whether supports and services are being implemented consistent with the individual's strengths and preferences and in the most integrated setting appropriate to the individual's needs. If any of these observations or assessments identifies an

24

unidentified or inadequately addressed risk, injury, need, or change in status; a deficiency in the individual's support plan or its implementation; or a discrepancy between the implementation of supports and services and the individual's strengths and preferences, then the case manager shall report and document the issue, convene the individual's service planning team to address it, and document its resolution.

3. Within 12 months of the effective date of this Agreement, the individual's case manager shall meet with the individual face-to-face at least every 30 days, and at least one such visit every two months must be in the individual's place of residence, for any individuals who:

   a. Receive services from providers having conditional or provisional licenses;

   b. Have more intensive behavioral or medical needs as defined by the Supports Intensity Scale ("SIS") category representing the highest level of risk to individuals;

   c. Have an interruption of service greater than 30 days;

   d. Encounter the crisis system for a serious crisis or for multiple less serious crises within a three-month period;

   e. Have transitioned from a Training Center within the previous 12 months; or

   f. Reside in congregate settings of 5 or more individuals.

4. Within 12 months from the effective date of this Agreement, the Commonwealth shall establish a mechanism to collect reliable data from the case managers on the number, type, and frequency of case manager contacts with the individual.

5. Within 24 months from the date of this Agreement, key indicators from the case manager's face to face visits with the individual, and the case manager's observations and assessments, shall be reported to the Commonwealth for its review and assessment of data. Reported key indicators shall capture information regarding both positive and negative outcomes for both health and safety and community integration, and will be selected from the relevant domains listed in Section V.D.3 above.

6. The Commonwealth shall develop a statewide core competency-based training curriculum for case managers within 12 months of the effective date of this Agreement. This training shall be built on the principles of self-determination and person-centeredness.

G. Licensing

1. The Commonwealth shall conduct regular, unannounced licensing inspections of community providers serving individuals receiving services under this Agreement.

2. Within 12 months of the effective date of this Agreement, the Commonwealth shall have and implement a process to conduct more frequent licensure inspections of community providers serving individuals under this Agreement, including:

     a. Providers who have a conditional or provisional license;

     b. Providers who serve individuals with intensive medical and behavioral needs as defined by the SIS category representing the highest level of risk to individuals;

     c. Providers who serve individuals who have an interruption of service greater than 30 days;

     d. Providers who serve individuals who encounter the crisis system for a serious crisis or for multiple less serious crises within a three-month period;

     e. Providers who serve individuals who have transitioned from a Training Center within the previous 12 months; and

     f. Providers who serve individuals in congregate settings of 5 or more individuals.

3. Within 12 months of the effective date of this Agreement, the Commonwealth shall ensure that the licensure process assesses the adequacy of the individualized supports and services provided to persons receiving services under this Agreement in each of the domains listed in Section V.D.3 above and that these data and assessments are reported to DBHDS.

H. Training

1. The Commonwealth shall have a statewide core competency-based training curriculum for all staff who provide services under this Agreement. The training shall include person-centered practices, community integration and self-determination awareness, and required elements of service training.

2. The Commonwealth shall ensure that the statewide training program includes adequate coaching and supervision of staff trainees. Coaches and supervisors must have demonstrated competency in providing the service they are coaching and supervising.

I. Quality Service Reviews

1. The Commonwealth shall use Quality Service Reviews ("QSRs") to evaluate the quality of services at an individual, provider, and system-wide level and the extent to which services are provided in the most integrated setting appropriate to individuals' needs and choice. QSRs shall collect information through:

     a. Face-to-face interviews of the individual, relevant professional staff, and other people involved in the individual's life; and

     b. Assessment, informed by face-to-face interviews, of treatment records, incident/injury data, key-indicator performance data, compliance with the service requirements of this Agreement, and the contractual compliance of community services boards and/or community providers.

2. QSRs shall evaluate whether individuals' needs are being identified and met through person-centered planning and thinking (including building on individuals' strengths, preferences, and goals), whether services are being provided in the most integrated setting appropriate to the individuals' needs and consistent with their informed choice, and whether individuals are having opportunities for integration in all aspects of their lives (e.g., living arrangements, work and other day activities, access to community services and activities, and opportunities for relationships with non-paid individuals). Information from the QSRs shall be used to improve practice and the quality of services on the provider, CSB, and system wide levels.

