IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,
    Plaintiff,

v.                                                                        Civil Action No. 3:12-cv-59-JAG

COMMONWEALTH OF VIRGINIA,
    Defendant,

and

PEGGY WOOD et al.,
    Intervenor-Defendants.

## OPINION

This case began when the United States, through the Department of Justice ("DOJ"), filed a complaint alleging that the Commonwealth of Virginia violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* The parties simultaneously submitted a consent decree for the Court's consideration, which would change the way the Commonwealth provides services to its intellectually and developmentally disabled populations. The Court permitted a group of certain disabled citizens to intervene (the "Intervenors") and oppose the proposed decree. After careful consideration, the Court approved the consent decree. (Dk. No. 112.) The Court closed the case, but continues to monitor the parties' progress under the decree.

The Commonwealth has since decided to close four of its five training centers, which housed large disabled populations. The Intervenors[1] filed a motion for injunctive relief to

---

[1] The Court notes that Peggy Wood is the only individual mentioned in the motion for injunctive relief whom the Court recognized as an Intervenor. (*See* Dk. No. 65.) Nevertheless, this Opinion will refer to the individuals whose interests the motion seeks to protect as "Intervenors."

prevent discharges and transfers from the training centers as they close. The Commonwealth opposed the motion.[2] For the reasons stated below, the Court denies the Intervenors' motion.

## I. BACKGROUND

The Court described the background of this case at length in the Order approving the consent decree (Dk. No. 112), but will reiterate pertinent facts here. The Commonwealth developed training centers decades ago to provide safe living environments for disabled citizens. The Intervenors resided in these training centers, and their families appreciated the treatment and safety that the training centers provided. Over time, experts in the field developed new modalities of care and preferred to allow disabled citizens to live in the broader community, rather than in restricted facilities. Moreover, Congress, through the ADA, "explicitly identified unjustified 'segregation' of persons with disabilities as a 'for[m] of discrimination.'" *Olmstead v. L.C.*, 527 U.S. 581, 600 (1999). The ADA thus encouraged "opportunities for people with developmental disabilities to enjoy the benefits of community living." *Id.* at 599. As a result, the Commonwealth accepted fewer individuals into training centers, and discharged many residents to community facilities.

In 2008, the DOJ began investigating Virginia's training centers and ultimately concluded that the centers violated the ADA by preventing disabled citizens from being part of the community. The DOJ demanded that Virginia change its system, and the Commonwealth essentially concurred with the DOJ's goal of community-based services.

The DOJ and Commonwealth agreed to a consent decree. Their agreement calls for the Commonwealth to increase the number of Medicaid waivers in Virginia, which assist disabled

---

[2] The Court also considered the disAbility Law Center of Virginia's amicus brief, filed on behalf of Virginia residents with intellectual and developmental disabilities, opposing the Intervenors' motion. (Dk. Nos. 261, 262.)

2

citizens by subsidizing the care and services they need. The decree focuses the Commonwealth's efforts on keeping disabled individuals in the community, and outlines how the Department of Behavioral Health and Developmental Services ("DBHDS"), and the local community service boards ("CSBs"), will share responsibility for community services. It further requires an independent reviewer to report to the Court regarding the decree's implementation.

The Intervenors opposed the decree because they believed its terms would not benefit residents of the training centers. They argued that the decree would require their removal from the training centers, which would harm their well-being, as they regarded the training centers as their homes. The Court considered these arguments, reviewed letters and amicus briefs for and against the decree, and toured facilities. The Court also held a fairness hearing, during which it allowed the United States, the Commonwealth, and the Intervenors to share their positions. Following these proceedings and after careful consideration, the Court approved the consent decree in August 2012.

Since that time, the Commonwealth has planned to cease residential operations at four of its five training centers, including the Central Virginia Training Center ("CVTC"). In August 2016, DBHDS notified authorized representatives of CVTC residents that its nursing facility would close. If the residents or their representatives did not select alternative placement within the time allotted, DBHDS transferred them to Hiram Davis Medical Center.

Citing two deaths that occurred after the transfers from CVTC began, the Intervenors now argue that Hiram Davis is inferior to CVTC. The Intervenors ask the Court for various forms of injunctive relief, with the goal of undoing and preventing further allegedly forcible or illegal transfers to Hiram Davis or other facilities that do not provide care comparable to the care CVTC provided.

