IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:12CV59-JAG |
| | ) | |
| v. | ) | |
| | ) | |
| COMMONWEALTH OF VIRGINIA, | ) | |
| | ) | |
| Defendant, | ) | |
| PEGGY WOOD, et. al., | ) | |
| | ) | |
| Intervenor-Defendant | ) | |

**AMICUS BRIEF IN SUPPORT OF ONGOING ENFORCEMENT OF THE
SETTLEMENT AGREEMENT DUE TO SIGNIFICANT NONCOMPLIANCE BY THE
COMMONWEALTH**

Dana Wrenn Traynham
VA State Bar #44606
Counsel for *amicus curiae*,
disAbility Law Center of Virginia
disAbility Law Center of Virginia
1512 Willow Lawn Drive, Suite 100
Richmond, VA 23230
(804) 225-2042
(804) 662-7431(fax)
Dana.traynham@dlcv.org

Zachary Scott DeVore
VA State Bar # 65401
Counsel for *amicus curiae*,
disAbility Law Center of Virginia
disAbility Law Center of Virginia
1512 Willow Lawn Drive, Suite 100
Richmond, VA 23230
(804) 225-2042
(804) 662-7431(fax)
Zachary.devore@dlcv.org

## FINANCIAL DISCLOSURE STATEMENT

Proposed amicus disAbility Law Center of Virginia hereby certifies that it is a 501(C)(3) not-for-profit corporation and has nothing to report under Local Civil Rule 7.1(a) and (b). The disAbility Law Center of Virginia does not, and has no parent, subsidiary, or affiliate entities that issues stock or debt securities. It has no partnerships, owners, or members of non-publicly traded entities.

Table of Contents

Financial Disclosure Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .iv

I.      Statement of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Introduction and Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

III.    Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.  Crisis Services are Still Inadequate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

        B.  Inadequate Crisis Services, Lack of Behavioral Supports, and Deficiencies in

            Staff Training Lead to Unfortunate and Often Dangerous Outcomes . . . . . . . . . .6

        C.  Continued Lack of Adequate Systems for Quality Control and Management

            Makes Collecting Meaningful Data Impossible and Negates Any Attempt to

            Prevent Bad Outcomes from Reoccurring . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

        D.  Case Examples . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

IV.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

iii

# TABLE OF AUTHORITIES

## CASE

*Olmstead v. L.C.,* 527 U.S. 581 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 7, 13

## STATUTES & REGULATIONS

42 U.S.C. §§ 12101 et. seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 7

42 U.S.C. §§ 15001 et. seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

42 U.S.C. § 15032 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Va Code § 51.5-39.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

12 VAC §§ 35-105 et. seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

## OTHER AUTHORITIES

Department of Behavioral Health and Developmental Services: Review of Serious Injuries
Reported by Licensed Providers of Developmental Services, Office of the State Inspector
General, December 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 10

What is a PRTF?, Centers for Medicare and Medicaid Services . . . . . . . . . . . . . . . . . . . . .7

Preadmission Screening and Resident Review (PASSRR) Program, Washington Developmental
Disabilities Administration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## I.      Statement of Interest

The disAbility Law Center of Virginia (dLCV) respectfully submits this brief on behalf of individuals with intellectual and developmental disabilities (I/DD) in support of the continued monitoring and enforcement of the Settlement Agreement (Doc. 112) in light of the Commonwealth's continued noncompliance. dLCV is the federally-mandated protection and advocacy (P&A) system for Virginians with disabilities. *Va. Code § 51.5-39.13*. Federal and state laws invest P&A systems with unique and extensive authority to advocate on behalf of individuals with developmental and other disabilities. For example, the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (*42 U.S. Code § 15001 et seq.*) provides the system with the authority to "pursue legal, administrative and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of individuals […]." *§ 15032 (a)(2)(A)*. Consistent with that authority, dLCV routinely represents clients with I/DD, including those with co-occurring behavioral or mental health support needs, to protect and enforce their rights. dLCV also investigates allegations of abuse and neglect of these individuals in institutional settings such as training centers and mental health facilities operated by the Department of Behavioral Health and Developmental Services (DBHDS). dLCV also conducts monitoring visits and investigations at a variety of community residential settings, for both adults and children.

dLCV has worked with, and on behalf of, children and adults identified in the Settlement Agreement's target population. Because of its extensive federal authority, dLCV is able to represent qualifying individuals as they shift from one service setting to another - whether the primary focus of the setting is mental health support, I/DD support, education, or corrections.

1

Our experience with this population gives us valuable insight into the issues identified by the Independent Reviewer.

