REPORT OF THE INDEPENDENT REVIEWER

ON COMPLIANCE

WITH THE

SETTLEMENT AGREEMENT

UNITED STATES v. COMMONWEALTH OF VIRGINIA

United States District Court for
Eastern District of Virginia

Civil Action No. 3:12 CV 059

April 1, 2024 – September 30, 2024

Respectfully Submitted By

Donald J. Fletcher
Independent Reviewer
December 13, 2024

# TABLE OF CONTENTS

**I.     EXECUTIVE SUMMARY** ..................................................... **3**

**II.    DISCUSSION OF COMPLIANCE FINDINGS** ......................... **5**

    A. Methodology ………………………………………….................... 5

    B. Compliance Findings ………………………………………..…… 8

            *1.    Case Management* …...……………………….…...…....... *8*

            *2.    Crisis and Behavioral Services* ….…………………....…. *10*

            *3.    Integrated Day Activities and Supported Employment* ………...……... *13*

            *4.    Community Living Options* …………………….……….... *15*

            *5.    Services for Individuals with Complex Medical Support Needs* ……..…. *18*

            *6.    Quality and Risk Management* …………………..……………..... *23*

            *7.    Provider Training* ……………………………….……...…….... *33*

            *8.    Quality Improvement Programs* ……………………………..... *35*

**III.   CONCLUSION** ....................................................... **39**

**IV.    RECOMMENDATIONS** ..................................................... **40**

**V.     SUMMARY OF COMPLIANCE** ............................................. **42**

    Section III.   Serving Individuals with IDD in the Most Integrated Settings ..… 42

    Section IV.   Discharge Planning and Transition from Training Centers ………. 54

    Section V.   Quality and Risk Management …………………..……………..... 63

    Section VI.   Independent Reviewer ……………………………............... 71

    Section IX.   Implementation of the Agreement ……………...….……..…. 72

**VI.    APPENDICES** ....................................................... **73**

    A. Case Management ………………………………………….......... 74

    B. Crisis and Behavioral Services …………….…………..….…..…....……. 86

    C. Integrated Day Activities and Supported Employment ……..….……... 100

    D. Community Living Options ……………………………………........ 110

    E. Services for Individuals with Complex Medical Support Needs ….……… 126

    F. Provider Training ………………………………………….............. 148

    G. Quality and Risk Management and Quality Improvement Programs…...... 159

    H. List of Acronyms …………………..…………….…..……………........ 261

.

2

# I. EXECUTIVE SUMMARY

This is the Independent Reviewer's Twenty-fifth Report on the status of compliance with the Provisions of the Settlement Agreement (Agreement) between the Parties to the Agreement: the Commonwealth of Virginia (the Commonwealth) and the United States, represented by the Department of Justice (DOJ). This Report documents and discusses the Commonwealth's efforts and progress during the past six months, focusing on the Twenty-fifth Review Period, April 1 – September 30, 2024.

In 2023, the Parties agreed to target the Independent Reviewer's studies and monitoring on certain of the Consent Decree's Provisions and their associated Compliance Indicators, i.e., those that Virginia has not previously met, either at all or twice consecutively, and those that have not been removed by the Court. For this Twenty-fifth Report, studies were therefore focused on 17 remaining Provisions and 41 Indicators. Any Provisions with which the Commonwealth had already achieved Sustained Compliance, as well as any Indicators that Virginia had met twice consecutively were not part of this review.

Leading up to this Report, the Commonwealth had achieved 13 of the remaining 41 Indicators. This Period's studies concluded that Virginia has now maintained its achievement of six of those Indicators over two consecutive reviews, and fulfilled a further two Indicators for the first time. This brings the Commonwealth into newly Sustained Compliance with one Provision of the Consent Decree.

Virginia's sustained achievement of six Indicators reflects stable and durable accomplishments across several areas for at least two consecutive review Periods (i.e., one year). These included monitoring CSB case management performance; tracking corrective actions and recommending needed enforcements to ensure remediation; securing within 30 days community residences for individuals admitted to its crisis therapeutic homes; reviewing and identifying incident trends, recommending and tracking implementation of prioritized quality improvement initiatives; and ensuring that CSBs comply with health and safety and community integration indicators. Once again, however, these achievements primarily involved Indicators related to the structural and functional aspects of the Commonwealth's statewide service system. While these aspects are valuable, these six Indicators operate in service to other Indicators that measure direct outcomes for the individuals at the heart of the Agreement.

This Period's reviews also determined that the Commonwealth did not achieve 32 of the remaining Indicators. From the perspective and interests of Virginians with IDD and their families, many of these unmet Indicators involve the most important service outcomes addressed by the Consent Decree. Despite some progress, the Commonwealth persists in falling short of delivering needed nursing services; initiating and providing adequate and appropriately delivered behavioral services; conducting initial crisis assessments in individuals' homes or other community settings; ensuring that dental exams occur annually; providing services that support daily access to the greater community; and ensuring that Direct Support Professionals and their supervisors receive competency-based training. For individuals with IDD, it is these service outcomes, rather than the structural inputs, that will ultimately achieve the Agreement's three stated goals of community integration, self-determination and quality services.

Virginia is working to meet these Indicators. Among other efforts, the Commonwealth has begun a process to study the pay rate increases needed to recruit and retain enough nurses, behaviorists and Direct Support Professionals so that adequate and appropriately delivered integrated community-based services can be provided to individuals with these identified needs. This process will continue throughout much of 2025.

For one more Indicator, because the Commonwealth's next relevant report will not be available until after March 2025, no new monitoring data from the current Period was available for review and analysis this time. The Independent Reviewer therefore deferred rating this Indicator until the next Report.

For the Twenty-sixth Period reviews, the Parties have agreed that the Independent Reviewer will target his studies and monitoring on 35 remaining Compliance Indicators across 16 Provisions that Virginia has not yet met, either at all or twice consecutively.

The following sections of the Agreement cover these remaining 35 Indicators:

- Case Management
- Crisis and Behavioral Services
- Integrated Day Activities and Supported Employment
- Community Living Options
- Services for Individuals with Complex Medical Support Needs
- Quality and Risk Management

- Provider Training
- Quality Improvement Programs

In closing, in addition to the Commonwealth completing the development of its service system's structures, functions and processes, it is critical to reiterate that the Consent Decree's goals of providing individuals with IDD opportunities for community integration, self-determination and quality services depend on Virginia consistently meeting these required service outcomes.


# II. DISCUSSION OF COMPLIANCE FINDINGS

## A.    Methodology

For this Twenty-fifth Review Period, the Independent Reviewer prioritized the following areas in order to monitor the Commonwealth's compliance with the requirements of the Agreement:

- Case Management;
- Crisis and Behavioral Services;
- Integrated Day Activities and Supported Employment;
- Community Living Options;
- Services for Individuals with Complex Medical Support Needs;
- Quality and Risk Management;
- Provider Training; and
- Quality Improvement Programs.

To analyze and assess Virginia's performance across these areas and their associated Compliance Indicators, the Independent Reviewer retained eight consultants to assist in:

- Reviewing data and documentation produced by the Commonwealth in response to requests by the Independent Reviewer, his consultants and the Department of Justice;
- Discussing progress and challenges with Virginia officials;
- Examining and evaluating documentation of supports provided to individuals;

5

- Interviewing caregivers, provider staff and stakeholders;
- Verifying the Commonwealth's determinations that its data sets provide reliable and valid data that are available for compliance reporting; and
- Determining the extent to which Virginia maintains documentation that demonstrates it meets all remaining Compliance Indicators and achieves Compliance with the Provisions.

The Independent Reviewer focused the Twenty-fifth Period studies on any Provisions with which the Commonwealth had not yet achieved Sustained Compliance, and their associated Compliance Indicators that had not already been met twice consecutively. These included Indicators that had been achieved only once or not at all, as determined in the Twenty-fourth Period Report.

To ensure that the Independent Reviewer had the facts necessary to conclude whether Virginia had met the metrics of these Indicators and achieved Compliance, the Commonwealth was asked to make sufficient documentation available that would:

- "Prove its Case" for having achieved all remaining Indicators for the Provisions being studied, and
- Supply its records to document that each of its data sets for the Provisions being studied provide reliable and valid data for compliance reporting.

To determine any ratings of Compliance for the Twenty-fifth Review Period, the Independent Reviewer considered information delivered by Virginia prior to October 30, 2024, and its responses to consultant requests for clarifying information up to November 8, 2024. To determine whether the Commonwealth had met the remaining Compliance Indicators and achieved the Provisions studied, the Independent Reviewer considered the findings and conclusions from the consultants' studies, Virginia's planning and progress reports and documents, as well as other sources.

The Independent Reviewer's determinations that Indicators have or have not been met, and the extent to which the Commonwealth has achieved Compliance, are best understood by reviewing the Discussion of Compliance Findings and the consultants' reports, which are included in the Appendices. To protect individuals' private health information, the summaries from the studies

of individuals' services included in the respective consultant reports are submitted to the Parties under seal.

For each study, Virginia was asked to make its records available that document the proper implementation of the Provisions and the associated remaining Compliance Indicators being reviewed. For each Indicator with a function or performance measure that utilized reported data, the Commonwealth must make available its completed *Process Document* and *Attestation*. With these two documents, Virginia asserts that each of its reported data sets has been verified as reliable and valid.

If any of the Commonwealth's monitoring cycles for certain Indicators were still in progress since the previous Twenty-fourth Period review, the Independent Reviewer determined a "deferred" rating for these relevant Indicators, since new information for this latest Period's study was not yet available for review and verification. (If any such Indicators were met in the previous review and the next Twenty-sixth Period study also finds they have been achieved, a determination of met twice consecutively will be made.)

Information that was not supplied for the studies was not considered in the consultants' reports or in the Independent Reviewer's findings and conclusions. If Virginia did not provide sufficient documentation, the Independent Reviewer determined that the Commonwealth had not demonstrated achievement of the associated Compliance Indicator.

Prior to completing a draft of this Twenty-fifth Report to the Court for the Parties to review, the Independent Reviewer distributed copies of the consultants' draft studies to DBHDS, and convened an exit call for each study. These calls provided an opportunity for senior staff from Virginia's relevant departments and their subject matter experts to discuss the contents together with the consultants and the Independent Reviewer. The discussions included the identification of any factual errors and misunderstandings, or needed clarifications. The reports were then modified as appropriate.

Finally, as required by the Agreement, the Independent Reviewer submitted this Report to the Parties in draft form for their review. The Independent Reviewer then considered any comments by the Parties before finalizing and submitting this Twenty-fifth Report to the Court.

## B.    Discussion of Compliance Findings

### 1.    Case Management

**Background**

As a result of the Twenty-fourth Period review, the Commonwealth had achieved one of the five Compliance Indicators associated with the Agreement's two remaining Case Management Provisions: III.C.5.b.i. and V.F.5.

Regarding Provision III.C.5.b.i.'s four Indicators studied last time, namely 2.3, 2.16, 2.18 and 2.20, Virginia had met the requirements for Indicator 2.3 twice consecutively. However, until the Commonwealth had completed a new Support Coordinator Quality Review (SCQR) cycle with new monitoring data available for review and verification, a rating for the other three Indicators (2.16, 2.18 and 2.20) had been deferred*. Therefore, Virginia had remained in Non-Compliance with this Provision.

For Indicator 2.16, the Twenty-third Period review had found that DBHDS had met just 64% of this element's 86% performance measure, and that the Department needed to invest in a more concerted and targeted quality improvement initiative.

The Twenty-third Period studies had also determined that Indicators 2.18 and 2.20 had been met for the first time.

For Provision V.F.5., the Commonwealth had not met the sole Indicator 47.1 in the Twenty-third Period, since it had not yet achieved the required 86% performance measure for two of its domain elements. For the Twenty-fourth Period, a rating for this Indicator had been deferred* until new SCQR monitoring data was available for review and verification. Therefore, Virginia remained in Non-Compliance with this Provision.

* Regarding deferred ratings, if the relevant Indicator had been met in the Twenty-third Period review, and the current Twenty-fifth Period study finds it has also been achieved, a determination of met twice consecutively will be made.

**Twenty-fifth Period Study**

For this latest review, the Independent Reviewer retained the same lead consultant as last time to assess the Commonwealth's status related to its achievement of the two remaining Case Management Provisions (III.C.5.b.i. and V.F.5.) and their four associated Indicators that had not yet been met, either at all or twice consecutively.

For Provision III.C.5.b.i., three remaining Indicators were reviewed, namely 2.16, 2.18 and 2.20. Provision V.F.5.'s Indicator 47.1 was also studied.

Key Points

- For Indicator 2.16, DBHDS's Case Management Steering Committee (CMSC) analyzed, as required, the data results from the *SCQR-Fiscal Year 2024*. Despite improvement over the Twenty-third Period data, 72% of the records reviewed achieved a minimum of nine of the ten indicators, and so again fell short of the required 86%.

- Regarding Indicator 2.18, DBHDS has now met its requirements twice consecutively. The Department continued to offer targeted technical assistance to CSBs as required, and requested a total of 17 Improvement Plans (IPs) during Fiscal Year 2024. The CMSC also communicated their concerns and new expectations for CSBs to the DBHDS Commissioner, but given the progress made by the CSBs, the Committee determined that recommendations for enforcement actions were not needed.

- For Indicator 2.20, Virginia has also now met its requirements twice consecutively. DBHDS tracked six CSB Corrective Action Plans (CAPs) for cited regulatory non-compliance to ensure remediation.

- Regarding Indicator 47.1, the CMSC established and tracked two performance measures in each of the domain elements of health and safety and community integration. The *SCQR-Fiscal Year 2024* data indicated that the Commonwealth met or exceeded the required 86% performance metric for all four measures.

See Appendix A for the consultant's full report.

**Conclusion**

Regarding Provision III.C.5.b.i.'s three remaining Compliance Indicators, 2.16, 2.18 and 2.20, Virginia has now achieved two of them (2.18 and 2.20) twice consecutively. However, the

Commonwealth did not achieve Indicator 2.16, so therefore remains in Non-Compliance with this Provision.

Regarding Provision V.F.5., Virginia met the sole Indicator 47.1 for the first time, and so achieved Compliance with this Provision for the first time.

## 2.    *Crisis and Behavioral Services*

**Background**

The Twenty-fourth Period study had reviewed five Crisis and Behavioral Services Provisions (III.C.6.a.i.-iii., III.C.6.b.ii.A., III.C.6.b.iii.B., III.C.6.b.iii.D. and III.C.6.b.iii.G.) and their associated seven Compliance Indicators that had not yet been achieved, either at all or twice consecutively.

Regarding Provision III.C.6.a.i.-iii.'s three remaining Compliance Indicators, namely 7.8, 7.18 and 7.19, Virginia had met the requirements of one of them (7.19) twice consecutively. However, the Commonwealth had not achieved the other two Indicators, 7.8 and 7.18, and so had remained in Non-Compliance with this Provision.

During the Twenty-fourth Period, Virginia had provided fewer than 50% of REACH crisis assessments in individuals' home or other community locations where the crises occurred, and so had again failed to make substantial progress toward meeting Indicator 7.8's required 86% performance metric. The same result occurred for Indicator 7.18 – the Commonwealth had again failed to achieve the 86% measure for individuals being referred for behavioral supports within 30 days of the need being identified.

For Indicator 7.19, DBHDS's monitoring process had again been effectively implemented and was sufficient to identify whether individuals had received the four required elements within the timeframe required by the DD Waiver regulations.

Regarding Provision III.C.6.b.ii.A.'s one remaining Compliance Indicator, namely 8.4, Virginia had again met its requirements, and had therefore achieved Sustained Compliance with this

Provision by having completed 87% of the required Crisis Education and Prevention Plans (CEPPs).

For Provision III.C.6.b.iii.B.'s one remaining Compliance Indicator, namely 10.4, the Commonwealth had not achieved its 86% metric, and so had remained in Non-Compliance with this Provision. Of individuals who were admitted to hospitals and Crisis Therapeutic Homes (CTHs), 79% had a community residence identified within the required 30 days.

Regarding Provision III.C.6.b.iii.D.'s sole Compliance Indicator, namely 11.1, Virginia had met its requirements for the first time, and had therefore achieved Compliance with this Provision for the first time, since 91% of individuals who had been admitted to CTHs during this previous Period had had a community residence identified within the required 30 days.

For Provision III.C.6.b.iii.G.'s one remaining Compliance Indicator, namely 13.3, the Commonwealth had again not met its requirements, and so had remained in Non-Compliance with this Provision. No children experiencing a crisis had been referred to or had accessed the host-home for children. DBHDS had reported having received funds to pursue an alternative solution.

**Twenty-fifth Period Study**

For this latest review, the Independent Reviewer retained the same consultants as previously to assess the status of Virginia's efforts toward achieving the Agreement's remaining four Crisis Services Provisions (III.C.6.a.i.-iii., III.C.6.b.iii.B., III.C.6.b.iii.D., and III.C.6.b.iii.G.) and their associated five Indicators that have not yet been met, either twice consecutively or at all.

These include two Indicators (7.8 and 7.18) associated with crisis and behavioral services, and three indicators (10.4, 11.1 and 13.3) related to crisis stabilization.

Key Points

- During this current Period, the Commonwealth again fell short of providing crisis assessments in the home or other community locations, as required by Indicator 7.8's 86% performance metric. For children and adults known to the system, REACH crisis assessments were provided at the individual's home, the residential setting, or other community settings for 55% in Fiscal Year 2024's fourth quarter, and for only 49% in the first quarter of Fiscal Year 2025. Significant variations continue between DBHDS's five

Regions. For example, in the fourth quarter of Fiscal Year 2024, Region III's REACH assessments achieved 76%, whereas in the first quarter of Fiscal Year 2025, Region I conducted merely 24% in community settings. More than 90% of the individuals who received their crisis assessments in their homes retained their home settings, whereas fewer than 70% of those who received their assessments at hospitals or CSB Emergency Services retained their home settings.

- For Compliance Indicator 7.18, only 75% of individuals needing therapeutic consultation (i.e., behavioral supports) were referred to a provider within 30 days of the need being identified. The monthly average number of days for referral, for those who were not connected within 30 days, ranged between 55 days in April 2024 and 62 days in June 2024. Overall, 18% of individuals with an identified need were not connected to a therapeutic consultant at all.

- Virginia did not achieve Compliance Indicator 10.4. Rather than the required 86% metric, 76% of individuals with a Waiver, known to REACH and admitted to a CTH or psychiatric hospital had a community residence identified within 30 days of admission.

- For the second consecutive Period, DBHDS surpassed the 86% performance metric for Indicator 11.1. The Department reported that for 63 (90%) of the 70 individuals with a Waiver, known to REACH and admitted to a CTH, a community residence was identified within the required 30 days.

- DBHDS is in the process of creating three CTHs for children instead of out-of-home crisis therapeutic prevention host-like homes. Once operational, these CTHs for children should fulfill Indicator 13.3's requirements.

See Appendix B for the consultants' full report.

**Conclusion**

Regarding Provision III.C.6.a.i.-iii.'s remaining two Compliance Indicators, namely 7.8 and 7.18, the Commonwealth did not achieve their requirements, and therefore remains in Non-Compliance with this Provision.

Regarding Provision III.C.6.b.iii.B.'s one remaining Compliance Indicator, namely 10.4, Virginia did not achieve its metrics, and so remains in Non-Compliance with this Provision.

Regarding Provision III.C.6.b.iii.D.'s sole Compliance Indicator, namely 11.1, the Commonwealth has met its requirements for the second consecutive Period. Therefore, Virginia has achieved Sustained Compliance with this Provision.

Regarding Provision III.C.6.b.iii.G.'s one remaining Compliance Indicator, namely 13.3, the Commonwealth did not meet its metrics, and therefore remains in Non-Compliance with this Provision.

### 3.     *Integrated Day Activities and Supported Employment*

**Background**

The Twenty-fourth Period study of Virginia's Integrated Day Activities and Supported Employment service system had determined that the Commonwealth had remained in Non-Compliance with the remaining Provision, namely III.C.7.a. None of its three outstanding associated Compliance Indicators (14.8–14.10) had been achieved.

For Indicator 14.8, the last review found that Virginia had met 80% of the required 90% of the numerical target for employed adults with DD Waiver services. This was despite having already reduced targets based on a smaller projected annual increase percentage of individuals employed.

Regarding Indicator 14.9, the Commonwealth had reported that out of the 21,879 individuals on either the DD Waivers or the waitlists, 23% were employed. This was below the required 25% metric.

For Indicator 14.10, with the expected annual growth in the number of individuals receiving Waiver-funded services, and Virginia's attempts to shift its services system to serving more people in integrated, community-based day settings and away from larger segregated settings, the Parties had agreed in January 2020 to a 3.5% annual increase requirement for this Indicator. As of March 2024, almost 22% of the 17,121 individuals with DD Waiver services had been authorized to participate in integrated day settings. Although this represented a 1.8% increase over the previous Twenty-third Period, it had remained less than this Indicator's required annual percentage increase.

**Twenty-fifth Period Study**

For this latest review, the Independent Reviewer retained the same consultant as previously to assess the status of the Commonwealth's compliance with the one remaining Integrated Day Activities and Supported Employment Provision, namely III.C.7.a. and its three relevant Indicators, 14.8, 14.9 and 14.10.

Key Points

- For Indicator 14.8, as of June 30, 2024, 1,020 Waiver participants were employed. This number represented 89% of DBHDS's Fiscal Year 2024 target. Although the Department had reduced its target to 1,142 during the Twenty-fourth Period, the latest percentage fell short of achieving the new target by 11%, and fell 1% short of achieving the Indicator's 90% performance measure. Virginia will meet this Indicator when the number of Waiver individuals who are employed is within 10% of the annual employment target.

- Regarding Indicator 14.9, of the 20,727 adults on either a DD Waiver or a waitlist as of June 30, 2024, 5,070 individuals (24.5%) were employed. While this represented an increase of 1.5% over the prior year, the Commonwealth nonetheless remained slightly short of the 25% requirement, and so did not meet this Indicator.

- For Indicator 14.10, since Virginia cannot determine its latest annual percentage increase until after its next report is produced (covering the period from March 31, 2024, to March 31, 2025), no new monitoring data for this current Period's study were available for analysis and verification. The Independent Reviewer has therefore determined that a rating for this Indicator is deferred.

See Appendix C for the consultant's full report.

**Conclusion**

Regarding Provision III.C.7.a.'s remaining three Compliance Indicators 14.8–14.10, the Commonwealth did not achieve two of them, namely 14.8 and 14.9. Until Virginia provides a new annual percentage increase for Indicator 14.10 after March 2025, its rating is deferred. Therefore, the Commonwealth remains in Non-Compliance with this Provision.

14

## 4.    *Community Living Options*

**Background**

For the Twenty-fourth Period review, three Indicators, namely 18.2, 18.6 and 18.9 had remained as part of Community Living Options Provision III.D.1. As a result of this study, the Commonwealth had failed to meet the requirements of Indicator 18.2, which had been achieved for the first time in the prior Twenty-third Period. Virginia had met the requirements of Indicator 18.6 twice consecutively, but had again not achieved Indicator 18.9 and so had remained in Non-Compliance with this Provision.

For Indicator 18.2, DBHDS's data had indicated that the percentage of authorizations for individuals with DD Waivers being served in most-integrated residential settings had continued to grow as a percentage of all residential settings, i.e., from 79.4% in 2016 to 90% in 2023. For the previous seven years, the Commonwealth had consistently achieved a positive annual trend, never below 1.2%. For the year September 2022 through September 2023, Virginia had maintained this trend, but was unable to sustain this Indicator's required annual increase of 2%.

Regarding Indicator 18.6, DBHDS had continued to report on the numbers of individuals with Level 6 or 7 needs receiving services in the five specified service types. The plan that the Department had submitted during this reporting Period was sufficient to address the identified prioritized barriers, i.e., limited access to respite services and insufficient provider capacity.

Indicator 18.9 requires the achievement of two performance metrics. In Fiscal Year 2023, DBHDS had reported that 77% of the 135 individuals with new nursing service authorization had these services delivered within 30 days, surpassing the required 70%. However, only 40% of the overall 616 individuals whose ISPs identified the need for nursing services had received at least 80% of the hours that they needed, falling short of the required 70% benchmark and failing to meet the annual nursing utilization rate requirement of this Indicator. For the members of the target population, receipt of needed nursing services is one of the most important outcomes required by the Settlement Agreement.

15

**Twenty-fifth Period Study**

For the latest review, the Independent Reviewer retained the same lead consultant as previously to assess whether sufficient evidence existed to determine if the Commonwealth has achieved each of Provision III.D.1.'s two remaining Indicators, i.e., 18.2 and 18.9.

Key Points

- As mentioned above for Indicator 18.2, DBHDS's data have been showing a significant positive annual trend: the number and percentage of authorizations for people being served in most-integrated residential settings (i.e. fewer than four individuals with DD) have continued to grow as a percentage of all residential settings. In 2024, this reached 90.5%, a 0.5% increase over the previous year. In tandem, the number and percentage of those residing in less-integrated residential settings have decreased during the same eight-year period. Despite this, however, the latest 0.5% annual increase did not meet this Indicator's 2% performance metric.

- Regarding Indicator 18.9's first metric, DBHDS reported that in Fiscal Year 2024 nursing services for 95% of the 105 individuals with new nursing service authorizations were initiated within the required 30-day timeline, once again exceeding the 70% timeliness performance metric.

  However, for the second metric, the Department reported that only 50% of the overall 601 individuals whose ISPs have identified the need for nursing services received 80% of their authorized hours. Virginia therefore fell well short of achieving this Indicator's second benchmark of 70%.

  Between Fiscal Year 2022 through Fiscal Year 2024, a three-year period when the impacts of the pandemic lessened and the Commonwealth implemented much needed pay rate increases for nurses, the annual percentage of individuals receiving at least 80% of their authorized hours increased from 34% to 50%. While reaching 50% represents a decidedly important accomplishment over the previous two years, this latest result nevertheless means that, to achieve this Indicator's 70% requirement, approximately 120 more people need to still receive 80% of their required nursing services.

  Given the importance of people with IDD – some of them with complex medical needs – being able to live in their home settings while receiving adequate health care, including essential nursing services, is critical. It is therefore vital that Virginia correctly counts the

16

number of individuals requiring such services. As previously reported to the Court, the nursing utilization data that DBHDS has provided since 2021 does not accurately measure the number of needed nursing services hours compared with the number delivered.

Two significant factors result in the Commonwealth's existing formula (i.e., the number of billed hours versus the number of authorized hours) that produces an inaccurate annual utilization percentage. Some individuals are authorized for more hours than they need, while others' needs are not counted at all because the nursing services that they require are not available in their geographic area. The latest collaborative study between the independent consultants' Individual Services Review (ISR) and DBHDS's Intense Management Needs Review (IMNR) found that of 12 individuals needing nursing services, three (25%) were not counted in the Department's formula because they did not have authorized nursing services hours. (This review was of too small a sample to generalize.)

Also, Virginia has not yet determined how often either of the two formula factors mentioned above occur annually. These discrepancies may well be impacting a significant number of other people in need. Regarding the 70% performance measure of this Indicator, the actual utilization percentage of hours received versus hours needed might be materially higher or lower than the percentage reported by DBHDS. However, because the two formula factors that are contributing to inaccuracies are often consistent for individuals from year to year, the reported positive trend line over the last three Fiscal Years that shows improving utilization percentages is likely to be accurate.

To avoid undercounting the number of individuals who need nursing supports in the future, the Department has recently implemented a new Individual Supports Plan (ISP) requirement that all those needing in-home nursing supports be identified regardless of the availability of nursing services.

See Appendix D for the consultant's full report.

**Conclusion**

Regarding Provision III.D.1.'s two outstanding Compliance Indicators, 18.2 and 18.9, the Commonwealth did not meet the requirements of either of them, and therefore remains in Non-Compliance with this Provision.


## 5.    *Services for Individuals with Complex Medical Support Needs*


**Background**

The Twenty-fourth Period's Individual Services Review (ISR) study had been designed as a two-phase, year-long review to assess Virginia's status regarding one of the three groups of needs for individuals with IDD as outlined in Provision V.D.2.a.-d.'s Indicator 36.8.

The first phase of this ISR study had been run in conjunction with DBHDS's own review of its pilot Intense Management Needs Review (IMNR) process and had two purposes. The primary one was to determine the adequacy of the IMNR specifically related to one of the three designated subgroups of individuals with DD Waiver services, namely those with complex health support needs. The secondary purpose of the ISR, and one of the IMNR's many objectives, was to identify possible positive and/or concerning areas related to the delivery of needed nursing services (Provision III.D.1's Indicator 18.9) and the receipt of annual physical and dental exams (Provision V.B.'s Indicator 29.20) in the management of health needs for this subgroup.

In terms of methodology and process, this ISR study and DBHDS's pilot IMNR review had focused attention on individuals with SIS level 6 needs (i.e., complex medical needs), who had been involved in annual meetings from April to September 2023 to develop their Individual Supports Plans (ISPs). A stratified sample of 30 individuals with IDD had then been randomly selected to include ten people from each of three of the Department's five Regions.

In several important respects, DBHDS's IMNR review had replicated the work of the consultants' ISR study. Both had utilized a monitoring questionnaire with written interpretive guidelines, had conducted on-site interviews with a primary caregiver with knowledge of the relevant health care services, had made observations of the person, their adaptive equipment and their residential setting, and had collected and analyzed facts from both the individual's health care records and the site visit itself.

The studies had been carried out in parallel to ensure that DBHDS's newly designed and implemented IMNR process could reliably determine the same significant health management concerns as the independent ISR review. Both studies' monitoring processes had been conducted by qualified clinicians overseen by experienced supervisors who had collaborated throughout the reviews' timeframes.

It had been understood, right from the start, that the randomly selected sample was not large enough to generalize findings for any Compliance determinations for the three Indicators involved.

Regarding Indicator 36.8, the ISR study had verified that the Commonwealth's IMNR process had adequately identified health management needs for the sample studied, as well as shortcomings. When one of those needs had required urgent attention, Virginia had taken immediate action. DBHDS's nurse reviewers had also developed appropriate remediation plans (i.e., corrective actions) during this first phase of its IMNR process. The remainder of the remediation process, (i.e., tracking, revising, and ensuring that the action addressed the deficiency) would be implemented and reviewed during the Twenty-fifth Period.

Both studies had concluded that sufficient and dependable in-home nursing services were critical to ensuring the wellbeing of these individuals, and that they could be safely supported in their current homes. Potentially serious, even grave, consequences of the failure to provide adequate and reliable nursing services could not be overstated, especially given the responsibilities managed by families as they care for their relative with complex medical support needs.

As a result of the reviews, the 66.7% nursing utilization rate for the individuals studied had been below Indicator 18.9's 70% benchmark. In addition, both the ISR and DBHDS's IMNR studies had identified factors that had contributed to the calculation of an inaccurate annual nursing utilization rate.

As well as a low nursing utilization rate, many families, even those who had received 80% of authorized hours had reported ongoing problems related to the inconsistency and unreliability of nursing services.

Progress had been evident regarding Indicator 29.20. Of the selected sample, 97% of people had received an annual physical exam. However, adequate dental care had still been lacking as

evidenced by 37% of the 30 individuals not having had an annual dental exam. Once again, two major obstacles had remained: the lack of dentists who accepted Medicaid and/or who had provided needed sedation.

Both studies had recommended that DBHDS should make systemic improvements to case managers' use of the Department's external monitoring form, the On-site Visit Tool (OSVT). Of the individuals studied, case managers had rarely identified significant health issues or had taken action to improve the management of their needs. These related to previously known risks being adequately addressed and previously unknown risks being identified, including the failure to receive adequate nursing services.

DBHDS had identified several needed refinements, including producing more consistent findings in its IMNR monitoring questionnaire and interpretive guidelines. The IMNR nurse reviewers and their supervisor had performed exceptionally well. The health needs management issues and concerns identified by the two studies had been generally aligned, as were the problems that required urgent attention. In such instances, the Department had been highly responsive and had taken appropriate and decisive action.

DBHDS's IMNR process had held significant promise for the Commonwealth's efforts to collect and analyze data related to individuals with complex health support needs.

**Twenty-fifth Period Study**

For this latest review, the Independent Reviewer retained the same consultants as previously to undertake the second phase of the ISR study. This again focused on the same three Indicators as during the prior Period, namely Provision V.D.2.a.-d.'s Indicator 36.8, Provision III.D.1's Indicator 18.9 and Provision V.B.'s Indicator 29.20, and was conducted once more in parallel with DBHDS's latest IMNR review.

This time, both studies focused on a new stratified sample of 30 individuals with SIS level 6 needs, all of whom were involved in annual ISP meetings from July to September 2023. The sample included ten people from each of the remaining two Regions and ten from one of the three Regions previously reviewed.

An additional purpose of this Twenty-fifth Period study was to verify whether Virginia has developed and put in place a systemic process to remediate identified concerns for the sample of 30 individuals studied during the Twenty-fourth period. Indicator 36.8 requires the Commonwealth to implement corrective actions, track the efficacy of these actions and make revisions as necessary to ensure the actions have addressed the identified deficiencies.

Once again, both the ISR and the IMNR studies reached the same conclusions.

<u>Indicator 36.8's Remediation Process – Key Point</u>
- DBHDS began its initial remediation process during the prior Twenty-fourth Period, when it made a serious and effective effort to identify needed corrective actions. During the current Period, the Department assigned implementation responsibilities for its remediation plans and began tracking their execution. DBHDS has not yet implemented a systemic process, however, to ensure that required outcomes occur. In some instances, the efficacy of the corrective actions could not be determined, and the required step of the overall remediation process to revise the corrective action as necessary was not fully implemented. As a result, the Department could not yet determine whether an action has been sufficient to address and resolve the documented deficiency.

<u>Indicator 18.9's Nursing Utilization Rate – Key Points</u>
- Of the ten of the 30 individuals studied who were identified as needing in-home nursing services, nine were authorized, since one person did not receive any authorized nursing services during the year the ISP was in effect.
- In addition to these ten with identified in-home nursing needs, two other people needed such services. However, their need – although known to their ISP teams – was not identified in their ISPs because no nursing services were available in their geographic area.
- Of the nine individuals authorized for in-home nursing services, five (56 %) received at least 80% of the approved number of hours. This percentage, however, does not accurately represent the nursing utilization rate for the total of 12 people in this latest study who actually needed in-home nursing services. Of these 12 individuals, only 40% received 80% of their needed hours.
- Overall, Virginia has been well aware for many years of the fundamental reason why individuals who need in-home nursing supports are either not receiving enough of them

or are receiving none at all: both the ISR and IMNR reviews again confirmed that there are insufficient nurses to meet this critical need in a timely manner.

Indicator 29.20's Annual Physical and Dental Exams – Key Points

- The ISR and IMNR studies each found sustained progress in the provision of annual physical exams, with 29 (97%) of the 30 individuals having received one within the previous 14 months.
- However, only 22 people (73%) had an annual dental exam. Both these studies again found that the same obstacles to getting annual dental exams remain. Too few dentists accept Medicaid, offer sedation, and provide services in the more rural areas of the Commonwealth. In addition, the ISR consultants determined that the website operated by DentaQuest did not provide, as it should, current and accurate information about the number and location of dentists who accept Medicaid.

Case Management – Key Points

- The ISR study consultants found that Virginia's Case Managers/Support Coordinators did not adequately utilize DBHDS's external monitoring safeguard process tool, the OSVT. They did not adequately identify or document unmet nursing needs, or take sufficient actions to address and resolve them. They also failed to identify problems and gaps in existing services as well as inaccuracies and inconsistencies in the information they included in the OSVT.
- Case management turnover negatively impacted the continuity of care and the timely identification of essential supports. This serious concern was raised by caregivers as an impediment to the provision of adequate healthcare.

It is important to reiterate the ongoing efforts by DBHDS to strengthen its on-site monitoring processes and to establish a reliable and consistent set of actions to remedy deficiencies documented at the individual, programmatic, and systemic levels. Now that the most recent fieldwork has been completed and the analysis of the findings is underway, the Department anticipates making additional refinements to its IMNR monitoring questionnaire and its remediation process.

See Appendix E for the consultants' full report.

**Conclusion**

Once again, the randomly selected sample was not large enough to generalize findings to determine the extent to which the Commonwealth has achieved or failed to meet the requirements of Provision V.D.2.a.-d.'s Compliance Indicator 36.8, Provision III.D.1's Compliance Indicator 18.9 and Provision V.B.'s Compliance Indicator 29.20.

Regarding Indicator 36.8, the year-long, two-phase ISR study verified that DBHDS's IMNR process adequately collected and analyzed data and identified health management needs for the samples studied. When one of those needs required immediate attention, the Department acted with urgency. DBHDS also developed corrective actions as required. However, the Department did not fully implement its remediation plans as required.

Regarding Indicator 18.9, a majority of individuals needing in-home nursing services did not receive 80% of their needed hours.

Regarding Indicator 29.20, the Commonwealth sustained progress with all but one of the latest sample of individuals receiving an annual physical exam. Too few people received an annual dental exam.

## 6.    *Quality and Risk Management*

**Background**

At the time of the previous Twenty-fourth Period study, seven Provisions, V.B., V.C.1., V.C.4., V.D.1., V.D.2., V.D.3. and V.D.4., and their outstanding 24 Compliance Indicators specified the Agreement's remaining requirements for the Commonwealth's Quality and Risk Management (QRM) system. Virginia had not yet achieved Sustained Compliance with any of these Provisions.

Provision V.B.

Regarding Provision V.B.'s 10 remaining Indicators, namely 29.13, 29.16–29.18 and 29.20–29.25, the Commonwealth had met the requirements of two of them (29.23 and 29.25) twice consecutively. Virginia had achieved an additional two Indicators, 29.13 and 29.16, for the first

time. However, the Commonwealth had not achieved six Indicators, 29.17, 29.18, 29.20–29.22 and 29.24, and had therefore remained in Non-Compliance with this Provision.

For Indicator 29.13, the Risk Management Review Committee (RMRC) had reviewed data and identified trends from allegations and substantiations of abuse, neglect, and exploitation, at least four times per year and so had met this Indicator's requirements for the first time.

Regarding Indicator 29.16, DBHDS had also met this Indicator's requirements for the first time. The Twenty-fourth Period study had verified that the RMRC had continued to oversee the look-behind process into serious incident reviews and follow up processes, including whether providers were implementing timely, appropriate Corrective Action Plans (CAPs). As well, the Committee had reviewed trends at least quarterly, had recommended follow-up actions and quality improvement initiatives when necessary, and had then tracked their implementation.

For Indicator 29.17, even though DBHDS's revised look-behind process into reviews of allegations of abuse, neglect and exploitation had addressed each of the required outcomes, the RMRC's data analysis had not been sufficiently developed and implemented to demonstrate achievement of this Indicator.

Regarding Indicator 29.18, Virginia had still not achieved its requirements, which involve meeting or exceeding the 86% threshold for all of the review process outcomes required by Indicators 29.16 and 29.17.

For Indicator 29.20, DBHDS had reported that it came close to, but did not yet achieve the 86% metric for annual physical exams for people supported in residential settings. The Department had also reported that 63%-64% of individuals with dental coverage had received annual dental exams. This had remained significantly below the required 86% benchmark, and so once again DBHDS had failed to meet this Indicator.

Regarding Indicator 29.21, out of 1,145 of people with identified behavioral support needs, just 729 (64%) had received adequate and appropriately delivered services. Even though this Twenty-Four Period study had found gradual and steady improvement over previous Periods, this percentage had still fallen below the Indicator's required 86% performance measure.

For Indicator 29.22, DBHDS had reported that 69% of its residential service recipients lived in a location that supported full access to the greater community. This review had also found

concerns regarding the validity of this measuring process, something that the Department needed to resolve. The Commonwealth had not achieved this Indicator's 95% benchmark.

Regarding Indicator 29.23, DBHDS had reported that more than 98% of individual service recipients were free from abuse, neglect and exploitation, surpassing the 95% performance benchmark for a second consecutive Period.

For Indicator 29.24, even though DBHDS had made significant revisions to its data collection methodology that uses serious incident information from the CHRIS reporting system, new and valid data regarding the percentage of people who were adequately protected from serious injuries in service settings had not been available for review and verification. Therefore, Virginia had not met this Indicator and its 95% threshold.

Regarding Indicator 29.25, the consultants had verified DBHDS's reported performance that for 99.9% of individual service recipients, seclusion or restraints had only been utilized after a hierarchy of less restrictive interventions were tried, as outlined in human rights committee-approved plans. The Commonwealth had therefore exceeded this Indicator's 95% requirement for a second consecutive Period.

Provision V.C.1.

Regarding Provision V.C.1.'s two remaining Indicators, namely 30.4 and 30.10, Virginia had not achieved either of them, and therefore had remained in Non-Compliance with this Provision.

For Indicator 30.4, the consultants' sample review of 40 of the 427 provider licensing inspections regarding risk management requirements that were conducted January – March 2024 by DBHDS's Office of Licensing (OL) had found that 82% had complied with this Indicator. However, this result had been based on a review of less than half of the total number of licensing inspections expected to be carried out in 2024, and therefore had been too small a sample from which to make a compliance determination. The result, though, had seemed to reflect a significant improvement over the 52% found during the prior Twenty-third Period review, but had remained less than the 86% benchmark.

Regarding Indicator 30.10, previous studies had confirmed that DBHDS has had regulations in place that require providers' risk management systems to report the incidence of common risks and conditions faced by people with IDD. However, based on the findings of the same review of

40 licensing inspections of providers, evidence had been insufficient that these systems had consistently identified such incidences. In addition, there had also been insufficient evidence that Licensing Specialists had been accurately and consistently identifying when a provider was not meeting these regulatory requirements.

Provision V.C.4.

Regarding Provision V.C.4.'s two remaining Indicators, namely 32.4 and 32.7, the Commonwealth had met the requirements of both of them twice consecutively. Therefore, Virginia had achieved Sustained Compliance with this Provision.

For Indicator 32.4, DBHDS had consistently implemented the required processes, and so had achieved this Indicator for the second consecutive Period. The Department had continued to assess providers' compliance in ensuring training and expertise for their staff responsible for the risk management function, i.e., reducing risks for people with IDD. For providers determined by DBHDS as non-compliant, the Department had issued the necessary CAPs.

Regarding Indicator 32.7, this Period's study had again verified that the RMRC had continued to meet monthly and had reviewed relevant data, information and related processes associated with risk management.

Provision V.D.1.

Regarding Provision V.D.1.'s five remaining Indicators, namely 35.1, 35.3, 35.5, 35.7 and 35.8, the Commonwealth had met the requirements of one of them, 35.3, for the first time. However, Virginia had not achieved the other four Indicators, 35.1, 35.5, 35.7 and 35.8, and had therefore remained in Non-Compliance with this Provision.

For Indicator 35.1, the Quality Review Team (QRT), whose ownership had transferred to DMAS, had begun to meet again and had reviewed quarterly data. However, the Team had not developed and/or monitored remediation plans when the Commonwealth's performance measures regarding systemic factors had fallen below the 86% threshold required by CMS.

Regarding Indicator 35.3, Virginia had met its requirements for the first time by establishing performance measures as required and approved by CMS for each of the specified areas, including health and safety and quality assurance.

26

For Indicator 35.5, even though the Commonwealth had collected and reviewed quarterly data reports for performance measures that had fallen below the 86% threshold, DBHDS had not provided evidence that the QRT had developed and/or adequately monitored written remediation plans with defined measures to monitor system performance, nor had the Team revised its improvement strategies if remediation actions had not had the required effect.

Regarding Indicator 35.7, the QRT had not produced a timely report that met its own standard (i.e., within six months of the end of the Fiscal Year). The data had continued to be inadequate for CSB quality improvement committees to establish meaningful and timely CSB-specific quality improvement activities. In addition, DBHDS had not provided evidence to show a local level or CSB review, at least annually, of the Waiver performance measures.

For Indicator 35.8, the most recently reported data had shown that 81% of individuals assigned a Waiver slot had been enrolled in a service within five months. This represented a decrease from the 83% reported in the previous Period's review, and below the required 86% performance benchmark.

Provision V.D.2.
Regarding Provision V.D.2.'s three remaining Compliance Indicators, namely 36.1, 36.3 and 36.8, Virginia had again failed to achieve Indicator 36.8. Until the Commonwealth had completed its next monitoring cycle and provided new data for review and analysis, the Independent Reviewer had deferred* any compliance rating for Indicators 36.1 and 36.3. Virginia therefore had remained in Non-Compliance with this Provision.

For Indicator 36.1, until DBHDS had completed its next annual *Data Quality Monitoring Plan (DQMP) Source System Assessment*, which had required revision and needed to address previous concerns regarding the validity and reliability of Quality Service Reviews (QSR) data, the compliance rating for this Indicator had been deferred* until the Twenty-fifth Period review. The next DQMP update was scheduled to occur in September 2024.

Regarding Indicator 36.3, even though DBHDS had a process in place to review and analyze the National Core Index (NCI) and QSR results for quality improvement, the Department had not adequately reviewed the inter-rater reliability threats for QSR data sets. As well, since data from QSR Round 6 would not be available for validation until the Twenty-fifth Period, the compliance rating for this Indicator had been deferred* until the next review.

For Indicator 36.8, DBHDS had not yet analyzed data on at least an annual basis, for a statistically valid sample, regarding the management of needs of individuals with identified complex behavioral, health and adaptive support needs. For one of these three groups, i.e., those with complex health/medical support needs, the Department had developed and implemented a promising new annual monitoring process, the Intense Management Needs Review (IMNR) that was part of the Twenty-fourth Period review, and would be part of the Twenty-fifth Period review as well.

Provision V.D.3.

Regarding Provision V.D.3's sole remaining Indicator 37.7, since DBHDS had not yet adequately reviewed the inter-rater reliability threats for QSR data sets, and Round 6 QSR data was not available for validation until the Twenty-fifth Period, the compliance rating for this Indicator had been deferred* until the next review.

Provision V.D.4.

The Commonwealth had met Provision V.D.4.'s sole Compliance Indicator 38.1 twice consecutively, and so had achieved Sustained Compliance with this Provision. DBHDS had continued to collect and analyze data from its source systems, and its source system reviews had remained current.

* Regarding deferred ratings, if the relevant Indicator had been met in the Twenty-third Period review, and the current Twenty-fifth Period study finds it has also been achieved, a determination of met twice consecutively will be made.

**Twenty-fifth Period Study**

For this latest review, the Independent Reviewer retained the same consultants as previously to assess the status of the five QRM Provisions and their 19 remaining Indicators which had not yet been met, either at all or twice consecutively. These were Provision V.B. (with eight remaining Indicators 29.13, 29.16–29.18, 29.20–29.22 and 29.24), Provision V.C.1. (with two remaining Indicators 30.4 and 30.10), Provision V.D.1. (with five remaining Indicators 35.1, 35.3, 35.5, 35.7 and 35.8), Provision V.D.2. (with three remaining Indicators 36.1, 36.3 and 36.8) and Provision V.D.3. (with one remaining Indicator 37.7). Virginia had not yet achieved Compliance with any of these Provisions.

Key Points for Provision V.B.

- For this Period, the RMRC reviewed and identified trends reflected in aggregate data related to serious incidents as well as to abuse, neglect and exploitation. These reviews were conducted more frequently than the minimum required by Indicator 29.13. DBHDS demonstrated that it met the requirements for data validity and reliability described in the *Curative Action for Data Validity and Reliability*. As a result, the Commonwealth met Indicator 29.13 for the second consecutive period.

- Virginia also sustained its achievement of Indicator 29.16. The latest study verified that the RMRC continued to oversee the look-behind process, review trends at least quarterly, recommend follow-up actions and quality improvement initiatives when necessary, and track implementation of initiatives approved for implementation.

- DBHDS completed its revised community look-behind process that addresses each of the outcomes required by Indicator 29.17. These included reviews of reported allegations of abuse, neglect, and exploitation. The latest study found that the results from the past six quarterly reviews had been presented to the RMRC. However, because the RMRC's data and trend analysis processes associated with this Indicator were incomplete, not fully implemented, and did not yet include a fully operational inter-rater reliability (IRR) process, the Commonwealth once again failed to meet this Indicator. Due to these factors, Virginia did not achieve Indicator 29.18 as well.

- Regarding Indicator 29.20, DBHDS data indicated that the Commonwealth very nearly achieved the 86% measure for people supported in residential settings receiving annual physical exams. However, for the most recently reported four quarters, the overall 64% achievement of annual dental exams for individuals with dental services remained well below the 86% threshold. Although not reflected in the most recent outcome, the Department continued to implement a number of systemic efforts to expand available resources. These are designed to increase, over time, the percentage of individuals in their residential settings who receive annual dental exams.

- DBHDS again did not achieve the 86% performance measure for Indicator 29.21. The Department reported that just 68% of people with identified behavioral support needs received adequate services. This meant that 32% of such individuals received inadequate or no services. In line with the applicable curative action, DBHDS used a corrected calculation methodology to ensure that the measure accurately reflected the entire cohort of people with identified behavioral support needs. Due to this change in the calculation

methodology, this latest percentage cannot be compared with previously reported data to determine trends.

- Virginia continued to complete work on its validation of settings, as required by Indicator 29.22, which specifically requires that the Commonwealth follows the CMS rules on Home and Community-based settings. Virginia did not finish all reviews or provide a finalized data report for this Period, though, citing a need for more time to adequately validate the related QSR results. This latest study did find that DBHDS satisfactorily completed revisions to the QSR methodology to address the validity concerns related to findings of compliance without evidence. However, the Department still needed to provide a well-defined protocol for this review process and a clear description of the overall QSR procedure for determining compliance with the requirements of the CMS settings rules and related guidance.

- DBHDS again did not meet Indicator 29.24's 95% performance measure. Although the Department made some needed revisions to its data collection methodology, significant additional modifications are essential before these yield valid data.

Key Points for Provision V.C.1.

- For Indicator 30.4 regarding risk management licensing requirements that providers should adhere to, OL assessed these in 98% of its inspections conducted, surpassing the 86% performance metric.

  However, in terms of how effectively OL conducted these inspections, the consultants reviewed another sample during this latest Period of 40 of the 468 inspections carried out April – June 2024. Because the consultants' Twenty-fourth Period findings had been based on too small a sample of OL's total licensing inspections carried out at that time, the consultants combined those findings with the outcome of this current review to give a result comparable with the prior Twenty-third Period's assessment. This latest outcome showed an increase to 83.6% compared with just 52% from the Twenty-third Period's study. This demonstrated significant progress, but OL's licensing inspections were still not sufficient to achieve this Indicator.

- Regarding Indicator 30.10, this Period's review found an incremental improvement in the accuracy of OL's determinations compared to the results from previous studies. However, the consultants again identified concerns regarding the accuracy and

consistency of OL's assessments of providers' processes and procedures, as required by this Indicator.

Key Points for Provision V.D.1.

- For Indicator 35.1, despite reviewing data on a quarterly basis, DBHDS again did not achieve this Indicator. The Department did not develop and/or monitor the needed remediation, as outlined in the Commonwealth's CMS approved Quality Improvement Systems (QISs) for each of the HCBS Waivers.

- Regarding Indicator 35.3, DBHDS continued to establish DD Waiver performance measures in the specified areas and to meet the Parties' *Curative Action for Data Validity and Reliability*. In addition, the QRT met twice during this Period to review and discuss related data reports. Virginia has now achieved this Indicator for the second consecutive time.

- The Commonwealth did not meet Indicator 35.5. DBHDS did not provide evidence that its QRT developed and/or monitored required remediation plans. In addition, the Team did not provide any systemic quality improvement plans, did not reference a written review of related Quality Improvement Initiatives (QIIs), did not have measures to monitor performance of these plans, and did not have evidence of formal monitoring every six months.

- Virginia achieved Indicator 35.7 for the first time. DBHDS provided an annual report on the status of its performance measures which included recommendations, and also provided documentation summarizing the completion of the CSB review at the local level.

- The Commonwealth continued to not meet Indicator 35.8. Of the individuals assigned a DD Waiver slot, Virginia's most recent data showed that 81% were enrolled in a Waiver-funded, community-based service within five months, rather than the required 86% performance metric.

Key Points for Provision V.D.2.

- Regarding Indicator 36.1, DBHDS issued its *2024 Data Quality Monitoring Plan Annual Update,* including for 15 data source systems. However, the Department did not meet the required criteria for validity and reliability related to QSR data sets, and has acknowledged this concern. By the conclusion of this Period, DBHDS was already developing remedial strategies to address these threats.

- For Indicator 36.3, even though DBHDS's process was in place to review and analyze the NCI and QSR results for quality improvement, for the last three Periods, the Department has not adequately reviewed the IRR threats for QSR data sets, so did not achieve the requirements of this Indicator.

- For Indicator 36.8, DBHDS implemented the second phase of its Intensive Management Needs Review (IMNR), a year-long, two-phase study focused on 60 randomly selected individuals with intensive health management needs. The IMNR reviewed 30 such people in each of the Twenty-fourth and Twenty-fifth Periods. The Independent Reviewer implemented parallel Individual Services Review (ISR) studies during these Periods. These confirmed that the IMNR process was sufficient to monitor the adequacy of health management and supports provided for this one subgroup of the three who are the focus of this Indicator.

  This Period's review also confirmed that the Department implemented its first IMNR remediation process for the 30 individuals studied during the previous Twenty-fourth Period. The IMNR nurse reviewers had effectively developed needed corrective actions and DBHDS had assigned responsibility to implement these remediation plans. The Department has not yet executed a systemic process, however, to determine the efficacy of these plans, nor has DBHDS taken the process step to revise corrective actions as necessary to ensure that the remediation addresses and resolves the identified deficiencies.

  Additionally, the Department did not report a review of the adequacy of management and supports for the two other subgroups, i.e., individuals with complex behavioral or adaptive support needs.

Key Point for Provision V.D.3.

- Regarding Indicator 37.7, the Commonwealth did not meet its requirements due to DBHDS not having adequately reviewed the IRR threats for QSR data sets. The Department acknowledged this concern and, by the end of this Period, was already developing remedial strategies to address these threats.

See Appendix G for the consultants' full report.

**Conclusion**

Regarding Provision V.B.'s eight remaining Compliance Indicators, namely 29.13, 29.16–29.18, 29.20–29.22 and 29.24, Virginia has met the requirements of two of them (29.13 and 29.16) twice consecutively. However, the Commonwealth did not meet six Indicators, 29.17, 29.18, 29.20–29.22 and 29.24, and therefore remains in Non-Compliance with this Provision.

Regarding Provision V.C.1.'s two remaining Compliance Indicators, namely 30.4 and 30.10, Virginia has not achieved either of them, and therefore remains in Non-Compliance with this Provision.

Regarding Provision V.D.1's five remaining Compliance Indicators, namely 35.1, 35.3, 35.5, 35.7 and 35.8, the Commonwealth has sustained its achievement of Indicator 35.3 twice consecutively, and has met an additional Indicator, 35.7, for the first time. However, Virginia did not achieve the other three Indicators, 35.1, 35.5 and 35.8, and therefore remains in Non-Compliance with this Provision.

Regarding Provision V.D.2.'s three remaining Compliance Indicators, namely 36.1, 36.3 and 36.8, the Commonwealth has not achieved any of them, and therefore remains in Non-Compliance with this Provision.

Regarding Provision V.D.3's one remaining Compliance Indicator 37.7, Virginia did not meet its requirements, and therefore remains in Non-Compliance with this Provision.


## 7.    *Provider Training*

**Background**

The Twenty-fourth Period review had focused on the one remaining Provision related to Provider Training, namely V.H.1., and its two outstanding Compliance Indicators, 49.4 and 49.12.

For Indicator 49.4, even though Quality Service Reviews (QSR) Round 6 had begun, it was not scheduled for completion by the conclusion of this Period's study, hence no new data was

available for analysis and findings. The Independent Reviewer had therefore determined that a rating for this Indicator was deferred*.

Regarding Indicator 49.12, for calendar year 2023 and for the first part of 2024, less than 75% of licensed providers had met the requirements during DBHDS's Office of Licensing's (OL's) annual licensing inspections. Since this result fell below the 86% performance measure, this Indicator remained unmet. The study had verified, though, that OL had required those providers who had failed to comply with related regulatory training requirements to implement Corrective Action Plans (CAPs) in response.

Therefore, Virginia had remained in Non-Compliance with this Provision.

* Regarding deferred ratings, if the relevant Indicator had been met in the Twenty-third Period study, and the current Twenty-fifth Period review finds it has also been achieved, a determination of met twice consecutively will be made.

**Twenty-fifth Period Study**

For this latest review, the Independent Reviewer retained the same consultant as previously to assess whether sufficient evidence existed to determine if the Commonwealth has met each of Provision V.H.1.'s two remaining Indicators, 49.4 and 49.12.

Key Points
- Indicator 49.4 requires achievement of a 95% benchmark for each of two outcome measures: the percentage of provider agency staff who meet the provider orientation and training requirements, and the percentage of provider agency Direct Support Professionals (DSP)s who meet competency training requirements. Based on recommendations made in the previous Twenty-fourth Period study and from its own analysis of existing processes, DBHDS identified the primary factors contributing to its previous low scores, implemented process improvements, and expanded provider training and technical assistance. From Round 5 to Round 6 of its Quality Services Review (QSR) studies, the score related to the provider orientation and training requirements improved from 78% to 87%. However, the score related to DSPs meeting competency training requirements declined from 85% to 78%. Since Virginia did not achieve the required 95% thresholds for either measure, this Indicator remained unmet.

34

- Regarding Indicator 49.12, DBHDS reported that it did not meet the required 86% threshold. Specifically, during Calendar Year 2024 (through August 12, 2024), the Department determined that only 74% of 995 providers achieved this Indicator's measures during OL's annual licensing inspections. OL continued to expand training and technical assistance for providers and Licensing Specialists regarding this Indicator's specific regulatory requirements, and also continued to require CAPs in response to any determination that providers had not met the necessary regulations.

See Appendix F for the consultant's full report.

**Conclusion**

Regarding Provision V.H.1's Compliance Indicator 49.4, the Commonwealth did not meet its requirements. For Compliance Indicator 49.12, Virginia once again did not achieve its requirements. Therefore, the Commonwealth remains in Non-Compliance with this Provision.

## 8.    *Quality Improvement Programs*

**Background**

As of the Twenty-fourth Period review, three Provisions, V.E.1.–V.E.3., and their associated seven remaining Indicators (42.3, 42.4, 43.1, 43.3, 43.4, 44.1 and 44.2) specified the Agreement's requirements for Quality Improvement (QI) Programs.

Regarding Provision V.E.1.'s two remaining Compliance Indicators 42.3 and 42.4, Virginia had again met Indicator 42.3's requirements, surpassing the 86% benchmark for the second consecutive Period. However, DBHDS once more had failed to achieve Indicator 42.4's requirement for licensed providers to comply with 86% of each of the 11 elements of the licensing regulations: the Department had reported that providers had met only four of these elements. DBHDS had cited relevant providers, as required, for violation of any sub-regulation and had ensured that a Corrective Action Plan (CAP) to address the violation had been implemented. Overall, the Commonwealth had remained in Non-Compliance with this Provision.

Regarding Provision V.E.2. and its three remaining Compliance Indicators, namely 43.1, 43.3 and 43.4, no new information had been available since the prior Twenty-third Period review, when all three Indicators had been met. Virginia had not updated its *Process Document* and *Attestation* at that time, however. Until DBHDS completed its next monitoring cycle and provided new data sets for validation purposes, compliance ratings for these three Indicators had been deferred*. The Commonwealth had therefore remained in Non-Compliance with this Provision.

Regarding Provision V.E.3.'s two Compliance Indicators, namely 44.1 and 44.2, new information had also not been available since the previous Twenty-third Period review. At that time, Indicator 44.1 had been met for the first time. However, Indicator 44.2 had not been achieved: the consultants could not verify that any of the 15 Quality Services Review (QSR) vendor-issued QI plans had sufficiently addressed the QI deficiencies or had identified the needed remediation or technical assistance.

As well, Virginia had not updated its *Process Document* and *Attestation* to address previously identified inter-rater reliability concerns. Until DBHDS completed its next monitoring cycle and provided new data sets for validation purposes, compliance ratings for these two Indicators had been deferred*, and the Commonwealth therefore had remained in Non-Compliance with this Provision.

* Regarding deferred ratings, if the relevant Indicator was met in the previous review, and the Twenty-fifth Period study finds it has also been achieved, a determination of met twice consecutively will be made.

**Twenty-fifth Period Study**

For the latest review, the Independent Reviewer retained the same consultants to assess the status of Virginia's three QI Programs Provisions, V.E.1.–V.E.3., none of which has yet achieved Sustained Compliance. This study focused on a total of six Indicators that have either remained unmet or whose rating has been deferred, namely Provision V.E.1.'s Indicator 42.4, Provision V.E.2.'s Indicators 43.1, 43.3 and 43.4, and Provision V.E.3.'s Indicators 44.1 and 44.2.

Key Point for Provision V.E.1.

- For Indicator 42.4's requirement that 86% of providers are compliant with each of the 11 sub-regulations, DBHDS reported, and the consultants verified that providers met or exceeded this benchmark for only two of these 11 elements, and so the Commonwealth

36

has still not achieved this Indicator. For the first two quarters of 2024, the latest study again confirmed that DBHDS cited each non-compliant provider and ensured that a CAP had been implemented.

Key Points for Provision V.E.2.

- As a result of the Twenty-third Period review a year ago, even though Virginia had met the requirements of the remaining three Indicators for this Provision (i.e., 43.1, 43.3 and 43.4) for the first time, this finding included a caveat that DBHDS needed to further examine its *Process Documents* and *Attestations* for QSR data sets to ensure that the inter-rater reliability (IRR) threats had been adequately identified and addressed.

  The Department did not fulfill this caveat during the Twenty-fifth Period for any of the three remaining Indicators. DBHDS is developing remedial strategies to address these IRR threats, but has not yet completed an adequate examination of previously identified QSR data reliability concerns.

  While the Department met the requirements for its provider reporting measures related to health and safety, DBHDS did not meet all of the requirements related to the community integration measures that are evaluated through the QSR process. The Round 6 QSR methodology did not specify the expectation that providers track and address their individual results through their QI programs, and did not require incorporation of community integration into a provider's QI plan. The Department recognized the QSR data were likely not reliably measuring community integration, and has assigned the Community Engagement Advisory Group (CEAG) to review and revise community inclusion reporting measure definitions.

Key Points for Provision V.E.3.

- The Twenty-fifth Period study found that, for Round 6 of DBHDS's QSR, the Department included many more specific QI elements than in previous Rounds, and that many of these also included more explicit criteria and guidance for the QSR reviewers.
- Even though Indicator 44.1 had been met as a result of the Twenty-third Period review, that finding had included the caveat that DBHDS needed to further examine its *Process Documents* and *Attestations* for Quality Services Review (QSR) data sets to ensure that IRR threats had been adequately identified and addressed. The Department did not fulfill this

caveat during the Twenty-fifth Period. The elements of DBHDS's QSR Provider Quality
Review (PQR) tool were not sufficiently congruent with the criteria required by this
Indicator to assess the adequacy of its providers' QI programs.  In particular, the PQR
tool did not deliver sufficient information to determine whether providers developed or
implemented improvement plans when goals were not met.

- Regarding Indicator 44.2, once again, significant IRR discrepancies were found between
  the QSR reviewers' and the consultants' findings, and so the Department did not fulfill
  this caveat. In addition, the QSR methodology did not adequately identify the QI needs
  for specific providers.

- For both Indicators, DBHDS has been developing remedial strategies to address these
  IRR threats, but has not completed an adequate examination of previously identified
  QSR data reliability concerns.

See Appendix G for the consultants' full report.

**Conclusion**

Regarding Provision V.E.1.'s one remaining Compliance Indicator 42.4, the Commonwealth did
not meet its requirements, and therefore remains in Non-Compliance with this Provision.

Regarding Provision V.E.2.'s three remaining Compliance Indicators, namely 43.1, 43.3 and
43.4, Virginia did not meet the requirements of any of them. Therefore, the Commonwealth
remains in Non-Compliance with this Provision.

Regarding Provision V.E.3.'s two Compliance Indicators, namely 44.1 and 44.2, Virginia did
not meet the requirements of either of them. Therefore, the Commonwealth remains in Non-
Compliance with this Provision.

# III. CONCLUSION

During the Twenty-fifth Review Period, Virginia, through its lead agencies DBHDS and DMAS, and their sister agencies, continued its diligent efforts and progress toward fulfilling the requirements of the remaining Provisions of the Agreement.

Of the 41 Compliance Indicators studied for this Report, the Commonwealth achieved six Indicators for the second consecutive time and an additional two Indicators for the first time. For another Indicator, because Virginia had not completed a relevant monitoring cycle since the previous Twenty-fourth Period studies and so could not provide new data for review and analysis, the Independent Reviewer deferred rating this until the next Twenty-sixth Period review.

In total, the Commonwealth has now met the requirements of eight of the 41 outstanding Indicators, either for the first time or twice consecutively, resulting in coming into Compliance with one Provision for the first time. These achievements primarily reflect stable accomplishments across structural and functional aspects of Virginia's statewide service system.

This Period's reviews also determined that 33 Compliance Indicators remain unmet. Many of these involve service outcomes for individuals with IDD. For this group of people, despite some progress, the Commonwealth continues to fall short of the Consent Decree's requirements to provide adequate and/or appropriately delivered services to directly improve their quality of life.

Throughout this Twenty-fifth Review Period, Virginia's staff and DOJ gathered and shared information that helped to facilitate further movement toward effective implementation of the Agreement's Provisions. The willingness of both Parties to openly and regularly discuss relevant issues continues to be impressive and productive. The involvement and contributions of advocates and other stakeholders have helped the Commonwealth to formulate policies and processes and to take measurable steps toward fulfilling its promises to all citizens of Virginia, especially those individuals with IDD and their families.

The Independent Reviewer greatly appreciates the assistance that was so generously given by these individuals, as well as their families, their case managers and their service providers.

# IV. RECOMMENDATIONS

The Independent Reviewer recommends that the Commonwealth undertake the eight actions listed below, and provide a report that addresses these recommendations and their status of implementation by March 31, 2025. Virginia should also consider the additional recommendations and suggestions included in the consultants' studies, which are contained in the Appendices.

**Case Management**

1. For Indicator 2.16, DBHDS should investigate and identify the successful strategies implemented by the 14 CSBs who achieved the 86% benchmark for nine of this Indicator's ten elements. The Commonwealth should then share these strategies with the 26 underperforming CSBs and provide them with related technical assistance to improve performance consistency statewide.

2. Regarding Indicator 2.16's one element (i.e., 2.10) where CSBs consistently underperform, DBHDS should direct its Case Management Steering Committee and its Employment First Advisory Group to develop joint improvement recommendations. These should include training and mentoring for case managers, as well as training for individuals and their families about two important aspects. One is the needed prioritization of employment. The other is to confirm that Virginia's Employment First policy requires that discussions regarding employment services and goals must take place during the annual individual service planning process.

**Crisis Services**

3. For Indicator 7.8, DBHDS should meet with the REACH teams from its Regions II and III to identify their successful strategies in conducting assessments in individuals' homes or community locations where crises occur. The Department should then share these approaches with the underperforming REACH teams in Regions I, IV and V and require that these three teams implement workplans that incorporate such productive strategies.

**Integrated Day Activities and Supported Employment**

4. Regarding Indicator 14.10, DBHDS should work with its Community Engagement Advisory Committee to identify obstacles to increased participation in integrated day services. The Commonwealth should then prioritize and implement solutions to expand this participation,

such as in Community Engagement, and to decrease participation in congregate settings, e.g., Group Day activities.

**Community Living Options**

5. For Indicator 18.9, DBHDS should conduct a study to determine the number of individuals with IDD who need nursing services, but either whose need has not been identified in their ISPs, or who do not receive any authorized nursing hours.

**Quality and Risk Management**

6. Regarding Indicator 29.22, DBHDS should develop a complete written protocol so that the QSR process regarding HCBS compliance is clearer for all involved. This protocol should include the validation processes contained in Virginia's approved *Statewide Transition Plan* as well as the required criteria specified in the *HCBS Settings Rule* and relevant CMS guidance.

7. For Indicator 29.24, DBHDS should revise its proposed processes to address concerns regarding the adequate protection from harm for individuals in service settings. Given the very small number of serious injuries that the Department investigates, it should review a sufficient sample of serious injury referrals to validate the adequacy of its investigation referral process. Revisions should also include written guidance for the Incident Management Unit's (IMU's) triage process so that a reported injury categorized as "suspicious in nature" can be clearly determined to require an investigation or not. In addition, the revised processes should indicate that the IMU must always complete a 90-day trend analysis as part of triaging serious injury reports.

8. Regarding Indicator 36.1, DBHDS should address continuing concerns regarding the validity and reliability of its QSR data. This includes examining and resolving potential inter-rater reliability (IRR) deficiencies in all QSR data sets that are relevant to unmet Indicators.

# V. SUMMARY OF COMPLIANCE

*Note:* Previously, for greater clarity, Virginia created a numbering system that assigned a discrete number for each Compliance Indicator. The Independent Reviewer has adopted this system; these numbers can be seen below in the Comments column for Provisions.

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **III** | **Serving Individuals with Developmental Disabilities in the Most Integrated Setting** | Ratings prior to the 25th Period are <u>not</u> in bold.<br><br>Ratings for the 25th Period are in **bold.**<br><br>If Compliance ratings have been achieved twice consecutively, Virginia has achieved "Sustained Compliance." | Comments include the Commonwealth's status with each of the Compliance Indicators associated with the Provision.<br><br>The Findings Section and attached consultant reports include explanatory information regarding the Compliance Indicators.<br><br>*The Comments in <u>italics</u> below are from a prior period when the most recent compliance rating was determined.* |
| **III.C.1.a.i.-ix.** | The Commonwealth shall create a minimum of 805 waiver slots to enable individuals in the target population in the Training Centers to transition to the community according to the… schedule (in i-ix). | Sustained Compliance | *The Commonwealth created more than the required number of waiver slots, and it prioritized slots for the designated target populations, as required over the ten years FY 2012–2021.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **III.C.1.b.i.-x.** | The Commonwealth shall create a minimum of 2,915 waiver slots to prevent the institutionalization of individuals with intellectual disabilities in the target population who are on the urgent waitlist for a waiver, or to transition to the community, individuals with intellectual disabilities under 22 years of age from institutions other than the Training Centers (i.e., ICFs and nursing facilities) according to the …schedule (in i.-x.) | Sustained Compliance | *The Commonwealth created more than the required number of waiver slots, and it prioritized slots for the designated target populations, as required over the ten years FY 2012-2021.*<br><br>*The Parties agreed to consider the effectiveness of the discharge and transition process at Nursing Facilities (NFs) and ICFs as an indicator of compliance for III.D.1.* |
| **III.C.1.c.i.-x.** | The Commonwealth shall create a minimum of 450 waiver slots to prevent the institutionalization of individuals with developmental disabilities other than intellectual disabilities in the target population who are on the waitlist for a waiver, or to transition to the community individuals with developmental disabilities other than intellectual disabilities under 22 years of age from institutions other than the Training Centers (i.e., ICFs and nursing facilities) according to the … schedule (in i-x). | Sustained Compliance | *See Comment re: III.C.1.b.i-ix.* |
| **III.C.2.a.-i.** | The Commonwealth shall create an Individual and Family Support Program (IFSP) for individuals with ID/DD whom the Commonwealth determines to be the most at risk of institutionalization. In the State Fiscal Year 2021, a minimum of 1,000 individuals will be supported. | Sustained Compliance | *The Commonwealth again met the one remaining Indicator 1.1, achieving Sustained Compliance for the first time.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **III.C.5.a.** | The Commonwealth shall ensure that individuals receiving HCBS waiver services under this Agreement receive case management. | Sustained Compliance | *207 (100%) of the individuals reviewed in the Individual Services Review studies during the 10th, 11th, 12th, 13th, 14th, 15th, 16th, 18th, and 20th Periods had case managers and current Individual Support Plans.* |
| **III.C.5.b.** | For the purpose of this agreement, case management shall mean: | | |
| **III.C.5.b.i.** | Assembling professionals and nonprofessionals who provide individualized supports, as well as the individual being served and other persons important to the individual being served, who, through their combined expertise and involvement, develop Individual Support Plans ("ISP") that are individualized, person-centered, and meet the individual's needs. | Non Compliance<br><br>**Non Compliance** | Of the three remaining Indicators studied this Period, Virginia met two, namely, 2.18 and 2.20, but did not meet 2.16 and therefore the Commonwealth remains in Non-Compliance. |
| **III.C.5.b.ii.** | Assisting the individual to gain access to needed medical, social, education, transportation, housing, nutritional, therapeutic, behavioral, psychiatric, nursing, personal care, respite, and other services identified in the ISP. | Non Compliance<br>Non Compliance | *When Virginia achieves the Indicators for III.C.5.b.i., it also achieves compliance for this Provision.* |
| **III.C.5.b.iii.** | Monitoring the ISP to make timely additional referrals, service changes, and amendments to the plans as needed. | Non Compliance<br>Non Compliance | *When Virginia achieves the Indicators for III.C.5.b.i., it also achieves compliance for this Provision.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **III.C.5.c.** | Case management shall be provided to all individuals receiving HCBS waiver services under this Agreement by case managers who are not directly providing such services to the individual or supervising the provision of such services. The Commonwealth shall include a provision in the Community Services Board ("CSB") Performance Contract that requires CSB case managers to give individuals a choice of service providers from which the individual may receive approved waiver services and to present practicable options of service providers based on the preferences of the individual, including both CSB and non-CSB providers. | Sustained Compliance | *The Independent Reviewer and Parties agreed in April 2020 that this provision is in Sustained Compliance.* |
| **III.C.5.d.** | The Commonwealth shall establish a mechanism to monitor compliance with performance standards. | Sustained Compliance | *The Commonwealth has met all six Compliance Indicators, 6.1a, 6.1b, 6.1, 6.2, 6.3, and 6.4. Virginia has achieved Sustained Compliance.* |
| **III.C.6.a.i.-iii.** | The Commonwealth shall develop a statewide crisis system for individuals with intellectual and developmental disabilities. The crisis system shall: i. Provide timely and accessible support … ii. Provide services focused on crisis prevention and proactive planning … iii. Provide in-home and community-based crisis services that are directed at resolving crises and preventing the removal of the individual from his or her current placement whenever practicable. | Non Compliance  **Non Compliance** | Of the remaining two remaining Compliance Indicators, namely 7.8 and 7.18, the Commonwealth did not meet either of them and therefore remains in Non-Compliance. |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **III.C.6.b.i.A.** | The Commonwealth shall utilize existing CSB Emergency Services, including existing CSB hotlines, for individuals to access information about referrals to local resources. Such hotlines shall be operated 24 hours per day, 7 days per week. | Sustained Compliance | *CSB Emergency Services are utilized. Regional Education, Assessment, Crisis Services, Habilitation (REACH) hotlines are operated 24 hours per day, 7 days per week, and provide access to information for adults and children with IDD.* |
| **III.C.6.b.i.B.** | By June 30, 2012, the Commonwealth shall train CSB Emergency Services (ES) personnel in each Health Planning Region on the new crisis response system it is establishing, how to make referrals, and the resources that are available. | Sustained Compliance | *REACH trained CSB staff during the past seven years. The Commonwealth requires that all Emergency Services (ES) staff and case managers are required to attend training.* |
| **III.C.6.b.ii.A.** | Mobile crisis team members adequately trained to address the crisis shall respond to individuals at their homes and in other community settings and offer timely assessment, services, support, and treatment to de-escalate crises without removing individuals from their current placement whenever possible. | Sustained Compliance | *Of the remaining one Compliance Indicator, the Commonwealth again met Indicator 8.4 and achieved Sustained Compliance for the first time.* |
| **III.C.6.b.ii.B.** | Mobile crisis teams shall assist with crisis planning and identifying strategies for preventing future crises and may also provide enhanced short-term capacity within an individual's home or other community setting. | Non Compliance Non Compliance | *The Parties agreed that the Indicators for III.C.6.a.i.–iii. and III.C.6.b.ii.A. cover this provision.* |
| **III.C.6.b.ii.C.** | Mobile crisis team members adequately trained to address the crisis also shall work with law enforcement personnel to respond if an individual with IDD comes into contact with law enforcement. | Sustained Compliance | *During the 19th–22nd Review Periods, law enforcement personnel were involved. Mobile crisis team members worked with law enforcement personnel to respond regardless of whether REACH staff responded in person or remotely using telehealth.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **III.C.6.b.ii.D.** | Mobile crisis teams shall be available 24 hours per day, 7 days per week and to respond on-site to crises. | Sustained Compliance | *REACH Mobile crisis teams for children and adults are available around the clock and respond on-site, or remotely due to COVID precautions, at all hours of the day and night.* |
| **III.C.6.b.ii.E.** | Mobile crisis teams shall provide local and timely in-home crisis support for up to three days, with the possibility of an additional period of up to 3 days upon review by the Regional Mobile Crisis Team Coordinator | Sustained Compliance | *In each Region, the individuals are provided in-home mobile supports, or telehealth due to COVID precautions, for up to three days as required. Days of support provided ranged between a low of one and a high of sixteen days.* |
| **III.C.6.b.ii.H.** | By June 30, 2014, the Commonwealth shall have a sufficient number of mobile crisis teams in each Region to respond to on-site to crises as follows: in urban areas within one hour, in rural areas within two hours, as measured by the average annual response time. | Sustained Compliance | *The Commonwealth added staff to REACH teams in all five Regions and for five years demonstrated a sufficient number of staff to respond to on-site crises within the required average annual response times. Appropriate COVID precautions temporarily replaced many on-site responses.* |
| **III.C.6.b.iii.A.** | Crisis Stabilization programs offer a short-term alternative to institutionalization or hospitalization for individuals who need inpatient stabilization services. | Sustained Compliance | *All Regions continue to have crisis stabilization programs that are providing short-term alternatives for adults and have two crisis stabilization homes for children.* |
| **III.C.6.b.iii.B.** | Crisis stabilization programs shall be used as a last resort.  The State shall ensure that, prior to transferring an individual to a crisis stabilization program, the mobile crisis team, in collaboration with the provider, has first attempted to resolve the crisis to avoid an out-of-home placement and, if that is not possible, has then attempted to locate another community-based placement that could serve as a short-term placement. | Non Compliance<br><br>**Non Compliance** | Of the remaining one Compliance Indicator, the Commonwealth did not achieve 10.4. and therefore remains in Non-Compliance. |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **III.C.6.b.iii.D.** | Crisis stabilization programs shall have no more than six beds and lengths of stay shall not exceed 30 days. | Compliance<br><br>**Sustained**<br><br>**Compliance** | *The Commonwealth achieved sole Indicator 11.1 in two consecutive Periods, and therefore has achieved Sustained Compliance for the first time.* |
| **III.C.6.b.iii.E.** | With the exception of the Pathways Program at SWVTC … crisis stabilization programs shall not be located on the grounds of the Training Centers or hospitals with inpatient psychiatric beds. By July 1, 2015, the Pathways Program at SWVTC will cease providing crisis stabilization services and shall be replaced by off-site crisis stabilization programs with sufficient capacity to meet the needs of the target population in that Region. | Compliance<br><br><br>***Non***<br><br>***Compliance*** | *The Parties agreed that the Indicators for III.C.6.b.iii.G. cover this Provision.* |
| **III.C.6.b.iii.F.** | By June 30, 2012, the Commonwealth shall develop one crisis stabilization program in each Region. | Sustained<br><br>Compliance | *Each Region developed and currently maintains a crisis stabilization program for adults with IDD in each Region and has two programs for children.* |
| **III.C.6.b.iii.G.** | By June 30, 2013, the Commonwealth shall develop an additional crisis stabilization program in each Region as determined necessary by the Commonwealth to meet the needs of the target population in that Region. | Non<br><br>Compliance<br><br>**Non**<br><br>**Compliance** | Of the remaining one Indicator, the Commonwealth did not achieve 13.3 and therefore is in Non Compliance. |
| **III.C.7.a.** | To the greatest extent practicable, the Commonwealth shall provide individuals in the target population receiving services under this Agreement with integrated day opportunities, including supported employment. | Non<br><br>Compliance<br><br>**Non**<br><br>**Compliance** | Of the remaining three Compliance Indicators, The Commonwealth did not achieve two of them, namely 14.8, and 14.9. For 14.10, a new rating was Deferred*. Therefore, Virginia remains in Non-Compliance.<br><br>The Court removed Indicators 14.2-14.7** |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **III.C.7.b.** | The Commonwealth shall maintain its membership in the State Employment Leadership Network ("SELN") established by the National Association of State Developmental Disabilities Directors.  The Commonwealth shall establish a state policy on Employment First for the target population and include a term in the CSB Performance Contract requiring application of this policy. The Employment First policy shall, at a minimum, be based on the following principles: (1) individual supported employment in integrated work settings is the first and priority service option for individuals with intellectual or developmental disabilities receiving day program or employment services from or funded by the Commonwealth; (2) the goal of employment services is to support individuals in integrated work settings where they are paid minimum or competitive wages; and (3) employment services and goals must be developed and discussed at least annually through a person-centered planning process and included in the ISP. The Commonwealth shall have at least one employment service coordinator to monitor implementation of Employment First practices for individuals in the target population. | Non Compliance | *The indicators for III.C.7.a. serve to measure III.C.7.b.* |
| **III.C.7.b.i.** | Within 180 days of this Agreement, the Commonwealth shall develop, as part of its Employment First Policy, an implementation plan to increase integrated day opportunities for individuals in the target population, including supported employment, community volunteer activities, community recreation opportunities, and other integrated day activities. | Sustained Compliance | *The Commonwealth had previously developed plans for both supported employment and for integrated community activities. Its updated plan includes outcomes and bench marks for FY 21–FY 23* |
| **III.C.7.b.i.A.** | Provide regional training on the Employment First policy and strategies through the Commonwealth. | Sustained Compliance | *DBHDS continued to provide regional training.* |

49

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **III.C.7.b.i. B.1.** | Establish, for individuals receiving services _through the HCBS waivers,_ annual baseline information regarding: | Sustained Compliance | _The Commonwealth has sustained its improved method of collecting data. For the sixth consecutive full year, data were reported by 100% of the employment service organizations. They continue to report the number of individuals, length of time, and earnings as required in III.C.7.b.i.B.1.a., b., c., d., and e. below._ |
| **III.C.7.b.i. B.1.a.** | The number of individuals who are receiving supported employment. | Sustained Compliance | _See answer for III.C.7.b.i.B.1._ |
| **III.C.7.b.i. B.1.b.** | The length of time individuals maintain employment in integrated work settings. | Sustained Compliance | _See answer for III.C.7.b.i.B.1._ |
| **III.C.7.b.i. B.1.c.** | Amount of earnings from supported employment; | Sustained Compliance | _See answer for III.C.7.b.i.B.1._ |
| **III.C.7.b.i. B.1.d.** | The number of individuals in pre-vocational services. | Sustained Compliance | _See answer for III.C.7.b.i.B.1._ |
| **III.C.7.b.i. B.1.e.** | The length-of-time individuals remain in pre-vocational services. | Sustained Compliance | _See answer for III.C.7b.i.B.1._ |
| **III.C.7.b.i. B.2.a.** | Targets to meaningfully increase: the number of individuals who enroll in supported employment each year. | Sustained Compliance | _The Parties agreed in January 2020 that this provision is in Sustained Compliance and that meeting these targets will be measured in III.D.1._ |
| **III.C.7.b.i. B.2.b.** | The number of individuals who remain employed in integrated work settings at least 12 months after the start of supported employment. | Sustained Compliance | _Th number of individuals employed and the length of time employed are both determined annually._ |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **III.C.7.c.** | Regional Quality Councils (RQC), described in V.D.5. … shall review data regarding the extent to which the targets identified in Section III.C.7.b.i.B.2 above are being met. These data shall be provided quarterly … Regional Quality Councils shall consult with providers with the SELN regarding the need to take additional measures to further enhance these services. | Sustained Compliance | *RQCs did complete a quarterly review of employment data and consultation as required.* |
| **III.C.7.d.** | The Regional Quality Councils shall annually review the targets set pursuant to Section III.C.7.b.i.B.2 above and shall work with providers and the SELN in determining whether the targets should be adjusted upward. | Sustained Compliance | *RQCs did complete a quarterly review of employment data but did not document discussions with the RQCs regarding employment targets.* |
| **III.C.8.a.** | The Commonwealth shall provide transportation to individuals receiving HCBS waiver services in the target population in accordance with the Commonwealth's HCBS Waivers. | Sustained Compliance | *Of the remaining two Compliance Indicators, the Commonwealth met both 16.2 and 16.8 in both the 22nd and 23rd Periods and therefore has achieved Sustained Compliance for the first time.* |
| **III.C.8.b.** | The Commonwealth shall publish guidelines for families seeking intellectual and developmental disability services on how and where to apply for and obtain services.  The guidelines will be updated annually and will be provided to appropriate agencies for use in directing individuals in the target population to the correct point of entry to access | Sustained Compliance | *The Commonwealth again met the two Compliance Indicators 17.1 and 17.2 and therefore has Sustained Compliance.* |
| **III.D.1.** | The Commonwealth shall serve individuals in the target population in the most integrated setting consistent with their informed choice and needs. | Non Compliance **Non Compliance** | Of the remaining two Compliance Indicators, the Commonwealth did not meet either 18.2 or 18.9 and therefore remains in Non-Compliance. |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| III.D.2. | The Commonwealth shall facilitate individuals receiving HCBS waivers under this Agreement to live in their own home, leased apartment, or family's home, when such a placement is their informed choice and the most integrated setting appropriate to their needs.  To facilitate individuals living independently in their own home or apartment, the Commonwealth shall provide information about and make appropriate referrals for individuals to apply for rental or housing assistance and bridge funding through all existing sources. | Sustained Compliance | *As of 12/31/21, the Commonwealth had created new options for 1,872 individuals who are now living in their own homes. This is 1,531 more individuals than the 341 individuals who were living in their own homes as of 7/1/15.* |
| III.D.3. | Within 365 days of this Agreement, the Commonwealth shall develop a plan to increase access to independent living options such as individuals' own homes or apartments. | Sustained Compliance | *The Commonwealth developed a plan, created strategies to improve access, and provided rental subsidies.* |
| III.D.3.a. | The plan will be developed under the direct supervision of a dedicated housing service coordinator for the Department of Behavioral Health and Developmental Services ("DBHDS") and in coordination with representatives from the Department of Medical Assistance Services ("DMAS"), Virginia Board for People with Disabilities, Virginia Housing Development Authority, Virginia Department of Housing and Community Development, and other organizations ... | Sustained Compliance | *DBHDS has a dedicated housing service coordinator. It has developed and updated its housing plan with these representatives and with others.* |
| III.D.3.b.i.-ii. | The plan will establish for individuals receiving or eligible to receive services through the HCBS waivers under this Agreement: Baseline information regarding the number of individuals who would choose the independent living options described above, if available; and recommendations to provide access to these settings during each year of this Agreement. | Sustained Compliance | *Virginia estimated the number of individuals who would choose independent living options. It established the required baseline, updated and revised the Plan with new strategies and recommendations, and tracks progress toward achieving plan goals.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **III.D.4.** | Within 365 days of this Agreement, the Commonwealth shall establish and begin distributing from a one-time fund of $800,000 to provide and administer rental assistance in accordance with the recommendations described above in Section III.D.3.b.ii. | Sustained Compliance | *The Commonwealth established the one-time fund, distributed funds, and demonstrated viability of providing rental assistance. The individuals who received these one-time funds received permanent rental assistance.* |
| **III.D.5.** | Individuals in the target population shall not be served in a sponsored home or any congregate setting, unless such placement is consistent with the individual's choice after receiving options for community placements, services, and supports consistent with the terms of Section IV.B.9 below. | Sustained Compliance | *The Commonwealth met all three Compliance Indicators 19.1–19.3 twice consecutively and therefore achieved Sustained Compliance for the first time.* |
| **III.D.6.** | No individual in the target population shall be placed in a nursing facility or congregate setting with five or more individuals unless such placement is consistent with the individual's needs and informed choice and has been reviewed by the Region's Community Resource Consultant (CRC) and, under circumstances described in Section III.E below, the Regional Support Team (RST). | Non Compliance Removed** | *The Court removed Indicators 20.1-20.13**.* |
| **III.D.7.** | The Commonwealth shall include a term in the annual performance contract with the CSBs to require case managers to continue to offer education about less restrictive community options on at least an annual basis to any individuals living outside their own home or family's home … | Sustained Compliance | *The Commonwealth included this term in its annual performance contract, developed and provided training to case managers and implemented a form for the annual ISP form process regarding education about less restrictive options.* |
| **III.E.1.** | The Commonwealth shall utilize Community Resource Consultant ("CRC") positions located in each Region to provide oversight and guidance to CSBs and community providers, and serve as a liaison between the CSB case managers and DBHDS Central Office…The CRCs shall be a member of the Regional Support Team ... | Sustained Compliance | *Community Resource Consultants (CRCs) are located in each Region, are members of the Regional Support Teams, and are utilized for these functions.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **III.E.2.** | The CRC may consult at any time with the Regional Support Team (RST). Upon referral to it, the RST shall work with the Personal Support Team ("PST") and CRC to review the case, resolve identified barriers, and ensure that the placement is the most integrated setting appropriate to the individual's needs, consistent with the individual's informed choice. The RST shall have the authority to recommend additional steps by the PST and/or CRC. | Sustained Compliance | *DBHDS has sustained improved RST processes. CRCs and the RSTs continue to fulfill their roles and responsibilities.* |
| **III.E.3.a.-d.** | The CRC shall refer cases to the Regional Support Teams (RST) for review, assistance in resolving barriers, or recommendations whenever (specific criteria are met). | Sustained Compliance | *The RSTs, which meet monthly and fulfill their assigned functions when they receive timely referrals.* |
| **IV.** | **Discharge Planning and Transition from Training Centers** | **COMPLIANCE\*** designates the portions of the Consent Decree achieved by Virginia and relieved by the Court. | Comments explain the Commonwealth's status with each Provision. |
| **IV.** | By July 2012, the Commonwealth will have implemented Discharge and Transition Planning processes at all Training Centers consistent with the terms of this section | COMPLIANCE\* | *The Commonwealth developed and implemented discharge planning and transition processes prior to July 2012. These processes continue at SEVTC.* |
| **IV.A.** | To ensure that individuals are served in the most integrated setting appropriate to their needs, the Commonwealth shall develop and implement discharge planning and transition processes at all Training Centers consistent with the terms of this Section and person-centered principles. | COMPLIANCE\* | *For the one area of Non-Compliance previously identified – lack of integrated day opportunities – the Parties established indicators for III.C.7.a to serve as the measures of compliance for IV.A.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **IV.B.3.** | Individuals in Training Centers shall participate in their treatment and discharge planning to the maximum extent practicable, regardless of whether they have authorized representatives. Individuals shall be provided the necessary support (including, but not limited to, communication supports) to ensure that they have a meaningful role in the process. | COMPLIANCE* | *The Independent Reviewer's Individual Services Review studies found that DBHDS has consistently complied with this provision. The discharge plans reviewed were well organized and well documented.* |
| **IV.B.4.** | The goal of treatment and discharge planning shall be to assist the individual in achieving outcomes that promote the individual's growth, wellbeing, and independence, based on the individual's strengths, needs, goals, and preferences, in the most integrated settings in all domains of the individual's life (including community living, activities, employment, education, recreation, healthcare, and relationships). | COMPLIANCE* | *For the one area of Non-Compliance previously identified – lack of integrated day opportunities – the Parties established indicators for III.C.7.a to serve as the measures of compliance for IV.B.4.* |
| **IV.B.5.** | The Commonwealth shall ensure that discharge plans are developed for all individuals in its Training Centers through a documented person-centered planning and implementation process and consistent with the terms of this Section. The discharge plan shall be an individualized support plan for transition into the most integrated setting consistent with informed individual choice and needs and shall be implemented accordingly. The final discharge plan will be developed within 30 days prior to discharge. | COMPLIANCE* | *The Independent Reviewer's Individual Services Review studies found that DBHDS has consistently complied with this provision and its sub provisions a.-e., e.i. and e.ii. The discharge plans are well documented.* |
| **IV.B.5.a.** | Provision of reliable information to the individual and, where applicable, the authorized representative, regarding community options in accordance with Section IV.B.9; | COMPLIANCE* | *See comment re: IV.B.5.* |
| **IV.B.5.b.** | Identification of the individual's strengths, preferences, needs (clinical and support), and desired outcomes. | COMPLIANCE* | *See comment re: IV.B.5.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **IV.B.5.c.** | Assessment of the specific supports and services that build on the individual's strengths and preferences to meet the individual's needs and achieve desired outcomes, regardless of whether those services and supports are currently available; | COMPLIANCE* | *See comment re: IV.B.5.* |
| **IV.B.5.d.** | Listing of specific providers that can provide the identified supports and services that build on the individual's strengths and preferences to meet the individual's needs and achieve desired outcomes. | COMPLIANCE* | *See comment re: IV.B.5.* |
| **IV.B.5.e.** | Documentation of barriers preventing the individual from transitioning to a more integrated setting and a plan for addressing those barriers. | COMPLIANCE* | *See comment re: IV.B.5.* |
| **IV.B.5.e.i.** | Such barriers shall not include the individual's disability or the severity of the disability. | COMPLIANCE* | *See comment re: IV.B.5.* |
| **IV.B.5.e.ii.** | For individuals with a history of re-admission or crises, the factors that led to re-admission or crises shall be identified and addressed. | COMPLIANCE* | *See comment re: IV.B.5.* |
| **IV.B.6.** | Discharge planning will be done by the individual's PST…Through a person-centered planning process, the PST will assess an individual's treatment, training, and habilitation needs and make recommendations for services, including recommendations of how the individual can be best served. | COMPLIANCE* | *For the one area of Non-Compliance previously identified − lack of integrated day opportunities − the Parties established indicators for III.C.7.a to serve as the measures of compliance for IV.B.6.* |
| **IV.B.7.** | Discharge planning shall be based on the presumption that, with sufficient supports and services, all individuals (including individuals with complex behavioral and/or medical needs) can live in an integrated setting. | COMPLIANCE* | *The Commonwealth's discharge plans indicate that individuals with complex/intense needs can live in integrated settings. Interviews and documents reviewed indicate that this process remains in place at SEVTC.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **IV.B.9.** | In developing discharge plans, PSTs, in collaboration with the CSB case manager, shall provide to individuals and, where applicable, their authorized representatives, specific options for types of community placements, services, and supports based on the discharge plan as described above, and the opportunity to discuss and meaningfully consider these options. | COMPLIANCE* | *The Individual Services Review studies determined that individuals and their authorized representatives, were provided with information regarding community options and had the opportunity to discuss them with the PST. Interviews and documents reviewed indicate that this process remains in place at SEVTC.* |
| **IV.B.9.a.** | The individual shall be offered a choice of providers consistent with the individual's identified needs and preferences. | COMPLIANCE* | *The Independent Reviewer's Individual Services Review studies found that Commonwealth had offered a choice of providers. Interviews and documents reviewed indicate that this process remains in place at SEVTC.* |
| **IV.B.9.b.** | PSTs and the CSB case manager shall coordinate with the … community providers identified in the discharge plan as providing appropriate community-based services for the individual, to provide individuals, their families, and, where applicable, their authorized representatives with opportunities to speak with those providers, visit community placements (including, where feasible, for overnight visits) and programs, and facilitate conversations and meetings with individuals currently living in the community and their families, before being asked to make a choice regarding options.  The Commonwealth shall develop family-to-family peer programs to facilitate these opportunities. | COMPLIANCE* | *The Individual Services Review studies determined that individuals and their authorized representatives did have an opportunity to speak with individuals currently living in their communities and their family members. Interviews and documents reviewed indicate that this process remains in place at SEVTC.* |
| **IV.B.9.c.** | PSTs and the CSB case managers shall assist the individual and, where applicable, their authorized representative in choosing a provider after providing the opportunities described above and ensure that providers are timely identified and engaged in preparing for the individual's transition. | COMPLIANCE* | *The Individual Services Review studies determined that PSTs and case managers assisted individuals and their Authorized Representative. Interviews and documents reviewed indicate that this process remains in place at SEVTC.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| | | | |
| **IV.B.11.** | The Commonwealth shall ensure that Training Center PSTs have sufficient knowledge about community services and supports to: propose appropriate options about how an individual's needs could be met in a more integrated setting; present individuals and their families with specific options for community placements, services, and supports; and, together with providers, answer individuals' and families' questions about community living. | COMPLIANCE* | *The Individual Services Review studies determined that individuals /Authorized Representatives who transitioned from Training Centers were provided with information regarding community options. Interviews and documents reviewed indicate that this process remains in place at SEVTC.* |
| **IV.B.11.a.** | In collaboration with the CSB and Community providers, the Commonwealth shall develop and provide training and information for Training Center staff about the provisions of the Agreement, staff obligations under the Agreement, current community living options, the principles of person-centered planning, and any related departmental instructions. The training will be provided to all applicable disciplines and all PSTs. | COMPLIANCE* | *The Independent Reviewer confirmed that training has been provided.*<br><br>*Interviews and documents reviewed indicate that this process remains in place at SEVTC.* |
| **IV.B.11.b.** | Person-centered training will occur during initial orientation and through annual refresher courses. Competency will be determined through documented observation of PST meetings and through the use of person-centered thinking coaches and mentors. Each Training Center will have designated coaches who receive additional training. The coaches will provide guidance to PSTs to ensure implementation of the person-centered tools and skills. Coaches … will have regular and structured sessions and person-centered thinking mentors. These sessions will be designed to foster additional skill development and ensure implementation of person centered thinking practices throughout all levels of the Training Centers. | COMPLIANCE* | *The Independent Reviewer confirmed that staff receive required person-centered training during orientation and annual refresher training.*<br><br>*Interviews and documents reviewed indicate that this process remains in place at SEVTC.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **IV.B.15.** | In the event that a PST makes a recommendation to maintain placement at a Training Center or to place an individual in a nursing home or congregate setting with five or more individuals, the decision shall be documented, and the PST shall identify the barriers to placement in a more integrated setting and describe in the discharge plan the steps the team will take to address the barriers. The case shall be referred to the Community Integration Manager and Regional Support Team in accordance with Sections IV.D.2.a and f and IV.D.3 and such placements shall only occur as permitted by Section IV.C.6. | COMPLIANCE* | *See Comment for IV.D.3.* |
| **IV.C.1.** | Once a specific provider is selected by an individual, the Commonwealth shall invite and encourage the provider to actively participate in the transition of the individual from the Training Center to the community placement. | COMPLIANCE* | *The Independent Reviewer's Individual Services Review studies found that provider staff participated in the pre-move ISP meeting and were trained in the support plan protocols. Interviews and documents reviewed indicate that this process remains in place at South Eastern Virginia Training Center (SEVTC).* |
| **IV.C.2.** | Once trial visits are completed, the individual has selected a provider, and the provider agrees to serve the individual, discharge will occur within 6 weeks, absent conditions beyond the Commonwealth's control.  If discharge does not occur within 6 weeks, the reasons it did not occur will be documented and a new time frame for discharge will be developed by the PST. | COMPLIANCE* | *The Independent Reviewer's Individual Services Review studies found that almost all individuals had moved within 6 weeks, or reasons were documented. Interviews and documents reviewed indicate that this process remains in place at SEVTC.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **IV.C.3.** | The Commonwealth shall develop and implement a system to follow up with individuals after discharge from the Training Centers to identify gaps in care and address proactively any such gaps to reduce the risk of re-admission, crises, or other negative outcomes.  The Post Move Monitor, in coordination with the CSB, will conduct post-move monitoring visits within each of three (3) intervals (30, 60, and 90 days) following an individual's movement to the community setting.  Documentation of the monitoring visit will be made using the Post Move Monitoring (PMM) Checklist.  The Commonwealth shall ensure those conducting Post Move Monitoring are adequately trained and a reasonable sample of look-behind Post Move Monitoring is completed to validate the reliability of the Post Move Monitoring process. | COMPLIANCE* | *The Independent Reviewer determined the Commonwealth's PMM process is well organized. It functions with increased frequency during the first weeks after transitions.*<br><br>*The Independent Reviewer's Individual Services Review studies found that PMM visits occurred. The monitors had been trained and utilized monitoring checklists.*<br><br>*Interviews and documents reviewed indicate that this process remains in place at SEVTC.* |
| **IV.C.4.** | The Commonwealth shall ensure that each individual transitioning from a Training Center shall have a current discharge plan, updated within 30 days prior to the individual's discharge. | COMPLIANCE* | *The Independent Reviewer's Individual Services Review studies found that for almost all individuals, the Commonwealth updated discharge plans within 30 days prior to discharge.*<br><br>*Interviews and documents reviewed indicate that this process remains in place at SEVTC.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **IV.C.5.** | The Commonwealth shall ensure that the PST will identify all needed supports, protections, and services to ensure successful transition in the new living environment, including what is most important to the individual as it relates to community placement. The Commonwealth, in consultation with the PST, will determine the essential supports needed for successful and optimal community placement. The Commonwealth shall ensure that essential supports are in place at the individual's community placement prior to the individual's discharge. | COMPLIANCE* | *The Independent Reviewer's Individual Services Review studies found that the Personal Support Teams (PSTs), including the Authorized Representative, had determined and documented, and the CSBs had verified, that essential supports to ensure successful community placement were in place prior to placement.*<br><br>*Interviews and documents reviewed indicate that this process remains in place at SEVTC.* |
| **IV.C.6.** | No individual shall be transferred from a Training Center to a nursing home or congregate setting with five or more individuals unless placement in such a facility is in accordance with the individual's informed choice after receiving options for community placements, services, and supports and is reviewed by the Community Integration Manager to ensure such placement is consistent with the individual's informed choice. | COMPLIANCE* | *The Independent Reviewer's Individual Services Review studies found that discharge records for almost all individuals who moved to settings of five or more did so based on their informed choice after receiving options.*<br><br>*Interviews and documents reviewed indicate that this process remains in place at SEVTC.* |
| **IV.C.7.** | The Commonwealth shall develop and implement quality assurance processes to ensure that discharge plans are developed and implemented, in a documented manner, consistent with the terms of this Agreement. These quality assurance processes shall be sufficient to show whether the objectives of this Agreement are being achieved. Whenever problems are identified, the Commonwealth shall develop and implement plans to remedy the problems. | COMPLIANCE* | *The Independent Reviewer confirmed that documented Quality Assurance processes have been implemented consistent with the terms of the Agreement. When problems have been identified, corrective actions have occurred with the discharge plans.*<br><br>*Interviews and documents reviewed indicate that this process remains in place at SEVTC.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **IV.D.1.** | The Commonwealth will create Community Integration Manager ("CIM") positions at each operating Training Center. | COMPLIANCE* | *The Independent Reviewer confirmed that the Facility Director job description at SEVTC specifically identifies responsibility for CIM duties and responsibilities.* |
| **IV.D.2.a.** | CIMs shall be engaged in addressing barriers to discharge, including in all of the following circumstances: The PST recommends that an individual be transferred from a Training Center to a nursing home or congregate setting with five or more individuals. | COMPLIANCE* | *The Independent Reviewer's Individual Services Review studies found that CIMs were engaged in addressing barriers to discharge.*<br><br>*Interviews and documents reviewed indicate that this process remains in place at SEVTC.* |
| **IV.D.3.** | The Commonwealth will create five Regional Support Teams, each coordinated by the CIM. The Regional Support Teams shall be composed of professionals with expertise in serving individuals with developmental disabilities in the community, including individuals with complex behavioral and medical needs. Upon referral to it, the Regional Support Team shall work with the PST and CIM to review the case and resolve identified barriers. The Regional Support Team shall have the authority to recommend additional steps by the PST and/or CIM. | COMPLIANCE* | *The Independent Reviewer's Individual Services Review studies found that five RSTs were functioning with the required members and were coordinated by the CIMs.*<br><br>*Interviews and documents reviewed indicate that this process remains in place at SEVTC.* |
| **IV.D.4.** | The CIM shall provide monthly reports to DBHDS Central Office regarding the types of placements to which individuals have been placed. | COMPLIANCE* | *The CIM provides monthly reports and DBHDS provides the aggregated weekly and. monthly information to the Reviewer and DOJ.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **V.** | **Quality and Risk Management System** | Ratings prior to the 25th Period are <u>not</u> in bold.<br><br>Ratings for the 25th Period are in **bold.**<br><br>If Compliance ratings have been achieved twice consecutively, Virginia has achieved "Sustained Compliance." | Comments include the Commonwealth's status with each of the Compliance Indicators associated with the provision.<br><br>The Findings Section and attached consultant reports include additional explanatory information regarding the Compliance Indicators.<br><br>*The Comments in* <u>italics</u> *below are from a prior period when the most recent compliance rating was determined.* |
| **V.A.** | To ensure that all services for individuals receiving services under this Agreement are of good quality, meet individuals' needs, and help individuals achieve positive outcomes, including avoidance of harms, stable community living, and increased integration, independence, and self-determination in all life domains (e.g., community living, employment, education, recreation, healthcare, and relationships), and to ensure that appropriate services are available and accessible for individuals in the target population, the Commonwealth shall develop and implement a quality and risk management system that is consistent with the terms of this Section. | | *Provision V.A. will be in Compliance when the Commonwealth is determined to comply with all the requirements of the Provisions and associated Compliance Indicators in Section V. Quality and Risk Management System.* |

63

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **V.B.** | The Commonwealth's Quality Management System shall:  identify and address risks of harm; ensure the sufficiency, accessibility, and quality of services to meet individuals' needs in integrated settings; and collect and evaluate data to identify and respond to trends to ensure continuous quality improvement. | Non Compliance<br><br>**Non Compliance** | Of the remaining eight Compliance Indicators, the Commonwealth met two, namely 29.13 and 29.16, but did not meet six (29.17, 29.18, 29.20–29.22 and 29.24). |
| **V.C.1.** | The Commonwealth shall require that all Training Centers, CSBs, and other community providers of residential and day services implement risk management processes, including establishment of uniform risk triggers and thresholds, that enable them to adequately address harms and risks of harm. | Non Compliance<br><br>**Non Compliance** | Of the remaining two Compliance Indicators, the Commonwealth did not meet either (30.4 and 30.10) and remains in Non-Compliance. |
| **V.C.2.** | The Commonwealth shall have and implement a real time, web-based incident reporting system and reporting protocol. | Sustained Compliance | *DBHDS implemented and maintains a web-based incident reporting system and reporting protocol.* |
| **V.C.3.** | The Commonwealth shall have and implement a process to investigate reports of suspected or alleged abuse, neglect, critical incidents, or deaths and identify remediation steps taken. | Sustained Compliance | *DBHDS revised its regulations, increased the number of investigators and supervisors, added expert investigation training, created an Investigation Unit, includes double loop corrections in Corrective Action Plans (CAPs) for immediate and sustainable change, and requires 45-day checks to confirm implementation of CAP s re: health and safety.* |
| **V.C.4.** | The Commonwealth shall offer guidance and training to providers on proactively identifying and addressing risks of harm, conducting root cause analysis, and developing and monitoring corrective actions. | Sustained Compliance | *Of the remaining two Compliance Indicators, the Commonwealth again met both (32.4, and 32.7) and achieved Sustained Compliance for the first time.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **V.C.5.** | The Commonwealth shall conduct monthly mortality reviews for unexplained or unexpected deaths reported through its incident reporting system. The …mortality review team … shall have at least one member with the clinical experience to conduct mortality re who is otherwise independent of the State. Within ninety days of a death, the mortality review team shall: (a) review, or document the unavailability of:  (i) medical records, including physician case notes and nurse's notes, and all incident reports, for the three months preceding the individual's death; … (b) interview, as warranted, any persons having information regarding the individual's care; and (c) prepare and deliver to the DBHDS Commissioner a report of deliberations, findings, and recommendations, if any.  The team also shall collect and analyze mortality data to identify trends, patterns, and problems … and implement quality improvement initiatives to reduce mortality rates to the fullest extent practicable. | Sustained Compliance | *Of the remaining one Compliance Indicator, the Commonwealth again met 33.15 and achieved Sustained Compliance for the first time.* |
| **V.C.6.** | If the Training Center, CSBs, or other community provider fails to report harms and implement corrective actions, the Commonwealth shall take appropriate action with the provider. | Sustained Compliance | *The Commonwealth has met all eight Compliance Indicators 34.1– 34.8 and has achieved Sustained Compliance for the first time.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **V.D.1.** | The Commonwealth's HCBS waivers shall operate in accordance with the Commonwealth's CMS-approved waiver quality improvement plan to ensure the needs of individuals enrolled in a waiver are met, that individuals have choice in all aspects of their selection of goals and supports, and that there are effective processes in place to monitor participant health and safety. The plan shall include evaluation of level of care; development and monitoring of individual service plans; assurance of qualified providers. Review of data shall occur at the local and State levels by the CSBs and DMAS/DBHDS, respectively. | Non Compliance<br><br>**Non Compliance** | Of the remaining five Compliance Indicators, the Commonwealth has met one (35.3) for the second consecutive time and met another (35.7) for the first time, but has not met three (35.1, 35.5, and 35.8) and therefore remains in Non-Compliance. |
| **V.D.2.** | The Commonwealth shall collect and analyze consistent, reliable data to improve the availability and accessibility of services for individuals in the target population and the quality of services offered to individuals receiving services under this Agreement. | Non Compliance | Of the remaining three Compliance Indicators, namely 36.1, 36.3 and 36.8, the Commonwealth has not any of them and therefore remains in Non-Compliance. |
| **V.D.3.** | The Commonwealth shall begin collecting and analyzing reliable data about individuals receiving services under this Agreement selected from the following areas in State Fiscal Year 2012 and will ensure reliable data are collected and analyzed from each of these areas by June 30, 2014. Multiple types of sources (e.g., providers, case managers, licensing, risk management, Quality Service Reviews) can provide data in each area, though any individual type of source need not provide data in every area (as specified): | Compliance<br><br>**Non Compliance** | The Commonwealth did not meet the remaining one Compliance Indicator (37.7),and therefore remains in non-compliance. |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **V.D.4.** | The Commonwealth shall collect and analyze data from available sources, including the risk management system described in V.C. above, those sources described in Sections V.E-G and I below (e.g. providers, case managers, Quality Service Reviews, and licensing), Quality Service Reviews, the crisis system, service and discharge plans from the Training Centers, service plans for individuals receiving waiver services, Regional Support Teams, and CIMs. | Sustained Compliance | *The Commonwealth has again met the sole Compliance Indicator 38.1 and achieved Sustained Compliance for the first time.* |
| **V.D.5.** | The Commonwealth shall implement Regional Quality Councils (RQCs) that shall be responsible for assessing relevant data, identifying trends, and recommending responsive actions in their respective Regions of the Commonwealth. | Sustained Compliance | *Of the remaining two Compliance Indicators, the Commonwealth again met both of them (39.4-39.5) and achieved Sustained Compliance for the first time.* |
| **V.D.5.a.** | The Councils shall include individuals experienced in data analysis, residential and other providers, CSBs, individuals receiving services, and families, and may include other relevant stakeholders. | Sustained Compliance | *The five Regional Quality Councils include all the required members.* |
| **V.D.5.b.** | Each Council shall meet on a quarterly basis to share regional data, trends, and monitoring efforts and plan and recommend regional quality improvement initiatives. The work of the Regional Quality Councils shall be directed by a DBHDS quality improvement committee. | Sustained Compliance | *Of the remaining three Compliance Indicators, the Commonwealth has again met all of them (40.2, 40.5 and 40.7) and has achieved Sustained Compliance.* |
| **V.D.6.** | At least annually, the Commonwealth shall report publicly, through new or existing mechanisms, on the availability … and quality of supports and services in the community and gaps in services, and shall make recommendations for improvement. | Sustained Compliance | *The Commonwealth has again met the sole Compliance Indicator 41.5 and achieved Sustained Compliance for the first time.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **V.E.1.** | The Commonwealth shall require all providers (including Training Centers, CSBs, and other community providers) to develop and implement a quality improvement ("QI") program including root cause analysis that is sufficient to identify and address significant issues. | Non Compliance<br><br>**Non Compliance** | The Commonwealth again has not met the one remaining Indicator (42.). and remains in Non-Compliance. |
| **V.E.2.** | Within 12 months of the effective date of this Agreement, the Commonwealth shall develop measures that CSBs and other community providers are required to report to DBHDS on a regular basis, either through their risk management/critical incident reporting requirements or through their QI program. | Compliance<br><br>**Non Compliance** | Of the three remaining Indicators (43.1, 43.3 and 43.4), the Commonwealth did not meet any of them and remains in non-compliance. |
| **V.E.3.** | The Commonwealth shall use Quality Service Reviews and other mechanisms to assess the adequacy of providers' quality improvement strategies and shall provide technical assistance and other oversight to providers whose quality improvement strategies the Commonwealth determines to be inadequate. | Non Compliance<br><br>**Non Compliance** | Of the remaining two Compliance Indicator (44.1 and 44.2), the Commonwealth did not meet either of them and remains in Non-Compliance. |
| **V.F.1.** | For individuals receiving case management services pursuant to this Agreement, the individual's case manager shall meet with the individual face-to-face on a regular basis and shall conduct regular visits to the individual's residence, as dictated by the individual's needs. | Sustained Compliance | *The case management and the ISR study found Compliance with the required frequency of visits, many of which are remote due to COVID precautions. DBHDS reported data that some CSBs are below target.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **V.F.2.** | At these face-to-face meetings, the case manager shall: observe the individual and the individual's environment to assess for previously unidentified risks, injuries, needs, or other changes in status; assess the status of previously identified risks, injuries, needs, or other change in status; assess whether the individual's support plan is being implemented appropriately and remains appropriate for the individual; and ascertain whether supports and services are being implemented consistent with the individual's strengths and preferences and in the most integrated setting appropriate to the individual's needs…. | Non Compliance<br><br>Non Compliance | *When Virginia achieves the Indicators for III.C.5.b.i., it also achieves compliance for this Provision.* |
| **V.F.3.a.-f.** | Within 12 months of the effective date of this Agreement, the individual's case manager shall meet with the individual face-to-face at least every 30 days, and at least one such visit every two months must be in the individual's place of residence, for any individuals (who meet specific criteria). | Sustained Compliance | *The ninth, twelfth, fourteenth, and sixteenth and eighteenth ISR studies found that the case managers had completed the required monthly visits for 130 of 134 individuals (96.0%).* |
| **V.F.4.** | Within 12 months from the effective date of this Agreement, the Commonwealth shall establish a mechanism to collect reliable data from the case managers on the number, type, and frequency of case manager contacts with the individual. | Sustained Compliance | *The Commonwealth has again met both Compliance Indicators 46.1 and 46.2, and therefore achieved Sustained Compliance for the first time.* |
| **V.F.5.** | Within 24 months from the date of this Agreement, key indicators from the case manager's face-to-face visits with the individual, and the case manager's observation and assessments, shall be reported to the Commonwealth for its review and assessment of data.  Reported key indicators shall capture information regarding both positive and negative outcomes for both health and safety and community integration and will be selected from the relevant domains listed in V.D.3. | Non Compliance<br><br>**Compliance** | The Commonwealth met the sole remaining Compliance Indicator 47.1, and therefore achieved Compliance for the first time. |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **V.F.6.** | The Commonwealth shall develop a statewide core competency-based training curriculum for case managers within 12 months of the effective date of this Agreement.  This training shall be built on the principles of self-determination and person-centeredness. | Sustained Compliance | *The statewide CM training modules have been updated and improved and are consistent with the requirements of this provision.* |
| **V.G.1.** | The Commonwealth shall conduct regular, unannounced licensing inspections of community providers serving individuals receiving services under this Agreement. | Sustained Compliance | *OLS regularly renewed unannounced inspection of community providers.* |
| **V.G.2.a.-f.** | Within 12 months of the effective date of this Agreement, the Commonwealth shall have and implement a process to conduct more frequent licensure inspections of community providers serving individuals ... | Sustained Compliance | *OLS has maintained a licensing inspection process with more frequent inspections.* |
| **V.G.3.** | Within 12 months of the effective date of this Agreement, the Commonwealth shall ensure that the licensure process assesses the adequacy of the individualized supports and services provided to persons receiving services under this Agreement in each of the domains listed in Section V.D.3 above and that these data and assessments are reported to DBHDS. | Sustained Compliance | *The Commonwealth again met all four Compliance Indicators 48.1, 48.2, 48.3 and 48.4 and achieved Sustained Compliance for the first time.* |
| **V.H.1.** | The Commonwealth shall have a statewide core competency-based training curriculum for all staff who provide services under this Agreement.  The training shall include person-centered practices, community integration and self-determination awareness, and required elements of service training. | Non Compliance<br><br>**Non Compliance** | Of the remaining two Compliance Indicators, the Commonwealth has not met Indicators 49.4 and 49.12. Therefore, Virginia remains in Non-Compliance. |
| **V.H.2.** | The Commonwealth shall ensure that the statewide training program includes adequate coaching and supervision of staff trainees. Coaches and supervisors must have demonstrated competency in providing the service they are coaching and supervising. | Sustained Compliance | *The Commonwealth met all three Compliance Indicators 50.1, 50.2, and 50.3, and has achieved Compliance for the third consecutive review and therefore has achieved Sustained Compliance.* |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **V.I.1.a.-b.** | The Commonwealth shall use Quality Service Reviews ("QSRs") to evaluate the quality of services at an individual, provider, and system-wide level and the extent to which services are provided in the most integrated setting appropriate to individuals' needs and choice. | Non Compliance<br><br>Removed** | *The Court removed Indicators 51.1–51.5*** |
| **V.I.2.** | QSRs shall evaluate whether individuals' needs are being identified and met through person-centered planning and thinking (including building on individuals' strengths, preferences, and goals), whether services are being provided in the most integrated setting.. | Non Compliance<br><br>Removed** | *The Court removed Indicators 51.1–51.5*** |
| **V.I.3.** | The Commonwealth shall ensure those conducting QSRs are adequately trained and a reasonable sample of look-behind QSRs are completed to validate the reliability of the QSR process. | Non Compliance Removed** | *The Court removed Indicators 53.1–53.4*** |
| **V.I.4.** | The Commonwealth shall conduct QSRs annually of a statistically significant sample of individuals receiving services under this Agreement. | Sustained Compliance | *The Commonwealth's contractor completed the annual QSR process based on a statistically significant sample of individuals.* |
| **VI.** | **Independent Reviewer** | **Rating**<br><br>**COMPLIANCE*** Provisions achieved and relieved by the Court. | **Comments** |

| Settlement Agreement Reference | Provision | Compliance Rating | Comments |
|---|---|---|---|
| **VI.D.** | Upon receipt of notification, the Commonwealth shall immediately report to the Independent Reviewer the death or serious injury resulting in ongoing medical care of any former resident of a Training Center. The Independent Reviewer shall forthwith review any such death or injury and report his findings to the Court in a special report, to be filed under seal with copies to the parties. The parties will seek a protective order permitting these reports to be …and shared with Intervener's counsel. | COMPLIANCE* | *DBHDS promptly reports to the IR. The IR, in collaboration with a nurse and independent consultants, completes his review and issues his report to the Court and the Parties. DBHDS has established an internal working group to review and follow-up on the IR's recommendations.* |
| **IX.** | **Implementation of the Agreement** | **Rating**<br><br>Ratings prior to the 25th Period are <u>not</u> in bold. | **Comment** |
| **IX.C.** | The Commonwealth shall maintain sufficient records to document that the requirements of this Agreement are being properly implemented … | Sustained Compliance | *The Commonwealth has again met all four Compliance Indicators (54.1–54.4), and therefore achieved Sustained Compliance for the first time.* |

Notes:

* Until new monitoring data is available for review and verification, the Independent Reviewer has determined a Deferred rating for this Indicator.

** The Parties recommended and the Court removed these Indicators from the Consent Decree on July 27, 2023.

COMPLIANCE*: On March 3, 2021, the Court ordered that it found the Commonwealth in compliance with Sections IV. and Provision VI.D. of the Consent Decree and relieved the Commonwealth of those portions of the Decree. For the one area of Non-Compliance in Section IV previously identified – lack of integrated day opportunities – the Parties established indicators for III.C.7.a to serve as the measures of compliance for three Provisions, namely IV.A, IV.B.4, and IV.B.6.

# VI. APPENDICES

PAGE #

**A. CASE MANAGEMENT** ............................................................ **74**

**B. CRISIS AND BEHAVIORAL SERVICES** ..................................... **86**

**C. INTEGRATED DAY ACTIVITIES AND SUPPORTED EMPLOYMENT** ....... **100**

**D. COMMUNITY LIVING OPTIONS** .......................................... **110**

**E. SERVICES FOR INDIVIDUALS WITH COMPLEX MEDICAL SUPPORT NEEDS** ............................................................. **126**

**F. PROVIDER TRAINING** ...................................................... **148**

**G. QUALITY AND RISK MANAGEMENT AND QUALITY IMPROVEMENT PROGRAMS** ............................................. **159**

**H. LIST OF ACRONYMS** ........................................................ **261**

# **APPENDIX A**

## **Case Management**

### **By**

### **Kathryn du Pree, MPS**

# Case Management
# 25th Review Period
# Study Report

## Introduction

This report constitutes the eighth review of the Compliance Indicators (CIs) for Case Management services. This review took place during the twenty-fifth review period. The focus of the review is to determine if the Commonwealth has achieved the four case management Compliance Indicators (CIs) that have not been met or sustained in the previous two consecutive reviews. The Parties have agreed upon the indicators to determine compliance with Case Management Provisions that remain out of sustained compliance. These include CIs that relate to Provisions III.C.5.b.i. and V.F.5. These CIs address the Commonwealth's responsibilities to review and monitor the quality of service coordination and the delivery of waiver services to analyze the findings of the quality review related to CSB Case Management performance across ten elements (*CI 2.16*); to specifically analyze and monitor the achievement of four key indictors related to health and safety and community integration (*CI 47.1*); and to require and track the effectiveness of corrective actions undertaken by CSBs that underperform meeting the performance expectations for the service indicators (*CI 2.18 and 2.20*).

For this subset of CIs associated with these Provisions, progress toward achieving the agreed upon CI metrics are reviewed and reported below. This review includes an analysis and reporting of Virginia's status implementing only the CI requirements associated with Case Management that have not been met twice consecutively (see Table below). This includes *CIs 2.16 (including elements 2.6-2.15), 2.18, 2.20, and 47.1. CIs 2.18 and 2.20* were Met in the 23rd review period. *CIs 2.16 and 47.1* were Not Met in the 23rd review period. The Independent Reviewer deferred any determination of compliance for these four CIs during the 24th review period because there was insufficient data to make a determination.

For this report the documents reviewed are identified in Attachment A. I did not conduct any interviews as all follow up questions could be answered by Eric Williams, subject matter expert for DBHDS.

## Summary of Findings for the 25th Period

The chart below lists the CIs and their two most recent ratings. *CIs 2.18 and 2.20* were Met for the second consecutive review period, allowing for a deferral in the 24th period. *CI 47.1* is Met for the first time. *CI 2.16* remains Not Met but the Commonwealth has made significant progress.

The results of DBHDS's Support Coordinator Quality Review (SCQR) could not be reviewed in the 24th review period because of a lack of the annual data. The reviews by CSBs are conducted between January and June of each year and the look-behind conducted by DBHDS Quality Research Specialists in the Office of Quality Assurance and Healthcare occurs in July and August of each year. The determination of compliance was deferred for the 24th reporting period as a result.

The results of the SCQR performed in FY24 were shared (1) for review in the 25th review period. The SCQR for FY24 returned to including 400 individuals for its review, rather than the 479 reviewed in FY23. In FY23 DBHDS added children to the 400 individuals routinely sampled in the SCQR. Because the findings were so similar, DBHDS decided it was reasonable to include children in the 400 sample. The Case Management Steering Committee (CMSC) reviewed the results of the SCQR-FY24 and determined for CY23 records that 72% (288/400) compared to 64% (307/479) in FY23 (CY22), achieved a minimum of nine of the ten indicators. This is an improvement in performance but remains below the benchmark of 86%. This represented a continuing steady improvement over the 42% achievement found in the CY20 records and the 53% achievement found in the CY21 records.

Across the records reviewed, nine of the ten indicators were above 86%; compared to five that were at or above the benchmark in FY23. The one indicator, which remains significantly below the 86% benchmark was at 68.5%, compared to 54% in FY23, requires that ISPs have specific measurable outcomes. It also requires that employment be discussed and facilitated. This second requirement was added to this Indicator, Indicator 3, in FY22. DBHDS broke out the performance of Indicator 3 in its most recent report to reflect the development of specific and measurable outcomes, which was the original requirement of Indicator 3, and the achievement of employment discussions and facilitation of employment goals. In this breakout, the State has achieved a performance rate of 99.8% for developing measurable outcomes (399/400 records reviewed), but only 69% for the employment expectation (275/400 records reviewed). DBHDS then combines those not met which is 126, including 1 record for measurable outcomes and 125 for employment. This indicates overall that 31.5% of the records reviewed do not meet the benchmark and 68.5% do meet the benchmark. Achieving 68.5% is a significant improvement in performance compared to the 54% in FY23, but remains well below the benchmark of 86%.

Across CSBs, fourteen (35%) of the forty CSBs achieved at the 86% benchmark level or better. These results indicate improvement in that ten (25%) CSBs met the benchmark in the FY23 SCQR. However, these findings continue to highlight the large number (26) and percentage of CSBs (65%) that are not in compliance (1).

The CMSC continued to monitor the CSBs for the Performance Measure Indicators (PMI) relevant to *CI 2.16* and additional indicators, addressing employment and community engagement discussions and goals; Regional Support Team (RST) timeliness and underperforming CSBs related to the SCQR results. The minutes of the monthly CMSC meetings that occurred between January and August 2024 provide evidence of both regular and meaningful involvement of the CMSC in the oversight of the CSBs' Case Management services and DBHDS' implementation of quality review, analysis, technical assistance, training, and

communication with CSBs (3). The CMSC spent significant time during the past several months reviewing RST data to identify trends. DBHDS required CSBs to address RST and ISP performance in their Improvement Plans (IP), specifically addressing the retention of Support Coordinators and the timeliness of referrals to the RSTs.  In addition, DBHDS also developed and issued a book for Service Coordinators (SC) explaining their responsibilities regarding quality monitoring. It also provided training for a greater understanding of the On-Site Visitation Tool (OSVT) and to clarify SC responsibilities. The CMSC reviewed and monitored eight IPs for ISP timeliness (3).

The CMSC sent a letter to the Commissioner in January summarizing the Committee's activities and findings (4).

The CMSC also added the performance expectations for Targeted Case Management (TCM) and Enhanced Case Management (ECM) to the Watch List process. DBHDS set a threshold of three consecutive quarters below 90% to trigger the Watch List process for these case management responsibilities (2).

The CMSC continued to oversee the partnership between DBHDS and DMAS to issue and follow Case Management related Corrective Action Plans (CAPs) required of CSBs. Between April and August, DMAS accepted three such CAPs. Technical Assistance was offered to each of these CSBs and was accepted by one (2).

## Data Process and Attestation

All data processes which have been reviewed previously and verified to be reliable and valid remain in place. All attestations are completed and current.

## Compliance Indicator Achievement

Table 1 below summarizes the status of the case management compliance indicators.

**Table 1**
**Case Management Findings**

| # | Indicator | Facts | Analysis/Conclusions | 24th | 25th |
|---|---|---|---|---|---|
| 2.6 | 2.6 • The CSB has offered each person the choice of case manager. | 2.6 Compliance reported for the FY24 SCQR at 87%. This is compared to 83% in the FY23 SCQR. This is above the benchmark of 86%. | 2.6 See CI 2.16. | | |

| | | | | | |
|---|---|---|---|---|---|
| 2.7 | 2.7 • The case manager assesses risk, and risk mediation plans are in place as determined by the ISP team. | 2.7 Compliance reported at 94%, compared to 88.5% in the FY23 SCQR. This continues to be above the benchmark of 86%. | 2.7 See CI 2.16. | | |
| 2.8 | 2.8 • The case manager assesses whether the person's status or needs for services and supports have changed and the plan has been modified as needed. | 2.8 Compliance reported at 90%. This is compared to 84% performance in the FY23 SCQR. This is now above the benchmark of 86%. | 2.8 See CI 2.16. | | |
| 2.9 | 2.9 • The case manager assists in developing the person's ISP that addresses all the individual's risks, identified needs and preferences. | 2.9 Compliance reported at 90% which is an increase from the 84% in the FY23 SCQR finding. This is now above the 86% benchmark. | 2.9 See CI 2.16. | | |
| 2.10 | 2.10 • The ISP includes specific and measurable outcomes, including evidence that employment goals have been discussed and developed, when applicable. | 2.10 Compliance reported at 68.5%. This is a significant increase from the FY23 SCQR score of 54% but remains substantially below the benchmark of 86%. | 2.10 See CI 2.16. | | |
| 2.11 | 2.11 • The ISP was developed with professionals and nonprofessionals who provide individualized supports, as well as the individual being served and other persons important to the individual being served. | 2.11 Compliance reported at 90%. This is an increase from FY23 SCQR of 88%. This continues to be above the benchmark of 86%. | 2.11 See CI 2.16. | | |

| 2.12 | 2.12. • The ISP includes the necessary services and supports to achieve the outcomes such as medical, social, education, transportation, housing, nutritional, therapeutic, behavioral, psychiatric, nursing, personal care, respite, and other services necessary. | 2.12 Compliance reported at 99%. This is a comparable to the 98.5% FY23 SCQR score and continues to be above the benchmark of 86%. | 2.12 See CI 2.16. | | |
| 2.13 | 2.13 • Individuals have been offered choice of providers for each service. | 2.13 Compliance reported at 97%. This is an improvement over the FY23 SCQR score of 93% and continues to be. above benchmark of 86%. | 2.13 See CI 2.16. | | |
| 2.14 | 2.14 • The case manager completes face-to-face assessments that the individual's ISP is being implemented appropriately and remains appropriate to the individual by meeting their health and safety needs and integration preferences. | 2.14 Compliance reported at 89%. This is an improvement to the performance on the FY23 SCQR of 84%. This is now above the benchmark of 86%. | 2.14 See CI 2.16. | | |
| 2.15 | 2.15 • The CSB has in place and the case manager has utilized where necessary, established strategies for solving conflict or disagreement within the process of developing or revising ISPs, and addressing changes in individual needs, including, but not limited to, reconvening the planning team as necessary to meet individual needs. | 2.15 Compliance reported at 100%. This is comparable to the SCQR FY23 score of 100% and remains well above benchmark of 86%.<br><br>(Data source for 2.6-2.15 is Document 1) | 2.15 See CI 2.16. | | |

| 2.16 | The Case Management Steering Committee will analyze the Case Management Quality Review data submitted to DBHDS that reports on CSB case management performance each quarter. In this analysis 86% of the records reviewed across the state will be in implementation with a minimum of 9 of the elements assessed in the review. | The CMSC has reviewed the results of the SCQR FY24 (1) and determined for CY23 records that 72% of the records achieved at a minimum nine of the ten indicators, which is below the benchmark of 86%. This is an improvement on the 64% achievement for the previous reporting period. There was an increase in compliance for all Indicators except Indicator 5 which remained at 100%. Only Indicator 3 fell below the 86% performance target in FY24. Indicator 3, which includes employment discussion and facilitation improved from 54% in the FY23 SCQR to 68.5% in the FY24 SCQR.<br><br>The DD CMSC data review process document (3) and the SCQR Process Documentation were reviewed for case management performance on the ten elements in the compliance indicators and the Look-Behind sub-sample review. The FY 2024 SCQR Final Report (1) provides the results on the 10 indicators, the look-behind and OCQI Interrater performance. DBHDS has selected the Maxwell RE coefficient to use for scoring Interrater | As reported in the 25th reporting period, these results indicate improvement, e.g., fourteen CSBs met the benchmark for CY23, compared to ten CSBs met the benchmark in CY22 compared to six CSBs met the benchmark for CY21 records, and three CSBs met the benchmark for CY20 records; 64% of 479 records compared to 53% of 400 records achieved at 86%, and 42% in CY20. However, they also highlight the large amount of CSB underperformance to be corrected.<br><br>DBHDS did provide related data to demonstrate the role the CMSC is taking to review the quality and performance of the CSBs (2,3). The CMSC tracked the CSBs performance on fifteen performance measures. This indicator aligns with *CI 2.6- 2.15,* but the CMSC also measures and tracks performance related to discussions and goal setting for employment, community engagement and community relationships. The CSB performance is measured using data for all individuals on the waiver who have had an ISP meeting during the review period. Except for the PMIs for individuals to have goals in employment (62%); employment | NM | NM |

| | | | | | |
|---|---|---|---|---|---|
| | | reliability. This tool determines that moderate agreement ranges from .40 to .59 and Substantial Agreement ranges from .60 to 1. Any score below .4 is considered weak. The review of the ten indicators demonstrates that all ten were within the substantial range for Interrater Reliability which is agreement between the CSB and the OCQI scores., However, one was in the moderate range (.52) and two were in the weak range (both .28) for the look-behind calculations which looks at the level of agreement between OCQI reviewers.<br><br>The SCQR Process is now in its sixth cycle of implementation and has shown its value as a measurement for CSB case management effectiveness and an effective improvement process. | discussions with adolescents (60%); goals for community engagement (61%); RST timeliness for non-emergencies (55%); and ECM face to face visits (85%) the remaining measures range in achievement from 87%-96%. These measures include: employment discussions; community engagement discussions; community involvement; residential RST requests; TCM face-to-face visits; and ISPs in WaMS. These data are based on self-reporting by Case Managers. The CMSC uses this data to determine Quality Improvement Initiatives (QII) that are recommended to DBHDS for implementation.<br><br>The Commonwealth has not yet achieved this indicator because only 72% of the records reviewed met a minimum of nine of the indicators. As a result, *CI 2.16* remains not met. | | |
| *2.18* | If, after receiving technical assistance, a CSB does not demonstrate improvement, the Case Management Steering Committee will make recommendations to the Commissioner for enforcement actions pursuant to the CSB Performance Contract and licensing regulations. | DBHDS continues to offer targeted technical assistance to CSBs who underperform on three or more of the ten indicators following look-behinds. Ten (25%) CSBs had only one indicator below 86%. Three CSBs had less than 50% of their records with nine of ten indicators meeting the metric of 86%; and 3 or | DBHDS through the CMSC, performs analysis and provides technical assistance (TA) to CSBs to improve performance and quality.  The CMSC continues to inform the Commissioner of DBHDS of the performance of the CSBs in key areas and makes recommendations for the Commissioner's enforcement actions as is | **D** | **M** |

| | | more indicators below 50%. These CSBS were reviewed in March 2024. Two CSBs declined TA and one CSB accepted TA.

Across FY24, DBHDS requested a total of seventeen Improvement Plans (IPs). These included six for ISP timeliness, ten for RST timeliness and one for SCQR results. Two CSBs were removed from the Watch List for achieving above target performance.

The CMSC prepared a letter to the Commissioner during the 24th reporting period (4) which was included in the documents for the 25th period as it was issued during FY24 and is only sent annually. This letter summarized the concerns of the CMSC regarding ISP data entry and the timeliness of referrals to the RSTs. It discusses its new expectation for CSBs regarding target performance for face-to-face visits for Enhanced and Targeted Case Management. The CMSC planned to begin requesting IPs for these performance issues in FY24 Q4, if a CSB falls below the target for performance for three consecutive quarters. However, this has been postponed due to the | warranted.

This indicator was met in the 23rd period. It was deferred in the 24th period. The CI is met in the 25th period. The Commonwealth has sustained compliance for this CI. | | |

| | | DBHDS transition from CCS3 to the new Enterprise Data Warehouse (EDW). This has postponed implementation until FY26 Q1 at the latest (6). | | | |
|---|---|---|---|---|---|
| 2.20 | All elements assessed via the Case Management Quality Review are incorporated into the DMAS DD Waiver or DBHDS licensing regulations. Corrective actions for cited regulatory non-implementation will be tracked to ensure remediation. | DBHDS meets quarterly with the Department of Medical Assistance (DMAS) QMR to share and track citations relating to the SCQR elements (2). They have cross-walked and tracked actions jointly since 1.23. The ten CM elements assessed pursuant to the requirements of *CI 2.16* are addressed by DMAS through its quality reviews. The elements have been incorporated into the DMAS Waiver or DBHDS licensing regulations. The action plans to address corrective actions are shared with DBHDS. The Department is currently tracking six CSB Corrective Action Plans (CAP). Three were tracked prior to this reporting period and three began to be tracked in the 25th reporting period. | DBHDS and DMAS have instituted joint tracking of CAPs. This process is in its fourth year.<br><br>This indicator remained met after a new rating determination was deferred in the 24th review period. This CI is Met in the 25th review period. The Commonwealth has sustained compliance for this CI. | D | M |
| 47.1 | The Case Management Steering Committee will establish two indicators in each of the areas of health & safety and community integration associated with selected domains in V.D.3 and based on a review of the data submitted from case management monitoring processes. Data indicates 86% | CMSC has continued to review twenty performance measure indicators including the seven indicators (PMIs) selected by DBHDS (3). The SCQR, completed in FY24 Q3 and Q4 addressed the review for CY23 records. The performance | VA is tracking two indicators in the areas of health and safety: ISP implementation and Change in Status, and two in the area of community integration: Relationships and Choice. Based on the FY24 SCQR data, the two indicators related to health and safety were each | D | M |

| | | | | |
|---|---|---|---|---|
| implementation with the four indicators. | percentages from the SCQR-FY24 were:<br><br>Change in Status (PMI-16 at 89%)<br><br>ISP Implementation (PMI-17 at 90%)<br><br>Relationships (PMI-18 at 93%)<br><br>Choice (PMI-19 based on Indicator 1: 87% and Indicator 2: 97%)<br><br>The CMSC also tracks two additional PMIs:<br><br>Employment Goals (PMI-2 at 58-64% over FY24 4 quarters))<br><br>Employment discussion with 14–17-year-old (PMI-3 at 50-67% over FY24 quarters%)<br><br>CMSC has engaged in crosswalks and discussion about congruence between PMIs, QSR results, and QMR-DMAS audits (2)<br><br>The CMSC continued to meet regularly in this reporting period and was engaged in monitoring the delivery of case management services by the CSBs and reviewed the direct review, monitoring, technical assistance, training and policy direction issued by DBHDS (2). The CMSC | performing above the benchmark of 86%; 89% and 90% respectively. The two indicators related to community integration were performing at 93% and an average of 92% respectively. Since VA has four indicators in the areas of health and safety and community integration and is above the 86% benchmark on two of them, this indicator is Met for the first time. | | |

| | | uses data DBHDS collects from CSBs in each quarter for a number of indicators. These data are derived from WaMS data from the ISPs that are convened in each quarter. | | | |
|---|---|---|---|---|---|

## Recommendations

Virginia did not meet the performance measure for CI 2.16. DBHDS should perform a Deep Dive with the fourteen CSBs that did achieve or exceed the 86% benchmark that nine of the ten indicators were at or above 86% to determine what strategies have made these CSBs successful in meeting these performance expectations. DBHDS should then share these strategies with the other twenty-six CSBs, and additionally provide training and technical assistance directly, or through peer mentoring by the successful CSBs to improve performance more consistently throughout the Commonwealth.

Generally, the CSBs score poorly on one Indicator. This Indicator requires that ISPs have specific outcomes, and that employment be discussed and facilitated. It is the latter aspect of this Indicator which is presenting a challenge to the CSBs. DBHDS should ask the CMSC and the E1AG to collaborate to make a set of joint recommendations including training and mentoring of Service Coordinators; and training for families and individuals regarding the importance of employment and to confirm the DBHDS policies that require these discussions take place as part of the design of the ISP.

Attachment A
Documents Reviewed

1. SCQR Final Report FY24
3. CMSC Semiannual Report FY24 3rd and 4th Quarters
4. CMSC Meeting Minutes: 1.2.24,3.4.24,4.10.24, 5.7.24,6.4.24,7.2.24,8.6.24
4. CMSC Recommendations Letter Final
5. CSB Indicators QMR Data Tracking
6. Email from Eric Williams 10.15.24

Submitted:
Kathryn du Pree MPS
October 31, 2024

# APPENDIX B

## Crisis and Behavioral Services

**by**

**Kathryn du Pree, MPS**
**Joseph Marafito, MS**

**Review of Crisis Services for the Independent Reviewer**
**Twenty Fifth Review Period**

## Crisis Services, Mobile Crisis, and Crisis Stabilization Review

This review was conducted during the twenty-fifth review period. The focus of the review was to determine if the Commonwealth achieved compliance with the Compliance Indicators (CIs) that have not been met for two consecutive review periods to date. The Parties have agreed upon a number of indicators to determine compliance with crisis services Provisions that remain out of compliance. These include CIs that relate to Provisions III.C.6.a.i.-iii for Crisis Services; III.C.6.b.i.i.A. for Mobile Crisis; and III.C.6.b.i.i.i.B., III.C.6.b.i.i.i.D; and III.c.6.b.i.i.i.G for Crisis Stabilization. These CIs, which have not been met or sustained, include: *7.8, 7.18, 10.4, 11.1 and 13.3*. The Commonwealth met *CI 11.1* for the first time in the 24th reporting period; but had not yet met the other CIs previous to this review period. These CIs are associated with each of crisis services' main components identified as Prevention, Mobile Crisis and Crisis Stabilization. Prevention is identified in the CIs to include assessment in the home; behavior supports in the home; and the availability of direct support professionals. For this subset of these Provisions, progress toward achieving the agreed upon CI metrics will be reviewed and reported.

In the 24th review period, Virginia met the requirement of *CIs 7.19 and 8.4* for the second consecutive time. Respectively, these relate to individuals receiving all elements of therapeutic consultation services within 180 days of the service authorization and that the Comprehensive Educational Prevention Plans (CEPPs) are developed within fifteen days of the behavioral assessment being completed. In the 24th review period *CIs 7.8, 7.18, 10.4, 11.1 and 13.3* had not been met for two consecutive periods. *CI 7.8* was not met because only 46% of children and adults received a crisis assessment at home or in another community location where the crisis occurred. *CI 7.18* was not met because only 74% of the individuals identified as needing therapeutic consultation (behavioral supports) were referred to a provider within thirty days of the need being identified. *CI 10.4* was not met because only 79% of the individuals who were known to REACH and admitted to a CTH, or psychiatric hospital had a community residence identified within thirty days of their admissions. *CI 13.3* was not met because no children were referred to the host homes during the 24th review period. *CI 11.1* was met for the first time because 91% of the individuals who were known to REACH and admitted to a CTH had a community residence identified within thirty days. This CI differs from *CI 10.4* which includes individuals admitted to both CTHs and psychiatric hospitals.

DBHDS provided the documents and files that were requested. Attachment A lists the documents that were reviewed for the purposes of determining compliance with the CIs reviewed for study during the 25th period. Where applicable, this report cites the document number as listed in Attachment A. In addition to reviewing all relevant documents, I interviewed Nathan Habel, Director of Behavioral Services and Projects and Sharon Bonaventura, Regional Crisis Systems Manager. I appreciate the time these subject matter

experts gave to both answering questions and providing all needed documentation and follow-up.

The Independent Reviewer continues to be deeply concerned about the high number of individuals with I/DD whose initial crisis assessment occurs at hospitals rather than in the individuals' homes as expected in *CI 7.8*. A high percentage of these individuals continue to be admitted to psychiatric hospitals compared to those who have assessments at home and who more frequently utilize in-home supplemental supports or crisis stabilization services as alternatives to hospitalization. This dynamic results in an increased number of children and adults with I/DD who are admitted to psychiatric hospitals in Virginia rather than receiving the mobile crisis service and crisis stabilization services required by the Agreement.

This concern continues to be borne out based on the data submitted by DBHDS for FY24 Q4 and FY25 Q1. During this time period 55% of crisis assessments took place in the home or other community locations in FY24 Q4, and 49% in FY25 Q1. Since the Parties agreed to *CI 7.8*, including before, throughout and after the end of the pandemic, the percentage of individuals each quarter who received crisis assessments at the location where the crisis occurred has not shown significant improvement. However, the State achieved its highest percentage of 55% in FY24 Q4. Table 1 includes the percentages of crisis assessments performed in a community setting since FY 20 Q3.

***Table 1: The % of individuals who received their initial crisis assessment at home, residential setting, or community setting (non-hospital/CSB location).***

| Date | Percentage |
|---|---|
| FY 2020 Q3 | 46% |
| FY 2020 Q4 | 41% |
|  |  |
| FY 2021 Q1 | 53% |
| FY 2021 Q2 | 34% |
| FY 2021 Q3 | 35% |
| FY 2021 Q4 | 42% |
|  |  |
| FY 2022 Q1 | 51% |
| FY 2022 Q2 | 36% |
| FY 2022 Q3 | 40% |
| FY 2022 Q4 | 36% |
|  |  |
| FY 2023 Q1 | 44% |
| FY 2023 Q2 | 49% |
| FY 2023 Q3 | 37% |
| FY 2023 Q4 | 40% |
|  |  |
| FY 2024 Q1 | 46% |
| FY 2024 Q2 | 48% |
| FY 2024 Q3 | 52% |
| FY2024 Q4 | 55% |
|  |  |
| FY2025 Q1 | 49% |

Since Compliance Indicator *7.8* was established in FY20 Q3, the quarterly percentage of children and adults who received crisis assessments at home or other community location has ranged from 34% - 55%. Furthermore, there have been significant variances, of up to 19%, between successive quarters. These variances have reflected the results of the crisis assessment practices within the Commonwealth's five Regions and do not indicate either a significant positive or negative systemic change. Data from the most recent four quarters have been consistently nearer the top of the 34% - 55% range and there have been smaller % changes between quarters. However, after a small but steady upward trend in crisis assessments completed in community settings, there was a drop of 6% for the first quarter of FY25 from the State's performance in FY24 Q4 (2,3).

As of the 25th Period, far too many children and adults continue to be assessed for a crisis at CSB Emergency Services Departments or hospitals which leads to the predictable increased rate of hospitalizations compared to the rate for individuals who receive a crisis assessment in a community setting. This finding aligns with the results of previous studies. The results of these assessments strongly support the Independent Reviewer's and Expert Reviewer's contention that it is essential to provide these assessments in the community including the individual's home setting because it is far more likely that the individual will retain this setting and not be hospitalized if the assessment occurs in the community. It is important to note that there are persistent and substantial variations in the percentages between Regions. For example, Region IV conducted only 32% of its crisis assessments in community settings in the fourth quarter of FY24, compared to Region III that had 76% of the crisis assessments conducted in community settings. Region I had only 24% in the first quarter of FY 25, whereas Region II had 62% of crisis assessments conducted in the community during this same quarter. No Region met the benchmark in either quarter or across the review period.

**Table 2: Crisis Assessments Conducted In Community Settings for Individuals Known to REACH**

| Date | Average % assessed in community setting | Range | |
|---|---|---|---|
| FY 24 Q4 | 55% | Region IV 32% | Region III 76% |
| FY 25 Q1 | 49% | Region 1 24% | Region II 62% |

During FY24 Q4 and FY25 Q1 the outcomes for individuals (known and unknown to REACH) who received a crisis assessment in the community and retained their home setting were 90% and 91% respectively. This compares to 66% and 63% when the crisis assessment occurred in a hospital, or CSB ESD (Emergency Services Department). These data are depicted in Tables 3 and 4 below. These data are derived from the total number of crisis assessments including those conducted for children and adults with DD who were both known and not known to REACH. This included 761 children and 1,252 adults for a total of 2,013 individuals who were assessed for a crisis in the 25th reporting period (4,5,6,7 and 9), compared to 1,725 individuals with DD who received a crisis assessment in the 24th review period. Comparing these data to the data reported in the 24th period, I find that fewer

children were assessed for a crisis: 761 in the 25th period compared to 862 in the 24th period. This is a decrease of 101 (12%) of children assessed for crisis. Far more adults were assessed for a crisis in the 25th period when a total of 1,252 adults compared to 863 adults were assessed in the 24th period. This is an increase of 389 (45%) adults (2,3). DBHDS does not report separately data regarding the number of individuals who are known to the system who receive a crisis assessment at home or in another community location where the crisis occurs in terms of the outcomes of these assessments.

***Table 3: Results of Crisis Assessments Conducted in Community Locations***

| Time | Remain Home | CTH/CSU | Other | Hospitalized |
|------|-------------|---------|-------|--------------|
| FY24 Q4 | 90% | 4% | 2% | 4% |
| FY25 Q1 | 91% | 3% | 1% | 5% |

***Table 4: Results of Crisis Assessments Conducted in Hospitals and CSB ES***

| Time | Remain Home | CTH/CSU | Other | Hospitalized |
|------|-------------|---------|-------|--------------|
| FY24 Q4 | 66% | 8% | 3% | 23% |
| FY25 Q1 | 63% | 6% | 3% | 28% |

The Expert Reviewer reviewed the Quarterly REACH reports (4,5,6,7) to determine the status of the Commonwealth's implementation of the systemic changes needed to resolve the obstacles that have previously slowed progress toward achieving this indicator's measure of compliance. DBHDS continues to report and track all aspects of crisis assessment and services performed by the regional REACH programs. Regions continue to meet the overall expectations for timely response to crises.

All REACH programs continue to use telehealth to some extent and do not respond to all crisis calls in person.  Regions vary in the percentage of responses that are onsite with Regions III and V conducting more onsite assessments (99% and 100% of the time respectively) during FY24 Q4 and FY25 Q1 compared to the other regions. Region I conducted 31%, Region II 85%, and Region IV conducted 59% of its crisis assessments onsite. Overall, REACH staff conducted 506 (84%) of the 602 crisis assessments completed face-to-face (4,5,6,7)

DBHDS explained that it has set an expectation that REACH staff will no longer perform crisis assessments via telehealth but are expected to attend all crisis assessments onsite. However, the Code of Virginia governing hospital screenings allow for these assessments to be conducted by ES and hospital staff using telehealth. The Commonwealth will only have REACH staff participate in an onsite assessment if Virginia's CSB ES or hospital staff are performing the assessment onsite and include the REACH staff. DBHDS reports the ES and ED staff are using telehealth more frequently in certain parts of the state and some families prefer and request a telehealth assessment. DBHDS also reported that there is not any significant difference in the rate of hospitalizations as a result of an assessment conducted

onsite versus using telehealth. No data were provided to confirm this but as reported previously in this report, significantly more individuals whose crisis was assessed in the community retain their setting at the completion of the assessment.

The Children's and Adult's CTH programs continued to be underutilized during both quarters primarily because of staffing shortages (4,5,6,7). In FY24 Q1 only forty-two children and fifty-three adults were admitted to the CTHs. The utilization was only 28% in the Children's CTHs. The utilization of the Adult CTHs ranged from 19% in Region I to 79% in Region III. In FY25 Q1 only forty-nine adults and thirty-one children were admitted to the CTHs. The utilization was only 25% in the Children's CTHs. The Adult CTHs utilization was 25% or below in Regions I, IV and V. Region II reported 54% utilization and Region III reported 96% utilization of the CTH beds. Region III is consistently high in the utilization of its CTH.  No Regions reported a waiting list. However, a high number of individuals are hospitalized after a crisis assessment who might have been able to be stabilized at a CTH if the program was fully available.

During the interview with the subject matter experts, I discussed the low utilization of the CTHs and the continued hospitalization of individuals with DD after a crisis assessment. DBHDS staff continue to provide data that verifies on-going REACH staffing shortages. DBHDS also reports that REACH programs do not collect and report data related to the acuity level of individuals who are referred to the CTH programs. REACH asserts, however, that in recent years individuals referred generally have a higher acuity levels and that such individuals, when admitted need more staff support. Others may have an acuity level that precludes them from admission to the CTH because the program is not structured or staffed to support individuals with more intense needs and/or are only willing to be supported in an acute facility. DBHDS also reports that since prevention and mobile crisis services continue to be provided, and the outcome is that almost all recipients of these services retain their residential setting after participating in other prevention or mobile crisis services that there may be less need for the CTHs. Although admissions to hospitals continue to decrease, there continues to be many individuals with DD who could benefit from a stay for stabilization at a CTH if these settings were fully staffed and could admit more individuals.

In this reporting period, the Commonwealth reports data of a decrease in hospitalizations for individuals with DD, which follows a trend of fewer hospitalizations over the past few years. The Commonwealth reports separately for hospitalizations in state psychiatric facilities and private psychiatric hospitals (11). In state psychiatric facilities the Commonwealth reports cover several years. Although REACH services were in place, the number of hospitalizations peaked in FY19 when a total of 1,018 children and adults with DD were admitted to these facilities for a behavioral or mental health crisis. This number has steadily dropped since FY21, the first full year of the pandemic, when 588 individuals with DD were admitted, to FY23 when 345 individuals were admitted. The reported data for FY24 indicate that a slightly higher number were hospitalized in FY24 compared to FY23. There were a total of 364 admissions including 94 children and 270 adults to state psychiatric facilities in FY24 The Commonwealth began reporting admissions to private psychiatric hospitals in FY21 when 735 children and adults with DD were admitted to these facilities. The annual number

of admissions to the private hospitals has always been higher than those to the public hospitals. Private hospital admissions have decreased from 735 in FY21 to 561 in FY23. The admissions to private psychiatric hospitals were reported for the entire fiscal year. There were 399 total admissions including 138 children and 261 adults. The number of admissions to private psychiatric hospitals continues to decrease in FY24 (1).

DBHDS reported on the use of the out-of-home crisis therapeutic prevention host-home like services for children in the 24th review period. These settings were expected to provide an accessible statewide alternative support to families and therefore reduce hospitalizations for children. Three years ago, the Commonwealth awarded contracts to two providers to serve these children, but the homes did not materialize as residential settings to support children with DD in crises. As explained in Table 7 below, DBHDS is working with the Regions to develop Children's CTHs where none currently exist as an alternative to the host-home model. This will offer families an out-of-home alternative within their region but may not address the concerns families have to be able to have their children continue to attend school when they are psychiatrically stable but have not returned home. As of this review period, none of these new CTHs for children were operational.

DBHDS continues to conduct quarterly reviews of the REACH programs (9,10). These reviews include data review; review of compliance standards and program performance; clinical chart review of selected program participants; review of any previous corrective actions and an in-person interview to discuss clinical improvement. During the most recent quarterly reviews, most of the Regions met all or the majority of the REACH standards. DBHDS reviewers provide feedback on areas that are partially met and expect improvement. Region I's REACH program continues to have more areas of underperformance than other regions. This program was required to submit an Action Plan to increase REACH responsiveness and access in the region. This plan was required as a result of qualitative reviews and underperformance during the 23rd reporting period. DBHDS reported in the 24th review period that the leadership of this REACH program has changed, and that its performance is slowly improving. However, the quarterly reviews for FY24 Q4 and FY25 Q1 still note areas of underperformance in Region I. Much of the corrective action plan addressed the impact of the staffing shortage the Region has continued to experience. DBHDS staff report Region I continues to have difficulty hiring and retaining qualified staff. The lack of staffing continuity impedes the Region's progress meeting the performance standards. Region III met all of its performance standards. Other Regions perform as expected with the exception of their respective CTH programs. Regions II, IV and V are noted as only partially meeting the REACH standards for this area because of low percentages of utilization.

The REACH programs continue to experience significant staffing shortages statewide (8). Vacancies in these community programs range during the 25th review period from 10% for supervisory/clinical positions to 48% for mobile crisis support workers. The Children and Adult CTH programs experience vacancies as well. The Adult CTH programs overall have 15% of their positions vacant while the Children's CTH experiences a 16% vacancy rate. The Adult Transition Homes (ATH) have more vacancies, totaling 25%. Comparing the 25th

review period to the 24th review period, I note that the vacancy rate has decreased for supervisory positions, mobile support positions and the CTH Adult Program. The vacancy rate increased in the 25th reporting period for REACH Coordinators and the ATH program. The most severe staff shortage is among the REACH Coordinators where 48% of the positions are unfilled.

The DBHDS REACH Quarterly Reports note that the CTH program is not being fully utilized in any Region. DBHDS attributes this to staffing shortages and serving individuals with higher acuity who need more intense staffing. The following Tables depict the data regarding staffing as of FY25 Q1.

***Table 5: FY25 Q1 Annual REACH Staffing Data for REACH Crisis Teams***

| Position | RI | RII | RIII | RIV | RV | Total |
|---|---|---|---|---|---|---|
| Supervisory/clinical filled | 8 | 12 | 16 | 17 | 11 | **64** |
| Supervisory/clinical vacant | 1 | 0 | 4 | 1 | 1 | **7** |
| Total | 9 | 12 | 20 | 18 | 12 | **71** |
| Percent Vacant | 11% | 0% | 20% | 6% | 8% | **10%** |
| | | | | | | |
| Coordinator filled | 4 | 17 | 3 | 11 | 0 | **35** |
| Coordinator vacant | 12 | 7 | 9 | 4 | 0 | **32** |
| Total | 16 | 24 | 12 | 15 | 0 | **67** |
| Percent Vacant | 75% | 29% | 75% | 27% | N/A | **48%** |
| | | | | | | |
| Mobile filled* | 0 | 8 | 6 | 11 | 26 | **51** |
| Mobile vacant | 0 | 0 | 21 | 5 | 7 | **33** |
| Total | 0 | 8 | 27 | 16 | 33 | **84** |
| Percent Vacant | N/A | 0% | 78% | 31% | 21% | **39%** |
| | | | | | | |
| Hospital Liaison | 1 | 1 | 1 | 2 | 1 | |

***Table 6: FY25 Q1 Annual REACH Staffing Analysis for REACH CTH and ATH Settings***

| Position | RI | RII | RIII | RIV | RV | Total |
|---|---|---|---|---|---|---|
| Adult CTH filled | 9 | 21 | 23 | 26 | 25 | **104** |
| Adult CTH vacant | 2 | 4 | 2 | 4 | 6 | **18** |
| Total | 11 | 25 | 25 | 30 | 31 | **122** |
| Percent Vacant | 18% | 16% | 8% | 13% | 19% | **15%** |
| | | | | | | |
| Children's CTH filled | | 14 | | 27 | | **41** |
| Children's CTH vacant | | 5 | | 3 | | **8** |
| Total | | 19 | | 30 | | **49** |
| Percent Vacant | | 26% | | 10% | | **16%** |
| | | | | | | |
| ATH Filled | | 18 | | 18 | | **36** |
| ATH Vacant | | 4 | | 8 | | **12** |
| Total | | 22 | | 26 | | **48** |
| Percentage Vacant | | 18% | | 31% | | **25%** |

DBHDS continues to use the Behavioral Support Program Adherence Review Instrument (BSPARI) to determine the quality of the behavior programs developed by behaviorists and provided to individuals with therapeutic consultation (1). DBHDS is to be commended for developing this comprehensive review process that has achieved high inter-rater reliability. The DBHDS BCBAs who conduct these reviews provide feedback and offer assistance to behaviorists to help improve the quality of plans and therefore services that individuals with DD receive to address problematic behaviors and increase positive behaviors. This is a clear example of the focus DBHDS places on continuous quality improvement in providing services to individuals with behavioral needs.

**Summary of Findings**

Five CIs were reviewed in the 25th period. CIs *11.1* is now met for two consecutive periods. Virginia has not met CIs *7.8, 7.18, 10.4 or 13.3*.  Table 7 summarizes the facts and conclusions for the review of these CIs. All processes and attestations have been verified in previous studies and no substantive changes have been made.

Table 7 below summarizes the status of the Commonwealth's efforts to meet the Crisis Services CIs.

*Table 7: Crisis Services Compliance Indicator Achievements*

| # | Indicator | Facts | Analysis/Conclusions | 24 | 25 |
|---|---|---|---|---|---|
| *SA Provision- III.C.6.a.i-iii: The Commonwealth shall develop a statewide crisis system for individuals with intellectual and developmental disabilities. The crisis system shall: i. Provide timely and accessible support; ii. Provide services focused on crisis prevention and proactive planning; iii. Provide in-home and community-based crisis services that are directed at resolving crises and preventing the removal of the induvial from his or her current placement whenever practicable.* | | | | | |
| 7.8 | 86% of children and adults who are known to the system will receive REACH crisis assessments at home, the residential setting, or other community setting (non-hospital/CSB location) | DBHDS reported (2,3) for the percentages of individuals who had a crisis assessment conducted in community settings:<br><br>FY24 Q4 55%<br>Range: 32% RIV to 76% RIII<br>DBHDS reported for this quarter the numbers of assessments completed as well as the percentages. A total of 380 assessments were completed of which 208 (55%) were conducted in community locations.<br><br>FY25 Q1: 49%<br>Range: 24% RI to 62% RIII | A total of 745 children and adults were assessed for a crisis in this reporting period (FY24 Q4 and FY25 Q1). Of these children and adults known to REACH, 388 (52%) received their crisis assessment in the home or community setting to de-escalate the crisis where it occurred. This percentage aligns with the average annual percentage since FY 2020 and remains far below the performance metric of 86%. Since a higher percentage of individuals are hospitalized when the assessment occurs at either the CSB-ES office or hospital this remains a | NM | NM |

| | | | | | |
|---|---|---|---|---|---|
| | | DBHDS reported for this quarter the numbers of assessments completed as well as the percentages. A total of 365 assessments were completed of which 180 (49%) were conducted in community locations. | significant concern. These data are described in the report.<br><br>Virginia has not met this CI's 86% benchmark and remains far below the expected performance metric. | | |
| 7.18 | Within one year of the effective date of the permanent DD Waiver regulations, 86% of those identified as in need of the Therapeutic Consultation service (behavioral supports) are referred for the service (and a provider is identified) within 30 days. | 953 individuals needed TC (behavioral supports) between 2.24 and 6.24 (1). Of these individuals 715 (75%) were connected to a behaviorist within 30 days, compared to 962 (74%) of the individuals connected within 30 days in the previous reporting period. Two of the regions, Regions II and III met or exceeded the benchmark of 86% at least once during the reporting period. Region II has the most individuals needing therapeutic consultation. Region III met or exceeded the performance benchmark three times in the reporting period. The average number of days for people connected beyond thirty days was 66 (February), 70 (March), 54.5 (April), 57 (May) and 62 (June). Only 777 (82%) of individuals who needed a behaviorist were connected to one at all, which is a slight increase in the percentage of individuals who were connected in the 24th period (81%). | Overall, only 715 (75%) of the 953 children and adults who were identified for TC were connected to a TC provider within 30 days. This is a decrease in the number of individuals authorized compared to the previous reporting period when 1,307 individuals were identified as needing TC. The number of children and adults who were connected within 30 days to a provider decreased by 247 individuals from 962 to 715 individuals since the 24th reporting period.  However, it must be noted that DBHDS reports on seven months for the even numbered reporting periods and only five months for the odd numbered periods.<br><br>DBHDS provided updates to its activities and strategies to address the root cause analysis using the Performance Diagnostic Checklist to identify the business problems and identify related solutions, it undertook in FY23 This analysis was conducted by a DBHDS BCBA with subject matter expertise. Potential variables that DBHDS identified as contributing to the Commonwealth's underperformance include Support Coordinator's (SC's) awareness of the behavioral resources available to individuals in need of therapeutic consultation and the Settlement Agreement | **NM** | **NM** |

| | | | requirements; unique CSB business practices; and supervisory support for SCs in this area of performance. DBHDS continues to provide training, communication and follow up with CSBs regarding expectations and service provider availability and has done so monthly since July 2023 with CSB leadership. DBHDS also informs CSBs of new providers in their regions and has made a search engine available for timely access by CSB Service Coordinators. Fifteen providers were added to the search engine in this reporting period. DBHDS funded seven new providers and are reviewing requests from two additional providers. | | |
| | | | DBHDS has worked to increase the number of providers available in Regions following up on last year's gap analysis. Their efforts brings the total number of providers to 95 which is an increase of one in this reporting period. | | |
| | | | Virginia has continued to not meet this indicator because only 75% of the individuals who need TC are connected to a provider within 30 days. | | |

**SA Provision- III.C.6.b.iii.B.: Crisis stabilization programs shall be used as a last resort. The State shall ensure that, prior to transferring an individual to a crisis stabilization program, the mobile crisis team, in collaboration with the provider, has first attempted to resolve the crisis to avoid an out-of-home placement and, if that is not possible, has then attempted to locate another community-based placement that could serve as a short-term placement.**

| # | Indicator | Facts | Analysis/Conclusions | 24 | 25 |
|---|---|---|---|---|---|
| 10.4 | 86% of individuals with a DD waiver and known to the REACH system who are admitted to CTH facilities and psychiatric hospitals will have a community residence identified within 30 days of admission. | DBHDS reports separately on those admitted to a CTH and those admitted to a psychiatric hospital (2,3,11). The following data combines these data to evaluate compliance with *CI 10.4*. The data are for individuals with a DD waiver and known to REACH, not a report of everyone with DD who was hospitalized or admitted to a CTH. In FY24 Q4 and FY25 Q1 a total of 371 individuals were hospitalized or admitted to REACH. A total of 282 (76%) had a community residence identified within 30 days. This is a decrease compared to the previous reporting period when 79% of the individual admitted to either a CTH or hospital had a residential provider identified within 30 days of admission | In this reporting period only two of the five Regions met or exceeded the 86% expectation. Over both quarters in the 25th period, 371 individuals were admitted to hospitals and CTHs of which 282 (76%) had a community residence identified in 30 days.  The Commonwealth has not met the requirements of this Indicator. | NM | NM |

**SA Provision- III.C.6.b.iii.D.: Crisis stabilization programs shall have no more than six beds and lengths of stay shall not exceed 30 days.**

| # | Indicator | Facts | Analysis/Conclusions | 24 | 25 |
|---|---|---|---|---|---|
| 11.1 | 86% of individuals with a DD waiver and known to the REACH system admitted to CTH facilities will have a community residence identified within 30 days of admission. This CI is also in III.C.b.iii.B. | DBHDS reports (11) that in FY24 Q4 and FY25 Q1 70 individuals were admitted to the CTH who were known to REACH and on a waiver. Of these 63 (90%) had a community residence identified within 30 days of the admission to the CTH. | 63 (90%) of the individuals admitted to a CTH in this reporting period had a community residence identified within 30 days of their admission. The only Region that fell below the benchmark was Region III (64%). Regions I and IV had community residences identified within 30 days for 100% of the individuals admitted to the CTHs in their Regions. The Commonwealth's performance | M | M |

| | | | has improved. It has now met and exceeded the 86% benchmark for the two consecutive periods. | | |
|---|---|---|---|---|---|

<br>

**SA Provision- III.C.6.b.iii.G.: By June 30, 2013, the Commonwealth shall develop an additional crisis stabilization program in each Region as determined necessary by the Commonwealth to meet the needs of the target population in that Region.**

| # | Indicator | Facts | Analysis/Conclusions | 24 | 25 |
|---|---|---|---|---|---|
| 13.3 | The Commonwealth will implement out-of-home crisis therapeutic prevention host-home like services for children connected to the REACH system who are experiencing a behavioral or mental health crisis and would benefit from this service through statewide access in order to prevent institutionalization of children due to behavioral or mental health crises. | As reported in the 24th review period, DBHDS has met with the three Regions that do not have a CTH for children. Regions III and V have decided to develop CTHs to serve six children each. Funds have now been awarded. The Children's CTH operated by Region II is actually physically located in Region I and may meet the needs of children in crisis living in this part of the state. Region II is proposing to develop a second Children's CTH in the more populated part of the Region. The use of the existing CTHs for therapeutic crisis prevention for eight children is an example of DBHDS' plans to provide out-of-home crisis prevention services throughout the state by operating a children's CTH in every Region. | The new CTHs for children are under development but there has been no children served to meet the performance expectation for CI 13.3, so it remains Not Met. | NM | NM |

<u>Recommendation</u>

Virginia did not meet the performance expectations for *CI 7.8*, which requires crisis assessments to be conducted in community settings rather than in Emergency Services Departments. Regions vary as to the percentage of crisis assessments that are conducted in the community. Regions II and III more routinely conduct the larger percentages of crisis assessments in community settings. DBHDS should met with these Regions' REACH teams to determine what makes them more successful in conducting the assessments in the individual's home or community location. DBHDS should identify best practices and share these with the other REACH teams if they include strategies that could be replicated.

Attachment A

Document List

1. Behavior Supports Report FY25 Q1
2. Supplemental Crisis Report FY24 Q4
3. Supplemental Crisis Report FY25 Q1
4. REACH Data Summary Report-Children: FY24 Q4
5. REACH Data Summary Report- Children FY25 Q1
6. REACH Data Summary Report- Adults: FY24 Q4
7. REACH Data Summary Report- Adults: FY25 Q1
8. REACH Staffing Reports for FY25 Q1: All Regions
9. FY24 Q4 REACH Quarterly Qualitative Reviews: All Regions
10. FY25 Q1 REACH Quarterly Qualitative Reviews: All Regions
11. Emails from Sharon Bonaventura 10/18/24 and 10/21/24

Submitted by:
Kathryn du Pree MPS
Joseph Marafito MS
October 31, 2024

# APPENDIX C

**Integrated Day Activities and Supported Employment**

**by**

**Kathryn du Pree, MPS**

**Integrated Day Activities Including Supported Employment for the Independent Reviewer**
**Twenty-Fifth Review Period**

The purpose of this study is to review the Commonwealth of Virginia's progress achieving the Settlement Agreement's (SA) Compliance Indicators (CIs) for Integrated Day Activities including Supported Employment (Section III.C.7.a. and b.) during the 25th review period. This study will review evidence to determine if the Commonwealth has met CIs *14.8, 14.9* and *14.10*. The Commonwealth has not yet achieved the benchmarks for these three CIs for the first time, and, therefore, the focus of this review is to analyze the Commonwealth's related performance during the 25th period.

Integrated Day Activities was last studied in the 24th review period. In that period the Commonwealth did not meet any of these indicators. The 24th study found that although more individuals with DD were employed, Virginia did not meet 90% of its revised targets set by *CI 14.8*. Regarding *CI 14.9*, 23% of individuals with DD were employed through the Department of Aging and Rehabilitation Services (DARS) or the waivers administered by DBHDS, which did not meet the measure that 25% of all individuals with DD either on a waiver or on the waiver waiting list are employed. *CI 14.10* requires the Commonwealth to increase the percentage of individuals with DD in an integrated day service including employment by 3.5%. The 24th review period found that the percentage of these individuals increased by 1.5%.

Facts were gathered regarding the Commonwealth's progress related to the performance measures for the three remaining CIs associated with the SA provisions III.C.7.a. The focus of this period's review, therefore, will be to review the Commonwealth's progress toward achieving the employment targets for all individuals with DD on the waivers or the waiver waiting list; increased employment specifically within waiver service options for individuals enrolled in a DD waiver; and an increased percentage of waiver recipients who are participating in the most integrated settings for their employment and day services.

**Settlement Agreement Provisions**
Provision III.C.7.a. requires that: to the greatest extent practicable, the Commonwealth shall provide individuals in the target population receiving services under this Agreement with integrated day opportunities, including supported employment.

The three CIs associated with Provisions III.C.7.a. that Virginia has not met twice consecutively, or that were not relieved by the Court, include:

*CI 14.8* New Waiver Targets established by DBHDS's Employment First Advisory Group. The data target for FY20 is 936 individuals in Individual Supported Employment (ISE) and 550 individuals in Group Supported Employment (GSE) for a total of 1486 in supported employment. Compliance with the Settlement Agreement is attained when the Commonwealth is within 10% of the targets.

*CI 14.9* The Commonwealth has established an overall target of employment of 25% of the combined total of adults ages18-64 on the DD waivers and waitlist.

*CI 14.10* DBHDS service authorization data continues to demonstrate an increase of 3.5% annually of the DD Waiver population being served in the most integrated settings as defined in the Integrated Employment and Day Services Report (an increase of about 500 individuals each year as counted by unduplicated number recipients).

**Methodology**

This review focused on the Commonwealth's progress toward achieving the indicators for increasing the number of individuals who are engaged in supported employment or who are competitively employed, and those who are receiving Community Engagement (CE) and other integrated day services. I engaged in the following activities to review and analyze the DBHDS' progress toward meeting the remaining three CIs for integrated day activities.

**Interviews**: I interviewed members of the Employment First Advisory Group (E1AG). The E1AG meets bi-monthly and met regularly in the 25th review periods (# 6). The E1AG returned to meeting in person in July 2023 and has continued to meet in person in the 25th review period. The E1AG members who were interviewed continue to be pleased about the direction of the E1AG. The return to in-person meetings and scheduling the sub-committee and E1AG meetings to occur on the same day has increased participation. The members I interviewed expressed satisfaction with the Commonwealth's decision to expand the membership to embrace representatives of other disability groups including mental health and substance use. Members report the work is still DD focused because of the continued efforts by Virginia to meet the SA requirements. There is some concern that the decision to combine the sub-committee and Advisory Group meetings on the same day does not leave as much time for more rigorous analysis of the data and a discussion of barriers and possible solutions by the members of the E1AG. Members would appreciate receiving draft reports ahead of the meetings with sufficient time for them to thoroughly review them and be prepared to discuss the policy implications. The members who were interviewed were pleased with the continued collaboration between DARS and DBHDS and the initiatives to end sub-minimum wage work and increase customized employment.

E1AG members remain concerned with the challenges to meeting the employment targets. While more individuals with DD were employed as of June 2024. Members hope future meetings can be structured to have time for policy level discussions so that they can provide input into DBHDS' strategic planning efforts to increase employment and both the number and percentage of individuals with DD who are engaged in integrated day activities.

**Documents:** I reviewed the Semiannual Report on Employment; the Provider Data Summary for the State FY2024; the meeting minutes for the Employment First Advisory Group (E1AG) and the Community Engagement Advisory Committee (CEAG); the Community Engagement Strategic Plan; and the Employment Services Strategic Plan.

## Summary of Findings for the 25th Period

The purpose of this review is to determine the Commonwealth's progress meeting the following Compliance Indicators: *14.8, 14.9 and 14.10*. None of these were met in previous studies.

*CI 14.8* It is the responsibility of the E1AG to work with DBHDS to set and review the targets. The E1AG has a data committee which reviews the employment data at least annually and completes trend analyses. The Commonwealth made progress towards achieving its employment targets though 2019, reaching 89% of the target it set (i.e., 1,078 employed compared to the target of 1,211) for that year.

An expected decline in the number of employed waiver participants occurred during the pandemic. The decline was dramatic between June 2019 and June 2020 (from 1,078 to 715 employed waiver participants). This decline began to turn around in FY22 when 764 individuals on the waiver were employed. The Commonwealth did not meet its target for FY23 of 1,486 waiver participants employed but did achieve employment for 986 of these individuals which was a 29% increase in employment in one year. This was reported in the 23rd reporting period.

As reported in the 23rd Study Report, during the pandemic, DBHDS revised its waiver employment targets for 2022, reducing the target to 1,211 which was the pre-pandemic target for 2019. The E1AG met in April 2022 to revise the employment targets. This decision was made after a review and analysis of the impact of the COVID pandemic on employment outcomes for individuals with I/DD in Virginia. The decision was to return to the targets of 2019 for 2022 and those of 2020 for 2023.

In the fall of 2023, DBHDS planned to return to its pre-existing targets for the out-years through 2026. However, during the 24th review period, DBHDS and the E1AG undertook a more rigorous analysis of the employment data. DBHDS and the E1AG Data Committee members reviewed the historic approach to setting employment targets. Percentage increases year to year were not consistently set by the Commonwealth. The E1AG committee's review found that originally, there was no apparent methodology or review of actual and projected performance to set the targets. As an example, between 2016 and 2017 the expected increase in employment was 15% yet it increased to 28% between 2017 and 2018. The E1AG reviewed the last few years' performance including the declining enrollment in GSE. This decrease in the reliance of GSE has been anticipated and promoted as Virginia views ISE as the more integrated employment opportunity. As a result of its data analysis, the E1AG Data Committee recommended reducing future employment targets based on what they consider a more realistic annual increase of 15% in employment for waiver participants.

This new approach results in the following targets based on the actual achievement in FY23:
- FY24 1,142
- FY25 1,310
- FY26 1,512

DBHDS' target for FY24 is 1,142. As of June 30, 2024, there were 1,020 waiver participants employed. This number represents 89% of the target of 1,142 for this fiscal year. This is the first time Virginia has achieved 89% since 2019, which was pre-pandemic. Virginia will meet the target when the performance is within 10% of the benchmark for the year. This year Virginia is within 11% of the benchmark for 2024.

*CI 14.9* The data reported by the Commonwealth is derived from data submitted by its Employment Service Organizations (ESO) and Department for Aging and Rehabilitative Services (DARS). The data are analyzed by DBHDS and the E1AG.  There were 20,727 individuals receiving or on the wait list for waiver services as of 6.30.24. Of these individuals a total of 5.070 (4,491 in ISE and 579 in GSE) were employed. This represents 24.5% of the waiver population, an increase of 1.5% compared to FY23. This is an increase of 111 individuals who are employed compared to the number employed in the 24th period.  *CI 14.9* is not yet achieved as Virginia did not meet the outcome that 25% of the waiver participants and individuals on the waiting list for waiver services were in integrated day services but is very close to meeting the benchmark and continues to make steady progress. These data are described in Table 1 below.

*CI 14.10* The Commonwealth established 25.2% (3,279/13,014) as the baseline number and percentage for this indicator in March 2018 when there were service authorizations (SA) for 3,279 individuals with DD being served in the most integrated employment and day service settings and 13,014 individuals in the DD waivers. For this reporting period, the most recent full year data report is from 3.31.23 to 3.31.24, which is the same full year data that was used during the 24th review period. In March 2023, there were 3,254 (20.1%) individuals with DD who received waiver services and participated in integrated employment or day services of 16,187 in the DD Waiver population. In March 2024, a year later, 3,762 (21.9%) of 17,121 individuals in the DD Waiver population participated in the most integrated settings for employment and day services. While the number of waiver participants in integrated day services increased by 508 individuals, the percentage of waiver participants with SAs for integrated day services increased by only 1.8 percent. The Commonwealth had not yet returned to or surpassed the number or the percentage of individuals participating in integrated day settings in 3/31/20 which was 4,171 of 14,620 individuals (28.5%). This was the largest number and percentage of participants in the most integrated employment and day service settings since the baseline was set in March 2018.

A new compliance rating for CI 14.10 is Deferred until a review of the next year's data is available after March 2025.

**Compliance Indicator Achievement**

Table 1 below summarizes the status of the compliance indicators for integrated day services.

**Table 1**
**Integrated Day Services Findings**

| # | Indicator | Facts | Analysis/Conclusions | 24th | 25th |
|---|-----------|-------|---------------------|------|------|
| 14.8 | New Waiver Targets established by the Employment First Advisory Group. The data target for FY20 is 936 individuals in ISE and 550 individuals in GSE for a total of 1486 in supported employment. Compliance with the Settlement Agreement is attained when the Commonwealth is within 10% of its targets. | The E1AG met in the 24th period to revise the employment targets (# 6). The E1AG made the decision to lower the targets after it reviewed and analyzed the previous methodology for setting the targets; the decrease in the use of GSE and post-pandemic systems issues including a shortage of employees for employment supports. The targets for 2024 are 1,142 individuals employed overall including 842 in ISE and 300 in GSE.<br><br>During the 25th period, as reported in the Semiannual Employment Report through June 2024, the number of individuals who were employed was 1,020 of whom 719 were in ISE and 301 were in GSE (#1). This data reflects employment for the full fiscal year.<br><br>The data reported are derived from data submitted by the Employment Service Organizations (ESO) and DARS. The data are analyzed by DBHDS and | The Commonwealth has increased the number of individuals with waiver-funded services who are employed by 34 since the FY23 when 986 individuals were employed. The increases are in both ISE (17 more individuals) and GSE (17 more individuals). It is understandable that the Commonwealth wanted to set reasonable and achievable targets and want the targets to reflect the commitment to increasing ISE rather than GSE. However, it is concerning that even after reducing its targets Virginia failed to meet the targets that it set for FY24. Overall, Virginia met 89% of its target by employing 1,020 individuals compared to a target of 1,142.<br><br>This CI remains Not Met. | **NM** | **NM** |

| 14.9 | The Commonwealth has established an overall target of employment of 25% of the combined total of adults ages 18-64 on the DD waivers and waitlist. | DBHDS reports that there were 20,727 individuals on either the waivers or the waiver waiting list as of 6.30.24, a decrease of 1,152 from 6.30.23 when there were 21,879 individuals reported. Therefore, the goal is to have 5,182 individuals employed by 6.30.34 to achieve the 25% metric. DBHDS reports in the Semiannual Employment Services report of 6.30.24 that 5,070 individuals are employed. This is 24.5% of the number of individuals on waivers or the waiver waiting list. There has been an increase of 111 individuals employed since the 24th reporting period when 4,959 individuals with DD were employed. The increase in the number of individuals employed in ISE is 118. The number of individuals in GSE decreased by 7 (1).

This is the 19th semiannual employment report produced by DBHDS. Data were submitted by 100% of the Employment Service Organizations (ESO) and by DARS. The | the E1AG (1,2).

The Settlement Agreement establishes a target of 25% employment for the adults on the I/DD waivers or wait lists. In this reporting period, the most recent full year data report is from 3.31.23 to 3.31.24, which is the same full year data that was used during the 24th period study. At that time, only 23% of this population was employed in ISE or GSE offered by DBHDS or DARS. The Commonwealth has achieved 23% in the both the 24th and 25th reporting periods. DBHDS reports that of the 4,959 individuals with DD who are employed, 4373 (88%) are employed through ISE. | NM | NM |
| --- | --- | --- | --- | --- | --- |

| | | individuals employed primarily participate in the Extended Employment Services (EES); Long-term Employment Support Services (LTESS); and HCBS waiver programs. The E1AG normally conducts trend analyses for the data in the semiannual employment reports and used this analysis to make recommendations to DBHDS which are contained in the semiannual reports. The E1AG had not received the Semiannual Report on Employment June 2024 by the time this report was written so has been unable to conduct a trend analysis including the most recent data. | | | |
| --- | --- | --- | --- | --- | --- |
| 14.10 | DBHDS service authorizations data continues to demonstrate an increase of 3.5% annually of the DD Waiver population being served in the most integrated settings as defined in the Integrated Employment and Day Services Report (an increase of about 500 individuals each year as counted by unduplicated number recipients). | The baseline for this indicator was established in 2018 when there were service authorizations for 3,179 individuals with I/DD being served in the most integrated employment and day service settings. For this reporting period the comparison is from 3.31.23 to 3.31.24. In March 2023, there were 3,254 (20.1%) individuals with DD and waiver-funded services who participated in integrated | There are 508 more individuals in integrated day services in March 2024 compared to March 2023. Comparing the achievement of the number of service authorizations in March 2023 to March 2024, this is an increase from 3,254 to 3,762 individuals in integrated day services, which is a 1.8% increase. This is an increase compared to the 1.5% increase in the number of individuals with DD in | **NM** | **D** |

| | | employment or day services of the total number of 16,187 individuals who receive DD waiver services. In March 2024, 3,762 (21.9%) of the 17,121 individuals with DD who receive waiver services were participating in the most integrated settings for employment and day services. This is an increase over the year of only 1.8%. (2,14). | integrated settings in the 23rd reporting period. However, these data are the same as were reported in the 24th period.<br><br>Without data for a subsequent full year period, a new rating for this indicator is deferred. | | |
| . | | | | | |

**Recommendation**

Virginia did not meet the performance expectation of *CI 14.10* to increase the percentage of individuals participating in IDA including both Employment and Community Engagement. DBHDS has reinstated the Community Engagement Advisory Group (CEAG), which includes many stakeholders. The CEAG focuses on policy, family and individual education, and training for SCs. The CEAG is interested in data analysis and having input into DBHDS policy that impacts the success of CE. DBHDS should engage the CEAG to discuss the issues related to increasing participation in CE and decreasing the involvement in Day Activities which are not integrated to develop a set of recommendations to implement that will assist Virginia to meet *CI 14.10.*

Attachment A

Documents Review
Integrated Day Services- Title or File Name

1. Semiannual Report on Employment June 2024 Data: Issued October 2024
2. Provider Data Summary Report FY2024 Final: Issued May 2024
3. Community Engagement Work Plan FY24-26
4. CEAG Meeting Minutes 4.19.24,8.16.24
5. E1AG Plan for FY24-26 with Quarterly Updates
6. E1AG Meeting Agendas and Minutes: 4.17.24
7. CEAG Work Plan FY24 Q3 and Q4 Updates
8. CEAG Combined Feedback
9. Community Life Engagement Case Manager Training
10. Community Life Engagement Individual and Family Training
11. Approved 7.29.24 Increase Coaching and CE
12. Employment Discussion Options for 14-17 Year Olds
13. Employment and Workplace Assistance Training 4.10.24
14. DR0055-Residential Setting Report 03312024-DOJ-1

Submitted by:
Kathryn du Pree MPS
October 24, 2024

# **APPENDIX D**

## **Community Living Options**

**by**

**Kathryn du Pree, MPS**

**Community Living Options Report**
**25th Review Period**
**Prepared for the Independent Reviewer**

Introduction

This report constitutes the seventh review of the compliance indicators for Community Living Options (Integrated Settings - Section III.D.1). In the Independent Reviewer's 22nd Report to the Court, the Commonwealth provided documentation that twenty (20) of twenty-three (23) Compliance Indicators (CI) had been achieved, of which seventeen (17) were met for two consecutive study periods.  In the 23rd review period six CIs were reviewed of which three CIs, *18.3, 18.4 and 18.5* had been met once before, and three CIs, *18.2, 18.6 and 18.9* had not been met previously. The study conducted during the 23rd period concluded that CIs *18.3, 18.4, and 18.5* were met for a second consecutive review, and *18.2* and *18.6* were met for the first time. *CI 18.9* remained not met. In the 24th review period, the remaining three CIs that had not been met for two consecutive review periods were reviewed, *18.2, 18.6, and 18.9. CI 18.6* was met for the second consecutive time. Neither *CI 18.2 nor CI 18.9* were met in the 24th review period.

The 24th review found that the Commonwealth had not achieved the performance metric for *CI 18.9.* During the first six-months of FY24, only 40% of the 616 individuals with authorized nursing services received the hours allotted to them 80% of the time, which was significantly less than the 70% of individuals required.

This seventh review being conducted during the 25th period is to determine if the Commonwealth has achieved compliance with the CIs that it had not previously met for two consecutive review periods, i.e., *CIs 18.2 and 18.9.*

For this review the facts gathered are identified and analyzed for each indicator in the Findings Table below. The documents which include these facts are listed by reference in Attachment A and most are found in the Commonwealth's library of documents. Follow up information was provided by Susan Moon, Director, Health Support Network and Brian Nevetral, OIH Project Manager.

Summary of Findings for the 25th Review Period

This review found that the two indicators reviewed continued to not be met although progress was evident. *CI 18.2* was found to be not met in this reporting period for reasons described below. *CI 18.9*, which addresses the delivery of nursing services to both children and adults, remains not met. The reasons related to *CI 18.9* are also described below.

Regarding *CI 18.2*, DBHDS data showed that the number and percentage of authorizations for individuals being served in most-integrated residential settings (i.e. fewer than four individuals with DD) has continued to grow as a percentage of all residential settings, i.e., from 79.4% in

2016 to 90.5% in 2024. This data is included in the DBHDS HCBS residential settings report
using WaMS data (2). Data showed a .5% annual increase between 3.31.23 and 3.31.24, which

fails to meet the 2% benchmark. This percentage is derived from the comparison of data
reported through 3.1.23 when 14,562 (90%) of the 16,167 individuals receiving waiver services
resided in integrated settings to the data reported through 3.31.24 when 14,933 (90.5%) of the
16,499 individuals receiving waiver services resided in integrated settings. For seven years,
Virginia consistently achieved a positive annual trend (never below 1.2%). For the year 3.1.23
through 3.31.24, the Commonwealth maintained this trend but was unable to achieve an annual
increase of 2% and therefore did not meet this CI's performance metric during the 25th period.

The number and percentage of individuals residing in less-integrated residential settings have
decreased during the same seven-year period.  In 2016, the baseline was 2,446 individuals in less-
integrated settings, compared to 1,605 individuals in March 2023, and 1,566 individuals in
March 2024. There was a decrease of 39 individuals between March 2023 and March 2024
decreasing the percentage from 9.9% to 9.5% of the DD waiver population which results in a
percentage decrease of .4% for individuals living in less-integrated settings.

Over 90% of Virginia's waiver participants now reside in integrated residential settings. The
actual numerical increase of 371 individuals in integrated settings between March 2023 and
March 2024, is a 2.5% increase numerically comparing this reporting period to the previous
reporting period as described in Table 4 below. Because of the increased number of waiver
recipients, the denominator changes each year. Therefore, the change in percentage is
determined by comparing the percentage totals from year to year, not the numerical increase.
Having maintained a positive seven-year trend and achieving over 90% of individuals living in
most-integrated settings, it becomes increasingly difficult for Virginia to achieve an annual 2%
increase.  It is the considered opinion of this reviewer that this CI's current 2% annual increase
performance metric may be an appropriate performance measure for a small set number of years
under the Settlement Agreement but is not a viable long-term metric especially when the
percentage remaining in less-integrated homes becomes increasingly small. A more useful
performance metric would require Virginia to continue a positive multi-year trend in the
percentage of individuals living in most-integrated settings as well as a corresponding multi-year
decrease in the percentage living in less-integrated settings. Virginia has continued to maintain
these trends of  decreasing the number and percentage of individuals in non-integrated settings
and increasing the number and percentage of individuals in integrated settings.

**Table 1**
**Integrated Settings per WaMS**

|  | March 31, 2022 Provider Data Summary | March 31, 2023 Provider Data Summary | March 31, 2024 Provider Data Summary |
|---|---|---|---|
| Number/percentage of individuals in integrated settings | 87.7%<br>13,527/15,428 | 90%<br>14,562/16,187 | 90.5%<br>14,933/16,499 |
| Number/percentage of individuals in non-integrated settings | 12.3%<br>1901/15,428 | 9.9%<br>1,605/16,187 | 9.5%<br>1,566/16,499 |
| Percentage change of individuals in integrated settings |  | 2.3% | .5% |

In its review of nursing services, DBHDS provided the data analysis for all of FY24 in the Nursing Services Data Report issued in September 2024 to determine compliance with *CI 18.9*.

*CI 18.9* requires both timeliness (i.e. within 30 days) to initiate newly authorized nursing services and consistent utilization of authorized nursing hours. DBHDS reports that it has achieved the timeliness benchmark for the initial delivery of nursing services to both EPSDT and Waiver service recipients (105 individuals). The Commonwealth previously achieved this performance for Waiver recipients, and for individuals receiving nursing services under EPSDT. Table 2 below depicts the achievements over the past three years regarding the timeliness of initiating newly authorized nursing services. It also indicates that DBHDS has not yet achieved the nursing utilization benchmark (i.e., receipt of the number of hours identified in the ISP 80% of the time) for 70% of individuals in the DD waivers or receiving services under EPSDT.

The Office of Integrated Health (OIH) performed the review of the FY24 data for nursing services authorized and delivered from 7.1.23 - 6.30.24. There were 601 unique individuals with 1,997 service authorizations (SA). Services were newly authorized for 105 unique individuals. Authorizations were effected within thirty days for 90% of EPSDT recipients compared to 75% in the previous reporting period, and for 97% of DD Waiver participants, compared to 78% in the previous reporting period. The overall timeliness for the initiation of nursing services for those with new authorizations was for 100 (95%) of the 105 individuals. DBHDS has achieved a significant increase in the percentage of individuals with new service authorizations receiving these services within the timeliness metric.

Virginia did not achieve the level of nursing hours utilization performance expected. Only 300 (50%) of the 601 unique individuals with SAs received 80% of the hours allotted. However, while this is a significant increase compared to the total percentage of those who received 80% of their authorized hours in FY23 which was 40%, it is only now approaching the performance level of FY20. The Commonwealth explains that it has learned that the number or authorized hours in Part V of the ISP for an individual whose needs for nursing services may be inflated to cover

either RN or LPN services. These duplicate authorizations can both be requested and approved due to likely scheduling challenges for the nursing services provider agencies that do not know in advance which staff will be available. Hours beyond the expected weekly schedule may also be authorized to address unexpected health events/emergencies. The Independent Reviewer's Individual Services Review study of individuals with complex medical needs found that the ISPs of some individuals who actually needed nursing services did not indicate such a need, and no nursing service were authorized, because there were no nurses available. Therefore, the number of authorized hours in Part V of an individual's ISP may not be accurate. This explanation was given in the 24th reporting period but the issue of potential for an inaccurate number of authorization remains a challenge for determining the actual number of hours each individual needs. Therefore, it is not currently possible to determine the accurate percentage of the number of needed hours of nursing support that are actually delivered to the individual. Table 2 depicts the summary of utilization for EPSDT and Waiver individuals for all nursing services that were authorized.

**Table 2**
**Nursing Services**

|  | FY22 | FY23 | FY24 |
|---|---|---|---|
| EPSDT Timeliness | 55% | 75% | 90% |
| Waiver Timeliness | 83% | 78% | 97% |
| EPSDT Utilization | 18% | 26% | 32% |
| Waiver Utilization | 36% | 42.5% | 53% |

*Note: the nursing utilization percentages are determined by dividing the number of billed hours by the number of authorized hours.*

DBHDS's Nursing Utilization Report includes a specific breakdown of the utilization of both Private Duty Nursing (PDN) and Skilled Nursing, both by RN and LPN level nurses. The report indicates a more significant increase in the utilization of Skilled Nursing compared to PDN, unlike the findings in the 24th period study. Between FY23 and FY24 the utilization of 80% of authorized hours of Skilled Nursing by an RN increased from 7% to 20% and from 24% to 26% of Skilled Nursing by an LPN. The utilization of 80% of one's authorized hours for PDN both by RNs and LPNs decreased by 7% for RN services and 2% for LPN services comparing FY24 to FY23 utilization. Although the percentages decreased for utilization of PDN in this review period, the utilization is still much higher for PDN at 58% delivered by RNs and 47% delivered by LPNs, than for those comparable nursing professionals delivering Skilled Nursing.

Because of the episodic need, especially for skilled nursing, and difficult to predict nature of home healthcare (health need spikes, emergencies, etc.) in general and the presence of multiple SAs for both the RN and LPN levels of nursing, the system has continued its tendency to over authorize nursing hours (#3) for those whose need is specified in their ISPs. This suggests that the reported aggregate utilization rates will regularly fall below the actual service authorization amount because this number is inflated for some individuals for the reasons stated.

The Commonwealth has not yet determined the extent of excess authorizations or the number of individuals who need nursing services but do not receive any authorized hours.

The Commonwealth has expanded the provider stimulant Jump Start Funding to include nursing services. DBHDS awarded $23,940 in funding during this reporting period. These funds are available to nursing service providers to expand integrated services including Skilled Nursing and Private Duty Nursing. Virginia has not yet determined the extent to which the nursing rate increases provided in July 2022 contributed to the reported nursing utilization rate increases in PDN during FY23. The Commonwealth has increased the rates for PDN and skilled nursing services three times since the start of the pandemic. The first increase was effective in FY22, increasing the rate by $4 per hour, and the second increase of $7 per hour was effective in FY23. The methodology to determine these rate increases is to use the midpoint of the Bureau of Labor Statistics (BLS) rate for the hourly wages of nurses while also factoring costs related to benefits, mileage, time off and productivity to compute an hourly rate. The new rate that became effective in FY22 was based on the BLS midpoint for nursing wages set in FY20.  The General Assembly approved a 3% rate increase for skilled and private duty nursing services, which took effect in July 2024.

Table 3 depicts the DBHDS reported total number of individuals including both those using EPSDT and those enrolled in a DD waiver who needed and received nursing services from FY19 through FY24. DBHDS reported that the total number of individuals needing nursing services decreased significantly (28%) between FY21 when 860 individuals needed nursing services to 601 in FY24 a period that included hundreds of new waiver participants. Although, DBHDS speculated on the root causes, it could not explain the factors behind this dramatic decrease. DBHDS commented in the 24th review period that some providers with nurses on staff choose to provide the service without requesting specific service authorization because of the extra documentation and administrative burden associated with the authorization process.

This data provides a longitudinal perspective regarding the utilization of nursing services pre and post pandemic and pre and post the nursing agency pay rate increases which started in July 2022. In FY19, 311 (48%) of individuals needing nursing services receive 80% or more of their allotted nursing hours. Whereas, in FY24 only 300 (50%) received 80%. The Commonwealth has not yet returned to the level of nursing services utilization reported in the years prior to the pandemic. The rate at which individuals received in-home nursing services plummeted, like most types of services, in FY 21. Since this low point, the utilization rate has increased from 29% to 50%, although the number of recipients remains significantly below pre-pandemic levels and dropped slightly from FY23 to FY24. DBHDS has not yet been determined the extent to which this increase since FY 21 is due to a gradual recovery from the pandemic and/or the impact of the significant FY22 and FY23 nursing pay rate increases.

**Table 3**
**Nursing Services**

| Fiscal Year | Percentage receiving 80% of hours | Number of individuals receiving 80% or more | Total number of individuals needing nursing services |
|---|---|---|---|
| FY19 | 48% | 311 | 648 |
| FY20 | 51% | 372 | 736 |
| FY21 | 29% | 247 | 860 |
| FY22 | 34% | 208 | 613 |
| FY23 | 40% | 247 | 616 |
| FY24 | 50% | 300 | 601 |

***Note: the nursing utilization percentages are determined by dividing the number of billed hours by the number of authorized hours.*

It is impressive that DBHDS completes a "Deep Dive" annually to ascertain the reasons for late starts for nursing services and to determine barriers to utilization. This year DBHDS nurses contacted representatives for 324 of the 601 individuals with SAs for nursing services. Of the 324 Service Coordinators (SC) contacted, 283 (87%) reported that adequate nursing services were received by waiver participants most of the time. DBHDS reported that the SCs were generally positive about the nurses and the nursing agencies. Nursing shortage was the barrier most mentioned related to the workforce challenges to address the needs of children and adults with DD. Representatives also reported an insufficient number of nurses for evening and weekend coverage, too few nurses in rural areas; and no shift differential to make evening and weekend hours more attractive to work. Other barriers included the lack of physician understanding of waiver services and process requirements, service authorization complexity, and Medicaid billing barriers.

DBHDS also reviews all nursing services authorizations which totaled 2,291 for FY24. Only twenty-one requested authorizations were rejected. All were explained and were the result of a duplicate authorization; lack of Medicaid enrollment; improper documentation; or a change from a RN to LPN provider. All that had been rejected were addressed using a new service authorization.

The Department also provided a further breakdown of the FY24 utilization data by living situation. Listed below are the percentages of individuals by living situation who received at least 80% of their authorized nursing hours. In FY 24, as in FY23, individuals living in group homes were more likely to receive a higher percentage of their authorized hours than those living with their families in sponsored homes, or independently.

- Group Home- 134/265 (51%) compared to 48% in FY23
- Living with Family- 73/265 (28%) compared to 35% in FY23
- Sponsored Home- 8/38 (21%) compared to 11% in FY23
- Living Independently- 2/12 (17%) compared to 36% in FY23

DBHDS also reported the percentage of utilization that met the 80% benchmark by Regions in FY 24. The significant differences in the percentages across the five regions remains but the percentages have increased for all Regions except for Region 3:

- Region 1- 33% compared to 24% in FY23
- Region 2- 76% compared to 65% in FY23
- Region 3- 17% comparable to 17% in FY23
- Region 4- 38% compared to 31% in FY23
- Region 5- 45% compared to 34% in FY23

DBHDS compares each Regions' performance against the metric for FY21, FY22, FY23 and FY24. Region 3 remains the region with the lowest percentage; Region 1 continues a gradual increase but remains the second lowest; Regions 4 and 5 have realized increases in FY24 compared to previous years; and Region 2 has increased significantly again from 65% to 76% of their individuals receiving 80% of their allocated hours. In all likelihood Regions 1 and 3 have fewer nurses given the rural nature of these parts of the Commonwealth. It is not surprising that Region 2 achieves the highest percentage of utilization since it comprises an area that has more health professionals. Region 2 is the only Region that met or exceeded the 70% benchmark for this aspect of *CI 18.9* in FY24.

The data reported by DBHDS that compares the percentage of hours delivered to authorized hours by SIS. During FY24, the DBHDS noted the changes in the percentages of individuals who received 80% of their authorized nursing hours. Comparing the percentages for those individuals with Level 4-7 SIS scores, 46% of individuals with a Level 4, compared to 33% in FY23; 65% of those with a Level 5, compared to 38% in FY23; and 53% of individuals with a Level 6, compared to 44% in FY23 received 80% of their authorized nursing services. The only level receiving a lower percentage of authorized hours are individuals with a Level 7 which decreased slightly from 44% to 43% of the Service Authorization.

DBHDS continues to refine nursing training and to convene stakeholders to identify unresolved barriers to the consistent and timely delivery of skilled and private duty nursing (PDN). The Nursing Services Report identifies the various barriers to greater utilization of nursing services and makes many recommendations for process improvements including continuing dialogue with stakeholders to identify barriers and solutions; automation of data to enable the DBHDS to complete trend analyses and create a data dashboard; develop a service provider database; use the results of the IMNR; and request Jump Start funding FY25.While the recommendations address many of the barriers, the workforce shortage is once again not addressed directly in the recommendations.

In the 23rd review period DBHDS shared a draft of a proposed Intense Management Needs Review (IMNR) process to assess and monitor the adequacy of management and supports provided to all individuals whose SIS evaluation results placed them in tier four level six (intense management needs) to meet their needs. The purpose of the IMNR is to ensure the documentation properly reflects the continuity of care across services is addressing the

individual's medical management needs. The review process was modified before implementation to include on-site observations and interviews so that the IMNR mirrors the

Individual Service Review (ISR) study's process conducted by the Independent Reviewer. The sample for the 24th study period included a randomly selected sample from a cohort of individuals with SIS Level 6 needs. The process includes interviews, record reviews and on-site observations completed by Registered Nurse Care Consultants (RNCC). The RNCC will note clinical and non-clinical issues in the findings and conclusions. The DBHDS IMNR process is designed to include Remediation Plans that will define the expected corrective action to be taken by Providers and Case Managers. A Quality Assurance Team will verify all facts and that the reviewers' clinical judgments were made consistent with their training and expertise. DBHDS plans to track the efficacy of the corrective action(s) and make future revisions as necessary to ensure that the action(s) address the deficiency. DBHDS plans to produce IMNR reports semi-annually to align with the ISR studies.

The first IMNR was conducted during the 24th reporting period. It included a sample of thirty individuals with complex support needs (i.e., SIS level 6). In part, it examined whether these individuals utilized the nursing service hours they were authorized to receive.

A second IMNR (3) was conducted in August 2024. In this sample of 30 individuals, eleven (37%) needed nursing services of whom eight were authorized for nursing services. Six (75%) of the eight individuals who were authorized to receive nursing services received 80% of their authorized hours. Of the nine whose ISPs identified that nursing services were needed, the six who received 80% of their authorized hours confirms that 67% received the benchmark percentage of the authorized hours. Of the eleven individuals needing nursing services, six (55%) received 80% of their authorized hours.

As part of this IMNR, nine individuals in Region 5 were reviewed by both a RNCC from the Office of Integrated Health Support Networks and a Nurse Consultant working for the Independent Reviewer. The review noted five areas of concern. Service Authorization Specialists (SAS) are reducing the nursing hours for individuals who previously were approved for 24/7 PDN. The SASs are recommending Skilled Nursing oversight and delegation to replace some of the hours of PDN. This is causing disruptions in service delivery, delays in service authorizations, and departures by nurses who are leaving their positions. The IMNR study also notes difficulties recruiting nurses to provide services to individuals who need few hours of nursing; complexities of the service authorization process and a lack of reimbursement for providers for the administrative time and costs involved in developing the documentation need for these authorization; and a lack of clarity from SAS' when a plan is pending. These barriers are causing delays to the delivery of nursing services for waiver participants.

All Process Documents and Attestations have been previously reviewed and the Processes have been determined to be reliable and valid. However, the extent of the validity that the authorized hours equal the number of hours needed has not been established.

## Compliance Indicator Achievement

Table 4 below summarizes the status of the Compliance Indicators this study reviewed.

**Table 4**
**Community Living Options Findings**

| # | Indicator | Facts | Analysis and Conclusions | 24th | 25th |
|---|-----------|-------|--------------------------|------|------|
| 18.2 | *a. Data continues to indicate an annual 2% increase in the overall DD waiver population receiving services in the most integrated settings.* | There were a total of 16,499 individuals in the DD waivers in FY24 compared to 16,167 in FY23. Data showed a .5% increase in individuals receiving services in most-integrated settings between 3.31.23 and 3.31.24. The number of these individuals increased by a total of 371 individuals from 14,562 in FY23 to 14,933 in FY24.<br><br>In this same time period, the number of individuals with DD Waiver services living in less-integrated situations decreased from 1605 to 1566 (.2%). | This indicator had consistently trended in a positive direction through the 24th reporting period but did not demonstrate a continued increase of 2% in this reporting period.  The baseline was established in 2016. At that time 79.4% of people with DD Waiver services lived in integrated settings. The total percentage living in integrated settings as of 3.31.24 is 90.5%. While the increase of 371 individuals is 2.5% of the 14,562 individuals receiving waiver services in the previous reporting period, the calculation is computed by comparing the percentages from year to year because the denominator varies. This methodology results in an annual increase of only .2%. Therefore, this CI is not met. | NM | NM |
| 18.9 | *6. DBHDS established a baseline annual utilization rate for private duty (65%) and skilled nursing services (62%) in the DD Waivers as of* | DBHDS issued its Nursing Services Data Report: Nursing Hours Utilization III.D.I Full Year Review of FY24 (#3). In this reporting period there was a total of | This indicator has not yet been fully achieved. It will be achieved when both the timeliness and utilization performance metrics are reached. | NM | NM |

| | | |
|---|---|---|
| *June 30, 2018, for FY 2018. The utilization rate is defined by the hours for the service are identified a need in an individual 's ISP and then whether the hours are delivered. Data will be tracked separately for EPSDT and waiver funded nursing. Seventy percent of individuals who have these services identified in their ISP (or, for children under 21 years old, have prescribed nursing because of EPSDT) must have these services delivered within 30 days, and at the number of hours identified in their ISP, eighty percent of the time.* | 601 unique individuals and an additional 105 unique individuals with ID/D with a new service authorization that began in FY24.<br><br>**Timeliness**: Of these 105 individuals, 100 (95%) started services within 30 days.<br>These numbers include 30 children receiving EPSDT and 75 adults receiving waiver services. 27 (90%) of the 30 children; and 73 (97%) of the 75 adults with waiver services received nursing services within 30 days.<br><br>**Utilization:** 601 individuals utilized EPSDT or waiver-funded nursing services. Only 300 (50%) received 80% of the hours that were allotted to them. This includes 29 (32%) of the 90 children receiving nursing through EPSDT, and 271 (53%) of the 511 adults receiving DD waiver services. The percentages for each group and overall have increased since FY23.<br><br>The recently completed IMNR offer additional data regarding the need for nursing service among individuals with complex medical support needs and the barriers to the utilization of authorized hours by these individuals. | The indicator requires that the percentage of hours delivered versus needed be determined. The Commonwealth reports that the Parties believed when this Indicator was agreed upon the number of hours of needed nursing hours was included in the ISP. However, DBHDS reported that the authorizations requests made by providers on the CMS 485 Form for waiver participants and Form 62 for children using EPSDT may not reflect the number of hours needed. DBHDS reports this is because some providers may be unsure if they will be able to provide the services through an RN or LPN, so some providers request more hours than are needed. Providers also want to have sufficient hours authorized to address emergency needs for additional nursing. The Commonwealth has learned that, as explained above, the number of authorized hours may not always be an accurate portrayal of needed nursing hours.<br><br>In addition, the 25th Period ISR study found that of the 12 individuals needing nursing services, the ISPs of 2 |

| | | | (17%) did not indicate that these services were needed. Neither of these individuals received any authorized hours.

When the data are compared to timeliness and utilization in FY23 the following differences emerge. The timeliness of starting services for children using EPSDT improved from 75% to 90% of individuals beginning to receive services within 30 days. Timeliness also increased from 78% to 97% for adults on the DD waivers. The Commonwealth significantly exceeded the expectation of the 70% benchmark for timeliness. This requirement of timeliness is achieved again.

The Commonwealth has also committed to 70% of individuals needing nursing services receiving the number of hours in their ISP 80% of the time. This requirement has not been achieved since overall, only 300 (50%) of the 601 individuals with authorized nursing services received the hours allotted to them 80% of the time.

DBHDS reported its utilization data for FY19 through FY24.  It is | | |
|---|---|---|---|---|---|

121

important to note that the Commonwealth reports having used the same nursing rate methodology since 2019. Therefore, the trend line of the utilization rates reported for the past five years very likely reflects reality. However, multiple factors contribute to individual utilization rates that are either too low or too high. The Commonwealth has not completed a study to determine the extent to which these different factors skew the reported utilization rates.

These annual utilization rates, which were all determined using the same methodology, showed that utilization rates declined from FY20 (51%) to FY21 (29%) at the peak impact of the pandemic. Since that low point, the percentages have steadily increased for adults. Since FY21, 12.5% more adults receive 80% of the allotted nursing hours to meet their needs. The percentage increased from 30% in FY21, to 36% in FY22 to 42.5% in FY23 and to 50% in FY24. There has also been an increase in the percentage for children which reached a low

| | | | point of 18% in FY22 climbing to 32% during FY24. The utilization increases in FY23 and FY24 occurred after the Commonwealth significantly increased its nursing agency pay rates.  Virginia has not yet determined the extent to which the pay rate increases versus the diminishing impact of the pandemic caused the increases.<br><br>DBHDS reported that it cannot replicate the methodology that it used to establish the FY18 utilization of nursing services baseline included in this CI. Without being able to use the same calculation methodology, DBHDS cannot report and, this reviewer cannot determine or verify whether the utilization rate reported for FY 24 was higher or lower than the actual CI baseline in FY18. The baseline reported 6.30.18 for FY18 was 65% for PDN and 62% for SN services. Regardless of its relationship to the baseline, this CI has not been achieved. | | |

<u>Recommendation</u>

Virginia did not meet the performance expectation for *CI 18.9* regarding the utilization of
nursing services. DBHDS should study and determine the estimated number of individuals who
need nursing services but who do not have the need identified in their ISPs or who have not
received any nursing service hours to ascertain how many individuals meet this criteria; whether
the lack of services is related to regional differences in the availability of nursing, and if teams are
not identifying this need if the team members know that nursing services will not be available for
the individual. Based on their findings, DBHDS should propose to the Independent Reviewer
how DBHDS will address the deficiencies in the system.

DBHDS interviewed Service Coordinators to determine the barriers to consistent utilization of
nursing services. The Study highlights the reasons that were given by the SCs. DBHDS should
determine which of these reasons create barriers for the most individuals and present a work plan
to address the challenges which include reduced coverage for evenings and weekends; lack of
nursing in more rural areas; service authorization complexity; and barriers related to Medicaid
billing and waiver processes.

Since nursing staff shortages are always noted, DBHDS should undertake a study to determine if
the rate increases have kept pace with the wages for RNs and LPNs in other sectors of Virginia
so that DD nursing services can remain competitive to attract nurses.

DBHDS continues to report that the need for nursing services may be inflated due to providers
not knowing whether an RN or LPN will provide the service and because providers project extra
hours for the potential of future emergencies that require more nursing services for periods of
time. DBHDS should determine if these legitimate needs can be reflected in the ISP or SA
documentation without inflating the actual number of hours individuals need regularly,
regardless of what level of nurse professional is available to provide nursing.

Attachment A
Documents Reviewed
 Title or Filename

1. CLO 25th Study Period Document Tracker
2. Provider Data Summary FY24: Issued May 2024
3. DBHDS Nursing Services Data Report FY24:  Issued September 2024

Submitted by:
Kathryn du Pree MPS
Expert Reviewer
October 24, 2024

# <u>APPENDIX E</u>

**Services for Individuals**

**with**

**Complex Medical Support Needs**

**by**

**Elizabeth Jones, MS, Team Leader**
**Marisa C. Brown, MSN, RN**
**Barbara Pilarcik, RN**
**Julene Hollenbach, RN, BSN, NE-BC**

**TWENTY-FIFTH PERIOD INDIVIDUAL SERVICES REVIEW STUDY:**

**Individuals with Complex Medical Needs**

Submitted By:

Marisa C. Brown, MSN, RN
Julene Hollenbach, RN, BSN, NE-BC
Barbara Pilarcik, RN
Elizabeth Jones, Team Leader

November 11, 2024

## Introduction/Overview

The health and safety of the individuals included under the terms of the Settlement Agreement has never ceased to be a major priority for the Parties, the Independent Reviewer, and the Court.

As a result, for the second consecutive review period, the Independent Reviewer has continued his assessment of the Commonwealth's initiative, the Intense Management Needs Review (IMNR) process, related to Compliance Indicator 36.8. This Indicator requires the Department of Behavioral Health and Disability Services (DBHDS) to collect and analyze data regarding the management of supports for individuals with complex medical, behavioral, and adaptive support needs.

Phase I of the IMNR process was initiated as a pilot during the 24th review period. In several important respects, this process deliberately mirrors the work of the Individual Services Reviews (ISRs) completed by the consultant team supervised by the Independent Reviewer. Both processes require the use of a Monitoring Questionnaire for a sample of individuals with complex medical needs. The Monitoring Questionnaire is administered through on-site interviews with the primary caregiver with knowledge of and responsibility for the healthcare services of the individual selected for review, observations of the person, adaptive equipment, and the residential setting, and the analysis of facts obtained from numerous documents related to the individual's health and programmatic needs. These documents include the most recent Individual Support Plan (ISP), case management notes, medical and medication records, incident reports, and On-Site Visit Tools (OSVTs).

During the 25th review period, Phase II of the IMNR process, which focuses on the remediation requirements of Compliance Indicator 36.8 for the individuals studied during Phase I of DBHDS's pilot study conducted during the 24th review period, proceeded as planned. The ISR review team examined whether DBHDS had sufficiently developed corrective actions based on its analysis, tracked the efficacy of each action, and revised, as necessary, to ensure that the action actually addressed the deficiency identified during Phase I.

In both the 24th and 25th review periods, the field work was a collaborative effort. The Independent Reviewer's and DBHDS's nurse reviewers worked in pairs. They completed similar Monitoring Questionnaires, reviewed the same records, and participated in the same interviews. However, during the current review period, the Monitoring Questionnaires were scored independently and the responses were not shared. Discussion about individual cases were encouraged but the nurses did not refer to the scores themselves.

The collaboration between DBHDS and the Independent Reviewer's team is a key feature that continues beyond the actual fieldwork. Since the 24th review period, all of the nurse reviewers have participated in several discussions and information sessions. DBHDS staff have been present to answer questions and explain policy and procedures relevant to the obligations of Compliance Indicator 36.8.  These periodic conversations have been cordial and very informative. The nurses share their knowledge and experience; they exchange recommendations

at both the individual and systemic levels. In addition, DBHDS's Director of the Office of Integrated Health (OIH) and the ISR Team Leader speak routinely to prepare the work, assess

the findings, and propose refinements that will help investigate and/or resolve problems with the delivery of healthcare supports.

A recent example of this collaboration occurred on October 18, 2024 with the case study related to a gentleman reviewed during the most recent fieldwork. This gentleman experienced serious pressure wounds as a result of his hospitalization. At the completion of his site visit, the concerns identified by the nurse reviewers were quickly reported to OIH. The Director of OIH conducted an extensive examination of the circumstances related to this individual's care, identified the resources that were available, and took steps to ensure that information about these resources would be more broadly distributed. The actions taken by the Director of OIH and her colleagues prompted discussion of potential interventions for other at-risk individuals as well as proactive measures for the system as a whole. Other examples of collaborative review include the discussion of the OSVTs, now scheduled for December 2024. This discussion is intended to evaluate the use of the OSVTs in order to determine whether adjustments to the existing form and protocol should be considered in order to improve their effectiveness.

The thoughtful and responsive collaboration experienced with DBHDS has contributed significantly to the work undertaken by the Independent Reviewer's team and is very much appreciated. Furthermore, providers and families repeatedly commended the presence of nurse reviewers on-site. One residential provider stated that their presence and involvement was more valuable than in-service training sessions. Families seemed especially pleased with the assistance they received from the Commonwealth's nurses in addressing such problems as delayed adaptive equipment or the inability to obtain information about a referral to the dentist. Families also expressed interest in the recommendations made by the nurses that could improve the management of healthcare needs, including the identification of relevant resources at the national level.

## Methodology

Prior to the onset of the actual fieldwork, several discrete actions occur for each of the review periods. The actions include the updating of the Monitoring Questionnaires to improve accuracy as well as discussions focusing on the details of the site visits and any necessary preparation.

The Team Leader for the Independent Reviewer prepares a script that is used by DBHDS staff to inform the primary caregivers about the purpose of the review and the expectations for the visit to the residential setting. After the caregivers are contacted by DBHDS, the Team Leader schedules the site visit appointments and responds to any questions about the role of the Independent Reviewer and his use of the healthcare information gathered during the course of the fieldwork.

129

Without exception, the caregivers contacted for this review period were gracious and welcoming in responding to the request for a site visit. The caregivers who had participated in earlier reviews, for different individuals, were especially cooperative. Caregivers who were experiencing d

difficulties with obtaining assistance for a specific need were reassured that their concerns would be documented by the nurse reviewers and addressed to the extent possible.

The Independent Reviewer randomly selected 30 individuals from a cohort of individuals with SIS level 6 needs (i.e., complex medical) who had an annual ISP meeting between July 1 and September 30, 2023. The random selection was stratified with ten individuals selected from each of three Regions (I, III, and V).

This sample is not sufficient to generalize this review's findings or any of its identified themes to all individuals with complex medical support needs. As explained for the 24th review period, since this is not a statistically valid sample, the Independent Reviewer has determined that the requirements of V.D.2.a-d Compliance Indicator 36.8 will be met for the group of people with complex medical needs by repeating a review of 30 randomly selected individuals in two successive periods, if the review includes on-site observations, review of the individual's medical records and contemporaneous notes (such as staff notes between shifts and Medication Administration Records), interviews with primary caregivers, verification of the facts stated by those interviewed, and a small set of clinical judgement determinations based on the facts. To produce reliable and replicable findings, it continues to be essential that facts are reported and verified rather than relying on opinions.

Each of these criteria were met during both the 24th and 25th review periods.

Furthermore, as referenced above, the 24th review period study was the first of DBHDS's two phase pilot program to collect and analyze data for one of the three named subgroups identified in Compliance Indicator 36.8, namely individuals with complex health needs.

For the sample of individuals in Phase I, DBHDS completed its IMNR Monitoring Questionnaires during the 24th review period. The 24th review period implementation of Phase I concluded with DBHDS's analysis identifying individual issues that needed corrective actions to resolve. During this 25th period, the ISR study reviewed whether DBHDS implemented the corrective actions that it identified during the preceding review period, and whether the IMNR process tracked the efficacy of their corrective actions and revised them as necessary to ensure that the actions addressed the identified deficiency.

**Characteristics of the Sample**

The randomly selected sample for the 25th review period includes 30 individuals with SIS level 6 needs (i.e., complex medical) who had their annual ISP meeting between July 1 and September 30, 2023.

130

Fourteen males and sixteen females are included in the sample. Ages range from 14 years old to 77 years old with the majority of the adults (67%) between the ages of 30 and 58. Three teenagers and five individuals in their seventies were reviewed.

Language abilities vary across the sample. Six people are able to speak for themselves; eight people have limited spoken language and need some support; one person relies on a communication device; four people use gestures; five people vocalize; and five people use facial expressions. One gentleman uses a combination of sign language and gestures. He can say "Yes" and "No." (This gentleman has good cognition and his communication challenges prevent him from being able to interact with people as effectively as possible. The nurse reviewer recommended a Speech and Language assessment for him.)

Ten of the individuals live in group homes; nine live in sponsored homes; and eleven live with family in their own homes.

Everyone in the sample uses adaptive equipment. Only one person walks without support. Five people walk with some support. Twenty-four people (80%) use wheelchairs.

A Demographic Table is included in Attachment A.

## Discussion of Major Themes and Initial Findings

The ISR study for the 25th review period continues to examine the Commonwealth's performance in meeting three critical requirements related to the Compliance Indicators agreed to by the Parties and ordered by the Court. These requirements focus on whether individuals receive annual physical and dental examinations and whether individuals whose ISPs indicate that they need nursing services have those services identified, authorized, and delivered. Although the Monitoring Questionnaires utilized for the findings in this report assess many more aspects of health care for individuals with complex medical needs, the obligations specified in Compliance Indicators 18.9, 29.20, and 36.8 are the primary focus of the narrative below.

It is important to reiterate the ongoing efforts by DBHDS to strengthen its on-site monitoring processes and to establish a reliable and consistent set of actions to remedy deficiencies documented at the individual, programmatic, and systemic levels. Now that the most recent fieldwork has been completed and the analysis of the findings is underway, DBHDS anticipates making additional refinements. For example, as noted above, DBHDS has scheduled a December 2024 discussion regarding the accuracy and thoroughness of the OSVTs.

The themes related to Compliance Indicator 18.9 were initially identified in the report for the 24th review period. The current findings are summarized below.

Theme: The reliability and consistency of sufficient nursing supports is absolutely critical to the continuity of the individual's health care and for the stabilization of the household as a whole.

It is clearly documented from multiple sources that each of the people included in the sample for this review period require consistent competent care and treatment for complex medical conditions. The sample of individuals reviewed have associated risks that depend on prompt and sufficient interventions by trained caregivers. Each of the 30 individuals relies on adaptive equipment, including equipment for bathing and lifting. Choking risks are present for 26 people (87%). Bowel-related concerns present risks for 23 people (77%). A major seizure disorder has been diagnosed for 19 people (63%). Nutrition is administered through a tube for 9 people (30%). Psychotropic medications are prescribed for 18 people (60%).

More than a third of the people reviewed live with their families. In each of these families, there is a primary caregiver with major responsibility for the care of their family member with a developmental disability and intense medical support needs. In particular, their households are very dependent on receiving the services and supports specified in the ISP.

Theme: The findings from DBHDS and the Independent Reviewer's team agree that nine of the individuals reviewed (30%) are authorized for nursing services during this specific review cycle. (The Independent Reviewer's nurse identified one additional person (#18) who needed and was to receive nursing supports beginning on September 13, 2024, after this current review cycle ended. The nurse had been hired by the nursing agency but had not started for work at the time of the site visit.)  The nine individuals have the appropriate documentation in their records. However, there are two additional individuals (# 22 and #25) identified by the Independent Reviewer's nurse who needed but did not receive authorization for nursing services. Reportedly, their ISPs did not include them as a need because their case manager concluded that there are no nursing service agencies with available nursing staff located in the specific areas where they live in Region I.

Instead of the nursing care, these two individuals (#22 and #25) receive personal assistance services, despite medical conditions that require attention by a nurse.  For example:

> Individual #22 has multiple medical challenges, including but not limited to, use of a gastronomy tube, a dislocated right hip, easily prone to aspiration pneumonia, skin breakdown, dehydration, falls and bowel obstruction.

> Individual #25 is at risk of skin breakdown, aspiration pneumonia, falls, urinary tract infections, dehydration, sepsis, and pressure sores. He has had three hospitalizations between July 1, 2023 to June 30, 2024.

Lastly, it was documented that Individual #24 began receiving nursing support in May 2024. The residential provider reported that she requested nursing support every year, but it was not included in the previous ISPs because there were no nursing services available. Individual #24 has a tracheostomy, diabetes, chronic aspiration syndrome, chronic kidney disease requiring dialysis, and a pressure wound.

Theme: DBHDS and the Independent Reviewer's team agree that, of the nine individuals authorized for nursing services, five (56%) received at least 80% of their authorized hours.

Of the remaining four people who need nursing services, two individuals received some nursing hours but did not meet the criteria of 80%. Two individuals (#23 and #24) were to receive nursing hours but, according to the records reviewed, none were billed at the time of this report.

Therefore, of the 12 individuals who need nursing care, only five (42%) received 80% of the hours needed.

DBHDS knows the reasons for the lack of nursing hours. The work completed for this report corroborated that there are insufficient resources to meet the critical need for nursing services in a timely manner. Individuals #22, #23, #24 and #25, referenced above, live in Region I. The IMNR and ISR nurse reviewers share the concern that medical conditions create risks for vulnerable people and that the skilled staff required for their care are not available or accessible, especially in family living situations where there is a sole caregiver responsible for health and safety.

> Individual #14 was hospitalized multiple times. His nursing hours were routinely unfilled because of a lack of available nurses. By necessity, all care had to be provided by his brother. During one hospitalization, this individual developed a very serious pressure wound; he was discharged without instructions for its care. It is not known if the presence of a nurse in the home for forty hours a week prior to and after his hospitalizations would have prevented the multiple and serious health problems he experienced. Having a nurse involved with Individual #14 and his family, helping to support his complex medical needs during this stressful time, could have improved care and treatment following his discharge from the hospital. Individual #14's home is in Region III.

> Individual #05 was authorized for seven hours per week of nursing services for the time period November 1, 2023 through April 30, 2024. Only 50% of the hours were billed. The same number of hours have been approved for the new ISP but the provider reports that they cannot find a nurse to perform the services. Individual #05 lives in Region V.

Theme: Support Coordinator turnover negatively impacts the continuity of care and the timely identification of essential supports. This serious problem was raised by caregivers as an impediment to the provision of adequate healthcare. For example:

> Individual #08 lives with and is cared for by her grandmother. The grandmother reported that she does not know who the Support Coordinator is and that no one comes to her house for any visits. Individual #08 has high support needs; she is at risk for choking, bowel obstruction, and is tube-fed. She lives in Region V.

> Individual #19's sponsor reported that there have been four Support Coordinators in the last four years. The Support Coordinators do not know Individual #19 and are not able to contribute to meetings or to assist in locating necessary resources. She lives in Region III.

133

Individual #26 has had four different Support Coordinators since 2018. Each time that a new Support Coordinator begins, there is a lengthy learning process to become knowledgeable about her needs. She lives in Region I.

Individual #29's parent reported that she has had five or six Support Coordinators in the last two years. The frequent changes have resulted in frustration and poor continuity of care. It is possible that this has been a contributing factor in the failure to adequately address Individual #29's health risks. Her risks are related to a poor diet, obesity, heavy smoking, pressure sores, lack of dental care, and minimal monitoring of three psychotropic medications. She lives in Region I.

Theme: Support Coordinators would benefit from additional training in the purpose for and completion of the OSVTs. Although there will be a lengthier discussion of this concern in the December 2024 meeting with DBHDS, the Independent Reviewer's nurses again have cited the failure to complete these forms as required, the failure to identify problems and gaps in service, as well as inaccuracies and inconsistencies in the information included in the OSVT. The OSVTs are intended as an external monitoring safeguard to ensure that significant issues are identified, documented, resolved, and monitored. Without assurance that the Support Coordinators can be reliable reporters of critical information, there is the serious likelihood that people with complex medical needs and high-risk factors will not receive the interventions required to protect them from harm.

The themes related to Compliance Indicator 29.20 are summarized below:

Theme:  Among the small sample reviewed, progress is again evident in the provision of an annual physical exam.

The Independent Reviewer's nurses confirmed that 97% of the people in the sample had an annual physical exam. There was one person (#07) who did not. He was scheduled for the annual exam in July 2024 but his mother's hospitalization required rescheduling to a later date. The physical had not been rescheduled at the time of the site visit.

Theme: Among the small sample reviewed, the progress in providing annual dental exams remains insufficient to meet the 86% performance benchmark for this Compliance Indicator. Although it is noteworthy that every person reviewed for this report now has dental coverage, the systemic concerns regarding 1) the lack of dentists who accept Medicaid; 2) the lack of dentists with the capacity to treat people under sedation or who require environmental accommodation; and 3) the lack of available dental care in the more rural areas of the Commonwealth still remain.

During the 25th review period, there were 22 individuals (73%) who received an annual dental exam. (Individual #18 is edentulous so credit was given for the Primary Care Physician's examination of his oral cavity.) Although the small sample of 30 individuals does not allow findings to be generalized, this finding likely reflects an improvement over the finding of 63% in

the prior review period. Nonetheless, work remains to be done and the availability of resources continues to need continued appraisal and remediation.

The inability to have adequate dental care is well-recognized as a serious health risk. The facts documented for the people in the sample who lacked sufficient and timely dental care are sobering. For example:

Individual # 01 has not had a dental exam since March 2023 because her dentist decided not to accept Medicaid any longer. A second appointment with a new dentist was made but that dentist also cancelled her appointment after deciding not to accept Medicaid. She lives in Region V.

Individual #02 has not seen a dentist since 2022. No explanation was provided. She lives in Region V.

Individual #08 has not been able to find a dentist who accepts Medicaid. Her most recent exam was in March 2023. She lives in Region V.

Individual #09 has not seen a dentist since 2016. The Support Coordinator is helping her to find a dentist. However, the OSVTs do not cite this as a specific concern. She lives in Region V.

Individual #22 was last seen by a dentist in June 2021. She requires sedation and has been on the VCU dental program's waiting list for over two years. She lives in Region I.

Individual #24 requires sedation for further treatment. His last appointment was in 2023; he family cannot find a dentist who can provide a thorough assessment, x-rays, and cleaning while under sedation. He lives in Region I.

Individual # 27 is now scheduled for a dental appointment with sedation in October 2024. He did not have an annual exam in the year of the review period. He lives in Region I.

Individual #29 has not had a dental exam in over ten years. Her mother stated that she has had difficulty finding a dentist who accepts Medicaid and could accommodate the width of her daughter's wheelchair. The DBHDS nurse reviewer promptly contacted the DBHDS Mobile Dental Unit who indicated that they would be able to accommodate her wheelchair and would schedule her examination. When the mother reported that she has another daughter who receives waiver services, uses a wheelchair, and has not seen a dentist in over ten years, the DBHDS Mobile Dental Unit said they would provide care to her as well. The family greatly appreciated this assistance from DBHDS's nurse and Mobile Dental Unit. This individual and her family live in Region I.

As a result of information gathered through the site visit interviews with the primary caregivers, the ISR nurse reviewers determined that the website operated by DentaQuest did not provide current and accurate information about the number and location of dentists who accept Medicaid. As a result, caregivers made appointments that were then cancelled by the dentist because the dentist no longer accepted Medicaid payments. This observation was reported to the Director of OIH. She promptly agreed to investigate this concern and propose corrective actions in a meeting with DMAS.

Although there has been incremental progress in the completion of annual dental exams for people included in this review cycle, it is clear that additional resources are still required, especially in the more rural areas of the Commonwealth and for people who must rely on Medicaid. It is also critically important for the lack of dental care to be documented thoroughly and consistently by the Support Coordinators so that reliable data can be collected about the need for and necessary location of additional resources and other corrective actions.

Theme: The IMNR nurses had carefully documented concerns with the management of individuals' health needs and promptly recommended corrective actions, and, in certain urgent cases, initiated the implementation of the corrective actions. For the concerns identified during the 24th period, the IMNR nurses made a serious and effective effort to identify needed corrective actions. This period's study verified that DBHDS had assigned responsibility for implementing the remediation plans, but not yet completed, tracking the efficacy of its corrective actions or making revisions to ensure that the actions addressed the deficiency.

DBHDS had not yet implemented a systemic remediation process that identified the outcomes required "to address the deficiency" as required by indicator 36.8. Therefore, in some instances, with the desired outcome not being identified, the process step to revise the corrective action as necessary was not yet fully implemented. As a result, there was not yet a determination whether an action was sufficient to resolve the deficiency. For example, the IMNR process tracked and confirmed that a needed dental exam was scheduled but did not verify that the exam had actually occurred.

DBHDS acknowledges that the final steps in its remediation process needs to be tightened up and included in a written process description. DBHDS plans to make and implement these needed remediation system improvements during Phase II of the remediation process, which will be studied during the 26th review period.

The following Table summarizes the findings for each of the Compliance Indicators discussed in this report. Further detail is included about each individual's specific circumstances and overall health care needs in the Monitoring Questionnaires that will be shared with the Parties. As customary, the Issues Pages included in certain Monitoring Questionnaires will outline practices or concerns that require further review by DBHDS as part of its remediation efforts. The remediation protocol is an integral part of the IMNR process and will be a continuing source for discussion and data analysis in the months ahead.

136

### TABLE ONE: SUMMARY OF INDIVIDUAL FINDINGS

| ID# | Family Home Or Group Home | Nursing Services Needed | ISP Indicated Nursing Hours Needed | Received Some Authorized Nursing Hours | 80% of Authorized Nursing Hours were Received | Annual Physical Exam | Annual Dental Exam |
|---|---|---|---|---|---|---|---|
| 01 | Group | No | No | NA | NA | Yes | No |
| 02 | Group | Yes | Yes | Yes | Yes | Yes | No |
| 03 | Group | No | No | NA | NA | Yes | Yes |
| 04 | Group | No | No | NA | NA | Yes | Yes |
| 05 | Group | Yes | Yes | Yes | No | Yes | Yes |
| 06 | Own/Family | No | No | NA | NA | Yes | Yes |
| 07 | Own/Family | No | No | NA | NA | No*** | Yes |
| 08 | Own/Family | Yes | Yes | Yes | Yes | Yes | No |
| 09 | Group | Yes | Yes | Yes | Yes | Yes | No |
| 10 | Own/Family | No | No | NA | NA | Yes | Yes |
| 11 | Sponsor | Yes | Yes | Yes | Yes | Yes | Yes |
| 12 | Sponsor | No | No | NA | NA | Yes | Yes |
| 13 | Own/Family | No | No | NA | NA | Yes | Yes |
| 14 | Own/Family | Yes | Yes | Yes | No | Yes | Yes |
| 15 | Sponsor | No | No | NA | NA | Yes | Yes |
| 16 | Sponsor | No | No | NA | NA | Yes | Yes |
| 17 | Sponsor | No | No | NA | NA | Yes | Yes |
| 18 | Group | Yes | Yes | NA* | NA* | Yes | Yes**** |
| 19 | Sponsor | No | No | NA | NA | Yes | Yes |
| 20 | Sponsor | No | No | NA | NA | Yes | Yes |
| 21 | Own/Family | Yes | Yes | Yes | Yes | Yes | Yes |
| 22 | Own/Family | Yes | No** | NA | NA | Yes | No |
| 23 | Group | Yes | Yes | No | No | Yes | Yes |
| 24 | Sponsor | Yes | Yes | No | No | Yes | No |
| 25 | Own/Family | Yes | No** | NA | NA | Yes | Yes |
| 26 | Own/Family | No | No | NA | NA | Yes | Yes |
| 27 | Sponsor | No | No | NA | NA | Yes | No |
| 28 | Group | No | No | NA | NA | Yes | Yes |
| 29 | Own/Family | No | No | NA | NA | Yes | No |
| 30 | Group | No | No | NA | NA | Yes | Yes |
| % | | (12/30) 40% Needed Nursing Hours | (10/30) 33% ISP Indicated Needed Nursing Hours | (7/9) 78% Received Some Authorized Hours | (5/9) 56% Received 80% of Authorized Hours | (29/30) 97% Received Physical Exam | (22/30) 73% Received Dental Exam |

*Not scheduled to begin until September 13, 2024.
**ISP did not include need for nursing services because there are none available in local area.
***Needed to be rescheduled due to parent's illness.
****Edentulous. PCP examines oral cavity.

### Concluding Comments

In summary, the findings from the 25th ISR Study are not generalizable. However, they have documented that 97% of the people in the sample have had an annual physical and 73% have had an annual dental exam, as required by Compliance Indicator 29.20. As required by Compliance Indicator 18.9, 80% of the nursing hours were authorized and received by 56% of the people identified to require them in their ISPs. However, of the 12 individuals who the nurse reviewers confirmed needed nursing care, only five (42%) received 80% of their authorized hours.

As anticipated, the need for additional dental resources was identified in Region I. However, the ISR study also found that dentists who accept Medicaid are lacking in Region V.

Further collaboration is planned between DBHDS and the Independent Reviewer as the Commonwealth continues to refine its IMNR process. The staff of the OIH are to be commended for their diligent efforts to ensure that the data derived from the site visits and other information sources are not only examined carefully for positive trends and deficient practices but that they lead to thoughtful, effective interventions for the individuals who need them in order to maintain their desired health outcomes.

The recommendations resulting from the 25th ISR Study have been mentioned over the course of this collaborative effort. They include the review and possible modification of the protocols regarding the OSVTs; the accurate identification in the ISPs of all individuals who need nursing care; the inclusion of social isolation as a health-related factor to be addressed through individualized supports; the continuing benefit of case study discussions and, as appropriate, root cause analyses. Finally, as the review of the DBHDS's remediation efforts continues, it is expected that additional recommendations may be forthcoming for consideration.

The Independent Reviewer and the ISR Team appreciate the thoughtful and cordial work of the DBHDS leadership and staff as we continue our work with them. We are also appreciative of the individuals, families and residential providers who met with us and shared their experiences with the system of supports available to them.

**ATTACHMENTS**

## Demographic Tables

| Region | | |
|---|---|---|
| I | 10 | 33% |
| III | 10 | 33% |
| V | 10 | 33% |

| Sex | | |
|---|---|---|
| Male | 14 | 47% |
| Female | 16 | 53% |

| Age Group | | |
|---|---|---|
| Under 21 | 3 | 10% |
| 21-30 | 6 | 20% |
| 31-40 | 6 | 20% |
| 41-50 | 4 | 13% |
| 51-60 | 4 | 13% |
| 61-70 | 2 | 7% |
| 71-80 | 5 | 17% |
| 81-90 | 0 | 0% |
| Over 90 | 0 | 0% |

| Mobility Status | | |
|---|---|---|
| Walks without support | 1 | 3% |
| Walks with support | 5 | 17% |
| Uses wheelchair | 24 | 80% |
| Confined to bed | 0 | 0% |

| Residence Type | | |
|---|---|---|
| Group home | 10 | 33% |
| Own/family home | 11 | 37% |
| Sponsored home | 9 | 30% |

**SUMMARY OF DATA**

INDIVIDUAL SERVICES REVIEW: 25th REVIEW PERIOD

**DEMOGRAPHICS / OBSERVATION**

2. **Gender**:        14 Males, 16 Females

4. **Age Range**:

Under 21: 3
21-30: 6
31-40: 6
41-50: 4
51-60: 4
61-70: 3
71-80: 4

5. **Mobility Status**: (Check the highest level only)

**1** Walks without support      **5** Walks with support      ☐ Total assistance with walking
**24** Uses wheelchair            ☐ Confined to bed

57. **What method of communication does the person utilize?**

Language Spoken: (Check the highest level only)

**6** Spoken Language, Fully Articulates Without Assistance
**8** Limited Spoken Language, Needs Some Staff Support
**1** Communication Device
**4** Gestures
**5** Vocalizations
**5** Facial Expressions
**1** Other

6. **Authorized Representative (Relationship):**

a. Guardian:        **18** Yes

b. Authorized Representative:   **7** Yes

d. Relationship:  **12** Parent      **4** Sibling      **3** Other relative
                   **3** Other, e.g. friend          **3** Public guardian

10. **Type of Residence**:

**11** Own/family home  **9** Sponsored home  ☐ Supported Apartment
☐ Psychiatric facility  **10** Group home      ☐ ICF- ID
☐ Nursing facility      ☐ Rehabilitation facility

141

## **INDIVIDUAL'S SUPPORT PLANS/PLAN OF CARE**

|  |  | Yes | No | NA | CND |
|---|---|---|---|---|---|
| 34. | a.  Is the Individual's Support Plan current? | 29 | 1 |  |  |
| 35. | Has the Individual's Support Plan been modified as necessary in response to a major health-related event for the person, if one has occurred? | 2 | 3 | 25 |  |
| 39. | Does the Individual's Support Plan have specific and measurable outcomes and support activities? | 10 | 20 |  |  |
| 45. | Does the individual require adaptive equipment? | 30 |  |  |  |
|  | a.  If Yes, is the equipment reported as available? | 28 | 2 |  |  |
|  | b.  If No, has it reportedly been ordered? |  | 2 | 28 |  |
|  | c.  If available, is the equipment reportedly in good repair and functioning properly? If No, list any equipment in need of repair: | 23 | 7 |  |  |
|  | d.  If No, has the equipment reportedly been in need of repair more than 30 days? | 2 | 4 | 24 |  |
|  | e.  If No, has anyone reportedly acted upon the need for repair? | 5 | 1 | 24 |  |
| 46. | Is staff/family member knowledgeable and able to assist the individual to use the equipment? | 28 | 2 |  |  |
| 47. | Is staff/family member assisting the individual to use the equipment as prescribed? | 28 | 2 |  |  |

| 48. | Is the individual receiving supports identified in his/her Individual Support Plan?<br><br>Supports:<br>    a.  Residential/In-Home<br>    b.  Medical (physician and medical specialists)<br>    c.  Dental<br>    d.  Health (nursing and other health supports)<br>        1.  Based on the health and safety needs identified in the ISP, and after consulting with a qualified health professional, did the provider/family identify that nursing supports were required?<br>        2.  If so, after the assessment by a qualified health professional, did the need for nursing services result in the completion of a Health Care Plan (CMS 485)?<br>        3.  If so, did the schedule of activities and/or Part 5 specify the number of nursing hours identified on the CMS 485 to be provided?<br>    g.  Mental Health:<br>        1. Psychiatry<br>    i.  Communication/assisted technology, if needed. | | | | |
|---|---|---|---|---|---|
| | | 30<br>30<br>22<br>30<br>10<br><br><br><br>10<br><br><br>10<br><br><br>9<br>6<br>8 | <br><br>8<br><br>20<br><br><br><br><br><br><br><br><br><br>3<br>1 | <br><br><br><br><br><br><br><br>20<br><br><br>20<br><br><br>21<br>21<br>21 | |
| | | **Yes** | **No** | **NA** | **CND** |
| 56. | Is residential staff able to describe the individual's health related needs and their role in ensuring that the needs are met? | 25 | | 5 | |

## HEALTH CARE

| | | Yes | No | NA | CND |
|---|---|---|---|---|---|
| 97. | If ordered by a physician, was there a current physical therapy assessment? | 9 | 2 | 19 | |
| 98. | If ordered by a physician, was there a current occupational therapy assessment? | 4 | 1 | 25 | |
| 99. | If ordered by a physician, was there a current psychological assessment? | 2 | | 28 | |
| 100. | If ordered by a physician, was there a current speech and language assessment? | 8 | | 22 | |
| 101. | If ordered by a physician, was there a current nutritional assessment? | 4 | | 26 | |
| 102. | Were any other relevant medical/clinical evaluations or assessments recommended? | 20 | 10 | | |
| 103. | Are there needed assessments that were not recommended? | 11 | 19 | | |
| 104. | Are clinical therapy recommendations (OT, PT, S/L, psychology, nutrition) implemented or is staff actively engaged in scheduling appointments?<br><br>a.  OT<br>b.  PT<br>c.  S/L<br>d.  Psychology<br>e.  Nutrition<br>f.  Other | <br><br><br>3<br>11<br>5<br>2<br>10<br>1 | <br><br><br>1<br>1<br><br>1<br><br> | <br><br><br>26<br>18<br>25<br>27<br>20<br>29 | |
| 105. | Did the individual have a physical examination within the last 12 months or is there a variance approved by the physician? | 29 | 1 | | |
| 106a. | Did the individual have a dental examination within the last 12 months or is there a variance approved by the dentist? | 22 | 8 | | |
| 106b. | Does the individual have coverage for dental services? | 30 | | | |
| 107. | Were the dentist's recommendations implemented within the time frame recommended by the dentist? | 20 | 7 | 3 | |

144

| 108. | Were the Primary Care Physician's (PCP's) recommendations addressed/implemented within the time frame recommended by the PCP? | 28 | | 2 | |
|---|---|---|---|---|---|
| | | **Yes** | **No** | **NA** | **CND** |
| 109. | Were the medical specialist's recommendations addressed/implemented within the time frame recommended by the medical specialist? | 25 | 2 | 3 | |
| 110. | Is lab work completed as ordered by the physician? | 28 | | 1 | 1 |
| 112. | Are physician ordered diagnostic consults completed as ordered within the time frame recommended by the physician? | 14 | 1 | 15 | |
| 114. | Is there monitoring of fluid intake, if applicable per the physician's orders? | 5 | | 25 | |
| 115. | Is there monitoring of food intake, if applicable per the physician's orders? | 4 | | 26 | |
| 116. | Is there monitoring of tube feedings, if applicable per the physician's orders? | 8 | | 22 | |
| 117. | Is there monitoring of seizures, if applicable per the physician's orders? | 18 | | 12 | |
| 118. | Is there monitoring of weight fluctuations, if applicable per the physician's orders? | 13 | 1 | 16 | |
| 119. | Is there monitoring of positioning protocols, if applicable per the physician's orders? | 14 | | 16 | |
| 130. | Does this individual receive psychotropic medication? | 18 | 12 | | |
| 133. | If Yes, is there documentation that the individual and/or a legal guardian has given informed consent for the use of psychotropic medication(s)? | 15 | 3 | 12 | |
| 134. | Does the individual's nurse or psychiatrist conduct monitoring as indicated for the potential development of tardive dyskinesia, or other side effects of psychotropic medications, using a standardized tool (e.g. AIMS) at baseline and at least every 6 months thereafter)? | 4 | 7 | 12 | 7 |

| 135. | Do the individual's clinical professionals conduct monitoring for digestive disorders that are often side effects of psychotropic medication(s), e.g., constipation, GERD, hydration issues, etc.? | 13 | 2 | 12 | 3 |
|------|------|----|----|----|----|
| 136. | Is there any evidence of administering excessive or unnecessary medication(s), including psychotropic medications? | | 27 | | 3 |

## SUMMARY QUESTIONS

| | | Yes | No | NA | CND |
|------|------|-----|----|----|-----|
| 94. | Is the residence free of any safety issues or needed repairs?<br><br>If no, check concerns:<br><br>   a.  Carpet edge poses a fall hazard<br>   b.  Loose railings<br>   c.  Broken furniture/windows<br>   d.  No first aid supplies<br>   e.  Slanted/unsteady stairs/ramp | 26 | 2<br><br><br><br><br><br>2 | | 2 |
| 137. | Based on documentation reviewed and interview (s) conducted, is there any evidence of actual or potential harm, including neglect?<br><br>If Yes, cite:<br><br>   a.  Was a Risk Assessment Tool completed for the annual ISP meeting?<br>   b.  Did it cite any evidence of actual or potential harm, including neglect? | | 30 | | |
| 138. | In your professional judgment, does this individual's health care require further review? | 4 | 26 | | |

**SUPPLEMENTAL QUESTIONS**

| | | Yes | No | NA | CND |
|---|---|---|---|---|---|
| 141. | Has there been a psychiatric hospitalization? | | 30 | | |
| 142. | Have there been any events related to the individual's high risk health factors (i.e. aspiration, choking, constipation, falls, etc.) | 6 | 24 | | |
| 143. | Has there been an emergency room visit or unexpected medical hospitalization? | 13 | 17 | | |
| 147. | Has there been the use of physical, chemical, or mechanical restraint? | | 30 | | |
| 152. | a. Did the Case Manager identify an unidentified or inadequately addressed health-related risk, injury, need, or change in status? | 3 | 9 | 18 | |
| | b. If Yes or No, did they document, report and convene the ISP team? | | 12 | 18 | |

147

# **APPENDIX F**

## **Provider Training**

### **by**

### **Chris Adams, MS**

TO:           Donald Fletcher, Independent Reviewer
FROM:         Chris Adams, Consultant

RE:           25th Study Report: Provider Training

DATE:         October 12, 2024

## Introduction

Prior to initiation of the 25th study of the requirements at Provision V.H.1, the Commonwealth was found to have achieved and sustained achievement of the requirements in the following eleven Compliance Indicators (CIs):

- **49.1** – DBHDS makes available an Orientation Training and Competencies Protocol that communicates DD Waiver requirements for competency training, testing, and observation of DSPs and DSP Supervisors.

- **49.2** – The Commonwealth requires DSPs and DSP Supervisors, including contracted staff, providing direct services to meet the training and core competency requirements contained in DMAS regulation 12VAC30-122-180, including demonstration of competencies specific to health and safety, within 180 days of hire. The training must include seven specific components enumerated in the Compliance Indicator.

- **49.3** – DSPs and DSP Supervisors who have not yet completed training and competency requirements including passing a knowledge-based test with at least 80% success, are accompanied and overseen by other qualified staff who have passed the core competency requirements for the provision of any direct services. Any health-and-safety-related direct support skills will only be performed under direct supervision, including observation and guidance, of qualified staff until competence is observed and documented.

- **49.5** – DBHDS make available for nurses and behavioral interventionists training, online resources, educational newsletters, electronic updates, regional meetings, and technical support that increases their understanding of best practices for people with developmental disabilities, common DD-specific health and behavioral issues and methods to adapt support to address those issues, and the requirements of developmental disability services in Virginia, including development and implementation of individualized service plans.

- **49.6** – Employers and contractors responsible for providing transportation will meet the training requirements established in the DMAS transportation fee for service and managed care contracts. Failure to provide transportation in accordance with the contracts may result in liquidated damages, corrective action plans, or termination of the vendor contracts.

- **49.7** – The DBHDS Office of Integrated Health provides consultation and education specific to serving the DD population to community nurses, including resources for ongoing learning and developmental opportunities.

- **49.8** – DBHDS licensing regulations require DBHDS licensed providers, their new employees, contractors, volunteers, and students to be oriented commensurate with their function or job-specific responsibilities with commensurate documentation by the provider. The orientation must address nine specific requirements enumerated in the Compliance Indicator.

- **49.9** – The Commonwealth requires through the DBHDS Licensing Regulations that all employees or contractors who are responsible for implementing an individual's ISP demonstrate a working

149

knowledge of the objectives and strategies contained in the ISP, including an individual's detailed health and safety protocols.

- **49.10 –** The Commonwealth requires all employees and contractors without a clinical license who are responsible for medication administration to demonstrate competency of this set of skills under direct observation prior to performing the task without direct supervision.
- **49.11 –** The Commonwealth requires all employees or contractors who will be responsible for performing de-escalation and/or behavioral interventions to demonstrate competency of this set of skills under direct observation prior to performing the tasks with any individual service recipient.
- **49.13 –** Consistent with CMS assurances, DBHDS in conjunction with DMAS QMR staff, reviews citations and makes results available to providers through quarterly provider roundtables.

The focus of this 25th study is on the following CIs:

- **49.4 –** At least 95% of DSPs and their supervisors receive training and competency testing per DMAS regulation 12VAC30-122-180. In the 24th study, the determination of whether the requirements for CI 49.4 were deferred due to the pending initiation of QSR Round 6.
- **49.12 –** At least 86% of DBHDS licensed providers receiving an annual inspection have a training policy meeting established DBHDS requirements for staff training, including development opportunities for employees to enable them to support the individuals receiving services and to carry out their job responsibilities. These required training policies will address the frequency of retraining on serious incident reporting, medication administration, behavior intervention, emergency preparedness, and infection control, to include flu epidemics. Employee participation in training and development opportunities shall be documented and accessible to the department. DBHDS will take appropriate action in accordance with Licensing Regulations if providers fail to comply with training requirements required by regulation. The results of the 24th study noted that DBHDS was not able to achieve the 86% threshold requirement for this CI. The Office of Licensing initiated numerous initiatives to reach the 86% threshold, but these efforts have not yet proven sufficient to meet the threshold.

### Summary of Findings 25th Study

DSP and DSP Supervisor training and core competency requirements are codified at 12 VAC 30-122-180 which became effective 03/31/2021. In November 2021, recognizing concerns regarding the adequacy of the DMAS provider review process specific to assessment of providers meeting these training and core competency requirements, the parties agreed to modifications in the process to utilize data and information from Quality Service Reviews (QSRs) to measure achievement of the requirements of CIs 49.2, 49.3 and 49.4. Results from the 21st, 23rd, and 24th studies confirmed that these process changes address each of the requirements of CIs 49.2, 49.3, and Curative Action #10 and provide objective data to measure the training threshold requirements at CI 49.4.

This current study assessed whether there is evidence to determine if valid and reliable data sufficient to meet the 95% threshold required at CI 49.4 is being produced by the scoring and data validation procedures. For the 23rd and 24th studies, DBHDS provided a detailed description of the process to obtain data and information related to CIs 49.2, 49.3, and 49.4 and a description of the verification, validation and testing processes completed by the data analyst. Further modifications and improvements to these processes were implemented in QSR Round 6 and were evaluated as a part of this 25th study.

The criteria established by DBHDS requires achievement of the 95% threshold for two measures: (1) percentage of provider agency staff meeting provider orientation and training requirements, and (2) percentage of provider agency DSPs meeting competency training requirements. Both have to be at or above 95% to achieve the threshold. This threshold was not achieved for either measure in QSR Round 5 or QSR Round 6.

The findings from previous studies verified that DBHDS has a licensing requirement at 12VAC35-105-450 that contains the training policy requirements in CI 49.12. Additionally, licensing requirements at 12VAC35-105-50, 100, 110, and 115 prescribe negative actions and sanctions that can be taken with providers with significant or re-occurring citations. There have been no changes to these requirements since their effective date.

Based on the data reported by DBHDS, the Commonwealth has not yet achieved the 86% threshold requirement at CI 49.12. Specifically:

- During CY2022, 973/1156 licensed providers (84.17%) met these requirements during their annual licensing inspection.
- During CY2023, 819/1105 licensed providers (74.12%) met these requirements during their annual licensing inspection.
- During CY2024 (through 08/12/2024), 735/995 providers (73.87%) met these requirements during their annual licensing inspection.

Utilizing results from analysis of data from the 24th study, OL modified its compliance determination criteria to provide a more accurate measurement of provider compliance with the specific requirements at §450 and this CI. Details of that modification are described in the §49.12 CI section of the table below. Further analysis of data and information by OL from the sample review that was a part of this 25th study will further inform efforts to achieve both accurate and consistent assessment of provider compliance with these licensing requirements in DBHDS's subsequent inspections.

## Methodology

For this 25th study, the Consultant employed procedures similar to those utilized in previous studies. These included a review of documents and records provided by DBHDS that describe efforts taken to improve the accuracy and consistency of Licensing Specialist determinations of whether providers comply with the applicable licensing requirements. The evidence also included content and participation levels for training for providers and for Licensing Specialists relevant to the requirements at CI 30.4 and 30.12.

To verify and validate the Licensing Specialist determinations specific to compliance with 12VAC35-105-450 and CI 49.12, the Consultant reviewed licensing inspection results for a sample of 40 providers across each of the five regions conducted by 31 Licensing Specialists between 04/09/2024 and 07/16/2024. This date range for the sample was chosen to include a majority of provider inspections conducted after OL provided comprehensive training to its Licensing Specialists related to findings from the 24th review. Based on review of the sample provider's training policies, the consultant agreed with the Licensing Specialist determinations in 33/40 (82.5%) determinations. Using the same comparative methodology in the 24th review, the consultant agreed with the Licensing Specialist determinations in 32/39 (82%) determinations.

**Compliance Indicator Achievement**

The Commonwealth has not achieved the threshold percentage requirements for CI 49.4 and CI 49.12. The process descriptions provided specific to CI 49.4 are well-documented, reflect current processes and procedures, and the resulting data has been determined to be valid and reliable. There were no changes made to the data collection and analysis process descriptions for CI 49.12 since the completion of the 24th study.

The table below details the facts, analysis, and conclusions drawn from the review of the Commonwealth's efforts to achieve and sustain the requirements of Provision V.H.1, CIs 49.4 and 49.12.**mpliance Indicator Table**

The table below details the facts, analysis, and conclusions drawn from the 24th period review of the Commonwealth's efforts to meet and sustain the requirements of Provision V.H.1, Compliance Indicators 49.4 and 49.12.

| 25ᵗʰ Period Study Findings |
|---|
| **V.H.1:** The Commonwealth shall have a statewide core competency-based training curriculum for all staff who provide services under this Agreement. The training shall include person-centered practices, community integration and self-determination awareness, and required elements of service training. |

| CI | Facts | Analysis | Conclusion(s) |
|---|---|---|---|
| **49.4:** At least 95% of DSPs and their supervisors receive training and competency testing per DMAS regulation 12VAC30-122-180. | *12VAC30-122-180* contains the regulatory requirements relevant to this Compliance Indicator and *Curative Action #10*. Beginning with the QSR Round 3 in 11/2021, assessment of this measure was shifted from the DMAS Quality Management Review process to the QSR process conducted by the Health Services Advisory Group (QSR vendor).<br><br>The *Process Document DSP Comp Ver 007* dated 09/20/2024 and related *DSP Competencies Attachment B 9.30.2024* attestation statement provide information that incorporates all process changes made for QSR Round 6 specific to the training and competency assessment processes required by this CI.<br><br>DBHDS has continued to evaluate | DMAS established a regulation at *12VAC30-122-180* to require that DSPs and DSP Supervisors receive the training and competency testing required by this CI. To refine the process for measuring achievement of the requirements of this CI, the Commonwealth modified the methodology through *Curative Action #10* to utilize data from specific sections of the QSR process as evidence.<br><br>The Commonwealth documented the data definitions and data collection/reporting procedures in a process document that has been revised several times to reflect process improvements. The most recent version is entitled *Process Document DSP Comp Ver 007* dated 09/20/2024. The changes made in this most recent update of the process document were validated by the Chief Data Officer on 10/01/2024 and documented on the *DSP Competencies Attachment B 9.30.2024* data set attestation form.<br><br>Data is collected from the QSR process for two outcomes:<br>**Outcome 1:** Percentage of provider agency staff meeting provider orientation and training requirements. This includes reviewing training documentation for DSP's and training and competency assessments provided by DSP supervisors.<br>**Outcome 2:** Percentage of provider agency DSPs meeting competency training requirements. This includes observations of | 23ʳᵈ – Not Met<br><br>24ᵗʰ - Deferred<br><br>25ᵗʰ – Not Met |

| CI | Facts | Analysis | Conclusion(s) |
|---|---|---|---|
| | and refine processes and supports needed to assist providers to more consistently meet the training and competency testing requirements of this CI. Some improvements were incorporated into QSR Round 6 and the steps to accomplish others are being developed for future implementation.<br><br>For the QSR Round 6, DBHDS implemented a number of process improvements to increase the accuracy and validity of the data used to measure this CI. Based on review of these changes, they address specific questions that have been raised from previous studies.<br><br>The QSR Round 6 scores for Requirement 1 (PCR) and Requirement 2 (PQR) both continued to fall below the 95% threshold required by this CI. Improvement was noted in comparison with the Round 5 score for Requirement 1 but regression was noted in comparison with the Round 5 score for Requirement 2. | DSP's providing supports and DSP Supervisors' oversight and monitoring of DSP staff.<br><br>In response to recommendations made from the 24th study and several internal process analysis efforts, the following process updates were made. These include:<br>1.  Adding two additional elements to the PCR alert triggers that were initiated in Round 6. These include (1) observation to determine if specialized supports are being implemented as required during the QSR observation, and (2) determination of whether repairs or follow-up on repairs for equipment utilized by the individual are occurring.<br>2.  Implementing a process to describe the steps taken when providers are found to be deficient to include expanded training and technical assistance.<br>3.  Expanding provider training and technical assistance efforts targeted for providers who are experiencing challenges to meet the training and competency assessment process requirements.<br><br>Additionally, DBHDS has conducted several analyses to identify the primary factors contributing to low scores for Outcomes 1 & 2. These initiatives were incorporated into a Quality Improvement Initiative approved by the Quality Improvement Committee in 06/2024 – *Approved 7.19.24 DSP SFY24 QII Toolkit*. The results of these efforts are focused on reducing the administrative burden for providers to consistently and correctly meet the training and competency assessment requirements. Specific changes that are planned for implementation include (1) streamlining the advanced competencies, (2) streamlining required documentation around competencies; and (3) streamlining the DSP training itself. | |

154

| CI | Facts | Analysis | Conclusion(s) |
|---|---|---|---|
| | | For Round 6 of the QSR, a number of process improvements have been made to further validate the accuracy of the data used to calculate the percentages required to measure this CI. While this was the first time that these additional validation procedures were utilized in the scoring process, the process improvements address previously identified data validation questions. Their utility will be further proven in subsequent rounds of the QSR scoring processes.<br><br>The table below provides a summary of scoring for Outcome 1 (PCR) and Outcome 2 (PQR) for QSR Rounds 3, 4, 5, and 6.<br><br><table><tr><td></td><td>QSR R3*</td><td>QSR R4*</td><td>QSR R5</td><td>QSR R6</td></tr><tr><td rowspan="2">Req 1 (PCR)</td><td>511/565</td><td>272/320</td><td>235/302</td><td>519/599</td></tr><tr><td>90.40%</td><td>85.00%</td><td>77.81%</td><td>86.6%</td></tr><tr><td rowspan="2">Req 2 (PQR)</td><td>1092/1133</td><td>653/719</td><td>492/577</td><td>237/306</td></tr><tr><td>92.30%</td><td>92.82%</td><td>85.27%</td><td>77.45%</td></tr></table><br>*Note: QSR data from Rounds 3 and 4 were not verified as reliable and valid.<br><br>Neither of the measures used in the scoring process for this CI met the 95% threshold. The score for Requirement #1 from the PCR was improved over Round 5 but the score for Requirement #2 from the PQR decreased. | |
| **49.12:**<br>At least 86% of DBHDS licensed providers receiving an annual inspection have a training policy meeting established | DBHDS has regulatory requirements at *12VAC35-105-450 and 12VAC35-105-50, 100, 110 and 115* that address the requirements of this CI.<br><br>The DBHDS Office of Licensing's | DBHDS has a licensing requirement at *12VAC35-105-450* that contains the training policy requirements in this CI. Additionally, licensing requirements at *12VAC35-105-50, 100, 110, and 115* prescribe negative actions and sanctions that can be taken with providers with significant or recurring citations.<br><br>The Office of Licensing (OL) has continued to expand training | 24th – Not Met<br><br>25th – Not Met |

| CI | Facts | Analysis | Conclusion(s) |
|---|---|---|---|
| DBHDS requirements for staff training, including development opportunities for employees to enable them to support the individuals receiving services and to carry out their job responsibilities. These required training policies will address the frequency of retraining on serious incident reporting, medication administration, behavior intervention, emergency preparedness, and infection control, to include flu epidemics. Employee participation in training and development opportunities shall be documented and accessible to the department.

DBHDS will take appropriate action in accordance with Licensing Regulations if providers fail to comply | *OL Annual Compliance Determination Chart* provides detailed guidance to Licensing Specialists on how to assess compliance with these regulations.

The Office of Licensing (OL) continues to expand training and technical assistance for providers and Licensing Specialists regarding specific regulatory requirements including those at §450.

In annual licensing inspections conducted in CY2024 through 08/12/2024, Licensing Specialists determined that 735/995 providers (73.87%) met requirements at §450. This remains below the 86% threshold required by this CI.

The consultant's sample review of Licensing Specialist determinations specific to the requirements at §450 noted agreement with Licensing Specialists on 33/40 (82.5%) determinations, a similar agreement level to the sample review from the 24th study. | and technical assistance for providers and Licensing Specialists regarding specific regulatory requirements including those at §450. These include internal training for new and incumbent Licensing Specialists. The Office of Community Quality Management has implemented an Expanded Consultant Technical Assistance (ECTA) process for providers who have been identified as non-compliant with certain regulations including §450. Instructions for Licensing Specialists in the *OL Annual Compliance Determination Chart* continue to be reviewed and updated to provide clear and concise information for Licensing Specialists in making determinations of whether providers are meeting each licensing requirement.

On 04/17/2024, the OL presented information to Licensing Specialists in an all-staff meeting that included feedback from the consultant regarding sample findings from the 24th study *4.17.24 Updates Related to the 24th Study Period All Staff Meeting PowerPoint*.This presentation included specific information regarding the regulatory requirements at §450 for provider training policy content.

The following comparative data table summarizes the results of annual licensing inspections specific to the licensing requirements at *12VAC35-105-450* conducted in CY2022, CY2023, and CY2024 through 08/12/2024 and documented in CONNECT data reports for each period provided by OL. The 86% threshold requirement of this CI was not met in CY2022 or CY2023 and continues not to be met in CY2024 through 08/12/2024. | |

| Comparative Compliance Data for CI 49.12 | | | |
|---|---|---|---|
| | CY22 | CY23 | CY24 To Date |

| CI | Facts | Analysis | | | | | | | Conclusion(s) |
|---|---|---|---|---|---|---|---|---|---|
| with training requirements required by regulation. | | Total Inspections | 1,156 | | 1,105 | | 995 | | |
| | | Compliant | 973 | 84.17% | 819 | 74.12% | 735 | 73.87% | |
| | | Non-Compliant | 148 | 12.80% | 233 | 21.09% | 205 | 20.60% | |
| | | Non-Compliant Systemic | 27 | 2.34% | 53 | 4.80% | 55 | 5.53% | |
| | | Non-Determined | 8 | 0.69% | - | - | - | - | |

The comparative data analysis in the table above reflects a decrease in the percentage of providers who have a training policy that meets established DBHDS requirements for staff training as required by this CI. The Consultant reviewed the training policy and CAP reports relevant to this CI for 40 sampled providers. Of the 40 providers in the sample, the Licensing Specialist determined that 30/40 (75%) met the requirements at §450. Based on review of the sample provider's training policies, the consultant agreed with the Licensing Specialist determinations in 33/40 (82.5%) determinations. Using the same comparative methodology in the 24th review, the consultant agreed with the Licensing Specialist determinations in 32/39 (82%) determinations.

While OL continues to focus significant efforts on improving provider compliance with the licensing requirements in §450 and this CI, and while OL requires a CAP in response to any determination that the requirements of §450 are not met, the Commonwealth has not yet achieved the 86% threshold requirement and continues not to meet the requirements of this CI.

157

**RECOMMENDATIONS:**
There are no recommendations related to Provision V.H.1, Compliance Indicators 49.4 and 49.12.

**INTERVIEWS CONDUCTED:**
The following individuals were interviewed virtually or provided clarifying information via email or through TEAMS to inform these study analyses.

1. Heather Norton, Assistant Commissioner, Developmental Services
2. Dev Nair, Assistant Commissioner, Division of Quality Assurance and Governmental Relations
3. Eric Williams, Director, Office of Provider Development
4. Jae Benz, Director, Office of Licensing
5. Mackenzie Glassco, Associate Director of Quality and Compliance

**DOCUMENTS REVIEWED:**
The following documents were reviewed during the course of this study:

- 12VAC30-122-180
- Curative Action #10
- Process Document DSP Comp Ver 007
- DSP Competencies Attachment B 9.30.2024
- Approved 7.19.24 DSP SFY24 QII Toolkit
- 12VAC35-105-450
- 12VAC35-105-50, 100, 110, and 115
- OL Annual Compliance Determination Chart
- 4.17.24 Updates Related to the 24th Study Period All Staff Meeting PowerPoint
- Documents from 40 sample providers including:
  - Employee Training Policy
  - OL Data Reports Regarding Compliance Determinations for §450, §520, & §620

# APPENDIX G

## Quality and Risk Management
## and
## Quality Improvement Programs

## By

## Rebecca Wright, MSW, LICSW
## Chris Adams, MS

## Quality and Risk Management System 25ᵗʰ Period Study

The Settlement Agreement in U.S. v. Commonwealth of Virginia requires the Commonwealth to ensure that all services for individuals receiving services under this Agreement are of good quality, meet individual's needs, and help individuals achieve positive outcomes, including avoidance of harms, stable community living, and increased integration, independence, and self-determination in all life domains (e.g., community living, employment, education, recreation, healthcare, and relationships), and to ensure that appropriate services are available and accessible for individuals in the target population, the Commonwealth shall develop and implement a quality and risk management system that is consistent with the terms of this section. The related provisions are as follows:

**Section V.B:** The Commonwealth's Quality Management System shall: identify and address risks of harm; ensure the sufficiency, accessibility, and quality of services to meet individuals' needs in integrated settings; and collect and evaluate data to identify and respond to trends to ensure continuous quality improvement.

**Section V.C.1:** The Commonwealth shall require that all Training Centers, CSBs, and other community providers of residential and day services implement risk management processes, including establishment of uniform risk triggers and thresholds, that enable them to adequately address harms and risks of harm. Harm includes any physical injury, whether caused by abuse, neglect, or accidental causes.

**Section V.C.4:** The Commonwealth shall offer guidance and training to providers on proactively identifying and addressing risks of harm, conducting root cause analysis, and developing and monitoring corrective actions.

**Section V.D.1:** The Commonwealth's HCBS waivers shall operate in accordance with the Commonwealth's CMS-approved waiver quality improvement plan to ensure the needs of individuals enrolled in a waiver are met, that individuals have choice in all aspects of their selection of goals and supports, and that there are effective processes in place to monitor participant health and safety. The plan shall include evaluation of level of care; development and monitoring of individual service plans; assurance of qualified providers; identification, response and prevention of occurrences of abuse, neglect and exploitation; administrative oversight of all waiver functions including contracting; and financial accountability. Review of data shall occur at the local and state levels by the CSBs and DBHDS/DMAS, respectively.

**Section V.D.2 a-d:** The Commonwealth shall collect and analyze consistent, reliable data to improve the availability and accessibility of services for individuals in the target population and the quality of services offered to individuals receiving services under this Agreement. The Commonwealth shall use data to: a. identify trends, patterns, strengths, and problems at the individual, service-delivery, and systemic levels, including, but not limited to, quality of services, service gaps, accessibility of services, serving individuals with complex needs, and the discharge and transition planning process; b. develop preventative, corrective, and improvement measures to address identified problems; c. track the efficacy of preventative, corrective, and improvement measures; and d. enhance outreach, education, and training.

160

**Section V.D.3:** The Commonwealth shall begin collecting and analyzing reliable data about individuals receiving services under this Agreement selected from the following areas in State Fiscal Year 2012 and will ensure reliable data is collected and analyzed from each of these areas by June 30, 2014. Multiple types of sources (e.g., providers, case managers, licensing, risk management, Quality Service Reviews) can provide data in each area, though any individual type of source need not provide data in every area: Safety and freedom from harm (e.g., neglect and abuse, injuries, use of seclusion or restraints, deaths, effectiveness of corrective actions, licensing violations); Physical, mental, and behavioral health and well-being (e.g., access to medical care including preventative care), timeliness and adequacy of interventions (particularly in response to changes in status); Avoiding crises (e.g., use of crisis services, admissions to emergency rooms or hospitals, admissions to Training Centers or other congregate settings, contact with criminal justice system); Stability (e.g., maintenance of chosen providers, work/other day program stability); Choice and self-determination (e.g., service plans developed through person-centered planning process, choice of services and providers, individualized goals, self-direction of services);Community inclusion (e.g., community activities, integrated work opportunities, integrated living options, educational opportunities, relationships with non-paid individuals); Access to services (e.g., waitlists, outreach efforts, identified barriers, service gaps and delays, adaptive equipment, transportation, availability of services geographically, cultural and linguistic competency); and Provider capacity (e.g., caseloads, training, staff turnover, provider competency).

**Section V.E.I:** The Commonwealth shall require all providers (including Training Centers, CSBs, and other community providers) to develop and implement a quality improvement ("QI") program, including root cause analyses, that is sufficient to identify and address significant issues and is consistent with the requirements of the DBHDS Licensing Regulations at 12 VAC 35-105-620 in effect on the effective date of this Agreement and the provisions of this Agreement.

**Section V.E.2:** Within 12 months of the effective date of this Agreement, the Commonwealth shall develop measures that CSBs and other community providers are required to report to DBHDS on a regular basis, either through their risk management/critical incident reporting requirements or through their QI program. Reported key indicators shall capture information regarding both positive and negative outcomes for both health and safety and community integration, and will be selected from the relevant domains listed in Section V.D.3. above. The measures will be monitored and reviewed by the DBHDS quality improvement committee, with input from Regional Quality Councils, described in Section V.D.5 above. The DBHDS quality improvement committee will assess the validity of each measure at least annually and update measures accordingly.

**Section V.E.3:** The Commonwealth shall use Quality Service Reviews and other mechanisms to assess the adequacy of providers' quality improvement strategies and shall provide technical assistance and other oversight to providers whose quality improvement strategies the Commonwealth determines to be inadequate.

The Parties (i.e., the Commonwealth of Virginia and the U.S. represented by DOJ) jointly submitted to the Federal Court a complete set of compliance indicators (CIs) for all provisions with which Virginia had not yet been found in sustained compliance. The agreed upon compliance indicators were formally submitted on Tuesday, January 14, 2020.

For this 25th Period review, the study served as a follow-up to previous studies that have been competed annually since 2017 regarding the status of the Commonwealth's achievements for these selected Quality and Risk Management System requirements and systems. For the 25th Period reviews, the Parties have agreed to target the CIs that have not been Met twice consecutively in the two most recent reviews.

The following summarizes the compliance status of the Provisions and Compliance Indicators under review as of the time this 25th Period Report began:

| Compliance Indicator | Corresponding Provision | 23rd/24th Status |
|---|---|---|
| **Quality and Risk Management study** | | |
| 29.13 | V.B | NM/M |
| 29.16 | V.B | NM/M |
| 29.17 | V.B | NM/NM |
| 29.18 | V.B | NM/NM |
| 29.20 | V.B | NM/NM |
| 29.21 | V.B | NM/NM |
| 29.22 | V.B | NM/NM |
| 29.24 | V.B | NM/NM |
| 30.4 | V.C.1 | NM/NM |
| 30.10 | V.C.1 | NM/NM |
| 35.1 | V.D.1 | NM/NM |
| 35.3 | V.D.1 | NM/M |
| 35.5 | V.D.1 | NM/NM |
| 35.7 | V.D.1 | NM/NM |
| 35.8 | V.D.1 | NM/NM |
| 36.1 | V.D.2.a-d | M/Deferred |
| 36.3 | V.D.2.a-d | M/Deferred |
| 36.8 | V.D.2.a-d | NM/NM |
| 37.7 | V.D.3 | M/Deferred |
| 42.4 | V.E.1 | NM/NM |
| 43.1 | V.E.2 | M/Deferred |
| 43.3 | V.E.2 | M/Deferred |
| 43.4 | V.E.2 | M/Deferred |
| 44.1 | V.E.3 | M/Deferred |
| 44.2 | V.E.3 | NM/Deferred |

**Study Methodology:**

This study sought to gather and investigate facts and verify data and documentation provided by the Commonwealth to assess the sufficiency of the Commonwealth's actions to achieve and sustain achievement with each of the CIs described in the previous section.  The methodology included a review of the documents that Virginia maintains to demonstrate that it has properly implemented and fulfilled the Agreement's requirements, interviews with state officials, subject matter experts, and stakeholders, and verification that Virginia's relevant Process Documents and Attestations are complete.

Evidence gathering included:

- Review of documentary evidence provided by the Commonwealth specific to the requirements set out in each Indicator.
- A review of a sample of relevant records from 40 randomly selected licensed providers and Community Services Boards (CSBs) across each of the five regions in the Commonwealth, annual Office of Licensing (OL) inspection reports, and evidence packets that OL used in assessing regulatory compliance during the period 4/1/24-6/30/24 and review and analysis of any data from sources that DBHDS determined to be valid and reliable as well as other available data from the QSR process.
- A comparative review of QSR Quality Improvement findings for a sample providers and CSBs with regard to compliance with CI 44.1 and CI 44.2.
- A comparative review to investigate and verify the data quality related to CI 36.8.
- Review of any changes that have been made to policies, procedures, and/or practices relating to the requirements in the applicable Compliance Indicators listed above.
- For CIs that rely on data to demonstrate compliance, the data validation process included review and analysis of documents described above for each CI focusing on:
    a. Threats to data integrity previously identified by DBHDS assessments.
    b. Actions taken by DBHDS that resolved these problems including completion dates for those activities.
    c. Review of the verification process that DBHDS completed that confirmed that the data reported is reliable and valid.
    d. The date when the Commonwealth's Attestation that the Process Document was properly completed, that the threats were sufficiently mitigated, and that the data reported are reliable and valid.
- Where the Parties had agreed to Curative Actions relevant to any of these Compliance Indicators as of the date of this proposal, the study also reviewed the current status of implementation.
- Interviews with key DBHDS staff.

**Study Findings:**

The bullets below summarize the results of the 25th Period study, followed by a more detailed summary of each section.

- DBHDS achieved a fully Met status for the second consecutive time for the following CIs: 29.13, 29.16  and 35.3.
- DBHDS also achieved a fully Met status for the first time for the following CIs: 35.7.

- DBHDS did not meet the requirements for the following CIs: 29.17, 29.18, 29.20, 29.22, 29.24, 30.4, 30.10, 35.1, 35.5, 35.8, 36.1, 36.3, 36.8. 37.7, 42.4, 43.1, 43.3, 43.4, 44.1 and 44.2.

## Section V.B.

Previous reports have stressed that having valid and reliable data was a crucial pre-requisite to a functional QMS and frequently documented deficiencies in this area. As described in previous reports, on 1/21/22, the Parties jointly filed with the Court an agreed-upon *Curative Action for Data Validity and Reliability*. It stated that DBHDS would continue to review data sources and update the quality management plan annually as required, including recommendations around actionable items for the systems to increase their quality and a deep dive into each source system every 3-5 years to test and follow the data and to review and identify source system threats to data reliability and validity.

The *Curative Action for Data Validity and Reliability* includes two elements: The first requires DBHDS to continue to complete periodic assessments of its data source systems, including the identification of threats to data validity and reliability and actions taken to mitigate those threats. The second entails confirming the validity and reliability of specific data sets and their use in producing data for compliance reporting. While the confirmation process itself is outside the provenance of OCQM, that office is responsible for identifying the threats to data validity and reliability in the data collection methodologies. The *Curative Action for Data Validity and Reliability* describes creation of a Process Document that, among other things, for each applicable purpose must describe the data set to be used, a methodology for addressing any threats to validity and reliability of the data available in the data set, and a methodology for addressing any threats to validity and reliability in the process of pulling the data from the data set. Once this is complete, the office of the Chief Data Office (CDO) completes a review and attests that the process will produce valid and reliable data. This is known as the Data Set Attestation.

For the 25th Period, DBHDS efforts for CI 29.13 sufficiently demonstrated it met the requirements for data validity and reliability described in the *Curative Action for Data Validity and Reliability*. As a result of these overall efforts, the Commonwealth met CI 29.13 for the second consecutive period.

At the time of the 24th Period, some deficiencies remained related to RMRC review of abuse, neglect, and exploitation (ANE) data (i.e., CI 29.13) and look behind-reviews for both serious incident and ANE processes (i.e., CI 29.16 - CI 29.18). For the 25th Period, DBHDS made progress and met CI 29.13 and 29.16 for the second consecutive time, each for the first time. However, the requirement to complete look-behind reviews of reported allegations of abuse, neglect, and exploitation required at CI 29.17 was implemented in Q3 FY23 and results from six quarterly reviews have been presented to the RMRC. The data and trend analysis processes associated with this CI continue to evolve; however, the full implementation of the process remains incomplete and does not include a fully operational inter-rater reliability process. These facts also negatively impacted CI 29.18, which remained not met.

At the time of the 24th Period, DBHDS did not meet reporting requirements for several V.B metrics, including CI 29.20 (i.e., annual physical and dental exams), CI 29.21 (i.e., adequacy of behavioral services), CI 29.22 (i.e., residential settings compliant with HCBS community integration requirements), and CI 29.24 (i.e., individual protection from serious injury).  For this 25th Period, DBHDS again did not meet the requirements for these four CIs.  This study noted some progress, but also some remaining concerns.

- For CI 29.20, DBHDS data indicated that the Commonwealth very nearly achieved 86% for annual physical exams for people supported in residential settings, but that achievement of annual dental exams for individuals with coverage for dental services remained well below that 86% threshold. It was again important to note the apparent improvement for annual physical exams was likely the result of changes to the data collection methodology, which DBHDS modified during late SFY23 to allow for the exam to occur within a 14 month period ahead of the ISP anniversary date, instead of 12 months. However, it was again positive that DBHDS continued to implement a number of systemic efforts to increase resources for annual dental exams. DBHDS still needed to review the Process Documents and Data Set Attestations for these two CIs.

- For CI 29.21, DBHDS again did not yet achieve compliance with these requirements, reporting that 64% of people with identified behavioral support needs received adequate services and 36% received inadequate or no services. At the behest of the Independent Reviewer, DBHDS used a corrected calculation methodology that was in line with the *Agreed-Upon Curative Action for Compliance Indicator 29.21*, filed with the Court on 7/11/22. This revised methodology is designed to ensure that the measure denominator accurately reflects the entire cohort of people with identified behavioral support needs.  Of note, due to the change in the calculation methodology, the currently reported percentage cannot be compared to previously reported data for the purpose of determining trends.

- For CI 29.22, the Commonwealth did not meet the requirements of this CI.  DBHDS and DMAS continued to work to complete validation of settings, but had not yet completed all reviews. DBHDS did not provide a finalized data report for this Period, citing a need for more time to adequately validate the QSR results.  While this study did find that DBHDS proposed revisions to the QSR methodology to address the validity concerns related to findings of compliance without evidence that remediation was satisfactorily completed, DBHDS still needed to provide a clear protocol for this process. In addition for this 25th Period, DBHDS still did not provide a clear description of the overall QSR protocol for determining HCBS compliance that outlined and incorporated all of the validation processes in the approved Statewide Transition Plan (STP) or the requirements of the HCBS Settings Rule and related CMS guidance.  In addition, the Round 6 PCR and PQR tools still contained elements that addressed key HCBS requirements for integration in and access to the greater community that were not included in the designated list of questions used to calculate compliance, nor did they always provide sufficient guidance for making a reliable determination. In September 2024, DBHDS also received a *CMS Site Visit Report* related to HCBS compliance and will need to address the deficiencies it noted.

- For CI 29. 24, at the time of the 24th Period, DBHDS made significant revisions to the data collection methodology, which used serious incident data from the CHRIS incident reporting system, and provided a revised Process Document. It defined individuals who

were not protected from serious injury as those for whom a licensing investigation
revealed a licensing violation that required a corrective action plan (CAP).  This was a
novel application of the IMU and Investigation processes that, with some revisions, could
potentially provide valid and reliable data. However, the proposed methodology reflected
a funneling effect that appeared to significantly limit the serious injuries that could
possibly reach the investigation stage. For this 25th period, DBHDS made some further
enhancements to the proposed methodology, including a revision to the algorithm for
identifying the percentage of individuals that have not been protected from serious injury.
It now included all individuals who had a single serious injury that resulted in a CAP, and
those who had two or more serious injuries during a rolling 12 month period, whether or
not these resulted in a CAP. This addressed the previous study's concern that the
methodology did not adequately take into account individuals with multiple injuries.
However, the revised methodology still did not address how DBHDS would validate that
the very low numbers of investigation referrals, and thus investigations, did not
inappropriately and artificially lower the  number of people with serious injuries who
required a CAP.

**Section V.C.1**
During CY24 to date, the Office of Licensing conducted licensing inspections and assessed all
applicable licensing requirements at *12VAC35-105-520a-e* in 98% of the inspections.  However,
the current assessment process still does not sufficiently evaluate all of the requirements at CI
30.4. This also prevented DBHDS from meeting the requirements for CI 30.10.  Specific to the
requirements at 30.4, from review of a sample of 40 annual licensing inspections completed
between 04/01/2024-06/30/2024, the consultant concurred with the licensing specialist
determination for 55% of providers. This was a slight improvement over the same sample review
of 40 providers conducted during the 24th Study when the consultant agreed with the licensing
specialist determination in only 50% of provider inspections. For 30.10, the sample review
process demonstrated an incremental improvement in the accuracy of the licensing specialist
determinations compared to the results in previous studies; however, there continues to be
concerns regarding the accuracy and consistency of licensing specialist assessments of providers'
processes and procedures to meet the requirements of 30.10. The Office of Licensing has
continued to provide training and technical assistance to providers and to licensing specialists
regarding these requirements and should continue these efforts to improve the accuracy and
consistency of the licensing specialist assessments of compliance with the requirements at CI 30.4
and CI 30.10. The Consultant will again share the results of the sample reviews with the Office
of Licensing at the conclusion of this review to provide additional detail regarding targeted areas
of improvement necessary to continue the improvements in accuracy and consistency.

**Section V.D.1:** For the 25th Period, DBHDS met the requirements for CI 35.3 (i.e., related to
data validity and reliability, providing sufficient Process Documents and applicable Data Set
Attestations for each Waiver Performance Measure and a quarterly review of data) for the
second consecutive time.  In addition, for the first time, the Commonwealth met the
requirements for CI 35.7, including an annual local level Community Service Boards (CSB)
review of the Waiver Performance Measures. However, despite reviewing data on a quarterly
basis, DBHDS again did not meet the requirements for CI 35.1 or CI 35.5, because they again

did not develop and/or monitor needed remediation, as required in the Quality Improvement Systems (QIS) outlined in Appendix H for each of the HCBS Waivers and in the March 2014 CMS memorandum entitled *Modifications to Quality Measures and Reporting in §1915(c) Home and Community-Based Waivers*. Going forward, the Quality Review Team (QRT) will need to work with DBHDS to obtain and review any such proposed remediation plans in writing and ensure that those plans focus on systemic factors, where present, and include the specific strategy to be employed and the defined measures that will be used to monitor performance.  DBHDS also again did not meet CI 35.8 (i.e., at least 86% of individuals who are assigned a waiver slot are enrolled in a service within 5 months), because the most recently reported data showed performance at only 81%.

**Section V.D.2 a-d:**  At the time of the 23rd Period,  DBHDS met CI 36.1 and CI 36.3 for the first time.  For the 24th Period, a determination was deferred until the completion of the next annual *Data Quality Monitoring Plan (DQMP) Source System Assessment*, and further examination of potential inter-rater reliability (IRR) deficiencies and their impact on data validity and reliability, specifically related to significant discrepancies between the data findings of the QSR reviewers and those of the Independent Reviewer's consultants. This included the need for examination of each of the Process Documents and Attestations that use QSR data sets.  For this QRM study, that impacts the following CIs that rely on QSR data sets: HCBS residential compliance (i.e., CI 29.22), use of QSR data for analysis and quality improvement (CI 36.3), PMI data quality (CI 37.7), provider reporting measures (i.e., CI 43.1. 43.3 and CI 43.4), and provider quality improvement programs (i.e., CI 44.1 and CI 44.2).

For this 25th Period, DBHDS completed the next annual *Data Quality Monitoring Plan (DQMP) Source System Assessment*, including a needed revision to address some potential breakdown in the quality and thoroughness of  the source system assessment process. However, DBHDS had not yet reviewed all of the QSR related Process Documents, and for those that they did review, it appeared the IRR focus remained largely on vendor IRR among themselves and not on the ongoing significant discrepancies with what IR consultants find when reviewing the same data. In other words, DBHDS still needed to develop adequate remediation for the problem of vendor IRR being good internally, but remaining at odds with the findings of experts in the field. In interview, DBHDS staff acknowledged an understanding of the need to address these concerns going forward.  It was positive that at the conclusion of this 25th Period, DBHDS staff were already working to develop remedial strategies to address these threats.

The Commonwealth did not yet meet all of the criteria for CI 36.8.  DBHDS again implemented an *Intense Management Needs Review Process* (IMNR) to assess and monitor the adequacy of supports provided to 30 individuals with identified complex medical needs. As previously reported, for this 25th Period, the Independent Reviewer's ISR study paralleled the *IMNR* for individuals with complex medical needs, and again found that it provided reliable data. The ISR study also evaluated the adequacy of the methodology for analyzing aggregate data from the reviews to monitor the overall adequacy of management of the needs of individuals with identified complex medical needs, but not for those with complex adaptive and behavioral support needs.

While, overall, this CI minimally requires a statistically significant sample on an annual basis, the Independent Reviewer has approved an exception for the subgroup of individuals with complex medical needs, allowing for review of 60 randomly selected individuals in an annual period (i.e., 30 each during two successive periods). Of note, this exception did not apply to the other subgroups of individuals (i.e., individuals with complex adaptive and behavioral support needs) and therefore the evidence submitted did not demonstrate a statistically significant sample for these two subgroups.

**Section V.D.3:** The sole remaining requirement, CI 37.7, requires the Office of Community Quality Management (OCQM), as the successor to the Office of Data Quality and Visualization to assess data quality and inform the committee and workgroups regarding the validity and reliability of the data sources used for Performance Measure Indicators (PMIs).  Pursuant to the findings for CI 36.1, this study could not determine that DBHDS met the requirements, due to the continuing concerns for data validity and reliability.

**Section V.E.I:**  DBHDS continued to demonstrate that at least 86% of DBHDS licensed providers of DD services have been assessed for their compliance with *12 VAC 35-105- 620* during their annual inspections.  However, DBHDS did not meet CI 42.4, which requires that at least 86% of DBHDS-licensed providers of DD services are compliant with *12 VAC 35-105-620*. DBHDS is now measuring comparative compliance with each of the 12 sub-regulations across a calendar year. In CY23, 4/11 sub-regulations met or exceeded the 86% threshold. DBHDS began evaluating provider compliance at §620.C.3 during CY24, but results from CY24 Q1 and Q2 data noted that providers met requirements in only 2/12 of the sub-regulations.  In CY24 Q1 and Q2, there was evidence that a CAP is required from each of the 461 providers who were not compliant with one or more of the requirements of this CI.

**Section V.E.2:**  At the time of the 23rd Period, the Commonwealth met the requirements for the remaining three CIs for this Provision (i.e., CI 43.1, CI 43.3 and CI 43.4), each for the first time.  However, this finding included a caveat that DBHDS needed to further examine the Process Documents and Data Set Attestations for QSR data sets to ensure the IRR threats had been adequately identified and addressed.  During the 24th Period, DBHDS did not complete any additional examination of the related Process Documents and Data Set Attestations for this QSR data.  For this 25th period, as described above, DBHDS still did not complete an adequate examination of the QSR data and reliability concerns.  However, it was positive that at the conclusion of this 25th Period, DBHDS staff were already working to develop remedial strategies to address these threats.

While DBHDS met the requirements for the health and safety Provider Reporting Measures (i.e., the 12 surveillance measures), it did not meet all of the requirements of the 11/9/21 Curative Action, as those related to the community integration provider reporting measures that are evaluated through the QSR process. The Round 6 QSR methodology did not have an expectation that providers will track and address their individual results related to community integration through their QI programs, as required, and did not reflect that incorporation of community integration into a provider's QI plan is mandatory. Based on interview and document review, DBHDS staff recognized the QSR data were likely not reliably measuring

community integration. It was positive the DBHDS Assistant Commissioner reported that she
had assigned the Community Engagement Advisory Group (CEAG) review and revise
community inclusion reporting measure definitions.

**Section V.E.3:** The 23rd Period review determined that the Commonwealth met the
requirements for CI 44.1 (i.e., to use the QSR to assess provider quality improvement programs)
for the first time, but did not meet CI 44.2 because the study could not confirm that any of 15
vendor-issued QIPs sufficiently addressed the quality improvement deficiencies or identified the
needed remediation or need for technical assistance. At the time of the 24th Period, this study
deferred a finding until the 25th Period, due to factors, including 1) the scheduling of Round 6
provider reviews and the resulting inability to completed needed sampling 2), the DBHDS
timeframes for submission of documents for review for Round 6 QSR, resulting in inadequate
time to review significant revisions in the processes for evaluation provider quality improvement
programs,  and 3) the need for DBHDS to complete a review of IRR concerns with regard to
data validity and reliability of QSR data sets.

For this 25th Period, CI 44.1 and CI 44.2 CI were not met because the findings of this review
clearly indicated that significant discrepancies between QSR reviewers and the IR consultant
continued  to occur, as evidenced by a sampling process focused on comparing the consultant's
findings to those of the QSR reviewers. In addition, although DBHDS updated a Process
Document entitled *QSR Quality Improvement Findings*, dated 8/18/24, it did not yet address the
significant IRR discrepancies between QSR reviewer findings and those of experts in the field.
Again, it was positive that at the conclusion of this 25th Period, DBHDS staff were already
working to develop remedial strategies to address these threats.

For this 25th Period, for Round 6 QSR, based on review of the PQR tool, this study found it
included many more specific quality improvement elements than the previous versions, and that
many also included more specific criteria and guidance for the reviewers.  The PQR tool did
provide for a wealth of data DBHDS can mine with regard to provider QI practices.  However,
the construction of the PQR elements was not entirely congruent with the criteria of CI 44.1 to
assess the adequacy of providers' quality improvement programs.  In particular, the PQR tool
did not provide sufficient information to determine whether providers developed or implemented
improvement plans when goals were not met, as no element probed this requirement.  In
addition, for CI 44.2, the QSR methodology did not yet adequately identify the quality
improvement needs for specific providers.

The tables below summarize the status of each CI studied for this report:

| V.B Indicators: | Status |
|---|---|
| 29.13 The RMRC reviews and identifies trends from aggregated incident data and any other relevant data identified by the RMRC, including allegations and substantiations of abuse, neglect, and exploitation, at least four times per year by various levels such as by region, by CSB, by provider locations, by individual, or by levels and types of incidents. | Met |

| V.B Indicators: | | Status |
|---|---|---|
| 29.16 | The RMRC conducts or oversees a look behind review of a statistically valid, random sample of DBHDS serious incident reviews and follow-up process. The review will evaluate whether:  i. The incident was triaged by the Office of Licensing incident management team appropriately according to developed protocols; ii. The provider's documented response ensured the recipient's safety and well-being; iii. Appropriate follow-up from the Office of Licensing incident management team occurred when necessary; iv. Timely, appropriate corrective action plans are implemented by the provider when indicated.  v. The RMRC will review trends at least quarterly, recommend quality improvement initiatives when necessary, and track implementation of initiatives approved for implementation. | Met |
| 29.17 | The RMRC conducts or oversees a look-behind review of a statistically valid, random sample of reported allegations of abuse, neglect, and exploitation. The review will evaluate whether: i. Comprehensive and non-partial investigations of individual incidents occur within state-prescribed timelines; ii. The person conducting the investigation has been trained to conduct investigations; iii. Timely, appropriate corrective action plans are implemented by the provider when indicated. Iv. The RMRC will review trends at least quarterly, recommend quality improvement initiatives when necessary, and track implementation of initiatives approved for implementation. | Not Met |
| 29.18 | At least 86% of the sample of serious incidents reviewed in indicator 5.d meet criteria reviewed in the audit. At least 86% of the sample of allegations of abuse, neglect, and exploitation reviewed in indicator 5.e meet criteria reviewed in the audit. | Not Met |
| 29.20 | At least 86% of the people supported in residential settings will receive an annual physical exam, including review of preventive screenings, and at least 86% of individuals who have coverage for dental services will receive an annual dental exam. | Not Met |
| 29.21 | At least 86% of people with identified behavioral support needs are provided adequate and appropriately delivered behavioral support services. | Not Met |
| 29.22 | At least 95% of residential service recipients reside in a location that is integrated in, and supports full access to the greater community, in compliance with CMS rules on Home and Community-based Settings. | Not Met |
| 29.24 | At least 95% of individual service recipients are adequately protected from serious injuries in service settings. | Not Met |

| V.C.1 Indicators: | | Status |
|---|---|---|
| 30.4. | At least 86% of DBHDS-licensed providers of DD services have been assessed for their  compliance with risk management requirements in the Licensing Regulations during their annual inspections. Inspections will include an assessment of whether providers use data at the individual and provider level, including at minimum data from incidents and investigations, to identify and address trends and patterns of harm and risk of harm in the events reported, as well as the associated findings and recommendations. This includes identifying year-over-year trends and patterns and the use of baseline data to assess the effectiveness of risk management systems. The licensing report will identify any identified areas of non-compliance with Licensing Regulations and associated recommendations. | Not Met |

| V.C.1 Indicators: | Status |
|---|---|
| 30.10 To enable them to adequately address harms and risks of harm, the Commonwealth requires that provider risk management systems shall identify the incidence of common risks and conditions faced by people with IDD that contribute to avoidable deaths (e.g., reportable incidents of choking, aspiration pneumonia, bowel obstruction, UTIs, decubitus ulcers) and take prompt action when such events occur or the risk is otherwise identified. Corrective action plans are written and implemented for all providers, including CSBs, that do not meet standards. If corrective actions do not have the intended effect, DBHDS takes further action pursuant to V.C.6. | Not Met |

| V.D.1. Compliance Indicators | Status |
|---|---|
| 35.1: The Commonwealth implements the Quality Improvement Plan approved by CMS in the operation of its HCBS Waivers. | Not Met |
| 35.3 The Commonwealth has established performance measures, reviewed quarterly by DMAS and DBHDS, as required and approved by CMS in the areas of: a. health and safety and participant safeguards, b. assessment of level of care, c. development and monitoring of individual service plans, including choice of services and of providers, d. assurance of qualified providers, e. whether waiver enrolled individuals' identified needs are met as determined by DMAS QMR, f. identification, response to incidents, and verification of required corrective action in response to substantiated cases of abuse/neglect/exploitation (prevention is contained in corrective action plans). | Met |
| 35.5: Quarterly data is collected on each of the above measures and reviewed by the DMAS-DBHDS Quality Review Team. Remediation plans are written and remediation actions are implemented as necessary for those measures that fall below the CMS-established 86% standard. DBHDS will provide a written justification for each instance where it does not develop a remediation plan for a measure falling below 86% compliance.  Quality Improvement remediation plans will focus on systemic factors where present and will include the specific strategy to be employed and defined measures that will be used to monitor performance. Remediation plans are monitored at least every 6 months. If such remediation actions do not have the intended effect, a revised strategy is implemented and monitored | Not Met |
| 35.7:  The DMAS-DBHDS Quality Review Team will provide an annual report on the status of the performance measures included in the DD HCBS Waivers Quality improvement Strategy with recommendations to the DBHDS Quality Improvement Committee. The report will be available on the DBHDS website for CSBs' Quality Improvement committees to review. Documentation of these reviews and resultant CSB-specific quality improvement activities will be reported to DBHDS. The above measures are reviewed at local level including by Community Service Boards (CSB) at least annually. | Met |
| 35.8:  The Commonwealth ensures that at least 86% of individuals who are assigned a waiver slot are enrolled in a service within 5 months, per regulations | Not Met |

| V.D.2 Compliance Indicators | Status |
|---|---|
| 36.1: DBHDS develops a Data Quality Monitoring Plan to ensure that it is collecting and analyzing consistent reliable data. Under the Data Quality Monitoring Plan, DBHDS assesses data quality, including the validity and reliability of data and makes recommendations to the Commissioner on how data quality issues may be remediated. Data sources will not be used for compliance reporting until they have been found to be valid and reliable. This evaluation occurs at least annually and includes a review of, at minimum, data validation processes, data origination, and data uniqueness. | Not Met |
| 36.3 At least annually, DBHDS reviews data from the Quality Service Reviews and National Core Indicators related to the quality of services and individual level outcomes to identify potential service gaps or issues with the accessibility of services. Strategic improvement recommendations are identified by the Quality Improvement Committee (QIC) and implemented as approved by the DBHDS Commissioner. | Not Met |
| 36.8: DBHDS collects and analyzes data (at minimum a statistically valid sample) at least annually regarding the management of needs of individuals with identified complex behavioral, health and adaptive support needs to monitor the adequacy of management and supports provided. DBHDS develops corrective action(s) based on its analysis, tracks the efficacy of that action, and revises as necessary to ensure that the action addresses the deficiency. | Not Met |

| V.D.3 Compliance Indicators | Status |
|---|---|
| 37.7: The Office of Data Quality and Visualization will assess data quality and inform the committee and workgroups regarding the validity and reliability of the data sources used in accordance with V.D.2 indicators 1 and 5. | Not Met |

| V.E.1 Compliance Indicators | Status |
|---|---|
| 42.4: On an annual basis, at least 86% of DBHDS-licensed providers of DD services are compliant with 12 VAC 35-105-620. Providers that are not compliant have implemented a Corrective Action Plan to address the violation. | Not Met |

| V.E.2 Compliance Indicators | Status |
|---|---|
| 43.1: DBHDS has developed measures that DBHDS-licensed DD providers, including CSBs, are required to report to DBHDS on a regular basis, and DBHDS has informed such providers of these requirements. The sources of data for reporting shall be such providers' risk management/critical incident reporting and their QI program. Provider reporting measures must: a. Assess both positive and negative aspects of health and safety and of community integration; b. Be selected from the relevant domains listed in Section V.D.3 above; and c. Include measures representing risks that are prevalent in individuals with developmental disabilities (e.g., aspiration, bowel obstruction, sepsis) that are reviewed at least quarterly by the designated sub-committee as defined by the Quality Management Plan | Not Met |
| 43.3: The DBHDS Office of Data Quality and Visualization assists with analysis of each provider reporting measure to ensure that the data sources are valid, identify what the potential threats to validity are, and ensure that the provider reporting measures are well-defined and measure what they purport to measure. The QIC or designated | Not Met |

| | |
|---|---|
| subgroup will review and assess each provider reporting measure annually and update accordingly. | |
| 43.4  Provider reporting measures are monitored and reviewed by the DBHDS Quality Improvement Committee ("QIC") at least semi-annually, with input from Regional Quality Councils, described in Section V.D.5. Based on the semi-annual review, the QIC identifies systemic deficiencies or potential gaps, issues recommendations, monitors the measures, and makes revisions to quality improvement initiatives as needed, in accordance with DBHDS's Quality Management System as described in the indicators for V.B. | Not Met |

| V.E.3 Compliance Indicators | Status |
|---|---|
| 44.1: In addition to monitoring provider compliance with the DBHDS Licensing Regulations governing quality improvement programs (see indicators for V.E.1), the Commonwealth assesses and makes a determination of the adequacy of providers' quality improvement programs through the findings from Quality Service Reviews, which will assess the adequacy of providers' quality improvement programs to include: a. Development and monitoring of goals and objectives, including review of performance data.  b. Effectiveness in either meeting goals and objectives or development of improvement plans when goals are not met. c. Use of root cause analysis and other QI tools and implementation of improvement plans. | Not Met |
| 44.2: Using information collected from licensing reviews and Quality Service Reviews, the Commonwealth identifies providers that have been unable to demonstrate adequate quality improvement programs and offers technical assistance as necessary. Technical assistance may include informing the provider of the specific areas in which their quality improvement program is not adequate and offering resources (e.g., links to on-line training material) and other assistance to assist the provider in improving its performance. | Not Met |

**V.B. Analysis of 23rd Review Period Finding**

| V.B The Commonwealth's Quality Management System shall: identify and address risks of harm; ensure the sufficiency, accessibility, and quality of services to meet individuals' needs in integrated settings; and collect and evaluate data to identify and respond to trends to ensure continuous quality improvement. |
| --- |

| Compliance Indicator | Facts | Analysis | Conclusion |
| --- | --- | --- | --- |
| **29.13** The RMRC reviews and identifies trends from aggregated incident data and any other relevant data identified by the RMRC, including allegations and substantiations of abuse, neglect, and exploitation, at least four times per year by various levels such as by region, by CSB, by provider locations, by individual, or by levels and types of incidents. | Overall, for this 25th Period review, DBHDS met the requirements for this CI.

Previous reviews confirmed that DBHDS had established written processes that laid out an adequate framework for completing these responsibilities. For the 25th Period, these tools and processes continued to be in place.

For the 25th Period, RMRC meeting minutes evidenced that the RMRC reviewed some type of aggregate data related to serious incidents (i.e., IMU Data Review, Serious Incident Data Review or Care Concerns) on at least nine | For this 25th Period review, DBHDS met the overall requirements for this CI. The review confirmed that DBHDS had established written processes that laid out an adequate framework for completing these responsibilities. RMRC meeting minutes also evidenced that the RMRC reviewed some type of aggregate data related to serious incidents and ANE on three occasions and were on track to meet the requirement for quarterly review.

For the 25th Period, these included the *RMRC Charter*, updated 6/24/24, which required that the RMRC review data for serious incidents and allegations and substantiations of abuse, neglect, and exploitation at least four times per year; the *SFY25 RMRC Task Calendar*, which is the scheduling tool used by the RMRC to ensure that it conducts reviews and analysis of surveillance data specific to abuse/neglect, exploitation, Office of Human Rights look-behind results, serious incidents, the IMU look-behind (triage) process, incident management care concerns, timeliness of reporting and related citations, relevant state facilities data, and performance measures; and, the *SFY25 RMRC Work Plan*, which is the comprehensive tracking and information tool used by the RMRC to document their review and analysis activities, including the activities undertaken, data and information reviewed/analyzed, and follow-up activities resulting from the analysis of data and information.

For the 25th Period, RMRC meeting minutes evidenced that the RMRC reviewed some type of aggregate data related to serious incidents (i.e., IMU Data Review, Serious Incident Data Review or Care Concerns) on at least nine occasions between 9/11/23 and 9/16/24, including at least four times during this review period. During that same timeframe, the RMRC also reviewed abuse, neglect and exploitation (ANE) data related to allegations and/or substantiations at least six times, including three | 24th - Met

**25th - Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | occasions between 9/11/23 and 9/16/24, including at least four times during this review period.  During that same timeframe, the RMRC also reviewed abuse, neglect and exploitation (ANE) data related to allegations and/or substantiations at least six times, including three times during this review period.<br><br>DBHDS staff previously (i.e., during the 23rd and 24th Period reviews) provided documentation that was sufficient to demonstrate DBHDS met the data validity and reliability requirements.<br><br>At the time of this 25th Period review, DBHDS submitted an updated Process Document entitled *SIR by Type Surveillance Rates ANE VER005,* dated 8/8/24, a Data Set Attestation dated 9/7/24,  for the | times during this review period.<br><br>As reported at the 23rd and 24th Period reports, DBHDS staff previously provided documentation that was sufficient to demonstrate DBHDS met the data validity and reliability requirements.  At the time of this 25th Period review, some of these documents continued unchanged and some had been updated. These documents were sufficient to demonstrate DBHDS met the data validity and reliability requirements. These included:<br>• A Process Document entitled *SIR by Type /Serious Incident Rates VER005*, dated 8/8/24, which had been modified for this 25th Period review to reflect additions or changes to data reports used in calculating the measures .<br>• A Data Set Attestation for the SIR Process Document and the related data reports, dated 9/27/24.<br>• With regard to ANE data validity and reliability, DBHDS submitted a Process Document (i.e., *HR Process Document Free From ANE 29.23, Ver 005,* dated 10/12/2023) and an updated Data Set Attestation, dated 3/6/24.<br><br>At the time of the 24th Period review, DBHDS had not yet reviewed the SIR Process Document and Data Set Attestation, but were able to provide evidence to show that they had previously implemented remedial strategies to address the specific concerns and recommendations in the CHRIS-SIR and CHRIS-HR updates.  In interview, DBHDS staff stated that it was likely that the CHRIS-SIR and CHRIS-HR updated assessments missed some of the completed remediation due to the readying of the RMRC Roadmap Progress V4 within the same timeframe that OCQM was completing the source system assessments.<br><br>Going forward, in order to ensure accuracy and timeliness, DBHDS staff stated an intent to enhance the pre-publication review of the source system documents to ensure accuracy as well as to ensure that any time a source system assessment or update identifies threats to data validity and reliability or recommendations. For this 25th Period, based on review of the *2024 Data Quality Monitoring Plan Annual Update*, dated 9/16/24, DBHDS made this relevant process revision: "DBHDS has consolidated all | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | Process Document and the related data reports. DBHDS had also submitted a Process Document entitled *HR Process Document Free From ANE 29.23, Ver 005*, dated 10/12/23 and an updated Data Set Attestation, dated 3/4/24. These continued to demonstrate sufficiency for data validity and reliability. | places where source system information is stored, has created a share point site for all recommendations and subsequent completion criterion to be reviewed and followed up on to ensure future system issue resolutions are not overlooked. The Director of Transition Network Supports reviews this information at least semi-annually to ensure recommendations are being addressed and documentation of this work is maintained and stored appropriately." | |
| **29.16** The RMRC conducts or oversees a look behind review of a statistically valid, random sample of DBHDS serious incident reviews and follow-up process. The review will evaluate whether: i. The incident was triaged by the Office of Licensing incident management team appropriately according to developed protocols. ii. The provider's documented response ensured the recipient's | In 2022, DBHDS implemented a look-behind review of a statistically valid, random sample of serious incident reviews and follow-up processes conducted by VCU and with subsequent improvements and expansions of the process, it now includes review of each of the four outcomes required by this CI. This 25th study verified that the RMRC continues to oversee the | The Virginia Commonwealth University (VCU) has continued to conduct and report findings from the look-behind review of a statistically valid, random sample of serious incident reviews and follow-up processes for seven quarters through Q1 CY2024. Each of these reviews conducted since Q2 CY2023 has evaluated sample data specific to Outcomes 1, 2, 3, and 4. An inter-rater reliability scoring process was implemented in Q1 CY2023 and an 88% threshold score was established by VCU. The comparative data table below details percentage scores for each of the outcomes across the seven quarterly look-behind reviews completed to date and the rater reliability scores for the five most recent quarters as well. Percentage scores below the 86% threshold for Outcomes 1-4 are in red in the table. There have been no scores below the 86% threshold since Q1 CY2023. VCU provided a summary report of findings of the Q4 CY2023 quarterly look-behind review (*Quarter 4 IMULB Report Final 6.5.24*) to the RMRC for review and analysis. The *RMRC Minutes 06.17.24 Approved* documented the content, review and recommendations made by the RMRC in response to review of this information. | 24th – Met **25th - Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| safety and well-being. iii. Appropriate follow-up from the Office of Licensing incident management team occurred when necessary. iv. Timely, appropriate corrective action plans are implemented by the provider when indicated. v. The RMRC will review trends at least quarterly, recommend quality improvement initiatives when necessary, and track implementation of initiatives approved for implementation. | look-behind process, review trends at least quarterly, recommend follow-up actions and quality improvement initiatives when necessary, and track implementation of initiatives approved for implementation.<br><br>DBHDS continues to utilize a comprehensive tabular tracking report for all recommendations, process improvements, and remedial or corrective actions taken in response to findings from the VCU report and recommendations from the RMRC.<br><br>Data across the seven quarters reviewed by VCU demonstrate consistent percentage compliance at or above the 86% threshold established by DBHDS for this measure. The validity of these scores is further evidenced by an | VCU provided a summary report of findings of the Q1 CY2024 quarterly look-behind review (*Quarter 1 IMULB Report Final 9.5.24*) to the RMRC for review and analysis. The **RMRC Minutes 09.16.24 Approved** documented the content, review, and recommendations made by the RMRC in response to review of this information.<br><br>The results of the look-behind reviews for the most recent seven quarters are summarized in the table below: | |

| 29.16 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Quarter: | Q2 CY2022 | Q3 CY2022 | Q1 CY2023 | Q2 CY2023 | Q3 CY2023 | Q4 CY2023 | Q1 CY2024 |
| Dates: | 4/22-6/22 | 7/22-9/22 | 1/23-3/23 | 4/23-6/23 | 7/23-9/23 | 10/23-12/23 | 01/24-03/24 |
| Rpt Date: | 2/26/23 | 5/22/23 | 8/29/23 | 1/15/24 | 2/26/24 | 6/5/24 | 9/5/24 |
| RMRC Review: | 5/22/23 | 5/22/23 | 9/11/23 | 1/22/24 | 2/26/24 | 6/17/24 | 9/16/24 |
| Outcome 1: | 59% | 78% | 100% | 100% | 100% | 100% | 100% |
| Outcome 2: | 86% | 77% | 90% | 93% | 100% | 96% | 100% |
| Outcome 3: | 73% | 72% | 82% | 91% | 95% | 95% | 96% |
| Outcome 4: | Not Assessed | Not Assessed | Not Assessed | 86% | 100% | 89% | 88% |
| Rater Reliability: | Not Assessed | Not Assessed | 93.0% | 98.0% | 99.5% | 98.0% | 96.0% |
| NOTES: There was no review completed for Q4 CY22<br>Rater Reliability Threshold: 88.0% | | | | | | | |

The RMRC review of these reports is documented in the **RMRC Minutes 06.17.24 Approved** and the **RMRC Minutes 09.16.24 Approved**. These RMRC reviews did not identify any relevant trends nor any recommended quality improvement initiatives. The

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | inter-rater reliability scoring process that began in Q1 CY2023 and has been consistently utilized since that time with results exceeding the 88.0% threshold established by VCU in each succeeding quarter. | inter-rater reliability scores reported by VCU based on their 25% sample analysis have remained above 95% for the most recent four quarters.<br><br>The Office of Licensing continues to initiate specific corrective and improvement actions to address findings and recommendations from each of the quarterly look-behind reviews completed to date. A summary of these actions from each quarter is documented in the *VCU IMU Look-Behind DBHDS Response documents dated 5.20.2024 and 9.5.2024.* Each of these follow-up reports includes specific action steps and targeted completion dates which provide a structured tracking mechanism for ongoing RMRC oversight of any corrective actions initiated.<br><br>Based on this consultant's review and analysis of information relevant to this CI, the RMRC has continued to consistently conduct/oversee a look-behind review of a statistically valid, random sample of DBHDS serious incident reviews and follow-up processes that address each of the four outcomes referenced in the CI. The process also includes an inter-rater reliability component. The RMRC oversight process includes reviewing the look-behind report results and follow-up actions taken by the Office of Licensing to address each area of identified concern. A brief summary of these reviews and results are included in the RMRC meeting minutes. These processes address each of the requirements of this CI. | |
| **29.17**<br>The RMRC conducts or oversees a look-behind review of a statistically valid, random sample of reported allegations of abuse, neglect, and exploitation. The review will evaluate whether:<br>i. comprehensive and non-partial investigations of individual incidents | DBHDS implemented a revised Community Look-Behind (CLB) review process in 06/2023 that addresses each of the outcomes required by this CI.<br><br>OHR Regional Managers carry out the CLB Process each quarter utilizing a comprehensive review | The Community Look-Behind (CLB) is a DBHDS review of abuse reports among individuals receiving DD services in licensed community provider settings conducted by the DBHDS Office of Human Rights (OHR). The OHR case reviews completed by OHR Regional Managers include evaluation of three targeted outcomes required by this Compliance Indicator:<br>• **Outcome 1 –** Comprehensive and non-partial investigations of individual incidents occur within state-prescribed timelines.<br>• **Outcome 2 –** The person conducting the investigation has been trained to conduct investigations.<br>• **Outcome 3 –** Timely, appropriate corrective action plans are implemented by the provider when indicated. | 24th - Not Met<br><br>**25th - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| occur within state-prescribed timelines.<br>ii. The person conducting the investigation has been trained to conduct investigations.<br>iii. Timely, appropriate corrective action plans are implemented by the provider when indicated.<br>iv. The RMRC will review trends at least quarterly, recommend quality improvement initiatives when necessary, and track implementation of initiatives approved for implementation. | tool. To date, the OHR analyzed, summarized, and reported six quarters of data to the RMRC for review.<br><br>Automation of the CLB review process using the PowerApps platform was completed and implemented in 06/2024.<br><br>The inter-rater reliability component for the CLB process is essential, and its structure and full implementation has not yet been finalized.<br><br>Delays in the full implementation of the CLB process including the IRR component continue to limit the provision of valid and reliable data to the RMRC to achieve the outcomes required by this CI. | In addition to the three required outcomes, DBHDS has expanded the CLB process to include three additional targeted outcomes:<br><br>• **Outcome 4 –** Facts of the provider investigation support the director's determination regarding whether the allegation was substantiated.<br>• **Outcome 5 –** Involved staff were interviewed during the provider investigation.<br>• **Outcome 6 –** Involved individuals were interviewed.<br><br>After making substantive changes in the CLB process, DBHDS re-initiated reviews in June 2023. During each quarter, OHR Regional Managers conduct a review of 75 sample cases and evaluate whether the outcomes outlined above are met. However, the ***RMRC CLB Report Q4 FY24 Summary*** states that for the Q4 SFY24 review, six providers did not respond to the request for information and the process to replace a case that is outlined in the ***29.17 29.18 HR Process Document VER008*** was not effective resulting in a reduced sample size of 69 cases. Once remedial actions are determined to assure consistent inclusion of 75 sample cases each quarter, a revision to both the "Boundaries" and "Process" sections of the Process Document will need to be made to accurately describe how the revised process will work. DBHDS has completed development and implementation of an automated system to support the CLB process. Testing of the automated system operation began in 04/2024 with full implementation in 06/2024. A sample selection feature was added in 09/2024 but remains in the testing phase at this time.<br><br>The table below summarizes the results from each of the six quarterly reviews conducted since re-implementation of the CLB process. The OHR uses an 86% threshold to measure achievement of each outcome as indicated by reviewer responses to discrete questions in the ***CLB Review Form.*** Percentage scores below the 86% threshold are in red in the table:<br><br>**29.17** | |

| Compliance Indicator | Facts | Analysis | | | | | | | Conclusion |
|---|---|---|---|---|---|---|---|---|---|
| | | | Q3 SFY23 Results Jan-Mar | Q4 SFY23 Results Apr-Jun | Q1 SFY24 Results Jul-Sep | Q2 SFY24 Results Oct-Dec | Q3 SFY24 Results Jan-Mar | Q4 SFY24 Results Apr-Jun | |
| | | Report Date: | 8/28/23 | 8/28/23 | 12/18/23 | 2/26/24 | 6/17/24 | 9/16/24 | |
| | | RMRC Review: | 8/28/23 | 8/28/23 | 12/19/23 | 2/26/24 | 6/17/24 | 9/16/24 | |
| | | Sample Size: | 75 | 75 | 75 | 75 | 75 | 69 | |
| | | Outcome 1: | 83% | 81% | 81% | 88% | 89% | 81% | |
| | | Outcome 2: | 64% | 60% | 65% | 59% | 61% | 59% | |
| | | Outcome 3: | 89% | 87% | 75% | 80% | 95% | 100% | |

The following three outcomes are not specifically required by this Compliance Indicator but were added to the CLB review process to provide additional data to the OHR and RMRC regarding consistency of process implementation and identification of process improvement initiatives.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Outcome 4: | 87% | 93% | 97% | 94% | 96% | 93% | |
| | | Outcome 5: | 71% | 76% | 84% | 84% | | 83% | |
| | | Outcome 6: | 48% | 35% | 53% | 56% | | 43% | |

Based on information summarized in the **RMRC CLB Report Q4 FY24 Summary**, assuring that comprehensive, non-partial investigations are completed within specific timeframes (Outcome 1) was scored above the 86% threshold in SFY24 Q2 and Q3 but fell below the threshold to 81% in Q4. Assuring that trained investigators conduct investigations (Outcome 2) continues to be the lowest scoring area in this evaluation process with scores remaining at or near the 60% level over the past three quarters. Implementation of timely appropriate corrective action plans (Outcome 3) showed substantial improvement with scores of 95% and 100% in the two most recent quarterly reviews. In response to the continued low scores for Outcome 2, OHR has implemented several corrective actions including requiring providers to sign an attestation statement that investigations are completed by a trained investigator, adding an additional validation that the provider has a trained investigator during the waiver validation onsite visit process, and providing additional training to providers regarding the requirement that all investigations must be completed by a trained investigator. To

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | | further support providers to have a trained investigator, DBHDS shared additional information with providers about available resources to obtain required training for persons who will be conducting investigations.<br><br>The results of each quarter's CLB reviews are summarized in the ***RMRC CLB Quarterly Reports*** presented to and reviewed by the RMRC as is required by this CI. The RMRC review of trends and development of recommendations for quality improvement initiatives is improving as described in the previous paragraph, but these initiatives have not yet proven effective to consistently meet or exceed threshold scores for Outcomes 1 and 2.<br><br>The 24th study noted that the CLB process does not include an inter-rater reliability (IRR) component. The ***RMRC CLB Report Q4 FY24 Summary*** describes the current status of the development and implementation of this process noting that it remains in a testing phase with an updated status report to be presented to the RMRC in their 12/2024 meeting.<br><br>The projected date by which the revised CLB process will be fully operational is currently anticipated for late September/early October 2024; however, specific information as to whether this target date was achieved was not available at the time of conclusion of this review.<br><br>A status update regarding the development and implementation of the IRR process is summarized in the "Change Control" section of the ***29.17 29.18 HR Process Document VER008***; however, the details of how the IRR sampling process is carried out are not described in the "Change Control" section. These details will need to be added to the Process Document once the IRR process is finalized. Written instructions for the IRR process remain under development at this time and were not available for review.<br><br>While some improvements to the CLB process have been implemented and have achieved positive results, the full implementation of the CLB process remains | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | | incomplete and does not include a fully operational IRR process. Based on assessment of the current process implementation, the results being provided to the RMRC each quarter are not fully validated and limit the RMRC carrying out their oversight responsibilities required by this CI. Based on the results of this evaluation outlined above, the requirements of this CI have not yet been met.  The full implementation of the CLB process and all of its components including the IRR process needs to remain a central focus of the RMRC to continue progress toward meeting the requirements of this CI. | |
| **29.18**<br>At least 86% of the sample of serious incidents reviewed in indicator 5.d meet criteria reviewed in the audit.<br><br>At least 86% of the sample of allegations of abuse, neglect, and exploitation reviewed in indicator 5.e meet criteria reviewed in the audit. | The Commonwealth continues to meet the 86% threshold for all four of the outcome requirements related to the RMRC conducting or overseeing a look behind review of a statistically valid, random sample of DBHDS serious incident reviews and follow-up processes (CI 29.16) over the most recent four quarters.<br>The Commonwealth has met  the 86% threshold for only one of three outcome requirements (Outcome 3) related to the RMRC conducting a look-behind review of a statistically valid, random sample of reported allegations of abuse, | Details regarding the implementation of the review processes required at CIs 29.16 and 29.17 are described in the previous two sections of this report.<br><br>Regarding the requirements that relate to CI 29.16:<br>The *Quarter 4 IMULB Report Final 6.5.24* and the *Quarter 1 IMULB Report Final 9.5.24* presented to the RMRC contained a summary report of findings from the most recent Incident Management Look-Behind Reviews conducted by VCU.  The *RMRC Minutes 06.17.24 Approved* and the *RMRC Minutes 09.16.24 Approved* documented the content, review and recommendations made by the RMRC in response to their review and analysis of this information.<br><br><br>The results of the look-behind reviews for the most recent seven quarters are summarized in the table below: | 24th - Not Met<br><br>**25th – Not Met** |

**29.16**

| Quarter: | Q2 CY2022 | Q3 CY2022 | Q1 CY2023 | Q2 CY2023 | Q3 CY2023 | Q4 CY2023 | Q1 CY2024 |
|---|---|---|---|---|---|---|---|
| Dates: | 4/22-6/22 | 7/22-9/22 | 1/23-3/23 | 4/23-6/23 | 7/23-9/23 | 10/23-12/23 | 01/24-03/24 |
| Rpt Date: | 2/26/23 | 5/22/23 | 8/29/23 | 1/15/24 | 2/26/24 | 6/5/24 | 9/5/24 |
| RMRC Review: | 5/22/23 | 5/22/23 | 9/11/23 | 1/22/24 | 2/26/24 | 6/17/24 | 9/16/24 |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | neglect, and exploitation (CI 29.17). The other two outcomes did not achieve the 86% threshold in Q4 SFY 24.

The Commonwealth has not yet met the requirements of CI 29.18 as it requires meeting or exceeding the 86% threshold for all of the outcomes required by both CIs 29.16 and 29.17. | (see table below) | |

Analysis column content:

| | | | | | | |
|---|---|---|---|---|---|---|
| **Outcome 1:** | 59% | 78% | 100% | 100% | 100% | 100% | 100% |
| **Outcome 2:** | 86% | 77% | 90% | 93% | 100% | 96% | 100% |
| **Outcome 3:** | 73% | 72% | 82% | 91% | 95% | 95% | 96% |
| **Outcome 4:** | Not Assessed | Not Assessed | Not Assessed | 86% | 100% | 89% | 88% |
| **Rater Reliability:** | Not Assessed | Not Assessed | 93.0% | 98.0% | 99.5% | 98.0% | 96.0% |

**NOTES:** There was no review completed for Q4 CY22
Rater Reliability Threshold: 88.0%

The percentage results of the look-behind reviews have exceeded the 86% threshold in each of the four most recent quarters. Additionally, the inter-rater reliability scoring established by VCU has exceeded 95% in each of the four most recent quarters. DBHDS initially met the requirements of CI 29.16 in the 24th study and has continued to meet these requirements in this current study.

Regarding the requirements that relate to CI 29.17:
In review of evidence related to the Community Look-Behind (CLB) required at CI 29.17, DBHDS has implemented the revised process to conduct these reviews and implemented an automation component for the process in 06/2024. Additions to the automation process were also implemented in 09/2024. To date, the OHR has provided data to the RMRC for six quarters for review, evaluation, and recommendation of needed follow-up actions. The table below summarizes results for these six quarters specific to the three required outcomes in CI 29.17 and the three additional outcomes that DBHDS has added to the process to further its evaluation of functions. Percentage scores below the 86% threshold are in red in the table:

| **29.17** | | | | | | |
|---|---|---|---|---|---|---|
| | Q3 SFY23 Results Jan-Mar | Q4 SFY23 Results Apr-Jun | Q1 SFY24 Results Jul-Sep | Q2 SFY24 Results Oct-Dec | Q3 SFY24 Results Jan-Mar | Q4 SFY24 Results Apr-Jun |
| **Report Date:** | 8/28/23 | 8/28/23 | 12/18/23 | 2/26/24 | 6/17/24 | 9/16/24 |

183

| Compliance Indicator | Facts | Analysis | | | | | | | Conclusion |
|---|---|---|---|---|---|---|---|---|---|

| | | RMRC Review: | 8/28/23 | 8/28/23 | 12/19/23 | 2/26/24 | 6/17/24 | 9/16/24 | |
|---|---|---|---|---|---|---|---|---|---|
| | | Sample Size: | 75 | 75 | 75 | 75 | 75 | 69 | |
| | | Outcome 1: | 83% | 81% | 81% | 88% | 89% | 81% | |
| | | Outcome 2: | 64% | 60% | 65% | 59% | 61% | 59% | |
| | | Outcome 3: | 89% | 87% | 75% | 80% | 95% | 100% | |

The following three outcomes are not specifically required by this Compliance Indicator but were added to the CLB review process to provide additional data to the OHR and RMRC regarding consistency of process implementation and identification of process improvement initiatives.

| | | Outcome 4: | 87% | 93% | 97% | 94% | 96% | 93% | |
|---|---|---|---|---|---|---|---|---|---|
| | | Outcome 5: | 71% | 76% | 84% | 84% | | 83% | |
| | | Outcome 6: | 48% | 35% | 53% | 56% | | 43% | |

The results of each quarter's CLB reviews are summarized in the ***RMRC CLB Quarterly Reports*** presented to and reviewed by the RMRC as is required by this CI. The RMRC review of trends and development of recommendations for quality improvement initiatives is improving as described in the previous paragraph, but these initiatives have not yet proven effective to consistently meet or exceed threshold scores for Outcomes 1 and 2. See further analysis of the efforts by DBHDS to meet the requirements of CI 29.17 in the preceding section.

Based on the scores noted for Outcomes 1-3 above, DBHDS has not yet met the requirements of CI 29.17.

CI 29.18 requires that the Commonwealth meet or exceed the 86% threshold for all of the outcomes required by CIs 29.16 and 29.17. Based on evidence reviewed for this study, the Commonwealth continues to meet the requirements for CI 29.16 but has not yet met the requirements for CI 29.17.

| **29.20** At least 86% of the people supported in | For the 25th Period, DBHDS did not meet the requirements of this CI | At the time of the 24th Period review, this CI was not met because DBHDS data indicated that the Commonwealth did not achieve 86% for annual physical exams for people supported in residential settings or 86% for annual dental exams for | 24th - Not Met  **25th - Not Met** |
|---|---|---|---|

184

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| residential settings will receive an annual physical exam, including review of preventive screenings, and at least 86% of individuals who have coverage for dental services will receive an annual dental exam. | because data indicated that the Commonwealth did not yet achieve 86% for people supported in residential settings who have coverage for dental services who received annual dental exams. The *Office of Integrated Health Annual Physical and Dental Exams*, dated 8/6/24, reported dental exam performance at 65%. This data was predicated on a 14-month look behind period, rather than 12 months.<br><br>For annual physical exams it was positive that this same reporting indicated overall performance of 85.75% for the four most recent quarters (i.e., FY24, Q1-Q4). This also used the 14-month look behind period.<br><br>At the time of the 23rd Period review, DBHDS provided updated Process Documents (i.e., *Annual* | individuals who have coverage for dental services.<br><br>For this 25th Period, DBHDS again did not yet meet the requirements for this CI, as described below.  For context, it was also notable that the 24th Period study found the data reported for that timeframe and for both types of exams could not be used to trend improvement from previous periods because of  changes to the data collection methodology (i.e., to expand the "annual" definition from 12 months to 14 months for administrative purposes to ensure documentation in the ISP).  Data reporting using the revised methodology began for FY23 Q4, meaning any DBHDS trend reporting based on any time prior to that would likely paint an inaccurate picture of change over time.<br><br>**Annual Physical Exam Data**: At the time of the 24th Period, the *Developmental Disabilities Annual Report and Evaluation, State Fiscal Year 2023, Published Date February 27, 2024* reported slow yet steady progress for physical exams during 2023 and the previous two fiscal years. For this 25th Period, it remained the most current version of that report. The report documented a variety of reasons why the 86% target was not achieved (e.g., difficulty locating a primary care physician, accessibility of the medical office, anxiety and fear of medical encounters, transportation, and for some, a support person/advocate to accompany them during the process.)<br><br>For this 25th Period, DBHDS also provided a report entitled *Office of Integrated Health Annual Physical and Dental Exams*, dated 8/6/24.  A chart in the report, entitled *ANNUAL DENTAL & PHYSICAL EXAMS -12MO & 14MO*, indicated that using 14-month data, for the last four reporting quarters, DBHDS achieved the following for physical exams: FY23 Q4 -86%; FY24 Q1-85%; FY24 Q2-85%; FY24 Q3-87%. Twelve (12) month data for the same time period ran 9% to 10% lower. In addition, the document reported that for FY24 Q4, DBHDS achieved 86%.  Therefore, for the four quarters of FY24, the overall performance was 85.75%.<br><br>Although, the findings from the Independent Reviewer's 25th Period Individual Services Review (ISR) and DBHDS's parallel Intense Management Needs Review (IMNR) studies of 30 individuals with complex medical needs was too small to | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | *Dental Exams Ver 005* and *Annual Physical Exams Ver 005*), both dated 8/24/23, and a single Data Set Attestation, dated 8/4/23.<br><br>At that time, the study noted the Data Set Attestation did not clearly reference the adequacy of mitigation strategies for ensuring that ISPs are completed by their effective date. In addition, the 24th Period study found that DBHDS needed to review and clarify the Scope section of both Process Documents (i.e., for both types of exams), which appeared to still indicate that the date of an annual exam, either physical or dental, must occur within the year proceeding the Annual ISP date (i.e. rather than within 14 months).<br><br>For this 25th Period, DBHDS did not provide | generalize to all individuals with waivers, these studies found that 29 (97%) had an annual physical exam using the within 14-months of the previous exam. The full ISR study can be found at Appendix E.<br><br>**Annual Dental Exam Data:** At the time of the 24th Period, DBHDS provided a document entitled *Annual Dental 29.20 24th Review*, dated 2/1/24.  It reported data for three quarters showing performance remaining steady at 63% to 64%.<br><br>For this 25th period, the aforementioned report, entitled *Office of Integrated Health Annual Physical and Dental Exams* and dated 8/6/24, indicated that using 14-month data, for the last four reporting quarters, DBHDS achieved the following for dental exams: FY23 Q4 -63%; FY24 Q1-63%; FY24 Q2-64%; FY24 Q3-66% .  Twelve (12) month data ran 4%-5% lower. In addition, the document reported that for FY24 Q4, DBHDS achieved 67%.  Therefore, for the four quarters of FY24, the overall performance was 65%.<br><br>The ISR and IMNR studies found that, of 30 individuals with intense medical needs, 67% had an annual dental exam.<br><br>The report provided a description of both actions taken from 2022-2024 to impact improvements in access to both annual physical and dental exams, as well as next steps upcoming in 2025. Given the noted improvement in physical exam performance, the actions during 2024 and upcoming for 2025 focused on dental exams.  Examples included:<br>• Two DBHDS Regional Quality Councils have been involved in conducting surveys of regional DentaQuest credentialed dentists to determine how many were taking new patients, caring for people with DD, offering sedation, etc. The results are being presented to the DMAS Dental Program.<br>• The DMAS Dental Program team is working with DentaQuest to increase the network of credentialed dentists providing care to Medicaid beneficiaries<br>• DentaQuest has developed and is expanding their complex Case Coordination Team initially created to assist MCO Care Coordinators with | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | updated documents reflecting any of the recommended changes. | emergent dental needs. The teams are available as a resource to waiver Support Coordinators.<br>• The OIH dental team continued to serve individuals across the Commonwealth. In FY24 523 individual were seen by one team.  DBHDS is expanding the OIHSN Dental Program and seeking to expand the sedation program through two new RFPs focused on Regions 1 and 3. DBHDS also plans to increase the number of clinics at CSB locations.<br><br>The ISR detailed review of 30 individuals found that eight individuals (27%) with complex medical needs lacked sufficient and timely dental care. Adequate dental resources were often not available because dentists did not accept Medicaid clients or did not offer sedation. The ISR study also determined that the website operated by DentaQuest did not provide current and accurate information about the number and location of dentists who accept Medicaid.<br><br>With regard to data validity and reliability, at the time of the 23rd Period review, DBHDS provided updated Process Documents (i.e., *Annual Dental Exams Ver 005* and *Annual Physical Exams Ver 005*), both dated 8/24/23, and a single Data Set Attestation, dated 8/4/23.  Of note, at that time, DBHDS had issued a *DQMP* document entitled *WaMS Recommendations: Data Source System Enhancement Progress*, with a completion date of 8/4/23.  This document indicated that with regard to ensuring that ISPs are completed by their effective date, that DBHDS was still making changes to the quarterly ISP Compliance report format to include the number and percentage of ISPs not placed in the proper status before the effective date of the related ISP year and that this modification would be considered when issuing corrective action plan requests and providing technical assistance starting in FY24. At the time of the 23rd Period, the study noted the Data Set Attestation did not clearly reference the adequacy of mitigation strategies for ensuring that ISPs are completed by their effective date.<br><br>The 24th Period study found that DBHDS needed to review and clarify the Scope section of both Process Documents (i.e., for both types of exams), which appeared to | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | | still indicate that the date of an annual exam, either physical or dental, must occur within the year proceeding the Annual ISP date (i.e. rather than within 14 months). This was in conflict with the changes in the sections entitled "Methodology" of the Process Documents and could potentially impact the validity of the reported data. DBHDS also still needed to ensure the Attestation confirmed the adequacy of the remediation strategy for ensuring that ISPs are completed by their effective date.

For this 25th Period, DBHDS did not provide updated documents reflecting any of the recommended changes.

Of note, DBHDS collected additional related data for completion of these exams that could potentially serve as comparative data for ongoing validation.  Round 6 QSR data, with a lookback period of 7/1/23 through 1/31/24 (i.e., the first seven months of FY24), found performance for dental exams at 57% and for physical exams at 83%. In addition, as mentioned above, the *Intense Management Needs Review Report Twenty-Fifth Review Period*, dated October 2024, found that for the period between 7/1/23 through 9/1/23 (i.e., the first two months of FY24), 66.7% of sampled individuals with complex medical needs received an annual dental exam, while 96.7% received an annual physical exam. | |
| **29.21** At least 86% of people with identified behavioral support needs are provided adequate and appropriately delivered behavioral support services. | For this 25th Period, DBHDS did not yet achieve compliance with CI 29. 21.

Based on review of the *Behavioral Supports Report: Q1/FY25*, DBHDS reported that, for all FY24, only 68% (1526/2260) received adequate services and 32% (734/2260) received | At the time of the 24th Period review, DBHDS did not yet achieve compliance with CI 29.21, because DBHDS reported that, overall, 64% of people with identified behavioral support needs received adequate services and 36% received inadequate or no services. As also described in the 24th Period study, DBHDS calculated these percentages using a corrected calculation methodology, to be in line with the *Agreed-Upon Curative Action for Compliance Indicator 29.21*, filed with the Court on 7/11/22. This revised methodology was designed to ensure that the measure's denominator accurately reflects the entire cohort of people with identified behavioral support needs. Of note, due to this change in calculation methodology, the reported percentage for the 24th Period cannot be compared to previously reported data for the purpose of determining trends.

For this 25th Period, DBHDS did not yet achieve compliance with CI 29.21. Based on | 24th - Not Met

**25th - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | inadequate or no services.<br><br>During this period, the Independent Reviewer requested an updated methodology for calculating data presented for CI 29.21 to incorporate both BSPARI scores above 30 point and utilization of therapeutic behavioral consultation services. BSPARI scores and utilization data had previously been deemed valid and reliable.<br><br>A review of the requested updated methodology and the Data Set Attestation provided by the Chief Data Officer concluded that the additional calculation requested by the Independent Reviewer does not negatively affect the integrity of the process. Therefore the process, as reflected in the Process Document entitled *Therapeutic* | review of the *Behavioral Supports Report: Q1/FY25*, DBHDS reported that, for all FY24, 68% (1526/2260) received adequate services and 32% (734/2260) received inadequate or no services.<br><br>During this period, the Independent Reviewer requested an updated methodology for calculating data presented for CI 29.21 to incorporate both BSPARI scores above 30 point and utilization of therapeutic behavioral consultation services. BSPARI scores and utilization data had previously been deemed valid and reliable.  A review of the requested updated methodology provided by the VA Director of Behavioral Services and Projects, and the Data Set Attestation provided by the Chief Data Officer resulted in the conclusion that the additional calculation requested by the Independent Reviewer does not negatively affect the integrity of the process. Therefore the process, as reflected in the Process Document entitled *Therapeutic Consultation – Behavior Supports*, dated 6/1/24, remains reliable and valid. | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | *Consultation – Behavior Supports,* dated 6/1/24, remains reliable and valid. | | |
| **29.22** At least 95% of residential service recipients reside in a location that is integrated in, and supports full access to the greater community, in compliance with CMS rules on Home and Community-based Settings. | For this 25th Period, DBHDS did not yet meet the criteria for this CI because it did not submit a final data report that demonstrated compliance. DBHDS provided a document entitled *HCBS Data* that indicated 88% (8479/9613) of residential service recipients resided in a location that is integrated in, and supports full access to the greater community, in compliance with CMS rules on Home and Community-based Settings. However, this included individuals for whom a QSR QIP had been issued, and was subject to further calculation and validation. In interview, DBHDS staff indicated | At the time of the 24th Period review, the Commonwealth did not meet the requirements of this CI because the data report submitted indicated that sixty-nine percent (69%) settings had been deemed compliant, based on a review by DBHDS, DMAS or as part of the QSR process.<br><br>For this 25th Period, DBHDS did not submit a final data report. In interview, DBHDS staff indicated they were still in the midst of reviewing the Round 6 data and did not expect to be able to complete a comprehensive and thorough validation until after the close of this review period. Preliminarily, DBHDS provided a document entitled *HCBS Data* that indicated 88% (8479/9613) of residential service recipients resided in a location that is integrated in, and supports full access to the greater community, in compliance with CMS rules on Home and Community-based Settings. However, this included individuals for whom a QSR QIP had been issued, and was subject to further calculation and validation.<br><br>In addition for this 25th Period, as discussed during interview, there remained other concerns with regard to the evaluation processes of compliance with the federal regulation at *CMS-2249-F/CMS-2296-F* (i.e., requirements that the "setting is integrated in and supports full access of individuals receiving Medicaid HCBS to the greater community, including opportunities to seek employment and work in competitive integrated settings, engage in community life, control personal resources, and receive services in the community, to the same degree of access as individuals not receiving Medicaid HCBS.")<br><br>For the most part, the 24th Period study detailed these same concerns that needed to be addressed before the data could be considered valid and reliable. This 25th Period review found that DBHDS had made some improvements, as documented in an updated Process Document, dated 10/10/24, but these had not fully resolved the | 24th - Not Met<br><br>**25th - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | they were still in the midst of reviewing the Round 6 data and did not expect to be able to complete a comprehensive and thorough validation until after the close of this review period.<br><br>In addition for this 25th Period, and as described at the time of the 24th Period, there remained other concerns with regard to the evaluation processes of compliance with the federal regulations at *CMS-2249-F/CMS-2296-F*.<br><br>This 25th Period review found that DBHDS had made some improvements, as documented in an updated Process Document, dated 10/23/24.<br><br>It indicated that, going forward, DBHDS will not count any provider | issues of data validity and reliability. However, it was positive that an additional update to the Process Document on 10/23/24, resolved concerns about ensuring that DBHDS did not count settings as compliant until all remediation was complete.<br><br>• The 24th Period *HCBS Settings* Process Document (i.e., updated 4/19/24), added a requirement for DBHDS staff to contact the provider to determine and validate implementation of any HCBS quality improvement plan prior to inclusion in the *HCBS Master Tracking Spreadsheet* as a compliant setting. It broadly addressed a previous question concerning validity of the measure (i.e. that it counted individuals who lived in settings for which the QSR vendor found noncompliance and issued a quality improvement plan, but without any evidence required to show that the noncompliance had been successfully remediated), but it did not provide specific detail with regard to the methodology and criteria DBHDS staff would apply to the determination and validation of the successful implementation of the quality improvement plan.<br><br>For this 25th Period, the 10/10/24 version of the Process Document continued to reflect gaps in the process for ensuring all HCBS remediation was complete. It continued to state that a setting could be considered compliant if issued a QIP related to HCBS "since the provider will have to implement their quality plan." It also indicated that DBHDS planned to complete a five percent review of providers with a QIP to ensure implementation of the QIP. In interview, DBHDS staff indicated they understood that the Commonwealth must validate compliance for each setting and could not rely on an assumption that a provider would implement the QIP, nor apply a 5% sample finding to every setting.<br><br>On 10/23/24, DBHDS provided a newly revised Process Document that indicated, going forward, for any questions that are determined to be HCBS relevant with a no response, DBHDS will follow up with the provider and require that the provider submit a remediation plan and documentation of remediation of no responses. DBHDS will not count any provider requiring | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | requiring remediation as in compliance until evidence is obtained of successful implementation of the remediation plan. This resolved the deficiency with regard to validity of the measure.<br><br>In addition, although the Round 6 PCR and PQR tools continued to evidence opportunities for IRR deficiencies to occur, it was positive that the 10/23/24 revision of the Process Document included a strategy for an examination of potential IRR concerns for the use of the QSR data set, through a ten percent look-behind of QSR determinations. To ensure this will be adequate for achieving compliance, DBHDS should ensure that the look-behind protocol is clearly defined.<br><br>These improvements had not fully resolved the | remediation as in compliance until evidence is obtained of successful implementation of the remediation plan. This resolved the deficiency with regard to validity of the measure.<br>• At the time of the 24th Period, the study found that many key HCBS requirements with regard to integration in and access to the greater community were not included in the list of QSR PCR questions used in the calculation and that they did not provide sufficient guidance for determining a Yes or No response, and/or were text field responses that did not provide a Yes or No response. The 24th Period provided a number of examples. One of those pointed out that a Yes answer to Question 31 requires that the ISP and/or other individual record documentation demonstrates that annual education was provided about less restrictive community options to any individuals living outside their own home or family's home, and specifically a non-disability specific settings and an option for a private unit in a residential setting. This is a key HCBS requirement, but for this 25th Period review, it still was not included in the PCR questions used to determine compliance. For this 25th Period, other similar concerns remained. DBHDS still needed to review the examples in the 24th Period report and make needed adjustments to those items as well as complete a comprehensive review of questions for similar concerns.<br>• DBHDS still needed to review the PQR tool to ensure guidance is sufficient for making an accurate evaluation. For example, as documented at the time of the 24th Period review, the PQR tool continues to include only three questions designated for inclusion in the calculation for compliance (i.e., Question 31: Does the agency have policies and procedures that address HCBS rights; Question 32: Are those policies and procedures reviewed with the individuals being served; Question 52: Does provider documentation show that the setting has implemented annual HCBS specific training with all staff?) None of these provided sufficient written guidance for reviewers to reliably evaluate whether the policies, procedures, HCBS rights document or annual training addressed all needed regulatory criteria.<br>• DBHDS also needed to ensure the PQR tool includes all appropriate | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | issues of data validity and reliability for this 25th period. DBHDS made available the Round 6 PCR and PQR tools and, upon request, a list of the questions used to calculate this measure. This study again found that some key HCBS requirements with regard to integration in and access to the greater community were not included in the list of QSR PCR questions used in the calculation and that they did not provide sufficient guidance for determining a Yes or No response, and/or were text field responses that did not provide a Yes or No response.<br><br>In addition, DBHDS still needed to review the PQR tool to ensure reviewer guidance is sufficient for making an accurate evaluation and the PQR tool includes all appropriate items in the | items in the calculation. It was not clear why the calculation did not include items 54-56 (i.e., Does the provider promote individual participation in non-large group activities; Does the provider promote individual participation in non-large group activities; Does the provider encourage individual participation in community outings with people other than those with whom they live), since No answers would indicate HCBS noncompliance requiring remediation.<br><br>As described at the time of the 24th Period study, for this 25th period DBHDS still needed to develop a formal written protocol that outlines the HCBS compliance process from start to finish. Of note, the protocol should incorporate all of the validation processes in the approved Statewide Transition Plan (STP) and the requirements of the HCBS Settings Rule and related CMS guidance. In particular, DBHDS should ensure that the protocol documents how it takes the following into account:<br>• Per CMS guidance, the validation of settings compliance must be setting-specific. This means that the finding of compliance for one provider setting cannot be used to attest to compliance for the provider's additional settings.<br>• Per the Commonwealth's *Addendum to the Commonwealth of Virginia's Statewide Transition Plan February 2019*, for onsite reviews to validate remediation, a "minimum of 25% of individuals receiving services in a setting will be interviewed and no less than 2 individuals for smaller settings of 2 or more persons receiving services."<br>• Based on review of a September 24, 2024 communication from CMS and the attached *CMS Site Visit Report* for visit dates of 6/24/24 through 6/27/24, CMS identified various deficiencies in the validation processes and specified an expectation that the Commonwealth will incorporate remediation for these on a systemic basis. In particular, CMS stated that the issues in the report must be addressed in the state's overall assessment process of all providers of HCBS to ensure that they are being assessed appropriately against all the regulatory settings criteria. CMS also requested the state provide a written response no later than 10/25/24 that addresses how the state will apply the | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | calculation. It was not clear why the calculation did not include items 54-56 (i.e., regarding provider support of community integration), since No answers would indicate HCBS noncompliance requiring remediation.<br><br>As described at the time of the 24th Period study, for this 25th period DBHDS still needed to develop a formal written protocol that outlines the HCBS compliance process from start to finish. Of note, the protocol should incorporate all of the validation processes in the approved Statewide Transition Plan (STP) and the requirements of the HCBS Settings Rule and related CMS guidance, as well as CMS Site Visit findings issued on 9/24/24.<br><br>DBHDS did yet not | findings to ensure compliance. Given that CMS will be the final arbiter of compliance, DBHDS should consider requesting that CMS review the assessment/validation protocol and tools once the above modifications are completed.<br><br>At the time of the 24th Period, the study found that DBHDS needed to ensure that the Process Document and Data Set Attestation addressed potential threats to data reliability related to IRR deficiencies. As indicated above, for this 25th Period, the Round 6 PCR and PQR tools continued to evidence opportunities for IRR deficiencies to occur. It was therefore positive that the 10/23/24 revision of the Process Document included a strategy for an examination of potential IRR concerns for the use of the QSR data set, through a ten percent look-behind of QSR determinations. To ensure this will be adequate for achieving compliance, DBHDS should ensure that the look-behind protocol is clearly defined.<br><br>DBHDS did not yet provide a Data Set Attestation for this measure. As reported previously, going forward, DBHD will also need to ensure that Process Documents and Attestations are in place for this specific use of the data from WaMS, CONNECT and the *HCBS Master Tracking Spreadsheet* maintained by DMAS. | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | provide a Data Set Attestation for this measure.  As reported previously, going forward, DBHD will also need to ensure that Process Documents and Attestations are in place for this specific use of the data from WaMS, CONNECT and the HCBS Master Tracking Spreadsheet maintained by DMAS. | | |
| **29.24**<br>At least 95% of individual service recipients are adequately protected from serious injuries in service settings. | For this 25th Period, this CI was not met because, although DBHDS made revisions to its methodology for calculating this measure, it did not yet yield valid data.<br><br>A revised algorithm, as evidenced in the Process Document *entitled Individuals Protected from Serious Injury*, dated 7/26/24, included in the numerator both those who they had a single serious injury that | At the time of the 24th Period review, DBHDS made significant revisions to the previous data collection methodology and provided a revised Process Document entitled *Individuals Protected from Serious Injury*, dated 2/21/24.  It defined individuals considered to have *not* been protected from serious injury as those who experienced an injury that was related to a licensing violation that required a corrective action plan (CAP). Only individuals for whom a licensing investigation of the serious injury found a licensing violation requiring a CAP are considered to have not been protected.<br><br>At the time, DBHDS had various processes in place for reporting, identifying and reviewing serious injuries, as well as referring them for investigation, through well-established Incident Management Unit (IMU) and Investigation processes. However, the 24th Period study found that the proposed methodology reflected a funneling effect that appeared to significantly limit the serious injuries that could possibly reach the investigation stage and therefore result in a CAP.  Some revisions and/or additions were needed to use the established processes to reliably measure the percentage of individuals who are protected from serious injury.  DBHDS needed to address the following concerns: | 24th - Not Met<br><br>**25th - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | resulted in a CAP, but also those who had two or more serious injuries during a rolling 12 month period, whether or not these resulted in a CAP. In part, the latter addressed the 24th Period finding that DBHDS needed a more thorough methodology for identification and tracking of individuals with repeated injuries.<br><br>Using the revised algorithm, DBHDS reported that for the period 7/1/23 through 6/30/24, 97.3% (456/16,288) of individuals were adequately protected from serious injury.<br><br>Of the 456 individuals, 14 were for individuals with a licensing investigation that resulted in a CAP, while the remaining 448 were for people with more than one serious injury in the 12 month | • The very small percentage of serious injuries referred for investigation and the likewise small percentage of those referrals that DBHDS actually investigated.<br>• The limitations of the Care Concerns criteria as the basis for investigation referral, and the investigatory criteria including, but not limited to, the short 30-day look behind for repeated injuries;<br>• A more thorough methodology for identification and tracking of individuals with repeated injuries;<br>• Re-visiting whether a formal CAP sufficiently captures the various actions IMU and investigator staff take that were remedial in nature and represented a form of corrective action (i.e., even though DBHDS did not issue a formal CAP).<br><br>For this 25th Period, and as evidenced in the Process Document entitled *Individuals Protected from Serious Injury*, dated 7/26/24, DBHDS reported they revised the algorithm for identifying the percentage of individuals that have not been protected from serious injury. The numerator for the measure to determine if an individual is not protected from serious injury now includes both those who had a single serious injury that resulted in a CAP, but also those who had two or more serious injuries during a rolling 12 month period, whether or not these resulted in a CAP. While this did not fully address the concern that repeated serious injuries did not necessarily result in additional scrutiny or investigation, it was sufficient to ensure that repeated serious injuries were not excluded from the calculation of those that were not protected. It is conceivable that this could contribute to an over-count of the number of individuals who were not protected, but this remains an unknown since all the repeat injuries are not necessarily investigated.<br><br>For the period 7/1/23 through 6/30/24, total number of serious injuries reported stood at 2,414. The number of IMU referrals of serious injuries referred to licensing for an investigation was 255 (i.e., at 9.5%), and the number of licensing investigations was 94 (i.e., 37% of referrals.) Of note, DBHDS staff reported the pending implementation of a Specialized Investigation Unit for DD incidents, including serious injuries, with an anticipated start date of 11/1/24. It is possible that this will impact the number and percentage of referrals that lead to investigations, and DBHDS stated | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | period.<br><br>This algorithm and the Process Document required additional revision to ensure a valid measure.  In particular, it needed to factor out of the numerator the number of ANE allegations and rights violations substantiated by the Office of Human Rights (OHR), based on referrals of suspicious serious injuries from the IMU.  This is consistent with the 24th Period finding that DBHDS needed to re-visit whether a formal CAP sufficiently captures the various actions IMU and investigator staff take that were remedial in nature and represented a form of corrective action (i.e., even though DBHDS did not issue a formal CAP).<br><br>Based on DBHDS staff report, during the period 7/1/23 through | they intended to monitor this.<br><br>Using the algorithm described above, DBHDS reported that for the period 7/1/23 through 6/30/24, 97.3% (456/16,288) of individuals were adequately protected from serious injury.   Of these 456 individuals, 14 were for individuals with a licensing investigation that resulted in a CAP, while the remaining 448 were for people with more than one serious injury in the 12 month period.<br><br>As described further below, this algorithm and the Process Document required additional revision to ensure a valid measure.  In particular, it needed to factor out of the numerator the number of ANE allegations and rights violations substantiated by the Office of Human Rights (OHR), based on referrals of suspicious serious injuries from the IMU.<br>• Based on documents reviewed and DBHDS staff report, DBHDS updated *Appendix D-SIR Investigations* to clarify that the IMU refers certain serious incidents to other internal DBHDS offices such as Office of Integrated Health (OIH) and Office of Human Rights (OHR), which may result in remedial actions by those offices, regardless of whether they are referred for investigation or receive a CAP. Based on DBHDS staff report, the IMU does not track the outcomes of these referrals.  However, in order to have a valid measure of individuals protected from serious injury, DBHDS would at least need to factor out serious injuries of unknown origin that OHR determined to be substantiated ANE or a violation of rights.<br>• Based on DBHDS staff report, during the period 7/1/23 through 6/30/24, the IMU referred 470 serious injuries to OHR. This number of referrals represented almost 12% of the 2,414 serious injuries that occurred during that same period. This represented the largest number and percentage of referrals IMU made for serious injuries.<br>• Of note, the updated *Appendix D-SIR Investigation* indicates that IMU MAY refer for investigation serious injuries of unknown origin, particularly injuries of unknown origin that IMU determines during triage process that were not reported to the Office of Human Rights (OHR) and appear suspicious in nature. | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
|  | 6/30/24, the IMU referred 470 serious injuries to OHR. This number of referrals represented almost 12% of the 2,414 serious injuries that occurred during that same period. This represented the largest number and percentage of referrals IMU made for serious injuries.<br><br>Based on DBHDS staff report, the IMU does not track the outcomes of OHR referrals and therefore does not have the data to factor in substantiations as a lack of protection.<br><br>The 24th Period study also found that DBHDS needed to address the limitations of the Care Concerns criteria as the basis for investigation referral, and the investigatory criteria including, but not limited to, the short 30-day look | OHR DBHDS needed to provide written guidance in this section for IMU staff about the assessment of "suspicious in nature." In interview, DBHDS staff agreed to add this guidance. In addition, DBHDS should clarify why this type of serious injury falls into the category of MAY be referred versus those that MUST be referred.  These actions must be completed to ensure valid and reliable data for this measure.<br><br>For this 25th Period, the aforementioned Process Document included a description of other CQI processes intended to enhance surveillance of serious injuries. Of note, at the time of the 24th Period review, DBHDS staff indicated they planned to consider having DBHDS nursing staff review a sample of serious injuries referred for investigation to determine if they agreed that appropriate services were in place to protect individuals from injury when no citations/corrective actions were implemented.  While this would be an appropriate step for validating the investigation outcomes, it would not fully validate whether referrals for investigation were adequately and appropriately made.<br><br>Based on review of the relevant Process Document, the CQI processes did not include a focused  sampling procedure (i.e., one isolating serious injury referrals) that would suffice to validate the adequacy of the investigation referral process for serious injuries. The processes described in the Process Document included the following:<br>• During monthly supervision with staff, the supervisor will review 10 % of closed Death and Serious Incident reports to review for quality of triage, trend analysis, documentation and closure timeliness.<br>• Monthly, IMU will review a 10% sample of "other categories" to determine if they should have been categorized differently and if, in fact, they should have been report.  This process began in February 2023. Based on staff report, for the past six month period, IMU staff sampled 128 records and discovered two serious injuries.<br>• Monthly, per staff, IMU will complete an internal look behind, based on a 10% sample, for imminent danger. The Process Document indicated the sample will include reports referred and not referred for imminent danger per |  |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | behind for repeated injuries; and the very small percentage of serious injuries referred for investigation and the likewise small percentage of those referrals that DBHDS actually investigated.<br><br>For the former, DBHDS made a revision to *Appendix D-SIR Investigations* to clarify that the IMU MAY include triaging incidents to investigation such as the completion of a trend analysis of previous incidents within the last 90 days that reveals concerning patterns.  In interview, DBHDS staff indicated IMU staff always completed this trend analysis and that they would correct this language to reflect that they MUST do so.<br><br>For the latter concern, for the period 7/1/23 through 6/30/24, total | protocol.  DBHDS provided a document entitled *Internal Memo: Imminent Danger & Summary Suspension*, dated August 2024. This document was received at the conclusion of the review, but upon preliminary review, it did not appear to describe the look-behind protocol.<br><br>Also for this 25th Period, in May 2024 and September 2024, DBHDS made additional revisions to their IMU and Investigation protocols. The updates to *Appendix D-SIR Investigations* clarified which incidents MAY be referred by IMU, which MUST be referred by IMU, which MUST be investigated, and which MAY be investigated.  As discussed during interview with DBHDS staff, some of these sections contained some ambiguous language, which will require additional updating. As described above, this included the criteria for determining if a serious injury of unknown origin was suspicious in nature.<br><br>In addition, for incidents that MAY be referred for investigation, the language indicated that the IMU MAY include triaging incidents to investigation such as the completion of a trend analysis of previous incidents within the last 90 days that reveals concerning patterns.  Although DBHDS IMU staff reported they will always complete a 90-day trend analysis, the language is not sufficiently clear to show that they MUST and requires revision.  In part, this longer look-behind period (i.e., 90 days vs  30 days) is intended to ameliorate the concern that the brief 30-day look behind period for repeated injuries (i.e., as cited in the Care Concerns) would likely screen out many such repeated incidents from investigation.  In interview, DBHDS staff indicated IMU staff always completed this trend analysis and that they would correct this language to reflect that they MUST do so.<br><br>DBHDS reported they revised the *Investigation Protocol Chapter* with regard to the section Determining Priority of Investigations.  These priorities included all reported allegations of suspected abuse, neglect, with injury in which it is reasonable to assume that the individual's safety may be at ongoing risk. | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | number of serious injuries reported stood at 2,414. The number of IMU referrals of serious injuries referred to licensing for an investigation was 255 (i.e., 9.5%), and the number of licensing investigations was 94.  This was 37% of referrals, but only four (4) percent of reported serious injuries.  Based on DBHDS staff report, this was essentially stable over the past several years.  Of note, DBHDS staff reported the pending implementation of a Specialized Investigation Unit for DD incidents, including serious injuries, with an anticipated start date of 11/1/24.  It is possible that this will impact the number and percentage of referrals that lead to investigations, and DBHDS stated they intended to monitor this.<br><br>The Process Document for this CI included a | | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | description of other CQI processes intended to enhance surveillance of serious injuries, but they did not include a focused sampling procedure (i.e., one isolating serious injury referrals) that would suffice to validate the adequacy of the investigation referral process for serious injuries. | | |

**V.C.1 Analysis of 23ʳᵈ Review Period Findings**

| V.C.1: The Commonwealth shall require that all Training Centers, CSBs, and other community providers of residential and day services implement risk management processes, including establishment of uniform risk triggers and thresholds, that enable them to adequately address harms and risks of harm. Harm includes any physical injury, whether caused by abuse, neglect, or accidental causes. |
| --- |

| Compliance Indicator | Facts | Analysis | Conclusion |
| --- | --- | --- | --- |
| **30.4:** At least 86% of DBHDS-licensed providers of DD services have been assessed for their compliance with risk management requirements in the Licensing Regulations during their annual inspections.<br><br>Inspections will include an assessment of whether providers use data at the individual and provider level, including, at minimum, data from incidents and investigations, to identify and address trends and patterns of harm and risk of harm in the events reported, as well as the associated findings and recommendations. This | DBHDS continues to exceed the 86% threshold of DBHDS-licensed providers of DD services being assessed for their compliance with risk management requirements in the Licensing Regulations during their annual inspections. During the period from 01/01/2024-06/30/2024, 98% of inspections conducted assessed compliance with all applicable licensing requirements.<br><br>The requirements of this CI that relate to providers use of data to identify and address trends and patterns of harm and risk of harm are specifically referenced in the guidance for providers | From 01/01/2024-06/30/2024, OL conducted 902 licensing inspections. Within this number of inspections, 882 inspections (98%) included assessment of all licensing requirements. This high percentage has been consistent over the past several years of data reporting.<br><br>The *OL Annual Compliance Determination Chart*, updated each year prior to the initiation of the annual licensing inspection cycle, contains specific instructions to the Licensing Specialist to assess whether providers are meeting the requirements at §520.C.5 and the requirements of this CI. The OL continues to expand and refine these instructions prior to the initiation of each calendar year's licensing inspection cycle to ensure that Licensing Specialists have comprehensive and complete instructions regarding how to measure whether providers are meeting each licensing requirement applicable to their operations. The requirements for §520.C.5 and this CI are:<br>• The provider uses data at the individual and/or provider level, including at minimum data from incidents and investigations, to identify and address trends and patterns of harm and risk of harm (defined as care concerns) in the events reported.<br>• The provider is tracking data in order to evaluate trends and patterns over time, including year-over-year as applicable. After a year of tracking data, the provider will use this baseline data to assess the effectiveness of their Risk Management System.<br>• The provider uses their data to summarize findings and make recommendations which may include remediation and planned/implemented steps taken to mitigate the potential for future incidents. | 24ᵗʰ - Not Met<br><br>**25ᵗʰ - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| includes identifying year-over-year trends and patterns and the use of baseline data to assess the effectiveness of risk management systems.<br><br>The licensing report will identify any identified areas of non-compliance with Licensing Regulations and associated recommendations. | and Licensing Specialists for licensing regulation §520.C.5.<br><br>The OL has continued to expand and refine its guidance for providers and for Licensing Specialists regarding the requirements of §520.C.5 and instructions to Licensing Specialists regarding how to accurately assess whether the provider is meeting these requirements.<br><br>Based on sample review of 80 providers across the five regions who had licensing inspections conducted on or after 04/01/2024 that were conducted in the 24th and 25th period studies, the consultant determined that Licensing Specialists are not accurately assessing provider compliance with risk management requirements in the Licensing Regulations, | The OL continues to develop and provide training and information to providers regarding methods by which they can utilize data as the foundation of their risk management and quality improvement processes to identify and address trends and patterns of harm and risk of harm. After each semi-annual study, OL has developed and/or expanded training for Licensing Specialists and for providers to increase awareness of the requirements to meet licensing regulation §520.C.5. Based on sample reviews, the results of these efforts have expanded the number of providers that are conducting comprehensive data-based analyses as an integral part of their risk management and quality improvement processes.<br><br>DBHDS reported on the *30.4 RM Compliance Total FY24 Q3 Q4* document that during the third and fourth quarters for FY2024, during annual inspections 895 providers were assessed for compliance with §520.C.5. 697/895 (77.88%) were found to be in compliance from these assessments. To evaluate the consistency and accuracy of Licensing Specialist assessments of whether providers are meeting the risk management requirements in §520 of the Licensing Regulations, during the 24th period study the consultant drew a sample of 40 licensed providers who had an annual licensing inspection conducted between 01/01/2024-03/15/2024. From this sample, the consultant agreed with the Licensing Specialist determinations regarding each of the elements within §520 in 82% of the sample reviews. Because the 40-provider sample was drawn from only a limited number of inspections that had been completed through 03/15/2024, the results were determined not to be sufficient to make an accurate determination. To complete the sample assessment across a larger number of licensing inspections, the same assessment was conducted with another sample of 40 providers whose licensing inspections were conducted between 04/01/2024-06/30/2024. The results of the combined samples from the 24th and 25th studies are comparable to the results from the same assessment conducted during the 23rd period study.<br><br>During the 23rd period study, the consultant agreed with the Licensing Specialist determinations in 52% of the assessments conducted during the 23rd period study. Using results from the combined assessments conducted during the 24th and 25th | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | specifically those at §520.C.5, in accordance with the guidance for this regulation in the *OL Annual Compliance Determination Chart*. | studies, this percentage agreement increased to 83.6%. While this increase demonstrates significant improvement over the 23rd study results, there continues to be significant disagreement with Licensing Specialist findings related to the requirements at §520.C.5 that focus on use of data to identify trends and patterns of harm and risk of harm which are specifically referenced in this CI. The consultant agreed with the Licensing Specialist determination for §520.C.5 in only 55% of the CY2024 sample reviews compared to 52% in CY2023 sample reviews. The most frequent reasons that providers did not meet this licensing regulation included not establishing baseline measurements, not conducting longitudinal trend and pattern analysis beyond one single quarter, and not identifying and comparing data to determine whether there are quarter-over-quarter and/or year-over-year trends and patterns.

Many of the efforts of OL to improve the consistency of Licensing Specialist determinations specific to this regulation were implemented only shortly before the time period from which the sample inspection reports were requested. With continued attention to and specific focus on methods to improve the consistency by which Licensing Specialists assess whether providers are meeting the requirements at §520.C.5, it is anticipated that the agreement percentages will continue to increase.


Consistent with findings in previous studies, DBHDS continues to exceed the 86% threshold of DBHDS-licensed providers of DD services being assessed for their compliance with risk management requirements in the Licensing Regulations during their annual inspections. Based on concerns noted by the consultant from the sample review, the consultant could not validate the accuracy of determinations made by Licensing Specialists about whether providers are meeting the requirements of §520.C.5 and this CI consistent with instructions in the *OL Annual Compliance Determination Chart*. | |
| **30.10:** To enable them to | The regulations at §160.C, §160.D.2, 520.C, | As has been confirmed in previous studies, the regulations at §160.C, §160.D.2, 520.C, and §520.D require providers to report serious incidents which include | 24th - Not Met |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| adequately address harms and risks of harm, the Commonwealth requires that provider risk management systems shall identify the incidence of common risks and conditions faced by people with IDD that contribute to avoidable deaths (e.g., reportable incidents of choking, aspiration pneumonia, bowel obstruction, UTIs, decubitus ulcers) and take prompt action when such events occur, or the risk is otherwise identified.

Corrective action plans are written and implemented for all providers, including CSBs, that do not meet standards.
If corrective actions do not have the intended effect, DBHDS takes further action pursuant to V.C.6. | and §520.D require providers to report serious incidents which include "incidents of common risks and conditions faced by people with IDD that contribute to avoidable deaths (e.g., aspiration pneumonia, bowel obstructions, UTIs, choking incidents, etc.)" and that providers take prompt action when such events occur, or the risk is otherwise identified.

DBHDS continues to expand and refine its training and training tools for providers and Licensing Specialists that highlight the necessity of provider focus on common risks and conditions faced by people with IDD that contribute to avoidable deaths.

A review of documentary evidence from 40 sample providers who had an | "incidents of common risks and conditions faced by people with IDD that contribute to avoidable deaths (e.g., aspiration pneumonia, bowel obstructions, UTIs, choking incidents, etc.)" and that providers take prompt action when such events occur, or the risk is otherwise identified. Each of these incidents of common risks and conditions is identified as a "care concern" and as such requires reporting and heightened monitoring of individual incidents of these common risks and conditions. If OL finds that a provider did not report an incident involving one or more of these types of common risks and conditions, or that their Annual Systemic Risk Assessment and follow-up process required at §520.C and §520.D do not incorporate specific procedures about how the provider will respond to and follow up on care concerns identified by the OL Incident Management Unit, OL will issue a CAP to the provider for non-compliance with one or more of these regulations.

To ensure increasing comprehensive address of care concerns, DBHDS continues to expand and refine its training and training tools for providers and Licensing Specialists that highlight the necessity of provider focus on common risks and conditions faced by people with IDD that contribute to avoidable deaths. As noted in previous studies, DBHDS developed and encourages providers to utilize an Excel-based risk tracking tool template and has provided instruction on its use via a pre-recorded YouTube video, made available to providers in May 2023. This video includes  instructions on how the tool can be used effectively to record and track risk areas, including those risks associated with  common risks and conditions faced by people with IDD that contribute to avoidable deaths. Providers that are utilizing this tool have demonstrated its effectiveness in identifying relevant trends and patterns of occurrences of these common risks and conditions. The tool also provides monthly data frequencies sufficient to calculate "incidence" rates for each of these common risks and conditions.

The regulations at §520.C & D require that the provider's risk management plans and systemic risk assessments contain a description of how they identify the incidence of these common risks and conditions, a description of how they use data to assess and evaluate the incidence of these common risks and conditions, and the requirement for implementation of corrective action to address issues related to | **25th - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | annual licensing inspection between 04/01/2024-06/30/2024 did not demonstrate that the sample providers were consistently using data at the individual and provider level, including data from incidents and investigations, to identify and address trends and patterns of harm and risk of harm in the events reported, as well as the associated findings and recommendations. The sample review also identified that Licensing Specialists are not accurately and consistently identifying when a provider is not meeting these licensing requirements. | these common risks and conditions.<br><br>The regulatory guidance, training, and example tools that OL has developed and implemented have been effective in improving provider compliance with the regulations relevant to this CI; however, despite these efforts, the consistency by which Licensing Specialists accurately assess whether providers are meeting these requirements has not yet been achieved. For this 25th study, the consultant drew a sample of 40 providers across the five regions that had a licensing inspection conducted on or after 04/01/2024 and reviewed documentary evidence relevant to the specific regulatory requirements associated with this this CI. Following is a brief description of the findings comparing Licensing Specialist determinations of whether providers met the licensing requirements and whether, based on the consultant's review of relevant provider documentation, he agreed with the Licensing Specialist determination.<br>• Does the provider's systemic risk assessment process incorporate uniform risk triggers and thresholds (care concerns) as defined by the department?<br>   ○ Licensing Specialists determined that 35/40 sample providers met this requirement.<br>   ○ The consultant agreed with the Licensing Specialist's determination for 34/39 (87%) providers. There was one sample provider that did not supply evidence sufficient for the Consultant to make a determination.<br>   ○ The consultant's agreement rate (87%) in the 25th study was an improvement over the 78% agreement rate in the 24th study.<br>• Does the provider's risk management policy/plan describe how they identify the incidence of common risks and conditions faced by people with IDD that contribute to avoidable deaths?<br>   ○ Licensing Specialists determined that 32/40 (80%) sample providers met this requirement.<br>   ○ The consultant agreed with the Licensing Specialist's determination for 28/40 (70%) providers.<br>   ○ The consultant's agreement rate (70%) in the 25th study was an improvement over the 62% agreement rate in the 24th study.<br>• Does the provider's risk management policy/plan describe how they use data to | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
|  |  | assess and evaluate the incidence of common risks and conditions faced by people with IDD that contribute to avoidable deaths? <br> ○ Licensing Specialists determined that 33/40 (83%) sample providers met this requirement. <br> ○ The consultant agreed with the Licensing Specialist's determination for 22/40 (55%) providers. <br> ○ The consultant's agreement rate (55%) in the 25th study was the same percentage agreement in the 24th study. <br> • Does the provider's risk management policy/plan include a requirement that they implement corrective action plans to address issues related to common risks and conditions faced by people with IDD that contribute to avoidable deaths? <br> ○ Licensing Specialists determined that 30/39 (77%) sample providers met this requirement. <br> ○ The consultant agreed with the Licensing Specialist's determination for 27/40 (68%) providers. The Licensing Specialist could not make a determination of compliance for one of the providers in the sample based on insufficient documentary evidence being provided for their review; however, the Consultant disagreed with this rating and determined that, based on evidence submitted by the provider for the Consultant's sample review, this Licensing Specialist should have rated this one as non-compliant. <br> ○ The consultant's agreement rate (68%) in the 25th study was an improvement over the 63% agreement rate in the 24th study. <br> • Is there evidence that the provider implemented corrective action plans to address identified issues related to common risks and conditions faced by people with IDD that contribute to avoidable deaths? <br> ○ Licensing Specialists determined that 29/39 (74%) sample providers met this requirement. <br> ○ The consultant agreed with the Licensing Specialist's determination for 29/40 (73%) providers. The Licensing Specialist could not make a determination of compliance for one of the providers in the sample based on insufficient documentary evidence being provided for their review; however, the Consultant disagreed with this rating and determined that, based on evidence submitted by the provider for the Consultant's sample review, this Licensing |  |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | | Specialist should have rated this one as non-compliant.<br>o The consultant's agreement rate (73%) in the 25th study was an improvement over the 70% agreement rate in the 24th study.<br><br>The comparisons between the results of the consultant's agreement with the Licensing Specialist's determination in the 24th and 25th studies for the first four questions listed above demonstrate an incremental improvement in the accuracy of the Licensing Specialist determinations compared to those of the consultant in four of the five areas assessed. The most substantial provider performance improvements were noted regarding whether the provider's systemic risk assessment process incorporates uniform risk triggers and thresholds (care concerns) as defined by the department. The one area that provider performance did not show improvement was whether the provider's risk management policy/plan describes how they use data to assess and evaluate the incidence of common risks and conditions faced by people with IDD that contribute to avoidable deaths.<br><br>The variance between the assessments made by the Licensing Specialists and those of the consultant in each of the sample reviews continues to raise concern regarding providers understanding of what they must do to meet these licensing requirements and Licensing Specialists accurate determination of whether the provider's evidence is sufficient to demonstrate they are meeting these requirements. Based on the findings of this sample review, there is insufficient evidence that provider risk management systems consistently identify the incidence of common risks and conditions faced by people with IDD that contribute to avoidable deaths and take prompt action when such events occur, or the provider identified the risk in another manner. As described above, there was improvement in the consultant's agreement rates in the 25th study compared to the results noted in the 24th study;  however, there remains insufficient evidence that Licensing Specialists are accurately and consistently identifying whether a provider is meeting these licensing requirements. | |

**V.D.1 Analysis of 23rd Review Period Findings**

---

**Section V.D.1: The Commonwealth's HCBS waivers shall operate in accordance with the Commonwealth's CMS-approved waiver quality improvement plan to ensure the needs of individuals enrolled in a waiver are met, that individuals have choice in all aspects of their selection of goals and supports, and that there are effective processes in place to monitor participant health and safety. The plan shall include evaluation of level of care; development and monitoring of individual service plans; assurance of qualified providers; identification, response and prevention of occurrences of abuse, neglect and exploitation; administrative oversight of all waiver functions including contracting; and financial accountability. Review of data shall occur at the local and state levels by the CSBs and DBHDS/DMAS, respectively.**

---

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| 35.1: The Commonwealth implements the Quality Improvement Plan approved by CMS in the operation of its HCBS Waivers. | For this 25th Period, this CI was not met because the QRT did not develop and/or monitor specific needed remediation plans for Performance Measures (PMs) that fell below the 86% threshold.<br><br>This requirement is documented in a March 2014 memorandum entitled *Modifications to Quality Measures and Reporting in §1915(c) Home and Community-Based Waivers* and in the Quality Improvement Systems (QIS) outlined in Appendix H for each of the HCBS Waivers operated by DBHDS. | In a March 2014 memorandum entitled *Modifications to Quality Measures and Reporting in §1915(c) Home and Community-Based Waivers*, CMS defined requirements for quality improvement projects when a "performance indicator falls below a threshold of 86%. Any performance measure with less than an 86% success rate warrants further analysis to determine the cause. A QIP must be implemented once the cause is found unless the state provides justification accepted by CMS that a QIP is not necessary."<br><br>The Quality Improvement Systems (QIS) outlined in Appendix H for each of the HCBS Waivers operated by DBHDS also make the following statements:<br><br>• "Following the end of each quarter, the QRT reviews data related to the waiver assurances. Representatives from various DBHDS and DMAS divisions and departments work collaboratively on the QRT to provide data, discuss barriers to compliance, and present remediation strategies to correct areas of deficiency."<br>• "When performance of any PM is not meeting the accepted threshold, the team reviews data from the relevant unit noted above for the given PM to determine remediation strategies, monitor progress toward the attainment of the desired performance goal, and change strategies as needed."<br>• "The QRT also identifies systemic barriers to attainment of the target level of performance for any PM and the steps needed to address them. These remediation steps are in addition to any particular provider or individual | 24th - Not Met<br><br>**25th - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | Based on the QRT *End of Year (EOY) Report* for FY23, issued on 3/1/24 (i.e., the most recently issued report), 13 waiver PMs fell below 86% or did not have sufficient data during that year. Therefore, they required quality improvement.<br><br>Based on review of the presentation *DMAS DD WAIVER QRT Q3 SFY24,* several of the PMs (C5, C9, D1, D3, D6, G1 and G4) below 86% for FY23 also remained below 86% through FY24 Q3, when viewed as a cumulative percentage for the year-to-date. Therefore, they continued to be subject to a quality improvement project per CMS guidance.<br><br>DBHDS did not provide meeting minutes for the 4/2/24 meeting, but the QRT summary for the 7/25/24 meeting did not | remediation."<br><br>The 23rd Period and 24th Period reviews both found the Quality Review Team (QRT) had not consistently met to review quarterly data or to develop and/or develop and monitor needed remediation and quality improvement. For this 25th Period, the QRT met on 4/2/24 and on 7/25/24, review and discuss data for FY24 QI and Q2 and FY24 Q3 data respectively. Another meeting was scheduled for 10/24/24 to review FY24 Q4 data.<br><br>However, for this 25th Period, this CI was not met because the QRT did not develop and/or monitor specific needed quality improvement plans for Performance Measures (PMs) that fell below the 86% threshold.<br><ul><li>Based on the QRT *End of Year (EOY) Report* for FY23, issued on 3/1/24 (i.e., the most recently issued report), 13 waiver PMs fell below 86% or did not have sufficient data during that year. Therefore, they required quality improvement. While the FY23 *End of Year (EOY) Report* generally noted when systemic remediation and improvement were needed, in most instances it did not provide a specific remedial or improvement strategy with defined measures to facilitate the monitoring of performance.</li><li>Based on review of the presentation *DMAS DD WAIVER QRT Q3 SFY24*, several (C5, C9, D1, D3, D6, G1 and G4) of the PMs below 86% for FY23 also appeared to remain below 86% through FY24 Q3, when viewed as a cumulative percentage for the year-to-date. Therefore, they continued to be subject to a quality improvement project per CMS guidance.</li><li>DBHDS did not provide meeting minutes for the 4/2/24 meeting, but the QRT summary for the 7/25/24 meeting indicated that only two PMs (i.e., D1 and D3) fell below 86% during the quarter. That assessment did not sufficiently take into account the previous under-performance of the PMs in FY23 or those that that remained below 86% FY24 year-to-date. The QRT summary did not provide details of any quality improvement for D1 and D3, or any of the other PMs that required quality improvement based on FY23 performance or FY24 year-to-date performance.</li></ul> | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | provide details of any quality improvement projects for two PMs (i.e., D1 and D3) that fell below 86% for the quarter or for any of the other PMs that required quality improvement based on FY23 performance or FY24 year-to-date performance. | The QRT needed to develop, consistent with CMS requirements, a protocol for reviewing and analyzing quarterly data in a manner that facilitates the members' ability to identify PMs that require quality improvement, as well as to develop, implement and monitor needed quality improvement, including revising interventions when improvements do not occur. | |
| 35.3 The Commonwealth has established performance measures, reviewed quarterly by DMAS and DBHDS, as required and approved by CMS in the areas of: a. health and safety and participant safeguards, b. assessment of level of care, c. development and monitoring of individual service plans, including choice of services and of providers, d. assurance of qualified providers, e. whether waiver enrolled individuals' identified needs are met as determined by DMAS QMR, f. identification, response to | Overall, for the 25th Period, the Commonwealth met the requirements of this CI.

For this 25th Period, DBHDS continued to have established waiver Performance Measures and to meet the requirements of the *Curative Action for Data Validity and Reliability*. In addition, based on the evidence provided for review, the QRT met twice during this review period (i.e., on 4/2/24 and on 7/25/24) to review and discuss data | At the time of the 24th Period, the Commonwealth met the criteria for this CI. The Commonwealth had established Performance Measures as required and approved by CMS for each of the areas defined in CI 35.3. While it remained a quality management concern that QRT data review lagged many months behind, the Commonwealth met the requirement of this CI to review data quarterly. In addition, DBHDS had submitted a Process Document and applicable Data Set Attestation for each of the measures that relied on data collected by either DBHDS or DMAS.

For this 25th Period, DBHDS continued to have established waiver Performance Measures and to meet the requirements of the *Curative Action for Data Validity and Reliability*. In addition, based on the evidence provided for review, the QRT met twice during this review period (i.e., on 4/2/24 and on 7/25/24) to review and discuss data for FY24 QI and Q2 and FY24 Q3 data respectively. | 24th - Met

**25th - Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| incidents, and verification of required corrective action in response to substantiated cases of abuse/neglect/exploitation (prevention is contained in corrective action plans). | for FY24 QI and Q2 and FY24 Q3 data respectively. | | |
| 35.5: Quarterly data is collected on each of the above measures and reviewed by the DMAS-DBHDS Quality Review Team. Remediation plans are written and remediation actions are implemented as necessary for those measures that fall below the CMS-established 86% standard. DBHDS will provide a written justification for each instance where it does not develop a remediation plan for a measure falling below 86% compliance. Quality Improvement remediation plans will focus on systemic factors where present and will include the specific strategy to be employed and defined measures that will be used to monitor performance. Remediation plans are monitored at least | For the 25th Period, this CI was not met because DBHDS did not provide evidence that QRT members developed and/or monitored remediation plans as required.<br><br>For this 25th Period, DBHDS reported that the QRT met twice, on 4/2/24 and on 7/25/24, to review quarterly data.<br><br>For both meetings, DBHDS provided for review a PowerPoint presentation entitled *DMAS & DBHDS Quality Review Team (QRT) Quarterly Collaboration.* These evidenced that the QRT members reviewed data reports for performance measures | As described above with regard to CI 35.1, for this 25th Period, the QRT met twice during this review period (i.e., on 4/2/24 and on 7/25/24) to review and discuss data for FY24 QI and Q3 an FY24 Q3 data respectively, but did not yet meet the remaining requirements for this CI.<br><br>Consistent with the findings for the 24th Period, the presentations for both meetings during this 25the Period indicated the objectives were to present data for the DD HCBS Waiver, collaborate to address barriers, develop solutions and increase remediation efforts, optimize services for waiver participants, and prioritize & plan for improvement with monitoring the overall success of each stakeholder impacted by the DD HCBS Waiver.  The presentations focused on data reports for performance measures that fell below the 86% threshold and generally provided a brief synopsis of common findings that resulted in the lower scores.  However, they did not provide information about the development or monitoring of specific needed quality improvement plans for measures falling below 86% compliance<br><br>Upon request for minutes of QRT meetings to reflect the members' discussion, DBHDS provided a written summary from DMAS for the 7/25/24 meeting.  Given that a number of the measures have fallen below the threshold for multiple quarters, and sometimes multiple years, the lack of written plans, and ongoing and specific reporting on the implementation of the plans at least every six months, rendered the intended monitoring ineffective for the purpose of revising remedial strategies that did not have the intended outcome.  While it was positive that the QRT had returned to regular quarterly meetings, the next step should be to formalize the remediation planning and monitoring protocols. | 24th - Not Met<br><br>**25th - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| every 6 months. If such remediation actions do not have the intended effect, a revised strategy is implemented and monitored | that fell below the 86% threshold.<br><br>However, based on the available documentation, the QRT members discussed some provider-specific remedial actions for some measures, but not for others.<br><br>The QRT did not provide any systemic quality improvement plans and did not reference any review of related DBHDS QIIs in writing, did not have measures to monitor performance of these plans and did not have evidence of any formal monitoring every six months. | This is consistent with previous findings that there continued to be a need to develop improvement and remediation plans that evidenced a focus on systemic remediation, both in QRT proceedings as well as in the *QRT End of Year (EOY) Reports*.<br><br>At the time of the 24th Period review, it was positive that the DBHDS Assistant Commissioner was able to describe a current or proposed remediation plan, including some pending Quality Improvement Initiatives (QIIs,) for each of the measures that did not meet the threshold in the *SFY23 EOY Report*.  However, the QRT had not reviewed these plans in writing, did not have measures to monitor performance of these plans and did not have evidence of any formal  monitoring every six months.<br><br>These facts remained true for the 25th Period.  Going forward, the QRT will need to work with DBHDS to obtain and review any such proposed remediation plans in writing and ensure that those plans focus on systemic factors, where present, and include the specific strategy to be employed and the defined measures that will be used to monitor performance.  When the quality improvement plan is in the form of a DBHDS QII, the QRT may find it useful to review and adopt those strategies and measures, since to QII Toolkit addresses those components in some detail.  If, based on QRT assessment, proposed DBHDS remediation plans do not address the remedial needs or do not do so sufficiently, the QRT can either develop their own written plans and/or request appropriate modifications to the DBHDS plans. | |
| 35.7: The DMAS-DBHDS Quality Review Team will provide an annual report on the status of the performance measures included in the DD HCBS Waivers Quality improvement Strategy with recommendations to the | Overall, DBHDS met the requirements for this CI.<br><br>On 3/31/24, DBHDS issued the most recent version of the annual report, entitled *SFY23 EOY Report*. | At the time of the 24th Period review, the SFY24 QRT charter continued to include the requirement for the production of the *EOY Report* within no more than six months of the end of the preceding fiscal year.  On 3/31/24, DBHDS issued the *SFY23 EOY Report*.  The most recent version of the *EOY Report* available on the DBHDS website was for SFY21.  This did not meet the criteria for this CI.  However, as described further below, DBHDS did distribute the *SFY23 EOY Report* to CSBs by email on 4/11/24.  Going forward, DBHDS should ensure website posting as required. | 24th - Not Met<br><br>**25th - Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| DBHDS Quality Improvement Committee. The report will be available on the DBHDS website for CSBs' Quality Improvement committees to review. Documentation of these reviews and resultant CSB-specific quality improvement activities will be reported to DBHDS. The above measures are reviewed at local level including by Community Service Boards (CSB) at least annually. | DBHDS provided a DMAS memorandum, dated 10/10/14, that indicated they intended to produce the *SFY24 EOY Report* by the close of November. This would satisfy the annual requirement as well as be within the six month timeframe from the end of FY24.<br><br>The most recent version of the *EOY Report* available on the DBHDS website was for SFY21. This did not meet the criteria for this CI. However, DBHDS did distribute the *SFY23 EOY Report* to CSBs by email on 4/11/24. Going forward, DBHDS should ensure website posting as required.<br><br>For this 25th Period review, on 4/11/24, DBHDS distributed the *SFY23 EOY Report* to solicit CSB feedback by | For this 25th Period review, DBHDS did not provide an SFY25 QRT Charter, but did provide a DMAS memorandum, dated 10/10/14, that indicated they intended to produce the *SFY24 EOY Report* by the close of November. This would satisfy the annual requirement as well as be within the six month timeframe from the end of FY24.<br><br>The remaining requirements for CI 35.7 focus on local level and CSB reviews of EOY reports, at least annually. Previous reports described a process whereby DBHDS submitted the annual *EOY Report* to CSBs for review using a targeted *Survey Monkey* questionnaire. However, at the time of the 23rd and 24th Period reviews, DBHDS did not provide any evidence to show the CSB reviews occurred for the most recent *EOY Report*. For this 25th Period review, on 4/11/24, DBHDS distributed the *SFY23 EOY Report* to solicit CSB feedback by email, which also included a link to the survey. The email stated the due date as 4/30/24.<br><br>DBHDS provided documentation (i.e., *2023 Summary of Community Service Feedback*) summarizing the completion of CSB review of the *SFY23 EOY Report*. DBHDS reported that 24 of 40 (i.e., 60%) Community Service Boards (CSB) or Behavioral Health Authority (BHA) responded and that most agreed with the primary reasons the *EOY Report* postulated for why Performance Measures were not met. When CSBs and BHAs disagreed with the primary reasons, the survey asked them to describe other possible reasons as well as how they remediated the area of noncompliance. The top three reasons included: time and workload demands of Support Coordinator/Provider; Support Coordinator turnover and perhaps a lack of understanding about when ISPs needed to be updated. Generally, CSBs and BHAs reported training and technical assistance (e.g., attending Provider Roundtables) as remedial strategies. On 10/21/24, staff shared this information with the QIC, as evidenced by the *VA DD Waiver Quality Assurance Program: Quality Review Team 2023 Report Update for QIC.* | |

214

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | email, which also included a link to the survey. The email stated the due date as 4/30/24.<br><br>DBHDS provided documentation (i.e., *2023 Summary of Community Service Feedback*) summarizing the completion of CSB review of the *SFY23 EOY Report*, with 24 of 40 (i.e., 60%). Community Service Boards (CSB) or Behavioral Health Authority (BHA) responding.<br><br>Generally, CSBs and BHAs reported training and technical assistance (e.g., attending Provider Roundtables) as remedial strategies.<br><br>On 10/21/24, staff shared this information with the QIC, as evidenced by the *VA DD Waiver Quality Assurance Program: Quality Review Team 2023 Report Update* | | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | *for QIC.* | | |
| 35.8: The Commonwealth ensures that at least 86% of individuals who are assigned a waiver slot are enrolled in a service within 5 months, per regulations. | For the 25th Period, the Commonwealth did not meet this CI because the most recently reported data, as found in the *Case Management Steering Committee Semi-Annual Report State Fiscal Year 2024 3rd and 4th Quarters*, dated 8/30/24, showed performance at only 81% for each of the first three quarters of FY24. It indicated data for Q4 FY24 would be available in the next semi-annual report.<br><br>At the time of the 24th Period, DBHDS staff reported in interview that the CMSC would review the data on a quarterly basis and recommend needed action, including, but not limited to, follow-up with individual participants who had not received services within the 150-day timeframe. | For the 25th Period, the Commonwealth did not meet this CI because the most recently reported data, as found in the *Case Management Steering Committee Semi-Annual Report State Fiscal Year 2024 3rd and 4th Quarters*, dated 8/30/24, showed performance at only 81% for each of the first three quarters of FY24. This was consistent with the 81% performance reported for FY23, which was a decrease of two percentage points from FY22.<br><br>At the time of the 24th Period review, DBHDS reported in its 2/14/23 report to the Court that it would collect this data quarterly. Specifically, DBHDS stated that the data for this measure would be transitioning to quarterly tracking in Q3 SFY24 and that it would be available once the 150-day post-period occurs each quarter and reported in the next semi-annual report. DBHDS staff also reported in interview that the CMSC would review the data on a quarterly basis and recommend needed action, including, but not limited to, follow-up with individual participants who had not received services within the 150-day timeframe.<br><br>During this 25th Period, between April 2024-September 2024, the CMSC meeting minutes reflected that the committee reviewed the relevant data twice, at the CMSC meetings on 5/2/24 and 9/3/24. Both times, the data reflected 81% performance. At the first of these meetings, the minutes documented discussion about providing row level data to CSBs to be sure they understood the process, with an action step to discuss possible validation with one CSB first. Based on review of subsequent meeting minutes between 6/4/24 through 9/3/24, they did not reflect this follow-up occurred and DBHDS staff did not respond to a request for related evidence.<br><br>At the time of the 23rd Period, DBHDS submitted an applicable Process Document, entitled *DD CMSC VER 016*, dated 8/29/23, and an applicable Data Set Attestation, dated 8/30/23. These met the requirements for the *Curative Action for Data Validity and Reliability*. For this 25th Period review, these documents remained current. | 24th - Not Met<br><br>**25th - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | For this 25th Period, between April 2024-September 2024, the CMSC meeting minutes reflected that the committee reviewed the relevant data twice, at the CMSC meetings on 5/2/24 and 9/3/24. Both times, the data reflected 81% performance. At the first of these meetings, the minutes documented discussion about providing row level data to CSBs to be sure they understood the process, with an action step to discuss possible validation with one CSB first. Based on review of subsequent meeting minutes between 6/4/24 through 9/3/24, they did not reflect this follow-up occurred.<br><br>At the time of the 23rd Period, DBHDS submitted an applicable Process Document, entitled *DD CMSC VER 016*, dated 8/29/23, and | | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | an applicable Data Set Attestation, dated 8/30/23.  These met the requirements for the *Curative Action for Data Validity and Reliability*.<br><br>For this 25th Period review, DBHDS reported these documents remained current. | | |

### V.D.2 Analysis of 23rd Review Period Findings

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| **Section V.D.2: The Commonwealth shall collect and analyze consistent, reliable data to improve the availability and accessibility of services for individuals in the target population and the quality of services offered to individuals receiving services under this Agreement. The Commonwealth shall use data to:**<br>    **a.**   **Identify trends, patterns, strengths, and problems at the individual, service-delivery, and systemic levels, including, but not limited to, quality of services, service gaps, accessibility of services, serving individuals with complex needs, and the discharge and transition planning process;**<br>    **b.**   **Develop preventative, corrective, and improvement measures to address identified problems;**<br>    **c.**   **Track the efficacy of preventative, corrective, and improvement measures; and**<br>    **d.**   **Enhance outreach, education, and training.** | | | |
| 36.1: DBHDS develops a Data Quality Monitoring Plan to ensure that it is collecting and analyzing consistent reliable data. | For this 25th Period, DBHDS did not meet the criteria for data validity and reliability, related to QSR data sets. However, | Previous studies have documented the steps DBHDS has taken to address this CI. Overall, these documents described what appeared to be a sound process by which a designated office within DBHDS would complete an annual update for each of the data sources systems, and a process by which DBHDS would phase in broader re-assessments for each of the sources systems included in the original *Data Quality* | 24th - Deferred<br><br>**25th - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| Under the Data Quality Monitoring Plan, DBHDS assesses data quality, including the validity and reliability of data and makes recommendations to the Commissioner on how data quality issues may be remediated. Data sources will not be used for compliance reporting until they have been found to be valid and reliable. This evaluation occurs at least annually and includes a review of, at minimum, data validation processes, data origination, and data uniqueness. | DBHDS staff acknowledged this concern and, at the conclusion of this 25th Period, were already working to develop remedial strategies to address these threats.

The 24th Period determination was deferred until this 25th Period because, since the 23rd Period, DBHDS had not yet completed the next annual *Data Quality Monitoring Plan (DQMP) Source System Assessment*, which required revision, or addressed the previous caveat regarding validity and reliability of QSR data.

For this 25th Period, DBHDS issued the annual *2024 Data Quality Monitoring Plan Annual Update*, dated 9/16/24. The document provided Business Owner Action Plans and Updates for 15 source systems included | *Monitoring Plan (DQMP)*. As an output of this process, staff from the designated office would identify up to twelve actionable recommendations for each system, that, if completed, would result in the greatest improvement to data validity and reliability.

For context, and as described at the time of the 20th Period review, on 1/21/22 the Parties jointly filed with the Court an agreed-upon Curative Action regarding data reliability and validity that memorialized this process as a set of actions DBHDS would implement going forward. This Curative Action (i.e., *Curative Action for Data Validity and Reliability*) is also summarized in the Summary of this report above. It includes two elements: 1) internal periodic assessments of data source systems (i.e., the Source System Assessment), including the identification of threats to data validity and reliability and actions taken to mitigate those threats; and 2) a process for confirming the validity and reliability of specific data sets and their use in producing data for compliance reporting, including a Process Document and a Data Set Attestation. The Process Document must describe the data set to be used for the applicable indicator, a methodology for addressing any threats to validity and reliability of the data available in the data set, and a methodology for addressing any threats to validity and reliability in the process of pulling the data from the data set. Once this is complete, the office of the Chief Data Office (CDO) will complete a review and attests that the process will produce valid and reliable data.

**Source System Assessment:** At the time of the 23rd Period, DBHDS issued the *Data Quality Monitoring Plan Source System Report*, dated 9/28/23, which remained the most current version for the 24th Period. This annual update was produced using the methodology described in the *Data Quality Monitoring Plan: Annual Update Process*, described above. In addition to a chart of source systems, it included, for 16 source systems, a narrative description of the improvements DBHDS indicated staff had made in the following categories: Data Validation Controls, Key Documentation, Manual Data Processing, User Interface, and Backend Structure. The 23rd Period version of the *Data Quality Monitoring Plan Source System Report* also summarized areas of improvement identified during the previous year. | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | in the previous report.<br><br>The Plan resolved the 24th Period finding of a potential breakdown in the quality and thoroughness of the source system assessment process (i.e., as evidenced by errors in the annual updates to the assessments for CHRIS-SIR and CHRIS-HR), through creation of a share point site for all recommendations and subsequent completion criterion to be reviewed and followed up on and to ensure resolutions are not overlooked.<br><br>However, with regard to the QSR data source system, the 23rd and 24th Period study found some remaining concerns, concurrent with Round 5, that DBHDS still needed to address going forward. Chief among these was the failure of the assessment to address | For this 25th Period, DBHDS issued the *2024 Data Quality Monitoring Plan Annual Update,* dated 9/16/24. The document provided Business Owner Action Plans and Updates for 15 source systems included in the previous report:<br>1. Avatar<br>2. Children in Nursing Facilities Spreadsheet<br>3. CHRIS- Serious Incident Report (SIR)<br>4. CHRIS-Human Rights (HR)<br>5. Community Consumer Submission 3 (CCS3)<br>6. CONNECT<br>7. Consolidated Employment Spreadsheet<br>8. Protection and Advocacy Incident Reporting System (PAIRS)<br>9. Regional Educational Assessment Crisis Habilitation (REACH)<br>10. Support Coordination Quality Review (SCQR)<br>11. Waiver Management System (WaMS) Individual Support Plan (ISP) Proper<br>12. WaMS Customized Rate Module<br>13. WaMS Individual and Family Support Program (IFSP) Module<br>14. WaMS Regional Support Team (RST) Module<br>15. WaMS Waitlist Module<br><br>Of note, at the time of the 24th Period, several systems continued to be slated for replacement, including AVATAR, CHRIS-SIR, CHRIS-HR, CCC-3 and PAIRS. With regard to CHRIS-SIR and CHRIS-HR, on 4/17/24, DBHDS staff provided a document entitled *CI29.13-Data concerns Summary*, which included an RFP update related to the planned CHRIS replacement. It stated that DBHDS issued the RFP on 6/30/23 and it closed on 9/25/23. An evaluation team planned to follow-up with additional questions before making a selection. After the selection and before it could be finalized, contracts would need to be reviewed by the Office of the Attorney General (OAG) and the Virginia IT Agency (VITA). DBHDS reported a target date for the final contract approval of 2/24/25.<br><br>However, for this 25th Period, the current *DQMP* indicated that DBHDS was planning to issue a Request for Information (RFI), while also examining the | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | potential IRR deficiencies and their impact on data validity and reliability. Previous Reports to the Court have repeatedly identified these concerns and provided multiple examples of discrepancies between the data findings of the QSR reviewers and those of the Independent Reviewer's consultants.<br><br>For this 25th Period, DBHDS submitted an updated document entitled *OCQM Third Party Data Source System Validation Checklist Round Update 8.26.24 OCQM and Vendor Scoring version 2 fully executed.* These documents again did not appear to indicate any new processes and therefore did not address the failure of the previous assessment of this source system to address potential IRR deficiencies.  Similar concerns remained with regard to other related data set validity and | feasibility of building an in-house solution.  In interview, DBHDS staff confirmed that upon evaluation, none of the prior RFP responses were considered adequate to the meet current and future development needs.  DBHDS staff further reported the RFI closed in October 2024, with five of 25 responses still undergoing evaluation, with completion targeted for November 2024.  DBHDS IT staff were also continuing to evaluate feasibility of a potential in-house solution.  Planning for next steps remained pending the completion of these evaluations.<br><br>The 24th Period study also identified some potential breakdown in the quality and thoroughness of  the source system assessment process, as evidenced by errors in the annual updates to the assessments for CHRIS-SIR and CHRIS-HR, which serve as source systems for a number of PMIs and for reporting compliance with several CIs. These updated assessments failed to identify previously documented remedial strategies.  In addition, the process evidenced the lack of an adequate review of the draft assessments by the SME/process owner. While it appeared these breakdowns might have been limited in nature, in interview, DBHDS staff indicated they would undertake additional monitoring of the process through the office of the Assistant Commissioner to ensure such breakdowns would not occur in the future or become more widespread.<br><br>For this 25th Period, the 2024 *DQMP* made appropriate revisions, noting that "when CHRIS-SIR underwent its re-review documentation from the RMRC Data Roadmap cleanup was not available to the system analyst resulting in some recommendations being left as unresolved.  In an effort to assure that this does not occur in the future, DBHDS has consolidated all places where source system information is stored, has created a share point site for all recommendations and subsequent completion criterion to be reviewed and followed up on to ensure future system issue resolutions are not overlooked.  The Director of Transition Network Supports reviews this information at least semi-annually to ensure recommendations are being addressed and documentation of this work is maintained and stored appropriately."<br><br>With regard to QSR data, previous studies documented that successive versions of | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | reliability documents, including the *Round 6 QSR IRR Policy*, dated 5/15/24; the *QSR IRR Process Summary*, dated 2/7/24, and *DBHDS QSR IRR Actions Final*, dated 10/1/24.<br><br>At the time of the 24th Period study, the lack of action to adequately review Process Documents and Attestations that relied on QSR data impacted a number of other CIs.<br><br>For this 25th Period, on 10/23/24, DBHDS updated the HCBS Process Document to add a ten percent look-behind by DBHDS staff of a sample of providers that QSR found to be compliant.  In principle, this should be an adequate approach to ensuring IRR; however, DBHDS still needed to define the scope and methodology of the look- | the *External Data Validation Checklist* did not fully address previously identified concerns.  At the time of the 23rd Period, the study determined that, in its finished state, the document at least minimally met the requirements of the *Curative Action for Data Validity and Reliability*, but that, going forward, DBHDS would need to address the remaining concerns to remain in compliance.  Chief among these was the failure of the assessment to address potential IRR deficiencies, including multiple examples of discrepancies between the data findings of the QSR reviewers and those of the Independent Reviewer's consultants, which were repeatedly identified in previous Reports to the Court, and their impact on data validity and reliability.<br><br>For the 24th Period, DBHDS submitted an updated *External Data Validation Checklist* document entitled *OCQM Third Party Data Source System Validation Checklist with vendor and OCQM Scoring  HSAG Final*, dated 3/6/24, and a *OCQM Third Party Data System Validation Checklist Scoring Sheet QSR 2024*, dated 3/5/24.  These did not address the issue of significant discrepancies between the data findings of the QSR reviewers and those of the Independent Reviewer's consultants.  In addition, DBHDS referenced a document entitled *IRR Process Summary*, dated 1/19/24, which did not appear to indicate any new processes and therefore did not address the failure of the previous assessment of this source system to address potential IRR deficiencies.<br><br>For this 25th Period, DBHDS submitted an updated document entitled *OCQM Third Party Data Source System Validation Checklist Round Update 8.26.24 OCQM and Vendor Scoring version 2 fully executed.* These documents again did not appear to indicate any new processes and therefore did not address the failure of the previous assessment of this source system to address potential IRR deficiencies.  Similar concerns remained with regard to the related data set validity and reliability documents as identified below.<br><br>**Data Set Validity and Reliability:** As described above, the second element of the *Curative Action for Data Validity and Reliability* entails confirming the validity and reliability of specific data sets and their use in producing data for compliance reporting.  At the time of the 23rd and 24th Period reviews, DBHDS had made | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | behind process, as well as articulate how the findings would be used to improve IRR as needed.

DBHDS updated a Process Document entitled *Provider Reporting Measures*, dated 9/15/24, and a Process Document entitled *QSR Quality Improvement Findings*, dated 8/18/24, but neither of these specifically addressed the significant IRR discrepancies between QSR reviewer findings and those of experts in the field. The Verification sections in both documents stated that there were no data reliability and validity threats noted. However, for provider reporting measures, the Process Document did broadly identify possible surveillance measures that could be used for addressing QSR discrepancies compared to subject matter expert | significant strides in implementation of the requirements of *Curative Action for Data Validity and Reliability* and consistently provided more comprehensive Process Documents and Data Set Attestations that addressed identified threats to validity and reliability and the adequacy of mitigation strategies.  However, similar to, and in light of, the findings for the QSR source system assessment, the 23rd Period study indicated that DBHDS should further examine the Process Documents and Data Set Attestations for QSR data sets to ensure the IRR threats had been adequately identified and addressed. It appeared that DBHDS had at least minimally met this element for the 23rd Period, but only with that caveat.  For the 24th Period, DBHDS did not report completing any further examination for IRR threats to validity and reliability in Process Documents and Data Set Attestations that use QSR data sets.

For this 25th Period review, it was positive that prior to the beginning of Round 6, DBHDS corrected a 24th Period  error which had the effect of reducing the overall IRR effort (i.e., policy requiring only two IRR cases per reviewer, rather than three and not including a live video observation).  The updated *Round 6 QSR IRR Policy*, dated 5/15/24, included three IRR cases per reviewer and at least one live observation.

However, DBHDS did not further address potential IRR deficiencies with regard to the discrepancies between the data findings of the QSR reviewers and those of the Independent Reviewer's consultants as repeatedly identified in previous Reports. The updated Process Document entitled, *Quality Services Review Methodology*, dated 8/16/24, did include an OCQM recommendation that DBHDS program personnel should work together to establish a process for examining QSR elements and output following each completed *QSR Aggregate Report*. It also included a response indicating that, at the time of Round 5, key senior staff would assist with finalizing the QSR tools and provision of guidance.  However, this did not appear to be a new process, based on interviews from prior review periods, nor did it provide any specificity with regard to the discrepancies identified above.

Other documents submitted also did not address those concerns.  In addition to the aforementioned *Third Party Data Source System Validation Checklist* and *Round 6 QSR IRR* | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | findings. DBHDS should define the scope and methodology.<br><br>For CI 36.3 and CI 37.7 DBHDS did not provide updated data validity and reliability materials for review.<br><br>This 25th Period study requested, but DBHDS did provide, a list of any additional QSR Data Sets in use for any remaining CIs. | *Policy*, these documents included a *QSR IRR Process Summary*, dated 2/7/24, and *DBHDS QSR IRR Actions Final*, dated 10/1/24. Based on the review of these documents and interviews with QSR vendor and DBHDS staff, it appeared the IRR focus remained largely on vendor IRR among themselves and not on the ongoing significant discrepancies with what IR consultants find when reviewing the same data.  In other words, DBHDS still needed to develop adequate remediation for the problem of vendor IRR being good internally, but remaining at odds with the findings of experts in the field.<br><br>In interview, DBHDS staff acknowledged an understanding of the need to address these concerns going forward.  The interviews included robust discussions about possible solutions.  For example, while the relevant current Process Documents did not seem to be changed significantly from previous, some did seem to have some broader statements or concepts in the Continuous Quality Improvement (CQI) sections that could be developed as adequate strategies. For example, the Process Document for provider reporting measures indicated DBHDS would utilize NCI, ISP and Semi-Annual Employment data "as surveillance data." However, it was not clear which specific data points and QSR elements would be compared or how DBHDS would use the results to make IRR improvements.  Additional detail might include a clearly stated implementation plan, the scope of the review (e.g., what specifically will be reviewed and by when and by whom), and how the outcomes will be used to address discrepancies in the QSR process with other data collected by subject matter experts.<br><br>At the time of the 24th Period study, the lack of action to adequately review Process Documents and Attestations that relied on QSR data also impacted the following CIs included in this QRM study: HCBS residential compliance (i.e., CI 29.22) use of QSR data for analysis and quality improvement (CI 36.3), PMI data quality (CI 37.7), provider reporting measures (i.e., CI 43.1. 43.3 and 43.4), and provider quality improvement programs (i.e., CI 44.1 and CI 44.2).  The following described the status of each of these for this 25th Period:<br>• DBHDS updated a Process Document entitled *Provider Reporting Measures* dated 9/15/24, but again did not address the significant IRR discrepancies | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | | between QSR reviewer findings and those of experts in the field. The Verification section stated that there were no data reliability and validity threats noted for this data.<br><br>• DBHDS updated a Process Document entitled *QSR Quality Improvement Findings,* dated 8/18/24. It did not yet address the significant IRR discrepancies between QSR reviewer findings and those of experts in the field. In the Verification section, it continued to indicate there were no data reliability and validity threats noted for this data.<br><br>• As described with regard to CI 29.22 above, on 10/23/24, DBHDS updated the Process Document to add a ten percent look-behind by DBHDS staff of a sample of providers that QSR found to be compliant. In principle, this should be an adequate approach to ensuring IRR; however, as noted above, DBHDS still needed to define the scope and methodology of the look-behind process, as well as articulate how the findings would be used to improve IRR as needed.<br><br>• As reported at the time of the 24th Period study, the lack of action to adequately review Process Documents and Attestations that relied on QSR data also impacted the following CIs included in this QRM study: use of QSR data for analysis and quality improvement (CI 36.3), PMI data quality (CI 37.7). DBHDS did not provide updated materials for these CIs.<br><br>• This study requested, but DBHDS did provide, a list of any additional QSR Data Sets in use for any remaining CIs.<br><br>As a result of these facts, this study again cannot confirm that DBHDS has fully met the requirements of those specific CIs. DBHDS had not fully addressed the 23rd and 24th Period caveat regarding validity and reliability of QSR data through adequate revision of Process Documents and Attestations for the various QSR Data Sets or in the updated *External Data Validation Checklist*, despite the 24th Period deferral.<br><br>However, it was positive that, at the conclusion of this 25th Period, DBHDS staff were already working to develop remedial strategies to address these threats. | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| 36.3 At least annually, DBHDS reviews data from the Quality Service Reviews and National Core Indicators related to the quality of services and individual level outcomes to identify potential service gaps or issues with the accessibility of services. Strategic improvement recommendations are identified by the Quality Improvement Committee (QIC) and implemented as approved by the DBHDS Commissioner. | For the 25th Period, DBHDS did not meet the criteria for data validity and reliability. However, DBHDS staff acknowledged this concern and at the conclusion of this 25th Period, were already working to develop remedial strategies to address these threats.<br><br>Overall, DBHDS had a process in place to review and analyze the NCI and QSR results for quality improvement. However, as described with regard to CI 36.1 above, during the 23rd and 24th Periods and now for the 25th Period, DBHDS has not yet adequately reviewed the IRR threats for QSR data sets.<br><br>At the time of the 24th Period review, the QIC reviewed *2022-2023 NCI In-Person Survey* (IPS) data and recommendations on 3/25/24. This satisfied | At the time of the 23rd Period review, DBHDS had a process in place to review and analyze the NCI and QSR results for quality improvement. This remained true for the 24th Period. The *QIC Review Schedule SFY22 - SFY24* indicated the QIC review of NCI data would occur in the third quarter, while reviews of QSR data would take place on a quarterly basis.<br><br>**NCI:** At the time of the 24th Period review, the QIC reviewed *2022-2023 NCI In-Person Survey* (IPS) data and recommendations on 3/25/24, and assigned subcommittees to review recommendations and determine opportunities for quality improvement initiatives. The recommendations called for further exploration of the following: 1) the relationship between residential environment and outcomes, 2) community employment goals, 3) Continued understanding and mitigation of falls and 4) supporting friendships and social inclusion. This satisfied the annual review requirement.<br><br>For this 25th Period, as evidenced by the 6/24/24 QIC meeting minutes and materials Q3, the Community Inclusion & Integration (CII) KPA Subcommittee and the Regional Quality Councils presented responses to the NCI findings, including the identification of existing and proposed QIIs.<br><br>**QSR:** As reported at the time of the 24th Period, the QIC minutes showed that the QIC reviewed and discussed QSR data for all four quarters, including the meeting on 3/25/24. This satisfied the annual review requirement.<br><br>For the 25th Period review, the QIC minutes for 6/24/24 showed that the QIC received a QSR Round 6 update. The *Round 6 QSR Aggregate Report* was not yet released, so additional feedback on QSR recommendations was not yet due. The QIC also met on 10/21/24 and received an additional update, but this meeting was also before the release of the Round 6 aggregate report.<br><br>As described above for CI 36.1 above, DBHDS did not yet adequately review the IRR threats for QSR data. | 24th - Deferred<br><br>**25th - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | the annual review requirement.<br><br>For this 25th Period, as evidenced by the 6/24/24 QIC meeting minutes and materials Q3, the Community Inclusion & Integration (CII) KPA Subcommittee and the Regional Quality Councils presented responses to the NCI findings, including the identification of existing and proposed QIIs<br><br>As reported at the time of the 24th Period, the QIC minutes showed that the QIC reviewed and discussed QSR data for all four quarters, including the meeting on 3/25/24.  This satisfied the annual review requirement.<br><br>For the 25th Period review, the QIC minutes for 6/24/24 showed that the QIC received a QSR Round 6 update. DBHDS | | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | had not yet released the *Round 6 QSR Aggregate Report*, so additional feedback on QSR recommendations was not yet due.  The QIC also met on 10/21/24 and received an additional update, but this meeting was also before the release of the aggregate report. | | |
| 36.8: DBHDS collects and analyzes data (at minimum a statistically valid sample) at least annually regarding the management of needs of individuals with identified complex behavioral, health and adaptive support needs to monitor the adequacy of management and supports provided. DBHDS develops corrective action(s) based on its analysis, tracks the efficacy of that action, and revises as necessary to ensure that the action addresses the deficiency | As reported at the time of the 24th Period, for this 25th Period, the Commonwealth again did not meet the requirements of CI 36.8 because they had not yet analyzed data for a statistically valid sample regarding the management of needs of individuals with identified complex behavioral, and adaptive support needs on at least an annual basis.<br><br>For this 25th Period, as described in the ISR study, DBHDS again implemented an annual | At the time of the 24th Period review, DBHDS did not fully meet the requirements for this CI, because they had not yet analyzed data, on at least an annual basis, of a statistically valid sample regarding the management of needs of individuals with identified complex behavioral, health and adaptive support needs and did not have adequate processes for analyzing aggregate data from the reviews of individuals with complex medical needs, or those with complex adaptive or behavioral support needs, to monitor the overall adequacy of management and supports or to develop systemic corrective actions pursuant to such data analysis.<br><br>For one of these three groups (i.e., those with complex health/medical support needs), DBHDS had developed and implemented a very promising new annual monitoring process, the Intensive Management Needs Review (IMNR). The IMNR, largely mirrored the Independent Reviewer's Individual Services Review (ISR) process, and was completed in parallel with that latter study. For the initial implementation of this process during the 24th Period, DBHDS conducted 30 on-site reviews of individuals with complex health/medical support needs,  in conjunction with the Independent Reviewer nurses. The Independent Reviewer approved an exception for this subgroup, allowing for review of 60 randomly selected individuals in an annual period (i.e., 30 each during two successive periods).<br><br>For this 25th Period, as described in the ISR study the second phase of these parallel | 24th  - Not Met<br><br>**25th - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | monitoring process, the Intensive Management Needs Review (IMNR.)<br><br>This second phase of the IMNR study, completed in parallel with the IR's Individual Services Review (ISR), reviewed a different stratified sample of 30 individuals, including ten from each of two regions. DBHDS issued a report, entitled *Intense Management Needs Review Report Twenty-Fifth Review Period*, dated October 2024, that described the process and findings.<br><br>The 25th Period ISR study again verified that the Commonwealth's IMNR process adequately identified health management needs for the sample studied and that when one of those needs required urgent attention, Virginia took immediate action. | ISR and IMNR studies reviewed a different stratified sample of 30 individuals, including ten from each of the remaining two regions. DBHDS issued a report, entitled *Intense Management Needs Review Report Twenty-Fifth Review Period*, dated October 2024, that described the process and findings.<br><br>Based on the 24th Period Report to the Court, for CI 36.8, the ISR study verified that the Commonwealth's IMNR process adequately identified health management needs for the sample studied and that when one of those needs required urgent attention, Virginia took immediate action. For this 25th Period, the ISR study again confirmed these findings.<br><br>At the time of the 24th Period, this study found that the IMNR defined an adequate process for corrective actions to address specific individual findings, including timeframes and follow-up to ensure loop closure. However, the process did not yet provide a clear methodology for analyzing aggregate data from the reviews to monitor the overall adequacy of management of the needs of individuals with identified complex behavioral, health and adaptive support needs and the supports provided or to develop related systemic corrective actions pursuant to such data analysis. During this 25th period, DBHDS implemented its first IMNR remediation process for the individuals who health management needs were studied during the 24th period. DBHDS's initial IMNR remediation process was promising, but incomplete. Based on their analysis of the completed IMNR Monitoring Questionnaires, the DBHDS nurses identified needed and appropriate corrective actions. DBHDS then developed appropriate remediation plans for the individual issues identified and assigned these plans for implementation. DBHDS also began to track the implementation of these actions. However, it had not yet implemented a systemic process to identify the desired outcomes for each action. Therefore, in some instances, without the desired outcome being identified, the process step to revise the corrective action as necessary was not yet fully implemented. This in turn resulted in DBHDS not yet having determined whether the applicable actions were sufficient to address and resolve the deficiency.<br><br>During the 24th Period, for the other two subgroups (i.e. complex behavioral and | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | For this 25th Period, DBHDS did not report a review for individuals with complex adaptive support needs or individuals with complex behavioral support needs. Going forward, DBHDS still needed need to further define the review process and a sampling procedure for obtaining an adequate statistically significant sample size that provides an ability to meaningfully analyze aggregate results.<br><br>For this 25th period, DBHDS submitted a Process Document entitled *Intense Management Needs Review Process – 36.8*, dated 8/27/24. It did not yet address all three subgroups. DBHDS did not provide a related Data Set Attestation. | complex adaptive support needs), DBHDS nursing staff completed desk audits of another 30 individuals with complex adaptive support needs and/or behavioral health needs. This was not a statistically significant sample, and the Independent Reviewer's exception for individuals with complex health needs did not apply to these other subgroups. For this 25th Period, DBHDS did not report a review for individuals with complex adaptive support needs or individuals with complex behavioral support needs. Going forward, DBHDS still needed to further define the review process and a sampling procedure for obtaining an adequate sample size that provides an ability to meaningfully analyze aggregate results.<br><br>For the 24th Period, DBHDS did not provide a relevant Process Document or a Data Set Attestation for this new process. Per interview with DBHDS staff at that time, these remained pending based on the outcomes of the initial review. For this 25th period, DBHDS submitted a Process Document entitled *Intense Management Needs Review Process – 36.8*, dated 8/27/24. It did not yet address all three subgroups. DBHDS did not provide a related Data Set Attestation. | |

**V.D.3 Analysis of 23rd Review Period Findings**

Section V.D.3: The Commonwealth shall begin collecting and analyzing reliable data about individuals receiving services under this Agreement selected from the following areas in State Fiscal Year 2012 and will ensure reliable data is collected and analyzed from each of these areas by June 30, 2014. Multiple types of sources (e.g., providers, case managers, licensing, risk management, Quality Service Reviews) can provide data in each area, though any individual type of source need not provide data in every area:

  a.  **Safety and freedom from harm**(e.g., neglect and abuse, injuries, use of seclusion or restraints, deaths, effectiveness of corrective actions, licensing violations);

  b.  **Physical, mental, and behavioral health and wellbeing** (e.g., access to medical care (including preventative care), timeliness and adequacy of interventions (particularly in response to changes in status);

  c.  **Avoiding crises**(e.g., use of crisis services, admissions to emergency rooms or hospitals, admissions to Training Centers or other congregate settings, contact with criminal justice system);

  d.  **Stability**(e.g., maintenance of chosen living arrangement, change in providers, work/other day program stability);

  e.  **Choice and self-determination**(e.g., service plans developed through person-centered planning process, choice of services and providers, individualized goals, self-direction of services);

  f.  **Community inclusion** (e.g., community activities, integrated work opportunities, integrated living options, educational opportunities, relationships with non-paid individuals);

  g.  **Access to services** (e.g., waitlists, outreach efforts, identified barriers, service gaps and delays, adaptive equipment, transportation, availability of services geographically, cultural and linguistic competency); and,

  h.  **Provider capacity** (e.g., caseloads, training, staff turnover, provider competency)

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| 37.7: The Office of Data Quality and Visualization will assess data quality and inform the committee and workgroups regarding the validity and reliability of the data sources used in accordance with V.D.2 indicators 1 and 5. | For this 25th Period, DBHDS did not meet this CI because they had again not yet adequately reviewed the IRR threats, as described in detail with regard to CI 36.1. However, DBHDS staff acknowledged this concern and at the conclusion of this 25th Period, were already | V.D.2 indicator 5 (i.e., CI 36.5) requires that each KPA PMI describes key elements needed to ensure the data collection methodology produces valid and reliable data (e.g., definitions of key terms, data sources set targets, etc.). It also requires that each PMI describe a complete and thorough description of the specific steps used to supply the numerator and denominator for calculation. As described at the time of the 23rd Period review, DBHDS had met these requirements for two consecutive periods and achieved compliance.

As described with regard to CI 36.1 above, part of the *Curative Action for Data Validity and Reliability* previously re-defined responsibilities and methodologies for the assessment of data reliability and validity of the data sets for the PMIs.  These require an adequately completed Process Document (i.e., which replaced the PMI | 24th – Deferred

**25th - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | working to develop remedial strategies to address these threats.<br><br>At the time of the 23rd and 24th Periods, this study found that DBHDS still needed to further examine Process Documents and Data Set Attestations using QSR data sets, as those related to IRR deficiencies identified in Independent Reviewer reports.<br><br>For the remaining requirements of this CI, and as described with regard to CI 29.1 and CI 36.1 above, the *Curative Action for Data Validity and Reliability* has defined responsibilities and methodologies for the assessment of data reliability and validity of the data sets for the PMIs described in V.D.2, indicators 1 and 5.<br><br>V.D.2 indicator 1 (i.e., CI 36.1) requires an | Methodology) and a Data Set Attestation.  The designated Subject Matter Expert (SME) completes relevant Process Document(s) while the CDO issues the Data Set Attestation.<br><br>V.D.2 indicator 1 (i.e., CI 36.1) requires that DBHDS develops a *Data Quality Monitoring Plan* to ensure that it is collecting and analyzing consistent reliable data.  Under the *Data Quality Monitoring Plan*, DBHDS assesses data quality, including the validity and reliability of data and makes recommendations to the Commissioner on how data quality issues may be remediated.  It also requires that this evaluation occurs at least annually and includes a review of, at minimum, data validation processes, data origination, and data uniqueness.  Further, it specifies that data sources will not be used for compliance reporting until they have been found to be valid and reliable.<br><br>As described above for CI 36.1, for this 25th Period review, DBHDS continued to meet these requirements for most reporting purposes, with the exception of those using QSR data sets.  At the time of the 23rd and 24th Periods, this study found that DBHDS still needed to further examine Process Documents and Data Set Attestations using QSR data sets, as those related to IRR deficiencies identified in Independent Reviewer reports. For this 25th Period, as described with regard to 36.1 above DBHDS had still not yet adequately reviewed the IRR threats for QSR data sets. However, DBHDS staff acknowledged this concern and, at the conclusion of this 25th Period, were already working to develop remedial strategies to address these threats. | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | adequately completed Process Document (i.e., which replaced the PMI Methodology) and a Data Set Attestation.  The designated Subject Matter Expert (SME) completes relevant Process Document(s) while the CDO issues the Data Set Attestation.<br><br>V.D.2 indicator 5 (i.e., CI 36.5) requires that each KPA PMI describes key elements needed to ensure the data collection methodology produces valid and reliable data. As previously documented, DBHDS had achieved substantial compliance with these requirements. | | |

**V.E.1 Analysis of 23rd Review Period Findings**

| | | | |
|---|---|---|---|
| **Section V.E.1:** The Commonwealth shall require all providers (including Training Centers, CSBs, and other community providers) to develop and implement a quality improvement ("QI") program, including root cause analyses, that is sufficient to identify and address significant service issues and is consistent with the requirements of the DBHDS Licensing | | | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| 42.4: On an annual basis, at least 86% of DBHDS-licensed providers of DD services are compliant with 12 VAC 35-105-620. Providers that are not compliant have implemented a Corrective Action Plan to address the violation. | Based on data from CY 2024 Q1 & Q2 that was available at the time of this study, the requirement of this CI that 86% of DBHDS licensed providers of DD services are compliant with each of the sub-regulations at §620.C continues not to be met.

Based on CY2024 Q1 & Q2 data available for review during this study, DBHDS continues to meet the requirement that providers that are not compliant have implemented a CAP to address non-compliance with each sub-regulation | At the time of the 21st Period review, through a Curative Action the Parties filed with the Court on 4/2/22, the Commonwealth agreed to calculate the measure by determining whether 86% of the providers were compliant with each and every one of the 11 sub-regulations at *12VAC35-105-620.A-E* and including an evaluation of whether the provider was implementing its QI plan.

Using data and information included in evidentiary documents provided for the 23rd and 24th studies and the ***42.4 QI Compliance by Reg*** report provided for the 24th study, the table below provides a comparison of sub-regulation specific scores for CY2022, CY2023, and CY2024 Q1 & 2. The consultant independently validated each of these percentages through review of the raw data reports referenced above.

| Regulation | CY2022 | CY2023 | CY2024 (Q1 & 2) |
|---|---|---|---|
| 620A | 93.73% | 93.11% | 88.44% |
| 620B | 92.07% | 89.28% | 82.60% |
| 620C1 | 85.93% | 84.77% | 78.30% |
| 620C2 | 83.27% | 81.69% | 70.55% |
| 620C3 | Not Measured | Not Measured | 99.26% |
| 620C4 | 77.76% | 74.50% | 69.13% |
| 620C5 | 80.83% | 79.85% | 71.67% |
| 620D1 | 84.91% | 83.38% | 76.24% |
| 620D2 | 87.56% | 87.76% | 81.10% |
| 620D3 | 77.77% | 76.50% | 68.20% |
| 620E | 82.94% | 87.72% | 84.95% | | 24th - Not Met

**25th - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | determined not to have been met. | OL began assessing all 11 sub-regulations in §620.C in CY2024.  During the first two quarters of CY2024, only 2/11 requirements met or exceeded the 86% threshold. This compares to 4/10 in CY2023 and 3/10 in CY2022. A true comparison between CY2024 data and data from previous CYs cannot be made until all inspections for CY2024 are completed.  However, based on data from CY2024 Q1 & Q2 available at the time of this study, the requirement of this CI that 86% of DBHDS licensed providers of DD services are compliant with each of the sub-regulations at §620.C continues not to be met.<br><br>Regarding the requirement that providers that are not compliant have implemented a Corrective Action Plan (CAP) to address the violation, the DBHDS report ***42.4 620 CAP Status*** includes a list of all providers assessed for compliance with each element at §620.C between 01/01/2024-06/30/2024. During this period, OL assessed 461 providers. OL required a CAP for not meeting the requirements of each of the sub-regulations at §620.C. At the time that the CAP Status report was prepared, 400/461 CAPs (87%) had been received and approved by OL and 61 CAPs had not yet been received/approved but are being tracked to completion. Based on CY2024 Q1 & Q2 data available for review during this study, DBHDS continues to meet the requirement that providers that are not compliant have implemented a CAP to address non-compliance with each  sub-regulation determined not to have been met.<br><br>While meeting the requirements of this CI that providers that are not compliant have implemented a Corrective Action Plan to address the violation, based on data from the first two quarters of CY2024, DBHDS continues not to meet the requirement that at least 86% of DBHDS-licensed providers of DD services are meeting each of the sub-regulations at §620.C. | |

**V.E.2 Analysis of 23rd Review Period Findings**

**Section V.E.2: Within 12 months of the effective date of this Agreement, the Commonwealth shall develop measures that CSBs and other community providers are required to report to DBHDS on a regular basis, either through their risk management/critical incident reporting requirements or through their QI program. Reported key indicators shall capture information regarding both positive and negative outcomes for both health and safety and community integration, and will be selected from the relevant domains listed in Section V.D.3. above. The measures will be monitored and reviewed by the DBHDS quality improvement committee, with input from Regional Quality Councils, described in Section V.D.5 above. The DBHDS quality improvement committee will assess the validity of each measure at least annually and update measures accordingly.**

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| 43.1 DBHDS has developed measures that DBHDS-licensed DD providers, including CSBs, are required to report to DBHDS on a regular basis, and DBHDS has informed such providers of these requirements. The sources of data for reporting shall be such providers' risk management/critical incident reporting and their QI program. Provider reporting measures must: a. Assess both positive and negative aspects of health and safety and of community integration; b. Be selected from the relevant domains listed in Section V.D.3 above; and c. Include measures representing risks | For this 25th Period, DBHDS did not meet all the requirements for CI 43.1. DBHDS continued to meet these criteria for the 12 surveillance measures related to negative aspects of health and safety, but did not meet all of the requirements of the 11/9/21 Curative Action, as related to the community integration provider reporting measures that are evaluated through the QSR process.<br><br>The Curative Action and DBHDS memoranda to | For this 25th Period, DBHDS did not meet all the requirements for CI 43.1. For context, on 11/9/21, the Parties filed with the Court an agreed-upon Curative Action for this CI to develop and track provider reporting measures from domains listed in V.D.3. In addition to requiring ongoing provider reporting of 12 surveillance measures representing risks that are prevalent in individuals with developmental disabilities (e.g., aspiration, bowel obstruction, sepsis, etc.), which are collected through the incident management system and tracked by the RMRC, the Curative Action required DBHDS to develop and track provider reporting measures related to aspects of community integration through the QSR process.<br><br>The requirement for the ongoing provider reporting of 12 surveillance measures states the following: *DBHDS will continue collecting the negative aspects of health and safety that come from provider critical incident reporting (provider risk measures). Documentation of the process for calculating and reporting these rates is described in the document "Risk Incident Monitoring Rates." Providers are required to report all serious incidents within 24 hours of identification. The RMRC developed 12 measures from the critical incidents reported by providers. These measures are closely tied with the risks that are reviewed with the Risk Awareness Tool (RAT), and report the incidence rate for the 12 conditions as a proportion of the number of individuals on the DD waivers. The 12 rates measured are: aspiration pneumonia, bowel obstruction, sepsis, decubitus ulcer, fall,* | 24th - Deferred<br><br>**25th - Not Met** |

236

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| that are prevalent in individuals with developmental disabilities (e.g., aspiration, bowel obstruction, sepsis) that are reviewed at least quarterly by the designated sub-committee as defined by the Quality Management Plan. | providers of developmental disability services (i.e., on 8/27/23, 11/21/23 and 12/18/23), specify that each provider should have in their Quality Improvement Plan (QI Plan) a specific measure that addresses the promotion/participation in community integration as defined by meaningful work activities, non-large group activities (community engagement) and individual participation in community outings.<br><br>Based on review of the PQR and the QSR methodology, as well as interviews with DBHDS and QSR vendor staff, the methodology does not have an expectation that providers will be expected to track and address their individual results related to community integration through their QI programs, as required. | *dehydration, seizure, urinary tract infection, choking, self-injury, sexual assault, and suicide attempt. The "Surveillance Measures" report is reported quarterly to the RMRC. These measures were reported beginning in FY2021.*<br><br>For this 25th Period, DBHDS continued to meet these surveillance measure criteria.  As reported with regard to CI 29.13, above, the RMRC continues to collect reliable and valid data for the surveillance measures. Based on review of applicable meeting minutes during the 25th Period, the RMRC reviewed the data quarterly. As previously reported, for the measures for which data are collected through CHRIS-SIR,  DBHDS informs providers of these requirements through regulations at 12VAC35-105-160, as well as through various provider trainings and guidance documents.  These include the requirement to report all serious incidents within 24 hours of identification.<br><br>However, DBHDS did not yet meet all of the requirements of the Curative Action related to the community integration provider reporting measures, which are evaluated through the QSR. For this 25th Period, the following paragraphs outline the specific requirements, as italicized, and the current status of each.<br><br>*To ensure reliability and validity, DBHDS will ensure that appropriate tools that specify the parameters for collecting this data are made available to providers.  Significant deviations between data collected through the QSR process and data collected by a provider will be reviewed, assessed and  corrected.  The FY23 round of QSRs will begin approximately in October 2022, and this is when providers will begin to collect and report this data to DBHDS.*<br><br>As reported previously, DBHDS sent relevant memoranda on 8/27/23, 11/21/23 and 12/18/23 to providers of developmental disability services, describing expectations regarding provider risk management programs and provider reporting measures.  The expectations included that each provider should have in their Quality Improvement Plan (QI Plan) a specific measure that addresses the promotion/participation in community integration as | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | The QSR methodology does not reflect that incorporation of community integration into a provider's QI plan is mandatory. As long as the provider's QI plan demonstrates performance data tracking and at least one performance data-based goal/objective in one of four key areas (i.e., including but not limited to community integration), the process does not require the vendor to cite the need for a QSR QIP.  In other words, if a provider's QI Plan tracked data and had an acceptable goal in one of the other key areas, but not for community integration, their QSR report would not cite any community integration deficiency.<br><br>Based on this study's sample of 36 providers and the documentation | defined by meaningful work activities, non-large group activities (community engagement) and individual participation in community outings.  The document gave examples and also defined "meaningful work" and "meaningful community inclusion."<br><br>The 11/21/23 memorandum expanded upon the requirements for providers to track community integration as statewide performance measures through their QI Plans, consistent with the regulatory requirements, and noted that the QI Plans must include a measurable goal for either meaningful work or meaningful community inclusion. The memorandum also expanded on the examples of measurable goals and objectives in these two areas. The document stated that beginning with the 2024 annual licensing inspections, OL would be reviewing QIPs for adherence to this requirement and, for any identified non-compliance, providing a rating of Non-Determined and providing technical assistance.  On 12/18/23, the OL provided training for providers that included this information.<br><br>For this 25th Period, data from three QSR PQR tool questions were used to evaluate the following provider reporting measure: 86% of providers demonstrate a commitment to community inclusion by demonstrating actions that lead to participation in community integration activities.  This measure was intended to define the demonstration of commitment to community inclusion based on the extent to which providers demonstrate  the following:<br>   a.  N: The number of providers who promote meaningful work/ D: Number of providers reviewed<br>   b.  N: The number of providers who promote individual participation in non-large group activities/D: Number of providers reviewed<br>   c.  N: The number of providers who encourage participation in community outings with people other than those with whom they live/D: Number of providers reviewed<br><br>The three PQR elements (i.e., 54-56) used for these measures, respectively, and the accompanying reviewer, guidance are described in the bullets below.  Per | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | provided for review, it was not possible to validate the QSR findings that almost all providers encouraged or promoted community integration, with each of the three PQR elements reported in aggregate as being above 95%. Based on a sample of related documentation for of 36 individual providers that received a PQR for QSR Round 6, only six providers tracked related performance data for community integration measures (i.e., evidence of any actual outcomes for individuals served).<br><br>This appeared to be relatively consistent with the *Quality Improvement Plan Review QSR Provider Quality Review Round 6* document DBHDS submitted, which found that only five providers' QI plans relied on performance data for participation in | the QSR Methodology, providers received a document (i.e. *Round 6 PQR Evaluation Criteria March 2024)* to share this evaluation criteria.<br>• <u>Does the provider promote individual participation in meaningful work activities as defined by DBHDS</u>? The guidance indicated a "Yes" rating is indicated if the provider is able to demonstrate or verbalize methods or strategies to promote participation in meaningful work activities defined as individual-supported employment or employment in a small group that is community-based and not located at a center, and not work created solely for a person with a disability. It should be a job that an organization would have to pay someone with or without a disability to do. Reviewer notes indicated that the evaluation should consider policies or verbalized methods of promoting individual participation in meaningful work activities that meet the DBHDS definition. The provider should be able to describe what meaningful work activities look like for the individuals they support and how they incorporate that into their weekly activity schedules.<br>• <u>Does the licensed provider promote individual participation in non-large group activities?</u> The guidance stated that a simple "yes" or "no" from the provider is NOT sufficient to make a determination from this section—the reviewer must ask probing questions to be able to make a determination based on the provider's responses. Reviewers should consider policies or verbalized methods of promoting individual participation in non-large group activities. Does the provider offer opportunities for 1:1 outings or activities? How does the provider gather that information? How often are opportunities offered? What do these activities look like?<br>• <u>Does the licensed provider encourage individual participation in community outings with people other than those with whom, they live?</u> The guidance again indicated that A simple "yes" or "no" from the provider is NOT sufficient to make a determination from this section and that the reviewer must ask probing questions to be able to make a determination based on the provider's responses. Further, reviewers should consider policies or verbalized methods of promoting individual participation in community integration. How do they encourage participation in activities with people other than those they live with? Are | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | community activities for measurable (i.e. SMART) goals/objectives.<br><br>Despite these findings, for the sample of 36 QSR reports for Round 6, none included any results related to community integration.<br><br>The Curative Action states it will not be considered operational until DBHDS finds that the QSR data related to this data set for V.E.2 provides reliable and valid data for compliance reporting and the Independent Reviewer reviews and determines that DBHDS utilized a sufficient methodology to reach its findings.<br><br>Overall, the PQR elements did not appear to have adequate definition and guidance for QSR reviewers to produce valid and reliable data. The current | they offered options? How do they decide? If the person is not interested, how often do they check back in with them to offer different options? Are they offering options based on their preferences.<br><br>*The QSR vendor will present individual data gathered from QSR process to providers and individual and aggregate data to DBHDS. As part of the QSR quality improvement process, providers will be expected to incorporate their individual results into their QI programs and track and address them as measurable goals and objectives*:<br>For this 25th Period, *12VAC35-105-620.C.3* continues to require the following: "The quality improvement plan shall: Include and report on statewide performance measures, if applicable, as required by DBHDS."<br><br>Based on review of Round 6 tools and processes, as well as interviews with QSR vendor staff and DBHDS staff, the QSR process did not currently support an adequate evaluation of the expectation that providers will incorporate their individual results into their QI programs and track and address them as measurable goals and objectives.<br>• Based on review of a sample of 36 individual provider QSR reports for Round 6, none of the providers received any feedback about their QI Plans except for elements that required a QIP. Further, based on vendor staff interview, the QSR methodology does not require a QSR Quality Improvement Plan (QIP) for "no" responses to the three PQR community integration elements.<br>• The QSR reviewers reviewed provider QI plans to determine if they tracked performance data in four key areas, including but not limited to community integration, and to determine if they had goals/objectives in those four areas. However, the QSR methodology does not reflect that incorporation of community integration into a provider's QI plan is mandatory. As long as the provider's QI plan demonstrates performance data tracking and at least one performance data-based goal/objective in one of the key areas, the process does not require a QIP. In other words, if a provider's QI Plan tracked data and had an acceptable goal in one of the other key areas, but not for community | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | guidance for two of the three measures relies entirely on the providers' stated and written intentions or descriptions of practices, but not on evidence of the actual experiences of the individuals served.<br><br>In addition, based on interview and document reviews DBHDS staff recognized the QSR data were likely not reliably measuring community integration.<br><br>For example, the DBHDS *Quality Improvement Plan Review QSR Provider Quality Review Round 6* noted that "while DBHDS believes providers promote community inclusion and integration from a philosophical perspective, there remains a question whether all individuals supported by providers truly have the opportunity to engage in | integration, their QSR report would not cite any community integration deficiency.<br>• As discussed further below, at least two of the three PQR elements did not have sufficient reviewer guidance to evidence community integration outcomes for individuals.<br><br>*DBHDS will track and address overall statewide results through its QI committees, and providers will be expected to track and address their individual results through their QI programs.  DBHDS will report overall state-wide results to providers to assist them in setting goals for their programs:*  Based on QIC and subcommittee minutes and materials, DBHDS tracked and addressed overall statewide results for both types of provider reporting measures. Data on the 12 surveillance measures continue to be reported and reviewed by the RMRC, as detailed with regard to CI 29.13 above, and reported in the RMRC Annual Report.<br><br>For the community integration measures, at the end of each QSR Round, the vendor issues a *QSR Final Aggregate Report*, which is the primary vehicle DBHDS uses to report overall statewide results to providers.  However, as described above, the QSR methodology does not have an expectation that providers will be expected to track and address their individual results related to community integration through their QI programs. Based on a sample of 36 individual provider QSR reports for Round 6, none included any results related to community integration.<br><br>*This curative action will not be considered operational until DBHDS finds that the QSR data related to this data set for V.E.2 provides reliable and valid data for compliance reporting and the Independent Reviewer reviews and determines that DBHDS utilized a sufficient methodology to reach its findings:*<br>Based on interview and document reviews, DBHDS staff recognized the QSR data were likely not reliably measuring community integration. The DBHDS Associate Commissioner reported that she had assigned the Community Engagement Advisory Group (CEAG) review and revise community inclusion reporting measure definitions. | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | meaningful work, non-large group activities, and activities with people other than whom they live." <br><br> Another DBHDS document, the *SFY24 PMI Tracker Annual Review* noted the need to have a better way to measure meaningful community involvement, based on person's wishes, choices and integration. <br><br> It was positive the DBHDS Deputy Commissioner reported that she had assigned the Community Engagement Advisory Group (CEAG) review and revise community inclusion reporting measure definitions. <br><br> Also with regard to data validity and reliability, as described above with regard to CI 36.1, for this 25th Period, DBHDS updated the Process | For Round 6, DBHDS provided a report entitled *Provider Reporting Measures Summary*, dated 9/15/24. For the measure of the number of providers who promote meaningful work, the report indicated that performance dropped from scores above 90% for Rounds 3 through 5 to 81% for Round 6.  This varied from the reported 97% in the Round 6 QSR aggregate, and this appeared to be due to reviewers erroneously reporting the element was not applicable (NA.)  For the other two measures, scores remained high at 98% and 97% respectively. The *Provider Reporting Measures Summary* noted that "while DBHDS believes providers promote community inclusion and integration from a philosophical perspective, there remains a question whether all individuals supported by providers truly have the opportunity to engage in meaningful work, non-large group activities, and activities with people other than whom they live." <br><br> The *SFY24 PMI Tracker Annual Review* noted the need to have a better way to measure meaningful community involvement, based on a person's wishes, choices and integration.  In particular, the tracker noted it might be necessary to give some examples of what is not considered choice. Of note, the Tracker documented that Rounds 3-5 reported positive findings (i.e., above 90%) for all three of the community integration provider reporting measures, but these did not seem to be consistent with some of the related PCR (i.e., the QSR individual interview) questions, which had lower scores. <br><br> For Round 6, based on review of the *Round 6 QSR Aggregate Report*, this concern continued to be evident.  Scoring for several elements for the PCR stood out as possible calling into question the scoring of the PQR.  These included: do you have a job, at 25%; do you want to attend a church/synagogue/mosque or other religious activity of your choice at 68%, but do you attend religious services at only 59%; and are there things you would like to do that you are not able to do, at 27%. <br><br> Based on this study's sample of 36 providers and the documentation provided | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | Document *Provider Reporting Measures*, dated 9/15/24, and the relevant Data Set Attestation, 9/27/24, but the documents still indicated that there were no data reliability and validity threats noted.<br><br>It was positive that the Process Document broadly identified several possible related surveillance measures, and it appeared these could potentially be used for addressing QSR discrepancies when compared to subject matter expert findings. DBHDS still needed to define the scope and methodology for using the surveillance data to achieve this purpose. At the conclusion of this 25th Period, DBHDS staff were already working to develop remedial strategies to address these threats. | for review, it was also not possible to validate the QSR reviewer's findings that almost all providers encouraged or promoted community integration. The sample review found that there was minimal evidence in the documents reviewed that evidenced this. Per the documentation provided, only six providers tracked related performance data for these measures (i.e., evidence of any actual outcomes for individuals served). This appeared to be relatively consistent with the *Quality Improvement Plan Review QSR Provider Quality Review Round 6* DBHDS submitted, which found that only five providers' QI plans relied on performance data for participation in community activities for measurable (i.e. SMART) goals/objectives.<br><br>As DBHDS moves forward to review and revise the definition for the provider reporting measures, they should consider focusing on outcomes both in the definitions and in the QSR guidance. The current guidance for two of the three measures relies on the providers' stated and written intentions or descriptions of practices, but not on evidence of the actual experiences of the individuals served.<br><br>Also with regard to data validity and reliability, at the time of the 24th Period, DBHDS had not made needed updates to the pertinent Process Document and Data Set Attestation to address IRR as a potential threat to data validity and reliability. As described above with regard to CI 36.1, for this 25th Period, DBHDS updated the Process Document *Provider Reporting Measures*, dated 9/15/24, and the relevant Data Set Attestation, 9/27/24, but the documents still indicated that there were no data reliability and validity threats noted.<br><br>It was positive, though, that the Process Document broadly identified several possible related surveillance measures, and it appeared these could potentially be used for addressing QSR discrepancies when compared to subject matter expert findings. DBHDS still needed to define the scope and methodology for using the surveillance data to achieve this purpose. As described above with regard to CI 44.1 and 44.2 below, this was a particularly acute need as Round 6 QSR data did not appear to be consistently reliable based on this study's | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | | sample of 36 providers that received a PQR. However, it was positive that, at the conclusion of this 25th Period, DBHDS staff were already working to develop remedial strategies to address these threats. | |
| 43.3: The DBHDS Office of Data Quality and Visualization assists with analysis of each provider reporting measure to ensure that the data sources are valid, identify what the potential threats to validity are, and ensure that the provider reporting measures are well-defined and measure what they purport to measure. The QIC or designated subgroup will review and assess each provider reporting measure annually and update accordingly. | DBHDS did not meet the criteria for this CI because DBHDS did not complete a needed review of the Process Documents that rely on QSR data sets related to IRR concerns, and still needed to ensure these evaluations addressed IRR threats related to discrepancies between QSR reviewers and experts in the field.

However, it was positive that, at the conclusion of this 25th Period, DBHDS staff were already working to develop remedial strategies to address these threats.

The relevant documents included *QSR Quality Improvement Findings*, dated 8/18/24, and *Provider Reporting Measures*, dated 9/15/24, as well as the | Previous reports have documented that the Office of Data Quality and Visualization assisted with analysis of the 12 surveillance provider reporting measures. For this 25th Period, as described with regard to CI29.13 the Process Document and Data Set Attestation met the data validity and reliability requirements.

The provider measures were included in the annual PMI review, as evidenced in the aforementioned *SFY24 PMI Tracker Annual Review*.

However, as described in detail with regard to CI 36.1, for this 25th Period, DBHDS did not complete a needed review of the Process Documents that rely on QSR data sets related to IRR concerns and still need to complete these evaluations. This included *QSR Quality Improvement Findings*, dated 8/18/24, and *Provider Reporting Measures*, dated 9/15/24, as well as the related Data Set Attestations. As indicated with regard to CI 36.1 above, this lack of action impacts the ability for this study to confirm the overall methodology is sufficient for this CI. In addition, as described with regard to CI 43.1 above and CI 44.1 and CI 44.2 below, a sample review of 36 providers that received a PQR during Round 6 could not confirm that QSR reviewers scored the pertinent elements reliably.

However, it was positive that, at the conclusion of this 25th Period, DBHDS staff were already working to develop remedial strategies to address these threats. | 23rd - Deferred

**24th - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | related Data Set Attestations.  As indicated with regard to CI 36.1 above, this lack of action impacts the ability for this study to confirm the overall methodology is sufficient for this CI.<br><br>In addition, as described with regard to CI 43.1 above and CI 44.1 and CI 44.2 below, a sample of 36 providers that received a PQR during Round 6 could not confirm that QSR reviewers scored the pertinent elements reliably.<br><br>Otherwise, as previous reports have consistently documented, the Office of Data Quality and Visualization has assisted with analysis of the 12 surveillance provider reporting measures. | | |
| 43.4: Provider reporting measures are monitored and reviewed by the DBHDS | For this 25th Period, DBHDS did not meet the requirement to ensure | At the time of the 24th Period review, per the applicable Curative Action described above, DBHDS had defined provider reporting measures in all required domains.  This remained true for the 25th Period.  In addition, the | 24th - Deferred<br><br>**25th - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| Quality Improvement Committee ("QIC") at least semi-annually, with input from Regional Quality Councils, described in Section V.D.5. Based on the semi-annual review, the QIC identifies systemic deficiencies or potential gaps, issues recommendations, monitors the measures, and makes revisions to quality improvement initiatives as needed, in accordance with DBHDS's Quality Management System as described in the indicators for V.B. | that data reviewed were valid and reliable.<br><br>As described above with regard to CI 29.13, DBHDS had demonstrated the data validity and reliability for the12 surveillance measures.<br><br>However, as described with regard to CI 43.1 above, based on document review and a sample of 36 provider QSRs, DBHDS did not demonstrate data validity and reliability for the community integration measures.<br><br>As detailed with regard to CI 36.1, the updated the Process Document and Data Set Attestation for the provider reporting measures that assess aspects of community integration updates did not acknowledge or adequately examine the IRR threats to validity and reliability, nor did | QIC monitored and reviewed the provider measures at least semi-annually with input from Regional Quality Councils. Based on review of four sets of minutes of QIC meetings held between 9/20/23 through 6/24/24, this also remained true for this 25th Period.<br><br>As described above with regard to CI 29.13, DBHDS had demonstrated the data validity and reliability for the12 surveillance measures.  However, as described with regard to CI 43.1 above, based on document review and a sample of 36 provider QSRs, DBHDS did not demonstrate data validity and reliability for the community integration measures.<br><br>Also, as described with regard to CI 36.1 above, at the time of the 25th Period, this study found that while the DBHDS updated the Process Document and Data Set Attestation for the provider reporting measures that assess aspects of community integration, these updates did not acknowledge or adequately examine the IRR threats to validity and reliability, nor did they include any significant updates to IRR procedures implemented to address previously identified IRR deficiencies.  However, it was positive that, at the conclusion of this 25th Period, DBHDS staff were already working to develop remedial strategies to address these threats. | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | they include any significant updates to IRR procedures implemented to address previously identified IRR deficiencies.<br><br>However, it was positive that, at the conclusion of this 25th Period, DBHDS staff were already working to develop remedial strategies to address these threats.<br><br>DBHDS met the other criteria for this CI. DBHDS had defined provider reporting measures in all required domains.<br><br>In addition, based on review of four sets of minutes of QIC meetings held between 9/20/23 through 6/24/24, the QIC monitored and reviewed the provider measures at least semi-annually with input from Regional Quality Councils. | | |

**V.E.3 Analysis of 23rd Review Period Findings**

| Section V.E.3: The Commonwealth shall use Quality Service Reviews and other mechanisms to assess the adequacy of providers' quality improvement strategies and shall provide technical assistance and other oversight to providers whose quality improvement strategies the Commonwealth determines to be inadequate. |
| --- |

| Compliance Indicator | Facts | Analysis | Conclusion |
| --- | --- | --- | --- |
| 44.1: In addition to monitoring provider compliance with the DBHDS Licensing Regulations governing quality improvement programs (see indicators for V.E.1), the Commonwealth assesses and makes a determination of the adequacy of providers' quality improvement programs through the findings from Quality Service Reviews, which will assess the adequacy of providers' quality improvement programs to include: a. Development and monitoring of goals and objectives, including review of performance data. b. Effectiveness in either meeting goals and objectives or development of improvement plans when | For this 25th Period, this CI was not met because the findings of this review clearly indicated that significant discrepancies between QSR reviewers and the IR consultant continued to occur. In addition, although DBHDS updated a Process Document entitled *QSR Quality Improvement Findings*, dated 8/18/24, it did not yet address the significant IRR discrepancies between QSR reviewer findings and those of experts in the field. In the Verification section, it continued to indicate there were no data reliability and validity threats noted for this data. However, it was | For this 25th Period, for Round 6 QSR, DBHDS made significant changes to the PQR tool as it related to the assessment and determination of the adequacy of providers' quality improvement program.<br><br>Based on review of the PQR tool, this study found it included many more specific quality improvement elements than the previous versions, and that many also included more specific criteria and guidance for the reviewers. Of the 32 elements in the QI tab of the PQR tool, 22 (i.e., elements 8 through19 and 21through 30) focused on specific quality improvement activities and outcomes, as described below:<br>• Elements 8 through18 focused on the provider's tracking of performance data, including how, how often, the types of data (i.e., serious incidents, allegations of abuse and neglect, seclusion and restraint, participation in community activities and "other").<br>• Element 19 addressed the extent to which the provider performed any systematic review of the performance data (i.e., a. no evidence of systematic review, b. evidence of review over two periods or c. performance data collection and review, including documentation that performance data has been used to identify opportunities for improvement.)<br>• Elements 21, 22 and elements 23 through 26 focused on the number of goals/objectives in the provider's Quality Improvement Plan that both met SMART criteria (i.e., specific, measurable, achievable, relevant, time-bound) and were also based on performance data.<br>• Element 23 identified the specific QI tools used by the provider in the development of goals/objectives. | 23rd - Deferred<br><br>**25th - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| goals are not met. c. Use of root cause analysis and other QI tools and implementation of improvement plans. | positive that, at the conclusion of this 25th Period, DBHDS staff were already working to develop remedial strategies to address these threats.<br><br>For this 25th Period, for Round 6 QSR, DBHDS made significant changes to the PQR tool as it related to the assessment and determination of the adequacy of providers' quality improvement program.<br><br>Based on review of the PQR tool, this study found it included many more specific quality improvement elements than the previous versions, and that many also included more specific criteria and guidance for the reviewers.<br><br>The construction of the PQR elements was not entirely congruent with | • Elements 27 through 28 focused respectively on the number of goals/objectives that were met, showed progress but not yet met, or were not met. It was positive that these elements required a trend analysis as evidence, as this helped to demonstrate ongoing monitoring.<br>• Element 30 asked whether, if applicable, the provider made progress on the Round 4 QIP.<br><br>The construction of the elements was not entirely congruent with criteria a. through c. of this CI, which are as follows:<br>   a. Development and monitoring of goals and objectives, including review of performance data;<br>   b. Effectiveness in either meeting goals and objectives or development of improvement plans when goals are not met; and<br>   c. Use of root cause analysis and other QI tools and implementation of improvement plans.<br><br>The PQR tool did not provide sufficient information to determine whether providers developed or implemented improvement plans when goals were not met, as no element probed this requirement. The only probing of an improvement plan was for the Round 4 QIP (i.e., Element 30).<br><br>In addition, the QSR methodology did not yet adequately identify the quality improvement needs for specific providers. Based on interview with the QSR vendor, QSR reviewers were only required to generate QIPs for four of the 32 quality improvement elements. These included the following:<br>• Element 6: Does the agency have someone designated as responsible for risk management functions?<br>• Element 7: If yes, has the designated person completed department-approved training?<br>• Element 8: Does the provider collect and track performance data, including serious incidents and other risk information?<br>• Element 21: Does the provider's current quality improvement plan | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | criteria a. through c. of this CI.  The PQR tool did not provide sufficient information to determine whether providers developed or implemented improvement plans when goals were not met, as no element probed this requirement.  The only probing of an improvement plan was for the Round 4 QIP (i.e., Element 30).<br><br>Nevertheless, the PQR tool did provide for a wealth of data DBHDS can mine with regard to many provider QI practices.  DBHDS did not, and could also potentially mine the QSR data to identify the adequacy of certain aspects of a specific provider's quality improvement program.<br><br>For this 25th Period review, this study sampled related | include at least one goal or objective based on one or more of the performance data types above that meet SMART criteria?<br><br>Nevertheless, the PQR tool did provide for a wealth of data DBHDS can mine with regard to many, if not all, provider QI practices.  On 10/4/24, DBHDS provided a document entitled *Quality Improvement Plan Review QSR Provider Quality Review Round 6* that summarized an initial analysis of the aggregate PQR QI data.  The analysis was based on 307 providers that had a PQR, and, in some instances, the 230 providers with a current and signed QI Plan.  Of these, the report concluded that 36% (111/307) had current plans with at least one SMART goal, but that only 26% (81/307) used performance data.  Otherwise, this initial report did not yet focus on the adequacy of monitoring of goals and objectives or the development and implementation of improvement plans; however, the summary indicated DBHDS intended to do so.<br><br>DBHDS did not, but could, also potentially mine the QSR data to identify the adequacy of a specific provider's quality improvement program.  However, given the described limitations in the scope of the elements, DBHDS would not be able to evaluate the adequacy of  development or implementation of improvement plans when goals were not met.<br><br>For this 25th Period review, this study sampled related documents for 36 providers that received a Round 6 PQR and that had received a QIP for Round 4. The latter criteria ensured that this sample included seasoned, rather than new, providers. The documentation requested for review included the following:<br>• The provider's Annual Quality Improvement Plan required by 12VAC35-105-620.C that was reviewed during Round 6 QSR.<br>• Any related policies, procedures, tools, or protocols used to operationalize the provider's Quality Improvement Plan.<br>• Minutes of meetings related to the implementation of the provider's Quality Improvement Plan and related processes that were reviewed during Round 6 QSR.<br>• Any documents evidencing corrective actions the provider had taken to | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | documents for 36 providers that received a Round 6 PQR and that had received a QIP for Round 4.<br><br>The sampling process focused on comparing the consultant's findings to those of the QSR reviewers. For this 25th period, this sample was of adequate size (36/307 or 12%). Although there were still limitations to the direct comparisons that could be made, the findings clearly indicated that significant discrepancies continue to occur.<br><br>DBHDS updated a Process Document entitled *QSR Quality Improvement Findings*, dated 8/18/24. It did not yet address the significant IRR discrepancies between QSR reviewer findings and those of experts in the field. In the Verification section, it | address the findings of the QSR Round 4 PQR QIP.<br>• The PQR for the selected sample.<br>• The Round 4 QIP for each of the selected sample.<br>• As applicable, any relevant Round 6 QIP issued to a sample provider.<br><br>The sampling process focused on comparing the consultant's findings to those of the QSR reviewers. The ability to make direct comparisons was limited because 1) there was incongruence between criteria a-c of this CI and the QSR elements, including the lack of elements for evaluating development and evaluation of improvement plans when goals are not met, and 2) the documentation provided for the QSR reviewers findings consisted of the individual provider's Round 6 report and the Round 6 QIP, rather than the row level scoring for the tool. Based on review of the documentation provided, comparative results included the following:<br>• Element 8: Does the provider collect and track performance data, including serious incidents and other risk information. The QSR reviewers found 22% (8/36) of providers did not collect and track performance data. The ISR consultant agreed with five of these evaluations, while finding that three did show some evidence or collecting and tracking data (primarily SIR), even if it was not used for goal development or monitoring. However, the IR consultant also identified two additional providers that did not collect and track data.<br>• Element 21: Does the provider's current quality improvement plan include at least one goal or objective based on one or more of the performance data types above that meet SMART criteria? The IR consultant and QSR reviewers agreed for only 42% (15/36) of the providers. In all but one instance of disagreement, the QSR reviewers answered this element Yes, while the IR consultant answered No. The most frequent reason for disagreement was whether the providers used performance data for goal/objective development.<br>• QSR reviewers found that 50% (18 of 36) of the sampled providers required no quality improvement QIPs for Round 6 practices. Of those 18, the IR | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | continued to indicate there were no data reliability and validity threats noted for this data. | consultant found only one (3%) that evidenced achievement of all of the CI criteria a. through c.

The 23rd Period study reviewed a similar sample of documents from a set of Round 5 provider findings to test the validity of the QSR data for this CI. While the sample turned out not to be large enough to generalize the results, there were some clear discrepancies between the QSR reviewers' findings and the results of the sample review. For this 25th period, this sample was of adequate size (36/307 or 12%). Although there were still limitations to the direct comparisons that could be made, the findings above clearly indicated that significant discrepancies continued to occur.

Further with regard to data validity and reliability, as previously reported, the 23rd and 24th Period studies found continuing IRR deficiencies that multiple Reports to the Court have previously identified and recommended that DBHDS should further examine the Process Documents and Data Set Attestations for QSR data sets to ensure the IRR threats have been adequately identified and addressed.

For this 25th Period, as described above with regard to CI 36.1, DBHDS updated a Process Document entitled *QSR Quality Improvement Findings,* dated 8/18/24. In the Verification section, it continued to indicate there were no data reliability and validity threats noted for this data. It did not yet address the significant IRR discrepancies between QSR reviewer findings and those of experts in the field. However, it was positive that DBHDS staff acknowledged this concern and were already working to develop remedial strategies to address these threats. | |
| 44.2: Using information collected from licensing reviews and Quality Service Reviews, the Commonwealth identifies providers that have been unable to demonstrate | For this 25th Period, DBHDS did not meet the requirements for this CI.

Otherwise, DBHDS continued to offer a very successful Expanded | For this 25th Period, DBHDS continued to offer the very successful Expanded Consultation and Technical Assistance (ECTA), targeted to providers that have been unable to demonstrate adequate quality improvement programs. However, based on review of the QSR methodology and a comparative sample of 36 providers that had a Round 6 PQR as well, as on the findings outlined in CI 43.1 and 44.2 above, the QSR process did not yet yield an accurate and complete picture of technical assistance needs. | 24th - Not Met

**25th - Not Met** |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| adequate quality improvement programs and offers technical assistance as necessary. Technical assistance may include informing the provider of the specific areas in which their quality improvement program is not adequate and offering resources (e.g., links to on-line training material) and other assistance to assist the provider in improving its performance. | Consultation and Technical Assistance (ECTA) to providers who have licensing deficiencies for 12VAC35-105-520, 12VAC35-105-620 12VAC35-105-450, and for providers who receive a QSR QIP for provider collection and tracking of performance data (e.g., serious incident and other risk information, etc.)<br><br>However, based on review of the QSR methodology and a comparative sample of 36 providers that had a Round 6 PQR as well as findings outlined in CI 43.1 and 44.2 above, the QSR process did not yet yield an accurate and complete picture of provider technical assistance needs.<br><br>Based on a sample of 36 providers that received a PQR for Round 6, as well as a QIP for Round 4, the QSR vendor did not | Based on review of the document entitled *Expanded Consultation and Technical Assistance Standard Operating Procedures*, effective 8/28/24, the focus of TA can be one or more of the following licensure regulations and/or QSR Element(s):<br>• 12VAC35-105-520 (Risk Management)<br>• 12VAC35-105-620 (Quality Improvement)<br>• 12VAC35-105-450 (employee training and development policy: serious incident reporting, medication administration, behavior intervention, emergency preparedness, and infection control, to include flu epidemics)<br>• Specific DBHDS/QSR vendor agreed to element(s) that addresses the provider collection and tracking of performance data (e.g., serious incident and other risk information, etc.)<br><br>Any licensed DD provider with an Office of Licensing (OL)-approved CAP specific to the focus regulations or a QSR vendor-approved QIP specific to the above focus elements is eligible to receive ECTA. The above-referenced document described procedures for identifying such providers through licensing reviews and QSR results.<br>• For licensing reviews, OCQI runs three provider reports from CONNECT and then merges them to identify providers eligible for ECTA, including focus regulation citations received and existence of an OL-approved CAP for the focus regulations<br>• For QSR, the vendor sends OCQI a list of all providers from the currently completed round that received a QIP for the agreed upon focus data element(s).<br><br>Per this same document, invitations to participate in ECTA are then emailed directly to eligible providers, describing the technical assistance offered. In addition, announcements of ECTA are made at least quarterly through the Developmental Services Constant Contact listserv. ECTA is not mandatory and providers continue to self-select. | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | consistently issue QIPs that sufficiently addressed the quality improvement deficiencies and identified the needed remediation or need for technical assistance.<br><br>As described above, the construction of the tool is not sufficient to identify all quality improvement needs consistent with the criteria identified in CI 44.1.<br><br>In addition, provider-specific Round 6 DBHDS Quality Service Reviews, the reports only reference the inadequacies that result in a QIP. Those requirements are very limited and do not address all of the requirements for a quality improvement program as spelled out in CI 44.1.<br><br>Therefore, providers are not receiving information about all of the inadequacies in their | As reported at the time of the 23rd Period review, for Round 5 QSRs, Item 7 of the PQR required the QSR reviewers to document any areas of opportunities for quality improvement elements and that for such elements that were scored "no" the QSR reviewers needed to provide corresponding information to inform the provider about opportunities for improvement and to identify providers in need of technical assistance. This CI was not met at that time because the study could not confirm that any of 15 vendor-issued QIPs sufficiently addressed the quality improvement deficiencies and identified the needed remediation or need for technical assistance. While the sample size was small, the finding was universal.<br><br>For this 25th Period, based solely on the deficiencies in the QSR methodology for identifying inadequacies and informing providers of them, as summarized below, this CI is not yet met.<br>• This CI requires that the Commonwealth identify providers that have been unable to demonstrate adequate quality improvement programs and offers technical assistance as necessary. As described above, the construction of the tool is not sufficient to identify all quality improvement needs consistent with the criteria identified in CI 44.1.<br>• This CI also indicates that technical assistance may include informing the provider of the specific areas in which their quality improvement program is not adequate. The provider-specific Round 6 DBHDS Quality Service Review inform the providers they must submit a Quality Improvement Plan (QIP) to address any results/findings from the QSR where a QIP is indicated. However, based on review of 36 provider-specific Round 6 DBHDS Quality Service Reviews, the reports only include reference to the inadequacies that result in a QIP, which are limited to the four described above, and do not address all of the requirements for a quality improvement program as spelled out in CI 44.1. Therefore, providers are not receiving information about all of the inadequacies in their quality improvement programs.<br><br>In addition, this study included a Round 6 sample of 36 providers, consisting of 100% of the providers that had a Round 4 QIP. As described above with regard | |

| Compliance Indicator | Facts | Analysis | Conclusion |
|---|---|---|---|
| | quality improvement programs.<br><br>As described above with regard to CI 36.1, and CI 44.1, DBHDS updated a Process Document entitled *QSR Quality Improvement Findings*, dated 8/18/24. In the Verification section, it continued to indicate there were no data reliability and validity threats noted for this data.  It did not yet address the significant IRR discrepancies between QSR reviewer findings and those of experts in the field.<br><br>However, it was positive that DBHDS staff acknowledged this concern and were already working to develop remedial strategies to address these threats. | to CI 44.1, the study found ongoing significant discrepancies with the findings of the IR consultant.  For example, QSR reviewers found that 50% (18 of 36) of the sampled providers required no quality improvement QIPs for Round 6 practices.  Of those 18, the IR consultant found only one (3%) that evidenced achievement of all of the CI criteria a. through c.<br><br>For this 25th Period, as described above with regard to CI 36.1, and CI 44.1, DBHDS updated a Process Document entitled *QSR Quality Improvement Findings*, dated 8/18/24. In the Verification section, it continued to indicate there were no data reliability and validity threats noted for this data.  It did not yet address the significant IRR discrepancies between QSR reviewer findings and those of experts in the field.  However, it was positive that DBHDS staff acknowledged this concern and were already working to develop remedial strategies to address these threats. | |

**Recommendations:**

1. OHR should continue to fully develop and implement all elements of the OHR look-behind process required by CI 29.17 including the inter-rater reliability component.
2. For CI 29.20, DBHDS still needed to update the Data Set Attestation to clearly reference the adequacy of mitigation strategies for ensuring that ISPs are completed by their effective date.
   and clarify the Scope section of both the annual physical and annual dental Process Documents, which still appear to indicate that the date of an annual exam, either physical or dental, must occur within the year proceeding the Annual ISP date (i.e. rather than within 14 months.)
3. For CI 29.22, DBHDS should develop a formal written protocol that outlines the QSR HCBS compliance process from start to finish, which should incorporate all of the validation processes in the approved Statewide Transition Plan (STP) and the requirements of the HCBS Settings Rule and related CMS guidance.
4. Also for CI 29.22, DBHDS should ensure that the compliance calculation incorporates all of the PCR and PQR elements that address HCBS requirements with regard to integration in and access to the greater community and that each of compliance element with a Yes or No response provides sufficient guidance for making that determination. DBHDS should also consider requesting that CMS review the assessment/validation protocol and tools once these modifications are completed.
5. To meet the requirements of CI 29.24, DBHDS should revise the proposed processes to address identified concerns.
   a. OHR DBHDS needed to provide written guidance in this section for IMU staff about the assessment of "suspicious in nature."
   b. DBHDS should clarify why a serious injury of unknown injury that is suspicious in nature falls into the category of MAY be referred versus those that MUST be referred.
   c. DBHDS should revise language to indicate IMU staff always complete a 90-day trend analysis as part of a serious injury report triage.
6. In addition, for CI 29.24, DBHDS should implement a focused sampling procedure (i.e., one isolating serious injury referrals) that would suffice to validate the adequacy of the investigation referral process for serious injuries.
7. For CI 29.24, in order to have a valid measure of individuals protected from serious injury, DBHDS should revise the measure algorithm to factor out serious injuries of unknown origin that OHR determines to be substantiated ANE or a violation of rights.
8. For CI 35.1 and CI 35.5, the QRT should work with DBHDS to obtain and review any such proposed remediation plans in writing and ensure that those plans focus on systemic factors, where present, and include the specific strategy to be employed and the defined measures that will be used to monitor performance. If, based on QRT assessment, proposed DBHDS remediation plans do not address the remedial needs or do not do so sufficiently, the QRT can either develop their own written plans and/or request appropriate modifications to the DBHDS plans.
9. For CI 36.1, DBHDS should address the continuing concerns regarding validity and reliability of QSR data, including the need to examine and address potential IRR deficiencies in all QSR data sets. This recommendation also applies to the following CIs that rely on QSR data sets: HCBS residential compliance (i.e., CI 29.22), use of QSR data for analysis and quality improvement (CI 36.3), PMI data quality (CI 37.7), provider reporting measures (i.e., CI 43.1. 43.3 and CI 43.4), and provider quality improvement programs (i.e., CI 44.1 and 44.2).
10. The Office of Licensing should continue to encourage providers to utilize the Excel-based incident tracking tool template that was initially made available to providers in 2023 to more fully structure incident data analysis and specific inclusion of analysis of data specific to the common risks and conditions faced by people with IDD that contribute to avoidable deaths.

**Interviews:**

The following individuals provided information for this study through the Teams channel, email correspondence, and/or via telephone contact.

6.  Heather Norton, Deputy Commissioner
7.  Dev Nair, Assistant Commissioner, Division of Quality Assurance and Governmental Relations
8.  Michelle Laird, Incident Management Manager,
9.  Katherine Means, Senior Director of Clinical Quality Management
10. Eric Williams, Director, Office of Provider Development
11. Jae Benz, Director, Office of Licensing
12. Taneika Goldman, Director, Office of Human Rights
13. Mackenzie Glassco, Associate Director of Quality and Compliance
14. Kate O'Rourke, HSAG (QSR Vendor)
15. Suzanna Burton, DBHDS Quality Management Contracts Manager

**Documents Reviewed:**

Following is a summary of the documents utilized to draw conclusions about the content of this study:

1. Quarter 4 IMULB Report Final 6.5.24)
2. RMRC Minutes 06.17.24 Approved
3. Quarter 1 IMULB Report Final 9.5.24)
4. RMRC Minutes 09.16.24 Approved
5. VCU IMU Look-Behind DBHDS Response documents dated 5.20.2024 and 9.5.2024.
6. RMRC CLB Report Q4 FY24 Summary
7. 29.17 29.18 HR Process Document VER008
8. CLB Review Form.
9. RMRC CLB Quarterly Reports
10. OL Annual Compliance Determination Chart
11. 30.4 RM Compliance Total FY24 Q3 Q4
12. 42.4 QI Compliance by Reg
13. 42.4 620 CAP Status
14. Documents from 40 sample providers including:
    a. Most recent CAP report from annual inspection
    b. Care Concerns Identified since 01/01/2024
    c. Risk Management Policy/Plan
    d. Quality Improvement Policy/Plan
    e. Risk Manager Job Description
    f. Minutes of Quality Improvement Committee or related body
    g. Employee Training Policy
    h. OL Data Reports Regarding Compliance Determinations for §450, §520, & §620
15. RMRC Charter, updated 6/24/24
16. SFY25 RMRC Task Calendar SFY25
17. RMRC Work Plan
18. List of data reviewed with RMRC, dated 9/5/24
19. RMRC meeting minutes SFY24-9/16/24
20. SIR by Type /Serious Incident Rates VER005, dated 8/8/24 and Data Set, dated 9/27/24
21. HR Process Document Free From ANE 29.23, Ver 005, dated 10/12/2023 and updated Data Set Attestation, dated 3/6/24
22. Office of Integrated Health Annual Physical and Dental Exams, dated 8/6/24
23. Developmental Disabilities Annual Report and Evaluation, State Fiscal Year 2023, Published Date February 27, 2024
24. Annual Dental Exams Ver 005 and Annual Physical Exams Ver 005), both dated 8/24/23, and a single Data Set Attestation, dated 8/4/23
25. Intense Management Needs Review Report Twenty-Fifth Review Period, dated October 2024
26. Behavioral Supports Report: Q1/FY25
27. Therapeutic Consultation – Behavior Supports, dated 6/1/24
28. HCBS Settings Process Document, 10/10/24 and 10/23/24 versions
29. QSR PQR Tool, Round 6
30. QSR PCR Tool, Round 6
31. Addendum to the Commonwealth of Virginia's Statewide Transition Plan February 2019
32. CMS HCBS Site Visit Report for visit dates of 6/24/24 through 6/27/24
33. Individuals Protected from Serious Injury Process Document, dated 7/26/24

34. Appendix D-SIR Investigations
35. Investigation Protocol Chapter
36. March 2014 memorandum entitled Modifications to Quality Measures and Reporting in §1915(c) Home and Community-Based Waivers
37. Appendix H for each of the DD HCBS Waivers
38. QRT End of Year (EOY) Report for FY23, issued on 3/1/24
39. DMAS & DBHDS Quality Review Team (QRT) Quarterly Collaboration documents, dated 4/2/24 and 7/25/24
40. SFY 24 DD Waiver QRT Data (4.24.2024 QRT MTG)
41. SFY 24 DD Waiver QRT Data
42. DMAS memorandum, dated 10/10/14
43. 2023 Summary of Community Service Feedback
44. VA DD Waiver Quality Assurance Program: Quality Review Team 2023 Report Update for QIC
45. Case Management Steering Committee Semi-Annual Report State Fiscal Year 2024 3rd and 4th Quarters, dated 8/30/24
46. DD CMSC VER 016, dated 8/29/23, and an applicable Data Set Attestation, dated 8/30/23
47. 2024 Data Quality Monitoring Plan Annual Update, dated 9/16/24
48. OCQM Third Party Data Source System Validation Checklist with vendor and OCQM Scoring HSAG Final, dated 3/6/24
49. OCQM Third Party Data Source System Validation Checklist Scoring Sheet QSR 2024, dated 3/5/24
50. OCQM Third Party Data Source System Validation Checklist Round Update 8.26.24 OCQM and Vendor Scoring version 2 fully executed
51. IRR Process Summary, dated 1/19/24
52. Round 6 QSR IRR Policy, dated 5/15/24
53. Quality Services Round 6 Review Methodology, dated 8/16/24
54. QSR IRR Process Summary, dated 2/7/24
55. DBHDS QSR IRR Actions Final, dated 10/1/24
56. Provider Reporting Measures Process Document, dated 9/15/24
57. QSR Quality Improvement Findings, dated 8/18/24
58. QIC meeting minutes, SFY24 and 10/21/24
59. CMSC meeting minutes, SFY24 through 9/3/24
60. KPA meeting minutes, SFY24, 7/16/24 and 8/20/24
61. Intense Management Needs Review Process – 36.8, dated 8/27/24
62. DBHDS Provider Reporting Measures relevant memoranda dated 8/27/23, 11/21/23 and 12/18/23
63. Provider Reporting Measures Summary, dated 9/15/24
64. SFY24 PMI Tracker Annual Review
65. Round 6 QSR Aggregate Report
66. Quality Improvement Plan Review QSR Provider Quality Review Round 6
67. Documents from 36 sample providers including that received a Round 6 PQR and that had received a QIP for Round 4.
    a. The provider's Annual Quality Improvement Plan required by 12VAC35-105-620.C that was reviewed during Round 6 QSR.

    b.   Any related policies, procedures, tools, or protocols used to operationalize the provider's Quality Improvement Plan.

    c.   Minutes of meetings related to the implementation of the provider's Quality Improvement Plan and related processes that were reviewed during Round 6 QSR.

    d.   Any documents evidencing corrective actions the provider had taken to address the findings of the QSR Round 4 PQR QIP.

    e.   The PQR for the selected sample.

    f.   The Round 4 QIP for each of the selected sample.

    g.   As applicable, any relevant Round 6 QIP issued to a sample provider.

68. Expanded Consultation and Technical Assistance Standard Operating Procedures, effective 8/28/24

69. 44.1, 44.2 CTA Log FY24

# APPENDIX H

## List of Acronyms

| | |
|---|---|
| ADL | Activities of Daily Living |
| APS | Adult Protective Services |
| ADA | Americans with Disabilities Act |
| AR | Authorized Representative |
| AT | Assistive Technology |
| BCBA | Board Certified Behavior Analyst |
| BSP | Behavior Support Plan |
| BSPARI | Behavior Support Plan Adherence Review Instrument |
| CAP | Corrective Action Plan |
| CAT | Crisis Assessment Tool |
| CEPP | Crisis Education and Prevention Plan |
| CHRIS | Computerized Human Rights Information System |
| CIL | Center for Independent Living |
| CIM | Community Integration Manager |
| CI | Compliance Indicator |
| CIT | Crisis Intervention Training |
| CL | Community Living (HCBS Waiver) |
| CLO | Community Living Options |
| CM | Case Manager |
| CMS | Center for Medicaid and Medicare Services |
| COVLC | Commonwealth of Virginia Learning Center |
| CQI | Community Quality Improvement |
| CPS | Child Protective Services |
| CRC | Community Resource Consultant |
| CSB | Community Services Board |
| CSB ES | Community Services Board Emergency Services |
| CTA | Consultation and Technical Assistance |
| CTH | Crisis Therapeutic Home |
| CTT | Community Transition Team |
| CVTC | Central Virginia Training Center |
| DARS | Department of Aging and Rehabilitative Services |
| DBHDS | Department of Behavioral Health and Developmental Services |
| DD | Developmental Disabilities |
| DDS | Division of Developmental Services, DBHDS |
| DMAS | Department of Medical Assistance Services |
| DOJ | Department of Justice, United States |

| DS | Day Support Services |
|---|---|
| DSP | Direct Support Professional |
| DSS | Department of Social Services |
| DW | Data Warehouse |
| ECM | Enhanced Case Management |
| EDCD | Elderly or Disabled with Consumer Directed Services |
| EHA | Office of Epidemiology and Health Analytics (formerly DQV) |
| E1AG | Employment First Advisory Group |
| EPSDT | Early and Periodic Screening Diagnosis and Treatment |
| ES | Emergency Services (at the CSBs) |
| ESO | Employment Service Organization |
| FRC | Family Resource Consultant |
| GH | Group Home |
| GSE | Group Supported Employment |
| HCBS | Home- and Community-Based Services |
| HPR | Health Planning Region |
| HSN | Health Services Network |
| ICF | Intermediate Care Facility |
| ID | Intellectual Disabilities |
| IDD | Intellectual Disabilities/Developmental Disabilities |
| IFDDS | Individual and Family Developmental Disabilities Supports ("DD" waiver) |
| IFSP | Individual and Family Support Program |
| IMU | Incident Management Unit |
| IR | Independent Reviewer |
| IRR | Inter-rater Reliability |
| ISE | Individual Supported Employment |
| ISP | Individual Supports Plan |
| ISR | Individual Services Review |
| KPA | Key Performance Areas |
| LIHTC | Low Income Housing Tax Credit |
| MLMC | My Life My Community (website) |
| MOU | Memorandum of Understanding |
| MRC | Mortality Review Committee |
| NVTC | Northern Virginia Training Center |
| OCQI | Office of Continuous Quality Improvement |
| ODS | Office of Developmental Services |
| OHR | Office of Human Rights |
| OIH | Office of Integrated Health |
| OL | Office of Licensing |
| OSIG | Office of the State Inspector General |
| OSVT | On-Site Visit Tool |
| PASSR | Preadmission Screening and Resident Review |
| PCR | Person Centered Review |

| PCP | Primary Care Physician |
|---|---|
| PHA | Public Housing Authority |
| PMI | Performance Measure Indicator |
| PMM | Post-Move Monitoring |
| POC | Plan of Care |
| PST | Personal Support Team |
| QAR | Quality Assurance Review |
| QI | Quality Improvement |
| QIC | Quality Improvement Committee |
| QII | Quality Improvement Initiative |
| QMD | Quality Management Division |
| QMR | Quality Management Review |
| QRT | Quality Review Team |
| QSR | Quality Service Reviews |
| RAC | Regional Advisory Council for REACH |
| RAT | Risk Assessment Tool |
| RCA | Root Cause Analysis |
| REACH | Regional Education, Assessment, Crisis Services, Habilitation |
| RFP | Request For Proposals |
| RNCC | RN Care Consultants |
| RST | Regional Support Team |
| RQC | Regional Quality Council |
| SA | Settlement Agreement US v. VA 3:12 CV 059 |
| SC | Support Coordinator |
| SELN AG | Supported Employment Leadership Network, Advisory Group |
| SEVTC | Southeastern Virginia Training Center |
| SIR | Serious Incident Report |
| SIS | Supports Intensity Scale |
| SW | Sheltered Work |
| SRH | Sponsored Residential Home |
| SVTC | Southside Virginia Training Center |
| SWVTC | Southwestern Virginia Training Center |
| TC | Training Center |
| VCU | Virginia Commonwealth University |
| VHDA | Virginia Housing and Development Agency |
| WaMS | Waiver Management System |