IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:12CV59-JAG |
| | ) | |
| v. | ) | <u>Brief Amicus Curiae</u> |
| | ) | |
| COMMONWEALTH OF VIRGINIA, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PEGGY WOOD, et al., | ) | |
| | ) | |
| Intervenor-Defendants. | ) | |

**Brief Amicus Curiae of disAbility Law Center of Virginia on behalf of Virginians with Intellectual and Developmental Disabilities**

_____/s/_____
Zachary Scott DeVore
VA State Bar #65401
Rebecca Herbig
Virginia State Bar # 65548
Counsel for amicus curiae,
disAbility Law Center of Virginia
disAbility Law Center of Virginia
1512 Willow Lawn Drive, Suite 100
Richmond, VA 23230
(804) 225-2042
(804) 662-7431(fax)
Zachary.devore@dlcv.org
Rebecca.herbig@dlcv.org

i

## FINANCIAL DISCLOSURE STATEMENT

Proposed amicus disAbility Law Center of Virginia hereby certifies that it is a 501(c)(3) not-for-profit corporation and has nothing to report under Local Civil Rule 7.1(a) and (b). The disAbility Law Center of Virginia does not (and has no parent, subsidiary, or affiliate entities that) issue(s) stock or debt securities. It has no partnerships, owners, or members of non-publicly traded entities.

# TABLE OF CONTENTS

**FINANCIAL DISCLOSURE STATEMENT** ............................................................................... ii

**TABLE OF AUTHORITIES** ..................................................................................................... iv

**STATEMENT OF INTEREST** ................................................................................................... 1

**INTRODUCTION** ....................................................................................................................... 3

**ARGUMENT** ............................................................................................................................... 4

    THE PERMANENT INJUNCTION WILL IMPROVE REPORTING AND OVERSIGHT ..... 4

    THE PERMANENT INJUNCTION WILL HELP VIRGINIA CONTINUE TO
    TRANSFORM VIRGINIA'S DISABILITY SUPPORT SYSTEMS .......................................... 5

    THE PERMANENT INJUNCTION PROVIDES QUICKER AND MORE CERTAIN
    RELIEF THAN A CONTEMPT HEARING ............................................................................ 8

**CONCLUSION** ........................................................................................................................... 11

# TABLE OF AUTHORITIES

**Cases**

*Olmstead v. L.C*, 527 U.S. 581 (1999) .................................................................................. 5, 6, 7, 9

*Brown v. Plata*, 563 U.S. 493, 516 (2011) ...................................................................................... 9

*United States v. Georgia*, 546 U.S. 151 (2006) .............................................................................. 9

*Crutchfield v. U.S. Army Corps of Eng'rs*, 175 F. Supp. 2d 835, 844 (E.D. Va. 2001) ................ 10

*De Simone v. VSL Pharmaceuticals, Inc.*, 36 F.4th 518, 5295 (4th Cir. 2022) ............................ 10

*Rainbow School, Inc. v. Rainbow Early Education Holding LLC*, 887 F.3d. 610, 619 (4th Cir. 2018) .......................................................................................................................................... 10

*Spallone v. United States*, 493 U.S. 265, 296-97 (1990) ........................................................ 10, 11

*United States v. Providence*, 492 F.Supp. 602, 610 (DRI 1980) .................................................. 11

**Statutes**

Va. Code § 51.5-39.13 ..................................................................................................................... 2

42 U.S.C. §§ 15001 .......................................................................................................................... 2

42 U.S.C. §§ 15001-15083 .............................................................................................................. 2

**STATEMENT OF INTEREST**

The disAbility Law Center of Virginia ("dLCV") respectfully submits this *amicus curie* brief on behalf of Virginians with intellectual and developmental disabilities ("I/DD") for this Court's consideration on whether to terminate the Consent Decree ordered in *United States v. Commonwealth of Virginia* and approve the proposed Permanent Injunction.[1] dLCV supports terminating the Consent Decree and approving the proposed Permanent Injunction. dLCV believes that the proposed Permanent Injunction represents a fair resolution to the Order to Show Cause. At this stage of the litigation, a Permanent Injunction will better serve Virginians with disabilities than other remedies, such as Specific Performance or finding Virginia in contempt.[2]

