IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,              )
                                       )
        Plaintiff,                     )
                                       )
        v.                             )
                                       )
COMMONWEALTH OF VIRGINIA,              )
                                       )    CIVIL ACTION NO. 3:12CV59-JAG
        Defendant.                     )
                                       )
        and                            )
                                       )
PEGGY WOOD, et al.,                    )
                                       )
        Intervenor-Defendants.         )
                                       )

## ORDER OF PERMANENT INJUNCTION

This matter comes before the Court on the Joint Motion for Termination of Consent

Decree and Entry of Permanent Injunction filed by the Parties ("Motion").  Upon consideration

of the Motion, and good cause appearing, it is hereby

ORDERED that the Motion is GRANTED; it is further

ORDERED that the Consent Decree (Dkt. No. 112 entered on August 23, 2012) is

terminated; it is further

ORDERED that the Commonwealth of Virginia is hereby permanently enjoined as

follows:

1

**PROPOSED ORDER OF PERMANENT INJUNCTION**

I.    ACRONYMS ................................................................................................ 3

II.   DEFINITIONS ............................................................................................ 3

III.  DISSOLUTION OF CONSENT DECREE OF AUGUST 23, 2012 ................................. 4

IV.   TERMS ..................................................................................................... 4

V.    QUALITY MANAGEMENT ........................................................................... 20

VI.   PUBLICLY ACCESSIBLE DOCUMENT LIBRARY ............................................ 21

VII.  DISPUTE RESOLUTION ............................................................................ 23

VIII. COMPLIANCE MONITORING ...................................................................... 24

IX.   TERMINATION OF SECTION IV ................................................................... 29

X.    RETENTION OF JURISDICTION ................................................................... 29

I.    **ACRONYMS**

1.  BSPARI - Behavior Support Plan Adherence Review Instrument
2.  CLB - Community Look-Behind
3.  CMS - U.S. Centers for Medicare and Medicaid Services
4.  CMSC - Case Management Steering Committee
5.  CSB - Community Services Board
6.  CTH - Crisis Therapeutic Home
7.  DBHDS - Department of Behavioral Health and Developmental Services
8.  DD - Developmental Disabilities
9.  DD Waiver - Developmental Disability Waiver
10. DMAS - Department of Medical Assistance Services
11. EPSDT - Early and Periodic Screening, Diagnostic and Treatment
12. ICF/IID - Intermediate Care Facility for Individuals with Intellectual Disability
13. IMNR - Intense Management Needs Review Process
14. ISP - Individual Support Plan
15. PASRR - Preadmission Screening and Resident Review
16. QIC - Quality Improvement Committee
17. QII - Quality Improvement Initiative
18. QRT - DMAS-DBHDS Quality Review Team
19. REACH - Regional Education, Assessment, Crisis Services, Habilitation System
20. RMRC - Risk Management Review Committee
21. SCQR - Support Coordinator Quality Review
22. SIS - Supports Intensity Scale
23. VIDES - Virginia Individual Developmental Disability Eligibility Survey

II.   **DEFINITIONS**

24. "Consent Decree" refers to the consent decree entered by this Court in this case on August 23, 2012.  ECF No. 112.
25. "Licensing Regulations" refers to 12 Va. Admin. Code 35-105.
26. "Parties" refers to the United States and the Commonwealth of Virginia.
27. "Root Cause Analysis" refers to a problem-solving method designed to identify the underlying causes of a problem. The focus of a root cause analysis is on the systems,

processes, and outcomes that require change to achieve desired outcomes, strengthen areas of weakness, and prevent or substantially mitigate future risk of harm.

28. "Quality Improvement Initiative" refers to a focused strategy designed to support quality improvement activities. The strategy uses the "Plan, Do, Study, Act" cycle to achieve improvements. QIIs seek to improve systems and processes to achieve desired outcomes, strengthen areas of weakness, and prevent or substantially mitigate future risk of harm.

## III.    DISSOLUTION OF CONSENT DECREE OF AUGUST 23, 2012

29. The Consent Decree is hereby dissolved.

30. This Permanent Injunction replaces the Consent Decree.

## IV.    TERMS

31. **Community Services Board Quality Review (SCQR).** The Commonwealth will work to achieve a goal that 86% of Community Services Board (CSB) records meet a minimum of 9 of the 10 elements assessed in the Case Management Quality Review. To achieve that goal, the Commonwealth will take the following actions:

   a) During its annual quality review cycle starting each January, DBHDS will require a quality improvement plan from any CSB that has two or more elements with substantial or moderate interrater reliability between the CSB Support Coordinator Quality Review (SCQR) and the DBHDS Office of Community Quality Improvement Review not achieving 60% compliance. DBHDS will provide information about which CSBs need this support in the SCQR Report.

   b) DBHDS will provide targeted technical assistance with identifying measurable outcomes to any CSB (i) whose records are not 86% compliant with including specific and measurable outcomes in Individual Support Plans (ISPs) or (ii) that does not demonstrate improvement with respect to including specific and measurable outcomes in ISPs (including evidence that employment goals have been discussed and developed, when applicable, throughout its quality review cycle).

   c) If the Commonwealth has not achieved the goal within one year of the date of this Order after taking the actions in Paragraphs 31(a) and 31(b), DBHDS will increase the threshold for requiring a quality improvement plan from a CSB as set out in Paragraph 31(a). DBHDS will provide information about which CSBs need this support in the SCQR Report.

   d) If the Commonwealth has not achieved the goal within one year after taking the actions in Paragraph 31(c), DBHDS will conduct a root cause analysis and implement a Quality Improvement Initiative (QII) as determined appropriate by DBHDS. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.

32. **Community Setting Crisis Assessments.** The Commonwealth will work to achieve a goal that 86% of children and adults receive crisis assessments at home, the

residential setting, or other community setting (non-hospital/non-CSB office). Crisis Receiving Centers ("CRC") will only be counted as an "other community setting" after it is determined that the individual or supported decision maker was not directed by the Call Center, Emergency Services, or Mobile Crisis staff to present at a CRC. To achieve that goal, the Commonwealth will take the following actions:

a) DBHDS will continue to promote the use of the 988 24-hour crisis helpline by providing information on the helpline on its social media platforms, in print and television advertisements, and through informational bulletins developed or funded by DBHDS. DBHDS will require all mobile crisis team members to receive training within 90 days of hire on how to support and respond to individuals with developmental disabilities (DD) who are in crisis.

b) DBHDS will maintain its current efforts to assist the regions in filling vacant mobile crisis positions by discussing staffing at regional qualitative reviews of REACH programs and supporting REACH programs to implement quality improvement plans.

c) Within 6 months of the date of this Order, the Commonwealth will develop a plan that includes measurable goals, specific support activities, and timelines for implementation with consultation from stakeholders to enhance 988 supports and services to increase the likelihood that individuals will be assessed in the community.

d) From the date of this Order, DBHDS will monitor staffing at each REACH program to determine if they have sufficient staffing per shift to meet the goal, including through discussion and review of filled/vacant positions, utilization rates of mobile crisis, and times mobile crisis calls are being received in comparison to the number of staff working during those hours at each REACH program's quarterly review. If a quarterly review indicates that staffing is not sufficient to meet the goal, DBHDS shall review the region's current efforts to increase staffing and, if DBHDS determines necessary, will require a quality improvement plan that includes additional actions that DBHDS finds are necessary to enhance staffing. The Independent Reviewer, in the reports required under Paragraph 76, shall include a determination in his report on the adequacy of the Programs and Virginia's response to this requirement.

e) Semi-annually, beginning on January 1 and June 1 of each year, DBHDS will work with the two regions that are experiencing the most success in responding to people in crisis in the community to determine what is leading to their success. DBHDS will work with the two regions that are experiencing the most challenges in responding to people in crisis in the community to learn what is leading to those challenges. DBHDS will work with all the regions based on these lessons learned to implement a plan to improve performance in each of the regions.

f) If the Commonwealth has not achieved the goal within two years of the date of this Order after taking the actions in Paragraphs 32(a) through

32(e), DBHDS will conduct a root cause analysis and implement a QII as determined appropriate by DBHDS. As part of the root cause analysis, the Commonwealth will collect data on why individuals with developmental disabilities presented at a CRC instead of accessing mobile crisis services. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.

