IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


THE UNITED STATES OF AMERICA,

                    plaintiff,

          versus              3:12CV59

COMMONWEALTH OF VIRGINIA, et al

                    defendants,


Before:  HONORABLE JOHN A. GIBNEY, JR.
     Senior United States District Judge


HEARING


January 7, 2026

Richmond, Virginia


GILBERT F. HALASZ
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, VA 23219

APPEARANCES


Benjamin O. Tayloe, Jr., Esq.

Kyle Edward Smiddie, Esq.

U S Department of Justice



Allyson Kurzmann Tysinger, Esq.

Office of the Attorney General


**BREIT BINIAZAN, PC**
**by:  Jeffrey Arnold Breit, Esq.**


**WILMER CUTTLER PICERING HALE & DORR LLP**
**by:  Matthew Todd Jones, Esq.**


**for the defendants**

THE COURT:  Thank all for of you for coming, all of the interested people.  I appreciate the interest the members of the public have in this.

You know, I didn't get a chance to do this publicly before, but there are -- before we go into what issues we are facing now, I think we need to kind of look back ten or 12 years and see where we are when I came into this case.

It was a different world in those days.  To the extent that possibly many people were housed in large what were called training centers.  And while the litigation in this case did not require the termination of those centers, I think that the sense of the Commonwealth was that that was not a good way to treat people, and it was a form of warehousing, and that it was better for people to live with their families and in their community.

An awful lot of money and awful lot of effort went into moving hundreds, if not thousands, of people from these training centers out into the community.

And we have kind of, a lot was accomplished, but we have some loose ends to tie up, and -- there are more than a few, but we have some things that need to be completed in order to get this operating correctly. But a lot of people did a lot of things to essentially

turn the battleship around and send it sailing in a different direction.

I didn't get to acknowledge those people when we were here before, but I would like to thank first of all the attorneys who were involved in this case, who really did a lot of work, and who were treated by me with perhaps less than the amount of respect they deserved from time to time.  But attorneys prosper when they get yelled at.  An interesting view.

Ms Tyson, and Mr. Tayloe have been here from the beginning of this thing.  And Mr. Smiddie and our other friends, Mr. Jones and Mr. Breit, and Ms Curtis he been here pretty much the whole time.  And we have worked through a lot of different issues.  I really want to thank you for the big role they played in this case. But they didn't play the biggest role.  The biggest role was played by people, I think, at the Department. They have had, we have had quite -- we have had good leadership, and I think good efforts during that time. It has not always been as efficient as I might have wanted it to be, and candidly, as they might have wanted it to be.  But there were a lot of people who did many many good things.

First of those, the first person, one of those who needs to be acknowledged, even though he is no longer

involved in the case is James Stewart, who was the Commissioner when all this got started, and who had a vision of a different way of doing things in Virginia. And he kicked it off.  He and I went around to training centers, and we went to residential homes, and we went to supported day care centers because I knew nothing about this.  He took me all around, and he showed me what they were.  What was available.  And what was -- what his vision was for how this whole system worked. It was a vision.  He was a visionary.  And he did that. You know, I don't see him any more, but he deserves some credit on that.  As does our current, for another week or so, Nelson Smith.  Mr. Smith jumped into the cauldron when my patience for getting things done was at it's zenith.  And, you know, I gave him a hard time. And I remember one time I stormed into a meeting and slammed down a copy of the budget on the table and said, you know, essentially, you people aren't doing what you are supposed to do on this, and we are going to have a contempt hearing.  There is, I don't know, whatever it was, a zillion dollar budget.  And I stormed out.  Nothing there.  They were doing their duty.

       But, you know, he kept plugging.  And he has brought us pretty close to the finish line.  I don't

know what is next in Mr. Smith's life, but I hope that he continues to provide services to people who need them.

The same thing is true of Brady Curtis.  Brady was an attorney in this case, and then got hired by his client.

Is Brady going to be employed when then the new governor comes in?

AUDIENCE MEMBER:  Not that I know of, yet.

THE COURT:  Did not hear?

AUDIENCE MEMBER:  Not yet.

THE COURT:  Brady had a lot to do with getting this thing done, and I appreciate that work.

And then Heather Norton.  I can't tell you how much effort Heather put into this.  And, you know, she caught some grief, too.  But she really kept plugging through difficult times and problems that seemed insoluble at the moment.  And she kept doing it.  And she took a job that other people had tried to fill before her.  But she filled the job.  I really thank her for that service.

So, okay.  That ends the largesse.

So what we have at this stage of our proceeding is essentially three, as I look at it, three groups of services that people are looking at.  I get e-mails

from people and letters from people all the time sort of complaining that the group of services that they are interested in are not funded and that there has been a villainous ignorance of their needs.