3. The Commonwealth shall ensure those conducting QSRs are adequately trained and a reasonable sample of look-behind QSRs are completed to validate the reliability of the QSR process.

4. The Commonwealth shall conduct QSRs annually of a statistically significant sample of individuals receiving services under this Agreement.

## VI. Independent Reviewer

A. The Parties have jointly selected Donald J. Fletcher as the Independent Reviewer for this Settlement Agreement. In the event that the Independent Reviewer resigns or the Parties agree to replace the Independent Reviewer, the Parties will select a replacement. If the Parties are unable to agree on a replacement within 30 days from the date the Parties receive a notice of resignation from the Independent Reviewer, or from the date the Parties agree to replace the Independent Reviewer, they shall each submit the names of up to three candidates to the Court, and the Court shall select the replacement from the names submitted.

B. The Independent Reviewer shall conduct the factual investigation and verification of data and documentation necessary to determine whether the Commonwealth is in compliance with this Settlement Agreement, on a six-month cycle continuing during the pendency of the Agreement. The Independent Reviewer is not an agent of the Court, nor does the Independent Reviewer have any authority to act on behalf of the Court. The Independent Reviewer may hire staff and consultants, in consultation with and subject to reasonable objections by the Parties, to assist in his compliance investigations. The Independent Reviewer and any hired staff or consultants are neither agents nor business associates of the Commonwealth or DOJ.

C. The Independent Reviewer shall file with the Court a written report on the Commonwealth's compliance with the terms of this Agreement within 60 days of the close of each review cycle. The first report shall be filed nine months from the effective date of this Agreement. With the consent of the Court, the Court will hold a status conference after the filing of each written report. The Independent Reviewer shall provide the Parties a draft of his/her report at least 21 days before issuing the report. The Parties shall have 14 days to review and comment on the proposed report before it is filed with the Court. The Parties may agree to allow the Independent Reviewer an additional 20 days to finalize a report after he/she receives comments from the Parties, and such an agreement does not require Court approval. In preparing the report, the Independent

Reviewer shall use appendixes or other methods to protect confidential information so that the report itself may be filed with the Court as a public document. Either Party may file a written report with the Court noting its objections to the portions of the Independent Reviewer's report with which it disagrees. The Commonwealth shall publish and maintain these reports on the DBHDS website.

D. The Independent Reviewer, and any hired staff or consultants, may:

   1. Have ex parte communications with the Court upon the Court's request or with the consent of the Parties.

   2. Have ex parte communications with the Parties at any time.

   3. Request meetings with the Parties and the Court.

   4. Speak with stakeholders with such stakeholders' consent, on a confidential basis or otherwise, at the Independent Reviewer's discretion.

   5. Testify in this case regarding any matter relating to the implementation or terms of this Agreement, including the Independent Reviewer's observations and findings.

   6. Offer to provide the Commonwealth with technical assistance and, with the Commonwealth's consent, provide such technical assistance, relating to any aspect of this Agreement or its stated purposes.

   7. Conduct regular meetings with both Parties. The purpose of these meetings shall include, among other things, to prioritize areas for the Independent Reviewer to review, schedule visits, discuss areas of concern, and discuss areas in which technical assistance may be appropriate.

E. The Independent Reviewer and any hired staff or consultants shall not be liable for any claim, lawsuit, or demand arising out of their duties under this Agreement. This paragraph does not apply to any proceeding before this Court for enforcement of payment of contracts or subcontracts for reviewing compliance with this Agreement.

F. The Independent Reviewer and any hired staff or consultants shall not be subject to formal discovery, including, but not limited to, deposition(s), request(s) for documents, request(s) for admissions, interrogatories, or other disclosures. The Parties are not entitled to access the Independent Reviewer's records or communications, or those of his/her staff and consultants, although the Independent Reviewer may provide copies of records or communications at the Independent Reviewer's discretion. The Court may review all records of the Independent Reviewer at the Court's discretion.