## II. DISCUSSION

The Intervenors' motion asserts violations of (1) Virginia Code § 37.2-837(A)(3), which provides that individuals shall not be discharged from training centers against their will; and (2) Chapter 639 of the 2014 Acts of Assembly (the "Act"), which requires DBHDS to certify, before transferring training center residents, that the receiving facility provides a comparable quality of care, and that DBHDS has disclosed all legal placement options. The Commonwealth opposes the motion on the grounds that (1) the Intervenors lack standing; (2) the Court does not have subject matter jurisdiction over the motion; and (3) the Intervenors do not meet the standard for injunctive relief. The Court will consider each argument in turn.

### *A. Standing*

Article III limits federal courts to hearing cases or controversies, which means that parties invoking a federal court's authority must establish standing. *Ansley v. Warren*, 861 F.3d 512, 517 (4th Cir. 2017) (citing *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011)). To do so, a party must prove a "concrete and particularized injury that is fairly traceable to the challenged conduct of the defendant and is likely to be redressed by a favorable judicial decision." *Id.* (internal quotations and citations omitted). Courts consider intervenors parties to lawsuits until the party on whose side intervention occurred no longer remains in the suit. *Diamond v. Charles*, 476 U.S. 54, 68 (1986). At that point, intervenors must demonstrate that they independently fulfill the standing requirements. *Id.* In other words, intervenors continue as parties as long as the suit is "alive." *Shaw v. Hunt*, 154 F.3d 161, 166 (4th Cir. 1998).

This Court permitted the Intervenors to intervene before entering the consent decree, and added them as defendants to this suit. (Dk. No. 65.) Certain out-of-circuit cases have deemed a consent decree insufficient to establish an ongoing case or controversy, but this case is distinct.

*E.g., Dillard v. Chilton Cty. Comm'n*, 495 F.3d 1324, 1336 (11th Cir. 2007). Here, the Court did not merely retain jurisdiction in case the parties asked the Court to enforce the decree; rather, the Court actively monitors implementation of the decree. Thus, the Court finds that the Intervenors remain parties to this suit and have standing to bring their motion for injunctive relief.

## B. Subject Matter Jurisdiction

The party asserting subject matter jurisdiction bears the burden of proving it. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). If a federal court does not have federal question or diversity jurisdiction over a claim, it may assert supplemental jurisdiction if that claim is "so related" to another claim over which the court has original jurisdiction, meaning the claims form "part of the same case or controversy." 28 U.S.C. § 1367(a). In other words, a federal court has supplemental jurisdiction over state law claims if they arise out of "'a common nucleus of operative fact' such that the plaintiff would ordinarily be expected to try the claims in one judicial proceeding." *White v. Cty. of Newberry*, 985 F.2d 168, 171 (4th Cir. 1993) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).

The Intervenors assert their motion is part of the same controversy as the underlying case because the Court's Order approving the consent decree stated that Virginia Code § 37.2-837(A)(3) provided "bedrock assurance" that the Commonwealth would not evict individuals from training centers. (Dk. No. 112, at 9.) While the Intervenors' motion might relate to the facts underlying the DOJ's case against the Commonwealth, the claims are not "so related" that they form "part of the same case or controversy." 28 U.S.C. § 1367(a). The Intervenors' motion does not pertain to the Commonwealth's ADA violations. Nor does the motion seek to enforce the terms of the consent decree, which aims to improve the Commonwealth's ADA compliance. Moreover, one would not ordinarily expect a party to try claims regarding the training centers'

5

non-compliance with the ADA in the same proceeding as a claim under Virginia Code § 37.2-837(A)(3), which prevents the Commonwealth from forcibly removing residents from these training centers.

Even if the Intervenors' claims were "so related" to the underlying claims in this case, this Court would not have jurisdiction. Eleventh Amendment sovereign immunity insulates states from suits by its own citizens, *Bockes v. Fields*, 999 F.2d 788, 790 (4th Cir. 1993), and prevents federal courts from enjoining states based on state law claims. *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 124 (1984). Moreover, "neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment."[3] *Pennhurst*, 465 U.S. at 121. Thus, even if the Intervenors' state claims formed part of the same case or controversy as the DOJ's ADA claims, the Eleventh Amendment and *Pennhurst* bar the Court from exercising supplemental jurisdiction over them, as it does not have jurisdiction to enjoin the Commonwealth for violations of Virginia law.

For these reasons, the Court does not have subject matter jurisdiction over the Intervenors' motion. Nevertheless, the Court will discuss the merits of the Intervenors' motion for injunctive relief.

### C. Injunctive Relief

The Intervenors appear to request both permanent and preliminary injunctive relief, so the Court will address both. As a threshold matter, an injunction is an extraordinary remedy, which a court should only grant after carefully balancing the competing interests involved. *Vollette v. Watson*, 978 F. Supp. 2d 572, 583 (E.D. Va. 2013).