## II.        Introduction and Summary of Argument

The Commonwealth's evident lack of compliance with the Settlement Agreement in *United States v. Commonwealth of Virginia* continues to harm individuals in the target population. dLCV's monitoring of programs providing services to these individuals has revealed a number of alarming deficits in the Commonwealth's often fragmented disability service systems. Especially troubling are the number of individuals with I/DD who end up in psychiatric hospitals that are ill-equipped to keep them safe or provide appropriate treatment; the Commonwealth's failure to provide crisis and behavioral supports for all members of the Settlement Agreement's target population often leading to encounters with law enforcement rather than appropriate behavioral intervention; and the continued lack of adequate systems for quality control and data collection and analysis. The case studies discussed herein exemplify the systemic problems enumerated by the United States, the Independent Reviewer, and the State Inspector General. Whenever practicable, dLCV has shared its concerns directly with DBHDS and other responsible entities in an effort to seek reforms and service enhancements.

As the United States found in its 2011 findings letter to then Governor Robert McDonnell, individuals with I/DD in Virginia suffer direct harm while needlessly institutionalized. Children and adults with I/DD and co-occurring behavioral or mental health support needs are at even higher risk of unnecessary institutionalization in mental health facilities due to the Commonwealth's failure to prevent such admissions by ensuring a sufficient quantity of services, including crisis and respite services. If proper and sufficient services are not provided to individuals in their community, they often face unnecessary institutionalization which is in direct

2

violation of the Americans with Disabilities Act as interpreted by *Olmstead*. *Olmstead v. L. C.*, 527 U.S. 581 (1999). See also, 42 U.S.C. §§ 12001 et. seq.

The Department of Justice and the Commonwealth of Virginia are now well into the seventh year of the Settlement Agreement, and the Commonwealth remains out of compliance with several provisions of the Agreement despite the Independent Reviewer's persistent and clear guidance in each of his reports. dLCV concurs with the findings of the Independent Reviewer and with findings of the State Inspector General. *Department of Behavioral Health and Developmental Services: Review of Serious Injuries Reported by Licensed Providers of Developmental Services*, Office of the State Inspector General, December 2018 (OSIG Report), https://www.osig.virginia.gov/media/governorvirginiagov/office-of-the-state-inspector-general/pdf/2019-BHDS-002-Department-of-Behavioral-Health-and-Developmental-Services-Review-of-Serious-Injuries-Reported-by-Licensed-Providers-of-Developmental-Services.with.Reponse.pdf (last visited April 16, 2019).

The ongoing enforcement of the Settlement Agreement by this Court is necessary for the Commonwealth to achieve and maintain compliance with key terms of the Agreement. Without ongoing enforcement by the Court, the Commonwealth's commendable progress may be at risk.

## III.  Argument

### A.    *Crisis Services Are Still Inadequate*

The Commonwealth does not provide adequate or sufficient crisis services to maintain individuals in the community leading to unnecessary encounters with law enforcement and inappropriate and dangerous admissions to psychiatric hospitals and other institutional settings. One of the requirements of the Settlement Agreement was for Virginia to create a community

crisis services system enabling people with I/DD to avoid going into institutional settings.

Settlement Agreement, § III(C)(6).  Virginia, in response to this provision, created the Regional

Education, Assessment, Crisis Service Habilitation (REACH) program. While REACH programs

are available in all regions, the Commonwealth has not created enough capacity to handle the

crisis situations, much less provide effective prevention plans and strategies to avert future

crises. One failure that greatly hinders prevention of crises is the lack of beds for respite and

diversion of persons with I/DD who are in danger of being admitted to institutional settings.

The limited number of REACH crisis services beds is compounded by the REACH crisis

homes being used to house persons with I/DD who are not currently in a mental health crisis, but

simply lack another place to go. Such individuals have even included persons evicted from I/DD

group homes due to complexity of medical care. Because the REACH homes are being used to

house persons with complex care needs that are difficult to place in community facilities, those

persons can remain in the REACH crisis service beds for an extended period of time rendering

those beds unavailable for persons in crisis. Crisis intervention is currently the priority of the

REACH program but plans to provide long-term stabilization beds for adults and crisis beds for

children must also become a priority.

In addition to the limited capacity of crisis services, providers and their staff do not utilize

REACH early enough in the process to be effective. dLCV's monitoring of serious incidents

through DBHDS' serious incident reporting system, Computerized Human Rights Information

System (CHRIS), supports this finding of the Independent Reviewer. We have seen numerous

occasions where REACH is called after 911, and REACH often meets the individual at the

emergency room where the temporary detention order (TDO) process may already be underway.

4

REACH must be notified sufficiently early in the crisis to successfully divert individuals from hospitalization, not greet them there when they arrive.