The proposed Permanent Injunction will assist Virginians with I/DD by improving reporting and oversight, helping Virginia continue to transform its disability support systems, and helping to strengthen protections for Virginians with disabilities. Approval of the Permanent Injunction will also end the continued uncertainty over the current status of the Consent Decree, the long-pending Order to Show Cause issued to Virginia,[3] the potential that Virginia will be found in contempt, and the pending agreement for a permanent injunction prior to the forthcoming General Assembly session.

---

[1] dLCV recognizes that this court has expressed misgivings about the failure of the proposed Permanent Injunction to order Virginia to increase rates for service providers. dLCV agrees with the court over concerns about whether the funding in Virginia is adequate to provide needed services. dLCV writes this brief, in part, to assure the court that it will continue to advocate for improved access to services, including raising service rates to attract additional providers.

[2] dLCV does not take a position on the prudential considerations and merits on whether this court could or should hold Virginia in contempt or order Specific Performance. Given that the United States has disclaimed seeking a contempt finding in favor of seeking a permanent injunction, such a contempt finding, however meritorious, seems unlikely to survive an appeals process.

[3] The Order to Show Cause was initially issued on November 29, 2023. ECF 474.

dLCV is the federally-mandated Protection and Advocacy System ("P&A System") for Virginians with disabilities. Va. Code § 51.5-39.13. Federal and state laws provide P&A Systems with unique and extensive authority to advocate on behalf of individuals with disabilities, including I/DD. For example, the Developmental Disabilities Assistance and Bill of Rights Act of 2000 provides a P&A System with the authority to "pursue legal, administrative and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of [individuals with developmental disabilities]…." 42 U.S.C. §§ 15001-15083 at 15043 (a)(2)(A)(i). Pursuant to that authority, dLCV routinely represents individuals with I/DD, including those with co-occurring behavioral, mental health, and medical support needs, to protect and enforce their civil rights.

dLCV routinely investigates allegations of abuse and neglect of individuals with I/DD in state-operated institutional settings, such as Southeastern Virginia Training Center and the mental health facilities operated by the Department of Behavioral Health and Developmental Services ("DBHDS"). dLCV also conducts investigations and provides advocacy for persons in privately-operated institutional settings, including Intermediate Care Facilities ("ICF"), private psychiatric hospitals, Assisted Living Facilities ("ALF"), and Nursing Facilities. At the community level, dLCV conducts monitoring visits and investigations at a variety of residential and other integrated settings for both adults and children. These include Medicaid Waiver group homes and supported residential providers. As a result of dLCV's work, both in institutional settings and in the community, we routinely represent and advocate on behalf of Virginians with I/DD. In light of our experience, dLCV can provide first-hand information on what happens day-to-day in the lives of people receiving services from DBHDS and, thus, may provide valuable

insight and perspective to the court in determining whether to terminate the Consent Decree and approve the proposed Permanent Injunction.

dLCV (and its predecessor organization[4]) has long been involved in this matter, including filing numerous amicus briefs, such as a brief in support of approval of the original Consent Decree. ECF 50. dLCV has monitored the implementation of the Consent Decree since it was approved as part of our federally- and state-mandated duties. Additionally, dLCV engages in our federally-mandated role to educate policy makers by working with and providing information and data to the Administration, DBHDS, Department of Medical Assistance Services (DMAS), other state agencies, and the General Assembly. This role includes providing education of issues involving the Consent Decree, development of community residential facilities, community oversight, and community inclusion. dLCV shares the concern of this court that the reimbursement rates are inadequate to sustain an adequate number of providers – furthermore, dLCV shares with the court and the Independent Reviewer that the system for protection from harm and community oversight in Virginia should be improved - however, dLCV believes that such concerns are better addressed through approving the voluntary resolution of this complaint and working on the funding issue through the political process in Virginia.