33. **Therapeutic Consultation Services.** The Commonwealth will work to achieve a goal that 86% of individuals identified as in need of Therapeutic Consultation service are referred for the service and have a provider identified within 30 days. To achieve that goal, the Commonwealth will take the following actions:

a) Within 12 months of the date of this Order, DBHDS shall implement a technical assistance initiative with the CSBs that need the most support to connect people to behavioral supports and focus on improving case managers' awareness of the behavioral resources available to individuals in need of Therapeutic Consultation, unique CSB business practices, and supervisory support for case managers in this area of performance.

b) Annually, the Commonwealth will participate in at least one regional event and at least one statewide conference to promote Therapeutic Consultation services. The Commonwealth will provide technical assistance to providers regarding enrollment with Medicaid as a provider as they reach out to the Commonwealth for this support.

c) By July 1, 2025, the Commonwealth will create a training about enrolling with Medicaid as a Therapeutic Consultation provider and make it available for providers via DBHDS's website.

d) If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2024, and has not conducted a rate study meeting the requirements of Paragraph 59 in the preceding two years, the Commonwealth will initiate a rate study of Therapeutic Consultation by January 1, 2025. The rate study shall be completed in time to be considered during the 2026 legislative session. If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2028, and has not conducted a second rate study meeting the requirements of Paragraph 59, the Commonwealth will initiate a second rate study of Therapeutic Consultation by January 1, 2029. The rate study shall be completed in time to be considered during the 2030 legislative session. Any rate study required by this paragraph shall be conducted in accordance with Paragraph 59. This paragraph shall not be construed to require the Commonwealth to conduct more than two rate studies.

e) If the Commonwealth has not achieved the goal by June 30, 2026 after taking the actions in Paragraphs 33(a) through 33(c), DBHDS will also conduct a root cause analysis and implement a QII as determined appropriate by DBHDS. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.

34. **Behavioral Support Services.** The Commonwealth will work to achieve a goal that 86% of individuals with identified behavioral support needs are provided adequate and appropriately delivered behavioral support services. To achieve that goal, the Commonwealth will take the following actions:

   a) DBHDS will continue to address findings identified through the previously conducted root cause analysis initiated in Q1 of FY21 and updated subsequently as part of each semi-annual review.

   b) DBHDS will continue to use the BSPARI tool, or such other tool designed for behavioral programming that the parties agree upon, to determine whether individuals are receiving adequate and appropriate behavioral support services.

   c) DBHDS will continue to employ a total of four behavior analysts to provide technical assistance and training on behavioral support plans. Annually, the behavior analysts will (i) review a statistically significant sample of the behavioral plans submitted; (ii) provide feedback; and (iii) identify trends for improvement and develop additional training and technical assistance as determined necessary by DBHDS.

   d) If the Commonwealth has not achieved the goal within two years of the date of this Order after taking the actions in Paragraphs 34(a) and 34(b), DBHDS will conduct a root cause analysis and implement a QII as determined appropriate by DBHDS. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.

35. **Community Residences for Individuals with DD Waivers.** The Commonwealth will work to achieve a goal of 86% of individuals with a DD waiver and known to the REACH system who are admitted to a CTH or a psychiatric hospital have a community residence identified within 30 days of admission. To achieve that goal, the Commonwealth will take the following actions:

   a) DBHDS will enter into contracts with providers to develop homes for individuals with intense behavioral support needs that will be operational (*i.e.*, that an individual can move into the home) in accordance with the following schedule:

      i.   Region 1: one home operational by August 2024 and one additional home operational by February 2025;

      ii.  Region 2: two homes operational by August 2024 and one additional home operational by February 2025;

      iii. Region 3: one home operational by November 2024 and one additional home operational by February 2025;

      iv.  Region 5: one home operational by November 2024 and two additional homes operational by February 2025.

   b) If the Commonwealth has not achieved the goal after taking the actions in Paragraph 35(a) by June 30, 2025, DBHDS will conduct a root cause analysis and implement a QII as determined appropriate by DBHDS.

7

DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.

36. **Out-Of-Home Crisis Therapeutic Prevention Host-Home Like Services for Children.** To prevent institutionalization of children due to behavioral or mental health crises, the Commonwealth will implement out-of-home crisis therapeutic prevention host-home-like services for children connected to the REACH system who are experiencing a behavioral or mental health crisis and would benefit from this service by:

   a) Within one month of the date of this Order, DBHDS will send out a communication through the list serv for individuals and families on the waiver waiting list, and to the provider list serv communicating that the two CTHs existing in Regions 1 and 4 as of the date of this Order can be utilized for preventive stays by children across the Commonwealth.

   b) DBHDS will continue to track and report quarterly on the number of crisis prevention stays being utilized by children in each of the five regions.

   c) Providing funding in Fiscal Year 2025 to establish three additional CTH's in the regions where they do not exist as of the date of this Order (Regions 2, 3, and 5) that will be operational between May 2025 and January 2026.

   d) From the date of this Order and continuing until all three additional CTHs referenced in Paragraph 36(c) are operational, DBHDS will support up to a total of 1,000 days per year of respite for children connected to REACH, who have previously experienced or are at risk of experiencing a crisis, reside in regions without an operational CTH, and who do not otherwise have funding to access respite services at a rate of up to $500 per 24-hour period.

   e) If the Commonwealth has not achieved the goal after taking the actions in Paragraphs 36(a) through 36(d) by June 30, 2026, DBHDS will conduct a root cause analysis and implement a QII as determined appropriate by DBHDS. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.

37. **Day Services for DD Waiver Recipients.** The Commonwealth will work to achieve a goal of a 2% annual increase in the percentage of individuals on the DD waiver receiving day services in the most integrated settings. To achieve that goal, the Commonwealth will take the following action:

   a) Within one month of the date of this Order, DBHDS's Community Life Engagement Advisory Committee will implement a work plan that includes measurable goals, specific support activities, and timelines for implementation and that is focused on: defining meaningful community involvement; developing training and educational materials to enhance meaningful community involvement for individuals and families, providers, and case managers; and assessing community involvement data.

   b) If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2024, and has not conducted a rate study meeting

8

the requirements of Paragraph 59 in the preceding two years, the Commonwealth will initiate a rate study of Community Engagement, Workplace Assistance, and Community Coaching by January 1, 2025. The rate study shall be completed in time to be considered during the 2026 legislative session. If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2028, and has not conducted a second rate study meeting the requirements of Paragraph 59, the Commonwealth will initiate a second rate study of Community Engagement, Workplace Assistance, and Community Coaching by January 1, 2029. The rate study shall be completed in time to be considered during the 2030 legislative session. Any rate study required by this paragraph shall be conducted in accordance with Paragraph 59. This paragraph shall not be construed to require the Commonwealth to conduct more than two rate studies.

c) If the Commonwealth has not achieved the goal within two years of the date of this Order after taking the actions in Paragraph 37(a), DBHDS will also conduct a root cause analysis and determine whether a QII is warranted to address identified issues. A root cause analysis and consideration of QII will not be required if the percentage of individuals in the integrated day services reported above is 65% of the total number of the people receiving any day service.