And the way I brought them up to my mind is three processes, I guess.  First, there are a lot of folks who -- and this is, these groups are based on where they are today.  There are a lot of services that are included in the governor's proposed budget sent to the general assembly.  And that is important.  That is what we are all about.

There are other services that are really not included in the permanent injunction.  I have gotten a lot of letters about how they are filled.  We are still waiting for things like group home residential services, and group day school.  That these things are not readily available to people throughout the Commonwealth.

And, you know, in a perfect world they would be, but right now they are outside of my reach.  But they are not outside the reach of the governor, and more particularly, of the legislators of the Commonwealth who can amend the governor's budget to bring in these services that are seriously needed.

And then finally we have some things that are

included in the permanent injunction but for whatever reason have not been included in the governor's proposed budget.

And there are four important areas that are in the rate study.

I have been disturbed for quite some time about the Commonwealth's unwillingness to fund the services needed in this case. And, you know, it is easy to not fund it, because then you can look like you were a fiscal conservative and preserving everybody's assets. And you can look like you have done things to save money for the Commonwealth in other areas. But it is really money that needs to be spent. And the reason we did a rate study was to determine whether the people who provide these services in this case are funded adequately compared to folks in other areas. And there is four specific areas; nursing, personal assistants, skilled nursing and respite care.

While the rate study recommended substantial increases for the people who provide those services, the Governor's proposed budget does not do that.

Now, I know that our good friends in the General Assembly who came over and appeared before me on a suggestion to address that. And I hope they will.

But, what I would like to know is why isn't that

stuff in the budget?  You know, Prime Minister Churchill said there are two reasons for everything. There is the stated reason, and the real reason.

I would like to know what the real reason is why this stuff isn't in the budget.

I would like to hear from Mr. Breit.

MR. BREIT:  Judge, I have been given the lucky task to start this --

THE COURT:  Lucky to start what?

MR. BREIT:  I have been given the lucky task of starting.

THE COURT:  All right.

I want you to tell me why you think these things aren't in the budget.

MR. BREIT:  Judge, I can say, I have a saying when you talk about aircraft carriers to, -- aircraft carriers we are so proud of all the people that worked on them, it takes 5,000 people to operate an aircraft carrier, but it takes one person to lead.  And at the last hearing we had, that could not have happened without you.

THE COURT:  Well, we owe it all to the president who appointed me.

MR. BREIT:  Judge, I am here in a unique capacity today because I have taken on a new role as of

yesterday that will have an effect on certain things that we are going to be doing over the next couple of months.

THE COURT:  What is that new role?

MR. BREIT:  I effectively yesterday became chief of staff of the Speaker.

THE COURT:  Okay.  Paid position, or is this just Mr. Breit exercising his --

MR. BREIT:  Actually --

THE COURT:  -- incredible skills?

MR. BREIT:  It is a quarterly paid position, working in the Speaker's office as its chief for a minimum of 90 days.  So I found out about this hearing and what was missing.  I have been in communication a number of times with the Governor's office since the budget did come out.  And I am aware of the four items that were left out of the eleven that were unfunded. 125 million dollars in new dollars put in, and there are no funds at this point in time in the Governor's budget for the four.  The understanding that I have at this point in time, Judge -- and of course everything changes next week -- is that 85 percent of the dollars that were needed to do those four items that you listed would exceed about a billion dollars.  And only 15 percent of that money was going to be going to the

affected people that have been involved in the litigation.  So there is --

THE COURT:  Wait a second.  I thought that we said it was 125.

MR. BREIT:  125 new has gone into the seven items. The four items that are unfunded that you listed would be going to a much broader general population where the estimated cost would be a billion dollars, and only 15 percent of that would be going to the people with disabilities --

THE COURT:  Well, you know, I must say that I am sure there are people in the city who want nurses to be paid more, but my concern is what happens to the developmentally disabled people.  I don't understand why -- you are not telling me, I don't think, that it cost a billion dollars to provide these services to developmentally disabled people.

MR. BREIT:  I am definitely not telling you that. We have the Governor's budget.  The Governor created that budget in his own group.  I was hired as counsel for the Commonwealth by the Governor for purposes of this past year.  And now I have a new governor, new obligations, and so I took it upon myself to meet with Luke Torian, chairman of appropriations, and with Louise Lucas, chairman of senate finance, both who are

here at the hearing, as well as counsel for them. And I discussed with them the issues that were facing the budget in the likelihood that Judge Gibney would want to see us.

So, the way we handled it in an order last time was that there is going to be a two-year bi-annual budget. The Commonwealth can use its best efforts to work through the items that we are required to do. I expressed to both of the leaders and the finance committee and the speaker the need to amend the budget so we can address these concerns, because zero is still zero.

THE COURT: All right.

MR. BREIT: So the budget process literally is just beginning. I met this morning with the appropriations staff to tell them what I was doing today and that I wanted the data from them as well so that I could at least begin discussions as to what we needed to do to refine these four areas for the affected group as opposed to the billion dollar estimate they gave us. The Judge is fully aware medicaid has been affected greatly by both governors.