G. In order to determine compliance with this Agreement, the Independent Reviewer and any hired staff or consultants shall have full access to persons, employees, residences, facilities, buildings, programs, services, documents, records, including individuals' medical and other records, in unredacted form, and materials that are necessary to assess the Commonwealth's compliance with this Agreement, to the extent they are within the State's custody or control. This shall include, but not be limited to, access to the data and

records maintained by the Commonwealth pursuant to Section V above. The provision of any information to the Independent Reviewer pursuant to this Agreement shall not constitute a waiver of any privilege that would otherwise protect the information from disclosure to third parties. The Independent Reviewer and any hired staff or consultants may also interview individuals receiving services under this Agreement with the consent of the individual or his/her authorized representative. Access to CSBs and private providers and entities shall be at the sole discretion of the CSB or private provider or entity; however, the Commonwealth shall encourage CSBs and private providers and other entities to provide such access and shall assist the Independent Reviewer in identifying and contacting them. The Independent Reviewer shall exercise his/her access to Commonwealth employees and individuals receiving services under this Agreement in a manner that is reasonable and not unduly burdensome to the operation of Commonwealth agencies and that has minimal impact on programs or services being provided to individuals receiving services under this Agreement. Such access shall continue until the Agreement is terminated. The Parties agree that, in cases of an emergency situation that present an immediate threat to life, health, or safety of individuals, the Independent Reviewer will not be required to provide the Commonwealth notice of such visit or inspection. Any individually identifying health information that the Independent Reviewer and any hired staff or consultants receive or maintain shall be kept confidential.

H.  Budget of the Independent Reviewer

1.  Within 45 days of appointment, the Independent Reviewer shall submit to the Court for the Court's approval a proposed budget for State Fiscal Year 2013. Using the proposed budget for State Fiscal Year 2013, the Independent Reviewer shall also propose an equivalent amount prorated through the remainder of State Fiscal Year 2012 as the budget for State Fiscal Year 2012.

2.  The Independent Reviewer shall provide the Parties a draft of the proposed budget at least 30 days in advance of submission to the Court. The Parties shall raise with the Independent Reviewer any objections they may have to the draft of the proposed budget within 10 business days of its receipt. If the objection is not resolved before the Independent Reviewer's submission of a proposed budget to the Court, a Party may file the objection with the Court within 10 business days of the submission of the proposed budget to the Court. The Court shall consider such objections and make any adjustments it deems appropriate prior to approving the budget.

3.  Thereafter, the Independent Reviewer shall submit annually a proposed budget to the Court for its approval by April 1 in accordance with the process set forth above.

4.  At any time, the Independent Reviewer may submit to the Parties for approval a proposed revision to the budget, along with any explanation of the reason for the proposed revision. Should the Parties and Independent Reviewer not be able to agree on the proposed revision, the Court will be notified as set forth in Section V.H.2 above.

5. The approved budget of the Independent Reviewer shall not exceed $300,000 in any State Fiscal Year during the pendency of this Agreement, inclusive of any costs and expenses of hired staff and consultants, without the approval of the Commonwealth or the Court pursuant to Sections V.H.2. or H.4. above.

I. Reimbursement and Payment Provisions

1. The cost of the Independent Reviewer, including the cost of any consultants and staff to the Reviewer, shall be borne by the Commonwealth in this action up to the amount of the approved budget for each State Fiscal Year. All reasonable expenses incurred by the Independent Reviewer in the course of the performance of his/her duties as set forth in this Agreement shall be reimbursed by the Commonwealth. In no event will the Commonwealth reimburse the Independent Reviewer for any expense that exceeds the approved fiscal year budget or the amount approved under Sections V.H.4 or H.5 above. The Court retains the authority to resolve any dispute that may arise regarding the reasonableness of fees and costs charged by the Reviewer. The United States shall bear its own expenses in this matter. If a dispute arises regarding reasonableness of fees or costs, the Independent Reviewer shall provide an accounting justifying the fees or costs.

2. The Independent Reviewer shall submit monthly statements to DBHDS, with copies to the United States and the Court, detailing all expenses the Independent Reviewer incurred during the prior month. DBHDS shall issue payment in accordance with the monthly statement as long as such payment is within the approved State Fiscal Year budget. Such payment shall be made by DBHDS within 10 business days of receipt of the monthly statement. Monthly statements shall be provided to: Assistant Commissioner for Developmental Services, DBHDS, P.O. Box 1797, Richmond, Virginia 23238-1797.