---

[3] Congress abrogated states' sovereign immunity under Title II of the ADA, but this does not affect the immunity analysis regarding allegedly pendent state law claims. *See Willoughby v. Henrico Cty.*, No. 3:14-cv-223, 2014 WL 2925332, at *4 (E.D. Va. June 27, 2014), *aff'd*, 584 F. App'x 180 (4th Cir. 2014) (considering ADA and state law sovereign immunity separately).

1. Permanent Injunction

A party seeking a permanent injunction must establish: (1) the remedies available at law, such as monetary damages, are inadequate compensation for the injury suffered; (2) the movant suffered irreparable harm; (3) the balance of equities tips in the movant's favor; and (4) the injunction is in the public interest. *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

Courts often consider the first two factors together. *Vollette*, 978 F. Supp. 2d at 583. In other words, "generally, 'irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate.'" *MultiChannel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir.1994) (quoting *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973)), *abrogated on other grounds*.

Certainly, the serious bodily injury and death that the Intervenors allege constitutes irreparable harm, but this case involves further complexities. *See Columbia Gas Transmission, LLC v. Robert Borror Logging, LLC*, No. 2:12-cv-39, 2012 WL 2294870, at *2 (N.D. W.Va. June 15, 2012). Due to staffing inadequacies, which would expose residents to serious harm if left unaddressed, the Commonwealth planned to close CVTC. The DBHDS Commissioner transferred CVTC residents who did not select alternative placement to Hiram Davis, and Virginia Law authorizes the Commissioner to transfer individuals from one training center to another.[4] Va. Code § 37.2-840(A). It is not clear that the Commonwealth's lawful acts led to the particular irreparable harm the Intervenors allege, especially in light of the CVTC staffing crisis.

---

[4] The Court assumes without deciding that Hiram Davis qualifies as a training center pursuant to the definition in Virginia Code § 37.2-100. To the extent the parties dispute this definition, a state court would be a more appropriate venue to resolve the issue. *See Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 27 (1959) (noting that federal courts should abstain from deciding unsettled issues of state law).

Thus, with sympathy to the tragic circumstances the Court observed at the hearing on this motion, the Court finds the Intervenors have not carried their burden with regard to this element.

In determining whether the third factor, the balance of equities, tips in the movant's favor, courts must weigh the effects on each party of granting or withholding the requested relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). This entails balancing the harm the movant established under the second factor, with any harm the non-movant would suffer if the court granted the injunction. *Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir. 1997).

The Court struggles to reconcile the competing interests in this case. To begin, the Intervenors have not shown that the Commonwealth's actions pursuant to the consent decree led to the irreparable harm alleged. On the other hand, granting injunctive relief would require the Commonwealth to return Intervenors to training centers that have closed or soon will close. It would also prevent the Commonwealth from lawfully transferring residents from training centers that it plans to close. The consent decree does not preclude the Commonwealth from closing training centers; instead, it envisions a community-based scheme for disabled citizens, which will comply with the ADA. Moreover, Virginia law permits the Commonwealth to transfer training center residents, an especially salient principle for those who do not select alternative placement as the centers close. Va. Code § 37.2-840(A). Thus, pursuant to the ADA and Virginia law, the Commonwealth acted on its compelling interests to protect CVTC residents from harmful conditions at an understaffed facility and move toward community-based care. For these reasons, the balance of equities tips in the Commonwealth's favor.

Finally, courts must consider the public consequences of "employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. While the Court understands the Intervenors' concerns, the Commonwealth and DOJ have determined that closing the training centers serves

the public interest. Doing so will direct resources toward broader community-based services for Virginia's disabled residents, as set forth in the consent decree. The Commonwealth and DOJ agree that the preferred treatment modality allows disabled individuals to assimilate into their communities by providing quality community-based care, consistent with the ADA. When the Court approved the decree, it recognized that working toward these goals could entail a difficult transition period, but that ultimately the decree served the public interest, and that remains true. Granting the Intervenors' injunction would not serve the public interest, as it would undo the progress the parties have made toward goals the Court deemed in the best interest of the public when approving the decree.

Considering all four factors, the Intervenors have not carried their burden to establish that the Court should award permanent injunctive relief.

## 2. Preliminary Injunction

A party moving for a preliminary injunction must show: (1) the movant will suffer irreparable harm if the court does not grant relief; (2) the balance of equities tips in the movant's favor; (3) the injunction is in the public interest; and (4) the movant is likely to succeed on the merits. *Winter*, 555 U.S. at 20.