Adults are not the only ones harmed by the Commonwealth's inability to provide consistent, timely, and accessible crisis services. Repeatedly, desperate families are forced to admit their children to institutional settings in an attempt to ensure their child's safety and the safety of other individuals in the family home. In fact, "Families and providers reported that the REACH mobile teams were unresponsive and unhelpful." Report of the Independent Reviewer on Compliance with the Settlement Agreement, Doc. 300, December 13, 2018, 34 (IR Report). The Commonwealth's crisis stabilization homes for children are also long overdue.

dLCV strongly supports the Department of Justice's recommendation that the Commonwealth's long-awaited CTHs for children and transition homes for adults be operational by June 30, 2019. However, given the high rates of I/DD admissions to Commonwealth Center of Children and Adolescents (CCCA) and other institutional settings such as psychiatric residential treatment facilities (PRTFs), we anticipate the children's CTHs will be at or near capacity almost immediately. Therefore, DOJ's further recommendation that the Commonwealth implement crisis prevention "host home services" for children statewide is commendable. Unfortunately, as of March 2019,  DBHDS leadership was unable to clarify what licensing scheme would apply to this new service and was further unable to specify the daily rate providers can expect for this new service. Both are critically important pieces of information for the provider community and we worry that absent more specificity, the Commonwealth will not be able to offer this urgently needed crisis prevention service anytime soon.

A Departmental policy directive affirming all children require permanency and attachment is both welcome and long overdue. dLCV has closely monitored the Commonwealth's

5

development and implementation of "single point of entry" systems for pediatric nursing facilities and intermediate care facilities and we know firsthand that many children have benefited from the proactive involvement of state officials in the admission and diversion process. However, many children who were institutionalized in these settings before the single point of entry systems went into effect remain institutionalized to this day. We strongly support the Department of Justice's recommendation regarding the assignment of case managers well in advance of a child's anticipated discharge. However, more can and should be done, especially in pediatric nursing facility settings to build and maintain connections with the community.

Washington State has developed and implemented a Preadmission Screening and Resident Review (PASRR) specialized services model that supports community integration and eventual discharge for all individuals with I/DD in nursing facilities by utilizing established I/DD waiver providers. *Preadmission Screening and Resident Review (PASSRR) Program,* Washington Developmental Disabilities Administration, https://www.dshs.wa.gov/dda/consumers-and-families/pre-admission-screening-and-resident-review-pasrr-program (Last Visited April 16, 2019). As Virginia endeavors to improve outcomes for children in nursing facilities, Washington's PASRR arrangement for individuals with I/DD should serve as a model for the Commonwealth.

### B. Inadequate Crisis Services, Lack of Behavioral Supports, and Deficiencies in Staff Training Lead to Unfortunate and Often Dangerous Outcomes

As the Independent Reviewer reports, and dLCV's experience supports, staff in community-based programs are often not adequately trained to handle behavioral issues; they are not given the tools they need to prevent and respond to behavioral crises, i.e. behavior plans and supports; and they too often use 911 as the first line of behavioral intervention. These failures create a

system where individuals with I/DD often end up in a "bed of last resort", i.e. a state-operated mental health facility or jail, neither of which is set up to handle the needs of this population.

It is well-settled that unwarranted and unjustified institutionalization is discrimination based on disability. Americans with Disabilities Act, *42 U.S. Code § 12101, et seq.*; *Olmstead v. L. C.*, 527 U.S. 581 (1999). Such institutionalization segregates individuals from their community, thus isolating them from their community supports and services. When individuals with I/DD are institutionalized in jail or mental health facilities, they are further harmed by being removed from services designed for people with I/DD and placed in programs that are not therapeutic and often perilous and detrimental.

The number of individuals with I/DD admitted to state hospitals has increased significantly since 2015 and children are the most impacted. While the Settlement Agreement speaks most directly about children and young adults in nursing facilities and intermediate care facilities, many of Virginia's dually-diagnosed youth spend significant portions of their childhoods in PRTFs licensed by DBHDS and funded by Medicaid. A PRTF is an accredited non-hospital residential treatment facility which provides care for individuals up to the age of 21 who receive Medicaid services. *What is a PRTF?,* Centers for Medicare and Medicaid Services, https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/Downloads/WhatisaPRTF.pdf (Last Visited April 16, 2019). Virginians in the target population often spend months, and sometime years, in these institutional settings only to have no meaningful community-based supports available when they discharge home. CCCA has the highest proportion of dually-diagnosed admissions of all state hospitals. The most recent data dLCV received from DBHDS in December 2018 shows that approximately 33% of the hospital's admissions had I/DD diagnoses. dLCV also tracks the

number of individuals with I/DD who are admitted to state hospitals multiple times. That number has increased over the past six months with the highest rates occurring at CCCA. The Commonwealth is not effectively responding to this trend in order to prevent unnecessary and often repeated admissions to facilities that are not equipped to keep these individuals safe or provide them with appropriate treatment.

dLCV interviewed the administrators of three state-operated hospitals and they each expressed concern over the admissions of individuals with I/DD. Although they do their best to keep the individuals safe and provide meaningful treatment, the setting and the culture are not conducive to either of these endeavors. One administrator stated that some of the individuals with I/DD admitted to her facility may not even have a documented mental health diagnosis before the need for admission occurs.

There are many concerns for people with I/DD being admitted to psychiatric hospitals. They may be segregated or require 1:1 staffing for their entire hospital stay. Staff and treatment teams often lack training and experience with the needs of individuals with I/DD. Individuals with difficult or extreme behaviors find themselves physically and mechanically restrained which is contraindicated for most of this population. Behaviors can result in as-needed or *pro re nata* (PRN) medications that may calm or sedate an individual but cannot address the underlying behaviors and often function primarily as pharmacological restraints. People with I/DD are often mistreated by other patients and they may be unable to protect themselves both physically and emotionally. Individuals with I/DD often become less stable in situations that cause sensory overload, such as loud overcrowded psychiatric units. Finally, these individuals often face long hospital stays, not because they need the treatment or show any benefit from it but because of the difficulty in finding the necessary supports in the community upon discharge.

8

Individuals in the Settlement population do not just end up in psychiatric hospitals when the system fails them, they also find themselves in jail. One hospital administrator interviewed by dLCV stated that although the setting of a psychiatric hospital is far from ideal for an individual with I/DD, it is better than jail. DBHDS must fulfill its obligation to train front-line staff to handle challenging behaviors and call REACH for support earlier in the process, and professional behavioral support must become the norm rather than the exception.

### C.   Continued Lack of Adequate Systems for Quality Control and Management Makes Collecting Meaningful Data Impossible and Negates Any Attempt to Prevent Bad Outcomes from Reoccurring

dLCV commends the Commonwealth for completing the emergency licensing regulations. *See,* 12 VAC §§ 35-105 et. seq. However, this accomplishment actually does little to ensure safety and positive outcomes given the inadequacies related to quality control and management. As the Independent Reviewer has noted, the Commonwealth's Quality Management System does not consistently identify and address risks of harm, ensure the sufficiency, accessibility, and quality of services to meet individual needs in integrated settings, and collect and evaluate data to identify and respond to trends to ensure continuous quality improvement. Doc. 300, at 23-30, 54. Unfortunately, this continued noncompliance has profound consequences for individuals in the target population. Every year, in accordance with state law and policy, dLCV receives and reviews thousands of reports submitted by adult protective services (APS) and Computerized Human Rights Information System (CHRIS) that involve individuals in the target population. Because the Commonwealth does not collect and analyze consistent and reliable data, nor do they report publicly on a consistent basis, dLCV has adopted a number of internal processes to identify and quickly respond to emergent issues.

9

Systems for quality control and protection from harm are critical to the Commonwealth's long-term fidelity and sustainability of a quality service system. For example, as the OSIG report states, the CHRIS system has not been modified or improved since its development in 2012 despite consistent concerns about its inadequate design, inconsistent reporting by providers, and unreliability of the data it was created to produce. OSIG Report, 13 (with citations to IR Report, December 6, 2015, Doc. 204). dLCV has been reviewing all serious incident reports reported via CHRIS since October 2017 and we began expressing our concerns to DBHDS very early in this process. The lack of consistent reporting, the nonexistence of definitions of key terms used in the CHRIS form, and the overuse of the "Other" option make analyzing trends nearly impossible. If DBHDS is unable to reliably identify and analyze trends, their ability to make the community a safer place for individuals with I/DD is severely curtailed.

## IV. Case Examples

In the years since the Settlement Agreement was entered, dLCV has represented dozens of individuals in the Agreement's target population, completed numerous investigations, visited many residential and day programs, and reviewed thousands of CHRIS and APS reports. These are a few case examples that may provide a human face to the issues presented to the Court.

**Case 1**: An 18-year-old man with I/DD was stabbed by another patient while he was restrained and defenseless in a restraint chair in a state-operated mental health facility. Despite allegedly being on 1:1 supervision by staff at the time, the other individual was able to enter the room and repeatedly stab the young man in the neck. The DBHDS investigation found no neglect on the part of the staff who was supposed to protect this vulnerable individual.

**Case 2**: A young woman with I/DD was sexually assaulted by a male patient in a state-operated mental health facility. Again, DBHDS' internal investigation found no neglect on the part of its

10

employees who were supposed to protect this young woman. However, when dLCV reviewed the investigation, we found that the DBHDS investigator did not interview the victim, did not reference the available security footage, and did not include the hospital's police report as evidence.

**Case 3**: A child with extensive support needs related to his developmental disability and co-occurring behavioral health disability has experienced numerous stays in psychiatric residential treatment facilities. The family has struggled for many years to ensure their child has access to appropriate educational supports and home and community-based services. When these services proved inadequate, the child was admitted to CCCA for several months before ultimately transferring to a state-operated training center where he is expected to remain until such time that sufficient home and community-based supports are available.

**Case 4**: A man with I/DD living in a group home was arrested three times in two months, the last time being held without bond in a local jail. Each of the incidents that eventually led to arrest began with him eloping from his group home despite the fact that the group home identified eloping as his baseline behavior. Despite repeated harm from known behavior, the group home repeatedly stated in its CHRIS reports that no corrective action was necessary.

**Case 5**: A dually-diagnosed child with extensive support needs has had several admissions to psychiatric hospitals and then went to a PRTF for longer-term care. After many months, he was able to step down to a less intensive level of care provided in a therapeutic group home setting. Even though he continued to meet Medicaid's medical necessity criteria for this group home, the local child-serving entity responsible for covering room and board costs withdrew funding. He returned home without waiver services in place. Absent appropriate behavioral supports, he quickly cycled back into crisis. After being erroneously referred by his CSB case manager to a

crisis program that no longer held a contract for children's REACH services, he was admitted to CCCA.

**Case 6**: Through media reports, dLCV learned of two women with I/DD who were raped and impregnated by one staff member of a DBHDS-licensed program. In early April, we learned that there is possibly a third woman who was also impregnated at the same program and possibly by the same staff. dLCV is investigating whether these incidents were reported in a timely manner. At least three individuals were injured in the same way in the same program over a period of years.

**Case 7**: A residential provider reported in CHRIS that a staff member called police when a young man with I/DD repeatedly made sexual comments that made her uncomfortable. The individual was arrested and spent time in jail. This is an example of staff overreacting to behavioral issues rather than responding therapeutically using an appropriate behavior plan.

## V.   Conclusion

Despite several years of work, the Commonwealth is still out of compliance with many of its mandates in the Settlement Agreement. dLCV has been disheartened to see the same issues raised again and again by the Independent Reviewer with very little progress shown by the Commonwealth. We interact with the individuals harmed by this lack of progress every day and we read about their injuries in CHRIS and APS reports. The system for crisis prevention and management is insufficient and vulnerable individuals end up in jail, state-operated psychiatric hospitals, or other institutional settings as a result of the Commonwealth's failure to provide a robust or even adequate system of protection.

Children with I/DD, perhaps the most vulnerable of this population, are placed at risk at an even more alarming rate than their adult counterparts. They are institutionalized and face

repeated hospitalizations at a higher rate. Crisis services for children are even more inadequate than for adults. To comply fully with the terms of the Settlement Agreement, we believe the Commonwealth needs to expeditiously develop and implement additional services specifically designed to address the complex needs of dually-diagnosed youth. At a minimum, this should include much more intensive discharge planning supports when youth are preparing to leave CCCA and other institutional settings, post-move monitoring arrangements similar to what is currently available for individuals leaving state-operated training centers, and an Ombudsman program empowered to help families resolve service issues that involve the broad array of child serving agencies in Virginia.

The system Virginia has in place for quality control and management needs a major overhaul. The fact that so much of this work is still in the initial stages and the plans and policies are still in draft form this many years into the Agreement is disturbing. Quality control and management are essential in order for Virginia to comply with the mandates of the Americans with Disabilities Act as interpreted by *Olmstead*. *Olmstead v. L. C.*, 527 U.S. 581 (1999).  As long as Virginia fails in this area, Virginias with I/DD are going to be at risk of going to institutional settings including state hospitals and jails.

13

Respectfully submitted and DATED this 16th day of April 2019,

_____/s/_____

Dana Wrenn Traynham, 44606
Zachary Scott DeVore, 65401
disAbility Law Center of Virginia
1512 Willow Lawn Drive
Suite 100
Richmond, Virginia 23230
(804) 225-2042
(804) 662-7057 (fax)
Email: dana.traynham@dlcv.org
Email: Zachary.devore@dlcv.org

Counsel for *amicus curiae,*
disAbility Law Center of Virginia