## INTRODUCTION

When Virginia entered the Consent Decree, it made several pledges to transform its system of care. Virginia has made extremely impressive progress, including closing four of five of the Training Centers and dramatically increasing the availability of community services. Unfortunately, despite this dramatic improvement, Virginia has failed to fully comply with the Consent Decree, and this Court issued an Order to Show Cause due to Virginia's non-

---

[4] Virginia Office for Protection and Advocacy, an independent state agency until 2013.

compliance. Virginia and the United States have reached an agreement for a proposed Permanent Injunction to resolve this Order to Show Cause and replace the existing Consent Decree. The goal of this proposed Permanent Injunction is to continue to improve the care system for Virginians with I/DD. dLCV believes that the proposed Permanent Injunction is a fair resolution, and that it is the best way to resolve Virginia's non-compliance with the Consent Decree.

Furthermore, we believe that the subsequent amendments of the proposed Permanent Injunction have dramatically improved it, providing better assurances for Virginians with I/DD that Virginia will come into compliance.[5] dLCV believes that the Permanent Injunction will improve its disability support systems. This is a result both of the improved reporting and oversight and of the guidance provided for the Virginia General Assembly. Finally, the Permanent Injunction is voluntary, binding, and reaches a quicker resolution to the Order to Show Cause than a contempt hearing and potential appeals, making it a more efficient way to address the needs of Virginians with disabilities. Accordingly, dLCV supports the approval of the proposed Permanent Injunction as being in the best interest of Virginians with I/DD.

## ARGUMENT

**THE PERMANENT INJUNCTION WILL IMPROVE REPORTING AND OVERSIGHT**

Virginia's agreement to reporting requirements as part of the proposed Permanent Injunction will improve reporting on I/DD-related issues in the state, as well as improving oversight. Virginia's agreement to report on a variety of issues — first to the Independent Reviewer, who will continue to monitor compliance with the agreement for two years, and

---

[5] dLCV has always believed that a permanent injunction was the best and most likely outcome to the Order to Show Cause. A permanent injunction is the best tool to bring Virginia into full compliance and a voluntary resolution avoids issues that might come through a finding of contempt, including reallocation of scarce resources into litigation costs.

second to the public — will help maintain accountability for the State's compliance with set guidelines. For instance, in Paragraph 33, Virginia commits to serving individuals identified as needing Therapeutic Consultation service by referring at least 86% of those individuals for the service and identifying a provider within 30 days. ECF 543-1, at 6. The Permanent Injunction then lays out a timeline and specific steps to be followed by Virginia to achieve compliance. This same formula is reproduced in other sections, giving dLCV confidence in the Permanent Injunction's ability to improve reporting and oversight of Virginia's progress.

Additionally, Parts V and VI of the proposed Order of Permanent Injunction make permanent some of the steps that Virginia has taken to comply with the original Consent Decree. In Part V, Virginia agrees to continue the Quality Management steps they began under the Consent Decree. Part VI, titled "Publicly Accessible Document Library," ECF 543-1, at 21-23, requires that Virginia continue to maintain and make available the Library available to the public for reporting on its I/DD system. The proposed Permanent Injunction will ensure that the steps taken so far, along with the steps to occur in the future, are permanent.[6] The long-term retention of the publicly-accessible Library through the Injunction makes it a valuable resource for Virginians with disabilities, their families, and their advocates as well as providers. Part V and Part VI of the Proposed Consent Decree help to provide necessary assurances that Virginia will not backslide following the end of formal court oversight.

### THE PERMANENT INJUNCTION WILL HELP VIRGINIA CONTINUE TO TRANSFORM ITS DISABILITY SUPPORT SYSTEMS

The proposed Permanent Injunction includes a framework for improving disability support systems in Virginia. The proposed Permanent Injunction builds upon, updates, and

---

[6] dLCV notes that, while Part IV of the Permanent Injunction will terminate in seven years or upon Virginia's successful completion of the steps needs to come into compliance, Part V and VI will not terminate.

modernizes the original Consent Decree to reflect current steps Virginia needs to take to come into compliance with the ADA as interpreted by *Olmstead v. L.C*, 527 U.S. 581 (1999). These steps will help provide a smooth transition to bring Virginia into full compliance with the initial Consent Decree and continue to move forward. Crucially, these steps will end the fight over contempt and compliance with the original Consent Decree, which will redirect the resources used to respond to the Order to Show Cause back into serving Virginians with disabilities. Furthermore, approving this agreed-upon proposed Permanent Injunction provides certainty for Virginians with I/DD that Virginia will continue making progress towards systems transformation. This will help individuals, families, advocates, and providers by providing a baseline for compliance and the possibility of court enforcement if Virginia does not comply. Additionally, providing certainty helps individuals, families, advocates, and providers better focus their efforts at legislative reform and continued improvement. It is encouraging that Virginia, in agreeing to a Permanent Injunction that brings it into compliance with the original Consent Decree, is signaling that it is committed to long-term system transformation and improvement.

Continued transformation of Virginia's service delivery system is necessary due to Virginia's failure to come into compliance with the original Consent Decree. While Virginia has made undeniable progress in improving its system of care, it still falls short in 32 of 41 indicators. Independent Reviewer's Report, ECF 547 at 3-4. The Independent Reviewer notes that, for Virginians with I/DD and their families, "many of these unmet Indicators involve the most important service outcomes addressed by the Consent Decree." ECF 547 at 4. These indicators include "delivering needed nursing services; initiating and providing adequate and appropriately delivered behavioral services; conducting initial crisis assessments in individuals'

6

homes or other community settings; ensuring that dental exams occur annually; providing services that support daily access to the greater community; and ensuring that Direct Support Professionals and their supervisors receive competency-based training." *Id.* These items are keys to following the mandate of the Supreme Court of the United States in *Olmstead v. L.C.* To come into compliance with these items requires Virginia to devote extensive effort to them. A permanent injunction is exactly the type of tool that will require Virginia to devote its resources to solving these remaining problems.

  Additionally, the Permanent Injunction includes steps needed to address the funding and access to service issue. For instance, in Paragraph 38, ECF 538-1, at 9-10, titled "Private Duty Nursing," the Permanent Injunction states that, within six months of its entry, Virginia must identify the top three barriers to individuals accessing nursing services in each region based on objective data. This requirement will help Virginia and interested parties understand barriers to receiving this service. Also, Paragraph 38(d)(iii), ECF 538-1, at 10 requires a work plan to be created to resolve those discovered barriers. By allowing some flexibility in Virginia's manner of addressing its service shortcomings, the Permanent Injunction avoids the potential federalism issues that could come with the federal court requiring Virginia to conduct certain steps to come into compliance with the ADA. Given the current legal climate, taking the safe path for a fair agreed resolution is preferable for Virginians with I/DD who most heavily bear the risk of an adverse appellate court ruling and, at best, would suffer from additional delays for a resolution of the Order to Show Cause. For these reasons, we support the proposed Permanent Injunction as a better means of encouraging progress in Virginia's disability support systems.

  The proposed Permanent Injunction also provides a better foundation for working with the General Assembly to improve protections and access to resources for Virginians with

disabilities. An injunction provides definite targets for the Commonwealth to meet, and provides for political advocacy relating to matters, such as increased reporting and review. It also allows advocates to focus resources on legislative advocacy, rather than a potentially long fight over contempt and compliance issues. It is important to remember that bringing Virginia into compliance with the ADA as interpreted by *Olmstead v. L.C.* is a starting point and not a finish line. dLCV and other advocates are prepared to work with the General Assembly and the current and future Administrations in Virginia to assure compliance.

Finally, these changes will help lay the groundwork for legal changes in Virginia, and clearly place the decisions and accountability in the hands of the Commonwealth. This will help political accountability. The proposed Permanent Injunction calls for increased transparency and sets up a framework to ensure transparency. For all of these reasons, dLCV supports the Court's adoption of the proposed Permanent Injunction.

## THE PERMANENT INJUNCTION PROVIDES QUICKER AND MORE CERTAIN RELIEF THAN A CONTEMPT HEARING

dLCV supports adopting the proposed Permanent Injunction because it will provide more security to Virginians with disabilities and advocates for Virginians with disabilities when planning for their own lives or for advocacy work.

First, the proposed Permanent Injunction is voluntary. Both parties consent to be bound by its terms. This consent is crucial, as the terms of the proposed Permanent Injunction are described in great detail. Furthermore, Virginia agrees to the continued jurisdiction of the court.[7] Any variance from these terms gives the Court the opportunity to step in and hold Virginia to its

---

[7] Assuring that representatives of persons with developmental disabilities in Virginia could move to enforce the proposed Permanent Injunction in case of violation could alleviate concerns the court has with compliance or with the United States possibly abandoning enforcement of the agreement.

agreement. The fact that Virginia voluntarily signed on to the proposed Permanent Injunction means that it is more likely to comply with its terms, as all actors are aware of the Court's right to enforce the agreed-upon terms. The parties have submitted substantial improvements to the proposed resolution agreement since it was first introduced in response to concerns of the Independent Reviewer and the Court. These concerns included extended periods of reporting, which was one of dLCV's over-arching concerns with the initial proposed injunction. The most important factor of this agreement being voluntary is that approval of the proposed Permanent Injunction assures a positive resolution of the Order to Show Cause without a potentially prolonged court fight.

Second, a permanent injunction is a binding decision. Adopting this proposed Permanent Injunction would mean that it stands as the final judgment in this case; failure to comply exposes the Commonwealth to the risk of a finding of contempt by the Court. The finality of the proposed Permanent Injunction will better hold the Commonwealth to its terms than the existing Consent Decree (which is already well past its originally scheduled expiration date[8]), better protecting and serving Virginians with I/DD. Furthermore, providing a new court order with which Virginia must comply is consistent with the common practice in systemic cases. "When a court attempts to remedy an entrenched constitutional violation[9] through reform of a complex institution, such as this statewide prison system, it may be necessary in the ordinary course to issue multiple orders directing and adjusting ongoing remedial efforts." *Brown v. Plata*, 563 U.S. 493, 516 (2011). The proposed Permanent Injunction updates the steps that Virginia needs to take to

---

[8] This date, of course, was pushed back due to delays caused by the COVID-19 pandemic.
[9] While this action is based upon Title II of the Americans with Disabilities Act, for all practical purposes, as a Section 5 statute, Title II of the Americans with Disabilities Act is co-extensive with the Fourteenth Amendment due process clause. *United States v. Georgia*, 546 U.S. 151 (2006).

engage in the systemic reform of its system of care for people with I/DD in order to come into compliance with the requirements of the Americans with Disabilities Act as interpreted by *Olmstead v. L.C.*

Furthermore, such an injunction will be binding: "modification or dissolution of a permanent injunction is extraordinary relief and, as such, requires a showing of extraordinary circumstances." *Crutchfield v. U.S. Army Corps of Eng'rs*, 175 F. Supp. 2d 835, 844 (E.D. Va. 2001). Finally, the permanent injunction will be enforceable – if Virginia violates the permanent injunction, the United States can move for a finding of civil contempt. See, e.g., *De Simone v. VSL Pharmaceuticals, Inc.*, 36 F.4th 518, 5295 (4th Cir. 2022) (finding defendant in civil contempt for violating a permanent injunction in a false advertising and unfair competition case by continuing to make statements that had been found by the court to be false advertising); *Rainbow School, Inc. v. Rainbow Early Education Holding LLC*, 887 F.3d. 610, 619 (4th Cir. 2018) (finding party in contempt for continued violation of permanent injunction).

Third, permanent injunctions are quicker and more certain than a contempt finding and hearing. While a contempt finding might provide better relief for Virginians with I/DD, it would also bring a large amount of uncertainty and divert limited resources away from the system of care. For example, a contempt finding would be subject to appeal to the United States Court of Appeals for the Fourth Circuit and a writ of certiorari to the Supreme Court of the United States. Such an appeals process would, at best, likely delay implementation of corrective action for years. Such prolonged conflict would also deprive Virginia's system of care of needed resources which are instead dedicated to fighting a legal conflict over helping persons.[10] At worst, such an

---

[10] The United States Supreme Court has noted that contempt hearings and findings can deprive the very persons most in need of government services of those services. See, *Spallone v. United States*, 493 U.S. 265, 296–97 (1990)

appeals process could result in a worse result than the proposed Permanent Injunction. This proposed Permanent Injunction provides for fair relief that will benefit Virginians with I/DD.

In the interests of ensuring that Virginia reaches and sustains compliance, we believe that people with I/DD will be best served if dLCV, an interested non-party acting as the protection and advocacy agency for the Commonwealth of Virginia, has a formal method for alerting the court of any serious non-compliance. We are not requesting the right to participate in the case; rather, we request a method to alert the court of any major concerns that our agency encounters. Such a provision would ensure that Virginians with I/DD will have a voice regarding continued and sustained compliance.

dLCV is committed to continue to fulfill its federally-mandated duty to work with DBHDS, the General Assembly, and the Administration on the state level to improve the system of care. By providing a certain outcome to the Order to Show Cause, approval of the proposed Permanent Injunction makes clear which items are for the Court and the settlement agreement and which items are for legislative advocacy.

Finally, resolving the Order to Show Cause and original Consent Decree in favor of a permanent injunction better serves advocates, providers, families, and individuals with disabilities in their future advocacy efforts. The proposed Permanent Injunction gives requirements to Virginia, but does not dictate a path. The precise path to compliance, thus, will be set by DBHDS, DMAS, the Governor, and the General Assembly. These political actors are accountable to the people and can be held accountable if there is a failure to comply with the

---

(Brennan, J., dissenting) ("Fines assessed against the public fisc directly 'diminish the limited resources which the city has to comply with the Decree,' *United States v. Providence*, 492 F.Supp. 602, 610 (DRI 1980), and more generally curtail various public services with a likely disparate impact on poor and minority residents.") A fair voluntary outcome without a contempt hearing avoids this danger.

permanent injunction. dLCV is fully dedicated to working with the General Assembly and Administration in Virginia to resolve these issues.

## CONCLUSION

The interests of Virginians with I/DD are best served by adopting the proposed Permanent Injunction. dLCV believes it will improve reporting and oversight of Virginia's disability support systems, aid systemic improvements, and be a more binding commitment to serving Virginians with I/DD than a consent decree. We hope that the Court will consider the power of establishing a final, binding decision to hold the Commonwealth to its commitment to better serve Virginians with I/DD. Such a resolution avoids the dangers that could come from a prolonged fight over the Order to Show Cause and provides much needed understanding of the remaining steps that Virginia needs to take to come into compliance with the ADA as interpreted by *Olmstead*. The Consent Decree has served its purpose admirably, but it is time that a new agreement better suited for the current needs of Virginians with I/DD is implemented.

Respectfully submitted and DATED this 8th day of January 2025,

_____/s/_____

Zachary Scott DeVore
VA State Bar #65401
Rebecca Herbig
VA State Bar #65548
Counsel for *amicus curiae*,
disAbility Law Center of Virginia

disAbility Law Center of Virginia
1512 Willow Lawn Drive, Suite 100
Richmond, VA 23230

12

(804) 225-2042
(804) 662-7431(fax)
Zachary.devore@dlcv.org
Rebecca.Herbig@dlcv.org