38. **Private Duty Nursing.** The Commonwealth will work to achieve a goal that 70% of individuals on the DD waiver and children with DD receiving EPSDT with private duty nursing identified in their ISP or prescribed under EPSDT receive 80% of the hours identified as needed on the CMS485 or DMAS62 forms. To achieve that goal, the Commonwealth will take the following actions.

a) Semi-annually, on May 15 and November 15 of each year, DBHDS will continue to report data on utilization of nursing services and the work of the DBHDS Nursing Workgroup, except if the Independent Reviewer is monitoring the Commonwealth's compliance under Section VIII, DBHDS will report on April 15 and October 15 of each year.

b) By September 30, 2024, DBHDS will update the ISP to allow for collection of nursing needs data identified by the Risk Awareness Tool.

c) DBHDS will continue to implement an IMNR that will assess if individuals have unmet nursing or other medical needs and will work with families, providers, and case managers to take steps to resolve identified unmet needs. Semi-annually, on April 15 and October 15 of each year, DBHDS will report on the IMNR process, including the types of unmet needs identified and efforts taken to resolve them.

d) Within six months of the date of this Order, in consultation with the five DBHDS Registered Nurse Care Consultants, the Commonwealth will:

   i.   Identify which CSB catchment areas in each Region have the highest nursing shortages for this target population based on objective criteria

and data, including how many individuals with private duty nursing receive 80% of their hours;

ii.   Identify the top three barriers to individuals accessing nursing services in each region based on objective data, including stakeholder data and state and national workforce data and research;

iii.  Develop a work plan to resolve those barriers that includes measurable goals, specific support activities, and timelines for implementation; and

iv.   Include the barriers and efforts to resolve them, as well as the factual basis for those barriers and efforts, and results achieved in the semi-annual nursing report that is posted in the Library.

e) If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2024, or the semi-annual report of the Independent Reviewer, if there is one, and has not conducted a rate study meeting the requirements of Paragraph 59 in the preceding two years, the Commonwealth will initiate a rate study of Private Duty Nursing by January 1, 2025. The rate study shall be completed in time to be considered during the 2026 legislative session. If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2028, and has not conducted a second rate study meeting the requirements of Paragraph 59, the Commonwealth will initiate a second rate study of Private Duty Nursing by January 1, 2029. The rate study shall be completed in time to be considered at the 2030 legislative session. Any rate study required by this paragraph shall be conducted in accordance with Paragraph 59. This paragraph shall not be construed to require the Commonwealth to conduct more than two rate studies.

f) If the Commonwealth has not achieved the goal within two years of the date of this Order after taking the actions in Paragraphs 38(a) through 38(d), DBHDS also will conduct a root cause analysis and determine whether a QII is warranted to address identified issues. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.

39. **Skilled Nursing.** The Commonwealth will work to achieve a goal that 70% of individuals on the DD waiver and children with DD receiving EPSDT with skilled nursing identified in their ISPs or prescribed under EPSDT will have their skilled nursing needs met 80% of the time. To achieve that goal, the Commonwealth will take the following actions:

a) Semi-annually, on May 15 and November 15 of each year, DBHDS will continue to report data on utilization of nursing services and the work of the DBHDS Nursing Workgroup, except if the Independent Reviewer is monitoring the Commonwealth's compliance under Section VIII, DBHDS will report on April 15 and October 15 of each year.

b) As part of the IMNR Process, DBHDS will assess if individuals have unmet nursing or other medical needs and will work with families, providers, and case managers to take steps to resolve identified unmet needs. Semi-annually, on April 15 and October 15 of each year, DBHDS will report on the IMNR process, including the types of unmet needs identified, efforts taken to resolve them, and results achieved.

c) *Skilled Nursing Review.* Beginning within three months of the date of this Order, for individuals with a skilled nursing need identified in the Waiver Management System, DBHDS will begin to conduct on-site IMNR reviews as set forth in this paragraph. DBHDS will conduct the on-site IMNR reviews of a randomized sample of 10% of individuals annually (split between two six-month reviews) to determine if individuals' skilled nursing services needs are being met. In selecting individuals during each six-month review period to review, DBHDS shall include in the sample only individuals who were authorized to receive the service at least three months earlier, to ensure sufficient time for the sampled individuals to have received the service.

d) If the Commonwealth has not achieved the goal as reported in its December 1, 2024 status update, or the semi-annual report of the Independent Reviewer, if there is one, and has not conducted a rate study meeting the requirements of Paragraph 59 in the preceding two years, the Commonwealth will initiate a rate study of Skilled Nursing by January 1, 2025. The rate study shall be completed in time to be considered during the 2026 legislative session. If the Commonwealth has not achieved the goal as reported in its December 1, 2028 status update, and has not conducted a second rate study meeting the requirements of Paragraph 59, the Commonwealth will initiate a second rate study of Skilled Nursing by January 1, 2029. The rate study shall be completed in time to be considered at the 2030 legislative session. Any rate study required by this paragraph shall be conducted in accordance with Paragraph 59. This paragraph shall not be construed to require the Commonwealth to conduct more than two rate studies.

e) If the Commonwealth does not achieve the goal within two years of the date of this Order after taking the actions in Paragraphs 39(a) through 39(c), DBHDS will also conduct a root cause analysis and implement a QII as determined appropriate by DBHDS. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.

40. **Dental Exams.** The Commonwealth will work to achieve a goal that 86% of individuals who are supported in residential settings and have coverage for dental services will receive an annual dental exam. To achieve that goal, the Commonwealth will take the following actions:

a) DBHDS will operate a total of three mobile dental vehicles by March 31, 2025.

11

b) DBHDS will continue to employ or contract with a total of three dental assistants and four dental hygienists to staff the mobile dental vehicles.

c) DBHDS will continue to review referrals for dental services and work to connect people to community dental providers when available.

d) Within six months of the date of this Order, DBHDS will contract with at least one dentist or dentistry practice in each Region who can support sedation dentistry.

e) DBHDS will collaborate with dental providers to understand barriers to delivering services to individuals with developmental disabilities and, within six months of the date of this Order, will develop a plan with measurable goals, specific support activities, and timelines for implementation to mitigate those barriers.

f) Within six months of the date of this Order, the Commonwealth shall start an initiative that determines which 8 CSBs need the most assistance to ensure that individuals receive annual dental exams and, no later than three months after starting this initiative, begin to provide technical assistance to support relevant CSBs. This process will continue to be implemented annually until the Commonwealth achieves the goal.

g) If the Commonwealth has not achieved the goal within two years of the date of this Order after taking the actions in Paragraphs 40(a) through 40(f), DBHDS will conduct a root cause analysis and implement a QII. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.

41. **Protection From Serious Injuries in Service Settings.** The Commonwealth will work to achieve a goal that 95% of DD waiver service recipients will be protected from serious injuries in service settings. To achieve that goal, the Commonwealth will take the following actions:

a) DBHDS will continue working to ensure that all appropriate serious injuries are included when determining if this goal is met.

b) Within six months of the date of this Order, and annually thereafter, the DBHDS Office of Integrated Health will complete a quality review of a statistically significant sample of serious injuries reported to DBHDS via the CHRIS system (or successor) to determine if the Incident Management Unit process used by the DBHDS Office of Licensing adequately identifies all appropriate injuries to determine if individuals were protected from harm and if changes are needed to the way incidents are reviewed and referred.

c) Relevant processes will be revised, as warranted, based on the finding of the quality review referenced in Paragraph 41(b) to ensure that the Commonwealth accurately identifies the percentage of DD waiver recipients who are protected from serious injuries in service settings.

d) If the Commonwealth has not achieved the goal within two years of the date of this Order after taking the action in Paragraphs 41(a) through 41(c), DBHDS will conduct a root cause analysis and implement a QII. DBHDS will continue this quality improvement process until the metric is achieved and sustained for one year.

42. **Risk Management.** To ensure that the risk management programs of DBHDS-licensed providers of DD services identify the incidence of common risks and conditions faced by people with DD that contribute to avoidable deaths and take prompt action when such events occur or the risk is otherwise identified, the Commonwealth will take the following actions:

a) Within 24 months of the date of this Order, the Commonwealth shall establish inter-rater reliability among the Commonwealth's licensing specialists regarding provider compliance with the quality assurance trending requirements.

b) Within 12 months of the date of this Order, the Commonwealth shall offer technical assistance in accordance with DBHDS's Consultation and Technical Assistance Standard Operating Procedure to each provider that does not identify the incidence of common risks and conditions faced by people with DD that contribute to avoidable deaths.

c) Within one month of the date of this Order, when providers do not take prompt action when such events occur, or where the risk is otherwise identified despite lack of prompt action by providers, DBHDS will ensure that corrective action plans are written, implemented, and tracked, and take further actions as warranted.

43. **Timely Waiver Service Enrollment.** The Commonwealth will work to achieve a goal that 86% of individuals who are assigned a waiver slot will be enrolled in a service within five months. To achieve that goal, the Commonwealth will take the following actions:

a) Within three months of the date of this Order, DBHDS will track on a quarterly basis the number of individuals who are assigned a waiver slot but not enrolled in a service within five months.

b) Within three months of the date of this Order, the Commonwealth will contact individuals at the end of each quarter who have not been enrolled in a service within five months and their families and case managers to determine why services have not been initiated and what barriers delayed initiation of services. DBHDS will report on the barriers identified quarterly as well as actions being taken to remediate those barriers and results achieved.

c) Within one year of the date of this Order, the Commonwealth will conduct a root cause analysis of why services have not been initiated and what barriers delayed initiation of services. Based on the findings of the root cause analysis, the Commonwealth will prioritize the findings for quality improvement in consultation with the provider and system issues

13

resolution workgroups. The Commonwealth will implement a QII based on its prioritization consistent with continuous quality improvement principles and developed in collaboration with the provider and system issues resolution workgroups. The Independent Reviewer, in the reports required under paragraph 76, shall discuss the reasonableness of Virginia's response to this requirement. Individuals for whom initiation of services is delayed past five months at the request of the individual or the individual's authorized representative will not be included in determining if the Commonwealth meets the goal. The Commonwealth will revisit the root cause analysis annually and implement a QII as determined appropriate by DBHDS. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.

44. **Ongoing Service Analyses.** The Commonwealth, through DBHDS, will collect and analyze data at least annually regarding the management needs of individuals with identified complex behavioral, health, and adaptive support needs to monitor the adequacy of management and supports provided. DBHDS will develop corrective actions based on its analysis as it determines appropriate, track the efficacy of the actions, and revise as it determines necessary to address the deficiency. To implement the preceding steps, the Commonwealth will take the following actions:

   a) DBHDS will use data from the Skilled Nursing Review detailed in Paragraph 39(c), the IMNR process for individuals with complex medical needs, data from the care concerns process, data from the BSPARI quality reviews, and data from the Quality Service Reviews to monitor the adequacy of management and supports provided. Within six months of the date of this Order, DBHDS will develop a report consolidating the information from these sources to provide a comprehensive summary of the management and support provided to individuals with complex needs. This summary will be completed annually.

   b) DBHDS will continue to implement the IMNR process for no less than 70 people annually who have complex medical, behavioral, or adaptive support needs (Tier 4) to include onsite visits, reviews of specific health care documentation, and a factual questionnaire administered by qualified nursing professionals to primary caregivers most familiar with the person's health care needs.

45. **DD Service Providers' Compliance with Administrative Code.** The Commonwealth will work to achieve a goal that at least 86% of DBHDS-licensed providers of DD services comply with 12 VAC 35-105-620 in effect on the date of this Order or as may be amended. To achieve that goal, the Commonwealth will take the following actions:

   a) Within six months of the date of this Order, DBHDS will require that any provider not in compliance with 12 VAC 35-105-620.C.4 and D.3 (regarding corrective action plans) develop and implement a corrective action plan that includes the receipt of technical assistance, additional

training, and specific actions related to the respective areas of underperformance as determined appropriate by DBHDS.

b) Within six months from the date of this Order, for providers who are not compliant with 12 VAC 35-105-620.C.4 and D.3 (regarding corrective action plans) for two consecutive licensing inspections, DBHDS shall take appropriate further action to enforce adherence to the Commonwealth's regulations, which may include, but not be limited to, issuing citations, issuing systemic citations, issuing a health and safety corrective action plan, reducing a provider's license to provisional status, or revoking the provider's license as determined appropriate by DBHDS.

c) Within 24 months of the date of this Order, DBHDS will ensure that all DBHDS staff and contractors assigned to assess the adequacy of provider quality improvement programs have established inter-rater reliability in conducting such assessments.

46. **Quality Service Monitoring.** The Commonwealth will work to ensure that, using information collected from licensing reviews and Quality Service Reviews, it identifies providers that have been unable to demonstrate adequate quality improvement programs and offers technical assistance as necessary. To achieve that goal, the Commonwealth will take the following actions:

a) Within six months of the date of this Order, DBHDS will require that any provider not in compliance with quality improvement program regulations develop and implement a corrective action plan. DBHDS will continue to employ a total of 12 Quality Improvement Specialists. DBHDS Quality Improvement Specialists will continue to offer providers technical assistance, additional training, and specific actions related to the respective areas of underperformance.

b) Within six months from the date of this Order, for providers who are not compliant with quality improvement program regulations for two consecutive licensing inspections, DBHDS shall take appropriate further action to enforce adherence to the Commonwealth's regulations, which may include, but not be limited to, issuing citations, issuing systemic citations, issuing a health and safety corrective action plan, reducing a provider's license to provisional status, or revoking the provider's license as determined appropriate by DBHDS.

c) Within 24 months of the date of this Order, DBHDS will ensure that all DBHDS staff and contractors assigned to assess the adequacy of provider quality improvement programs have established inter-rater reliability in conducting such assessments.

47. **Training Requirement Compliance.** The Commonwealth will work to achieve a goal that 86% of DBHDS-licensed providers receiving an annual inspection will have a training policy that meets established DBHDS requirements. DBHDS will take action it determines appropriate if providers fail to comply with training requirements

required by regulation. To achieve that goal, the Commonwealth will take the following actions:

   a) Within six months of the date of this Order, DBHDS will require that any provider not in compliance with training requirements develop and implement a corrective action plan.

   b) Within three months of the date of this Order, DBHDS Quality Improvement Specialists will offer providers technical assistance, additional training, and specific actions related to the respective areas of underperformance.

   c) Within six months from the date of this Order, for providers who are not compliant with training requirements for two consecutive licensing inspections, DBHDS shall take appropriate further action to enforce adherence to the Commonwealth's regulations, which may include, but not be limited to, issuing citations, issuing systemic citations, issuing a health and safety corrective action plan, reducing a provider's license to provisional status, or revoking the provider's license as determined appropriate by DBHDS.

   d) Within 24 months of the date of this Order, DBHDS will ensure that all DBHDS staff and contractors assigned to assess training requirements have established inter-rater reliability in conducting such assessments.

48. **Training and Competency of Direct Support Professionals.** The Commonwealth will work to achieve a goal of at least 95% of Direct Support Professionals and their supervisors receive training and competency testing in accordance with 12 VAC 30-122-180 as in effect on the date of this Order or as may be amended. To achieve that goal, the Commonwealth will take the following actions:

   a) Within six months of the date of this Order, the Commonwealth shall determine, through a root cause analysis developed in collaboration with the provider and system issues resolution workgroups, why Direct Support Professionals and their supervisors do not receive training and competency testing per 12 VAC 30-122-180.

   b) Based on the findings of the root cause analysis required by Paragraph 48(a), DBHDS will prioritize the findings for quality improvement, taking into account the anticipated impact to the system, including potential negative impacts to current staffing. DBHDS will implement a QII based on its prioritization consistent with continuous quality improvement principles and developed in collaboration with the provider and system issues resolution workgroups.

   c) If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2024, and has not conducted a rate study meeting the requirements of Paragraph 59 in the preceding two years, the Commonwealth will initiate a rate study of Personal Assistance Services, Companion Services, Respite Services, In-Home Support Services, and Independent Living Support Services by January 1, 2025. The rate study

shall be completed in time to be considered during the 2026 legislative session. If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2028, and has not conducted a second rate study meeting the requirements of Paragraph 59, the Commonwealth will initiate a second rate study of Personal Assistance Services, Companion Services, Respite Services, In-Home Support Services, and Independent Living Support Services by January 1, 2029. The rate study shall be completed in time to be considered during the 2030 legislative session. Any rate study required by this paragraph shall be conducted in accordance with Paragraph 59. This paragraph shall not be construed to require the Commonwealth to conduct more than two rate studies.

d) If the Commonwealth does not achieve the goal within two years of the date of this Order after taking the actions in Paragraphs 48(a) and 48(b), DBHDS will also conduct a root cause analysis and implement a QII as determined appropriate by DBHDS. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.

49. **Residential Services Community Integration.** The Commonwealth will work to achieve a goal that 95% of residential service recipients reside in a location that is integrated in, and supports full access to, the greater community in compliance with the CMS rule on HCBS settings. To achieve that goal, the Commonwealth will take the following action:

a) In accordance with its CMS-approved Statewide Transition Plan, by December 31, 2025, the Commonwealth will complete its review of the remaining 3,296 locations for compliance with the CMS settings rule to determine if it is in compliance with the 95% goal.

50. **Supported Employment.** The Commonwealth will work to achieve a goal of being within 10% of the waiver employment targets set by the Employment First Advisory Group. DBHDS will continue to work with the Employment First Advisory Group, the Quality Improvement Committee (QIC), and the QIC subcommittees to develop and recommend QIIs to enhance employment of adults aged 18-64 on the DD waiver. If the goal is not met within two years of the date of this Order, DBHDS will conduct a root cause analysis and implement a QII. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.

51. **Supported Employment.** The Commonwealth will work to achieve a goal of meeting its established employment target of 25% for adults aged 18 to 64 on DD waivers and the waitlist. DBHDS will continue to work with the Employment First Advisory Group, the QIC, and the QIC subcommittees to develop and recommend QIIs to enhance employment of adults aged 18 to 64 on the DD waiver and the waitlist. If the goal is not met within two years of the date of this Order, DBHDS will conduct a root cause analysis and implement a QII. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.

52. **Look-Behind Analysis of Abuse, Neglect, and Exploitation Allegations.** The Commonwealth will continue its Community Look-Behind (CLB) review process to achieve a goal of collecting sufficient data for the Risk Management Review

17

Committee (RMRC) to conduct or oversee a look-behind review of a statistically valid, random sample of reported allegations of abuse, neglect, and exploitation. The review will evaluate whether: (i) investigations of individual incidents occur within state-prescribed timelines; (ii) the person conducting the investigation has been trained to conduct investigations; and (iii) corrective action plans are implemented by the provider when indicated. The RMRC will review trends at least quarterly, recommend QIIs when necessary, and track implementation of initiatives approved for implementation.

53. **Samples of Data from Look-Behind Analyses of Serious Incidents and Allegations of Abuse, Neglect, and Exploitation.** The Commonwealth will work to achieve a goal of showing 86% of the sample of serious incidents reviewed by the RMRC meet criteria reviewed in the audit and that at least 86% of the sample of allegations of abuse, neglect, and exploitation reviewed by the RMRC meet criteria reviewed in the audit. The Commonwealth will continue the look behind process and provide feedback to the RMRC related to its findings. If this goal is not met by December 31, 2024, DBHDS will conduct a root cause analysis and implement a QII. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.

54. **Annual Physical Exams.** The Commonwealth will work to achieve a goal that 86% of individuals supported in residential settings receive annual physical exams. To achieve that goal, the Commonwealth will take the following action:

    a) Within six months of the date of this Order, any time there is not an increasing trend in the percentage of individuals receiving an annual physical exam in consecutive annual reporting periods, DBHDS will conduct a root cause analysis and determine whether a QII is warranted to address identified issues. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.

55. **Assessment of Licensed Providers of DD Services.** The Commonwealth will work to achieve a goal that at least 86% of DBHDS-licensed providers of DD services have been assessed for their compliance with risk management requirements in the Licensing Regulations during their annual inspections. DBHDS will continue to conduct annual licensing inspections in accordance with Virginia Code § 37.2-411 in effect on the date of this Order or as may be amended and assess provider compliance with risk management requirements in the Licensing Regulations utilizing the Office of Licensing Annual Compliance Determination Chart.

56. **Data-Driven Quality Improvement Plans for HCBS Waiver Programs.** The Commonwealth will continue to implement the Quality Improvement Plan approved by CMS in the operation of its HCBS Waivers. The DMAS-DBHDS Quality Review Team (QRT) will meet quarterly in accordance with the CMS-approved Quality Improvement Plan and will review data, determine trends, and implement quality improvement strategies where appropriate as determined by the QRT to improve performance.

57. **Data-Driven Quality Improvement Plans for HCBS Waiver Programs.** The Commonwealth will continue to collect quarterly data on the following measures: (i)

health and safety and participant safeguards; (ii) assessment of level of care; (iii) development and monitoring of individual service plans, including choice of services and of providers; (iv) assurance of qualified providers; e) whether waiver enrolled individuals' identified needs are met as determined by DMAS QMR; and (v) identification, response to incidents, and verification of required corrective action in response to substantiated cases of abuse/neglect/exploitation. This data will be reviewed by the DMAS-DBHDS Quality Review Team. Remediation plans will be written and remediation actions implemented, as necessary, for those measures that fall below the CMS-established 86% standard. DBHDS will provide a written justification for each instance where it does not develop a remediation plan for a measure falling below 86% compliance. Quality Improvement remediation plans will focus on systemic factors (where present) and will include the specific strategy to be employed, as well as defined measures that will be used to monitor performance. Remediation plans will be monitored at least every six months. If such remediation actions do not have the intended effect, a revised strategy will be implemented and monitored.

58. **Case Management Steering Committee (CMSC) Measures.** The Case Management Steering Committee will continue to establish two indicators in each of the areas of health and safety and community integration associated with selected domains (safety and freedom from harm; physical, mental, and behavioral health and well-being; avoiding crises; community inclusion; choice and self-determination; stability; provider capacity; access to services) and based on its review of the data submitted from case management monitoring processes. The Commonwealth will work to achieve a goal of 86% compliance with the four indicators established by the CMSC. DBHDS will monitor data collected in these domains and determine if any intervention is needed.

59. **Rate Studies**

    a) For any rate study required to be conducted under paragraphs 33, 37, 38, 39, or 48, the following shall apply:

        i. The Commonwealth may either engage Guidehouse as a vendor to conduct the rate study or solicit for a vendor to conduct the rate study. If the Commonwealth engages Guidehouse, the United States may provide input on how the Commonwealth directs Guidehouse to perform the rate study, participate in Guidehouse's meetings with stakeholders and have an opportunity to review and comment on Guidehouse's draft report. If the Commonwealth solicits a different vendor to conduct the rate study, the United States may propose qualifications to be included in the Commonwealth's solicitation for a vendor to conduct the rate study, and the Commonwealth will not unreasonably withhold its consent to the inclusion of the United States' proposed qualifications in the solicitation. At a minimum, the selected vendor must have demonstrated experience analyzing rates and recommending rate changes that have successfully increased provider capacity. After a vendor is engaged, the United States may provide input on how the Commonwealth directs the vendor to

19

perform the rate study, participate in the vendor's meetings with stakeholders and have an opportunity to review and comment on the vendor's draft report. At a minimum, the rate study shall be in accordance with best practices and designed to target rates necessary to ensure sufficient capacity to reach the goals of paragraphs 33, 37, 38, 39, and 48.

ii.   The vendor shall submit a draft of the rate study to the parties for comment at least 30 days before finalizing the study and shall address any comments in the final version of the study.

iii.  The study shall be placed in the Library and filed (by either party) with the Court.

iv.   The Commonwealth shall make its best efforts in the two legislative sessions  immediately following publication of the results of the rate study to obtain from the General Assembly funding necessary to increase rates to those recommended by the study, accounting for any increases in inflation in the rate's implementation.

v.    Upon request of the United States, the Court shall hold a status conference one month after the Governor's proposed budget is submitted to the General Assembly if the rate increases identified in the Study are not in the proposed budget.

vi.   Upon request of the United States, the Court shall hold a public hearing within 30 days after the Governor and General Assembly have taken all steps necessary to finalize the budget.  The hearing shall address whether the rate increases identified in the Study are included in the budget, and, if not, whether the Court should order any steps.

## V.    QUALITY MANAGEMENT

60. DBHDS shall maintain a quality management system that includes the following components:

a)  Identification of areas of needed improvement;

b)  Development of improvement strategies and associated measures of success;

c)  Monitoring identified outcomes on at least an annual basis using identified measures;

d)  Revision of improvement strategies, as needed, where measures have not been achieved;

e)  Identification of areas of success to be expanded or replicated; and

f)  Documentation of information reviewed and corresponding decisions about whether an improvement strategy is needed.

61. The quality management system will be comprised of the following functions:

    a) Quality Assurance,

    b) Quality Improvement, and

    c) Risk Management.

62. The DBHDS Offices of Licensing and Human Rights shall continue to perform quality assurance functions of DBHDS by evaluating provider compliance with regulatory requirements and taking action as warranted to address identified violations. DBHDS shall utilize incident management protocols that include criteria for triaging specified events and a process for follow-up and coordination with licensing specialists and investigators and human rights advocates.

63. DBHDS shall maintain a quality improvement system. The quality improvement structure shall include a Quality Improvement Committee (QIC) and the following subcommittees (or successors that perform these basic functions), which shall report to the QIC: Mortality Review Committee; Risk Management Review Committee; Case Management Steering Committee; Regional Quality Councils; and Key Performance Area Workgroups that address health and wellness, community inclusion and integration, and provider capacity and competency.

64. DBHDS shall maintain a risk management system that implements processes for follow-up of specified incidents; reviews and evaluates data for identification of patterns and trends; and implements processes that enable DBHDS to identify and, where possible, prevent or mitigate future risks of harm.

65. The Commonwealth shall maintain a data program for its developmental disabilities services system that collects and analyzes data to improve the availability, accessibility, and quality of services for individuals with developmental disabilities. This data program shall include: identification and analysis of trends, application of continuous quality improvement principles to address identified issues, and utilization of formal or informal QIIs to effect desired system change. This data program shall also include evaluation of the data reliability.

## VI.    PUBLICLY ACCESSIBLE DOCUMENT LIBRARY

66. The Commonwealth will maintain a Library available to the public for reporting on its developmental disability system.

67. The Library shall continue to contain information, including statutes and regulations, policies and protocols, tools and checklists, manuals, charters, guidance, reference materials, data, reports, and other information to show how the developmental disability system is functioning, including information related to the Individual and Family Support Program, case management, integrated services, crisis/behavioral services, quality improvement, and risk management. Additionally, the Library will

contain the following information related to this Order, to be updated on a regular basis:

    a) Quarterly data on the percentage of children and adults who received crisis assessments at home, the residential setting, or other community setting (non-hospital/non-CSB emergency services office) within one hour for urban areas and two hours for rural areas. DBHDS will trend this data semi-annually to show the percentage of assessments in the community by region and statewide.

    b) Semi-annual Employment Data Report, including targets for waiver-funded supports for individual and group supported employment set by the Employment First Advisory Group and the annual results, and the number of individuals with DD ages 18-64 on the waiver or the waiver waitlist and the percentage of individuals in supported employment.

    c) Data on the types of day services being provided to individuals that are similar to those services listed in the Integrated Employment and Day Services Report.

    d) Summary of findings for any root cause analysis performed under the terms of this Order and mitigating strategies DBHDS implements to address findings.

    e) Semi-annually, DBHDS will produce service authorization data that includes the number of individuals authorized for each HCBS waiver service with separate columns for individuals with an identified complex medical or complex behavioral need as identified through an assessment tool that identifies the practical supports required by individuals to live successfully in their communities (*e.g.*, SIS Level 6 or 7 or similar).

    f) Annually, the Commonwealth will report the number of individuals under 22 years of age screened: (i) with VIDES for ICF/IID admission, (ii) with PASRR for nursing home admission (excluding med rehab, respite, and hospice), and (iii) level of care or resident reviews for individuals already in these settings.

    g) Data on the type of residential settings that individuals are living in similar to the Integrated Residential Settings Data Report.

    h) Semi-annual nursing report that includes data on the number and percentage of children and adults who received skilled and private duty nursing services and annual utilization rates for each service tracked separately for waiver funded and EPSDT.

    i) QRT Annual Report.

    j) Trend graphs updated no less than semi-annually reporting the following data:

    i.   Percentage of children and adults who receive crisis assessments at home, the residential setting, or other community setting (non-hospital/non-CSB office) (IV.32).

    ii.   Percentage of individuals who are admitted to a Crisis Therapeutic Home (CTH) or a psychiatric hospital who have a community residence identified within 30 days of admission (IV.35).

    iii.   Percentage to waiver employment target (IV.50).

    iv.   Percentage to overall DD employment target (IV.51).

    v.   Percentage of individuals on the DD waiver receiving day services in the most integrated settings (IV.37).

    vi.   Private duty nursing utilization (IV.38).

    vii.   Skilled nursing utilization (IV.39).

    viii.   Percentage of individuals who are supported in residential settings and have coverage for dental services who receive an annual dental exam (IV.40).

    ix.   Percentage of individuals supported in residential settings who receive an annual physical exam (IV.54).

    x.   Percentage of individuals identified as in need of Therapeutic Consultation service who are referred for the service and have a provider identified within 30 days (IV.33).

    xi.   Percentage of individuals with identified behavioral support needs who are provided adequate and appropriately delivered behavioral support services (IV.34).

    xii.   Percentage of individuals who are enrolled in a service within five months of being assigned a waiver slot (IV.43).

   k)  Each graph required in Paragraph 67(j) will trend data over no less than four years and no more than seven years and will be maintained until the Commonwealth is in sustained compliance with the underlying term for two years.

## VII. DISPUTE RESOLUTION

68. If the United States believes the Commonwealth has not complied with any term or terms of the Injunction, the United States will communicate its belief with specificity to the Commonwealth in a written notice.

69. The Commonwealth will have 45 days from the date of receipt of the written notice to respond in writing, including by (i) identifying specific actions steps to address and resolve the concern and/or (ii) identifying a specific plan to address the concern over an appropriate period of time.

70. If, after one month from the date of receipt of the Commonwealth's response, the parties fail to reach agreement on a plan for curative action, the United States may make an appropriate filing with the Court.

71. In an emergency related to the health and safety of an individual with IDD, Paragraphs 68-70 shall not apply and the United States may immediately make an appropriate filing with the Court.

## VIII.  COMPLIANCE MONITORING

72. The Commonwealth will ensure that it keeps the publicly accessible Library up to date, consistent with Section VI.

73. The Commonwealth will cooperate with reasonable demands for information by the United States and the Independent Reviewer relevant to the Commonwealth's compliance with the Permanent Injunction.

74. Donald J. Fletcher shall continue as the Independent Reviewer for this Order for two years from the date of this order, subject to extension at the agreement of the Parties or by further Order of the Court. In the event that the Independent Reviewer resigns or the Parties agree to replace the Independent Reviewer, the Parties will select a replacement. If the Parties are unable to agree on a replacement within 30 days from the date the Parties receive a notice of resignation from the Independent Reviewer, or from the date the Parties agree to replace the Independent Reviewer, the Parties shall each submit the names of up to three candidates to the Court, and the Court shall select the replacement from the names submitted.

   a) The Independent Reviewer is not an agent of the Court, nor does the Independent Reviewer have any authority to act on behalf of the Court. The Independent Reviewer may hire staff and consultants, in consultation with and subject to reasonable objections by the Parties, to assist in the Independent Reviewer's role. The Independent Reviewer and any hired staff or consultants are neither agents nor business associates of the Commonwealth or the United States.

   b) The Independent Reviewer, and any hired staff or consultants, may:

      i.   Have ex parte communications with the Parties at any time.

      ii.  Request and conduct meetings with the Parties, or the Parties and the Court.

      iii. Speak with stakeholders with such stakeholders' consent, on a confidential basis or otherwise, at the Independent Reviewer's discretion.

      iv.  Testify in this case regarding any matter relating to the implementation or terms of this Order, including the Independent Reviewer's observations and findings.

24

v.    Offer to provide and, if accepted, provide technical assistance to the Commonwealth in complying with this Order.

c)    The Independent Reviewer and any hired staff or consultants shall not be liable for any claim, lawsuit, or demand arising out of their duties under this Order. This paragraph does not apply to any proceedings before this Court for enforcement of payment of contracts or subcontracts for work performed in connection with this Order.

d)    The Independent Reviewer and any hired staff or consultants shall not be subject to formal discovery, including but not limited to, depositions, requests for documents, requests for admission, interrogatories, or other disclosures. The Parties are not entitled to access the Independent Reviewer's records or communications, or those of his staff and consultants, although the Independent Reviewer may provide copies or records or communications at the Independent Reviewer's discretion.

e)    Budget

i.    The Independent Reviewer shall submit annually a proposed budget for the following state fiscal year to the Court for its approval by April 1 in accordance with the process set forth below. The Independent Reviewer shall provide the Parties a draft of the proposed budget at least 30 days in advance of submission to the Court. The Parties shall raise with the Independent Reviewer any objections they may have to the draft of the proposed budget within 10 business days of its receipt. If the objection is not resolved before the Independent Reviewer's submission of a proposed budget to the Court, a Party may file the objection with the Court within 10 business days of the submission of the proposed budget to the Court. The Court shall consider such objections and make any adjustments it deems appropriate prior to approving the budget.

ii.    At any time, the Independent Reviewer may submit to the Parties for approval a proposed revision to the budget, along with any explanation of the reason for the proposed revision. Should the Parties and Independent Reviewer not be able to agree on the proposed revision, the Court will be notified as set forth in Paragraph 74(e)(i) above.

iii.    The approved budget of the Independent Reviewer shall not exceed $300,000 in any State Fiscal Year during the pendency of this Agreement, inclusive of any costs and expenses of hired staff and consultants, without the approval of the Commonwealth or the Court pursuant to Paragraphs 74(e)(i) or 74(e)(ii) above.

f)    Reimbursement and Payment Provisions

i.    The cost of the Independent Reviewer, including the cost of any consultants and staff to the Reviewer, shall be borne by the Commonwealth in this action up to the amount of the approved budget for each State Fiscal Year. All reasonable expenses incurred by the

25

Independent Reviewer in the course of the performance of his/her duties as set forth in this Agreement shall be reimbursed by the Commonwealth. In no event will the Commonwealth reimburse the Independent Reviewer for any expense that exceeds the approved fiscal year budget or the amount approved under Paragraphs 74(e)(i) or 74(e)(ii) above. The Court retains the authority to resolve any dispute that may arise regarding the reasonableness of fees and costs charged by the Reviewer. The United States shall bear its own expenses in this matter. If a dispute arises regarding reasonableness of fees or costs, the Independent Reviewer shall provide an accounting justifying the fees or costs.

ii. The Independent Reviewer shall submit monthly statements to DBHDS, with copies to the United States and the Court, detailing all expenses the Independent Reviewer incurred during the prior month. DBHDS shall issue payment in accordance with the monthly statement as long as such payment is within the approved State Fiscal Year budget. Such payment shall be made by DBHDS within 10 business days of receipt of the monthly statement. Monthly statements shall be provided to: Assistant Commissioner for Developmental Services, DBHDS, P.O. Box 1797, Richmond, Virginia 23218-1797.

iii. In the event that, upon a request by the United States or the Independent Reviewer, the Court determines that the Commonwealth is unreasonably withholding or delaying payment, or if the Parties agree to use the following payment procedure, the following payment procedure will be used:

1. The Commonwealth shall deposit $100,000.00 into the Registry of the Court as interim payment of costs incurred by the Independent Reviewer. This deposit and all other deposits pursuant to this Order shall be held in the Court Registry Investment System and shall be subject to the standard registry fee imposed on depositors.

2. The Court shall order the clerk to make payments to the Independent Reviewer. The clerk shall make those payments within 10 days of the entry of the Order directing payment. Within 45 days of the entry of each Order directing payment, the Commonwealth shall replenish the fund with the full amount paid by the clerk in order to restore the fund's total to $100,000.00.

g) The Independent Reviewer, including any hired staff or consultants, shall not enter into any contract with the Commonwealth while serving as the Independent Reviewer. If and when the Independent Reviewer ceases to be the Independent Reviewer, he shall not enter into any contract with the Commonwealth on a matter related to this Order without the written consent of the United States.

75. Semi-annually, on June 1 and December 1, the Commonwealth will provide to the United States and the Independent Reviewer status updates concerning its progress

with all the terms of Section IV of the Permanent Injunction. For each goal specified in Section IV, the status update shall include the following:

    a) A quantitative review of data collected that includes:

        i. Review of the processes used to collect and validate data;

        ii. Verification of data collected, including data collected from quality improvement initiatives implemented during the six-month review period preceding the status update;

    b) A qualitative review of data and processes used to verify inter-rater reliability related to licensing determinations, intense management needs review, and quality service reviews that includes

        i. A description of the findings of the Commonwealth's review of 30-50 randomly selected records to validate its determinations, including review of the tool used and documents reviewed; and

        ii. Interviews of key stakeholders and staff;

    c) A summary of any formal or informal quality improvement initiatives implemented and any measurable results of such initiatives;

    d) A determination of whether the goal has been met or not met with an explanation of the basis for such determination;

    e) For goals that have not been met within the preceding year, a list of:

        i. Other steps taken, as specified in Section IV or otherwise, to meet the specific goals and results of those steps; and/or

        ii. Other plans intended to be taken to meet the specified goals; and

    f) Any other pertinent information the Commonwealth believes it should bring to the United States' attention concerning compliance with the terms in Section IV of the Permanent Injunction.

76. The Independent Reviewer shall determine whether the Commonwealth is in compliance with Section IV of this Order on a six-month cycle with review periods starting in April and October.

    a) In order to determine compliance with Section IV of this Order, the Independent Reviewer and any hired staff or consultants shall have full access to persons, employees, residences, facilities, buildings, programs, services, documents, records, including individuals' medical and other records, in unredacted form, and materials that are necessary to assess the Commonwealth's compliance with Section IV of this Order, to the extent they are within the State's custody or control. This shall include, but not be limited to, access to the data and records maintained by the Commonwealth pursuant to Paragraph 67. The provision of any information to the Independent Reviewer pursuant to this Order shall not constitute a waiver of any privilege that would otherwise protect the

27

information from disclosure to third parties. The Independent Reviewer and any hired staff or consultants may also interview individuals receiving DD services with the consent of the individual or his/her authorized representative. Access to CSBs and private providers and entities shall be at the sole discretion of the CSB or private provider or entity; however, the Commonwealth shall encourage CSBs and private providers and other entities to provide such access and shall assist the Independent Reviewer in identifying and contacting them. The Independent Reviewer shall exercise his/her access to Commonwealth employees and individuals receiving services in a manner that is reasonable and not unduly burdensome to the operation of Commonwealth agencies and that has minimal impact on programs or services being provided to individuals. Such access shall continue for two years from the date of this Order or, if the Independent Reviewer's term is extended in accordance with Paragraph 74, through the extended term. The Parties agree that, in cases of an emergency situation that present an immediate threat to life, health, or safety of individuals, the Independent Reviewer will not be required to provide the Commonwealth notice of such visit or inspection. Any individually identifying health information that the Independent Reviewer and any hired staff or consultants receive or maintain shall be kept confidential.

b) The Independent Reviewer shall file with the Court a written report on the Commonwealth's compliance with the terms of Section IV of this Order within 60 days of the close of each review cycle.

c) The Independent Reviewer shall provide the Parties a draft of his report at least 21 days before issuing the report. The Parties shall have 14 days to review and comment on the proposed report before it is finalized. The Parties may agree to allow the Independent Reviewer an additional 20 days to finalize a report after he/she receives comments from the Parties, and such an agreement does not require Court approval. In preparing the report, the Independent Reviewer shall use appendixes or other methods to protect confidential information so that the report itself may be filed with the Court as a public document. Either Party may file a written report with the Court noting its objections to the portions of the Independent Reviewer's report with which it disagrees. The Commonwealth shall publish and maintain these reports on the DBHDS website.

77. Once the Commonwealth fully complies with a provision of the Permanent Injunction for a period of at least one year (where compliance means documented achievement

of a specified goal), that provision shall be deemed satisfied and the Commonwealth shall have no obligation to include the provision in subsequent status updates.

78. The Court shall, upon application of the Commonwealth, remove a satisfied provision from the Permanent Injunction.

## IX.    TERMINATION OF SECTION IV

79. The provisions in Section IV of this Permanent Injunction will terminate seven years from the date of its entry by the Court if the Parties agree, and the Court determines, or if the Court otherwise determines, that the Commonwealth has attained substantial compliance with its terms. Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to attain or maintain substantial compliance.

80. To demonstrate a showing of substantial compliance to the Court, in lieu of an agreement between the Parties, the Commonwealth shall submit a report to the Court six months prior to the seven-year mark documenting the status of its efforts to comply with the terms of Section IV of this Permanent Injunction that remain as of that time.

81. If the Court finds the Commonwealth's report satisfactory, the Court shall dissolve Section IV of the Permanent Injunction at the end of the seventh year.

82. The Commonwealth may request that the Court terminate Section IV of the Permanent Injunction prior to the end of the seventh year, provided that the Commonwealth demonstrates that it has complied fully with Section IV and maintained compliance for at least one year.

## X.    RETENTION OF JURISDICTION

83. This Court retains jurisdiction over this matter for purposes of construction, modification, and enforcement of this Order.

IT IS SO ORDERED.

Let the Clerk send a copy of this Order to all counsel of record.

Date: 15 January 2025

Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

Honorable John A. Gibney, Jr.

United States District Judge

29

WE ASK FOR THIS:

FOR THE UNITED STATES

JESSICA D. ABER
United States Attorney
Eastern District of Virginia

By: */s/ Robert McIntosh*
ROBERT McINTOSH
Virginia Bar Number 66113
Attorney for the United States of America
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Telephone:  (804) 819-7404
Facsimile:  (804) 771-2316
Robert.McIntosh@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

REGAN RUSH
Chief
Special Litigation Section

BENJAMIN O. TAYLOE, JR.
Deputy Chief
Special Litigation Section

By: */s/ Kyle Smiddie*
KYLE SMIDDIE
MATHEW SCHUTZER
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, D.C.  20530
Phone:  (202) 532-3249
Fax:  (202) 514-4883
kyle.smiddie@usdoj.gov
Mathew.schutzer@usdoj.gov

FOR THE COMMONWEALTH OF
VIRGINIA

ALLYSON K. TYSINGER
Senior Assistant Attorney General/Chief
Virginia State Bar No. 41982
VIRGINIA OFFICE OF THE
    ATTORNEY GENERAL
202 North 9th Street
Richmond, Virginia 23219
Phone:  (804) 786-1927
Fax:  (804) 371-8718
ATysinger@oag.state.va.us

*/s/ Whitney D. Russell*
WHITNEY D. RUSSELL
Virginia State Bar No. 98872
MATT JONES (*pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Phone:  (202) 663-6000
Fax:  (202) 663-6363
whitney.russell@wilmerhale.com
matthew.jones@wilmerhale.com

30

RANDY C. SPARKS
Virginia State Bar No. 40723
NEIL S. TALEGAONKAR
Virginia State Bar No. 44589
KAUFMAN & CANOLES, P.C.
1021 East Cary Street, Suite 1400
Richmond, Virginia 23219
Phone:  (804) 771-5700
Fax:  (888) 360-9092
rcsparks@kaufcan.com
nstalegaonkar@kaufcan.com

ALAN E. SCHOENFELD (*pro hac vice*)
DEBO P. ADEGBILE (*pro hac vice*)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Phone:  (202) 230-8800
Fax:  (202) 230-8888
alan.schoenfeld@wilmerhale.com
debo.adegbile@wilmerhale.com