THE COURT: Well, that is okay, we are only going to pay 45 cents a gallon for gas beginning tomorrow. You can get money that way.

MR. BREIT:  If we can do that, I will be the first person to sign up for Venezuelan gas.

But we are in a real cauldron issue here trying to figure out how the budget will look.  The reason that you have given us two years to do best efforts is because the picture in the beginning of '26 is likely to be different than the picture that we are going to see in the beginning of '27.  I think that the budget committee understands that.  I think it is going to address this.  That they know this isn't going away.  I made it clear that four items are unfunded.  The budget is being amended as we speak.

THE COURT:  All right.  Well --

MR. BREIT:  Does that answer to some extent?

THE COURT:  Well, I understand that.  I just don't understand why it's not in there now.  Maybe you are not the person to explain that.

MR. BREIT:  I may not be, other than they gave me an estimate of one billion dollars and only 15 percent.

THE COURT:  I don't understand why it is a billion dollars and only 15 percent goes to the disabled people.

MR. BREIT:  Well, to fix the issue, there is more of a financial effect on our budget, and much broader scope of people who will be receiving those services.

THE COURT:  Okay.  Why don't they just do it for the people that are getting services?

MR. BREIT:  I would hope that would have been addressed.  It was just that.  Zero.  I don't have an answer to that.

You may or may not know that Allyson, who has been here since the beginning, has been -- Allyson's new position yesterday, she will be in charge of health from the the Attorney General's Office starting next week.

THE COURT:  Congratulations.

MR. BREIT:  So she and I will be working together on that, I hope.  She is going to have a bigger role, and the Attorney General, who I spent time with, understands as well.

THE COURT:  Well, I am not going -- okay.  I am trying to figure out what somebody did to try to get it in the budget and why it's not there.

MR. BREIT:  I honestly can't answer that question.

THE COURT:  Is there anybody who can answer that question?

MR. BREIT:  Not in this room I would think.

I spoke to the chief of staff of the Governor and Governor's counsel, and asked them, asked them to go through this with me and explain to me your best

answer, how I will answer the zero budget for those four items.

THE COURT:  And their explanation is that it is a billion dollars, and we can't figure out a way to do it for the people who are in the consent decree.

MR. BREIT:  At this point in time, without input from the new legislative budget.  So they just plopped it on the --

THE COURT:  Well, that is the explanation, but not the real explanation.

MR. BREIT:  I am not --

THE COURT:  I understand.

MR. BREIT:  I get the message.

THE COURT:  Okay.

Does anybody else have anything to stay on behalf of the Commonwealth?

So let me ask you this.  Are you still going to be in the case barring when the new administration comes in, Mr. Jones?

MR. JONES:  I don't know the answer to that.

THE COURT:  Thank you for your help.

Does the Federal Government have anything to say about this?

MR. SMIDDIE:  No, Your Honor.

THE COURT:  Well, you know, the consent decree

says that they have to do their best effort to get it in there within two years.

I was shocked that it wasn't in there this year. But we will see where we go from here.

Anything else anybody wants to say?  Anything else from the government?

Federal Government?

MR. SMIDDIE:  Yes, if I may, Your Honor.

I know this not an issue today, necessarily, but I do want to put a marker down, Your Honor, that the United States does, and has, taken issue with the rates that were put into the budget, and in the rate calculation, and we may want to talk about that at a further time.

THE COURT:  You think the Guidehouse study came out at too low a result?

MR. SMIDDIE:  Yes, Your Honor.

THE COURT:  All right.

MR. SMIDDIE:  The only any other issue that we want to raise that we were in communication with the Commonwealth, is that the permanent injunction required that, you remember the library, Your Honor?

THE COURT:  Right, yes.

MR. SMIDDIE:  Yes.

THE COURT:  That was a brilliant idea.

MR. SMIDDIE:  I don't know who came up with that, Your Honor.

THE COURT:  Yes.

MR. SMIDDIE:  It required that the Commonwealth come up with accessible train tracks to help to follow how to get to different indicators and different trains that are happening, and not all of those are up yet, Your Honor.  And we make to want to make sure that is happening.  And we are hopeful that the Commonwealth will make that happen before --

THE COURT:  Ms Norton, that is coming up, isn't it?

MS NORTON: I don't know which one to --

THE COURT:  Well, you need to talk to Mr. Smiddie. I am sure he will have an inventory of things you need.

Okay.  Anything else?  All right.

Well, thank all very much.

Mr. Smith, Mr. Curtis, good luck in whatever comes next or you.

And thank you for your attendance today.

Let's adjourn court.

Recess court.

HEARING ADJOURNED

THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

GILBERT FRANK HALASZ
Official Court Reporter