3. In the event that, upon a request by the United States or the Independent Reviewer, the Court determines that the Commonwealth is unreasonably withholding or delaying payment, or if the Parties agree to use the following payment procedure, the following payment procedure will be used:

   a. The Commonwealth shall deposit $100,000.00 into the Registry of the Court as interim payment of costs incurred by the Independent Reviewer. This deposit and all other deposits pursuant to this Order shall be held in the Court Registry Investment System and shall be subject to the standard registry fee imposed on depositors.

   b. The Court shall order the clerk to make payments to the Independent Reviewer. The clerk shall make those payments within 10 days of the entry of the Order directing payment. Within 45 days of the entry of each Order directing payment, the Commonwealth shall replenish the fund with the full amount paid by the clerk in order to restore the fund's total to $100,000.00.

J. The Independent Reviewer, including any hired staff or consultants, shall not enter into any contract with the Commonwealth while serving as the Independent Reviewer. If the

Independent Reviewer resigns from his/her position as Independent Reviewer, he/she may not enter into any contract with the Commonwealth on a matter related to this Agreement during the pendency of this Agreement without the written consent of the United States.

K. Other than the semi-annual compliance report pursuant to Section VI.C above or proceedings before the Court, the Independent Reviewer, and any hired staff or consultants, shall refrain from any public oral or written statements to the media, including statements "on background," regarding this Agreement, its implementation, or the Commonwealth's compliance. In addition, the Independent Reviewer shall not establish or maintain a website regarding this Agreement, its implementation, or the Commonwealth's compliance.

## VII.   Construction and Termination

A. The Parties agree jointly to file this Agreement with the United States District Court for the Eastern District of Virginia, Richmond Division.

B. The Parties anticipate that the Commonwealth will have complied with all provisions of the Agreement by the end of State Fiscal Year 2021. Compliance is achieved where any violations of the Agreement are minor or incidental and are not systemic. The Court shall retain jurisdiction of this action for all purposes until the end of State Fiscal Year 2021 unless:

1. The Parties jointly ask the Court to terminate the Agreement before the end of State Fiscal Year 2021, provided the Commonwealth has complied with this Agreement and maintained compliance for one year; or

2. The United States disputes that the Commonwealth is in compliance with the Agreement at the end of State Fiscal Year 2021. The United States shall inform the Court and the Commonwealth by January 1, 2021, that it disputes compliance, and the Court may schedule further proceedings as appropriate. The Party that disagrees with the Independent Reviewer's assessment of compliance shall bear the burden of proof.

C. The burden shall be on the Commonwealth to demonstrate compliance to the United States pursuant to Section VII.B.1 above. If the Commonwealth believes it has achieved compliance with a portion of this Agreement and has maintained compliance for one year, it shall notify the United States and the Independent Reviewer. If the United States agrees, the Commonwealth shall be relieved of that portion of the Settlement Agreement and notice of such relief shall be filed with the Court. The Parties may instead agree to a more limited review of the relevant portion of the Agreement.

D. With the exception of conditions or practices that pose an immediate and serious threat to the life, health, or safety of individuals receiving services under this Agreement, if the United States believes that the Commonwealth has failed to fulfill any obligation under this Agreement, the United States shall, prior to initiating any court proceeding to remedy such failure, give written notice to the Commonwealth which, with specificity, sets forth the details of the alleged noncompliance.

31

1. With the exception of conditions or practices that pose an immediate and serious threat to the life, health, or safety of individuals covered by this Agreement, the Commonwealth shall have forty-five (45) days from the date of such written notice to respond to the United States in writing by denying that noncompliance has occurred, or by accepting (without necessarily admitting) the allegation of noncompliance and proposing steps that the Commonwealth will take, and by when, to cure the alleged noncompliance.

2. If the Commonwealth fails to respond within 45 days or denies that noncompliance has occurred, the United States may seek an appropriate judicial remedy.

3. If the Commonwealth timely responds by proposing curative action by a specified deadline, the United States may accept the Commonwealth's proposal or offer a counterproposal for a different curative action or deadline, but in no event shall the United States seek an appropriate judicial remedy for the alleged noncompliance until after the time provided for the Commonwealth to respond under Section VII.D.2 above. If the Parties fail to reach agreement on a plan for curative action, the United States may seek an appropriate judicial remedy.

4. Notwithstanding the provisions of this Section, with the exception of conditions that pose an immediate and serious threat to the life, health, or safety of individuals receiving services under this Agreement, the United States shall neither issue a noncompliance notice nor seek judicial remedy for the nine months after the effective date of this Agreement.

E. If the United States believes that conditions or practices within the control of the Commonwealth pose an immediate and serious threat to the life, health, or safety of individuals in the Training Centers or individuals receiving services pursuant to this Agreement, the United States may, without further notice, initiate a court proceeding to remedy those conditions or practices.

F. This Agreement shall constitute the entire integrated Agreement of the Parties.

G. Any modification of this Agreement shall be executed in writing by the Parties, shall be filed with the Court, and shall not be effective until the Court enters the modified agreement and retains jurisdiction to enforce it.

H. The Agreement shall be applicable to, and binding upon, all Parties, their employees, assigns, agents, and contractors charged with implementation of any portion of this Agreement, and their successors in office. If the Commonwealth contracts with an outside provider for any of the services provided in this Agreement, the Agreement shall be binding on any contracted parties, including agents and assigns. The Commonwealth shall ensure that all appropriate Commonwealth agencies take any actions necessary for the Commonwealth to comply with provisions of this Agreement.

I. The Commonwealth, while empowered to enter into and implement this Agreement, does not speak for the Virginia General Assembly, which has the authority under the Virginia Constitution and laws to appropriate funds for, and amend laws pertaining to, the Commonwealth's system of services for individuals with developmental disabilities. The

Commonwealth shall take all appropriate measures to seek and secure funding necessary to implement the terms of this Agreement. If the Commonwealth fails to attain necessary appropriations to comply with this Agreement, the United States retains all rights to enforce the terms of this Agreement, to enter into enforcement proceedings, or to withdraw its consent to this Agreement and revive any claims otherwise barred by operation of this Agreement.

J.  The United States and the Commonwealth shall bear the cost of their fees and expenses incurred in connection with this case.

## VIII.  General Provisions

A.  The Commonwealth agrees that it shall not retaliate against any person because that person has filed or may file a complaint, provided assistance or information, or participated in any other manner in the United States' investigation or the Independent Reviewer's duties related to this Agreement. The Commonwealth agrees that it shall timely and thoroughly investigate any allegations of retaliation in violation of this Agreement and take any necessary corrective actions identified through such investigations.

B.  If an unforeseen circumstance occurs that causes a failure to timely fulfill any requirement of this Agreement, the Commonwealth shall notify the United States and the Independent Reviewer in writing within 20 calendar days after the Commonwealth becomes aware of the unforeseen circumstance and its impact on the Commonwealth's ability to perform under the Agreement. The notice shall describe the cause of the failure to perform and the measures taken to prevent or minimize the failure. The Commonwealth shall take reasonable measures to avoid or minimize any such failure.

C.  Failure by any Party to enforce this entire Agreement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver, including of its right to enforce other deadlines and provisions of this Agreement.

D.  The Parties shall promptly notify each other of any court or administrative challenge to this Agreement or any portion thereof, and shall defend against any challenge to the Agreement.

E.  Except as provided in this Agreement, during the pendency of the Agreement, the United States shall not file suit under the ADA or CRIPA for any claim or allegation set forth in the complaint.

F.  The Parties represent and acknowledge this Agreement is the result of extensive, thorough and good faith negotiations. The Parties further represent and acknowledge that the terms of this Agreement have been voluntarily accepted, after consultation with counsel, for the purpose of making a full and final compromise and settlement of any and all claims arising out of the allegations set forth in the Complaint and pleadings in this Action, and for the express purpose of precluding any further or additional claims arising out of the allegations set forth in the Complaint and pleadings in this Action. Each Party to this Agreement represents and warrants that the person who has signed this Agreement on behalf of his or her entity is duly authorized to enter into this Agreement and to bind

33

that Party to the terms and conditions of this Agreement.

G. Nothing in this Agreement shall be construed as an acknowledgement, an admission, or evidence of liability of the Commonwealth under federal or state law, and this Agreement shall not be used as evidence of liability in this or any other civil or criminal proceeding.

H. This Agreement may be executed in counterparts, each of which shall be deemed an original, and the counterparts shall together constitute one and the same agreement, notwithstanding that each Party is not a signatory to the original or the same counterpart.

I. "Notice" under this Agreement shall be provided to the following or their successors:

> For the United States:

>> Chief of the Special Litigation Section
>> United States Department of Justice
>> Civil Rights Division
>> 601 D Street, N.W.
>> Washington, D.C. 20004

> For the Commonwealth:

>> Attorney General of Virginia
>> 900 E. Main Street
>> Richmond, VA 23219

>> Counsel to the Governor
>> Patrick Henry Building, 3rd Floor
>> 1111 E. Broad Street
>> Richmond, VA 23219

> For the Independent Reviewer:

>> Donald J. Fletcher
>> P.O. Box 54
>> 16 Cornwell Road
>> Shutesbury, MA 01072-0054

## IX. Implementation of the Agreement

A. The implementation of this Agreement shall begin immediately upon the Effective Date, which shall be the date on which this Agreement is approved and entered as an order of the Court.

B. Within one month from the Effective Date of this Agreement, the Commonwealth shall appoint an Agreement Coordinator to oversee compliance with this Agreement and to serve as a point of contact for the Independent Reviewer.

C. The Commonwealth shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented and shall make such records available

to the Independent Reviewer for inspection and copying upon request and on a reasonable basis.

D. The Commonwealth shall notify the Independent Reviewer and the United States promptly upon the unexplained or unexpected death or serious physical injury resulting in on-going medical care of any individual covered by this Agreement. The Commonwealth shall, via email, forward to the United States and the Independent Reviewer electronic copies of all completed incident reports and final reports of investigations related to such incidents, as well as any autopsies and death summaries in the State's possession. The provision of any information to the Independent Reviewer and the United States pursuant to this Agreement shall not constitute a waiver of any privilege that would otherwise protect the information from disclosure to third parties.

E. The United States shall have full access to persons, employees, residences, facilities, buildings, programs, services, documents, records, and materials that are within the control and custody of the Commonwealth and are necessary to assess the Commonwealth's compliance with this Agreement and/or implementation efforts.

  1. Such access shall include departmental and/or individual medical and other records in unredacted form.

  2. The United States shall provide notice at least one week in advance of any visit or inspection.

  3. The Parties agree that, in cases of an emergency situation that presents an immediate threat to life, health, or safety of individuals, the United States will be required to provide the Commonwealth with sufficient notice of such visit or inspection as to permit a Commonwealth representative to join the visit.

  4. Such access shall continue until this case is dismissed.

  5. The Commonwealth shall provide to the United States, as requested, in unredacted form, any documents, records, databases, and information relating to the implementation of this Agreement as soon as practicable, but no later than within thirty (30) business days of the request, or within a time frame negotiated by the Parties if the volume of requested material is too great to reasonably produce within thirty days.

  6. The provision of any information to the United States pursuant to this Agreement shall not constitute a waiver of any privilege that would otherwise protect the information from disclosure to third parties.

35

FOR THE UNITED STATES:

NEIL H. MacBRIDE
United States Attorney
Eastern District of Virginia

ROBERT McINTOSH
Assistant United States Attorney
600 East Main St., Suite 1800
Richmond, VA 23219
(804) 819-5400
Fax: (804) 819-7417
Robert.McIntosh@usdoj.gov
VA Bar #66113

Respectfully submitted,

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

EVE HILL
Senior Counselor

ALISON N. BARKOFF
Special Counsel for Olmstead Enforcement
Civil Rights Division

JONATHAN SMITH
Chief
Special Litigation Section

BENJAMIN O. TAYLOE, JR.
Deputy Chief
AARON B. ZISSER
JACQUELINE K. CUNCANNAN
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, D.C. 20530
(202) 305-3355
Fax: (202) 514-4883
Aaron.Zisser@usdoj.gov

36

FOR THE COMMONWEALTH:


_____

WILLIAM A. HAZEL, JR., M.D.
Secretary of Health and Human Resources
on Behalf of Governor Robert F. McDonnell



_____

KENNETH T. CUCCINELLI, II
as Attorney General of Virginia pursuant to Virginia Code § 2.2-514



_____

ALLYSON K. TYSINGER
Senior Assistant Attorney General
900 East Main Street
Richmond, Virginia  23219
(804) 786-1927
Fax:  (804) 371-8718
ATysinger@oag.state.va.us
Virginia State Bar No. 41982

ENTERED THIS _____ day of _____, 2012.


_____

UNITED STATES DISTRICT JUDGE