The Court incorporates its prior discussion of the balance of equities and public interest factors, as preliminary injunctive relief requires the Court to consider those factors as well. For a preliminary injunction, however, rather than determining whether irreparable harm *has* occurred, the Court must decide whether irreparable harm will *likely* occur if it denies the injunction. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). This irreparable harm must be "neither remote nor speculative, but actual and imminent." *Id.* (quotation omitted). "The likelihood of the predicted harm is the central consideration" in

whether to grant a preliminary injunction. *Emmett v. Johnson*, 489 F. Supp. 2d 543, 550 (E.D. Va. 2007). If the Court cannot say confidently that the harm will more likely than not occur, it should find that the movant did not satisfy their burden. *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 530 (4th Cir. 2007), *abrogated on other grounds*.

The Intervenors have not shown that serious bodily injury and death are "actual and imminent," and will occur if the Court does not grant this injunction. *Direx Israel, Ltd.*, 952 F.2d at 812. In other words, the Intervenors have not demonstrated that the Commonwealth's lawful training center closures and transfer of residents will likely result in the threatened harms. Because the Court cannot confidently say that failing to grant injunctive relief will more likely than not cause imminent harm, the Intervenors have not satisfied this element.

To receive a preliminary injunction, a movant must also make a clear showing that the case will likely succeed on the merits at trial. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010).

The Intervenors first claim a violation of Virginia Code § 37.2-837(A)(3), which prevents the Commonwealth from discharging individuals on Medicaid from training centers if they choose to remain. The Intervenors have not shown this claim will likely succeed, as they have not demonstrated that DBHDS discharged an Intervenor without consent. Peggy Wood had not selected another placement within the time provided, so DBHDS transferred her to Hiram Davis, but did not discharge her. The Intervenors thus have not made a "clear showing" that DBHDS violated § 37.2-837(A)(3) by discharging individuals who chose to remain in training centers. *Real Truth About Obama, Inc.*, 575 F.3d at 345 (quotation omitted).

The Intervenors also allege that the Commonwealth violated Chapter 639 of the 2014 Acts of Assembly. The Act requires DBHDS to certify that a receiving training center or

community-based option provides comparable medical, health, developmental, and behavioral care and safety, prior to transferring training center residents. Act of April 4, 2014, ch. 639, 2014 Va. Acts (uncodified). The Act also requires DBHDS to disclose all permissible placement options available under the consent decree to residents or authorized representatives before any transfer. *Id.*

The Intervenors have not clearly shown that their second claim will succeed. Their motion does not demonstrate that DBHDS failed to certify that Hiram Davis provides comparable care prior to transferring residents, especially in light of CVTC's staffing shortages. Moreover, the Act requires DBHDS to certify that the receiving treatment option provides comparable care, but it is not clear that the Act establishes a right of action for individuals who deem any certification false or improper.[5] The Intervenors also claim that DBHDS omits the name of the receiving training center on certification forms. Peggy Wood, however, received a certification form naming Hiram Davis, the receiving facility. (Dk. No. 249, Exh. 2.) The Intervenors thus have not made a clear showing that this claim will likely succeed on the merits.

For the foregoing reasons, the Intervenors have not established that these circumstances warrant preliminary injunctive relief.

## III. CONCLUSION

The Court recognizes the tragic situation at the heart of this case. The Commonwealth opened training centers with the best intentions for its disabled citizens, and those citizens and their families adjusted to the training centers, appreciating the safety the centers provided. Over

---

[5] Virginia state courts are better suited to resolve unsettled questions of state law regarding the Act. *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 717 (1996) ("[F]ederal courts have the power to refrain from hearing…cases raising issues intimately involved with [the States'] sovereign prerogative, the proper adjudication of which might be impaired by unsettled questions of state law.") (internal quotation and citation omitted).

11

time, new treatment modalities that better serve the public interest developed, replacing training centers as the preferred living arrangement. The Commonwealth now seeks to embrace a treatment philosophy focused on community-based services, and the transition from the training centers is naturally difficult for those who are accustomed to that way of life. The Court approved these goals under the consent decree because it found they served the public interest and aligned with the ADA's objective to encourage community living.

Perhaps the law is ill suited to accommodate the complex issues in this case. Nevertheless, the Court must adhere to the law. For the reasons stated in this Opinion, the Court finds that, although the Intervenors have standing to pursue their motion for injunctive relief, the Court does not have subject matter jurisdiction over that motion. Even if the Court had jurisdiction, the Intervenors would not succeed on their claims for injunctive relief. Therefore, the Court denies the Intervenors' motion for injunctive relief.

The Court will enter an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: February 2, 2018
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge