REPORT OF THE INDEPENDENT REVIEWER

ON COMPLIANCE

WITH THE

PERMANENT INJUNCTION

UNITED STATES v. COMMONWEALTH OF VIRGINIA

United States District Court for
Eastern District of Virginia

Civil Action No. 3:12 CV 059

October 1, 2025 – March 31, 2026

Respectfully Submitted By

Donald J. Fletcher
Independent Reviewer
June 13, 2026

# TABLE OF CONTENTS

**I.    EXECUTIVE SUMMARY** ....................................................... **3**

**II.   DISCUSSION OF COMPLIANCE FINDINGS** ........................... **6**
  A.  Methodology ...................................................................…....... 6
  B.  Discussion of Compliance Findings ....................................…...….. 8
       *1.    Case Management* …......................................…....….......  *8*
       *2.    Crisis and Behavioral Services* ..............................…....…...  *10*
       *3.    Integrated Day Activities and Supported Employment* ……...…........  *15*
       *4.    Community Living Options* ................................…........….  *18*
       *5.    Services for Individuals with Complex Behavioral Support Needs* ............  *20*
       *6.    Quality and Risk Management* ..........................…......…....….....  *25*
       *7.    Provider Training* ...................................................…....…....…..  *38*
       *8.    Quality Improvement Programs* .............................…..........…....  *40*
       *9.    Rate Study* .......................................................………………….  *43*

**III.  CONCLUSION** ................................................................... **48**

**IV.   RECOMMENDATIONS** ....................................................... **49**

**V.    SUMMARY OF COMPLIANCE** ........................................... **51**

**VI.   APPENDICES** .................................................................... **76**
  A.  Case Management ......................................................…....…... 77
  B.  Crisis and Behavioral Services ..............…..……...…........................…. 86
  C.  Integrated Day Activities and Supported Employment ……...……......….. 115
  D.  Community Living Options ............................................…......….. 130
  E.  Services for Individuals with Complex Behavioral Support Needs ….....…. 152
  F.  Provider Training ....................................................…..........…. 169
  G.  Quality and Risk Management and Quality Improvement Programs ….... 189
  H.  Recommended Rate Increases vs. Proposed Budgets ……..................….. 327
  I.  List of Acronyms ..........…..……....…...................................…......... 329

# I. EXECUTIVE SUMMARY

This is the Independent Reviewer's Twenty-eighth and penultimate Report on the status of compliance with the requirements of Civil Action No. 3:12 CV 059, which are delineated in the Permanent Injunction, approved by the Court on January 15, 2025, between the Parties: the Commonwealth of Virginia (the Commonwealth) and the United States, represented by the Department of Justice (DOJ).

This Report documents and discusses the Commonwealth's efforts and progress, and determines the status of Virginia's compliance and associated actions regarding the Permanent Injunction's remaining 27 of the 29 Section IV Terms, i.e. Terms 31–53, 55–57 and 59. As a result of the previous Twenty-seventh Period studies, Terms 54 (Annual Physical Exams) and 58 (Case Management Steering Committee Measures) had both been found to be in compliance for the second consecutive Period, achieving a rating of Sustained Compliance and therefore requiring no future review.

The timeframe for this latest Report was the Twenty-eighth Review Period, October 1, 2025 – March 31, 2026. This Period's studies determined that, after making steady progress over previous Periods, the Commonwealth commendably accomplished for the first time the specified goals for four of these remaining 27 Terms and achieved a rating of Compliance for Behavioral Support Services (Term 34), Community Residences (Term 35), Timely Waiver Service Enrollment (Term 43) and Data Driven Quality Improvement Plans (Term 57).

For two more Terms, Virginia accomplished the goals of Day Services (Term 37) and Supported Employment (Term 51) for the second time, achieving a rating of Sustained Compliance and requiring no further review. The compliance ratings for Terms 31, 38, 39, 42, 45–48, 50 and 55 were deferred until the next Twenty-ninth Period, when a full cycle of data will be available for study and verification.

Since the Commonwealth did not accomplish the specified goals for Terms 32, 33, 36, 40, 41, 44, 49, 52, 53 and 56, the compliance rating for these ten Terms was Not Achieved. Term 59, which focuses on the Rate Study, does not have its own stated goal and so does not receive a compliance rating.

In addition to achieving compliance with six Terms for either the first or second time, Virginia deserves commendation for its considerable efforts and advances during this Period across other

Terms. These include increasing the percentage of individuals receiving Private Duty Nursing (PDN), refining the Intense Management Needs Review (IMNR) process to monitor the adequacy of management and supports provided to individuals with complex needs, broadening the application of the highly successful Expanded Consultation and Technical Assistance (ECTA) program, and the Offices of Licensing and Human Rights' strengthening of their respective inter-rater reliability (IRR) processes.

However, more work remains until the Commonwealth can accomplish its unachieved goals. Virginia must significantly increase the percentage of crisis assessments conducted in community settings (Term 32), improve the percentage of individuals who receive annual dental exams (Term 40), evaluate whether pre-injury supports for known risks were in place, and then determine whether an investigation is necessary to more adequately protect individuals from serious injuries (Term 41), require case managers and residential staff to implement remediation plans to address identified service deficiencies (Term 44), and ensure that the Commonwealth and its providers have sufficient capacity to reach the goals of five Terms (i.e., 33, 37, 38, 39, and 48) by funding the rate increases recommended by Virginia's rate study.

It is important to underscore the critical role and interdependence of three of these unachieved Terms, namely Terms 41, 44 and 59. Accomplishing these Terms' goals and completing their associated actions will help the Commonwealth sustain a service system well into the future that can identify any shortcomings in protecting individuals with DD Waivers from serious injuries, provide valid and reliable data to inform its quality improvement initiatives, and improve its provision of needed support services. Overall, Virginia's service system will then have strengthened its capacity to better protect those at the heart of this Permanent Injunction: the Commonwealth's citizens with developmental disabilities.

Regarding Term 41, DBHDS does not yet have adequate systems to evaluate whether a seriously injured individual's support plan identified needed pre-injury protections, and whether such protections were put in place. The Department needs to provide reliable and valid data about the percentage of individuals who are both adequately and inadequately protected from such injuries.

For Term 44, DBHDS collects and analyzes data to identify service deficiencies and needed corrective actions, as required. However, in some cases, despite the Department's reviewers' concerted efforts,  case managers or residential staff did not adequately implement the corrective actions. In addition, although DBHDS produced the required annual report, the Department does not yet consolidate the collected data to provide a comprehensive summary of the adequacy of the

4

management and supports provided.

Finally, regarding Term 59, Virginia did not make its best initial efforts in two legislative sessions to obtain from the General Assembly the funds necessary to increase rates that its study recommended to ensure sufficient capacity to fulfill the goals of five Terms. Instead, the Governor's budget for Fiscal Year 2027 proposed funding only 29.3% of the overall necessary funds, enough to fully fund the recommended increases for just seven of the 11 DD Waiver services. The Commonwealth's House then approved a budget that followed the Governor's proposed rate increases for these seven services. The Senate's approved Fiscal Year 2027 budget fully funded the recommended rate increases for six of these seven services, and partially funded rate increases for two additional Waiver services that provide nursing. However, the Senate did not approve any funding for the recommended rate increases for companion services, an increase that the Governor had proposed and that the House had approved. In addition, for Fiscal Year 2028, the Senate approved an 8.1% increase, effective January 1, 2028, for the remaining companion, personal care and respite Waiver services. The General Assembly has not yet approved its final biennial budget for Fiscal Years 2027 and 2028.

For the next Twenty-ninth Period reviews, which will be contained in the Independent Reviewer's final Report, the following areas of Virginia's service system for individuals with intellectual and developmental disabilities (IDD) will be studied:

- Case Management
- Crisis and Behavioral Services
- Integrated Day Activities and Supported Employment
- Community Living Options
- Services for Individuals with Identified Complex Adaptive Support Needs
- Quality and Risk Management
- Provider Training
- Quality Improvement Programs
- Rate Study

In closing, as the Commonwealth continues its work toward achieving the remaining applicable Terms, Virginia is required to submit semi-annual progress reports until January 15, 2032. Two such reports have been completed to date; each contained reliable and valid data, as well as other factual information, analyses and explanations for its judgements as to whether the Commonwealth had achieved the Terms' goals and completed the delineated actions. These

reports comprised substantially similar content and determinations as the Independent Reviewer's previous Twenty-sixth and Twenty-seventh Period Reports. Virginia will continue to make these semi-annual reports, as well as its regular data reports and its quality review findings available to the public via its online Library, including after the role of the Independent Reviewer ends on January 15, 2027.

# II. DISCUSSION OF COMPLIANCE FINDINGS

## A.    Methodology

For this Twenty-eighth Review Period, the Independent Reviewer conducted studies to monitor the Commonwealth's status of its achievement of measurable goals and its implementation of required actions, as specified in Terms 31–59 of the Permanent Injunction.

These Terms address the following areas of Virginia's service system for individuals with IDD:

- Case Management;
- Crisis and Behavioral Services;
- Integrated Day Activities and Supported Employment;
- Community Living Options;
- Services for Individuals with Complex Behavioral Support Needs;
- Quality and Risk Management;
- Provider Training;
- Quality Improvement Programs; and
- Rate Study.

To analyze and assess the Commonwealth's performance across these areas, the Independent Reviewer retained eight consultants to assist in:

- Reviewing data and documentation produced by Virginia in response to requests by the Independent Reviewer, his consultants, and the Department of Justice;
- Discussing progress and challenges with Commonwealth officials;
- Examining and evaluating documentation of supports provided to individuals;

6

- Interviewing caregivers, provider staff and stakeholders;
- Verifying Virginia's determinations that its data sets provide reliable and valid data that are available for compliance reporting; and
- Determining the extent to which the Commonwealth maintains documentation that demonstrates its achievement of the Terms' specified goals and its implementation of the required actions.

To determine Compliance ratings and the status of completing required actions for the Twenty-eighth Review Period, the Independent Reviewer considered information delivered by Virginia prior to April 22, 2026, and its responses to consultant requests until May 12, 2026.

The Independent Reviewer determined four compliance ratings for the Terms' specified goals:

- *Sustained Compliance* indicates achievement of two successive ratings of *Compliance.*
- *Compliance* indicates achievement of the specified goal.
- *Not Achieved* indicates that the specified goal was not met.
- *Deferred* indicates that the Commonwealth will report complete data sets for review and analysis during the next Twenty-ninth Period, as per its established monitoring cycles.

In addition, the Independent Reviewer determined seven status ratings for the Terms' delineated actions:

- *Completed* indicates the full accomplishment of a listed action.
- *Completed and Ongoing* indicates the accomplishment of a delineated action in the current Period, but the accomplishment must be sustained in the future.
- *In Progress* indicates at least one documented step was taken to achieve the required action.
- *No Progress* indicates no documented steps were taken, and no progress was reported during the current Period.
- *Not Completed* indicates that progress began, but the required action was not completed within the specified timeframe.
- *Not Yet Implemented* indicates that documented steps are not yet underway for a required future action.
- *No Longer Required* indicates that Virginia has achieved Sustained Compliance and is no longer obligated to report status updates.

The Independent Reviewer's determinations are best understood by reviewing the Discussion of Compliance Findings and the consultants' reports, which are included in the Appendices. To

7

protect individuals' private health information, the summaries from the studies of individuals' services included in the respective consultant reports are submitted to the Parties under seal.

Information that was not supplied for the studies was not considered in the consultants' reports or in the Independent Reviewer's findings and conclusions. If the Commonwealth did not provide sufficient documentation, the Independent Reviewer determined that Virginia had not demonstrated achievement of the specified measurable goal or completion of the required action.

Prior to completing a draft of this Twenty-eighth Report to the Court for the Parties to review, the Independent Reviewer distributed copies of the consultants' draft studies to DBHDS and convened a debriefing call for each study. These calls provided an opportunity for senior staff from the Commonwealth's relevant departments and their subject matter experts to discuss the contents together with the consultants and the Independent Reviewer. The discussions included the identification of any factual errors and misunderstandings or needed clarifications. The reports were then modified as appropriate.

As required by the Permanent Injunction, the Independent Reviewer submitted this Report to the Parties in draft form for their review. The Independent Reviewer then considered any comments by the Parties before finalizing and submitting this Twenty-eighth Report to the Court.

## B.    <u>Discussion of Compliance Findings</u>

### *1.    Case Management*

**Background**

The previous Twenty-seventh Period's Case Management study had focused on its two associated Terms, namely Term 31 and Term 58.

For Term 31, the Commonwealth had not met the specified 86% goal, so the compliance rating was Not Achieved. In Fiscal Year 2025, 81% of CSB records had achieved a minimum of nine of the ten elements assessed in the Support Coordinator Quality Review (SCQR).

Regarding this Term's subsection 31a, DBHDS had planned to request four CSBs to develop quality improvement plans to strengthen the rate of agreement between the CSBs and the Department's look-behind review findings. For subsection 31b, the Department had provided

targeted technical assistance (TA) to every CSB, focusing on those items that historically had lacked substantial agreement. Regarding subsection 31c, the Department's Case Management Steering Committee (CMSC) had discussed the possibility of increasing the current 60% benchmark to 75% for requiring CSBs to develop a quality improvement plan if they fell below this measure on two or more of the ten elements.

For Term 58, since Virginia had met the specified goal for the second time, the Commonwealth had achieved a Sustained Compliance rating, indicating that this Term no longer required further review. DBHDS had reported that it had accomplished 94% for each of the two required Performance Measure Indicators (PMIs) related to health and safety. For the two PMIs involving community integration, the Department had also achieved 95% for the choice PMI, and 91% for the self-determination PMI. All these results had exceeded the Term's 86% performance measure.

### Twenty-eighth Period Study

For this latest review, the Independent Reviewer retained the same consultant as last time to assess Virginia's status regarding the goals and implementation of the required actions specified in the remaining Case Management Term of the Permanent Injunction, namely Term 31.

Key Points for Term 31

- Since DBHDS's data from its current annual SCQR cycle will not be available until the end of Fiscal Year 2026 and therefore cannot be assessed until the next Twenty-ninth Period, a compliance rating could not be determined.
- Regarding this Term's subsection 31a and based on previous SCQR findings, DBHDS reported that nine CSBs completed plans during this Period to improve the level of agreement between their SCQR results and DBHDS's Office of Community Quality Improvement's look-behind review.
- Also, as a result of Fiscal Year 2025's SCQR comparison with the look-behind review, DBHDS's CMSC required four CSBs to implement quality improvement plans. These CSBs had not accomplished the 60% threshold for agreement.
- Additionally for subsection 31a, and in preparation for Fiscal Year 2026's SCQR, the CMSC was in the process of implementing a Quality Improvement Initiative (QII) related to increasing the level of agreement on element 10 from moderate to substantial.
- Regarding subsection 31b and also in preparation for Fiscal Year 2026's SCQR, DBHDS again provided TA to every CSB. The CMSC had updated the TA to focus on those indicators with a low level of agreement between the Fiscal Year 2025 SCQR and the look-

9

behind review.

- For subsection 31c, DBHDS provided information, as required, in its Fiscal Year 2025 SCQR report about those CSBs that needed support, such as targeted TA, training and other elements of a quality improvement plan.

- Also regarding subsection 31c, at its January 2026 meeting, the CMSC increased the agreement threshold from 60% to 65%. This new threshold will come into effect in Fiscal Year 2026's SCQR.

See Appendix A for the consultant's full report.

## Conclusion

Regarding Term 31, since the Commonwealth has not yet completed its annual SCQR data for Fiscal Year 2026, the compliance rating for this Term is Deferred.

## *2.    Crisis and Behavioral Services*

## Background

The previous Twenty-seventh Period study had determined a compliance rating of Not Achieved for the four Terms (i.e., Terms 32, 33, 35 and 36) associated with Virginia's crisis and behavioral services.

For Term 32, DBHDS's crisis services system had performed just 50% of its crisis assessments in community settings and had again remained significantly below the 86% benchmark.

The Commonwealth had made progress implementing the actions listed in this Term's subsections 32a–b: DBHDS had developed staff training for its 988 media campaign and had updated the roles and responsibilities of REACH staff and program functions to assist the Regions in filling vacant mobile crisis positions. Despite these efforts, however, between 20% and 66% of staff positions had been vacant in four of the regional REACH programs.

Regarding subsection 32c, DBHDS had developed a work plan to improve the accessibility of 988 services to better support individuals with DD. Its goals, however, had not been clearly or sufficiently measurable to allow for an adequate evaluation of the impact and success of the Department's planned actions.

10

For subsection 32d, DBHDS had reported that maintaining REACH staffing had been a statewide challenge, and that most Regions had been using their staffing flexibly to ensure that the provision of basic functions of mobile crisis response and follow-up services could continue. The REACH staffing in Region 1, however, had been unable to flexibly use other staff to ensure sufficient mobile crisis response. The Department had not reported on its work with Regions 1 and 4 to implement improvement strategies, as required by subsection 32e.

Regarding Term 33's stated 86% measure for individuals identified as needing behavioral services during this Period, only 78% had been referred to and connected with a provider within 30 days of the need being identified.

For subsection 33a and ahead of schedule, DBHDS had already been implementing the provision of technical assistance (TA) initiatives with eight CSBs. Regarding subsection 33b, the Department had attended Virginia's 2025 Association for Behavior Analysts Annual Conference, participated in Regional Round Tables and provided TA to a number of Therapeutic Consultation providers to assist them in enrolling as Medicaid providers. For subsection 33d, the required rate study had been completed for consideration during the Commonwealth's 2026 General Assembly session and, if necessary, its 2027 session.

Regarding Term 35, DBHDS had reported it had fallen short of achieving this Term's 86% goal. A community residence had been identified within 30 days of admission for 82% of individuals with a DD waiver who had been admitted to a CTH or a psychiatric hospital.

This Term's subsections 35a.i–iv require that ten new homes for individuals with intense behavioral support needs were to be operational by February 2025, with a specific minimum number to be established in four of the five Regions. DBHDS had developed 11 new homes, and during the Twenty-seventh Period, 49 new beds had been utilized. In each of Regions 1 and 3, the second of the two required homes had been waiting to be licensed. Region 2 had opened more than the required number of homes, and the three required new homes in Region 5 had been operational.

Regarding Term 36, Virginia had not achieved this Term's requirements to implement three Crisis Therapeutic Homes (CTHs) for children connected to the REACH system – one for each of Regions 1, 3 and 5. As of October 2025, only one CTH in Region 3 had broken ground.

11

For subsection 36b, DBHDS had reported that six children utilized the CTH in Region 2 for crisis prevention stays, and that no children had used the CTH in Region 4. Regarding subsection 36c, the Commonwealth had provided the required funding to develop the new CTHs, but these homes were not yet operational.

Regarding subsection 36d, for the period until DBHDS's three new CTHs became operational, the Department had secured funding to provide support for all eligible children up to 1,000 days per year of crisis prevention respite services. However, since DBHDS had reported that no children at risk of crisis and their families had utilized these services in any of the three Regions as of the end of the prior Period, the fulfillment of this action had appeared stalled.

**Twenty-eighth Period Study**

For this latest review, the Independent Reviewer retained the same lead consultant as previously to assess Virginia's status regarding achievement of the goals and implementation of the required actions associated with the Commonwealth's crisis and behavioral services' four Terms. The Permanent Injunction's Terms 32 and 33 involve the provision of crisis and behavioral supports, and Terms 35 and 36 require the development of homes for crisis stabilization for individuals with intense behavioral support needs.

Key Points for Term 32

- DBHDS reported that it made a little progress toward achieving this Term's goal that 86% of children and adults with IDD receive crisis assessments in their homes or other community settings. From April 1, 2025, through March 31, 2026, 51.5% of crisis assessments occurred in such settings, an increase of 1.5% over the previous year. Another 34.5% improvement is still needed to meet the goal.
- Virginia's annual performance percentages for the past six years have ranged from 42% to the latest 51.5%, compared with this Term's 86% goal. Data from the last two years showed that performance was more consistent across four of DBHDS's five Regions. Over the past six years, however, the Commonwealth has demonstrated only minor durable systemic improvements while reporting compelling evidence showing that individuals who receive community-based crisis assessments are much more likely to retain their home settings and are significantly less likely to be hospitalized.
- For subsection 32a's two action items, Virginia began a monthlong targeted campaign in April 2026 to promote the use of its 988 24-hour crisis helpline. Additionally, DBHDS continued to require that all mobile crisis team members receive training within 90 days of being hired.

12

- Regarding subsection 32b, DBHDS reported that it maintained its efforts to assist Regions in filling vacant positions and to support REACH in implementing quality improvement programs. Despite the Department's efforts, however, 16%–44% of staff positions remained vacant in four of the five Regional REACH programs.
- For subsection 32c, DBHDS continued implementation of its planned activities to enhance 988 supports. Numerous trainings were offered.
- Regarding 32d, DBHDS continued to monitor staffing at each Regional REACH program. The Department conducted quarterly reviews and discussions with REACH staff regarding recruitment and retention, as well as the flexible use of staff to complete crisis assessments and provide mobile crisis supports. DBHDS determined that four Regions' REACH programs were sufficiently staffed to meet its crisis services standards, but that Region 1's REACH programs were not. The Department did not determine, however, whether each Regions' REACH programs had sufficient staff on each shift to meet the goal of conducting 86% of crisis assessments in community settings.
- For subsection 32e, DBHDS reported having worked with all of the Region's REACH Directors and staff to improve their performance in conducting crisis assessments in community settings. This group discussed lessons learned from Region 2, which conducted the highest percentage of community-based crisis assessments.

Key Points for Term 33

- DBHDS reported that from July 1 through December 31, 2025, 79% of individuals needing Therapeutic Consultation (TC) were referred to and connected with a TC provider within the required 30 days. This represented just a single percentage point increase over the previous Period, and so the Commonwealth again remained below this Term's 86% benchmark.
- For subsection 33a, DBHDS implemented improvement initiatives and continued to provide TA to those CSBs with the lowest performance in connecting individuals with needed behavioral supports.
- Regarding subsection 33b, DBHDS's behavior analysts attended Virginia's 2026 annual Association for Behavior Analysts Annual Conference and participated in Regional Round Tables. To increase the number of TC providers, DBHDS distributed information on enrollment and assisted 11 providers in becoming Medicaid providers of TC.

13

Key Points for Term 35

- DBHDS reported having exceeded this Term's 86% benchmark for the two quarters of this Period.  For individuals with DD Waivers and known to the REACH system who were admitted to either a CTH or a psychiatric hospital, 87% and 93% respectively had a community residence identified within the required 30 days of their admission.
- Regarding subsection 35a.i-iv, in Regions 1, 2, 3 and 5, the Commonwealth developed 12 new homes, all now operational, for individuals with intense behavioral support needs. This exceeded the requirement to develop ten such homes. However, the second of the two required homes in Region 3 was not yet operational.
- For subsection 35b, DBHDS had conducted a root cause analysis in 2023 which continued to guide the Quality Improvement Initiative (QII) that it had developed. During the latest Period, the Department addressed bottlenecks such as delays to providers' requests for customized rate approvals. REACH managers continued to work with families, providers and case managers to begin the discharge process to a community residence as soon as an individual was admitted to a CTH or psychiatric hospital.

Key Points for Term 36

- Virginia did not achieve this Term as none of the three new Youth Crisis Therapeutic Homes (YCTHs)  for children connected to the REACH system in each of Regions 1, 3 and 5 were yet operational for prevention or stabilization stays following a crisis.
- Regarding subsection 36b, DBHDS reported its ongoing tracking of the number of crisis prevention stays in the two operating YCTHs in Regions 2 and 4. During this Period, a total of 74 youth utilized the YCTHs. The number from each Region varied substantially, between a low of two from Region 5 to a high of 34 youth from Region 4.
- For subsection 36c, DBHDS reported that the establishment of the three additional YCTHs were all in progress, but as mentioned above, none were yet operational.
- Regarding 36d, for those families from the three Regions without YCTHs, the Commonwealth continued to make respite funds available until the new YCTHs are operational. DHBDS reported that no families of youth with DD from Regions 1,3, or 5 used the respite funding during this Period.

See Appendix B for the consultant's full report.

14

**Conclusion**

Regarding Term 32, since Virginia did not meet the specified goal, the compliance rating for this Term is Not Achieved.

Regarding Term 33, since the Commonwealth did not meet the specified goal, the compliance rating for this Term is Not Achieved.

Regarding Term 35, since Virginia met the specified goal, the Commonwealth has achieved Compliance with this Term for the first time.

Regarding Term 36, since Virginia did not meet the specified goal, the compliance rating for this Term is Not Achieved.

## *3.    Integrated Day Activities and Supported Employment*

**Background**

The previous Twenty-seventh Period study of Virginia's Integrated Day Activities and Supported Employment service system had determined different compliance ratings for each of the Permanent Injunction's three associated Terms (i.e., Terms 37, 50 and 51).

Regarding Term 37, since the Commonwealth's full annual data regarding the number of individuals with either DD Waivers or on the waitlist who had participated in employment and day services in integrated settings had not been available until the Twenty-eighth Period review, the compliance rating for this Term had been Deferred. (The prior Twenty-sixth Period study had determined that Virginia had exceeded this Term's 2.0% annual increase goal, with a result of 2.5%. The Commonwealth had therefore achieved compliance for the first time.)

DBHDS had revised its original Community Life Engagement Advisory Committee (CEAG) work plan to include measurable goals and implementation progress, aligning with this Term's subsection 37a.

As required by this Term's subsection 37b, Virginia had contracted with Guidehouse and had initiated a rate study that had included Integrated Day and Employment Services such as Workplace Assistance, Community Coaching, and Community Engagement. Guidehouse had

15

completed the rate study in time to be considered during the Commonwealth's 2026 General Assembly session, and if necessary, its 2027 session.

For Term 50, Virginia had not met the specified goal of achieving at least within 10% of its annual employment target for individuals aged 18–64 who are on DD Waivers. For Fiscal Year 2025, 84% of the target was met, and so the Commonwealth's rating for this Term was Not Achieved.

DBHDS had worked with its Employment First Advisory Group (E1AG), Quality Improvement Committee (QIC) and the QIC subcommittees to retire one Quality Improvement Initiative (QII) and to initiate another related to improving employment opportunities.

Regarding Term 51, Virginia had exceeded the employment target goal of 25% of all individuals aged 18–64 who were either on DD Waivers or on the waitlist, with 25.1% having been employed. This meant that the Commonwealth had achieved Compliance with this Term for the first time.

DBHDS had reported that its Regional Quality Council (RQC) for Region 3 had developed a QII to implement targeted trainings, designed to improve Individual Supports Plan (ISP) outcomes for individuals interested in employment. Although three trainings were conducted during Fiscal Year 2025, the Department had not documented specific progress related to ISP outcomes. DBHDS had reviewed this QII with its E1AG. There had been no evidence, however, that the Department had worked with the E1AG in initially developing such QIIs to improve employment.

**Twenty-eighth Period Study**

For this latest review, the Independent Reviewer retained the same consultant as previously to assess Virginia's status regarding the goals and its implementation of required actions specified in Terms 37, 50 and 51 of the Permanent Injunction.

Key Points for Term 37
- The Commonwealth achieved a 3.9% annual increase in the percentage of individuals on DD Waivers receiving service in the most integrated settings, exceeding this Term's 2.0% threshold.
- DBHDS's CEAG continued to update its workplan to align with the requirements of subsection 37a, including defining meaningful community involvement and developing training and educational materials to enhance this involvement.

16

Key Points for Term 50

- Employment data for individuals aged 18–64 who are on DD Waivers will not be available until the end of Fiscal Year 2026, so a compliance rating for this Term is deferred until the next Twenty-ninth Period review.
- To help increase outcomes for individuals interested in employment, DBHDS implemented a QII that focused on developing training materials and offering technical assistance in Regions 2 and 3. As a result, both Regions achieved the QII's 70% goal to increase employment outcomes.
- DBHDS and its E1AG were designing another QII to address benefits planning and access to vocational rehabilitation services.

Key Point for Term 51

- In 2025, Virginia once again exceeded its employment target of 25% of all individuals aged 18–64 who were either on DD Waivers or on the waitlist, achieving compliance for the second consecutive Period. Of the 20,994 people involved, 26% were employed.

See Appendix C for the consultant's full report.

.

**Conclusion**

Regarding Term 37, since the Commonwealth met the specified goal for the second time, Virginia has achieved a Sustained Compliance rating. Further review is no longer required.

Regarding Term 50, since the Commonwealth's achievement of its annual employment target for individuals aged 18–64 who are on DD Waivers cannot be determined until the end of Fiscal Year 2026, the compliance rating for this Term has been Deferred.

Regarding Term 51, since Virginia met the specified goal for the second consecutive Period, the Commonwealth has achieved a Sustained Compliance rating. Further review is no longer required.

## *4.    Community Living Options*

**Background**

As a result of the previous Twenty-seventh Period review, Virginia had not met the specified goals of the two Permanent Injunction Terms associated with Community Living Options (i.e., Terms 38 and 39). The Commonwealth's compliance rating had therefore been determined as Not Achieved.

In its Fiscal Year 2025 utilization data for combined Private Duty Nursing (PDN) and Skilled Nursing (SN), which was required by the previous Compliance Indicators through Calendar Year 2024, DBHDS had reported that just 59% of individuals had received the required 80% of their authorized hours. However, it was highly likely that this latest data had undercounted the percentage of individuals who had received at least 80% of their authorized nursing hours. The Department was to provide final Fiscal Year 2025 utilization data after June 30, 2026.

As required by these Terms' subsections 38a and 39a, DBHDS had continued to report data semi-annually regarding the utilization of nursing services and the achievements and focus of the Department's Nursing Workgroup. Consistent with subsection 38b, DBHDS had previously updated Individual Supports Plan (ISP) documents, with case managers being required to indicate the need for nursing services as identified by the Risk Awareness Tool. The consultants had verified that this ISP revision had been maintained.

DBHDS had continued to implement its Intense Management Needs Review (IMNR), as required by subsections 38c, 39b and 39c. To fulfill subsection 38d.i, in consultation with DBHDS's five Registered Care Consultants, the Department had completed the Twenty-seventh Period's requirement to identify those CSBs in each Region with the highest nursing shortage and those with the lowest utilization rates.

To fulfill subsection 38d.ii, DBHDS had produced its *Nursing Hours Utilization Report* through Fiscal Year 2025. This had included information regarding nursing workforce challenges, causes, issues and barriers. The Department had also reported gathering input from providers to identify the top three barriers in each Region. These top barriers and efforts to resolve them were to be listed and reviewed during the Twenty-eighth Period.

Regarding subsections 38d.iii and 38d.iv, DBHDS had produced its latest semiannual report, the *Nursing Access Work Plan*. However, this *Plan* had not yet identified the top three barriers, nor specific

18

steps to resolve them, as had been required.

Regarding subsections 38e and 39d, the rate study had been completed in time to be considered during Virginia's 2026 General Assembly session, and if necessary, its 2027 session.

**Twenty-eighth Period Study**

For this latest review, the Independent Reviewer retained the same consultants as previously to assess the Commonwealth's status regarding Community Living Options' specified goals and the implementation of required actions for Terms 38 and 39.

Key Points for Terms 38 and 39

- These Terms' goals specify that Virginia will work toward providing a minimum of 70% of individuals on DD Waivers or children receiving Early and Periodic Screening, Diagnostic and Treatment (EPSDT) with at least 80% of the nursing hours identified as needed on the appropriate Medicaid forms.
- Terms 38 and 39 have separate utilization goals for each of PDN and SN. For January through June 2025, the first six-month period of the Permanent Injunction, complete utilization data will not be available until after June 2026. The compliance ratings for these two Terms are therefore deferred until the next Twenty-ninth Period.
- Based on DBHDS's updated and final nursing utilization data for Fiscal Year 2024, as well as its preliminary data for Fiscal Year 2025, utilization of PDN exceeded the threshold of 70% of individuals receiving 80% of their authorized hours. SN utilization, however, remained below this benchmark.
- Regarding subsections 38a and 39a, DBHDS reported by April 15, 2026, as required, its utilization of nursing services, and the work of its Nursing Workgroup. Specifically, the Workgroup provided nursing utilization updates, the results of the most recent IMNR and identified topics for further training.
- For subsections 38c and 39b, DBHDS initiated the latest cycle of the required IMNR in mid-February 2026 and completed those reviews for 30 individuals on DD Waivers. For each review that identified concerns, the Department requested a remediation plan and established a timeline for its completion. The IMNR identified the types of unmet needs found, as well as the efforts taken to resolve the concerns that were identified in the previous IMNR conducted during the Twenty-seventh Period.
- Consistent with the requirements of subsection 39c, DBHDS annually selects two random samples that total a minimum of 10% of those individuals with SN service authorizations,

19

and conducts IMNRs to specifically determine if the selected individuals' skilled nursing needs are being met. By the end of the current Period, the Department completed the IMNR for 31 people, and reported that each had all of their skilled nursing needs met.

- Regarding subsection 38d.ii, DBHDS was in the process of identifying the top three barriers in each Region to individuals' access to nursing services. The Department developed a survey of providers of nursing services to help determine these top barriers.

- For subsections 38d.iii and 38d.iv, DBHDS updated its semiannual report, the *Nursing Access Work Plan* to include measurable goals, specific support activities and timelines for implementation. The Department also conducted a root cause analysis to help identify the primary barriers to nursing service access. The final *Plan* will list these barriers, include stakeholders' input, and is scheduled for completion during the next Twenty-ninth Period.

See Appendix D for the consultants' full report.

**Conclusion**

Regarding Term 38, since the Commonwealth's full Private Duty Nursing utilization data cannot be determined until after June 30, 2026, the compliance rating for this Term has been Deferred.

Regarding Term 39, since Virginia's complete Skilled Nursing utilization data cannot be determined until after June 30, 2026, the compliance rating for this Term has been Deferred.

## 5.    *Services for Individuals with Complex Behavioral Support Needs*

**Background**

The previous Twenty-seventh Period's Individual Services Review (ISR) study had focused on individuals with IDD with complex behavioral support needs. Its purpose had been to provide information to assist Virginia in its efforts to achieve certain specified goals of the Permanent Injunction, particularly Terms 40, 44 and 54.

Term 44 relates to the data collection, analysis, identification of concerns and required remediation processes for these individuals. Terms 40 and 54 relate to the requirement for annual dental and physical exams. Additionally, case managers' use of DBHDS's external monitoring safeguard process tool, the On-site Visit Tool (OSVT) had again been reviewed.

The study had been conducted once more in parallel with DBHDS's Intense Management Needs Review (IMNR) process, implemented by the Department's Office of Integrated Health Support Network (OIHSN). Both studies shared a randomly selected stratified sample of 30 individuals with SIS level 7 behavioral needs, all of whom had been involved in annual Individual Supports Plan (ISP) meetings from October 1, 2024, through December 31, 2024. The sample had included ten people from each of the Commonwealth's Regions 1, 3 and 4.

Both studies had completed their respective monitoring questionnaires utilizing document reviews, on-site observations, and interviews with primary caregivers to collect and analyze data regarding the management of the selected individuals' health support needs. Additionally, both studies had reviewed the status of Virginia's remediation system to address identified concerns arising out of the prior Twenty-sixth Period.

The selected sample had not been large enough to generalize findings to determine whether the Commonwealth had met the relevant requirements of these three Terms.

Regarding Term 44, of the 30 individuals in the selected sample, 77% had exhibited disruptive or harmful behaviors. Of these 23 people, behavioral support plans and behavioral interventions had been implemented for ten of them. The ISR study had found that residential providers with education, experience or training in working with people with behavioral support needs had helped to decrease or successfully manage unwanted behavior.

Both the ISR and IMNR reviewers had identified the same concerns for the selected sample of individuals, and OIHSN's nurses had promptly initiated IMNR corrective actions. To refine and effectively implement such corrective actions, OIHSN's nurses had engaged with DBHDS's behavioral services clinical staff. This had been an excellent example of the Department's collaboration across its Offices.

Regarding this Term's remediation goal, the latest ISR study had conducted a look-behind review to determine the status of DBHDS's remediation system. This review had focused on the concerns identified during the previous Twenty-sixth Period's ISR study of individuals with complex health needs. The identified health concerns needing corrective actions had included dental care, adaptive equipment, clinical appointments and assessments, and health care protocols; all of which had been identified by both the ISR and IMNR nurse reviewers.

OIHSN's nurses had frequently implemented needed corrective actions themselves. For example,

21

they had provided health-related protocols, referrals, and guidance to help resolve the concerns of families and residential providers. This assistance had resulted in the identified issue being addressed and improved care for the sampled individuals with health support needs.

OIHSN had routinely and consistently tracked the timeliness and effectiveness of the implemented corrective actions. In several instances, however, case managers or residential caregivers had failed to implement or oversee their assigned corrective actions in a timely manner. Despite repeated calls by OIHSN nurses, some corrective actions had not been implemented as required or within the timelines. For some identified concerns, the lack of resource availability and the lengthy wait for certain clinical appointments had significantly delayed the completion of the corrective actions.

Based on these examples, DBHDS's remediation system at that time had not demonstrated that it had led to the identified health-related support concerns being addressed, nor that the corrective actions had been effectively implemented with reliability throughout the DD service system as a whole.

For Term 40, the ISR nurse consultants had documented that 79% of the sample of people reviewed had received their annual dental exam. Although the sample was too small to generalize findings, progress in providing annual dental exams for these individuals had been consistent with DBHDS's reported system-wide data, which continued to improve but was still insufficient to meet this Term's 86% specified goal.

Regarding Term 54, all but one of the individuals, i.e., 97% had received an annual physical exam. This high percentage was similarly consistent with DBHDS's reported system-wide data, and exceeded this Term's 86% specified goal. A separate study from the Twenty-seventh Period Report had confirmed that Virginia had accomplished Term 54's goal for the second consecutive review, and so had achieved a rating of Sustained Compliance. Therefore, this Term required no further review, including in future ISR studies.

The Twenty-seventh Period's ISR review's analysis of the completion and accuracy of the OSVT for the 30 sampled individuals had documented variable results depending on the Region of residence. The frequency of timely completion of the OSVT had been highest in Region 3 with 100%; whereas in Regions 1 and 4, completion rates of 70% and 67% had respectively occurred. Of the OSVTs that had been completed, the ISR study had identified inconsistent information and errors in some of them.

22

**Twenty-eighth Period Study**

For this latest review, the Independent Reviewer retained the same consultants as previously to undertake another ISR study that focused again on the management and supports provided to the Commonwealth's individuals with IDD with complex behavioral support needs.

As part of this study, case managers' use of DBHDS's OSVT was also reviewed, as was the status of the Department's remediation of concerns identified during the previous Twenty-seventh period's ISR and IMNR studies.

Once again, the purpose of this latest review was to provide information that would assist Virginia in its endeavor to meet Terms 40 and 44 of the Permanent Injunction.

This ISR study was once more conducted in parallel with DBHDS's latest IMNR. Both studies were centered on a new stratified sample of 30 individuals with SIS level 7 behavioral needs, all of whom were involved in annual ISP meetings from July 1 through September 30, 2025. The sample included 15 people from each of the Commonwealth's Regions 2 and 5.

Both the ISR study and the IMNR completed their respective monitoring questionnaires by reviewing documents, conducting on-site observations, and interviewing primary caregivers to collect and analyze data regarding the adequacy of the management and supports provided to the selected individuals. As previously, the selected sample was not large enough to generalize findings to determine whether Virginia had met the relevant requirements of these two Terms.

Key Points for Terms 40

- Among the small sample of individuals reviewed, the consultants found evidence that the Commonwealth continued to make progress in the provision of annual dental exams. Of the 29 individuals who needed such an exam, 24 (83%) received one, representing an improvement over the previous Period's study, but still insufficient to meet this Term's 86% goal.
- Of the remaining six people (17%) who did not receive an annual dental exam, the study identified dental care concerns for four (14%) of them.

Key Points for Term 44

- The ISR study again determined that DBHDS's IMNR process effectively collected and analyzed information and data to help monitor the adequacy of management and supports provided. The IMNR nurse reviewers from the Department's OIHSN successfully

23

identified, reported and planned resolutions to concerns related to the health, safety, and well-being of individuals with complex behavioral support needs. Also, when possible, these nurses promptly responded to address the identified concerns, which was appreciated by providers and of critical importance to the individuals and their families.

- To improve the IMNR Monitoring Questionnaire, DBHDS involved its behavioral services clinicians in the refinement of fact-based monitoring questions related to the need and delivery of behavioral support services.

- The ISR study found that five of the sampled individuals who did not have formal behavioral support services no longer engaged in significant negative behaviors. The consultants commended the efforts of the family, sponsor or residential providers for their management of these individuals' supports, and the resulting reduction or elimination of any problematic past behavior.

- Of the remaining 25 selected individuals, most of whom engaged in aggression or self-injury and/or disruption of the environment, 20 of their authorized representatives expressed the desire for behavioral supports. However, the study showed a discrepancy between the expressed need for behavioral supports and whether individuals' ISPs authorized the need for such services. Behavioral support plans were actually in place for 15 (75%); whereas the ISPs for only 12 (60%) of these people authorized the need for behavioral services.

- The ISR review of DBHDS's remediation system found again that OIHSN's IMNR nurse reviewers had implemented planned corrective actions and tracked their efficacy. Of the selected sample of 27 concerns identified during the previous Twenty-seventh Period's ISR/IMNR reviews, 21 (78%) were appropriately addressed. Once again, despite repeated monitoring and prompting from the nurses, some case managers or residential staff did not respond to or implement the required corrective actions. Overall, DBHDS's remediation system still needs improvement to ensure all of the previously identified problems are adequately addressed.

Key Points for the OSVT

- The OSVT is an especially important service quality monitoring tool. When properly completed, it should confirm that the needs identified in individuals' ISPs are being met, or if not, what problems or obstacles must be addressed and resolved. The OSVT is also intended to identify any new or previously unidentified needs.

- This latest ISR study found that case managers completed OSVTs with the frequency required by DBHDS for only ten of the 30 individuals (33%).

24

See Appendix E for the consultants' full report.

**Conclusion**

Once again, the randomly selected sample was not large enough to generalize findings to determine whether Virginia met the relevant requirements of Terms 40 and 44.

Regarding Term 44, the ISR study verified for the second consecutive Period that the Commonwealth's IMNR process adequately collected and analyzed data and monitored the adequacy of management and supports provided for individuals with complex behavioral support needs. However, the IMNR's remediation system for concerns raised during the previous Twenty-seventh Period review was not yet sufficient to fulfill this Term's specific remediation system requirements.

## 6.    *Quality and Risk Management*

**Background**

At the time of the previous Twenty-seventh Period study, 13 Terms – i.e., Terms 34, 40–44, 49 and 52–57 – had encompassed Virginia's Quality and Risk Management (QRM) system.

That Period's review had determined that the compliance rating for 12 of these 13 Terms (34, 40–44, 49, 52–53 and 55–57) had been Not Achieved. For the remaining Term 54, the Commonwealth had exceeded the specified goal and had therefore achieved a rating of Sustained Compliance, with no future review of this Term required.

Regarding Term 34's 86% measure, DBHDS had reported that for Fiscal Year 2025, 80% of individuals with identified behavioral support needs had received adequate services; this had reflected a substantial improvement over the 68% reported in the previous study, but had remained below the Term's threshold.

For subsection 34a, DBHDS's semi-annual review had covered a range of topics and had demonstrated that the Department had continued to address the findings from its previous root cause analysis.

Regarding subsections 34b and 34c, DBHDS had reported that its five behavioral staff had once again used the Behavior Support Plan Adherence Review Instrument (BSPARI) tool to determine whether individuals had received adequate and appropriate behavioral support services. These Board Certified and Licensed Behavior Analysts had reviewed a significant sample of 400 behavior support plans for the full Fiscal Year 2025, and as required, had provided feedback to behaviorists, had identified trends for improvement and had used these findings to create additional training and technical assistance (TA).

For Term 40, DBHDS had reported that 69.1% of individuals supported in residential settings had received an annual dental exam during Fiscal Year 2025, and so did not meet this Term's 86% threshold.

Regarding subsection 40a, DBHDS had put into operation two mobile dental vehicles. Together with their two existing vehicles, the total had exceeded the required three vehicles. In the fourth quarter of Fiscal Year 2025, the Department's Mobile Dental Team had served the highest number of patients in a single quarter to date.

Virginia's efforts to fulfill the staffing requirements for subsection 40b had been ongoing. Of the seven required dental positions, six had been staffing the mobile dental vehicles, one short of the requirement. DBHDS had continued its efforts to hire the remaining dental position.

DBHDS had again completed the action required by subsection 40c by continuing to review referrals for dental services and to connect people to community dental providers when available. For subsection 40d and as a result of the Department's RFP, DBHDS had signed contracts with dental providers to serve Regions 1 through 4. A new RFP had been in process to contract with a dentist or dentistry practice in Region 5.

Regarding subsection 40e, DBHDS had updated its *Dental Work Plan* with ongoing implementation activities for each of the six steps outlined in its initial plan, together with measurable goals, specific support actions, and timelines for implementation. The Department had again completed the actions required by subsection 40f. During the previous Twenty-seventh Period, of the nine CSBs identified with the lowest percentage of individuals receiving annual dental exams, DBHDS had focused TA on the four CSBs that had not yet seen year-to-year increases.

For Term 41, DBHDS had modified its methodology for determining the percentage of DD Waiver service recipients who are protected from serious injury in service settings, as part of its

26

efforts to achieve this Term's 95% goal and meet the requirements for subsection 41a. However, these modifications had not significantly ameliorated the previously documented concern that very few serious injuries reach the investigation stage. The Department's current processes for determining the percentage of people who are protected had not yet yielded valid and reliable data; its methodology had still needed additional revisions.

DBHDS's Office of Integrated Health Support Network (OIHSN) had completed a quality review of a statistically significant sample of serious injuries reported for one month of this prior Twenty-seventh Period, but had not had sufficient data to begin making recommendations for any needed changes to the way incidents are reviewed and referred, as required by subsection 41b.

OIHSN had completed its first *Serious Injury Quality Review Report;* however, process revisions had remained under consideration and had not yet been completed, as required by subsection 41c.

For Term 42, DBHDS had not met this Term's goal of ensuring that its licensed providers of DD Waiver services had risk management processes that identified the incidence of common risks and conditions faced by people with DD that contribute to avoidable deaths. Its Licensing Specialists in its Office of Licensing (OL) had not consistently and accurately assessed whether its licensed providers had effectively implemented their risk management programs, including taking prompt action when such events occurred, or when the risk had otherwise been identified.

For subsection 42a, OL had developed and begun implementation of an Inter-rater Reliability (IRR)  process to formally evaluate the consistency and accuracy with which its Licensing Specialists assess whether licensed providers are meeting the applicable regulatory requirements.

The Expanded Consultation and Technical Assistance (ECTA) process had continued, as required by this Term's subsection 42b, and DBHDS had maintained and made improvements to strengthen the required TA process. The Commonwealth had continued to maintain the effective implementation of OL's Corrective Action Plan (CAP)  protocols, again fulfilling subsection 42c's requirements.

Regarding Term 43, DBHDS had reported an overall improved performance for Year 2025 of 78.6% of individuals assigned a Waiver slot who were enrolled in a Waiver service within the required five months. Although reflecting a positive trend, this percentage had still fallen short of this Term's 86% goal.

For subsection 43a, DBHDS had continued to track and report quarterly data on the number of individuals who had been assigned a Waiver slot but who were not enrolled in a service within five months. To complete the ongoing requirements of subsection 43b, the Department had updated its survey used to gather information from people awaiting the initiation of Waiver services. Of the 764 individuals surveyed, DBHDS had documented the reasons why services had not been initiated, barriers that had caused those delays, solution actions and the needed remediations.

Regarding Term 44, DBHDS had not met this Term's requirements to monitor the adequacy of management and supports provided because the Department had not yet collected and analyzed data regarding the management needs of individuals with identified complex adaptive support needs. Additionally, regarding the concerns of many individuals with health support needs identified in DBHDS's Intense Management Needs Review (IMNR), the Department had tracked the efficacy of the planned corrective actions. However, the remediation systems for implementing these corrective actions were inadequate, and revising them as necessary had not been provided.

As required for subsection 44a, DBHDS had produced its *2024 Ongoing Service Analysis Report* that had included a separate section with data from its Intense Management Needs Review (IMNR) process for individuals with complex medical support needs, the care concerns process, the Behavior Support Plan Adherence Review Instrument (BSPARI) quality reviews, as well as from the Quality Service Reviews (QSR). However, this *Report* had not included specific data regarding individuals with complex adaptive support needs. In addition, the Department had not yet consolidated the data from these various sources to provide a comprehensive summary of the management and support provided to individuals with complex needs. DBHDS had reported that plans were underway to combine information to identify and address needs across data sources.

DBHDS continued its progress toward meeting subsection 44b. The Department had expected to complete a second semi-annual IMNR review of individuals with complex behavioral needs during the Twenty-eighth period, and to subsequently collect data through the IMNR specific to people with complex adaptive support needs, beginning with the Twenty-ninth Period. A total of 70 individuals must be reviewed annually, as per this subsection's relevant requirement.

For Term 49, DBHDS had continued to review 1,230 residential settings to validate their compliance with the CMS rule on HCBS settings. Until the Department had completed this work, a calculation to assess the percentage of residential service recipients living in an integrated setting that supports full access to the greater community could not be determined as reliable. Virginia

28

therefore could not demonstrate achievement of this Term's 95% goal, and the action for subsection 49a had been in progress.

For future Rounds of the QSR, DBHDS had acknowledged that its Person-Centered Review (PCR) and Provider Quality Review (PQR) tools would need revisions to adequately assess compliance with the HCBS Settings Rule.

Regarding Term 52, DBHDS's Office of Human Rights (OHR) had continued its Community Look-Behind (CLB) process that evaluates whether investigations of abuse, neglect and/or exploitation involving individuals receiving DD services in licensed community provider settings were completed within established timelines, conducted by a trained investigator, and whether CAPs were implemented by the provider when indicated. The Office had continued to report its CLB findings, as required, to the Risk Management Review Committee (RMRC).

Once again, however, OHR's data reliability could not be verified, so the Commonwealth had not achieved this Term's goal. Its CLB IRR process had not been conducted on a regular and frequent basis, nor carried out by staff independent of the operation. The Office had been restructuring and improving this IRR process so that its reviews would be conducted quarterly and carried out by staff not directly involved in the process.

For Term 53, DBHDS's contractor, Virginia Commonwealth University (VCU) had continued to conduct quarterly serious incident reviews of statistically valid random samples of the Department's serious incident reviews. The results, which had consistently met or exceeded this Term's 86% threshold for each of the three required outcomes (i.e., timeliness, trained investigators and implemented CAPs), had been reported to the RMRC as required.

As mentioned above for Term 52, OHR had also continued its required CLB reviews of investigations into allegations of abuse, neglect and exploitation. This process had determined that 85%, 77% and 70% respectively of the investigations met the three required outcomes. However, these percentages had each fallen short of Term 53's 86% thresholds. In addition, concerns had remained regarding the adequacy and timeliness of the IRR process that had been used in OHR's CLB review system.

Regarding Term 54, DBHDS had reported that 89.1% of individuals supported in residential settings in Fiscal Year 2025 had received an annual physical exam. Virginia exceeded this Term's 86% goal for the second consecutive Fiscal Year, and therefore had achieved Sustained

29

Compliance.

For Term 55, of the annual inspections that OL had conducted during the first two quarters of 2025, the Office had reported that 99% had included assessment of each of the regulatory requirements. However, just 56% of inspections had actually met each of the regulation's requirements.

The consultants had reviewed documentary evidence from a sample of OL's annual inspections to determine whether Licensing Specialists had been accurately assessing provider compliance with the risk management requirements specified in the applicable regulations. Of the five relevant assessment questions, the consultants agreed with at least 86% of OL's determinations for three questions, but only agreed with 79% and 65% respectively for the remaining two questions. The Commonwealth therefore once again did not achieve this Term's requirements.

OL had designed and was implementing an improved IRR process to promote uniformity across Licensing Specialists' assessments. This will, in turn, enhance the accuracy and consistency of OL's regulatory compliance evaluations across its licensed providers.

Regarding Term 56, Virginia had not achieved all the specified goals, but had made considerable progress. The Commonwealth's Quality Review Team (QRT) had continued to meet quarterly. During the second and third quarters of Fiscal Year 2025, the QRT had reviewed collected data, and had discussed trends as well as the progress of its Quality Improvement (QI) and remediation strategies for each of the Waiver quality performance measures that had fallen below the CMS-established HCBS's 86% standard. However, the QRT once again had not reviewed current data and implemented QI strategies for the particular performance measure regarding the number and percentage of individuals aged 19 and younger with Waiver services who had an ambulatory or preventive care visit during the year.

For Term 57, Virginia had made significant progress determining the need for and implementing or updating remedial strategies for the Waiver quality performance measures that had fallen below HCBS's 86% standard. However, the Commonwealth had not met this Term's specified goals: the QRT again had not followed its own procedures to provide a documented rationale for not developing a remediation plan concerning one of these performance measures.

**Twenty-eighth Period Study**

For this latest review, the Independent Reviewer retained the same consultants as previously to assess Virginia's status regarding specified goals and its implementation of required actions, particularly the 12 remaining Terms of the Permanent Injunction related to Quality and Risk Management. These are Terms 34, 40–44, 49, 52–53, and 55–57.

Term 54 required no further review, with the Commonwealth having achieved Sustained Compliance as a result of the previous Twenty-seventh Period study.

Key Points for Term 34

- Continuing its substantially improved performance in recent periods, DBHDS reported data that represented significant additional progress. For the first time, Virginia exceeded this Term's 86% thresholds by providing adequate and appropriately delivered behavioral support services to 90% of the 1,702 individuals who needed these services during the first and second quarters of Fiscal Year 2026.
- For subsection 34a, DBHDS completed the actions required. The Department continued to address findings identified through its previously conducted root cause analysis, and updated related activities as part of its semi-annual *Behavioral Supports Report (BSR)*. These updates pertained to training, task clarification and prompting, behavioral resources, performance consequences, effort and competition, gap analysis and quality assurance.
- Regarding subsection 34b, DBHDS documented use of the BSPARI tool in its *BSR* to determine whether individuals were receiving adequate and appropriate behavioral support services. For the first three quarters of Fiscal Year 2026, the Department reported that behavioral staff reviewed a total of 271 plans.
- For subsection 34c, DBHDS also reported in the latest *BSR* that it still employed five Board Certified and Licensed Behavior Analysts, again exceeding the requirement. As required, these staff in the Department's Office of Behavior Network Supports completed reviews of an annual statistically significant random stratified sample of Behavior Support Plans (BSPs), provided feedback to behaviorists for 257 such Plans, continued to analyze BSPARI scores and trends over time to identify areas of improvement and recurring issues in behavioral programming, and used these findings to create additional training and TA.

Key Points for Term 40

- DBHDS reported that it did not achieve this Term's 86% threshold. For the four quarters of Calendar Year 2025, an average of 71.3% of the individuals who are supported in

31

residential settings and who have coverage for dental services received an annual dental exam.

- Regarding subsection 40a's requirement to operate a minimum of three mobile dental vehicles, DBHDS continued to exceed this requirement by operating five mobile dental vehicles.

- For subsection 40b's requirement to staff the mobile dental vehicles, DBHDS employed five of the seven positions during this Period. Due to one dental assistant resignation and the Department's difficulty in filling this position, as well as a previously vacant dental assistant position, two of the required three such positions remained vacant. The Commonwealth was re-evaluating its recruitment efforts.

- Regarding subsection 40c, DBHDS continued to utilize an online platform on its website to review referrals to community dental providers.

- For subsection 40d, based on its most recent *Dental Report*, DBHDS still had active contracts with dental practices in Regions 1–4. However, the Department was recruiting in Region 5, and anticipated that one or more contracts would be signed by June 30, 2026.

- Regarding subsection 40e, DBHDS described in its *Dental Report* its ongoing activities, in collaboration with dental providers, to achieve its plan's measurable goals to better understand barriers to dental care coordination, as well as its new initiatives to address these.

- For subsection 40f, DBHDS continued to use current data to identify the eight lowest performing CSBs, in order for its OIHSN to better target its TA. Six of the eight CSBs made some progress during this latest Period.

- Although subsection 40g is not due to be implemented until January 2027, DBHDS reported that it had begun gathering data to inform a root cause analysis.

Key Points for Term 41

- DBHDS did not achieve this Term's goal, nor subsection 41a, due to ongoing data validity and reliability concerns. The Department did not make any additional modifications during this Period to its previously flawed methodology for determining the percentage of individuals who were protected from serious injury. As discussed in earlier Reports, the processes in this methodology did not lead to a reliable evaluation of the presence of pre-injury supports, had not included all appropriate serious injuries and had produced invalid results.

- Regarding subsection 41b, OIHSN completed a second review of a statistically significant sample of serious injuries, as required. However, the Office will not reach a firm conclusion

32

regarding the Incident Management Unit's (IMU's) processes or service quality measures until the OIHSN review process is further refined for clarity and consistency. Although not yet final, the Office's preliminary results appeared to support the latest and earlier QRM studies' findings that DBHDS needs to implement additional process improvements to ensure appropriate evaluation of pre-injury supports and subsequent referrals for investigation.

- For subsection 41c, to improve clarity and consistency, DBHDS was considering revisions to its quality review processes.

Key Points for Term 42

- This term's goal aims to ensure that licensed providers of DD services have risk management processes in place to identify the incidence of common risks and conditions faced by people with DD that contribute to avoidable deaths. During this Period, DBHDS's OL began its 2026 annual inspections of such providers. However, since the Office will not complete a majority of these inspections, sufficient to generalize its statistical findings to all provider inspections until the next Twenty-ninth Period, this data cannot be assessed and a compliance rating, therefore, cannot yet be determined.

- Regarding subsection 42a, this Period's study confirmed that OL's IRR process followed its requirements and that, after earlier remedial actions had been implemented, the rating consistency among Licensing Specialists improved significantly from OL's July 2025 review to its January 2026 review.

- For subsection 42b, as outlined in its protocols, OL continued to enhance TA for those licensed providers who did not identify common risks contributing to avoidable deaths. Starting July 15, 2025, DBHDS made ECTA participation mandatory for providers cited twice consecutively for regulatory violations, and tracked participation outcomes. The latest study found that, after participating in the ECTA, these cited providers had made meaningful improvements in their quality and risk management systems to track the incidence of such common risks and conditions.

- Regarding subsection 42c, DBHDS again fulfilled this subsection's requirement to maintain the effective implementation of OL's CAP  protocols.

Key Points for Term 43

- Virginia continued the positive trend established in previous Reports and, for the first time, achieved this Term's goal that 86% of individuals assigned a Waiver slot were enrolled in a service within the required timeline. DBHDS reported that for two quarters (April 1,

33

2025, through September 30, 2025), 807 of 903 (89.4%) individuals who accepted DD Waiver slots were enrolled within the required five-months.

- For subsection 43a, DBHDS completed this ongoing action this Period by tracking and reporting quarterly data on the number of individuals who were assigned a Waiver slot but who had not been enrolled in a service within five months.

- Regarding subsection 43b, DBHDS continued to collect data from those awaiting services. Its latest *Quarterly Timely Waiver Service Enrollment Report* included the barriers that have delayed the initiation of services, the actions the Department took to remediate the barriers, and a summary of the reasons why services were not initiated within five months.

- For subsection 43c, in July 2025, DBHDS developed a strategy to improve the timeliness of initiating Waiver services, including plans to conduct focus groups and to subsequently initiate a root cause analysis. In October 2025, two focus groups with Support Coordinators took place, and a third focus group with individuals and families was in the planning stages. However, the root cause analysis was not completed by January 2026, as required.

Key Points for Term 44

- DBHDS did not meet this Term's requirements, since its data collection and analysis did not yet include annual data regarding the management needs of individuals with identified complex adaptive support needs. Additionally, the Department's remediation systems across all three populations of individuals with complex support needs remained inadequate in tracking corrective actions and making appropriate revisions as necessary.

- DBHDS plans to focus its Twenty-ninth Period IMNR process on the management needs of 30 individuals with complex adaptive support needs. In addition to this and other IMNR processes, the Department must ensure that its selected samples of individuals with complex needs for its various other reviews – e.g. the QSR – include a sufficient number of each of this Term's three target populations to allow findings to be generalized.

- Regarding subsection 44a, DBHDS produced its *2025 Ongoing Service Analysis Report* which included data from the IMNR process for individuals with complex medical needs, the care concerns process, the BSPARI quality reviews, and Round 7 of the QSR. Again however, the *Report* did not document the data consolidation to provide a comprehensive picture of the management and support needs for individuals with complex needs, nor did it examine the aggregate data for similarities in service needs or the adequacy of the management and supports provided. The Department did take the positive step of beginning to standardize

34

data categories across relevant data management platforms to better facilitate aggregation and comparison of remediation plans and corrective actions going forward.

- DBHDS also improved its planned remediation systems by adding new steps for escalation. When monitoring the efficacy of its remediation plans, if there is no provider response after two attempts by the Department's reviewer, or if the reviewer determines that the provider is not taking the remediation plan seriously, follow-up will escalate to DBHDS's Assistant Commissioner for Developmental Services, and then, if the provider's response continues to be insufficient, to the Deputy Commissioner for Community Services.

- For subsection 44b, DBHDS implemented a second consecutive IMNR study of the management needs of 30 randomly selected individuals with complex behavioral support needs. This IMNR included on-site visits and interviews with primary care givers by qualified nursing professionals who administered a fact-based monitoring questionnaire.

Key Point for Term 49

- Once again due to invalid and unreliable data, DBHDS did not achieve this Term's goal that 95% of residential service recipients live in an integrated setting that supports full access to the greater community. The Department did not submit documentation that demonstrated reliable and valid data for either its initial compliance validations or for ongoing compliance. Additionally, DBHDS did not submit updated documents to show that its data collection processes met the requirements to obtain valid and reliable data, nor had the CMS confirmed Virginia's compliance for its initial settings validations. The Department therefore did not fulfill the requirements of subsection 49a.

Key Points for Term 52

- DBHDS's OHR again conducted CLB reviews to ascertain whether investigations of abuse, neglect and/or exploitation involving individuals receiving DD services in licensed community provider settings were completed regarding the Term's three investigation outcomes of timeliness, investigator training and implementation of corrective action plans. This latest CLB process involved the review of a statistically significant and randomly selected annual sample of 300 investigations, 75 of which were reviewed each quarter.

- This Period's study confirmed that OHR provided a quarterly data summary and outcome trend analysis, as required, to the RMRC. Additionally, OHR strengthened its IRR process by including reviews conducted by an individual outside of OHR management as well as quarterly IRR evaluations that allows for trend analysis by focus area over

time. Although implementing enhancements were in initial stages with only three sets of results to date, this updated IRR process showed improvement. It was premature, however, to determine actionable trends, and the necessity to recommend QIIs.

- DBHDS did not meet the requirements of this Term, and will not achieve compliance until OHR and the RMRC address ongoing concerns regarding the lack of defined outcomes and measurement criteria within existing and future QIIs.

Key Points for Term 53

- A benchmark specified in this Term requires that at least 86% of the sample of serious incidents reviewed by the RMRC meet criteria reviewed in OHR's audit. DBHDS continued to maintain a look-behind quality assurance process for serious incidents through a collaboration with VCU, and presented results of its quarterly look-behind reviews to the RMRC. These results continued to exceed the 86% performance measure across all outcomes. Over the past four quarters, the IRR for VCU reviewers remained near 100%.

- This Term also states that DBHDS's OHR is required to conduct retrospective annual evaluations of allegations of abuse, neglect and exploitation to assess each of three mandated outcomes: timeliness, investigator training and implementation of corrective action plans. Although the Department continued to work toward achievement of this Term's threshold that at least 86% of the sample reviewed by the RMRC meet criteria also reviewed in OHR's audit, DBHDS did not meet two of these three outcomes. Over the four quarters of Calendar Year 2025, the Department achieved the investigator training outcome with a 91.9% average, came close to achieving the timeliness outcome with 84.2%, but again fell significantly short in implementing corrective action plans with only a 63% average.

- Although DBHDS made improvements to its required QII since its implementation, the QII reports often lacked sufficient data on individual improvement activities.

Key Points for Term 55

- OL continued to conduct annual inspections to assess provider compliance with DBHDS's risk management regulations. However, since results from OL were only available for inspections conducted during the first two months of 2026, the number of completed inspections was not sufficient to generalize the findings to verify OL's adherence to this Term's requirements. Virginia's achievement of this Term's 86% benchmark, therefore, could not be determined until the next Twenty-ninth Period review.

- Regarding 2026 inspections, to ensure consistent evaluation of regulatory compliance, the Office again updated its *Annual Compliance Determination Chart* with specific instructions for its Licensing Specialists' inspection assessments.

Key Point for Term 56

- Once again, the Commonwealth did not achieve the specified goals for this Term's required quarterly actions. The QRT met quarterly – in October 2025 and January 2026 – and reviewed data for the performance measures that fell below the CMS's 86% standard during Fiscal Year 2025. However, the Team did not provide meeting minutes or other documentation of its determinations of trends or its implementation of QI strategies from its October 2025 meeting.

Key Point for Term 57

- For the first time, Virginia achieved the requirements of this Term. For the QI plans for its HCBS DD Waiver programs, the QRT continued to collect data for the relevant performance measures. The Team reviewed underperforming measures (i.e., below 86%), discussed applicable remediation plans or the basis for its determinations that remediation was not necessary, and made needed revisions when implemented remediations did not have the intended effect. The QRT accomplished these actions in August 2025 and again in January 2026, which fulfilled this Term's minimum six-month timeline.

See Appendix G for the consultants' full report.

**Conclusion**

Regarding Terms 34, 43 and 57, since the Commonwealth met each of the specified goals, Virginia has achieved Compliance with these three Terms for the first time.

Regarding Terms 40, 41, 44, 49, 52, 53 and 56, since the Commonwealth did not achieve the specified goals, the compliance rating for each of these seven Terms is Not Achieved.

Regarding Terms 42 and 55, since Virginia has not yet completed a sufficient percentage of annual licensing inspections for 2026, the compliance rating for each of these two Terms is Deferred.

37

## 7.    *Provider Training*

**Background**

The previous Twenty-seventh Period review had focused on the two Terms of the Permanent Injunction related to Provider Training, i.e., Terms 47 and 48.

For Term 47, the Commonwealth had not met the specified goal, so the compliance rating for this Term was Not Achieved. From DBHDS's Office of Licensing's (OL's) 2025 annual inspections, the Department had determined that 77.6% of providers had a required training policy in place. Even though this percentage had reflected progress from the previous year, it had still remained less than the 86% benchmark.

For this Term's subsection 47a, the consultant had verified that OL had continued to expect any provider not in compliance with training requirements to develop and implement a Corrective Action Plan (CAP). Also, OL had continued to provide written and virtual training and guidance. Regarding subsection 47b, OL had previously established the Expanded Consultation and Technical Assistance (ECTA) process, in which providers may enroll voluntarily. The consultant had verified that, as required by subsection 47c, providers cited by OL for non-compliance over two consecutive inspections had been mandated to participate in the ECTA process. In addition, providers failing to initiate or complete mandatory ECTA technical assistance had been subject to further enforcement actions.

For subsection 47d, OL had developed and begun implementation of an Inter-Rater Reliability (IRR) process carried out by the Office's Quality Assurance staff who were not involved in the licensing inspections. This process formally evaluates the consistency and accuracy with which Licensing Specialists determine whether providers are meeting the applicable regulatory requirements for this Term.

Regarding Term 48, since Virginia had not met the specified goal, the compliance rating for this Term was Not Achieved. The Commonwealth had completed the Round 7 assessments of its QSR process, and DBHDS had determined that the 95% benchmark for this Term was not met.

Virginia utilizes two measures in the QSR process to establish its progress toward meeting this Term's goal; Round 7 had found that 92.7% of provider agency staff had met the applicable orientation and training requirements, and 81.6% of Direct Support Professionals (DSPs) and their supervisors had met competency-based training standards.

38

Regarding this Term's subsection 48b, DBHDS had continued to implement the Quality Improvement Initiative (QII) to address barriers to the Commonwealth's achievement of this Term's 95% goal. The QII had included specific plans to streamline the requirements for DSP/Supervisor training and competency testing while reducing the related administrative burdens for providers. The Department had also updated its *DSP Advanced Competencies* to consolidate, streamline and modernize its content; this updated process was to be piloted November 2025 through January 2026, with results evaluated during the Twenty-eighth Period study.

As required by this Term's subsection 48c, Virginia had completed its rate study in time to be considered by the Commonwealth's 2026 General Assembly session, and if necessary, its 2027 session.

**Twenty-eighth Period Study**

For this latest review, the Independent Reviewer retained the same consultant as previously to assess Virginia's status regarding the specified goals and implementation of required actions for Terms 47 and 48.

Key Points for Term 47

- Results from OL were only available for inspections conducted during the first two months of 2026. The Commonwealth's achievement of this Term's 86% benchmark could therefore not yet be determined.

- The consultant reviewed an abbreviated sample of providers' annual licensing inspections conducted in January and February 2026. During the next Twenty-ninth Period, this review will be combined with a study of a larger sample to produce generalizable results and a determination of whether 86% of the providers complied with this Term's training requirements.

- As required by subsections 47a–c, DBHDS continued to require CAPs, to provide written guidance and training to underperforming providers, and to mandate provider participation in its ECTA process when providers are found noncompliant with applicable licensing requirements.

- For subsection 47d, OL assessed the effectiveness of its first IRR review and subsequently made several improvements prior to conducting its second IRR review. The consultant verified the improved effectiveness of OL's refined approach and confirmed that the Office has established an IRR process that meets this subsection's requirements.

39

<u>Key Points for Term 48</u>

- Because Virginia is not scheduled to complete Round 8 of its annual Quality Service Reviews (QSR) until the next Twenty-ninth Period, data was not available for DBHDS to determine whether DSPs and their supervisors were receiving the necessary training and competency testing.

- For subsection 48b, the Commonwealth conducted a pilot program to evaluate the updated *DSP Advanced Competencies*, consistent with quality improvement principles, and found them easier to implement and that they reduced administrative burden. DBHDS was actively collaborating with its Provider Issues Resolution Workgroup to enhance and refine prioritized initiatives aimed at streamlining the revised advanced competencies.

See Appendix F for the consultant's full report.

**Conclusion**

Regarding Term 47, since the Commonwealth has not yet completed a sufficient number and percentage of annual licensing inspections for 2026, the compliance rating for this Term is Deferred.

Regarding Term 48, since Virginia has not yet completed Round 8 of its annual Quality Service Reviews (QSR), the compliance rating for this Term is Deferred.

## *8.    Quality Improvement Programs*

**Background**

As of the Twenty-seventh Period review, two Terms – i.e., Terms 45 and 46 – specified the Agreement's requirements for Quality Improvement (QI) Programs.

Term 45 requires that 86% of licensed providers of DD services comply with the applicable 11 sub-regulations. At the time of the previous study, the Commonwealth had completed 71% of its 2025 annual licensing inspections, a sufficient percentage to generalize the statistical findings and compare them with data from 2023 and 2024.

DBHDS had determined, however, that it did not meet this 86% benchmark and therefore had received a compliance rating of Not Achieved. Its Office of Licensing's (OL's) 2025 data had

40

indicated that providers had met or exceeded this percentage for only one of the 11 sub-regulations. The Department had also determined that its providers had received higher scores than in 2024 on nine sub-regulations, and lower scores on two of them.

For subsection 45a, the consultants had verified that DBHDS had continued to require any provider not in compliance with this Term's regulatory requirements to develop and implement an appropriate Corrective Action Plan (CAP). The Department had continued to have licensing regulations and implementation protocols in place that had met the requirements of this Term's subsection 45b. OL had consistently followed these protocols.

For subsection 45c, OL had developed and begun implementation of an inter-rater reliability (IRR) process that formally evaluates consistency and accuracy to assess whether providers have met this Term's regulatory requirements.

Regarding Term 46, Virginia had completed Round 7 of its Quality Service Reviews (QSR) in time for the previous Twenty-seventh Period study. As a result of DBHDS's preparatory work during the prior Twenty-sixth Period, the consultants had verified that the QSR Round 7 data available was considered valid (i.e., it measured what it purported to measure.)

However, the consultants' comparative review of 36 providers in the selected sample from DBHDS had found overall agreement with the QSR findings related to quality improvement only 65% of the time. Since the QSR Round 7 data provided could therefore not be determined to be reliable, the Commonwealth had not met this Term's requirements and had received a compliance rating of Not Achieved.

Regarding subsection 46a, the consultants had verified that DBHDS had continued to require that providers who receive OL citations for failing to comply with its regulatory requirements must develop and implement a CAP for each citation. In addition, the Department had continued to employ 12 QI Specialists to provide the individualized consultation, training and technical assistance, tailored to providers' specific needs and areas of underperformance.

For subsection 46b, OL had continued to cite providers who had failed to comply with this Term's regulatory requirements over two consecutive annual inspections. In response to any cited non-compliance, providers must develop and implement a CAP for each citation.

Regarding subsection 46c, OL had developed the needed formal, measurable framework for continuously assessing IRR among its Licensing Specialists, and had begun implementation of this

41

process in July 2025. The Office had anticipated completing its analysis of results and determining follow-up actions by September 30, 2025. This information was to be reviewed as part of the Twenty-eighth Period study.

### Twenty-eighth Period Study

For the latest review, the Independent Reviewer retained the same consultants to assess Virginia's status regarding the specified goals and its implementation of required actions for Terms 45 and 46 of the Permanent Injunction.

Key Points for Term 45

- During this Period, DBHDS's OL began its 2026 annual inspections of licensed providers of DD services. However, the Office will not complete a majority of these inspections, sufficient to generalize its statistical findings and compare them with data from 2024 and 2025, until the end of June 2026. Since this data cannot be assessed until the next Twenty-ninth Period, a compliance rating could not be determined.

- For this Term's subsection 45a, DBHDS continued to require providers not in compliance with the relevant regulations to develop, submit and implement CAPs that include technical assistance (TA), additional training, and targeted corrective actions aligned with identified areas of underperformance.

- Regarding subsection 45b, for providers with two consecutive citations, DBHDS continued to mandate its Expanded Consultation and Technical Assistance (ECTA) process to assist them in strengthening their QI and risk management practices. This Period's study verified that the Department consistently followed its ECTA protocols and was enforcing mandatory participation when providers were found noncompliant with applicable licensing requirements.

- For subsection 45c, this latest study confirmed that OL dependably followed its IRR process requirements. After initial remedial actions were implemented, rating consistency improved significantly from the Office's July 2025 IRR review to its January 2026 IRR review.

Key Points for Term 46

- Since the Commonwealth has not yet completed the majority of its 2026 annual licensing inspections as well as Round 8 of its QSR process, new data will not be available until the next Twenty-ninth Period. This data assesses which providers did not demonstrate

adequate QI programs and whether the QSR yielded relevant valid and reliable data. A compliance rating could therefore not be determined.

- For subsection 46a, OL continued issuing citations to providers who failed to comply with the applicable regulatory requirements, and required those providers to develop and implement a CAP for each citation. The Office continued to employ 12 QI Specialists who offered the required assistance.

- Regarding subsection 46b, DBHDS again completed this action. For the same violation over two consecutive inspections, the Department mandated that relevant providers begin the ECTA process within the required 45 days. According to OL's protocols, continued noncompliance or failure to complete required TA may lead to escalating enforcement actions.

- For subsection 46c, based on an analysis of results from two rounds of OL's Licensing Specialists' implementation of its new IRR process, this Period's study determined that the Office had established a valid process – an important and commendable step forward.

- Also regarding subsection 46c, DBHDS was unable to confirm that the IRR system among QSR reviewers was sufficient, since Round 8 of its annual QSR process was not yet completed. The Department did provide a clear methodology to measure the level of IRR between OL's Licensing Specialists and QSR reviewers.

See Appendix G for the consultants' full report.

**Conclusion**

Regarding Term 45, since Virginia has not yet completed the majority of its 2026 annual licensing inspections, the compliance rating for this Term is Deferred.

Regarding Term 46, since the Commonwealth has not yet completed both the majority of its 2026 annual licensing inspections and Round 8 of its annual QSR process, the compliance rating for this Term is Deferred.

## 9.    *Rate Study*

**Background**

For many years, Virginia has been unable to achieve certain goals specified in the Consent Decree. In 2024, the Parties had agreed that a rate study and subsequent rate increases were necessary to ensure that the Commonwealth's providers of services to individuals with IDD had sufficient

43

capacity to achieve these goals. The Permanent Injunction, approved in January 2025, had required Virginia to complete a study that would recommend increasing providers' funding rates for 11 DD Waiver services. By funding such recommended rate increases, the Commonwealth would help ensure sufficient capacity to achieve the goals of the Permanent Injunction's Terms 33, 37, 38, 39 and 48.

This rate study had begun during the Twenty-sixth Review Period. To conduct it, Virginia had engaged a qualified vendor, Guidehouse, and had formed the DMAS Rate Study Work Group. This Group had included representatives from DD service providers, advocacy groups and industry associations who would have opportunities to provide feedback during the rate development process.

The Permanent Injunction's Term 59 is dedicated solely to this rate study, and comprises six required actions. For the Twenty-seventh Period Report, the Independent Reviewer verified that Guidehouse had included DOJ and stakeholders in its meetings. Each had opportunities to provide input on how the rate study should be conducted.

As part of their respective input at that time, DOJ and some stakeholder representatives had encouraged the Commonwealth to direct Guidehouse to collect information needed to support funding rates with a laddered approach to Direct Support Professional (DSP) positions. This information would then guide recommendations for potential rate changes necessary to support and fund such laddered positions. If the necessary funds were approved, this would improve providers' capacity to build organizational structures to more effectively recruit and retain DSPs.

The vendor had submitted its draft rate study report to DMAS in July 2025. The draft report had included Guidehouse's extensive information gathering and thoughtful analysis, consistent with the Independent Reviewer's understanding of the established practices for conducting rate studies.

During the previous Twenty-seventh Period, DOJ, advocacy groups, service providers and industry association representatives had provided comments about the vendor's draft report, including concerns and questions.

DOJ had questioned whether the draft report fulfilled the Permanent Injunction's requirement that the study be designed to ensure sufficient capacity to achieve the specified goals of the five Terms 33, 37, 38, 39 and 48. Virginia's DD service providers and association representatives had also questioned whether Guidehouse's recommended rate increases were based too heavily on the

44

existing range of providers' pay rates. They had additionally questioned whether the vendor's recommended rates were sufficient to resolve providers' capacity to recruit and retain an adequate number of qualified staff, particularly DSPs, to achieve the specified goals of the 11 DD Waiver services.

For subsection 59a.ii, on October 15, 2025, DMAS had submitted the vendor's final report to the Governor, and placed it in the Library. The report had included responses to DOJ's written comments about Guidehouse's draft report. It was also filed with the Court, as required by subsection 59a.iii.

The report had included various rate comparisons with eight peer states and the District of Columbia. Guidehouse had justified these selections because its analysis had determined that these states and D.C. have either service structures or labor markets similar to the Commonwealth. The report's graphs had showed that Virginia's existing rates are typically above the average rates shown for the peer states.

In the Independent Reviewer's considered opinion, however, these graphs might have erroneously implied that the selected peer states were economic matches. This was not the case. There were three reasons why the vendor's graphic comparisons had not accurately portrayed how the Commonwealth's existing rates compared with those from states that were actually closer economic matches. Of the peer states that Guidehouse had selected for comparisons, six of the eight (75%) had a minimum wage 40% below Virginia's, and seven of the eight (87%) had median household incomes averaging 25% below the Commonwealth's. In addition, its report had compared Virginia's Fiscal Year 2026 rates with those of the selected peer states from 2023 to 2025.

In its final report, Guidehouse had not recommended different base rates that would be needed for a laddered DSP wage structure. The vendor had explained that the providers' responses to its survey had not identified consistent existing wage patterns across the different DSP job levels. Instead of using different base rates, the vendor had adopted a single average DSP base wage to establish its recommended rate changes.

In the considered opinion of the Independent Reviewer, the implementation of the vendor's recommended rate increases, if approved by the General Assembly, would have an important and positive impact on providers' capability to move toward accomplishing the five Terms' specified goals. However, the report's lack of adequate and compelling data to recommend rates that

45

support laddered positions for DSPs had indicated that Guidehouse's study was not designed to ensure sufficient provider capacity to recruit and retain an adequate number of DSP staff with the experience and competence needed to fully achieve the goals of the Permanent Injunction's applicable Terms.

For subsection 59a.iv, in October 2025, the Commonwealth began its efforts to obtain the necessary funds to implement the recommended rate increases by forwarding copies of the final rate study to the chairs of the Virginia legislature's House and Senate Appropriations Committees.

The actions in subsection 59a.v had not yet been implemented. They would be invoked one month after the Governor's proposed budget was submitted to the General Assembly, if the rate increases identified in the study had not been part of the proposed budget.

**Twenty-eighth Period Review**

For this latest review, the Independent Reviewer assessed the Commonwealth's status regarding Term 59's three remaining actions that are still applicable to the current Rate Study. This Study's recommended increased rates are to be considered during Virginia's 2026 and 2027 legislative sessions.

Key Points for Term 59

- For subsection 59a.iv, the Governor's biennial budget for Fiscal Years 2027 and 2028 proposed funding just 29.3% of the funds necessary to increase rates recommended by the study, covering only the proposed rate increases for seven of the 11 DD Waiver services, namely Community Coaching, Community Engagement, Independent Living Supports, In-Home Support Services, Therapeutic Consultation, Workplace Assistance and Companion Care. The Governor's proposed budget did not include any funding to increase the rates of the remaining four services, namely Personal Care, Respite Care, Private Duty Nursing and Skilled Nursing.

- The Commonwealth has not yet fulfilled this subsection's commitment to make its best efforts to obtain from the General Assembly the funding necessary to increase rates to those recommended by the study. Instead, the Governor's initial efforts set the stage for Virginia's House of Delegates and Senate decisions. Following the Governor's lead, the House approved its budget with the same insufficient 29.3% of the necessary funds, again covering only seven of the 11 DD Waiver services. The Senate's approved Fiscal Year 2027 budget fully funded the recommended rate increases for six of these seven services, and partially funded rate increases (just 3.8%–5.0%) for Private Duty Nursing and Skilled Nursing.

46

However, the Senate did not approve any funding for the recommended rate increases for Companion Care, an increase that the Governor had proposed and that the House had approved. Finally, for Fiscal Year 2028, the Senate did approve an 8.1% increase, effective January 1, 2028, for the remaining Companion, Personal and Respite Care Waiver services. This represented, though, a fraction of the overall recommended rate increases. The General Assembly has not yet approved its final biennial budget for Fiscal Years 2027 and 2028.

- Before and after the Governor's proposed biennial budget for Fiscal Years 2027 and 2028 was submitted to the General Assembly, both DMAS and DBHDS discussed the Permanent Injunction's rate increase expectations with senior Commonwealth administration and General Assembly officials, reminding them of the importance of the rate increases.

- Regarding subsection 59a.v, the Court held a status conference on January 7, 2026. At this open court hearing, Virginia's representatives acknowledged that its then Governor had not proposed all of the funds necessary to implement the recommended rates, and outlined planned steps to obtain the full funding.

- For subsection 59a.vi, as of the writing of this Twenty-eighth Period Report, the Commonwealth's current General Assembly and Governor have not taken all the steps to finalize Virginia's biennial budget. The Court, therefore, has not yet scheduled a follow-up public hearing.

See Appendix H for a table that shows the recommended rate increases for the 11 DD Waiver services, together with the funds proposed in each of the Governor's, House's and Senate's Fiscal Year 2027 budgets.

**Conclusion**

Regarding Term 59, the Commonwealth did not make its best initial efforts to obtain from the General Assembly the funds necessary to increase rates that its study recommended to ensure sufficient capacity to fulfill the goals of Terms 33, 37, 38, 39 and 40.

# III. CONCLUSION

During the Twenty-eighth Review Period, Virginia, through its lead agencies DBHDS and DMAS, and their sister agencies, continued its diligent efforts and progress toward its achievement of measurable goals and its implementation of required actions, as specified in Section IV's Terms 31–59 of the Permanent Injunction.

Of the 27 Terms that remained to be studied for this Report, the Commonwealth achieved Compliance for four Terms for the first time. Virginia achieved Sustained Compliance for two Terms, having met them both for the second time. Since the Commonwealth did not achieve the goals specified in ten of the Terms, its compliance rating for these was Not Achieved. For another ten Terms, data will not be available from a number of Virginia's established annual monitoring cycles until the next Twenty-ninth Review Period, so the compliance ratings for these Terms was Deferred.

The goals of three unachieved Terms are especially critical to the Commonwealth's ability to strengthen and sustain its DD service system. Achieving Term 41 will improve Virginia's ability to protect individuals from serious injuries. Meeting the requirements of Term 44 will provide essential information needed to develop targeted quality improvement initiatives that address service gaps. Providing necessary funds to increase the rates for 11 DD services, as recommended by the Commonwealth's rate study, will help ensure sufficient capacity to improve its provision of needed behavioral support services, day services, private duty and skilled nursing services and the training and competency of its Direct Support Professionals.

Throughout this Twenty-eighth Review Period, the Commonwealth's staff and DOJ once again gathered and shared information that helped to facilitate further movement toward effective implementation of the Permanent Injunction. The willingness of both Parties to openly and regularly discuss relevant issues continues to be impressive and productive. The involvement and contributions of advocates and other stakeholders have helped Virginia to formulate policies and processes and to take measurable steps toward fulfilling its promises to all citizens of the Commonwealth, especially those individuals with IDD and their families.

The Independent Reviewer greatly appreciates the assistance that was so generously given by these individuals, as well as their families, case managers and service providers.

48

# IV. RECOMMENDATIONS

The Independent Reviewer recommends that the Commonwealth undertake the ten actions listed below, and provide a report that addresses these recommendations and their status of implementation by September 30, 2026. Virginia should also consider any additional recommendations and suggestions included in the consultants' studies, which are contained in the Appendices.

## Case Management

1. DBHDS should include in its SCQR report the performance status of cited CSBs after they have received technical assistance and implemented the action steps and monitoring strategies outlined in their improvement plans.

## Crisis Services

2. DBHDS should determine whether REACH programs have the necessary number of authorized, funded and filled staff positions to fully utilize the capacity of their respective youth and adult crisis therapeutic homes.

## Community Living Options

3. DBHDS should ensure that the primary barriers that prevent individuals on DD Waivers from accessing nursing services, as well as its efforts to resolve them, are included in its semi-annual *Nursing Access Work Plan* and posted online in the publicly available Library.

## Quality and Risk Management

4. For individuals receiving services and who have known pre-existing risks at the time of serious injuries, DBHDS should measure whether they were adequately protected or not from such injury by considering that a lack of adequate pre-injury protections is indicative of a lack of protection.
5. DBHDS should include in its annual *Ongoing Service Analysis Report* the consolidation of data into a comprehensive summary. This summary should include cross-referencing and comparing data from the five identified sources to illuminate either gaps in services or opportunities for cross-learning.
6. DBHDS should focus a QII on needed improvements to the Office of Human Rights' Community Look-Behind process to establish outcomes and criteria for measuring achievements. These objectively measured outcome evaluations should then be built into the Risk Management Review Committee's process and documented in its minutes.

49

## Provider Training

7. DBHDS's Office of Licensing should issue a targeted information bulletin to all providers clarifying the information needed in their training policies. Examples of policy language should be included for what does and what does not fulfill the Office's applicable regulatory standards.

8. DBHDS should continue to revise its *DSP Advanced Competencies* in the areas of behavior, health and autism, and initiate specialized provider training to explain the purpose and expected results from these changes.

9. DBHDS should concentrate its QII regarding the training and competency of Direct Support Professionals on those specific areas where QSR Round 8 results indicate that improvements are most needed.

## Quality Improvement Programs

10. DBHDS should finalize a formal process and its associated *Process Document* for measuring the inter-rater reliability between Licensing Specialists and the QSR reviewers to assess the adequacy of providers' quality improvement programs.

50

# V. SUMMARY OF COMPLIANCE

According to the Terms in Section IV of the Permanent Injunction, the Commonwealth is working to achieve their specified goals and is required to implement the enumerated actions.

The Independent Reviewer has determined four compliance ratings for the Terms' specified goals:
- *Sustained Compliance* indicates achievement of two successive ratings of *Compliance.*
- *Compliance* indicates achievement of the specified goal.
- *Not Achieved* indicates that the specified goal was not met.
- *Deferred* indicates that the Commonwealth will report complete data sets for review and analysis during the next Twenty-seventh Period, as per its established monitoring cycles.

In addition, the Independent Reviewer determined seven status ratings for the Terms' delineated actions:
- *Completed* indicates the full accomplishment of a listed action.
- *Completed and Ongoing* indicates the accomplishment of a delineated action in the current Period, but the accomplishment must be sustained in the future.
- *In Progress* indicates at least one documented step was taken to achieve the required action.
- *No Progress* indicates no documented steps were taken, and no progress was reported during the current Period.
- *Not Completed* indicates that progress began, but the required action was not completed within the specified timeframe.
- *Not Yet Implemented* indicates that documented steps are not yet underway for a required future action.
- *No Longer Required* (with due date) indicates that a future action is required but is neither underway nor due.

51

| TERM | REQUIRED ACTIONS | **RATING** 27th **28th** |
|---|---|---|
| **31. Community Services Board Quality Review (SCQR).** The Commonwealth will work to achieve a goal that 86% of Community Services Board (CSB) records meet a minimum of 9 of the 10 elements assessed in the Case Management Quality Review.  To achieve that goal, the Commonwealth will take the following actions: | a) During its annual quality review cycle starting each January, DBHDS will require a quality improvement plan from any CSB that has two or more elements with substantial or moderate interrater reliability between the CSB Support Coordinator Quality Review (SCQR) and the DBHDS Office of Community Quality Improvement Review not achieving 60% compliance.  DBHDS will provide information about which CSBs need this support in the SCQR Report. *Completed and Ongoing* <br><br> b) DBHDS will provide targeted technical assistance with identifying measurable outcomes to any CSB (i) whose records are not 86% compliant with including specific and measurable outcomes in Individual Support Plans (ISPs) or (ii) that does not demonstrate improvement with respect to including specific and measurable outcomes in ISPs (including evidence that employment goals have been discussed and developed, when applicable, throughout its quality review cycle). *Completed and Ongoing* <br><br> c. If the Commonwealth has not achieved the goal within one year of the date of this Order after taking the actions in Paragraphs 31(a) and 31(b), DBHDS will increase the threshold for requiring a quality improvement plan from a CSB as set out in Paragraph 31(a).  DBHDS will provide information about which CSBs need this support in the SCQR Report. *Completed and Ongoing* <br> d. If the Commonwealth has not achieved the goal within one year after taking the actions in Paragraph 31(c), DBHDS will conduct a root cause analysis and implement a Quality Improvement Initiative (QII) as determined appropriate by DBHDS.  DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. *Not Yet Implemented* *Due January 15, 2027* | Not Achieved **Deferred** |
| **32. Community Setting Crisis Assessments.** The Commonwealth will work to achieve a goal that 86% of children and adults receive crisis assessments at home, the residential setting, | a) DBHDS will continue to promote the use of the 988 24-hour crisis helpline by providing information on the helpline on its social media platforms, in print and television advertisements, and through informational bulletins developed or funded by DBHDS.  DBHDS will require all mobile crisis team members to receive training within 90 days of hire on how to support and respond to individuals with developmental disabilities (DD) who are in crisis. *Completed and Ongoing* <br><br> b) DBHDS will maintain its current efforts to assist the regions in filling vacant mobile crisis positions by discussing staffing at regional qualitative reviews of REACH programs and supporting REACH programs to implement quality improvement plans. *Completed and Ongoing* | Not Achieved **Not Achieved** |

52

| | | |
|---|---|---|
| or other community setting (non-hospital/non-CSB office). Crisis Receiving Centers ("CRC") will only be counted as an "other community setting" after it is determined that the individual or supported decision maker was not directed by the Call Center, Emergency Services, or Mobile Crisis staff to present at a CRC.  To achieve that goal, the Commonwealth will take the following actions: | c) Within 6 months of the date of this Order, the Commonwealth will develop a plan that includes measurable goals, specific support activities, and timelines for implementation with consultation from stakeholders to enhance 988 supports and services to increase the likelihood that individuals will be assessed in the community. <br> *Completed and Ongoing* <br><br> d) From the date of this Order, DBHDS will monitor staffing at each REACH program to determine if they have sufficient staffing per shift to meet the goal, including through discussion and review of filled/vacant positions, utilization rates of mobile crisis, and times mobile crisis calls are being received in comparison to the number of staff working during those hours at each REACH program's quarterly review.  If a quarterly review indicates that staffing is not sufficient to meet the goal, DBHDS shall review the region's current efforts to increase staffing and, if DBHDS determines necessary, will require a quality improvement plan that includes additional actions that DBHDS finds are necessary to enhance staffing.  The Independent Reviewer, in the reports required under Paragraph 76, shall include a determination in his report on the adequacy of the Programs and Virginia's response to this requirement. *In Progress* <br><br> e) Semi-annually, beginning on January 1 and June 1 of each year, DBHDS will work with the two regions that are experiencing the most success in responding to people in crisis in the community to determine what is leading to their success.  DBHDS will work with the two regions that are experiencing the most challenges in responding to people in crisis in the community to learn what is leading to those challenges. DBHDS will work with all the regions based on these lessons learned to implement a plan to improve performance in each of the regions. <br> *Completed and Ogoing* <br><br> f) If the Commonwealth has not achieved the goal within two years of the date of this Order after taking the actions in Paragraphs 32(a) through 32(e), DBHDS will conduct a root cause analysis and implement a QII as determined appropriate by DBHDS.  As part of the root cause analysis, the Commonwealth will collect data on why individuals with developmental disabilities presented at a CRC instead of accessing mobile crisis services.  DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. <br> *Not Yet Implemented* <br> *Due January 15, 2027* | |
| **33. Therapeutic Consultation Services** <br><br> The Commonwealth will work to achieve | a) Within 12 months of the date of this Order, DBHDS shall implement a technical assistance initiative with the CSBs that need the most support to connect people to behavioral supports and focus on improving case managers' awareness of the behavioral resources available to individuals in need of Therapeutic Consultation, unique CSB business practices, and supervisory support for case managers in | Not Achieved |

| | | |
|---|---|---|
| a goal that 86% of individuals identified as in need of Therapeutic Consultation service are referred for the service and have a provider identified within 30 days.  To achieve that goal, the Commonwealth will take the following actions: | this area of performance.<br><div align="right">*Completed and Ongoing*</div><br>b) Annually, the Commonwealth will participate in at least one regional event and at least one statewide conference to promote Therapeutic Consultation services. The Commonwealth will provide technical assistance to providers regarding enrollment with Medicaid as a provider as they reach out to the Commonwealth for this support.<br><div align="right">*Completed and Ongoing*</div><br>c) By July 1, 2025, the Commonwealth will create a training about enrolling with Medicaid as a Therapeutic Consultation provider and make it available for providers via DBHDS's website.<br><div align="right">*Completed*</div><br>d) If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2024, and has not conducted a rate study meeting the requirements of Paragraph 59 in the preceding two years, the Commonwealth will initiate a rate study of Therapeutic Consultation by January 1, 2025.  The rate study shall be completed in time to be considered during the 2026 legislative session.  If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2028, and has not conducted a second rate study meeting the requirements of Paragraph 59, the Commonwealth will initiate a second rate study of Therapeutic Consultation by January 1, 2029.  The rate study shall be completed in time to be considered during the 2030 legislative session. Any rate study required by this paragraph shall be conducted in accordance with Paragraph 59.  This paragraph shall not be construed to require the Commonwealth to conduct more than two rate studies.   *Completed and Ongoing*<br><br>e) If the Commonwealth has not achieved the goal by June 30, 2026 after taking the actions in Paragraphs 33(a) through 33(c), DBHDS will also conduct a root cause analysis and implement a QII as determined appropriate by DBHDS.  DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.<br><div align="right">*Not Yet Implemented*<br>*Due January 15, 2026*</div> | **Not Achieved** |
| **34. Behavioral Support Services**<br><br>The Commonwealth will work to achieve a goal that 86% of individuals with | a) DBHDS will continue to address findings identified through the previously conducted root cause analysis initiated in Q1 of FY21 and updated subsequently as part of each semi-annual review.<br><div align="right">*Complete and Ongoing*</div><br>b) DBHDS will continue to use the BSPARI tool, or such other tool designed for behavioral programming that the parties agree upon, to | Not Achieved<br><br>**Compliance** |

| | | |
|---|---|---|
| identified behavioral support needs are provided adequate and appropriately delivered behavioral support services.  To achieve that goal, the Commonwealth will take the following actions: | determine whether individuals are receiving adequate and appropriate behavioral support services. _Complete and Ongoing_<br><br>c) DBHDS will continue to employ a total of four behavior analysts to provide technical assistance and training on behavioral support plans. Annually, the behavior analysts will (i) review a statistically significant sample of the behavioral plans submitted; (ii) provide feedback; and (iii) identify trends for improvement and develop additional training and technical assistance as determined necessary by DBHDS. _Complete and Ongoing_<br><br>d) If the Commonwealth has not achieved the goal within two years of the date of this Order after taking the actions in Paragraphs 34(a) and 34(b), DBHDS will conduct a root cause analysis and implement a QII as determined appropriate by DBHDS.  DBHDS will continue this quality improvement process until the goal is achieved and sustained for one. _Not Yet Implemented_ _Due January 15, 2027_ | |
| **35. Community Residences for Individuals with DD Waivers.** The Commonwealth will work to achieve a goal of 86% of individuals with a DD waiver and known to the REACH system who are admitted to a CTH or a psychiatric hospital have a community residence identified within 30 days of admission. To achieve that goal, the Commonwealth will take the following actions: | a)  DBHDS will enter into contracts with providers to develop homes for individuals with intense behavioral support needs that will be operational (*i.e.*, that an individual can move into the home) in accordance with the following schedule:<br><br>&bull; _Region 1: one home operational by August 2024 and one additional home operational by February 2025;_ _Completed_<br><br>&bull; _Region 2: two homes operational by August 2024 and one additional home operational by February 2025;_ _Completed_<br><br>&bull; _Region 3: one home operational by November 2024 and one additional home operational by February 2025;_ _In Progress_<br><br>&bull; _Region 5: one home operational by November 2024 and two additional homes operational by February 2025._ _Completed_<br><br>b)  If the Commonwealth has not achieved the goal after taking the actions in Paragraph 35(a) by June 30, 2025, DBHDS will conduct a root cause analysis and implement a QII as determined appropriate by DBHDS.  DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. _Completed and Ongoing_ | Not Achieved<br><br>**Compliance** |
| **36. Out-Of-Home Crisis Therapeutic Prevention Host-Home Like Services for** | a) Within one month of the date of this Order, DBHDS will send out a communication through the list serv for individuals and families on the waiver waiting list, and to the provider list serv communicating that the two CTHs existing in Regions 1 and 4 as of the date of this Order can be utilized for preventive stays by children across the Commonwealth. _Completed_ | Not Achieved<br><br>**Not Achieved** |

| | | |
|---|---|---|
| **Children.**<br><br>To prevent institutionalization of children due to behavioral or mental health crises, the Commonwealth will implement out-of-home crisis therapeutic prevention host-home-like services for children connected to the REACH system who are experiencing a behavioral or mental health crisis and would benefit from this service by: | b) DBHDS will continue to track and report quarterly on the number of crisis prevention stays being utilized by children in each of the five regions.<br><div align="right">*Completed and Ongoing*</div><br>c) Providing funding in Fiscal Year 2025 to establish three additional CTH's in the regions where they do not exist as of the date of this Order (Regions 2, 3, and 5) that will be operational between May 2025 and January 2026.<br><div align="right">*In Progress*</div><br>d) From the date of this Order and continuing until all three additional CTHs referenced in Paragraph 36(c) are operational, DBHDS will support up to a total of 1,000 days per year of respite for children connected to REACH, who have previously experienced or are at risk of experiencing a crisis, reside in regions without an operational CTH, and who do not otherwise have funding to access respite services at a rate of up to $500 per 24-hour period.       *In Progress*<br><br>e) If the Commonwealth has not achieved the goal after taking the actions in Paragraphs 36(a) through 36(d) by June 30, 2026, DBHDS will conduct a root cause analysis and implement a QII as determined appropriate by DBHDS.  DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.<br><div align="right">*Not Yet Determined*<br>*Due June 30, 2026*</div> | |
| **37. Day Services for DD Waiver Recipients.**<br><br>The Commonwealth will work to achieve a goal of a 2% annual increase in the percentage of individuals on the DD waiver receiving day services in the most integrated settings.  To achieve that goal, the Commonwealth will take the following action: | a) Within one month of the date of this Order, DBHDS's Community Life Engagement Advisory Committee will implement a work plan that includes measurable goals, specific support activities, and timelines for implementation and that is focused on: defining meaningful community involvement; developing training and educational materials to enhance meaningful community involvement for individuals and families, providers, and case managers; and assessing community involvement data.<br><div align="right">*Completed and Ongoing*</div><br>b) If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2 024, and has not conducted a rate study meeting the requirements of Paragraph 59 in the preceding two years, the Commonwealth will initiate a rate study of Community Engagement, Workplace Assistance, and Community Coaching by January 1, 2025.  The rate study shall be completed in time to be considered during the 2026 legislative session.  If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2028, and has not conducted a second rate study meeting the requirements of Paragraph 59, the Commonwealth will initiate a second rate study of Community Engagement, Workplace Assistance, and Community Coaching by January 1, 2029.  The rate study shall be completed in time to be considered during the 2030 legislative session. | **Sustained Compliance** |

| | | |
|---|---|---|
| | Any rate study required by this paragraph shall be conducted in accordance with Paragraph 59.  This paragraph shall not be construed to require the Commonwealth to conduct more than two rate studies.<br><br>*Completed and Ongoing*<br><br>c) If the Commonwealth has not achieved the goal within two years of the date of this Order after taking the actions in Paragraph 37(a), DBHDS will also conduct a root cause analysis and determine whether a QII is warranted to address identified issues.  A root cause analysis and consideration of QII will not be required if the percentage of individuals in the integrated day services reported above is 65% of the total number of the people receiving any day service.<br><br>*Not Yet Implemented*<br>*Date: January 15, 2027* | |
| **38. Private Duty Nursing.**<br><br>The Commonwealth will work to achieve a goal that 70% of individuals on the DD waiver and children with DD receiving EPSDT with private duty nursing identified in their ISP or prescribed under EPSDT receive 80% of the hours identified as needed on the CMS485 or DMAS62 forms.  To achieve that goal, the Commonwealth will take the following actions. | a) Semi-annually, on May 15 and November 15 of each year, DBHDS will continue to report data on utilization of nursing services and the work of the DBHDS Nursing Workgroup, except if the Independent Reviewer is monitoring the Commonwealth's compliance under Section VIII, DBHDS will report on April 15 and October 15 of each year.                      *Completed and Ongoing*<br><br>b) By September 30, 2024, DBHDS will update the ISP to allow for collection of nursing needs data identified by the Risk Awareness Tool.<br>*Completed and Ongoing*<br>c) DBHDS will continue to implement an IMNR that will assess if individuals have unmet nursing or other medical needs and will work with families, providers, and case managers to take steps to resolve identified unmet needs.  Semi-annually, on April 15 and October 15 of each year, DBHDS will report on the IMNR process, including the types of unmet needs identified and efforts taken to resolve them.<br>*Completed and Ongoing*<br><br>d) Within six months of the date of this Order, in consultation with the five DBHDS Registered Nurse Care Consultants, the Commonwealth will:<br>*Completed and Ongoing*<br><br>i. Identify which CSB catchment areas in each Region have the highest nursing shortages for this target population based on objective criteria and data, including how many individuals with private duty nursing receive 80% of their hours;          *Completed and Ongoing*<br><br>ii. Identify the top three barriers to individuals accessing nursing services in each region based on objective data, including stakeholder data and state and national workforce data and research;<br>*In Progress*<br><br>iii. Develop a work plan to resolve those barriers that includes measurable goals, specific support activities, and timelines for implementation; and                      *In Progress* | Not Achieved<br><br><br>**Deferred** |

| | | |
|---|---|---|
| | iv. Include the barriers and efforts to resolve them, as well as the factual basis for those barriers and efforts, and results achieved in the semi-annual nursing report that is posted in the Library.<br><br>*In Progress*<br><br>e) If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2024, or the semi-annual report of the Independent Reviewer, if there is one, and has not conducted a rate study meeting the requirements of Paragraph 59 in the preceding two years, the Commonwealth will initiate a rate study of Private Duty Nursing by January 1, 2025.  The rate study shall be completed in time to be considered during the 2026 legislative session.  If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2028, and has not conducted a second rate study meeting the requirements of Paragraph 59, the Commonwealth will initiate a second rate study of Private Duty Nursing by January 1, 2029.  The rate study shall be completed in time to be considered at the 2030 legislative session.  Any rate study required by this paragraph shall be conducted in accordance with Paragraph 59.  This paragraph shall not be construed to require the Commonwealth to conduct more than two rate studies.<br><br>*Completed and Ongoing*<br><br>f) If the Commonwealth has not achieved the goal within two years of the date of this Order after taking the actions in Paragraphs 38(a) through 38(d), DBHDS also will conduct a root cause analysis and determine whether a QII is warranted to address identified issues. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.      *Not Yet Implemented*<br>*Due January 15, 2027* | |
| **39. Skilled Nursing.**<br><br>The Commonwealth will work to achieve a goal that 70% of individuals on the DD waiver and children with DD receiving EPSDT with skilled nursing identified in their ISPs or prescribed under EPSDT will have their skilled nursing needs met 80% of the time.  To achieve that goal, the Commonwealth will | a) Semi-annually, on May 15 and November 15 of each year, DBHDS will continue to report data on utilization of nursing services and the work of the DBHDS Nursing Workgroup, except if the Independent Reviewer is monitoring the Commonwealth's compliance under Section VIII, DBHDS will report on April 15 and October 15 of each year.<br>*Completed and Ongoing*<br><br>b) As part of the IMNR Process, DBHDS will assess if individuals have unmet nursing or other medical needs and will work with families, providers, and case managers to take steps to resolve identified unmet needs.  Semi-annually, on April 15 and October 15 of each year, DBHDS will report on the IMNR process, including the types of unmet needs identified, efforts taken to resolve them, and results achieved.<br>*Completed and Ongoing*<br><br>c) Skilled Nursing Review.  Beginning within three months of the date of this Order, for individuals with a skilled nursing need identified in the Waiver Management System, DBHDS will begin to conduct on-site IMNR reviews as set forth in this paragraph.  DBHDS will conduct the on-site IMNR reviews of a randomized sample of 10% of individuals | Not Achieved<br><br><br>**Deferred** |

58

| take the following actions: | annually (split between two six-month reviews) to determine if individuals' skilled nursing services needs are being met.  In selecting individuals during each six-month review period to review, DBHDS shall include in the sample only individuals who were authorized to receive the service at least three months earlier, to ensure sufficient time for the sampled individuals to have received the service.<br>*Completed and Ongoing*<br><br>d) If the Commonwealth has not achieved the goal as reported in its December 1, 2024 status update, or the semi-annual report of the Independent Reviewer, if there is one, and has not conducted a rate study meeting the requirements of Paragraph 59 in the preceding two years, the Commonwealth will initiate a rate study of Skilled Nursing by January 1, 2025.   The rate study shall be completed in time to be considered during the 2026 legislative session.  If the Commonwealth has not achieved the goal as reported in its December 1, 2028 status update, and has not conducted a second rate study meeting the requirements of Paragraph 59, the Commonwealth will initiate a second rate study of Skilled Nursing by January 1, 2029.  The rate study shall be completed in time to be considered at the 2030 legislative session. Any rate study required by this paragraph shall be conducted in accordance with Paragraph 59. This paragraph shall not be construed to require the Commonwealth to conduct more than two rate studies.<br>*Completed and Ongoing*<br><br>e) If the Commonwealth does not achieve the goal within two years of the date of this Order after taking the actions in Paragraphs 39(a) through 39(c), DBHDS will also conduct a root cause analysis and implement a QII as determined appropriate by DBHDS.  DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.<br>*Not Yet Implemented*<br>*Due January 15, 2027* | |
| **40. Dental Exams.**<br><br>The Commonwealth will work to achieve a goal that 86% of individuals who are supported in residential settings and have coverage for dental services will receive an annual dental exam. To achieve that goal, the Commonwealth | a) DBHDS will operate a total of three mobile dental vehicles by March 31, 2025.                                                   *Completed*<br><br>b) DBHDS will continue to employ or contract with a total of three dental assistants and four dental hygienists to staff the mobile dental vehicles.                                   *In Progress*<br><br><br>c) DBHDS will continue to review referrals for dental services and work to connect people to community dental providers when available.<br>*Completed and Ongoing*<br><br>d) Within six months of the date of this Order, DBHDS will contract with at least one dentist or dentistry practice in each Region who can support sedation dentistry.                         *In Progress* | Not Achieved<br><br><br>**Not Achieved** |

| | | |
|---|---|---|
| will take the following actions: | e) DBHDS will collaborate with dental providers to understand barriers to delivering services to individuals with developmental disabilities and, within six months of the date of this Order, will develop a plan with measurable goals, specific support activities, and timelines for implementation to mitigate those barriers.    *Completed and Ongoing*<br><br>f) Within six months of the date of this Order, the Commonwealth shall start an initiative that determines which 8 CSBs need the most assistance to ensure that individuals receive annual dental exams and, no later than three months after starting this initiative, begin to provide technical assistance to support relevant CSBs.  This process will continue to be implemented annually until the Commonwealth achieves the goal.<br>*Completed and Ongoing*<br><br>g) If the Commonwealth has not achieved the goal within two years of the date of this Order after taking the actions in Paragraphs 40(a) through 40(f), DBHDS will conduct a root cause analysis and implement a QII. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.    *In Progress*<br>*Due January 15, 2027* | |
| **41. Protection From Serious Injuries in Service Settings.**<br><br> The Commonwealth will work to achieve a goal that 95% of DD waiver service recipients will be protected from serious injuries in service settings.  To achieve that goal, the Commonwealth will take the following actions: | a) DBHDS will continue working to ensure that all appropriate serious injuries are included when determining if this goal is met.<br>*In Progress*<br><br>b) Within six months of the date of this Order, and annually thereafter, the DBHDS Office of Integrated Health will complete a quality review of a statistically significant sample of serious injuries reported to DBHDS via the CHRIS system (or successor) to determine if the Incident Management Unit process used by the DBHDS Office of Licensing adequately identifies all appropriate injuries to determine if individuals were protected from harm and if changes are needed to the way incidents are reviewed and referred.<br>*In Progress*<br><br>c) Relevant processes will be revised, as warranted, based on the finding of the quality review referenced in Paragraph 41(b) to ensure that the Commonwealth accurately identifies the percentage of DD waiver recipients who are protected from serious injuries in service settings.<br>*In Progress*<br><br>d) If the Commonwealth has not achieved the goal within two years of the date of this Order after taking the action in Paragraphs 41(a) through 41(c), DBHDS will conduct a root cause analysis and implement a QII.  DBHDS will continue this quality improvement process until the metric is achieved and sustained for one year. | Not Achieved<br><br>**Not Achieved** |

| | | |
|---|---|---|
| | *Not Yet Implemented*<br><br>*Due January 15, 2027* | |
| **42. Risk Management.** To ensure that the risk management programs of DBHDS-licensed providers of DD services identify the incidence of common risks and conditions faced by people with DD that contribute to avoidable deaths and take prompt action when such events occur or the risk is otherwise identified, the Commonwealth will take the following actions: | a) Within 24 months of the date of this Order, the Commonwealth shall establish inter-rater reliability among the Commonwealth's licensing specialists regarding provider compliance with the quality assurance trending requirements.                     *Completed and Ongoing*<br><br>b) Within 12 months of the date of this Order, the Commonwealth shall offer technical assistance in accordance with DBHDS's Consultation and Technical Assistance Standard Operating Procedure to each provider that does not identify the incidence of common risks and conditions faced by people with DD that contribute to avoidable deaths.                     *Completed and Ongoing*<br><br>c) Within one month of the date of this Order, when providers do not take prompt action when such events occur, or where the risk is otherwise identified despite lack of prompt action by providers, DBHDS will ensure that corrective action plans are written, implemented, and tracked, and take further actions as warranted.                     *Completed and Ongoing* | Not Achieved<br><br>**Deferred** |
| **43.Timely Waiver Service Enrollment.**<br><br>The Commonwealth will work to achieve a goal that 86% of individuals who are assigned a waiver slot will be enrolled in a service within five months.  To achieve that goal, the Commonwealth will take the following actions: | a) Within three months of the date of this Order, DBHDS will track on a quarterly basis the number of individuals who are assigned a waiver slot but not enrolled in a service within five months.<br><br>                     *Completed and Ongoing*<br><br>b) Within three months of the date of this Order, the Commonwealth will contact individuals at the end of each quarter who have not been enrolled in a service within five months and their families and case managers to determine why services have not been initiated and what barriers delayed initiation of services.  DBHDS will report on the barriers identified quarterly as well as actions being taken to remediate those barriers and results achieved.                     *Completed and Ongoing*<br><br>c) Within one year of the date of this Order, the Commonwealth will conduct a root cause analysis of why services have not been initiated and what barriers delayed initiation of services. Based on the findings of the root cause analysis, the Commonwealth will prioritize the findings for quality improvement in consultation with the provider and system issues resolution workgroups.  The Commonwealth will implement a QII based on its prioritization consistent with continuous quality improvement principles and developed in collaboration with the provider and system issues resolution workgroups.  The Independent | Not Achieved<br><br>**Compliance** |

61

| | | |
|---|---|---|
| | Reviewer, in the reports required under paragraph 76, shall discuss the reasonableness of Virginia's response to this requirement.  Individuals for whom initiation of services is delayed past five months at the request of the individual or the individual's authorized representative will not be included in determining if the Commonwealth meets the goal.  The Commonwealth will revisit the root cause analysis annually and implement a QII as determined appropriate by DBHDS.  DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.                              *In Progress* | |
| **44. Ongoing Service Analyses.** The Commonwealth, through DBHDS, will collect and analyze data at least annually regarding the management needs of individuals with identified complex behavioral, health, and adaptive support needs to monitor the adequacy of management and supports provided. DBHDS will develop corrective actions based on its analysis as it determines appropriate, track the efficacy of the actions, and revise as it determines necessary to address the deficiency.  To implement the preceding steps, the Commonwealth will take the following actions: | a) DBHDS will use data from the Skilled Nursing Review detailed in Paragraph 39(c), the IMNR process for individuals with complex medical needs, data from the care concerns process, data from the BSPARI quality reviews, and data from the Quality Service Reviews to monitor the adequacy of management and supports provided. Within six months of the date of this Order, DBHDS will develop a report consolidating the information from these sources to provide a comprehensive summary of the management and support provided to individuals with complex needs. This summary will be completed annually.                              *In Progress*<br><br>b) DBHDS will continue to implement the IMNR process for no less than 70 people annually who have complex medical, behavioral, or adaptive support needs (Tier 4) to include onsite visits, reviews of specific health care documentation, and a factual questionnaire administered by qualified nursing professionals to primary caregivers most familiar with the person's health care needs.<br><br>                              *In Progress* | Not Achieved<br><br>**Not Achieved** |

| 45. DD Service Providers' Compliance with Administrative Code.<br><br>The Ccommonwealth will work to achieve a goal that at least 86% of DBHDS-licensed providers of DD services comply with 12 VAC 35-105-620 in effect on the date of this Order or as may be amended.  To achieve that goal, the Commonwealth will take the following actions: | a) Within six months of the date of this Order, DBHDS will require that any provider not in compliance with 12 VAC 35-105-620.C.4 and D.3 (regarding corrective action plans) develop and implement a corrective action plan that includes the receipt of technical assistance, additional training, and specific actions related to the respective areas of underperformance as determined appropriate by DBHDS.<br>*Completed and Ongoing*<br><br>b) Within six months from the date of this Order, for providers who are not compliant with 12 VAC 35-105-620.C.4 and D.3 (regarding corrective action plans) for two consecutive licensing inspections, DBHDS shall take appropriate further action to enforce adherence to the Commonwealth's regulations, which may include, but not be limited to, issuing citations, issuing systemic citations, issuing a health and safety corrective action plan, reducing a provider's license to provisional status, or revoking the provider's license as determined appropriate by DBHDS.          *Completed and Ongoing*<br><br>c) Within 24 months of the date of this Order, DBHDS will ensure that all DBHDS staff and contractors assigned to assess the adequacy of provider quality improvement programs have established inter-rater reliability in conducting such assessments.     *Completed and Ongoing* | Not Achieved<br><br><br>**Deferred** |
| 46. Quality Service Monitoring.<br>The Commonwealth will work to ensure that, using information collected from licensing reviews and Quality Service Reviews, it identifies providers that have been unable to demonstrate adequate quality improvement programs and offers technical assistance as necessary.  To achieve that goal, the Commonwealth will take the following actions: | a) Within six months of the date of this Order, DBHDS will require that any provider not in compliance with quality improvement program regulations develop and implement a corrective action plan.  DBHDS will continue to employ a total of 12 Quality Improvement Specialists.  DBHDS Quality Improvement Specialists will continue to offer providers technical assistance, additional training, and specific actions related to the respective areas of underperformance.<br>*Completed and Ongoing*<br><br>b) Within six months from the date of this Order, for providers who are not compliant with quality improvement program regulations for two consecutive licensing inspections, DBHDS shall take appropriate further action to enforce adherence to the Commonwealth's regulations, which may include, but not be limited to, issuing citations, issuing systemic citations, issuing a health and safety corrective action plan, reducing a provider's license to provisional status, or revoking the provider's license as determined appropriate by DBHDS.<br>*Completed and Ongoing*<br><br>c) Within 24 months of the date of this Order, DBHDS will ensure that all DBHDS staff and contractors assigned to assess the adequacy of provider quality improvement programs have established inter-rater reliability in conducting such assessments.<br>*In Progress*<br>*Due January 15, 2027* | Not Achieved<br><br><br>**Deferred** |

63

| 47. Training Requirement Compliance. The Commonwealth will work to achieve a goal that 86% of DBHDS-licensed providers receiving an annual inspection will have a training policy that meets established DBHDS requirements. DBHDS will take action it determines appropriate if providers fail to comply with training requirements required by regulation.  To achieve that goal, the Commonwealth will take the following actions: | a) Within six months of the date of this Order, DBHDS will require that any provider not in compliance with training requirements develop and implement a corrective action plan.        *Completed and Ongoing*<br><br>b) Within three months of the date of this Order, DBHDS Quality Improvement Specialists will offer providers technical assistance, additional training, and specific actions related to the respective areas of underperformance.        *Completed and Ongoing*<br><br>c) Within six months from the date of this Order, for providers who are not compliant with training requirements for two consecutive licensing inspections, DBHDS shall take appropriate further action to enforce adherence to the Commonwealth's regulations, which may include, but not be limited to, issuing citations, issuing systemic citations, issuing a health and safety corrective action plan, reducing a provider's license to provisional status, or revoking the provider's license as determined appropriate by DBHDS.        *Completed and Ongoing*<br><br>d) Within 24 months of the date of this Order, DBHDS will ensure that all DBHDS staff and contractors assigned to assess training requirements have established inter-rater reliability in conducting such assessments.        *Completed and Ongoing* | Not Achieved<br><br>**Deferred** |
| 48. Training and Competency of Direct Support Professionals. The Commonwealth will work to achieve a goal of at least 95% of Direct Support Professionals and their supervisors receive training and competency testing in accordance with 12 VAC 30-122-180 as in effect on the date of this Order or as may be amended. To achieve that goal, | a) Within six months of the date of this Order, the Commonwealth shall determine, through a root cause analysis developed in collaboration with the provider and system issues resolution workgroups, why Direct Support Professionals and their supervisors do not receive training and competency testing per 12 VAC 30-122-180.        *Completed and Ongoing*<br><br>b) Based on the findings of the root cause analysis required by Paragraph 48(a), DBHDS will prioritize the findings for quality improvement, taking into account the anticipated impact to the system, including potential negative impacts to current staffing.  DBHDS will implement a QII based on its prioritization consistent with continuous quality improvement principles and developed in collaboration with the provider and system issues resolution workgroups.        *Completed and Ongoing*<br><br>c) If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2024, and has not conducted a rate study meeting the requirements of Paragraph 59 in the preceding two years, the Commonwealth will initiate a rate study of Personal Assistance | Not Achieved<br><br>**Deferred** |

64

| | | |
|---|---|---|
| the Commonwealth will take the following actions: | Services, Companion Services, Respite Services, In-Home Support Services, and Independent Living Support Services by January 1, 2025. The rate study shall be completed in time to be considered during the 2026 legislative session. If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2028, and has not conducted a second rate study meeting the requirements of Paragraph 59, the Commonwealth will initiate a second rate study of Personal Assistance Services, Companion Services, Respite Services, In-Home Support Services, and Independent Living Support Services by January 1, 2029. The rate study shall be completed in time to be considered during the 2030 legislative session. Any rate study required by this paragraph shall be conducted in accordance with Paragraph 59. This paragraph shall not be construed to require the Commonwealth to conduct more than two rate studies.          _Completed and Ongoing_<br><br>d) If the Commonwealth does not achieve the goal within two years of the date of this Order after taking the actions in Paragraphs 48(a) and 48(b), DBHDS will also conduct a root cause analysis and implement a QII as determined appropriate by DBHDS.  DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.          _Not Yet Implemented_<br>_Due January 15, 2027_ | |
| **49. Residential Services Community Integration.**<br><br>The Commonwealth will work to achieve a goal that 95% of residential service recipients reside in a location that is integrated in, and supports full access to, the greater community in compliance with the CMS rule on HCBS settings.  To achieve that goal, the Commonwealth will take the following action: | a) In accordance with its CMS-approved Statewide Transition Plan, by December 31, 2025, the Commonwealth will complete its review of the remaining 3,296 locations for compliance with the CMS settings rule to determine if it is in compliance with the 95% goal.<br><br>                                        _In Progress_ | Not Achieved<br><br>**Not Achieved** |

| | | |
|---|---|---|
| **50. Supported Employment.**<br><br>The Commonwealth will work to achieve a goal of being within 10% of the waiver employment targets set by the Employment First Advisory Group. DBHDS will continue to work with the Employment First Advisory Group, the Quality Improvement Committee (QIC), and the QIC subcommittees to develop and recommend QIIs to enhance employment of adults aged 18-64 on the DD waiver.  If the goal is not met within two years of the date of this Order, DBHDS will conduct a root cause analysis and implement a QII. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | No specific actions are required, other than those specified in this Term. | Not Achieved<br><br>**Deferred** |
| **51. Supported Employment.**<br>The Commonwealth will work to achieve a goal of meeting its established employment target of | No specific actions are required, other than those specified in this Term. | Not Achieved<br><br>**Compliance** |

| | | |
|---|---|---|
| 25% for adults aged 18 to 64 on DD waivers and the waitlist.  DBHDS will continue to work with the Employment First Advisory Group, the QIC, and the QIC subcommittees to develop and recommend QIIs to enhance employment of adults aged 18 to 64 on the DD waiver and the waitlist.  If the goal is not met within two years of the date of this Order, DBHDS will conduct a root cause analysis and implement a QII. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | | |
| **52. Look-Behind Analysis of Abuse, Neglect, and Exploitation Allegations.**<br><br>The Commonwealth will continue its Community Look-Behind (CLB) review process to achieve a goal of collecting sufficient data for the Risk Management Review Committee (RMRC) to conduct | No specific actions are required, other than those specified in this Term. | Not Achieved<br><br>**Not Achieved** |

| | | |
|---|---|---|
| or oversee a look-behind review of a statistically valid, random sample of reported allegations of abuse, neglect, and exploitation.  The review will evaluate whether:  (i) investigations of individual incidents occur within state-prescribed timelines; (ii) the person conducting the investigation has been trained to conduct investigations; and (iii) corrective action plans are implemented by the provider when indicated.  The RMRC will review trends at least quarterly, recommend QIIs when necessary, and track implementation of initiatives approved for implementation. | | |
| **53. Samples of Data from Look-Behind Analyses of Serious Incidents and Allegations of Abuse, Neglect, and Exploitation.**  The Commonwealth will work to achieve a goal of showing 86% of the sample of serious incidents reviewed by the | No specific actions are required, other than those specified in this Term. | Not Achieved  **Not Achieved** |

| | | |
|---|---|---|
| RMRC meet criteria reviewed in the audit and that at least 86% of the sample of allegations of abuse, neglect, and exploitation reviewed by the RMRC meet criteria reviewed in the audit.  The Commonwealth will continue the look-behind process and provide feedback to the RMRC related to its findings.  If this goal is not met by December 31, 2024, DBHDS will conduct a root cause analysis and implement a QII. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | | |
| **54. Annual Physical Exams.**<br><br>The Commonwealth will work to achieve a goal that 86% of individuals supported in residential settings receive annual physical exams. To achieve that goal, the Commonwealth will take the following action: | a) Within six months of the date of this Order, any time there is not an increasing trend in the percentage of individuals receiving an annual physical exam in consecutive annual reporting periods, DBHDS will conduct a root cause analysis and determine whether a QII is warranted to address identified issues.  DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year.<br><br><div align="right">*No Longer Required*</div> | **Sustained Compliance** |

| | | |
|---|---|---|
| **55. Assessment of Licensed Providers of DD Services.**<br><br>The Commonwealth will work to achieve a goal that at least 86% of DBHDS-licensed providers of DD services have been assessed for their compliance with risk management requirements in the Licensing Regulations during their annual inspections.  DBHDS will continue to conduct annual licensing inspections in accordance with Virginia Code § 37.2-411 in effect on the date of this Order or as may be amended and assess provider compliance with risk management requirements in the Licensing Regulations utilizing the Office of Licensing Annual Compliance Determination Chart. | No specific actions are required, other than those specified in this Term. | Not Achieved<br><br><br>**Deferred** |
| **56. Data-Driven Quality Improvement Plans for HCBS Waiver Programs.**<br><br>The Commonwealth | No specific actions are required, other than those specified in this Term. | Not Achieved<br><br>**Not** |

| | | |
|---|---|---|
| will continue to implement the Quality Improvement Plan approved by CMS in the operation of its HCBS Waivers.  The DMAS-DBHDS Quality Review Team (QRT) will meet quarterly in accordance with the CMS-approved Quality Improvement Plan and will review data, determine trends, and implement quality improvement strategies where appropriate as determined by the QRT to improve performance. | | **Achieved** |

| | | |
|---|---|---|
| **57. Data-Driven Quality Improvement Plans for HCBS Waiver Programs.**<br><br>The Commonwealth will continue to collect quarterly data on the following measures:  (i) health and safety and participant safeguards; (ii) assessment of level of care; (iii) development and monitoring of individual service | No specific actions are required, other than those specified in this Term. | Not Achieved<br><br>**Compliance** |

71

| | | |
|---|---|---|
| plans, including choice of services and of providers; (iv) assurance of qualified providers; e) whether waiver enrolled individuals' identified needs are met as determined by DMAS QMR; and (v) identification, response to incidents, and verification of required corrective action in response to substantiated cases of abuse/neglect/exploitation.  This data will be reviewed by the DMAS-DBHDS Quality Review Team.  Remediation plans will be written and remediation actions implemented, as necessary, for those measures that fall below the CMS-established 86% standard.  DBHDS will provide a written justification for each instance where it does not develop a remediation plan for a measure falling below 86% compliance.  Quality Improvement remediation plans will focus on systemic factors (where present) and will include the specific strategy to be employed, as well as | | |

| | | |
|---|---|---|
| defined measures that will be used to monitor performance. Remediation plans will be monitored at least every six months.  If such remediation actions do not have the intended effect, a revised strategy will be implemented and monitored. | | |
| **58. Case Management Steering Committee (CMSC) Measures.**<br><br>The Case Management Steering Committee will continue to establish two indicators in each of the areas of health and safety and community integration associated with selected domains (safety and freedom from harm; physical, mental, and behavioral health and well-being; avoiding crises; community inclusion; choice and self-determination; stability; provider capacity; access to services) and based | No specific actions are required, other than those specified in this Term. | **Sustained Compliance** |

| | | |
|---|---|---|
| on its review of the data submitted from case management monitoring processes.  The Commonwealth will work to achieve a goal of 86% compliance with the four indicators established by the CMSC.  DBHDS will monitor data collected in these domains and determine if any intervention is needed. | | |
| **59 Rate Studies** | a) For any rate study required to be conducted under paragraph 33, 37, 38, 39, or 48, the following shall apply:<br><br>i. The Commonwealth may either engage Guidehouse as a vendor to conduct the rate study or solicit for a vendor to conduct the rate study. If the Commonwealth engages Guidehouse, the United States may provide input on how the Commonwealth directs Guidehouse to perform the rate study, participate in Guidehouse's meetings with stakeholders and have an opportunity to review and comment on Guidehouse's draft report. If the Commonwealth solicits a different vendor to conduct the rate study, the United States may propose qualifications to be included in the Commonwealth's solicitation for a vendor to conduct the rate study, and the Commonwealth will not unreasonably withhold its consent to the inclusion of the United States' proposed qualifications in the solicitation. At a minimum, the rate study shall be in accordance with best practices and designed to target rates necessary to ensure sufficient capacity to reach the goals of paragraphs 33, 37, 38, 39, and 48.      <u>*Not Completed*</u><br><br>ii. The vendor shall submit a draft of the rate study to the parties for comment at least 30 days before finalize the study and shall address any comments in the final version of the study.<br><div align="right"><u>*Completed*</u></div><br>iii. The study shall be placed in the Library and filed (by either party) with the Court.                <u>*Completed*</u> | |

| | | |
|---|---|---|
| | iv. The Commonwealth shall make its best efforts in the two legislative sessions immediately following publication of the results of the rate study to obtain the General Assembly funding necessary to increase rates to those recommended by the study, accounting for any increases in inflation in the rate's implementation. *In Progress* <br><br> v. Upon request of the United States, the Court shall hold a status conference one month after the Governor's proposed budget is submitted to the General Assembly if the rate increases identified in the Study are not in the proposed budget. *Completed* <br> vi. Upon request of the United States, the Court shall hold a public hearing within 30 days after the Governor and General Assembly have taken all steps necessary to finalize the budget. The hearing shall address whether the rate increases identified in the Study are included in the budget, and, if not, whether the Court should order any steps. *Not Yet Implemented* *Due June 2026* | |

# VI. APPENDICES

PAGE #

A.   CASE MANAGEMENT ................................................................ 77

B.   CRISIS AND BEHAVIORAL SERVICES .............................................. 86

C.   INTEGRATED DAY ACTIVITIES AND SUPPORTED EMPLOYMENT.. 115

D.   COMMUNITY LIVING OPTIONS ...................................................... 130

E.   SERVICES FOR INDIVIDUALS WITH COMPLEX BEHAVIORAL
     SUPPORT NEEDS ...................................................................... 152

F.   PROVIDER TRAINING ................................................................. 169

G.   QUALITY AND RISK MANAGEMENT AND QUALITY
     IMPROVEMENT PROGRAMS ......................................................... 189

H.   RECOMMENDED RATE INCREASES VS
     PROPOSED BUDGETS FOR FISCAL YEAR 2027 ............................... 327

I.   LIST OF ACRONYMS ................................................................. 329

# APPENDIX A

## Case Management

**By**

**Kathryn du Pree, MPS**

**Case Management**
**28th Review Period Report**
**Prepared for the Independent Reviewer**


## Introduction

This report summarizes the 28th review period study of the Permanent Injunction's requirements for Case Management services. The purpose of the review is to determine if the Commonwealth has progressed towards complying with the remaining Term of the Permanent Injunction (PI) under review and has implemented the specified actions. The Parties have agreed upon the terms to determine compliance with Case Management Provisions that previously remained out of sustained compliance. These include PI Terms that relate to the Settlement Agreement's Provisions III.C.5.b.i. and V.F.5. These terms address the Commonwealth's responsibilities to review and monitor the quality of service coordination and the delivery of waiver services to analyze the findings of the quality review related to CSB Case Management performance across ten elements (PI 31); and to specifically analyze and monitor the achievement of four key indictors related to health and safety and community integration (PI 58).

The remaining Term under review for Case Management during the 28h review period is Term 31 which is described below. The Commonwealth achieved compliance with Term 58 in the 27th review period for the second consecutive time so Virginia has achieved sustained compliance for Term 58. The compliance rating for Term 31 will be deferred until the 29th review period when the Commonwealth can produce a full year of data to determine its progress achieving Term 31. The focus of this review is to determine the extent to which the Commonwealth has successfully implemented the associated actions and implemented the recommendations made by the Expert and Independent Reviewers in the 27th study report associated with Term 31.

For this subset of PI Terms and associated actions, progress toward achieving the specified goal and implementing the delineated actions are reviewed and reported below. This review includes an analysis and reporting of Virginia's status implementing the PI requirements associated with Case Management, Term 31 that has not been met twice consecutively (see Table 1 below).

For this review the facts gathered are identified and analyzed in the Findings Table below for each associated action related to the Commonwealth's work to achieve the specified goal of Term 31. The documents which include these facts are listed by reference in Attachment A and most are found in the Commonwealth's library of documents. I communicated throughout the study with Eric Williams, Assistant Commissioner and Director of the Office of Provider Network Supports, who is the case management subject matter expert for DBHDS. I appreciate his communication and responsiveness throughout the study period.

The completed FY25 SCQR was used for the analysis in the 27th review period to determine compliance ratings and provide updates on DBHDS's efforts to implement various improvement strategies and summarize the review by the Case Management Steering Committee (CMSC) of the status of various initiatives related to Terms 31 and 58. For the current 28th period's review,

DBHDS provided its CMSC Report for FY26 Q1 and Q2; the minutes of CMSC and Work Group meetings; various training and technical assistance materials related to the implementation, interpretation and scoring of the SCQR; materials related to a Quality Improvement Initiative (QII) to address issues implementing the On-Site Visit Tool (OSVT) used by Support Coordinators (SC), as well as a QII to educate providers about the 10 Indicators and support SCs to meet the performance expectations for them. The result of the FY26 SCQR will be available for review during the 29th reporting period.

## Summary of Findings for the 28th Period

Table 1 below lists the remaining Case Management PI Term that continues to be monitored and its compliance rating. This rating for Term 31 is Deferred in this review period. The reviews by CSBs are conducted between January and June of each year and the look-behind conducted by DBHDS Quality Research Specialists in the Office of Quality Assurance and Healthcare occurs in July and August. The full set of data to analyze the Commonwealth's progress meeting Term 31 was not available during this reporting period and will be reviewed for compliance in the 29th review period. The Commonwealth achieved Sustained Compliance and satisfied the Term 58 requirements during the 27th review period and as detailed in the PI Term 77 will no longer be reviewed**.

**Term 31**: The CMSC continued to monitor the CSBs for the Performance Measure Indicators (PMI) including those related to the ten elements assessed by the SCQR as described in Term 31. These include: addressing employment and community engagement discussions and goals; assessing for changes in status and appropriately implemented services, discussions about unpaid relationships, as well as choice of providers and SC. The CMSC continues to monitor CSB performance with ISP completion, Regional Support Team (RST) timeliness, and underperforming CSBs related to the SCQR results. The minutes of the monthly CMSC meetings that occurred between October 2025, and February 2026 provide evidence of both regular and meaningful involvement of the CMSC in the oversight of the CSBs' Case Management services and DBHDS' implementation of quality review, analysis, technical assistance, training, and communication with CSBs (2,3). DBHDS required CSBs to address SCQR results, RST, and ISP performance in their Improvement Plans (IP) (1).  DBHDS requires that CSBs that underperform in any of these three areas are required to develop and implement an IP, which must be approved by the CMSC.

The CMSC also tracks the IPs for compliance with the SCQR Indicators. Prior to 2025, DBHDS required a CSB to develop an IP if it had three of more indicators self-scored at less than 50%.  In 2025, DBHDS revised the threshold to require CSBs to develop an IP if the CSB had two or more indicators that were self-scored at less than 60%, establishing a higher level of expected performance. The CMSC reports nine CSBs with IPs for SCQR performance were removed from the IP list as during FY26 Q2 as a result of improved performance (1). The CMSC reported that four CSBs were required to develop IPs for compliance with the SCQR Indicators, based on the findings of the FY25 SCQR. The CMSC recommended additional targeted technical assistance (TA) for failing to reach the target for two cycles based on their missed indicators. The CMSC increased the threshold for CSB performance meeting nine of the ten SCQR Indicators from 60% to 65%, effective for the FY26 SCQR (1).

79

The CMSC also develops and tracks Quality Improvement Initiatives (QII) to address trends in performance and systems issues that negatively impact performance. The CMSC had developed seven QIIs, of which four were completed as of June 2025 (1,2,3,4,5). One additional QII is now noted as completed in the CMSC report for FY26 Q1 andQ2. This addressed: improving the outcomes related to employment and community engagement (QII 6).

The remaining QII addresses improving the level of agreement for Indicator 10 (QII 7). The Independent Reviewer expressed concern in his 25th Report to the Court, submitted in December 2024, that the agreement between the CSB reviews and the look behind reviews needed improvement. The level of agreement had dropped from substantial to moderate agreement (76%) for this Indicator. This QII is the Onsite Visitation Tool (OSVT) QII that aims to strengthen SCs understanding and consistent use of the OSVT. The KPA Workgroup has designed this QII to address the underperformance of SCQR Indicator 10 which only achieved moderate agreement between the CSB scoring and the SCQR Look Behind in FY24. DBHDS received feedback from CSBs that this underperformance was caused by confusion among SCs about the use of the OSVT and asked DBHDS to provide clarification. DBHDS conducted eight focus groups between April 2025 and April 2026. As a result of the input from these focus groups and DBHDS' analysis of the performance issues, DBHDS revised the OSVT to use plain language; integrate the Crisis Risk Assessment; provide examples and created tiered concern/response categories; simplified behavioral consultation and nursing sections; and updated OSVT training for SCs. The CMSC plans to update the OSVT Question and Answer (Q and A) document and offer the updated training with a pre and post-test and evaluation to determine if any final adjustments are needed; and post the training online (1). The draft training module and the OSVT Guidance were shared with me. The training is being finalized so DBHDs can schedule training in FY26 Q4 (13).

A second QII to address SCQR performance has been developed by the Key Performance Areas (KPA) Workgroup and is being implemented through collaboration with the CMSC (QII 8). DBHDS reports plans to produce two videos, one targeted to SCs and one to providers. Feedback is being collected from CSBs prior to recording.  These videos will provide a "how to" meet the 10 indicators for SCs, and an overview of the same indicators for providers and how they can support the SC in achieving them. Slideshows have been completed and were provided for this study, CSB feedback has been requested from CSBs, and the next steps are to produce the videos following CSB input and release for systemwide use.  SCQR results for all indicators will be monitored to determine progress.

## Data Process and Attestation

All data processes which have been reviewed previously and verified to be reliable and valid remain in place. All attestations are completed and current.

### PI Terms and Actions Achievement and Status

Table 1 below summarizes the status of the case management compliance indicators.

80

**Table 1**
**Achievement of PI Terms**

| Term | 27th | 28th |
|---|---|---|
| 31. **Community Services Board Quality Review (SCQR).** The Commonwealth will work to achieve a goal that 86% of Community Services Board (CSB) records meet a minimum or 9 of the 10 elements assessed in the Case Management Quality Review. | **Not Achieved** | **Deferred** |
| 58. **Case Management Steering Committee (CMSC) Measures.** The Case Management Steering Committee will continue to establish two indicators in each of the areas of health and safety and community integration associated with selected domains (safety and freedom from harm; physical, mental, and behavioral health and well-being; avoiding crises; community inclusion; choice and self-determination; stability; provider capacity; access to services) and based on its review of the data submitted from case management monitoring processes. The Commonwealth will work to achieve a goal of 86% compliance with the four indicators established by the CMSC. DBHDS will monitor data collected in these domains and determine if any intervention is needed.<br><br>No Actions Required | **Achieved Sustained Compliance** | **No Longer Reviewed** |

**Table 2**
**Terms and Related Actions**

| Term and Actions | Facts | Analysis/Conclusion | 26th/27th |
|---|---|---|---|
| **31. Community Services Board Quality Review (SCQR).** The Commonwealth will work to achieve a goal that 86% of Community Services Board (CSB) records meet a minimum of 9 of the 10 elements assessed in the Case Management Quality Review. | The CMSC reports that in FY25 81% of the CSB records met a minimum of 9 of the 10 elements assessed in the SCQR. Additional reporting will occur during 29th review period. | Conclusion: This Term was not achieved in the 27th review period since only 81% of the records met the minimum requirement. It will be reviewed in the 29th review period for compliance. | Not Achieved<br><br>**Deferred** |

81

| | | | |
|---|---|---|---|
| **31. a)** During its annual quality review cycle, starting January each year, DBHDS will require a quality improvement plan from any CSB that has two or more elements with substantial or moderate interrater reliability between the CSB SCQR and the DBHDS Office of Community Quality Improvement Review not achieving 60% compliance. DBHDS will provide information about which CSBs need this support in the SCQR Report. | DBHDS reports in the FY25 SCQR that the CMSC will request IPs for the four CSBs that had two indicators below 60% agreement with the findings of the look behind review.<br><br>The CMSC FY26 Q1 and Q2 report documents that Improvement Plans (IPs) were requested of four specific CSBs (1). | Following a recommendation made by the Expert and Independent Reviewers in the 26th Review Period, the CMSC will report on the achievements of the four CSBs who were below 60% agreement on two or more indictors in the FY25 SCQR in the 29th review period.<br><br>DBHDS reports in the 28th review period that there were nine additional CSBs with IPs to improve the level of agreement scoring the SCQRs These CSBs received additional Technical Assistance (TA). DBHDS did report on the specific efforts and progress of these nine CSBs to implement their IPs as was recommended in the 26th review period by the Independent Reviewer. DBHDS reports these efforts included training and follow up to address employment performance expectations; use of monthly audit tools; data tracking; SCQR technical assistance; and ensuring compliance with the Virginia Informed Choice (VIC). These IPs have been completed (1).<br><br>The CMSC is currently implementing an OSVT QII related to Indicator 10. This QII is to improve the level of agreement on Indicator 10 from moderate to substantial agreement by 12.31.25. The percentage of agreement for Indicator 10 in the FY24 SCQR cycle was 76%. Presentations have been developed to train both Support Coordinators and Providers (7,8,9,10,11,12). The QII is extended to 10.31.26 so the CMSC can review the results of the FY26 SCQR for Indicator 10 to determine the effectiveness of the QII.<br><br>The CMSC and the Key Performance Areas (KPA) Workgroup have developed a | **Completed and Ongoing** |

82

| | | joint QII regarding meeting 9 of the 10 case management indicators during SCQR. This QII relates to producing two videos, one targeted to SCs and one to providers. DBHDS will collect feedback from CSBs prior to the final recording and posting online for systemwide use. DBHDS will report on its progress during the 29th period. | |
|---|---|---|---|
| **31. b)** DBHDS will provide targeted technical assistance with identifying measurable outcomes to any CSB (i) whose records are not 86% compliant with including specific and measurable outcomes in Individual Support Plans (ISPs) or (ii) that does not demonstrate improvement with respect to including specific and measurable outcomes in ISPs (including evidence that employment goals have been discussed and developed, when applicable, throughout its quality review cycle). | DBHDS provided TA to every CSB in preparation for the FY26 SCQR (1). The CMSC updated the technical guidance to assure alignment and eliminate any duplication. These TA sessions focused on the items that had a low level of agreement between the CSBs and the DBHDS look behind in the previous year. | | **Completed and Ongoing** |
| **31. c)** If the Commonwealth has not achieved the goal within one year of the date of this Order after taking the actions in Paragraphs 31(a) and 31(b), DBHDS will increase the threshold for requiring a quality improvement plan from a CSB as set out in Paragraph 31(a). DBHDS will provide information about which CSBs need this support in the SCQR Report. | Improvement plans have been requested from CSBs following the look behind when two or more indicators with substantial or moderate interrater reliability are below 60%.<br><br>The CMSC increased the threshold to two or more indicators below 65% at the CMSC Meeting held on 1.6.26. The increased threshold will be in effect for the review of the FY26 SCQR.<br><br>The CMSC reported in its FY26 Q1 and Q2 report that four CSBs did not reach the threshold of moderate or | DBHDS has drafted changes to the On Site Visitation Tool (OSVT) to incorporate the Crisis Risk Assessment Tool and to enhance and clarify wording in the OSVT as part of the QII referenced above. Questions were changed in the FY25 SCQR to ensure the completion and accuracy of the OSVT. The specific results of the SCQR OSVT questions indicate the OSVT is being completed fully and utilized correctly by the Support Coordinators. The FY26 SCQR will include the same added OSVT questions (1). In addition, a joint QII is being implemented under the KPA workgroups to increase provider awareness and support | **Completed and Ongoing** |

| | | | |
|---|---|---|---|
| | substantial agreement with the look behind results in FY25 using the 60% threshold which was in place at that time.<br><br>DBHDS will report the 2026 SQCR results using the higher threshold of 65% which was established by the CMSC as the new higher threshold effective for the FY26 SCQR. | of the 10 Indicators and provide clear instruction to CSBs on how to meet them.<br><br>DBHDS had not achieved the goal and increased the threshold to 65%. DBHDS also provided information, as required, about the CSBs that need support. | |
| **31.d**) If the Commonwealth has not achieved the goal within one year after taking the actions in Paragraph 31(c), DBHDS will conduct a root cause analysis and implement a Quality Improvement Initiative (QII) as determined appropriate by DBHDS. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | | | **Not Yet Implemented Due: 1/15/27** |
| | | | |

**Recommendations:** In the 29th review period, DBHDS should continue to provide information in the SCQR report on the status of these CSBs regarding any improvement in performance as a result of the TA and the implementation of the CSBs IPs for SCQR performance. This report should include a summary of the action steps and monitoring strategies that are included in IPs and the impact these actions have on improving performance.

84

Attachment A
Documents Reviewed

1.  CMSC Report FY26 Q1 and Q2 Final Version 3.5.26
2.  CMSC Meeting Minutes: 10.2.25,12.2.25, 1.6.26, 2.3.26
4.  CMSC Work Group Updates: 10.7.25, 12.2.25, 1.6.26, 2.3.36
5.  CMSC Updates for FY26 Q3 re: SCQR 2026
6.   Final SCQR FY26 Early TA Slides: 1.26.26
7. Official SCQR Guidance 2026: 1.20.26
8. QII Toolkit FY25 SCQR: 3.6.26 Update
9. Achieving the 10 SC Indicators: 3.5.26 Final
10. Achieving the 10 SC Indicators for Providers: 3.5.26
11. OSVT Guidance: 4.1.26 Update
12. OSVT Training for Service Coordinators: 4.1.26
13. Email from Eric Williams: 4.16.26


Submitted:
Kathryn du Pree MPS
May 19, 2026

# <u>APPENDIX B</u>

**Crisis and Behavioral Services**

**By**

**Kathryn du Pree, MPS**

**Crisis and Behavioral Services Report**
**28th Review Period**
**Prepared for the Independent Reviewer**

## Introduction

This report summarizes the 28th review period study of the Permanent Injunction's, requirements for crisis and behavioral services for individuals with developmental disabilities (DD). The purpose of the review is to determine if the Commonwealth has progressed towards complying with the remaining Terms of the Permanent Injunction (PI) under review and has implemented the specific listed actions. The Parties have agreed that Virginia's achievement of the specified goals of the Terms of the PI is required for determinations of compliance. This study reviews the remaining Terms that correspond with the Crisis and Behavioral Services Provisions with which the Commonwealth previously remained out of sustained compliance. Under review during the twenty-eighth period are Terms 32, 33, 35, and 36 which are described below. The focus of the review is to determine if the Commonwealth has achieved the measurable goals of these four crisis and behavior PI Terms and the extent to which they have successfully implemented the associated actions. The Parties have agreed upon the terms' goals to determine compliance related to the Crisis and Behavior Services Provisions that previously remained out of sustained compliance. These include PI Terms that relate to the Settlement Agreement's (SA) Provisions III.C.6.i.-iii for Crisis Services; III.C.6.i.i.A. for Mobile Crisis; and III.C.6i.i.i.B., III.C.6.i.i.i.D; and III.c.6.i.i.i.G for Crisis Stabilization. These terms address the Commonwealth's responsibilities to prevent admission to psychiatric hospitals at the time of a crisis through the availability of community based crisis assessments; connect individuals to behavioral services who need such services in a timely way; identify community residential options for individuals admitted to a crisis therapeutic home (CTH) or a psychiatric hospital for a behavioral or mental health crisis; and develop out-of-home crisis prevention services for youth with DD.

For this subset of PI Terms and associated actions, progress toward achieving the specified goals and implementing the delineated actions are reviewed and reported below. This review includes an analysis and reporting of Virginia's status implementing the PI requirements associated with Crisis and Behavior Services that have not been met twice consecutively (see Table 7 below). This includes PI Terms 32, 33, 35 and 36. The Commonwealth did not achieve the specified goals in any of these terms in a previous review period. In this reporting period, it again did not accomplish the specified goals of the PIs 32,33 and 36. However, after years of making steady progress, the Commonwealth has surpassed the 86% goal of PI 35 for the first time by achieving 90% compliance.

For this review the facts gathered are identified and analyzed for each specified goal in the Findings Table below. For this current review, DBHDS provided the Behavior Supports Report; the Supplemental Crisis Reports; the REACH Quarterly Summary Reports; the REACH Quarterly Qualitative Reports; and numerous materials to address the Commonwealth's progress implementing the actions associated with the PI Terms. All of the documents are listed

by reference in Attachment A, and most are found in the Commonwealth's library. Follow up information was provided by Sharon Bonaventura, Regional Crisis Systems Manager and Nathan Habel, Director of Behavioral Services and Projects. I greatly appreciate their information, knowledge, analysis and assistance. There are many data sources to determine if the actions related to each Term are being implemented as described in the PI. DBHDS' Subject Matter Experts organize the reports and related data so the information needed to determine the Commonwealth's status and progress toward achieving compliance with the PI Terms is understandable and logically presented.

## <u>Summary of REACH Services</u>

DBHDS continues to provide data reports which include the REACH Quarterly Summary Data, and the REACH Quarterly Qualitative Reviews that provide robust information of all aspects of the REACH programs.  I include data that I think is relevant and indirectly related to the Commonwealth achieving the specified goals of the terms in this section of the report to give the reader greater insight into the impediments, progress and status of meeting the requirements of the PI Terms associated with crisis services.

The Independent Reviewer continues to be deeply concerned about the high number of individuals with DD whose initial crisis assessments occur at hospitals rather than in the individuals' homes as expected in Term 32. A high percentage of these individuals whose crisis assessment is conducted in a hospital or CSB Emergency Departments (ED) setting, continue to be admitted to psychiatric hospitals rather than utilizing in-home supplemental supports or crisis stabilization services as alternatives to hospitalization. This dynamic results in an increased number of children and adults with DD being admitted to psychiatric hospitals in Virginia rather than receiving the mobile crisis service and crisis stabilization services created by the Commonwealth and required by the PI.

This concern continues to be borne out in the data submitted by DBHDS for FY26 Q2 and Q3. During these two quarters only 51% and 54% of crisis assessments took place in the community respectively. These most recent quarterly percentages are consistent with those that DBHDS has reported for six years.

***Table 1: The % of individuals who received their initial crisis assessment at home, residential setting, or community setting (non-hospital/CSB location)***

| Date | Percentage |
| --- | --- |
| FY 2020 Q3 | 46% |
| FY 2020 Q4 | 41% |
|  |  |
| FY 2021 Q1 | 53% |
| FY 2021 Q2 | 34% |
| FY 2021 Q3 | 35% |
| FY 2021 Q4 | 42% |
|  |  |
| FY 2022 Q1 | 51% |
| FY 2022 Q2 | 36% |

| | |
|---|---|
| FY 2022 Q3 | 40% |
| FY 2022 Q4 | 36% |
| | |
| FY 2023 Q1 | 44% |
| FY 2023 Q2 | 49% |
| FY 2023 Q3 | 37% |
| FY 2023 Q4 | 40% |
| | |
| FY2024 Q1 | 46% |
| FY 2024 Q2 | 48% |
| FY2024 Q3 | 52% |
| FY2024 Q4 | 55% |
| | |
| FY2025 Q1 | 49% |
| FY2025 Q2 | 49% |
| FY2025 Q3 | 47% |
| FY2025 Q4 | 50% |
| | |
| FY2026 Q1 | 51% |
| FY2026 Q2 | 51% |
| FY2026 Q3 | 54% |

These quarterly percentages indicate that over a six-year period, the Commonwealth has not increased the percentage of children and adults who have received crisis assessments at home or other community locations. Far too many children and adults continue to be assessed for a crisis at CSB Emergency Departments or hospitals which leads to the predictable higher rate of hospitalizations compared to the rate of hospitalizations for those individuals who receive a crisis assessment in a community setting. The results of these assessments strongly support the Independent Reviewer's and Expert Reviewer's contention that it is essential to provide these assessments in the community including the individual's home setting because it is far more likely that the individual will take advantage of Virginia's in-home and community-based crisis support services, retain their home setting and not be hospitalized. It is important to note that there are persistent and substantial performance variations in the percentages of crisis assessments conducted in community settings between Regions. For example, Region 1 had as few as 36% of crisis assessments conducted in community settings in each quarter in the review period, whereas Region 2 had 63% in FY26 Q2 and 59% in FY26 Q3 of crisis assessments conducted in community settings.

***Table 2: Crisis Assessments Conducted In Community Settings***

| Date | Average % assessed in community setting | Range | |
|---|---|---|---|
| FY 26 Q2 | 51% | Region 1- 36% | Region 2- 63% |
| FY 26 Q3 | 54% | Regions 1- 36% | Regions 2 -59% |

During the first three quarters of FY26, the outcomes for individuals who received a crisis assessment in the community were that 82% retained their community residential setting,

89

compared to 52%, who were able to retain their setting after a crisis assessment that occurred in a hospital, or CSB ED. Hospitalizations are much higher for individuals with DD who are assessed for a crisis in the hospital (27%) compared to the hospitalizations for individuals with DD who are assessed for a crisis in a community setting (6%). DBHDS no longer breaks out these percentages for just Q2 and Q3 but totals it for the full fiscal year to date. These data are depicted in Tables 3 and 4 below.

### *Table 3: Results of Crisis Assessments Conducted in Community Locations*

| Crisis Assessments Conducted in Community Locations | | | | |
|---|---|---|---|---|
| Time | Remain Home | CTH/CSU | Other | Hospitalized |
| FY26 Q1-Q3 | 82% | 4% | 8% | 6% |

### *Table 4: Results of Crisis Assessments Conducted in Hospitals or CSB ED Locations*

| Crisis Assessments Conducted in Hospitals or CSB EDs | | | | |
|---|---|---|---|---|
| Time | Remain Home | CTH/CSU | Other | Hospitalized |
| FY26 Q1-Q3 | 52% | 5% | 6% | 27% |

The Expert Reviewer reviewed the Quarterly REACH reports (4,5,6,7) to determine the status of the Commonwealth's implementation of the systemic changes needed to resolve the obstacles that have hindered significant progress toward achieving compliance with the Terms of the PI. While many aspects of the REACH program are no longer directly related to the specified goals of the PI Terms, the statewide crisis service system developed by the Commonwealth, including the regional REACH programs, in totality impact the location of crisis assessments, the prevention of hospitalization, and ultimately the reduction of behavioral and mental health crises. DBHDS continues to report and track all aspects of crisis assessment and services performed by the regional REACH programs. Regions continue to meet DBHDS's overall expectations for timely response to crises.  REACH programs are encouraged to respond to crisis face-to-face rather than using telehealth. Regions 2, 3 and 5 respond to over 95% of the crises face-to-face. Regions 1 and 4 use telehealth to some extent. Region 1 used telehealth most prevalently in the past but has increased its face-to-face percentages in the 28th period compared to the 27th period.

The Youth Crisis Therapeutic Homes (YCTH) and Adult (ACTH) programs were underutilized during both quarters of the 28th review period. Fewer than half of the available bed days were used in either the YCTH or ACTH during the 28th reporting period. There are staff vacancies in these programs as described later in this report, but the percentages of these vacancies in the ACTH (28%) and YCTH (29%) only partially explain the overall low percentage of utilization since not all bed days were utilized. The staff vacancy rate for the

90

ACTHs is consistent with the vacancy rate in the 27th reporting period. The vacancy rate in the YCTH dropped from 41% in the 27th period to 29% in the 28th reporting period. These vacancy rates remain higher than the vacancy rates reported in the 26th reporting period: 16% and 12% respectively. DBHDS reports minimal waiting lists for CTH admission, but a high number of individuals are still hospitalized after a crisis assessment who might have been able to be stabilized at a CTH if the program was fully available.

For the two quarters of the 28th period, the utilization for the YCTHs was 25% and 31% for the Region 2 YCTH, and 21% and 43% for the Region 4 YCTH over the two quarters respectively. Fifteen children from Regions 1,3, and 5 used the YCTHs in Regions 2 and 4. Seventy-four children in total used the YCTH in the 28th review period, compared to sixty-one children in the 27th review period which is an increase of thirteen children using the YCTHs.

The quarterly utilization for the Adult CTHs range from 9-70% in FY26 Q2 and 19-70% in FY26 Q3. Ninety-one adults used the CTH programs in the 28th reporting period, ranging from a low of four adults in Region 1 to twenty-seven adults in Region 2. This is an increase of thirty adults who used the ACTHs in the 28th reporting period compared to the number (61) who used the ACTH in the 27th reporting period.

The DBHDS REACH teams continue to provide prevention and mobile crisis services. The outcome is that almost all recipients of these services retain their residential setting after participating in REACH prevention or mobile crisis services. DBHDS reports the preference of people for only a Mobile Crisis Response (MCR) combined with the ability of staff to help deescalate the individual during the MCR process, has resulted in decreased use and reliance on the CTH program.  Although DBHDS reports this preference of families to use MCR services, it remains concerning that the CTHs are underutilized when a significant number of individuals with DD are hospitalized after the crisis and subsequent assessment.

DBHDS continues to conduct quarterly reviews of the REACH programs (8,9). These reviews include data review; review of compliance standards and program performance; clinical chart review of selected program participants; review of any previous corrective actions and an in-person interviews to discuss clinical improvement. Most of the Regions met all or the majority of the REACH standards. DBHDS reviewers provide feedback to the REACH programs on areas that are partially met and discuss expected improvement. DBHDS included a review of each program's staffing and the staff capacity to satisfactorily conduct all aspects of REACH programing with a focus on MCR as it is a requirement of the PI Term 32.

The standards DBHDS has established for the REACH programs address: Referral, Intake and Assessment; Community Crisis Response; CTH; Crisis Prevention; Staff Qualifications; Record Review; Mobile Crisis Response (MCR); Non-residential Crisis Stabilization; Staffing and Staff Training.  The first standard relates most directly to the specific goals of the PI to perform crisis assessments in the community and to prevent unnecessary hospitalization. Yet these REACH standards do not directly address the specified goal of PI Term 32 which is to complete crisis assessments in the community. Instead, DBHDS's Referral, Intake and

91

Assessment standard is to ensure the REACH program is compliant with the timeframes, follow up and closure of crisis responses, and to ensure the assessment was completed and documented. DBHDS Regional Managers include a review of data as to where the assessment occurred but none of the Regions were found to meet the specific goal of PI Term 32 of conducting the majority of crisis assessments in a community setting.  I previously recommended that there be a more targeted review of the REACH Teams' performance as it specifically relates to conducting crisis assessments in community settings and the lower performing Regions' implementation of the strategies related to PI Term and Action 32.e. DBHDS has implemented this recommendation as is detailed in Table 8 of this report.

The REACH programs continue to experience significant staffing shortages but have filled more positions since the 27th reporting period. Vacancies in the community programs now range from 26% for supervisory/clinical positions to 34% for mobile crisis support workers, compared to 29% and 40% in the 27th review period. The Children and Adult CTH programs experience vacancies as well. The Youth CTH programs overall have 29% of the positions vacant which is similar to the vacancy rate reported in the 27th review period. The Adult CTH and the Adult Transition Homes (ATH) have fewer vacancies, 28% and 11% respectively, which are also comparable to the vacancy rates in the previous reporting period. Not only do there continue to be significant vacancies in the two CTH programs, but the CTH staffing has been reduced as evidenced by the Staffing Reports for each Region for FY26 Q1 and now in FY26 Q3 which are included in the REACH Quarterly reports (7). Since the 27th reporting period there have been additional staff reductions in the Adult CTH programs (ACTH).  DBHDS reports this is most likely attributed to changes being made by CSB Region 10 as the Region 1 REACH program will transition to Easter Seals Port Health (ESPH) in May 2026 (17). However, this reduction in the staff working in the ACTHs is concerning in light of continued hospitalizations for individual with DD at the time of crisis assessments.

These CTH programs should all be fully utilized as a short-term, last resort option to prevent unnecessary or prolonged hospitalizations and are not currently being utilized to their full capacities. It is concerning that DBHDS's REACH programs have reduced the number of staff positions. The comparison below, indicates the number of positions have been decreased further in the ACTH program since the 27th reporting period.

**Table 5: Reduced CTH and ATH Staffing in FY26 Q3 compared to FY25 Q3**

| Time Reported | ACTH | YCTH | ATH |
|---|---|---|---|
| FY25 Q3 | 87 | 43 | 39 |
| FY26 Q1 | 77 | 31 | 27 |
| FY26 Q2 | 71 | 31 | 27 |
| Total Change | -16 | -12 | -12 |
| Percentage Change | 18% | 28% | 31% |

DBHDS reported in the 26th review period that each REACH Team has additional mobile crisis response staff, which are titled Behavioral Health Licensed (BHL) Services staff. These

92

positions were established and funded through the Governor's Right Help Right Now (RHRN) initiative to increase and improve the Commonwealth's response to individuals who experience mental health crises. These staff are trained in the MCR curriculum and provide backup to REACH staff allowing them to respond to crises by conducting crisis assessments. DBHDS does not review the status of these positions during the quarterly qualitative reviews that occur with REACH programs, but the data is included in Table 6 as this program and associated staff increase the crisis response capacity in each Region.

The number of staff associated with the REACH programs continues to vary across the Regions, in some areas significantly across the Regions.  The differences do not seem to be explained by the population sizes of the Regions. Region 4 has by far the most administrative, clinical and non-administrative QMHP or QDDP positions even though its population may not be dissimilar to Region 2. The number of MCR staff were more similar between Regions in the 27th reporting period than in the 26th reporting period, but the MCR staff have again been reduced in Region 1 in the 28th review period. The fact that the staffing continues to vary for the CTH programs is particularly curious since each CTH has the same bed capacity, and the ability to serve six individuals at one time. DBHDS has not explained the variation in the ACTH staffing across the five REACH programs.

DBHDS is now required to review, analyze and monitor the staffing of each Region and the impact of vacancies on meeting the specified goals for completing crisis assessments in community settings. DBHDS is focusing much of its qualitative review with the REACH programs to explore the impact of the staff vacancies and shares recommendations for improvement in recruitment and retention. I reiterate the recommendation I made in the 27th reporting period that it is important for DBHDS to determine if these differences in the number of staff, and the type of positions each Region uses impacts the REACH Teams' performance, especially in their ability to conduct assessments in the home/community, provide mobile supports, and utilize the CTHs as a last resort options to avoid hospitalization.

An example of my concern is that DBHDS reports that four of the five regions fully met the REACH quality standard for the MCR, and one Region partially met the standard. MCR staff overall have a current vacancy rate of 34%, a reduction of 6% since the previous reporting period; however, the staff vacancy rate is as high as 63% in Region 3 and 59% in Region 1. Also, Region 1's 25% BHL vacancy rate is the highest of all the Regions. It is difficult to understand how this high number and percentage of staff vacancies could not reduce these Regions' ability to provide timely crisis support which should be available to stabilize an individual's home situation and prevent the individual's hospitalization. The Regions that continue to meet the standards for MCR are doing so by creative uses of existing staff and interns. Staff normally assigned to other REACH functions are assisting to deliver MCR; MCR staff are working overtime; and interns are being used to deliver MCR. REACH programs and their staff should be complemented for implementing innovative solutions, but all of these solutions may not be sustainable.

The following Tables depict the data.

93

*Table 6: FY26 Q3 REACH Staffing Data for REACH Crisis Teams*

| Position | RI | RII | RIII | RIV | RV | Total |
|---|---|---|---|---|---|---|
| Administrators | 3 | 7 | 10 | 25 | 12 | **57** |
| Clinicians: Licensed and License eligible | 2 | 13 | 20 | 27 | 19 | **81** |
| Nurses | 1 | 8.5 | 6 | 10 | 5 | **30.5** |
| Nonadministrative Qs | 23 | 19 | 16 | 33 | 26 | **117** |
| Hospital Liaison | 1 | 1 | 2 | 2 | 1 | **7** |
| | | | | | | |
| Filled | 10 | 45.5 | 25 | 82 | 53 | **215** |
| Vacant | 20 | 3 | 29 | 15 | 10 | **77** |
| Total | 30 | 48.5 | 54 | 97 | 63 | **292.5** |
| Percent Vacant | 67% | 6% | 54% | 15% | 16% | **26%** |
| | | | | | | |
| Mobile Filled | 9 | 35 | 13 | 23 | 24 | **104** |
| Mobile Vacant | 13 | 0 | 22 | 12 | 6 | **53** |
| Total | 22 | 35 | 35 | 35 | 30 | **157** |
| Percent Vacant | 59% | 0% | 63% | 34% | 20% | **34%** |
| | | | | | | |
| BHL Filled | 40 | 35 | 33 | 50 | 26 | **178** |
| BHL vacant | 13 | 1 | 1 | 3 | 6 | **52** |
| Total | 53 | 36 | 34 | 53 | 32 | **230** |
| Percent Vacant | 25% | 3% | 3% | 6% | 19% | **23%** |

*Table 7: FY26 Q1 REACH Staffing Analysis for REACH CTH and ATH Settings*

| Position | RI | RII | RIII | RIV | RV | Total |
|---|---|---|---|---|---|---|
| Adult CTH filled | 6 | 16 | 11 | 9 | 6 | **51** |
| Adult CTH vacant | 0 | 0 | 9 | 2 | 5 | **20** |
| Total | 6 | 16 | 20 | 11 | 11 | **71** |
| Percent Vacant | 0% | 0% | 45% | 18% | 45% | **28%** |
| | | | | | | |
| Youth CTH filled | | 15 | | 17 | | **22** |
| Youth CTH vacant | | 1 | | 1 | | **9** |
| Total | | 16 | | 18 | | **31** |
| Percent Vacant | | 6% | | 6% | | **29%** |
| | | | | | | |
| ATH Filled | | 14 | | 12 | | **24** |
| ATH Vacant | | 2 | | 3 | | **3** |
| Total | | 16 | | 15 | | **27** |
| Percentage Vacant | | 12.5% | | 20% | | **11%** |

94

## Summary of Findings

Four PI Terms were reviewed in the 28th review period. The Commonwealth did not achieve compliance with Terms 32,33, or 36 in this period. The Commonwealth did achieve the specified goal and a compliance determination with the PI Term 35 for the first time.

**PI Term 32** which requires the Commonwealth to perform 86% of the crisis assessments in community settings was not accomplished because only 1,109 (53%) of the 2,095 crisis assessments completed in the reporting period were conducted in the community. This includes a comparable number of crisis assessments that were conducted in the 27th reporting period but the Commonwealth achieved a higher percentage of the assessments conducted in community settings in the 28th review period comparing the two reporting periods. In the 27th review period DBHDS reported 50% of the crisis assessments were performed in community settings. However, the higher percentage in the 28th period may or may not continue. The percentage conducted in community settings in the 26th period was 47.5% and the % in the 25th period was 52%.

**PI Term 33** which requires the Commonwealth to connect individuals with DD who need behavioral services, defined as Therapeutic Consultation (TC), with a provider within thirty days of the need being identified in the ISP, was not accomplished because only 1,343 (79%) of the 1,702 individuals who needed TC were referred and connected to a provider within thirty days. This is an increase in performance compared to the 27th reporting period when 78% of individuals had this connection within thirty days. Of the 359 individuals who were not connected within thirty days, 204 were eventually connected, leaving 155 individuals were not connected to a TC provider within the reporting period. DBHDS is addressing all of the actions associated with this PI Term.

**PI Term 35** which requires the Commonwealth to identify a community residence for individuals with DD within thirty days of their admission to a CTH or psychiatric hospital achieved compliance in the 28th review period because 277 (90%) of the 307 individuals admitted to a CTH or psychiatric hospital had a residence identified within thirty days. This percentage of timely referrals is an increase compared to the previous reporting period when the Commonwealth achieved 82% of individuals referred to a community setting within thirty days of their admission to a CTH or psychiatric hospital. DBHDS has selected five new providers to develop additional residential settings for individuals with intense behavioral needs. These homes are in various stages of development. When all of the new homes are operational DBHDS will have increased its beds for this population by 52, from 36 to 88 beds. DBHDS reports that as of FY26 Q3, 58 of the 88 beds are being utilized.

DBHDS continues to report these additional residential settings that exist, most were not fully utilized in this reporting period, although there was an increase from 49 beds to 58 beds being utilized in the 28th period compared to the utilization on in the 27th period.  DBHDS reported actions it took during the 28th reporting period to improve the number of operational home and the utilization of existing homes. These include follow up to address licensing issues to open the home in Region 1; monitoring the provider's performance that is delaying the opening of the

home in Region 3; and increasing the awareness of hospital, REACH and CSB SC staff of the availability of these homes. DBHDS is addressing all of the actions associated with this PI Term.

**PI 36** which requires the Commonwealth to fund and develop three new CTHs for youth (YCTH) in Regions 2, 3, and 5, was not achieved. DBHDS has funded the three additional YCTHs. Region 5 has approved the contract for the home being developed in its Region and is reviewing the design and seeking site approval. Regions 2 continues to look for property, and Region 3 has a property and is hiring staff. Region 3 projects the YCTH will open this summer.

DBHDS now reports the children who use the two existing YCTHs for preventive respite during this reporting period. The Respite funds have been approved and were available to families in Regions 1, 3, and 5 beginning in May 2025. However, these funds were not used by any family in either the 27th or 28th reporting period. DBHDS has taken steps in the 28th review period with REACH staff to ensure the REACH staff notify families of the availability of these respite funds at the time of REACH intake or when providing prevention and mobile crisis support. DBHDS is implementing all required actions that relate to this PI Term

DBHDS is implementing all of the expected actions related to Terms 32,33,35 and 36 as described in the Table below. Table 8 summarizes the findings for the PI Terms and Table 9 summarize the facts and conclusions for the review of these Terms.

All processes and attestations have been verified in previous studies.

*Table 7*
*Status of Achieving the Goals of the PI Terms*

| Term | 27th | 28th |
|---|---|---|
| 32. **Community Setting Crisis Assessments.** The Commonwealth will work to achieve a goal that 86% of children and adults receive crisis assessments at home, the residential setting, or other community setting (non-hospital/non-CSB office). Crisis Receiving Centers ("CRC") will only be counted as an "other community setting" after it is determined that the individual or supported decision maker was not directed by the Call Center, Emergency Services, or Mobile Crisis staff to present at a CRC. | **Not Achieved** | **Not Achieved** |
| 33. **Therapeutic Consultation Services.** The Commonwealth will work to achieve a goal that 86% of individuals identified as in need of Therapeutic Consultation service are referred for the service and have a provider identified within 30 days. | **Not Achieved** | **Not Achieved** |

96

| 35. **Community Residences for Individuals with DD Waivers.** The Commonwealth will work to achieve a goal of 86% of individuals with a DD waiver and known to the REACH system who are admitted to a CTH, or a psychiatric hospital have a community residence identified within 30 days of admission | **Not Achieved** | **Compliance** |
| --- | --- | --- |
| 36. **Out-Of-Home Crisis Therapeutic Prevention Host-Home Like Services for Children.** To prevent institutionalization of children due to behavioral or mental health crises, the Commonwealth will implement out-of-home crisis therapeutic prevention host-home-like services for children connected to the REACH system who are experiencing a behavioral or mental health crisis and would benefit from this service. | **Not Achieved** | **Not Achieved** |

**Table 8**
**Terms and Related Actions**

| Term and Actions | Facts | Analysis/Conclusion | 27th/28th |
| --- | --- | --- | --- |
| 32. **Community Setting Crisis Assessments.** The Commonwealth will work to achieve a goal that 86% of children and adults receive crisis assessments at home, the residential setting, or other community setting (non-hospital/non-CSB office). Crisis Receiving Centers ("CRC") will only be counted as an "other community setting" after it is determined that the individual or supported decision maker was not directed by the Call Center, Emergency Services, or | DBHDS reports the data separately for FY26 Q2 and FY26 Q3.

In FY26 Q2 only 51% of all crisis assessments were conducted in a community setting. The percentages across Regions ranged from a low of 36% in Region 1 to a high of 63% in Region 2.

In FY26 Q3 only 54% of all crisis assessments were conducted in a community setting. The percentages across Regions ranged from a low of 36% in Region 1 to a high of 59% in Region 2. | The Commonwealth continues to significantly underperform in the area of conducting crisis assessments in the community and has shown no significant improvement over nearly six years. Region 1 remains the Region with the lowest percentage of crisis assessments completed in community locations, although it has improved its performance compared to the 27th reporting period.

Conclusion: The Commonwealth did not achieve this term because only 53% of individuals with DD who experienced a crisis and were assessed received their assessment in a community setting. | Not Achieved

**Not Achieved** |

| | | | |
|---|---|---|---|
| Mobile Crisis staff to present at a CRC. To achieve that goal, the Commonwealth will take the following actions: | The total number of individuals with DD who were assessed for a crisis in this reporting period was 2,095 of whom 1,109 (53%) were assessed in community settings. This is an increase in percentage compared to the 50% of crisis assessments that were conducted in community settings in the 27th review period. | | |
| **32. a)** DBHDS will continue to promote the use of the 988 24-hour crisis helpline by providing information on the helpline on its social media platforms, in print and television advertisements, and through informational bulletins developed or funded by DBHDS. DBHDS will require all mobile crisis team members to receive training within 90 days of hire on how to support and respond to individuals with developmental disabilities (DD) who are in crisis. | DBHDS reported that it was implementing a 988 media campaign and that its Web Page includes Mobile Crisis Response (MCR) training for providers in the 26th reporting period.<br><br>DBHDS provided an update for the 28th review period that reported its month-long targeted outreach and media campaign in select markets of Virginia starting 3.31.26. The campaign materials will direct people to the new Get Help page on the website which features the availability of 988.<br><br>DBHDS was in the process of selecting and contracting with a vendor to develop training for MCR staff and DD service providers by February 2026. The vendor has been selected but there have been delays for the vendor to start as a result of another provider contesting the selection of the vendor. DBHDS continues to require training of the mobile crisis team staff within 90 days and monitors Regions' compliance that | | **Completed and Ongoing** |

| | this training occurs during the REACH quarterly qualitative reviews performed by DBHDS staff. | | |
|---|---|---|---|
| **32. b)** DBHDS will maintain its current efforts to assist the regions in filling vacant mobile crisis positions by discussing staffing at regional qualitative reviews of REACH programs and supporting REACH programs to implement quality improvement plans. | To help regions fill vacant REACH positions, DBHDS has updated the roles and responsibilities of REACH staff to coincide with changes made in the crisis system that are related to the REACH program functions and the overall focus on an inclusive crisis system.<br><br>DBHDS reports it will maintain its current efforts to assist the Regions to fill vacant mobile crisis positions. DBHDS does review staffing with each Region in its Quarterly Qualitative Reviews (8,9).<br><br>DBHDS reports that the QII for Region I is being implemented through a change in program administration. The administration and operation of the Region 1 REACH program will be operated by ESPH starting on May 2026. ESPH has successfully operated the REACH program in Reion 2 for several years. This change is being made to improve the performance of the REACH Region 1 program. | The Regions had more similarity in the number of staff assigned to MCR functions in the 27th period. Region 1 increased its number of MCR positions from 22 to 30 in the 27th reporting period but has decreased these positions to a total of 22 again (6).<br><br>With the exception of Region 2 which remains with no vacancies in MCR positions, the Regions continue to experience high vacancy rates for MCR staff. Region 5's vacancy rate remains the same at 20% comparing the 27th and 28th review periods. Region 1 has an increased vacancy rate from 35% to 59% in the 28th review period; Region 4 has a 34% vacancy rate; and Region 3's vacancy rate remains very high at 63%, decreased slightly from 66% in the 27th review period. The staff vacancies remain consistent with the staff vacancies in the 27th period and have in fact increased in Region 1 by 14%. | **Completed and Ongoing** |
| **32. c)** Within 6 months of the date of this Order, the Commonwealth will develop a plan that includes measurable goals, specific support activities, and timelines for implementation with | DBHDS provided information on the status of implementing its planned actions, including its training schedule for FY26 which includes training law enforcement, hospital staff, school system, and | The Plan has very specific actions that should assist DBHDS to achieve Term 32. The Plan now clearly states measurable goals in order to evaluate the impact and success of various actions included in the Plan. | **Completed and Ongoing** |

| | | | |
|---|---|---|---|
| consultation from stakeholders to enhance 988 supports and services to increase the likelihood that individuals will be assessed in the community. | community providers. Training is being offered in-person and virtually. REACH is also starting a quarterly newsletter to be routinely shared with private and public community partners. Numerous trainings are documented that were held between 10.2.25 and 12.10.25. | These include specific goals to increase the percentages of assessments that are conducted in community locations, expecting 55% and 65% of these crisis assessments to be conducted in community settings by 6.30.26 and 6.30.27 respectively. Other goals are to increase individuals' knowledge of available crisis services; use REACH, CSB, 988 Staff Skills training to improve access and communication during crisis assessments; increase MCR staffing and Call Center staff; build regional program capacity to increase the choice of community locations for conducting crisis assessments; and monitor services related to crisis assessments. Each goal has many measurable actions associated with the goal and reports on the progress to implement the actions and achieve the goals (18) | |
| **32.d**) From the date of this Order, DBHDS will monitor staffing at each REACH program to determine if they have sufficient staffing per shift to meet the goal, including through discussion and review of filled/vacant positions, utilization rates of mobile crisis, and times mobile crisis calls are being received in comparison to the number of staff working during those hours at each REACH program ' s quarterly review. If a quarterly review indicates that staffing is not sufficient to meet the goal, DBHDS shall | DBHDS did review staffing issues with each REACH team though its quarterly quality reviews, with a particular focus on staffing discussions in FY26 Q3. These discussions addressed both recruitment and retention. DBHDS reviews the actions and approaches each Region is taking to recruit additional staff and to flexibly and creatively use the staff that they have to complete crisis assessments and provide mobile crisis support.<br><br>DBHDS monitors each Region's staffing to determine if there is sufficient staffing to respond to crises 24/7, 365 days each year. However, there is not evidence that DBHDS | DBHDS determined that while staffing is a challenge across the Regions, most Regions are using their full complement of staff, including supervisors to ensure that the basic functions of mobile crisis response and follow up services are provided. Regions 1 and 3 each have a significant number of staff vacancies for their MCR. Region 1 is not fully meeting the staffing standards. Region 1 is transitioning from the existing CSB that manages the program to ESPH by May 1,2026. ESPH has operated the Region 2 REACH program successfully for many years. DBHDS determined Region 3 continues to respond to crises in person by successfully using supervisors and clinicians to assist responding to crises. Region 4 is using prevention staff to assist the MCR team to | **In Progress** |

100

| | | | |
|---|---|---|---|
| review the region's current efforts to increase staffing and, if DBHDS determines necessary, will require a quality improvement plan that includes additional actions that DBHDS finds are necessary to enhance staffing. The Independent Reviewer, in the reports required under Paragraph 76, shall include a determination in his report on the adequacy of the Programs and Virginia's response to this requirement. | has made a determination if each REACH program has sufficient staffing to meet the goal of Term 32 which is to *"achieve a goal that 86% of children and adults receive crisis assessments at home, the residential setting, or other community setting (non-hospital/non-CSB office)."* | respond to crises, thereby continuing to meet minimum coverage standards. Region 2 uses supervisory staff to meet its crisis response obligations and Region 5 is in the process of hiring and training many new staff. (8,9). | |
| **32.e)** Semi-annually, beginning on January 1 and June 1 of each year, DBHDS will work with the two regions that are experiencing the most success in responding to people in crisis in the community to determine what is leading to their success. DBHDS will work with the two regions that are experiencing the most challenges in responding to people in crisis in the community to learn what is leading to those challenges. DBHDS will work with all the regions based on these lessons learned to implement a plan to improve | DBHDS identified Regions 1 and 4 as needing TA in the 26th reporting period. The REACH workgroup discussed a number of relevant questions to specifically identify effective strategies and impediments.<br><br>DBHDS reports in the 28th reporting period that DBHDS staff held a meeting with REACH Directors and staff on 1.20.26 in part to discuss practices that improve the performance of some regions conducting crisis assessments in community settings. Region 2 is noted as a higher performed in this area, and in part this is credited to the flexibility ESPH has regarding hiring practices and recruitment incentives. | DBHDS coordinated an effort to assist Regions increase the number of crisis assessments in community settings.<br>As a result of the meeting held in January the REACH programs decided to offer focused training for Crisis Receiving Center (CRC) staff in early FY27 as these program become operational to ensure they are knowledgeable of the REACH programs and their mission and purpose. | **Completed and Ongoing** |

101

| | | | |
|---|---|---|---|
| performance in each of the regions. | The group discussed Region 2's work with school districts to address barriers to allowing crisis staff to respond to crises on grounds so students are not transported to s hospital for a crisis assessment. The group also discussed Region 2's outreach to county social workers to begin relationship building and to inform them of REACH crisis prevention services. | | |
| **32.f**) If the Commonwealth has not achieved the goal within two years of the date of this Order after taking the actions in Paragraphs 32(a) through 32(e), DBHDS will conduct a root cause analysis and implement a QII as determined appropriate by DBHDS. As part of the root cause analysis, the Commonwealth will collect data on why individuals with developmental disabilities presented at a CRC instead of accessing mobile crisis services. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | | | **Not Yet Implemented Due: 1/15/27** |
| 33. **Therapeutic Consultation Services.** The Commonwealth will work to achieve a goal | DBHDS reports the number of individuals who needed therapeutic consultation (TC) who were connected to this | This percentage (79%) is an increase from the previous reporting period, when 78% of individuals who needed TC | Not Achieved  **Not Achieved** |

| | | | |
|---|---|---|---|
| that 86% of individuals identified as in need of Therapeutic Consultation service are referred for the service and have a provider identified within 30 days. To achieve that goal, the Commonwealth will take the following actions: | service within thirty days; how many were not connected within thirty days; and the overall percentage of individuals connected to a provider within thirty days for the period July 1- December 31, 2025.<br><br>In this time period, 1,343 (79%) of the 1,702 individuals needing TC were connected to a provider within thirty days. Of these individuals, 359 (21%) were not connected to a TC provider within thirty days. This is an increase of both the number of individuals connected and the percentage of individuals connected compared to the 27th reporting period using data from January - June 2025 when 1,152 (78%) of 1,483 individuals were connected to a provider within 30 days.<br><br>DBHDS further reports that of the 1,702 individuals with authorizations for TC, a total of 1,547 (91%) received TC, and 155 (19%) did not receive TC between July and December 2025 (1). This is an increase of 4% compared to the time period of January -June 2025 when 87% of individual with authorizations were connected to a provider (1).<br>it | were connected to a provider within thirty days.<br><br>DBHDS provides data by region. It's report also includes data as to the average number of days to connect the individuals who were not connected in thirty days but were eventually connected to a TC provider. This ranges by month from a low average of 53 days in December to a high average of 83 days in September.<br><br>DBHDS's reported data indicating that 155 of the 359 who were not connected to a TC provider within thirty days were not connected at all during the reporting period, and that 204 of these individuals were connected to a provider, but not within the expected thirty days.<br><br>DBHDS conducted a root cause analysis and determined the performance of the SCs is key to improving the performance for connecting individuals to TC, since it is the SC who is responsible to facilitate this connection. To address the SCs role and improve the timeliness of the connections to TC providers, DBHDS has focused on training; task clarification and prompting; improving resources, materials and processes; and addressing performance consequences, effort and competition. DBHDS has continued improvement efforts in the 28th reporting period. These actions are described under 33.a. below (1).<br><br>Conclusion: The Commonwealth did not achieve this Term's 86% specified goal, because DBHDS reported that 79% of | |

| | | individuals with DD who had a need for TC were connected to a provider within 30 days of the need being identified. | |
|---|---|---|---|
| **33**. a) Within 12 months of the date of this Order, DBHDS shall implement a technical assistance initiative with the CSBs that need the most support to connect people to behavioral supports and focus on improving case managers' awareness of the behavioral resources available to individuals in need of Therapeutic Consultation, unique CSB business practices, and supervisory support for case managers in this area of performance. | DBHDS has implemented improvement initiatives and is providing technical assistance (TA) to low performing CSBs. DBHDS has identified the eight CSBs that it determined to be in the most need of TA, based on its review of their performance.\n\nDBHDS is providing training to the eight CSBs and offering TA. DBHDS provides real time data to these eight CSBs on a biweekly basis and offers these CSBs a comparison of their performance to the Region's overall performance. DBHDS met with the CSBs with less improved performance but determined the actions underway in these CSBs were appropriate to continue to address performance. To date, seven of the eight CSBs have improved performance connecting individuals with DD to TC services (1,13). | DBHDS also reports that there are currently 115 providers of therapeutic consultation, which is an increase of five providers since the 27th review period. | **Completed and Ongoing** |
| **33 b**) Annually, the Commonwealth will participate in at least one regional event and at least one statewide conference to promote Therapeutic Consultation services. The Commonwealth will provide technical assistance to providers regarding enrollment | DBHDS attended the Annual Conference for Behavior Analysts in April 2026.\n\nDBHDS also participated in Regional Round Tables earlier in the fiscal year.\nThe Behavior Network Supports hosts an exhibit booth to provide information on | | **Completed and Ongoing** |

104

| | | | |
|---|---|---|---|
| with Medicaid as a provider as they reach out to the Commonwealth for this support. | enrollment as a Medicaid provider for TC. In the 28th review period DBHDS provided TA to eleven TC providers to assist them to enroll as Medicaid providers (16). | | |
| **33.c**) By July 1, 2025, the Commonwealth will create a training about enrolling with Medicaid as a Therapeutic Consultation provider and make it available for providers via DBHDS's website. | As reported in the 26th reporting period, DBHDS has completed a three part training series and developed written instructions for providers to enroll in Medicaid and navigate the provider requirements. The training includes: Becoming a TC Provider; Getting Started; and Regulations and Guidelines. Training videos, slide decks and TA for completing task analysis continue to be available on the DBHDS Behavioral Services Web Page. | | **Completed** |
| **33.d**) If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2024, and has not conducted a rate study meeting the requirements of Paragraph 59 in the preceding two years, the Commonwealth will initiate a rate study of Therapeutic Consultation by January 1, 2025. The rate study shall be completed in time to be considered during the 2026 legislative session. If the Commonwealth has not achieved the goal as reported in its status | The Commonwealth under the leadership of the Department for Medical Assistant Services (DMAS) has contracted with Guidehouse to conduct the rate study. DMAS has created a DD Rate Work Group that convened 12.12.24 for the first of a series of monthly meetings. The Work Group includes representatives of providers, advocates and industry associations.<br><br>Guidehouse conducted a rate study for services in the three DD 1915 c waivers, the CCC Plus Waiver and State Plan services including Therapeutic Consultation (17,18). | | **Completed and Ongoing** |

105

| | | | |
|---|---|---|---|
| update of December 1, 2028, and has not conducted a second rate study meeting the requirements of Paragraph 59, the Commonwealth will initiate a second rate study of Therapeutic Consultation by January 1, 2029. The rate study shall be completed in time to be considered during the 2030 legislative session. Any rate study required by this paragraph shall be conducted in accordance with Paragraph 59. This paragraph shall not be construed to require the Commonwealth to conduct more than two rate studies. | Guidehouse issued a draft report in July 2025 with recommended rate increases for all of the services that they were directed to study and analyze, with the goal of recommending rates that would assure sufficient capacity.<br><br>The rate study includes direct, indirect, and administrative costs and adjusts for differences in costs in Northern Virginia compared to the rest of the Commonwealth (17,18).<br><br>The United States has identified concerns and asked questions about Guidehouse's draft report. The focus of DOJ's concerns questioned whether the completed rate study fulfills the PI requirements to design the study to ensure sufficient provider capacity to achieve the specified goal of this and the other identified Terms (7). The final report responded to each of DOJ's stated concerns (20).<br><br>On 10.15.25 the Commonwealth's Director of DMAS submitted the DD Waiver Rate Study report to Governor Youngkin, the Chairs of the House and Senate Appropriation Committees and Virginia's Department of Planning and Budget (23). The study was completed in time to be considered during the 2026 legislative session. | | |

106

| | | | |
|---|---|---|---|
| **33. e)** If the Commonwealth has not achieved the goal by June 30, 2026 after taking the actions in Paragraphs 33(a) through 33(c), DBHDS will also conduct a root cause analysis and implement a QII as determined appropriate by DBHDS. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | Although this action is not due to be implemented until July 2026, DBHDS reports that it has already started to determine how to best comply with the expectations of PI 33.e. DBHDS reports that the process it is using to improve the performance of the eight CSBs with the lowest performance ratings connecting individuals with TC providers is proving to be a successful intervention to improve performance. DBHDS plans to analyze other CSBs performance that may be lower than the eight CSBs receiving TA now, that are not meeting the expected level of performance and utilize the same approach to providing TA and monitoring with timely feedback to the CSBs to further improve the performance of these additional CSBs. | | **Not Yet Implemented Due:7/15/26** |
| 35. **Community Residences for Individuals with DD Waivers.** The Commonwealth will work to achieve a goal of 86% of individuals with a DD waiver and known to the REACH system who are admitted to a CTH, or a psychiatric hospital have a community residence identified within 30 days of admission. To achieve that goal, the Commonwealth will | DBHDS reports separately for FY26 Q2 and FY26 Q3, detailing that 87% in Q2 and 93% in Q3 e  The total number of individuals reported who were admitted to either a CTH or a psychiatric hospital in the full reporting period (FY26 Q2 and FY26 Q3) was 307. Of these individuals 277 (90%) had a residence identified within 30 days of their admission (2,3). | DBHDS has demonstrated continued improvement to meet this requirement through the 28th reporting period and has now achieved the goal of PI 35 for the first time.  DBHDS is taking actions it believes will improve the Commonwealth's performance to achieve this PI. These actions include timely involvement of REACH staff in hospital discharge planning and a review of the customized rate process to assist providers to receive authorization for additional staffing to support an individual in the community after a hospital discharge. | Not Achieved  **Compliance** |

| take the following actions: | | Conclusion: The Commonwealth achieved compliance with this Term for the first time identifying a community residence within 30 days of admission for 90% of the individuals known to REACH who were admitted to either a CTH or a psychiatric hospital in the 28th review period. | |
|---|---|---|---|
| **35. a)** DBHDS will enter into contracts with providers to develop homes for individuals with intense behavioral support needs that will be operational (*i.e.*, that an individual can move into the home) in accordance with the following schedule: | DBHDS began to address the need to increase the number of providers who offered residences to support individuals with intense behavioral support needs with an RFP issued in FY18. Since then, DBHDS continued to add providers, resulting in the development of residences with 36 beds. <br><br>Additionally, to comply with this requirement of the PI, DBHDS issued another RFP in FY24, selecting five new providers to develop 52 new beds. These new residences are at different stages of development as noted below. When all of the new residences are operational, the Commonwealth will have 88 beds in residences to support individuals with intense need for behavioral supports. Currently 58 (66%) of the total number of beds to support individuals with intense behavioral needs are being utilized, compared to 49 (58%) of the 85 beds that were reported as utilized in the 27th reporting period (2,3). | The Commonwealth has determined that more residences are needed for individuals with intensive behavioral needs, yet the existing homes are not fully utilized, nor have they been in previous reporting periods. There was an increase between the 27th and 28th review periods when bed use increased from 49 to 58 beds, and a total of 88 beds are being made available. | **In Progress** |

| | | | |
|---|---|---|---|
| **35.a**) i. Region 1: one home operational by August 2024 and one additional home operational by February 2025; | Region 1 is adding two new homes. One was operational previously. The second home became operational in the 28th review period. | | **Completed** |
| **35.a**) ii Region 2: two homes operational by August 2024 and one additional home operational by February 2025; | Region 2 has six new homes operational. This is two more homes than was anticipated. | | **Completed** |
| **35.a**) iii. Region 3: one home operational by November 2024 and one additional home operational by February 2025; | Region 3 had opened one new home in February 2025. The second home is under contract but not yet licensed. | This was the same status reported by DBHDS for the second home in the 27th review period. DBHDS provided a further update in the 28th review period. DBHDS is exploring options with another provider in Region 3. The next step is for the provider to submit a proposed budget. | **In Progress** |
| **35.a**) iv. Region 5: one home operational by November 2024 and two additional homes operational by February 2025. | Region 5 has three new homes operational. | | **Completed** |
| **35.b**) If the Commonwealth has not achieved the goal after taking the actions in Paragraph 35(a) by June 30, 2025, DBHDS will conduct a root cause analysis and implement a QII as determined appropriate by DBHDS. DBHDS will continue this quality improvement process until the goal is achieved | DBHDS reports that its staff conducted a Gap and Root Cause Analysis (RCA) in July 2023. This RCA continues to guide the QII of DBHDS. For the 28th review period DBHDS reports it continues to address bottlenecks regarding streamlining and approving providers' requests for customized rate approvals. REACH Managers continue to engage providers, | DBHDS has continued actions and activities to improve the timeliness of identifying community residences for individuals with DD within thirty days of their admission to a CTH or psychiatric hospital. DBHDS continues to meet or exceed the performance expectation for individuals using the CTHs but not for individuals being discharged from a psychiatric hospitals. | **Completed and Ongoing** |

109

| | | | |
|---|---|---|---|
| and sustained for one year. | families and the Service Coordinators during discharge meetings, starting the discharge process at the time of the individual's admission. DBHDS discusses the barriers to timely discharge for those in a CTH at the REACH Quarterly Quality Reviews in the 28th review period. | DBHDS reports actions it took in the 28th reporting period which include reviewing barriers and strategies with the providers operating these homes to utilize beds; ensure hospital discharge staff are aware of the contact information for all of the residential providers; work with REACH staff to promote referrals to these homes from CTH and ATH settings; and increase the awareness of these homes among Service Coordinators.<br><br>DBHDS reported that staff met on 2.16.26 to update the Root Cause Analysis (RCA). The staff concluded that the reasons that the goal was not achieved until recently were still relevant. These barriers include lack of choice in preferred communities; individuals and families changing their minds about a proposed move; staff training time; staff turnover and waiver system funding and processing.<br><br>The RCA update identifies the status of actions to address the root causes that were identified (10). | |
| 36. **Out-Of-Home Crisis Therapeutic Prevention Host-Home Like Services for Children.** To prevent institutionalization of children due to behavioral or mental health crises, the Commonwealth will implement out-of-home crisis therapeutic prevention host-home-like services for children connected to the REACH system who are | DBHDS reports the status of its plans to establish and operate YCTHs in the three Regions, that do not currently have a YCTH. The YCTH to serve Region 1 will physically be located in Region 2. None of the homes are operational. See the details under 36.c. | DBHDS continues to make progress, but the YCTHs will not be operational by May 2026 as anticipated. The YCTH in Region 3 is the closest to being operational and is projected to open in the summer of 2026.<br><br>Conclusion: The Commonwealth has not achieved this Term as none of the new YCTHs are available for children with DD to use for prevention or stabilization after a crisis. | Not Achieved<br><br>**Not Achieved** |

| | | | |
|---|---|---|---|
| experiencing a behavioral or mental health crisis and would benefit from this service by: | | | |
| **36.a**) Within one month of the date of this Order, DBHDS will send out a communication through the list serv for individuals and families on the waiver waiting list, and to the provider list serv communicating that the two CTHs existing in Regions 1 and 4 as of the date of this Order can be utilized for preventive stays by children across the Commonwealth. | DBHDS sent out communication regarding prevention admissions at YCTHs on 2.4.25. | DBHDS fulfilled this required action prior to the due date of 2.15.25 | **Completed** |
| **36.b**) DBHDS will continue to track and report quarterly on the number of crisis prevention stays being utilized by children in each of the five regions. | DBHDS reports that seven children in FY26 Q2 and Q3 used the CTH operated by Region 2 for prevention. Of the children who used it for prevention, two resided in Region 1 and the remaining five children resided in Region 2. No children in either Quarter used the YCTH in Region 4 for prevention (4,5)  DBHDS did report for each Region how many children used one of the YCTHs in FY26 Q2 and Q3: Region 1-9 Region 2- 22 Region 3- 7 Region 4- 34 Region 5-2 | DBHDS did report which Regions used the YCTHs for prevention as the Action requires. | **Completed and Ongoing** |

111

| | | | |
|---|---|---|---|
| **36.c)** Providing funding in Fiscal Year 2025 to establish three additional CTH's in the regions where they do not exist as of the date of this Order (Regions 2, 3, and 5) that will be operational between May 2025 and January 2026. | DBHDS is committed to increasing YCTHs to have one located in all five Regions to support crisis prevention admissions. Funding is authorized and the performance contracts are signed as has been reported previously. The homes to serve youth are not operational.<br><br>DBHDS reports that ESPH continues to search for a home for Region1 to purchase after deciding the four under review previously were not viable, ESPH has located a potential house that will come to the market later this Spring. NRVCSB in Region 3 is building a home to open in FY27 Q1. Staff are being hired. Western Tidewater (WTCSB) in Region 5 has submitted a site for review by the local County Planning Commission in Isle of Wright County. The Planning Commission provided feedback to WTCSB which has developed the packet for submission to the Commission (11). | | **In Progress** |
| **36.d)** From the date of this Order and continuing until all three additional CTHs referenced in Paragraph 36(c) are operational, DBHDS will support up to a total of 1,000 days per year of respite for children connected to REACH, who have previously experienced or are at risk of | DBHDS reports that no families of children with DD from Regions 1,3, or 5 used this respite funding in FY26 Q2 or FY26 Q3.<br><br>DBHDS reports that in FY26 Q3 a documentation requirement has been added for REACH staff who offer MCR and prevention services to use to document the offer of this respite finding to | | **In Progress** |

| | | | |
|---|---|---|---|
| experiencing a crisis, reside in regions without an operational CTH, and who do not otherwise have funding to access respite services at a rate of up to $500 per 24-hour period. | families. DBHDS further reported that staff were trained in all three Regions by 3.15.26 to complete this documentation acknowledging that families were informed of the availability of respite funds. | | |
| **36.e)** If the Commonwealth has not achieved the goal after taking the actions in Paragraphs 36(a) through 36(d) by June 30, 2026, DBHDS will conduct a root cause analysis and implement a QII as determined appropriate by DBHDS. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | | | **Not Yet Implemented Due: 6/30/26** |

**Status of Recommendations Made by the Expert Reviewer in the 27th Period:**
DBHDS should report in the future how many employees outside of REACH staff have been trained and certified as MCR providers (PI 32.a).
*Not done, remains a recommendation*

DBHDS should analyze how Region 2 is able to maintain such a low vacancy rate for the MCR and determine if any of the Region's strategies are applicable to other Regions (PI 32.b).
*Completed*

To increase the percentage of crisis assessments conducted in community settings, DBHDS should include measurable goals, specific support activities and timelines for implementation as required by PI Term 32.c. and should report its work with specific Regions to increase the number of crises assessed in community settings (PI 32.e).
*Completed*

DBHDS should undertake a review and analysis to determine if the REACH programs have the necessary number of staff authorized, funded and filled for the CTH and ATH programs to successfully meet their responsibilities related to the PI Terms for Crisis Services.

113

*Not done, remains a recommendation*

As part of DBHDS' qualitative review of the REACH programs, it should include a specific review of each Region's efforts and measurable progress to conduct crisis assessments in community settings with recommendations for improvement (PI 32.e).
*Completed*

DBHDS should refine the documentation it produces to verify the QII activities underway to address PI 35.b and connect these activities to the existing RCA.
*Completed*

DBHDS should report its steps to implement PI Action 36.d and undertake a root cause analysis if DBHDS continues to find there is no utilization of these respite funds (PI 36.d)
*Not done, remains a recommendation*

Attachment A
Document List

1.  Behavior Supports Report FY26 Q3
2.  Supplemental Crisis Report FY26 Q2
3.  Supplemental Crisis Report FY26 Q3
4.  REACH Data Summary Report-Children: FY26-Q2
5.  REACH Data Summary Report- Children FY26-Q3
6.  REACH Data Summary Report- Adults: FY26-Q2
7.  REACH Data Summary Report- Adults: FY26 Q3
8.  REACH Quarterly Qualitative Reviews FY26 Q2: Regions 1,2,3,4 and 5
9.  REACH Quarterly Qualitative Reviews FY26 Q3: Regions 1,2,3,4, and 5
10. PI 35.b. Update: Identification of a Community Residence within 30 days of Admission-Root Cause Analyses: 2.18.26
11. Status Updates for PI Term 36: 03.30.26
12.  PI 32 steps update
13.  TC Behavioral Services Graphs for 8 CSBs
14.  PI 35 Document
15.  Crisis Data Tracker
16. Call with Sharon Bonaventura and Nathan Habel 04.20.26
17. Email from Sharon Bonaventura 04.23.26
18. PI Term 32.c: Plan

Submitted by:
Kathryn du Pree MPS
May 19, 2026

114

# <u>APPENDIX C</u>

## Integrated Day Activities and Supported Employment

## By

## Kathryn du Pree, MPS

**Integrated Day Activities Including Supported Employment Report**
**Twenty-Eighth Review Period**
**Prepared for the Independent Reviewer**

# Introduction

This report summarizes the 28th review period study of the Permanent Injunction's requirements for Integrated Day Activities (IDA) which include employment. The purpose of the review is to determine if the Commonwealth has achieved the specified goals of the IDA terms of the Permanent Injunction (PI) and has implemented the listed actions. The terms under review for IDA during the twenty-eighth review period are Terms 37, 50, and 51 which are described below. The compliance rating for Term 50 will be deferred until the 29th review period when the annual data will be available to complete the review and rating.

The focus of the review is to determine if the Commonwealth has achieved the measurable goals of the two PI Terms, Terms 37 and 51, and the extent to which they have successfully implemented the associated actions. The Parties have agreed upon the terms to determine compliance related to the IDA Compliance Indicators that previously remained out of sustained compliance. These include PI terms that were associated with the Settlement Agreement's Provisions III.C.7.a.and b. These terms address the Commonwealth's responsibilities to increase employment opportunities for individuals with developmental disabilities (DD) through both DARS funded and HCBS employment opportunities, and to increase the percentage of individuals on DD waivers who receive their day services in the most integrated setting (MIS).

For this subset of PI terms and associated actions, the Commonwealth's progress toward achieving the specified goals and implementing the delineated actions are reviewed and reported below. This review includes an analysis and reporting of Virginia's status implementing the PI requirements associated with IDA that have not been achieved twice consecutively (see Table below). This includes PI Terms 50, 51 and 37. In the 26th review period, the Commonwealth achieved the specified goal and a rating of compliance for Term 37. The review of Term 37 was Deferred in the 27th review period and is reviewed in the 28th period to determine if the Commonwealth meets sustained compliance. In the 27th review period, Term 50 was Not Achieved, and for Term 51 the Commonwealth achieved Compliance for the first time. Term 51 is reviewed and rated in the 28th period to determine if the Commonwealth again achieved the specified goal and sustained compliance.

For this review the facts gathered are identified and analyzed for each specified goal in the Findings Table below. The documents which include these facts are listed by reference in Attachment A and most are found in the Commonwealth's library of documents.  Follow up information was provided throughout the study by Heather Norton, Deputy Commissioner, Community Services and I appreciate her responsiveness.

116

## Summary of Findings for the 28th Period

Facts were gathered regarding the Commonwealth's progress related to the specified goals for the three PI Terms associated with the SA provision III.C.7.a. The focus of this period's review, therefore, was to review the Commonwealth's progress toward achieving the employment targets for all individuals with DD on the waivers or the waiver waiting list; increasing employment specifically within waiver service options for individuals enrolled in a DD waiver; and increasing the percentage of waiver recipients who are participating in integrated settings for their employment and day services. The ratings for PI Terms 51 and 37 are made and reported below. The rating for Term 50 is deferred until the 29th review period, although the Commonwealth's status meeting Term 50 through the mid-year is described below.

**Methodology**: This review focused on the Commonwealth's progress toward achieving the specified goals of the Terms and implementing the related actions for increasing the number of individuals who are engaged in supported employment or who are competitively employed, and those who are receiving Community Engagement (CE) and other integrated day services. I engaged in the following activities to review and analyze the DBHDS' progress toward meeting the three PI Terms for IDA.

**Interviews:** I interviewed members of the Employment First Advisory Group (E1AG). The E1AG normally meets bi-monthly. Three meetings were conducted in the reporting period through April, and the minutes were made available to me through February (5). The E1AG subcommittees, which address policy, training and data also met three times during the reporting period (5). The E1AG members who were interviewed reported continued greater satisfaction with the direction of the E1AG since the 26th reporting period. This satisfaction among E1AG members has increased due to DBHDS resetting the work and mission of the E1AG and hiring an Employment Specialist who brings knowledge and expertise to the employment efforts of DBHDS and its E1AG. Members report improvement in the work of the sub-committees. The data committee is working with DBHDS to determine what data should be reported on the data dashboard that will be most useful to assist DBHDS to make strategic decisions to increase employment and that will be user friendly to stakeholders to better convey progress. The Education and Training subcommittee remains very active continuing to address the training needs of various stakeholder groups. The Policy subcommittee is mapping the process for Pre-Employment Transition Services (Pre-ETS), a vocational rehabilitation service, to address families and other stakeholders' confusion about the referral process. Members report the need for more analysis and discussion of the low number of individuals who express an interest in employment after a discussion about employment options with their Service Coordinator (SC). The members report the Policy subcommittee may be best used by refocusing on policy level questions rather than focusing on practices. Members in general discussed the continued impact of employment providers having too few workers to achieve the employment targets set for individuals with DD on the waivers. Members express concern about the continued impact of the workforce shortage on employment providers' ability to achieve future employment targets.

Members continue to report they would appreciate receiving draft reports ahead of the meetings with sufficient time for them to thoroughly review them and be prepared to discuss the policy implications. Terms 50 and 51of the PI require that the E1AG collaborate with the Quality

117

Improvement Committee (QIC) to develop QIIs. During this 28th reporting period, DBHDS has worked on collaboration with the E1AG to seek stakeholder input regarding barriers to employment and is using the information learned from the Listening Session the E1AG sponsored. DBHDS used the information elicited during the Listening Session to develop a QII to increase access to employment support for individuals with DD, that will lead to an increase in employment for these individuals. Members believed the feedback form the Listening Session validated much of what the E1AG members have discussed as strategies and priorities to improve employment performance in terms of achieving the employment targets.

Members report being encouraged that DBHDS will structure future E1AG meetings to allow time for policy level discussions so that they can provide input into DBHDS' strategic planning efforts to increase employment now that the Listening Session has been completed, input has been obtained regarding policy level changes that may be needed to improve employment, and new employment targets have been discussed for FY27-29. The members report these targets are being set based on an analysis of the actual growth in employment over the past three years. DBHDS has recently hired an Employment Specialist to assist both the work of DBHDS regarding employment initiatives and to support the work of the E1AG. Members are very encouraged by the interaction with this new Employment Specialist. One of the members I interviewed is also a member of the CEAG.

**Documents:** I reviewed the Semiannual Report on Employment; DR0023 Integrated Employment and Day Services; the meeting minutes for the Employment First Advisory Group (E1AG); the meeting minutes for the Community Engagement Advisory Group (CEAG); QII descriptions; training materials; the E1AG Plan for FY24-26 and the Community Engagement Annual Plan Update for 2026.

**Findings:** The purpose of this review is to determine the Commonwealth's progress achieving the specified goals of PI Terms 37, 50 and 51, which is described in Table 1 below. In the 26th review period, the Commonwealth achieved Term 37's specified goal and a rating of Compliance. The further review of Term 37 was deferred in the 27th period and is rated in the 28th period. In the 27th review period the Commonwealth achieved Term 51's specified goal and a rating of Compliance but did not achieve compliance for Term 50. A compliance determination for PI Term 50 is deferred in the 28th period as it can only be analyzed once the employment data for the full FY26 is available, which will be in the 29th review period. The Commonwealth has achieved the goals of both PI Term 37 and PI Term 51 in the 28th review period as detailed below and has achieved sustained compliance for PI Terms 37 and 51.

**PI 37**: The Commonwealth achieved the goal for this Term and a rating of Compliance for the first time in the 26th review period. In that review period the Commonwealth reached a 2.5% increase in the number of individuals participating in IDA in that period which achieved Compliance with Term 37. For the current review period, the Commonwealth has achieved a rating of Compliance for the second time. The Commonwealth achieved compliance with Term 37 in the 28th review period by accomplishing a 3.9% increase of the DD waiver population being served in the Most Integrated Setting (MIS).

118

DBHDS submitted data for March 2025 and March 2026 to compare the Commonwealth's achievement in increasing the percentage in the number of individuals participating in IDA. The data used to make this determination is the unduplicated number of individuals participating in IDA as a percentage of the total number of individuals participating in day programs including group day services. This percentage was 51.5% in March 2025, compared to 55.4% in March 2026 of the total number of adults with DD participating in day programs. The Commonwealth has increased this percentage by 3.9% in the year between March 2025 and March 2026. The actual number of adults with DD participating in IDA increased by 1,032 in this time period.

**PI 50:** DBHDS organized and structured the E1AG with the responsibility to work with DBHDS to set and review the targets. The E1AG has a data committee which reviews the employment data at least annually and completes trend analyses. The Commonwealth made progress towards achieving its employment targets though 2019, reaching 89% of the target it set (i.e.,1,078 employed compared to the target of 1,211) for that year (1).

An expected decline in the number of employed waiver participants occurred during the pandemic. The decline was dramatic between June 2019 and June 2020 (from 1,078 to 715 employed waiver participants). This decline began to turn around in FY22 when 764 individuals on the waiver were employed.

As reported in the 23rd period's Study Report, during the pandemic, DBHDS revised its waiver employment targets for 2022, reducing the target to 1,211 which was the pre-pandemic target for 2019. The E1AG met in April 2022 to revise the employment targets. It made this decision after its review and analysis of the impact of the COVID pandemic on employment outcomes for individuals with I/DD in Virginia. The decision was to return to the targets of 2019 for 2022 and those of 2020 for 2023.

In the fall of 2023, DBHDS planned to return to its pre-existing targets for the out-years through 2026. However, during the 24th review period, DBHDS and the E1AG undertook a more rigorous analysis of the employment data. DBHDS and the E1AG Data Committee members reviewed its historic approach to setting employment targets. Percentage increases year-to-year had not been consistently set by the Commonwealth. The E1AG committee's review found that originally DBHDS did not maintain a record of the methodology it used or the review it conducted of actual and projected performance, to set the employment targets. As a result of its data analysis, the E1AG Data Committee recommended reducing future employment targets based on what they consider a more realistic annual increase of 15% in employment for waiver participants.

Based on the actual achievement in FY23, its new approach resulted in the E1AG setting the following targets through FY26:
- FY24 1,142
- FY25 1,310
- FY26 1,512

119

DBHDS' target for FY26 is 1,512. As of December 2025, at the mid-year point, there were 1,138 waiver participants employed. This number represents 75% of the target of 1,512 for this fiscal year. This is an increase of thirty-three individuals who are employed through Individual Supported Employment (ISE) or Group Supported Employment (GSE) waiver services compared to June 2025. The increase in employment is attributed to ISE which increased by forty-four individuals. Participation in GSE decreased by eleven individuals. The Commonwealth will be rated for Term 50 in the 29th review period.  Virginia will meet the target when the performance is within 10% of the benchmark for the year.

The E1AG was reported in the 27th study to be meeting in December 2025 to collaborate with DBHDS to set the employment targets for waiver participants in waiver services for FY27-FY29. Data was presented by DBHDS staff at the E1AG meeting in December 2025, but there was no discussion at that meeting to set new targets for future years. One of the E1AG members reported to me that DBHDS involved the members of the E1AG in a discussion to set the employment targets at the E1AG meeting convened on April 15,2026. The minutes of that most Recent E1AG meeting were not available at the time I wrote this report.

PI Terms 50 and 51 require that DBHDS will work with the E1AG, the Quality Improvement Committee (QIC), and the QIC subcommittees to develop and recommend QIIs to increase employment for adults with DD. DBHDS's Regional Quality Councils (RQC) set the QII's which the QIC monitors. The PI expects the E1AG to be involved in developing QIIs to improve employment for individuals with DD. DBHDS reported the QII underway in the 27th review period that pertained to employment has been achieved and closed. It was conducted by the RQC in Region 3 and focused on training Service Coordinators (SC) and other stakeholders as the method to increase the number of adult waiver participants who have employment outcomes in their ISPs.

DBHDS is in the process of designing a QII to address employment outcomes with the engagement of the E1AG but has not yet finalized the QII. DBHDS and the E1AG sponsored a Listening Session in February 2026 to seek the input from providers, advocates, families and individuals about the barriers to creating and achieving employment outcomes. (5,6,7). Subsequent to that session, a small group of E1AG members met with DBHDS in early April to review and analyze what was shared in the Listening Session and to use this information to design the QII to improve employment outcomes.

DBHDS reports that the three primary themes identified from the Listening Session across categories were:
1. Inconsistent sharing of resources and knowledge in ways that are easy to understand, including information related to benefits planning.
2. The need for a pre-referral checklist outlining what VR requires, which individuals, families, Service Coordinators, and transition supports can use to reduce delays prior to a DARS referral.
3. Delays in the DARS referral and intake process.

Within the workgroup, discussion focused largely on mapping the employment process for individuals, families, and Service Coordinators. This included identifying activities that could

120

occur prior to a DARS referral to help streamline the process to ensure that everyone involved has clear expectations, timelines, and access to the resources and guidance needed to address any delays in the process. DBHDS reports that its staff is developing the Employment QII which will be shared with the Quality Improvement Committee (QIC) on 6.23.26.

**PI 51:** The Commonwealth achieved the specified goal and a rating of Compliance for the first time in the 27th reporting period. Now, for the second time, the Commonwealth achieved the specific goal and a rating of compliance in the 28th review period, and therefore, has achieved sustained compliance. The percentage of adults with DD employed through all employment programs offered by DARS and DBHDS is 26% of the total number of adults with DD on the waivers or waiver waiting list (1) in the 28th review period. The Commonwealth has exceeded the specified 25% goal of the total number of adults with DD on the waivers or waiver waiting lists to be employed. The Commonwealth has sustained compliance over two reporting periods.

The data reported by the Commonwealth is derived from data submitted by its Employment Service Organizations (ESO) and Department for Aging and Rehabilitative Services (DARS). The data are analyzed by DBHDS and the E1AG. These data were reviewed with the data committee and the E1AG at the April 2025 meeting of the Advisory Group. These data, complemented by historical data, were used to set new employment targets for FY27-FY29 as reported by an E1AG member in an interview with me.

There were 20,994 individuals receiving or on the wait list for waiver services as of 12.31.25. The target for employment for this six month period is 5,248, or 25% of the number of individuals with DD ages 18 to 64 on the waivers or waiver waitlist as of 12.31.25. Of these individuals a total of 5,463 (4,911 in ISE and 552 in GSE) were employed. This represents 26% of the waiver population, an increase of .9%, compared to 6.30.25 when 25.1% of the waiver population was employed (1). The number of individuals employed increased by 91 adults in this six month time period.

During the 28th period, Virginia achieved the 25% goal in PI Term 51 and a rating of Compliance for the second time. The Commonwealth achieved the outcome that  25% of the waiver participants and individuals on the waiting list for DD waiver services were in integrated day services, surpassing the compliance level of 25% by 1.0%. The Commonwealth has successfully increased the percentage of the individuals employed in the 28th reporting period, compared to the percentage of the individuals employed in the 27h reporting period.  These data are described in Table 2 below.

DBHDS's Community Engagement Advisory Group (CEAG) has revitalized the work of its three committees: education and training; policy; and data. It has developed training materials for SCs and providers which are in draft form and being finalized this fiscal year for dissemination. The CEAG developed a provider survey for Community Engagement (CE) and Community Coaching (CC) to determine provider interest and barriers to offering these services. The CEAG is analyzing the results of this survey in the 28th review period to determine how to increase the number of providers and the number of individuals who participate in CE and CC. The CEAG has revised its Work Plan to address the requirements of PI Term's action 37 a. which requires:

"*Within one month of the date of this Order, DBHDS' Community Life Engagement Advisory Committee will implement a work plan that includes measurable goals, specific support activities, and timelines for implementation and that is focused on: defining meaningful community involvement; developing training and educational materials to enhance meaningful community involvement for individuals and families, providers, and case managers; and assessing community involvement data.*"

This workplan, titled the CEAG Annual Plan 2026:  Advancing Community Life Engagement Across Virginia, was updated in FY26 Q2. It is organized by three long-term outcomes and seven strategies. The first outcome is to improve the understanding and philosophy among stakeholders, providers, and state agencies of Community Life Engagement (CLE) based on accepted national standards (four core pillars) and in alignment with best practice. The second outcome is to improve the understanding of primary barriers to providing community engagement, community guide, and community coaching services using data collected from DBHDS QII initiatives. The third outcome is to ensure CE services are being offered and provided to individuals across the state in the most integrated community settings based on the needs of the individual (3).

The CEAG Annual Plan identifies who is responsible to lead the strategy; what activities and tasks will be accomplished; the deliverable outcomes which are more short term than the long term outcome; and the timeline to complete the work. DBHDS, with input from its CEAG revised the Annual Plan to include measurable goals and DBHDS provided a status report though FY26 Q3 to this reviewer (3,8,9,10,11,12). The updates to the CEAG Annual Plan demonstrate progress by the CEAG to implement the actions on the Annual Plan Strategies to achieve the long term outcomes.

**PI Terms and Actions Achievement Status**

Table 1 below summarizes the status of the Terms for integrated day services.

**Table 1**
**Status of Meeting the Goals of the PI Terms**

| Term | 27th | 28th |
|---|---|---|
| 50. **Supported Employment.** The Commonwealth will work to achieve a goal of being within 10% of the waiver employment targets set by the Employment First Advisory Group. DBHDS will continue to work with the Employment First Advisory Group, the Quality Improvement Committee (QIC), and the QIC subcommittees to develop and recommend QIIs to enhance employment of adults aged 18-64 on the DD waiver. If the goal is not met within two years of the date of this Order, DBHDS will conduct a root cause analysis and implement a QII. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | **Not Achieved** | **Deferred** |

122

| | Compliance | Compliance |
|---|---|---|
| 51. **Supported Employment.** The Commonwealth will work to achieve a goal of meeting its established employment target of 25% for adults aged 18 to 64 on DD waivers and the waitlist. DBHDS will continue to work with the Employment First Advisory Group, the QIC, and the QIC subcommittees to develop and recommend QIIs to enhance employment of adults aged 18 to 64 on the DD waiver and the waitlist. If the goal is not met within two years of the date of this Order, DBHDS will conduct a root cause analysis and implement a QII. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | | |
| 37. **Day Services for DD Waiver Recipients.** The Commonwealth will work to achieve a goal of a 2% annual increase in the percentage of individuals on the DD waiver receiving day services in the most integrated settings. | **Deferred** *(compliance in the 26th review period)* | Compliance |

## Table 2
## Terms and Related Actions

| Term and Actions | Facts | Analysis/Conclusion | 27ʰ/28th |
|---|---|---|---|
| 50. **Supported Employment.** The Commonwealth will work to achieve a goal of being within 10% of the waiver employment targets set by the Employment First Advisory Group. DBHDS will continue to work with the Employment First Advisory Group, the Quality Improvement Committee (QIC), and the QIC subcommittees to develop and recommend QIIs to enhance employment of adults aged 18-64 on the DD waiver. If the goal is not met within two years of the date of this Order, DBHDS will conduct a root cause analysis and | DBHDS' target for FY26 is 1,512. This is the expected number of individuals to be employed by June, 2026. As of December, 2025, there were 1,138 waiver participants employed. This number represents 75% of the target of 1,512 for this fiscal year. This is an increase of thirty-three individuals since June 2025, who are employed through ISE or GSE waiver services. (1)<br><br>The QII reported in the 27th reporting period was being conducted in Regions 2 and 3. Training for SCs and other staff was the primary method to foster improvement.<br><br>The report on this QII for the 28th reporting period is found in the CMSC FY26 Q1 and Q2 report. The goal | The Commonwealth achieved 75% of the annual goal midway through FY26. DBHDS and the E1AG have made recommendations to address the need to increase the number of adults engaged in employment who are on DD waivers. One recommendation will further analyze how many waiver participants who are on waivers are not counted toward the achievement of this Term while they receive initial support from DARS or follow up support if the individual expresses interest in changing jobs. A second recommendation will address whether individuals who are on the DD waiver but fully employed without employment supports are counted in the data.<br><br>DBHDS reports that of 8,351 individuals with an ISP completed in FY26 Q1 and Q2, | Not Achieved<br><br>**Deferred** |

| | | | |
|---|---|---|---|
| implement a QII. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | of QII 6 is "to improve the following outcomes for individuals on the DD waiver by 10% by 6.30.25 with an aim to improve employment outcomes for all individuals with DD from the baseline of 26% in FY24 Q1 to 36% in FY25 Q4; and improve the employment for individuals interested in employment from the baseline of 58% in FY24 Q2 to 68% in FY25 Q4".<br><br>This QII was implemented by Regions 2 and 3 focusing on developing training materials and offering technical assistance. Regions 2 and 3 consistently met the goal of 70% for the goal to increase employment outcomes for individuals interested in employment so the QII was closed (13).<br><br>DBHDS and the E1AG are engaged in designing a QII to address benefits planning and access to vocational rehabilitation services. The minutes of the E1AG meetings document that DBHDS is involving the E1AG to develop this QII. The E1AG convened a listening session in February 2026 which involved nineteen stakeholders including family members, Service Coordinators, and employment providers with E1AG members. The purpose of the listening session was to identify barriers to employment, as well as what actions and strategies are working, and which actions and strategies are not fostering employment. This information is being used by the DBHDS and E1AG to design the QII (5,6, 7). | 8,156 (98%) of adults with DD had a discussion about employment with their Service Coordinator/team (1).<br><br>However, only 262 of the 356 (74%) of adults with DD who have an interest in employment have an employment outcome in their ISP (1). It is critical that teams address individual's interest in employment by developing measurable goals and objectives in their ISPs which is the necessary action to actually assisting adults to become employed.<br><br>The E1AG might also want to explore why so few adults 356 of the 8,156 (4%) who had a discussion about employment have an interest in pursuing employment. Currently, this is an unexplained and dramatic decrease from the 14% who had an interest in pursuing employment as reported in the 27th study for FY25.<br><br>Conclusion: The rating for this Term is Deferred in the 28th reporting period and will be rated in the 29h reporting period when the annual data for FY26 is available. A QII to address employment for adults with DD on the waivers is being designed with input from the E1AG. | |

124

| | | | |
|---|---|---|---|
| 51. **Supported Employment.** The Commonwealth will work to achieve a goal of meeting its established employment target of 25% for adults aged 18 to 64 on DD waivers and the waitlist. DBHDS will continue to work with the Employment First Advisory Group, the QIC, and the QIC subcommittees to develop and recommend QIIs to enhance employment of adults aged 18 to 64 on the DD waiver and the waitlist. If the goal is not met within two years of the date of this Order, DBHDS will conduct a root cause analysis and implement a QII. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | There were 20,994 individuals receiving or on the wait list for waiver services as of 12.31.25, a decrease of 682 individuals since June 2025. The target for employment for this six month period is 5,248, or 25% of the number of individuals with DD ages 18 to 64 on the waivers or waiver waitlist as of 12.31.25. Of these individuals a total of 5,463 (4,911 in ISE and 552 in GSE) were employed. This is 26% of all individuals on a DD waiver or waiting list (1).<br><br>The DBHDS reports a 100% response rate from its Employment Services providers for this twenty-second semi-annual data report (1).<br><br>See the description of the design of a new QII to address employment under Facts for Term 50. | Virginia achieved PI Term 51 as it exceeded the goal 25% threshold of the waiver participants and individuals on the waiting list for waiver services are employed, exceeding the expected outcome by 1%, employing 26% of individuals with DD on a waiver or a waiver waiting list. The Commonwealth has increased the percentage of individuals who are employed compared to the percentage employed in the 27ʰ reporting period.<br><br>Conclusion: This Term is Achieved in the 28th reporting period for the second time. Therefore, the Commonwealth has achieved Sustained Compliance. According to Term 77, Virginia has now satisfied Term 51 and is no longer obligated to provide future status updates. Therefore, this Term will not be reviewed in future studies of IDA and employment. | Compliance<br><br>**Sustained Compliance** |
| **37. Day Services for DD Waiver Recipients.** The Commonwealth will work to achieve a goal of a 2% annual increase in the percentage of individuals on the DD waiver receiving day services in the most integrated settings. To achieve that goal, the Commonwealth will take the following action: | For this reporting period, the most recent full year data report is from 3.31.25 to 3.31.26.<br><br>In March 2026, DBHDS reports there were 5,470 individuals in the DD Waiver population who participated in the integrated settings for employment and day services, compared to 4,438 individuals in March 2025 (2). In March 2025 the 4,438 individuals participating in IDA represented 51.5% of the 8,623 individuals participating in all day services, compared to 5,470 individuals participating in IDA in March 2026 representing 55.4% of the | The number of waiver participants in integrated day services increased by 1,032 individuals since March 2025.<br><br>The Commonwealth continues to increase the number of adults in integrated employment and day services.<br><br>Conclusion: The Commonwealth achieved this Term this reporting period. Having surpassed the PI Term 37 goal for two consecutive rating periods, Virginia achieved Sustained Compliance. According to Term 77, Virginia has now satisfied Term 51 and is no longer obligated to provide future status updates. Therefore, this Term will not be reviewed | Compliance (26th)<br><br>Deferred (27th)<br><br>**Sustained Compliance** |

125

| | | | |
|---|---|---|---|
| | 9,878 unique individuals participating in all day services.  This 3.9% increase between March 2025 and March 2026 exceeds the requirement of PI Term 37 of a 2% increase in participation in IDA annually. This comparison led to Virginia achieving the goal for this Term and a rating of compliance for the second time (2). | in future studies of IDA and employment. | |
| **37.a)** Within one month of the date of this Order, DBHDS's Community Life Engagement Advisory Committee will implement a work plan that includes measurable goals, specific support activities, and timelines for implementation and that is focused on: defining meaningful community involvement; developing training and educational materials to enhance meaningful community involvement for individuals and families, providers, and case managers; and assessing community involvement data. | DBHDS revised the original CEAG workplan to assure it aligns with requirements in the PI. The work plan, titled the CEAG Annual Plan 2026 Project Planning includes seven strategies which address the requirement of 37.a) to define meaningful community involvement; develop training and educational materials to enhance meaningful community involvement and assess community involvement data (3). . | The work plan was updated in FY26 Q3 and includes completion dates for the strategies that range from September 2025 to September 2026. DBHDS's CEAG work plan addresses the three areas of focus described in this action statement. This PI term's action requires, and the work plan includes measurable goals, specific support activities and the timelines for implementation. DBHDS has updated its CEAG Annual Plan to include measurable goals and has reported the Commonwealth's progress implementing the Annual Plan though FY26 Q3.<br><br>DBHDS includes sufficient specificity in the activities and tasks of the work plan and clearly defines the deliverables. to define meaningful community involvement; develop training and educational materials to enhance meaningful community involvement and assess community involvement data (3).which should enhance the achievement of outcomes. | **Completed and Ongoing** |
| **37. b)** If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2024, and has not conducted a rate study meeting the requirements | The Commonwealth under the leadership of the Department for Medical Assistant Services (DMAS) contracted with Guidepost to conduct the rate study.<br><br>Guidepost conducted a rate study for services in the three | The Commonwealth is fully implementing the activities associated with Term 37, and the actions required under 37. b. | **Completed and Ongoing** |

126

| | | | |
|---|---|---|---|
| of Paragraph 59 in the preceding two years, the Commonwealth will initiate a rate study of Community Engagement, Workplace Assistance, and Community Coaching by January 1, 2025. The rate study shall be completed in time to be considered during the 2026 legislative session. If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2028, and has not conducted a second rate study meeting the requirements of Paragraph 59, the Commonwealth will initiate a second rate study of Community Engagement, Workplace Assistance, and Community Coaching by January 1, 2029. The rate study shall be completed in time to be considered during the 2030 legislative session. Any rate study required by this paragraph shall be conducted in accordance with Paragraph 59. This paragraph shall not be construed to require the Commonwealth to conduct more than two rate studies. | DD 1915 c waivers, the CCC Plus Waiver and State Plan services including GSE, Workplace Assistance, Employment and Community Transportation, Community Coaching, Community Engagement, Community Guide, and Benefits Planning (11). Guidepost issued a draft report in July 2025 which suggests rate increases for all of the services that they were directed to study and analyze, with the goal of recommending rates that would assure sufficient capacity. The rate study includes direct, indirect, and administrative costs and adjusts for differences in costs in Northern Virginia compared to the rest of the Commonwealth (11). The United States has identified concerns and asked questions about Guidepost's draft report (14). The focus of DOJ's concerns questioned whether the completed rate study fulfills the PI requirement to design the study to ensure sufficient provider capacity to achieve the specified goal of this and the other identified Terms. The final report responded to each of DOJ's stated concerns. On 10.15.25 (18) the Commonwealth's Director of DMAS submitted the DD Waiver Rate Study report to Governor Youngkin, the Chairs of the House and Senate Appropriation Committees and Virginia's Department of Planning and Budget. | | |

127

| | The Governor's proposed FY27 budget included rate increases for seven of the eleven services addressed in the rate study.<br><br>The remaining four services were added as part of budget amendments by the Senate.  The General Assembly left without finalizing a budget.  The GA returns for a special session on 4/21 which is when the GA may finalize the budgets needed to increase the rates as recommended by the rate study. | | |
| --- | --- | --- | --- |
| **37. c**) If the Commonwealth has not achieved the goal within two years of the date of this Order after taking the actions in Paragraph 37(a), DBHDS will also conduct a root cause analysis and determine whether a QII is warranted to address identified issues. A root cause analysis and consideration of QII will not be required if the percentage of individuals in the integrated day services reported above is 65% of the total number of the people receiving any day service. | | | **Not Yet Implemented Due: 1/15/27** |

Attachment A
Documents Review
Integrated Day Services

1. Semiannual Report on Employment December 2025 Data: Issued March 2026
2. DR0023 Integrated Employment and Day Services: Issued March 31,2026
3. CEAG Annual Plan 2026: Advancing Community Living Engagement Across Virginia
4. E1AG Plan for FY24-26 with Quarterly Updates
5. E1AG Meeting Agendas and Minutes: 10.15.25, 12.17.25**,** 2.18.26
6. Data Analysis for Setting Employment Target QII Toolkit
7. E1AG Listening Session Summary
8. CEAG Meeting Summaries 10.17.25, 11.14.25
9. CLE_ICI Graphic
10. Community Engagement and Community Provider Survey Initial Results
11. Community Engagement and Community Provider Survey Compiled Results
12. Community Life Engagement Flow Updates
13. Case Management Steering Committee FY26 Q1 and Q2 Report


Submitted by:
Kathryn du Pree MPS
May 19, 2026

# <u>APPENDIX D</u>

**Community Living Options**

**By**

**Kathryn du Pree, MPS**
**Joseph Marafito, MS**

**Community Living Options Report**
**28th Review Period**
**Prepared for the Independent Reviewer**

## Introduction

This report summarizes the 28th review period study of the Permanent Injunction's requirements for community living options (CLO) which focus on the provision of private duty and skilled nursing services to children and adults with developmental disabilities (DD) who receive Early and Periodic Screening, Diagnosis and Treatment (EPSDT) or DD Waiver services. The Terms under review for community living options/nursing services during the twenty-eighth review period are Terms 38 and 39 which are described below. The additional focus of the review is to determine the extent to which the Commonwealth has successfully implemented the actions that are associated with Terms 38 and 39. The Parties have agreed upon the specified goals to determine compliance with the Permanent Injunction's (PI) CLO Terms that correspond with the Compliance Indicator (CI) with which the Commonwealth previously remained out of compliance. These Terms address the Commonwealth's responsibilities to increase the utilization of authorized nursing hours for individuals with DD through both EPSDT and HCBS waiver services. The Commonwealth's progress achieving these two Terms will be evaluated and rated during the 29th review period when sufficient data from FY25 Q3 and FY25 Q4 are fully available for this analysis to be completed. This report will provide information on the status of the Commonwealth's provision of both Private Duty Nursing (PDN) and Skilled Nursing (SN) in FY26 and update previously reported data regarding the provision of these nursing services in FY24 and FY25. This updated information for the prior two fiscal years, FY24 and FY25 is based on utilization data that DBHDS has been able to analyze that has become available to DBHDS staff since the 27th reporting period.

During the 28th period, DBHDS was able to report updated data regarding the utilization of PDN services for FY24 and FY25 that indicates an increase in the number of children and adults with DD receiving the authorized nursing services. During FY24 and the first two quarters of FY25, the Commonwealth was operating under the Compliance Indicators (CI). DBHDS reported combine utilization of PDN and SN services which did not achieve compliance with CI 18.9. for the eighteen month period, July 2023- December 2024. As of January 2025, a compliance determination under the PI requires DBHDS to achieve the measurable goals for PDN and SN separately. Since the 27th review period report, DBHDS continued to monitor late billings of nursing service that were received; and confirmed that its previously reported nursing utilization data were undercounted. DBHDS now reports that individuals with DD utilized a higher percentage of both PDN and SN during the 18 month period prior to the approval of the PI.  The higher nursing utilization percentage for PDN is important and valuable information. These updated data allow more accurate trend analysis for the years prior to the approval of the Permanent Injunction.

For PI Terms 38 and 39 and their associated actions, Virginia's progress toward achieving the specified goals and implementing the delineated actions are reviewed and reported below. This review includes an analysis and reporting of Virginia's status implementing the PI requirements

131

associated with CLO/nursing services, the goals of which the Commonwealth has not achieved twice consecutively (see Table below). This includes PI Terms 38 and 39. The PI Term PI 38 requires that 70% of individuals authorized for PDN receive 80% of the hours of the nursing services that are authorized. The PI Term 39 requires that 70% of individuals authorized for SN receive 80% of the hours of the nursing services that are authorized. The updated percentages of nursing services received by children and adults with DD who were authorized to receive PDN services is encouraging. The actual determination of the Commonwealth's compliance with Terms 38 and 39 will be made during the 29th period review when DBHDS reports its data for FY25 Q3 and Q4.

This report also describes the Commonwealth's progress toward meeting the terms at the mid-year point of FY26. In its review of nursing services, DBHDS provided the data analysis for FY26 Q1 and Q2 in the Nursing Services Data Report issued in April 2026 to determine the Commonwealth's progress meeting the requirements of both Terms 38 and 39 (2,5). DBHDS's OIHSN issued an updated Nursing Services Data Report on 4.10.26 with revised nursing utilization rates for FY24 and FY25; and utilization data through FY26 Q2. DBHDS then submitted a revised Nursing Services Data Report on 4.15.26 to address some data discrepancies in the report issued on 4.10.25 (5). DBHDS provides the caveat that billing for FY25 can be submitted through June 2026, and that billing for FY26 through Q2 will not be fully representative of nursing utilization until 12.31.26, because providers have up to twelve months after the service is delivered to bill the Commonwealth, and bills in dispute may be resolved and added to the utilization percentage after the twelve month period as explained above. The data I report in the following sections are the data for FY24 and FY25 which DBHDS has revised from those it reported previously based on its review of more current and complete billing data (2,5).

The OIHSN performed the review of the preliminary FY26 data for nursing services authorized and delivered from 7.1.25 through 12.31.25. DBHDS reported that for 300 (43%) of the 693 unique individuals with Service Authorizations (SA) received at least 80% of the hours allotted of either Private Duty Nursing (PDN) or Skilled Nursing (SN) services in FY26 Q1 and Q2. These data reflect the number of individuals for whom providers have billed and been paid for nursing services delivered in the first half of FY26. The OISHN breaks this data out separately. It is not surprising that as of April 2026, many bills for nursing services delivered during FY 26 had not yet been paid because providers have until 12.31.26 to bill for some of the services delivered between July 1 and December 31, 2025.

Table 1 below depicts DBHDS's summary of utilization for EPSDT and Waiver individuals for all nursing services, which includes both PDN and SN that were authorized. Table 1 includes the updated utilization data based on the DBHDS' review of current billing information for previous Fiscal Years 22 through FY24 (11,12). Utilization of nursing services increased by 1% for individuals receiving EPSDT and decreased by 5% for individuals receiving waiver services through FY25 compared to FY24.

Based on its updated billing data, DBHDS recalculated the percentage of individuals who received either PDN or SN between FY19 and FY25 in the 27th reporting period and has further updated the data for FY24 and FY25 in the 28th reporting period. DBHDS reported this updated FY24 and FY25 (5) data in its April 2026 Nursing Services Data Report.

132

Table 1 below compares DBHDS's originally reported utilization percentages for both EPSDT and DD Waiver participants for FY22- FY25 to the updated percentages of utilization of nursing hours as a result of its recalculation based on more comprehensive billing data (2,5). DBHDS now reports that its more complete billing data indicate that a significantly higher percentage of EPSDT recipients received at least 80% of their authorized nursing hours in FY24 and FY25 than were originally it reported based on the data available at the time. Providers can bill until June 30, 2026 for some of the nursing services provided in FY25 so the percentages DBHDS is able to report now, based on current billing information will predictably increase. DBHDS's recalculated percentages of nursing services utilization of the waiver participants receiving at least 80% of their authorized nursing hours increased very significantly in FY24 and FY25, reaching the highest percentage of utilization in FY24. The data depicted in Table 1 below does not relate directly to Terms 38 and 39 because the report combines the utilization of SN and PDN services.

**Table 1**
**Nursing Services Utilization Updated**

|  | FY22 | FY23 | FY24 | FY25* |
|---|---|---|---|---|
| EPSDT Utilization | 18% | 26% | 32% | 43% |
| EPSDT FY25 Update | 51% | 43% | 32% | N/A |
| **EPSDT FY26 Update** | **N/A** | **N/A** | **50%** | **51%** |
| Waiver Utilization | 36% | 42.5% | 53% | 53% |
| Waiver FY25 Update | 60% | 52% | 53% | N/A |
| **Waiver FY26 Update** | **N/A** | **N/A** | **72%** | **67%** |

*\*The updated FY 25 utilization data is preliminary and will likely increase until at least June 2026, which is twelve months after the end of FY 25.*
*Note: DBHDS determined the nursing utilization percentages by dividing the number of billed hours by the number of authorized hours within the fiscal year.*

Because of the episodic need, especially for skilled nursing, and difficult to predict nature of home healthcare (health need spikes, emergencies, etc.) in general and the presence of multiple SAs for both the RN and LPN levels of nursing, the system has continued its tendency to over authorize nursing hours for those whose need is specified in their ISPs. Previous Individual Service Review studies have identified individuals who needed nursing services but did not receive Service Authorizations (SA) or the needed service. Overall, these factors suggest that the aggregate utilization rates for SN for the most recent fiscal year reported by DBHDS will likely fall below the actual service authorization amount because this number is inflated for some individuals for the reasons stated. The Commonwealth has not yet determined the extent of excess authorizations.

133

Table 2 depicts the DBHDS revised reports of the total number of individuals including both those using EPSDT and those enrolled in a DD Waiver who needed and received nursing services from FY19 through FY25. DBHDS' report for FY25 indicates the first increase in the number of individuals authorized to receive nursing services since FY20 and the significant increases in the number of individuals receiving 80% of their authorized hours since FY24 and in the preliminary and incomplete utilization data for FY25 compared to the previous year's DBHDS reports utilization. DBHDS reported that at the end of FY25, 711 individuals were authorized to receive nursing services which is an increase of 54 individuals (11%) from the 657 who were authorized for nursing services in FY24. Because of the significant increase in the number of individuals with DD waivers, some of whom have complex medical needs, it is positive that the number of individuals authorized to receive nursing services did increase in FY25 compared to the previous fiscal years, 2019-2024.

The revised data reported by DBHDS provides a longitudinal perspective regarding the utilization rates of nursing services pre and post pandemic and pre and post the nursing agency pay rate increases which started in July 2022. In FY19, 265 (41%) of individuals needing nursing services received 80% or more of their allotted nursing hours. Whereas, even with preliminary and incomplete billing data, DBHDS reports in the most recent nursing report that in FY25 462 (65%) of the 711 unique individuals received 80% of the hours that were authorized. The Commonwealth is reporting its highest percentage of nursing utilization since it began reporting these rates in FY19 and an increased number of individuals authorized for nursing services. DBHDS has finally exceeded its highest number of individuals both authorized for nursing services from 667 in FY20 to 711 in FY25 and receiving 80% of their authorized nursing services from 347 in FY22 to 447 in FY24 and 462 in FY25.  The rate at which individuals received in-home nursing service was the lowest in FY19. Since this low point, the utilization rate had increased by at least 24% from FY19 to FY25, because the percentage that met the 80% benchmark in FY25 will increase once Virginia pays for all the services that were delivered. The numbers that are bolded in Table 2 represent revised data in the most recent nursing report based on complete billing data for FY24 and preliminary data for FY25.

**Table 2**
**Nursing Services**

| Fiscal Year | Percentage receiving 80% of hours | Number of individuals receiving 80% or more | Total number of individuals needing nursing services |
|---|---|---|---|
| FY19 | 41% | 265 | 647 |
| FY20 | 42% | 280 | 667 |
| FY21 | 45% | 277 | 616 |
| FY22 | 59% | 347 | 588 |
| FY23 | 51% | 303 | 594 |
| FY24 | 68% | **447** | 657 |
| FY25* | 65% | **462** | 711 |

*The updated FY 25 utilization data is preliminary. The percentage of individuals who received 80% or more will very likely increase when all paid bills through June 2026 have been counted.*

134

*Note: DBHDS determined the nursing utilization percentages by dividing the number of billed hours by the number of authorized hours within the fiscal year.*

.

DBHDS also reported the preliminary percentage of utilization that met the 80% benchmark by Region in FY 25. Even with preliminary FY25 data, variances in the percentages between Regions continue to indicate that nursing services utilization is not consistent throughout the Commonwealth. Region 3 remains the lowest in the percentage of utilization. Region 2 continues to report the highest utilization percentage, although its utilization rate may have decreased, as preliminary FY25 data indicates a lower percentage when compared to FY24. The preliminary FY25 utilization percentage of nursing services already shows that an increased percentage (i.e., 66% to 72%) of individuals in Region 4 received at least 80% of their authorized nursing hours.

The data reported by DBHDS in the most recent nursing services report compares the percentage of hours delivered to the number of authorized hours by Supports Intensity Scale (SIS) levels. Comparing the FY24 percentages to those in the preliminary FY25 for individuals with Level 5 SIS scores already indicates an increase from 68% in FY24 to 73% in FY25.

All of the data DBHDS reported above includes combined data for SN and PDN.  The PI has separate terms and specified goals for each type of nursing service. Term 38 requires that 70% of individuals receive at least 80% of the PDN hours for which they are authorized, and Term 39 requires 70% individuals to receive 80% of the SN hours for which they are authorized.

DBHDS does report the percentage of utilization that met 80% by Procedure Code (2,5). Four codes are contained in the utilization report: S9123: SN Registered Nurse; S9124: SN Licensed Practical Nurse; T1002: PDN Registered Nurse; and T1003: PDN Licensed Practical Nurse. These data, which include updated billing information, indicate a much higher utilization percentage of PDN compared to SN. Table 3 includes DBHDS's updated and revised utilization rates based on complete billing data**.** These calculations are not used to determine the percentage of individuals receiving 80% of their authorized nursing hours for PI 38 or PI 39 because the percentages in Table 3 do not reflect unique individuals and the amount of nursing each receives. Individuals can have an RN or LPN for both SN and PDN and can be counted multiple times for each procedure code.

**Table 3**
**Utilization of SN and PDN Nursing Services**

| Fiscal Year | Percentage receiving 80% of hours SN by RN | Percentage receiving 80% of hours SN by LPN | Percentage receiving 80% of hours PDN by RN | Percentage receiving 80% of hours PDN by LPN |
|---|---|---|---|---|
| FY19 | 23% | 37% | 60% | 65% |
| FY20 | 16% | 40% | 72% | 55% |
| FY21 | 16% | 43% | 63% | 58% |
| FY22 | 48% | 56% | 66% | 66% |
| FY23 | 10% | 28% | 80% | 66% |
| FY24 | 29% | 56% | 74% | 80% |
| FY25* | 21% | 51% | 76% | 76% |

135

*\* The updated FY 25 utilization data is preliminary. The percentage of individuals who received 80% or more will very likely increase when all paid bills through June 2026 have been counted.*
*Note: DBHDS determined the nursing utilization percentages by dividing the number of billed hours by the number of authorized hours within the fiscal year.*

DBHDS's current nursing utilization report does include separate data for Terms 38 and 39. DBHDS updated these data for FY24 and FY25 based on currently available billing data for these fiscal years billed through 12.31.25. DBHDS reports there were 459 individuals identified as needing PDN in FY24 of whom 367 (80%) and, with preliminary data, 399 (75%) of the 529 individuals authorized for PDN in FY25 who received 80% of the authorized hours delivered by either an RN or LPN. These data include both EPSDT and DD Waiver recipients. Providers have up to twelve months to bill for services provided to DD waiver recipients which indicates providers should bill for services provided in FY24 by June 30, 2025, and bill for services provided during FY25 by June 30,2026. However, DBHDS reports additional billing data for FY24 that was submitted after June 30,2025 and therefore was not available to DBHDS staff to analyze in the 27th reporting period. DBHDS explained that this is due to bills providers submitted with errors that they resubmitted at a later time, after being initially reviewed and rejected by DMAS (6,7).

DBHDS reports that the Commonwealth's preliminary and not yet complete FY25 utilization data shows that 529 individuals in either EPSDT or the DD Waiver were identified as needing PDN, of whom 399 (75%) received 80% of their authorized hours delivered by either an RN or LPN. DBHDS also reports that 529 individuals continue to have authorization for PDN in FY26 through 12.31.25, of whom 265 (50%) have received at least 80% of their authorized hours as evidenced by approved billing for these nursing services. (2,5)

In its preliminary FY25 data, DBHDS reported that 197 individuals who were receiving services through either EPSDT or the DD Waiver were identified as needing SN, of whom 73 (37%) received 80% of their authorized hours delivered by either an RN or LPN (2). In its very preliminary FY26 data, through 12.31.25, DBHDS reports that 174 individuals have authorization for SN, of whom 38 (22%) have received at least 80% of their authorized hours as evidenced by approved billing for these nursing services.
DBHDS issued the Nursing Access Work Plan Update in April 2026. This Plan describes the Commonwealth's planned actions associated with PI Terms 38 and 39. The Plan includes the strategies, responsible party, target date, status and any actual results of the strategies. DBHDS's OIHSN indicated it would develop measurable goals using the SMART (specific, measurable, achievable, relevant and time-bound goals) approach to address the identified barriers in the 27th reporting period which it has accomplished in the Work Plan Update (3).

The Update provides information as to DBHDS' status and progress implementing the actions and achieving the goals in the Work Plan. DBHDS has updated information regarding newly identified nursing providers in each Region; listed the Home Health companies in each Region and offered technical assistance (TA) to those companies that wish to access Jump Start funds; added all of the Home Health companies to the Search Engine; provided training to SCs to help them locate and access nursing providers in their geographic area; updated instruction to use the process for service authorization; and analyzed workforce data specific to the Regions.

136

DBHDS is committed to continuing its work with stakeholder groups to identify the top three barriers to accessing nursing services by 7.1.26 and analyze the related data by 10.1.26. The OISHN conducted a root cause analysis (RCA) with the Quality Management Office to identify barriers in each Region from the perspective of these DBHDS departments, noting the potential benefits and the difficulty of implementing each strategy to improve performance in each Region. These strategies include training; adding to the capacity by increasing the use of Home Health providers; orienting users to the service authorization process; and marketing Jump Start funding. DBHDS sent the mailing regarding Jump Start Funding to 224 Home Care Agencies and to all DD waiver providers that bill for DD Waiver Nursing services. DBHDS reports over 400 entities received this information about the Jump Start funding opportunity.

In addition to these specific goals, DBHDS through its OISHN is also addressing the need for incentives and salary increases; the lack of staffing; and the issue of inconsistent staffing. The Work Plan includes support for the implementation of the rate study to address salaries for nurses and describes possible solutions to address the need for more LPNs through efforts underway in other state departments. The OISHN is supporting the Department of Education's (DOE) plan to create a pathway for Direct Support Professional (DSP) learning opportunities and the creation of clinical internships for LPNs; and the Virginia Department of Health's (DOH) grants totaling $4.5 million to LPN approved licensing programs to increase the number of students who can participate in these programs and achieve their license.

DBHDS continues to utilize the Nursing Provider Database to assist individuals to locate nursing providers in their geographic area with the goal to increase the number of nursing providers who serve individuals under the DD Waiver.  DBHDS identified the number of providers it projects to add in each Region during FY26 and the status of this goal to date. DBHDs reports an overall growth in nursing providers across the state. DBHDS reports the following increases by Region between FY24 and FY25 as follows:
Region 1: 1
Region 2: 55
Region 3: 41
Region 4: 31
Region 5: 10

OISHN's FY26 goal is a 5% increase in the number of nursing services providers compared to FY25.

DBHDS continues to conduct its Intense Management Needs Review (IMNR) process to assess and monitor the adequacy of management and supports provided to all individuals whose SIS evaluation results placed them in tier four level six (intense medical needs) and level 7 (complex behavioral needs) to meet their needs. The purpose of the IMNR is to ensure that the actual supports provided to a randomly selected sample of individuals are being adequately managed and are addressing the selected individuals' support needs. DBHDS produces IMNR reports semi-annually to ensure alignment of the IMNR findings compared with the Independent Reviewer's Individual Services Review (ISR) studies of the same selected individuals.

The first IMNR and ISR parallel studies have been conducted semi-annually since the 25th review period. The 25th and 26th period studies each included a randomly selected sample of thirty individuals with complex health support needs (i.e., SIS level 6). They examined whether the selected individuals utilized the nursing service hours they were authorized to receive. The IMNR/ISR studies had similar findings that were consistent with DBHDS' data reports that the Commonwealth did not achieve the specified goals in Terms 38 and 39.

 In the 27th and current 28th review periods, the IMNR and ISR parallel studies involved a sample of thirty individuals with complex behavioral support needs. The IMNR was conducted in February 2026 in Regions 1 and 5, involving individuals with exceptional behaviors who score Level 7 on the SIS. The Registered Nurse Care Consultants (RNCC) from the OISHN are working with the Behavioral Network Support Team to ensure the recommendations from the most recent IMNR are appropriate to the needs of the individuals in the sample. The Remediation Plans have been shared with the CSB DD Directors and Service Coordinators. The RNCCs have provided support and technical assistance for emergent situations discovered during the IMNR process.  The need for ongoing training has been identified in the following areas: the understanding of skilled nursing needs; the audit process for SAs; the person centered protocols; and the expectations of both DMAS and DBHDS regarding the provision of skilled nursing. DBHDS also wants to work with stakeholders to ensure a smooth transition for individuals from EPSDT to the DD Waiver to achieve consistent continuity of care for these individuals. Additionally, DBHDS selects a random sample of 10% of the individuals who have SAs for SN and conducts the IMNR to determine if their nursing needs are being met. By the end of the 28th review period, DBHDS completed the IMNR for thirty-one individuals. The results are summarized in Table 5 below.

Previously, Process Documents and Attestations have been reviewed, and the Processes have been determined to be reliable and valid, with the exception of one Process that DBHDS revised during the 27th review period. In the 27th review period, DBHDS was asked to further revise its process document for Skilled Nursing PI 39 and PI 44 by the Expert Reviewer. These revisions were made in the 28th review period as described below.

The Skilled Nursing Process Document for PI 39 and PI 44 was found to be sufficient in most areas when it was reviewed as part of the 27th review period study. There were six areas of the process that the reviewer questioned. OIHSN was able to fully respond to three of the areas and provide support documentation that verified these three areas were sufficiently addressed in the process document. Three areas remained that either required DBHDS to provide an update or more detailed description of steps in the process, which DBHDS agreed to address in the 28th review period. These areas included following up on the remediation plans; addressing inconsistencies in the number of individuals reviewed as referenced in different steps in the process; and assigning the titles of staff designated to perform certain review functions. OISHN shared the SN PI 39 and PI 44 revised Process Document for review in the 28th review period.

DBHDS addressed follow up to the remediation plans by clarifying the responsibilities of the RNCC, detailing each step of their responsibilities for follow up when remediation plans are not submitted timely. DBHDS addressed the issues related to staff designated to perform certain functions. The responsibilities for each role have been described in detail in the Process

138

Document. DBHDS addressed staff assignments by requiring designated roles to be accompanied by the job title of the staff who are responsible for the functions, which allows for better tracking of staff responsibilities for each task that is assigned. DBHDS addressed the issue of inconsistencies in the number of individuals reviewed by describing the separation of the IMNR sample and assigning the number of individuals being reviewed to each of the three cohorts and align the sample selection statistically. This SN Process for PI 39 and PI 44 is verified as being thorough and inclusive of all necessary steps and actions.

**PI Terms and Actions Achievement and Status**

Table 4 below summarizes the status of the PI Terms and Actions this study reviewed.

**Table 4**
**Achievement of the PI Terms**

| Term | 27th | 28th |
|------|------|------|
| 38. **Private Duty Nursing.** The Commonwealth will work to achieve a goal that 70% of individuals on the DD waiver and children with DD receiving EPSDT with private duty nursing identified in their ISP or prescribed under EPSDT receive 80% of the hours identified as needed on the CMS485 or DMAS62 forms. To achieve that goal, the Commonwealth will take the following actions. | **Not Achieved** | **Deferred** |
| 39. **Skilled Nursing.** The Commonwealth will work to achieve a goal that 70% of individuals on the DD waiver and children with DD receiving EPSDT with skilled nursing identified in their ISPs or prescribed under EPSDT will have their skilled nursing needs met 80% of the time. | **Not Achieved** | **Deferred** |

**Table 5**
**Terms and Related Actions**

| Term and Actions | Facts | Analysis/Conclusion | 27th/28th |
|------------------|-------|---------------------|-----------|
| 38. **Private Duty Nursing.** The Commonwealth will work to achieve a goal that 70% of individuals on the DD waiver and children with DD receiving EPSDT with private duty nursing identified in their ISP or prescribed under | The OIHSN updated the review of the FY25 data for nursing services authorized and delivered from 7.1.24-6.30.25 based on current billing while noting that these data are considered preliminary until June 30, 2026 because providers have twelve months to submit bills for services provided in FY25. | More individuals (70) are authorized for nursing services in FY25 (529) to date than were authorized in FY24 (459). Although the FY25 data is preliminary, DBHDS reports that 399 (75%) individuals have received 80% of their authorized nursing hours, of the 529 who were authorized. | Not Achieved<br><br>**Deferred** |

139

| | | | |
|---|---|---|---|
| EPSDT receive 80% of the hours identified as needed on the CMS485 or DMAS62 forms. To achieve that goal, the Commonwealth will take the following actions. | Virginia did not achieve the level of nursing hours when considering the utilization performance for the combined PDN data during FY24 and the first two quarters of FY25. In its preliminary data for FY25 DBHDS reports that 399 (75%) of the 529 unique individuals with Service Authorizations (SA) have received 80% of their authorized PDN hours.<br><br>In FY24, 80% of unique individuals (367 of 459) with SAs receiving 80% of the PDN nursing hours allotted in FY24.<br><br>DBHDS can only report very preliminary data for a partial year for FY26. To date, 529 individuals are authorized to receive nursing services and of this number, 265 (50%) have received 80% of their authorized hours (2). | This is both the highest number of individuals reported as needing PDN and those receiving 80% of their authorized hours since DBHDS began reporting these data in FY19 at which time 344 individuals needed PDN. With the exception of a slight decrease in FY21(2%), the number needing PDN continues to increase annually which corresponds with annual increases in the total number of DD Waiver recipients.<br><br>DBHDS achieved the highest percentage of individuals receiving 80% of their hours in FY24 when 80% of individuals authorized for PDN received 80% of the allocated hours: 367 of 459 individuals authorized for nursing services).<br><br>Conclusion: PI 38 cannot be rated in this reporting period. DBHDs reports increase in PDN utilization in both FY24 and FY25 but the separate PI Terms and specified goals were approved for only the third and fourth quarters of FY25 and final PDN utilization for these two quarters are not yet available for PI 38.<br><br>A compliance rating for PI 38 is Deferred until the 29th reporting period when data for FY25 Q3 and Q4, billed through the fall of 2026 can be reported. | |
| **38.a)** Semi-annually, on May 15 and November 15 of each year, DBHDS will continue to report data on utilization of nursing services and the work of the DBHDS Nursing Workgroup. | DBHDS continues to report the data semiannually for the utilization of nursing services in the Nursing Hours Utilization Report (2,5). The DBHDS Nursing Workgroup's responsibilities include the review of nursing utilization data; the results of the most recent IMNR to determine areas of focus for improvement; identify additional topics for SN and | This action is underway in the Commonwealth | **Completed and Ongoing** |

140

| | | | |
|---|---|---|---|
| | PDN training and further training to bridge the gap between general nursing education and specific training needed to provide proficient waiver services to individuals with DD: and enhance the usability of WaMS with regard to nursing utilization. As reported earlier, the Nursing Work Plan includes strategies and specific responsibilities and timelines for the completion of the work (3). | | |
| **38. b**) By September 30, 2024, DBHDS will update the ISP to allow for collection of nursing needs data identified by the Risk Awareness Tool. | This was initiated 9.15.24 when DBHDS updated the ISP to allow for the collection of nursing needs data identified by the Risk Awareness Tool. The ISP now includes a question to identify if nursing waiver services are needed and identify additional related information.  The SC must respond to a number of options to indicate if appropriate referrals have been made and if the individual has been connected to nursing services, if they are otherwise being addressed, or if the individual has declined the service or does not require the service (2). | DBHDS reviewed 10,072 ISPs completed between July and December 2025. Of the 10,072 ISPs reviewed, 9,560 (95%) of the individuals did not need nursing services.<br><br>Of the remaining 512 individuals, 272 had connected to nursing services and 21 had a referral and were waiting to start the service. Nineteen additional individuals were to have a referral completed within thirty days of the ISP. Twenty-two needed nursing services but declined these services, and 178 individuals had their needs addressed by other supports. DBHDS reported following up on anyone with a referral who had not started nursing services yet. (2,5) | **Completed and Ongoing** |
| **38. c**) DBHDS will continue to implement an IMNR that will assess if individuals have unmet nursing or other medical needs and will work with families, providers, and case managers to take steps to resolve identified unmet needs. Semi-annually, on April 15 and October 15 of each year, DBHDS will report on the IMNR process, including the types of | DBHDS initiated the required IMNR reviews in mid-February and completed for 30 individuals using the DD Waiver.  Each review resulted in the request for a remediation plan and the timeline for its completion.<br><br>Additionally, fifteen individual reviews were completed across all Regions by OIHSN RNCCs to complete the IMNRs for the previous IMNR period. The barriers to nursing care the nurses and caregivers | | **Completed and Ongoing** |

141

| unmet needs identified and efforts taken to resolve them. | experienced, and the remedies they recommended to DBHDS were reported.<br><br>DBHDS's OIHSN nurses developed 128 remediation plans for the IMNRs completed in the 28th review period. The top categories included: documentation; assessment/evaluation protocols; and adaptive equipment. Actions to address the areas needing remediation included: scheduling appointments; updating documents; completing assessments and repairing adaptive equipment. The OIHSN RNCCs determined that the skilled nursing needs of all thirty individuals were met (2). | | |
|---|---|---|---|
| **38.d**) Within six months of the date of this Order, in consultation with the five DBHDS Registered Nurse Care Consultants, the Commonwealth will: | | | **In Progress** |
| **38.d). i.** Identify which CSB catchment areas in each Region have the highest nursing shortages for this target population based on objective criteria and data, including how many individuals with private duty nursing receive 80% of their hours; | DBHDS has identified the CSB with the highest nursing shortage in each Region. DBHDS has developed a Nursing Access Work Plan and updated it 4.15.26 (3). Within this process DBHDS is identifying the CSBs with the lowest utilization and targeting the provision of technical assistance and training to support the CSBs to increase utilization of the authorized nursing hours. | | **Completed and Ongoing** |
| **38.d) ii.** Identify the top three barriers to individuals accessing nursing services in each region based on objective data, including | DBHDS reports developing a survey for nursing services providers to complete which was completed.<br><br>The Nursing Hours Utilization Report through | DBHDS expected to have surveys for DD Waiver Services Providers (not nursing) and families to identify barriers conducted by 7.15.25 and would have the results analyzed by 8.30.25. OISHN reported in | **In Progress** |

142

| | | | |
|---|---|---|---|
| stakeholder data and state and national workforce data and research; | FY25 includes information on the nursing workforce challenge experienced in Virginia especially in its rural regions, taking its data from the Virginia State Office of rural Health. The report identified national reasons for nursing shortages that include pandemic burnout, educational obstacles, and retirement. The report also touches upon national nursing workforce issues and barriers. OIHSN provided a high level summary of this data as it relates to DD Nursing Services and nursing capacity in general in the Commonwealth (3). | the 28th period update that the surveys were underway. As a follow up the OISHN created a Nursing Access Search Engine for all DBHDS Offices and is providing TA for staff seeking DD Waiver nursing services. The Search Engine also lists all Home Health companies that are certified to provide services in Virginia and has offered Jump Start funds to those who indicated an interest in becoming DD Waiver nursing providers.<br><br>While the identification of barriers by nursing service providers and others is in progress, the activities related to completing this action have been delayed. DBHDS/OIHSN provided a new timeline to complete this action by 7.1.26 with the analysis completed by 10.1.26 | |
| **38.d) iii.** Develop a work plan to resolve those barriers that includes measurable goals, specific support activities, and timelines for implementation; and | DBHDS includes its work plan initiatives, next steps and recommendations which is an extensive list that includes ongoing assessment of need; analyzing utilization data; training and technical assistance; eliciting stakeholder input; and follow up on IMNR recommendations (3).<br><br>OIHSN reported its work with the Quality Management Office to conduct a root cause analysis to identify three key barriers in each Region. | This root cause analysis to identify barriers to nursing services utilization was conducted with members of the Nursing Services Work Group. Members identified barriers and rated each barrier in terms of its impact and its difficulty to achieve.<br><br>From this root cause analysis DBHDS/OIHSN identified the three top barriers in each Region and set one SMART goal for each Region. The identified barriers are:<br>• Lack of training<br>• Lack of agencies<br>• Limited access due to perceived risks of denial of authorization<br>• Lack of understanding the service<br>• Lack of understanding of Jump Start Funds | **In Progress** |

143

|  |  | • Unaware of group homes<br>• Lack of incentives<br>• Lack of knowledge of the DD Waiver<br>• Not enough LPNs<br>• Inconsistent staffing<br><br>OIHSN created specific support activities and in the 28th reporting period included actions to address the lack of incentives, inconsistent staffing and an insufficient number of LPNs.<br><br>Most of the specific activities are to identify training resources and distribute materials about the Jump Start Funds. OIHSN also commits to increasing the number of nursing service providers in each Region. The plan's goals are now measurable.<br><br>This is rated In Progress because the eventual plan to address barriers will need to include the input from stakeholders which is described above under 38.d.ii. |  |
| **38.d. iv.** Include the barriers and efforts to resolve them, as well as the factual basis for those barriers and efforts, in the semi-annual nursing report that is posted in the Library. | DBHDS did not identify or discuss the barriers in its semiannual report. The barriers and strategies to address them were included in the Work Plan. |  | **In Progress** |
| **38.e)** If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2024, and has not conducted a rate study meeting the requirements of Paragraph 59 in the preceding two years, the Commonwealth will | The Commonwealth under the leadership of the Department for Medical Assistant Services (DMAS) has contracted with Guidepost to conduct the rate study. DMAS has created a DD Rate Work Group that first convened 12.12.24. The Work Group includes representatives of providers, advocates and industry associations. |  | **Completed and Ongoing** |

144

| | | | |
|---|---|---|---|
| initiate a rate study of Private Duty Nursing by January 1, 2025. The rate study shall be completed in time to be considered during the 2026 legislative session. If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2028, and has not conducted a second rate study meeting the requirements of Paragraph 59, the Commonwealth will initiate a second rate study of Private Duty Nursing by January 1, 2029. The rate study shall be completed in time to be considered at the 2030 legislative session. Any rate study required by this paragraph shall be conducted in accordance with Paragraph 59. This paragraph shall not be construed to require the Commonwealth to conduct more than two rate studies. | Guidepost conducted a rate study for services in the three DD 1915 c waivers, the CCC Plus Waiver and State Plan services including Skilled Nursing and Private Duty Nursing Services (4,5). <br><br> Guidepost issued a draft report in July 2025 which suggests rate increases for all of the services that they were directed to study and analyze, with the goal of recommending rates that would assure sufficient capacity. <br><br> The rate study includes direct, indirect, and administrative costs and adjusts for differences in costs in Northern Virginia compared to the rest of the Commonwealth (4,5,6). <br><br> The United States has identified concerns and asked questions about Guidepost's draft report. The focus of DOJ's concerns questioned whether the completed rate study fulfills the PI requirements to design the study to ensure sufficient provider capacity to achieve the specified goal of this and the other identified Terms (7). The final report responded to each of DOJ's stated concerns (4). <br><br> On 10.15.25 (10) the Commonwealth's Director of DMAS submitted the DD Waiver Rate Study report to Governor Youngkin, the Chairs of the House and Senate Appropriation Committees and Virginia's Department of Planning and Budget. <br><br> The Governor's proposed FY27 budget will be the next | | |

145

| | Commonwealth effort to obtain from the General Assembly funding necessary to increase rates to those recommended by the study. (8,9). | | |
|---|---|---|---|
| **38.f)** If the Commonwealth has not achieved the goal within two years of the date of this Order after taking the actions in Paragraphs 38(a) through 38(d), DBHDS also will conduct a root cause analysis and determine whether a QII is warranted to address identified issues. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | | | **Not Yet Implemented Due:1/15/27** |
| **39. Skilled Nursing.** The Commonwealth will work to achieve a goal that 70% of individuals on the DD waiver and children with DD receiving EPSDT with skilled nursing identified in their ISPs or prescribed under EPSDT will have their skilled nursing needs met 80% of the time. To achieve that goal, the Commonwealth will take the following actions: | The OIHSN updated the review of the FY25 data for nursing services authorized and delivered from 7.1.24-6.30.25 based on current billing while noting that providers have until June 30, 2026 to bill for services provide in FY25. Based on the preliminary FY25 data, Virginia did not achieve the level of nursing hours utilization performance expected. Only 73 (37%) of the 197 unique individuals with Service Authorizations (SA) received 80% of the hours allotted.

DBHDS reports that 174 individuals have authorization for SN in FY26 through 12.31.25. Preliminary FY25 data indicate that 38 (22%) have received at least 80% of their authorized hours (2). | The number of individuals authorized for skilled nursing services continues to decline after a peak in FY19 when 353 individual were authorized for SN. In FY25, 197 individuals were authorized. At this point in FY26, there are 174 individuals who are authorized for SN, of whom 38 (22%) have received 80% of their authorized hours.

There was a decrease in utilization from FY24 when 42% of those individuals with authorization received 80% of their authorized hours to FY25 when 37% of those authorized individuals received 80% or more of their service hours. Since providers can bill for up to twelve months after the service was provided, DBHDS reports its FY25 data will not be considered final until a full year has passed from the end of each | Not Achieved

**Deferred** |

146

| | | | |
|---|---|---|---|
| | | fiscal year. DBHDS will update its FY25 billing data after June 30, 2026.<br><br>This twelve month billing period will require a full year after a service period ends before DBHDS reports its final utilization percentage.<br><br>Conclusion: PI 39 is Deferred until the 29th reporting period when DBHDS can report on utilization for FY25 Q3 and Q4 with the caveat that all billing may not be completed. | |
| **39.a**) Semi-annually, on May 15 and November 15 of each year, DBHDS will continue to report data on utilization of nursing services and the work of the DBHDS Nursing Workgroup. | See 38. a. | | **Completed and Ongoing** |
| **39.b**) As part of the IMNR Process, DBHDS will assess if individuals have unmet nursing or other medical needs and will work with families, providers, and case managers to take steps to resolve identified unmet needs. Semi-annually, on April 15 and October 15 of each year, DBHDS will report on the IMNR process, including the types of unmet needs identified and efforts taken to resolve them. | See 38. c. | | **Completed and Ongoing** |
| **39.c**) *Skilled Nursing Review.* Beginning within three months of the date of this Order, for individuals with a skilled | DBHDS reports its implementation of this IMNR through the 28th review period. DBHDS reviews a random sample of 10% of the | OISHN reviewers ask questions of both Caregivers and Nurses to understand what each group determines are gaps in service delivery and summarizes these | **Completed and Ongoing** |

147

| | | | |
|---|---|---|---|
| nursing need identified in the Waiver Management System, DBHDS will begin to conduct on-site IMNR reviews as set forth in this paragraph. DBHDS will conduct the on-site IMNR reviews of a randomized sample of 10% of individuals annually (split between two six-month reviews) to determine if individuals' skilled nursing services needs are being met. In selecting individuals during each six-month review period to review, DBHDS shall include in the sample only individuals who were authorized to receive the service at least three months earlier, to ensure sufficient time for the sampled individuals to have received the service. | individuals with SN authorizations (approximately 250 per year) to determine if their needs are being met.<br><br>DBHDS reviews individuals within two months of the start of the SN authorization. DBHDs requires a remediation plan as indicated by the IMNR findings, and OISHN staff provide TA to the providers. DBHDS reports that 31 reviews were completed through the 28th reporting period and the reviews included individuals from all five Regions. OISHN reports the gender, age, mobility status, method of communication and health indicators for the individuals in the IMNR sample. All of the individuals in the sample received a physical examination within the past fourteen months and 25 (81%) had a dental examination in the past fourteen months.<br><br>OISHN added a 32nd individual to report on authorized hours.<br>   • 17 (53%) individuals were authorized for both RN and LPN services<br>   • 8 (25%) individuals were authorized for just RN services, and<br>   • 7 (22%) individuals were authorized for just LPN services.<br><br>Four individuals were newly enrolled in services and all four began services within thirty days of the nursing services authorization. | issues caregivers and nurses identified in the Nursing Hours Utilization Report (2.5). These issues include assessment; nursing delegation; education and training.<br>The nurses and caregivers identified a number of barriers including the SA process and reimbursement; staff coverage; staff competency and training; access to specialists and clinicians; insurance eligibility; durable medical equipment; physical accessibility of physician offices; and guardianship issues.<br>The nurses and caregivers who responded were also asked to offer suggestions for DBHDS to address these barriers. The responses focused on simplifying and standardizing the SA process; setting clear expectations for Part V of the ISP; reduce recertification cycles; and creating efficiencies to the alert system regarding service authorizations. | |

| | | | |
|---|---|---|---|
| | DBHDS's OIHSN nurses developed 128 remediation plans for the IMNRs completed in the 28th review period. The top categories included: documentation; assessment/evaluation protocols; and adaptive equipment. Actions to address the areas needing remediation included: scheduling appointments; updating documents; completing assessments and repairing adaptive equipment. The OIHSN RNCCs determined that the skilled nursing needs of all thirty-one individuals were met (2). | | |
| **39.d)** If the Commonwealth has not achieved the goal as reported in its December 1, 2024 status update and has not conducted a rate study meeting the requirements of Paragraph 59 in the preceding two years, the Commonwealth will initiate a rate study of Skilled Nursing by January 1, 2025. The rate study shall be completed in time to be considered during the 2026 legislative session. If the Commonwealth has not achieved the goal as reported in its December 1, 2028 status update and has not conducted a second rate study meeting the requirements of Paragraph 59, the Commonwealth will initiate a second rate study of Skilled Nursing by January 1, 2029. The | See 38.e. | | **Completed and Ongoing** |

149

| | | | |
|---|---|---|---|
| rate study shall be completed in time to be considered at the 2030 legislative session. Any rate study required by this paragraph shall be conducted in accordance with Paragraph 59. This paragraph shall not be construed to require the Commonwealth to conduct more than two rate studies. | | | |
| **39.e)** If the Commonwealth does not achieve the goal within two years of the date of this Order after taking the actions in Paragraphs 39(a) through 39(c), DBHDS will also conduct a root cause analysis and implement a QII as determined appropriate by DBHDS. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | | | **Not Yet Implemented Due 1/15/27** |

**Recommendations**: DBHDS should ensure the barriers and resolutions to increase nursing utilization are posted in the Library as required by 38.d. iv.

Attachment A
Documents Reviewed

1. CLO 28th Study Period Document Tracker
2. DBHDS Nursing Services Data Report Updates FY19-FY24; FY26 Q1 and Q2 April 2026: 04.10.26
3. Nursing Work Plan/Nursing Access Report Updated 4.15.26
4. SN 39 and 44 Process Document
5. DBHDS Nursing Services Data Report Updates FY19-FY24; FY26 Q1 and Q2 April 2026:04.15.26
6. Email from Heather Norton 4.22.26
7. Email from Susan Moon 4.22.26
8. Email form Heather Norton 4.30.26

Submitted by:
Kathryn du Pree MPS
Joseph Marafito MS
Expert Reviewers
May 18, 2026

# APPENDIX E

## Services for Individuals
## with
## Complex Behavioral Support Needs

### By

**Elizabeth Jones, MS, Team Leader**
**Marisa C. Brown, MSN, RN**
**Barbara Pilarcik, RN**
**Julene Hollenbach, RN, BSN, NE-BC**

# TWENTY-EIGHTH INDIVIDUAL SERVICES REVIEW STUDY:

## Individuals with Complex Behavioral Needs

Submitted By:

Marisa C. Brown, MSN, RN
Julene Hollenbach, RN, BSN, NE-BC
Barbara Pilarcik, RN
Elizabeth Jones, Team Leader
May 19, 2026

## Introduction/Background

As required by the Independent Reviewer's responsibilities under the Permanent Injunction, this report is submitted to summarize the most recent review of a randomly selected sample of individuals included in the requirements of Terms 40 and 44.

| Term |
|---|
| 40. The Commonwealth will work to achieve a goal that 86% of individuals who are supported in residential settings and have coverage for dental services will receive an annual dental exam. |
| 44. The Commonwealth, through DBHDS, will collect and analyze data at least annually regarding the management needs of individuals with identified complex behavioral, health, and adaptive support needs to monitor the adequacy of management and supports provided. DBHDS will develop corrective actions based on its analysis as it determines appropriate, track the efficacy of the actions, and revise as it determines necessary to address the deficiency. To implement the preceding steps, the Commonwealth will take the following actions:<br><br>b) DBHDS will continue to implement the IMNR process for no less than 70 people annually who have complex medical, behavioral, or adaptive support needs (TIER 4) to include onsite visits, reviews of specific healthcare documentation, and a factual questionnaire administered by qualified nursing professionals to primary caregivers most familiar with the person's healthcare needs. |

The 28th Individual Services Review (ISR) Study replicates the methodology designed and implemented for the 27th Study, completed in October 2025. The current Study is the second consecutive semi-annual review that focuses on individuals with complex behavioral support needs. It also continues to assess the implementation of the Department of Behavioral Health and Disability Services' (DBHDS) Intense Management Needs Review (IMNR)/Office of Integrated Health Support Network (OIHSN) remediation system, designed to verify that any corrective actions related to programmatic deficiencies at the individual and/or systemic levels are identified and resolved appropriately and effectively. In order to evaluate the outcomes of the remediation process, individuals with complex behavioral needs whose services were reviewed during the 27th review period were selected for follow-up inquiries by the Independent Reviewer's team of nurses.

As with prior Reviews, although the sample for this Study is too small to permit its findings to be generalized to the system as a whole, it is another opportunity to assess the availability and accessibility of resources necessary to ensure the health, safety, and overall well-being of individuals with a developmental disability and complex behavioral needs receiving essential services from the Commonwealth. Hopefully, the findings from the 28th ISR Study will be useful to DBHDS as they continue their own efforts to meet the obligations included in Terms 40 and 44.

Collaboration with the leadership and clinical staff of OIHSN is a critical aspect of the detailed planning for the ISR Study's process and implementation. OIHSN has taken a well-organized set of actions identifying and notifying the residential providers to be interviewed, assembling the relevant documentation, and assisting in the site visit logistics. The ISR and IMNR Monitoring Questionnaires are coordinated so that comparable and consistent information is gathered. The preparation of the ISR and IMNR questions about behavioral supports was highly reliant on the

154

involvement of DBHDS's clinicians with behavioral expertise. The three OIHSN nurses continue to be paired with three nurses from the Independent Reviewer's team. Over the course of several Studies, the nurses now have developed a collegial relationship that is especially helpful when problems unexpectedly occur during the course of the site visits. The participation of the OIHSN nurses is also very beneficial in providing timely information or prompt attention to any concerns requiring DBHDS intervention, often including the scheduling of dental appointments or the repair of adaptive equipment. The appreciation for this collaboration cannot be overstated.

Additionally, periodic ISR and IMNR conference calls/online meetings have been instrumental in sharing relevant information about resources, specific issues involving individual client circumstances, and potential strategies for enhancing knowledge and/or performance competencies. For example, after one of the Independent Reviewer's nurses notified OIHSN about a conference and training on Dementia and DD that focused on identifying and supporting people with dementia and provided a "train the trainer" option, the Director of OIHSN arranged for two of DBHDS's OIHSN nurses to attend. Since then, the OIHSN Nurses have worked to develop and implement actions related to the clinical interventions presented at the conference that include the provision of training opportunities across the Commonwealth and the start of a referral process for individualized consultation. Finally, on April 9, 2026, all participants in the IMNR Study, as well as DBHDS staff with interest in and assignments related to health or behavioral supports, participated in an online meeting to share their observations from the site visits and their recommendations for recognizing and sustaining positive practices.

Planning for the final ISR Study, with its focus on individuals with adaptive support needs, is expected to begin soon.

### 28th Review Period Study

The Independent Reviewer determined that there will be 30 individuals reviewed for the 28th ISR Study. These individuals were selected from a cohort of all individuals living in Regions II or V with DD Waiver services and a Support Intensity Scale score of level 7 (complex behavioral)  needs whose annual ISP meetings occurred between July 1, 2025 to September 30, 2025. The sample was stratified to include fifteen individuals with five alternates from each Region.

The six nurse reviewers, three from the Independent Reviewer's ISR team and three from OIHSN, again conducted joint site visits, examined the same documents, and interviewed the same caregivers and, whenever possible, the selected individuals. The respective Monitoring Questionnaires were prepared by OIHSN and by the Independent Reviewer's Team Leader in order to align the questions and promote consistency in gathering information. Discussion about the individuals in the sample was permitted but the actual scoring of each Questionnaire was completed separately by the nurse reviewers.

The site visits were completed during the weeks of February 16 and February 23, 2026.

155

The sample includes nineteen males and eleven females. The ages range from 14 to 56. There are four younger people, aged 14, 18 and two aged 19. However, the majority of the individuals are between 22 and 40 years of age (60%).

Communication methods are described primarily as "fully able to articulate spoken language without assistance" (60%). However, 20% of the individuals reviewed either use gestures (17%) or vocalizations (3%).

The majority of the individuals (60%) walk without support and the remaining individuals (17%) require some support while walking. No one in the selected sample requires a wheelchair.

The largest number of people (33%) in the selected sample live in a sponsored home. The other residential sites include a group home (30%) or the family home (30%). Interestingly, two men, ages 25 and 33, live in supported apartments in Region V. The nurse reviewer notes indicate that the Supported Apartment program, community engagement and staff coverage have given the 25 year-old Individual #20, independence and community inclusion. The support of his parents and his resilience have been crucial to his current capacity for growth through adversity. Similarly, Individual #14 has a very close relationship with his primary support staff. He has a very active life in the community including Special Olympics tournaments, softball, baseball, and flag football. He goes to the library and is able to use public transportation. He has contact with members of his family, as desired.

A Demographic Table for the current sample is included as an Attachment.

### Discussion of Major Themes and Initial Findings

As referenced above, this review period's Study is comprised of two distinct sections: 1) in response to the requirements of Term 40, there is an examination of the dental care provided to a sample of individuals in residential settings; 2) as required by Term 44, there is a review of the behavioral supports provided to a sample of individuals with complex behavioral needs as well as a look-behind analysis of the remedial actions taken to correct deficiencies identified during the 27th review period.

Due to the nature of this current Study, the second consecutive one with a primary focus on people with complex behavioral support needs, the findings related to Term 44 will be discussed first and the findings related to Term 40 will follow.

Term 44: Initial Findings from the Independent Reviewer's Team

The descriptions and issues included below are drawn from the ISR Monitoring Questionnaires completed by the three nurse consultants retained by the Independent Reviewer. It is possible that additional discussions with the staff of DBHDS may result in supplementing these findings.

Although there are notable differences in the provision of behavioral supports across the people reviewed for this Study, one commonality shared by the majority of the individuals is the

prescription of psychotropic medications. Given the diagnoses documented in their records, such as bipolar disorder, schizoaffective disorder, anxiety, depression, and impulse control disorder, this is not unexpected.

Twenty-six of the thirty people reviewed (87%) are prescribed psychotropic medications; four people (13%) are not. The number of these medications for an individual ranged from one to nine. The nurse consultants examined these prescriptions carefully and recommended, in response to Question 136, that three (12%) of the twenty-six people be further reviewed to determine whether their prescriptions are excessive or unnecessary.

No one in the sample is currently involved with the police. However, the histories of three individuals indicate time in jail for two people and in prison for one individual, who remains under supervision with restrictions.

Two individuals have a history of psychiatric hospitalization. Two individuals have been referred to crisis services and crisis stabilization.

Restraint is used daily for one individual (#13) in her family home. The restraint consists of brief physical contact that stops or redirects the unwanted behavior. Another individual (#10) is placed in time-out at her family home one to two times per week when physically aggressive. This young woman has a Behavior Support Plan (BSP) at school; it was not transferred for use in her home. Her parent has asked for behavioral support services in the home but they are not included in the ISP at this time.

The provision of behavioral supports to the individuals in the sample is most clearly described by dividing them into two groups.

Group One: The first group includes five individuals ( #s 8, 12,14, 19 and 27) who no longer engage in any behaviors that could result in: 1) injury to self or others; 2) disruption of the environment; 3) limitations to community-based resources; 4) the inability to learn or generalize skills; and/or 5) negatively impact his/her quality of life and greater independence. None of their ISPs authorize behavioral services. None of these individuals receives behavioral supports, although one individual (# 12) has a BSP in place that is dated August 8, 2025. The BSP is based on a Functional Behavior Assessment and includes behaviors for decrease and increase. Although the data to be collected are described, data are analyzed by the agency management rather than by a qualified behavior clinician.

For this Group, there is commendation noted for the efforts of the family, sponsor, or residential providers for their management of the individual's behavior and the resulting reduction or elimination of any problematic behavior in the past. For example, Individual #27's sponsor demonstrates the importance of a healthy relationship. Individual #19 has lived with her sponsor for sixteen years and all undesirable behaviors exhibited in a prior group home placement no longer occur.

Group Two: This group consists of all remaining twenty-five individuals in the sample. As detailed in the Attachment, the majority of the individuals engage in aggression or self-injury

157

and/or disruption of the environment. As a result, they have difficulty learning or generalizing skills and accessing community resources. Their quality of life and greater independence is negatively impacted.

Twenty of the individuals, their Guardians or Authorized Representatives expressed their desire for behavioral services, either during the site visit interviews or as recorded in the documentation provided for the individual. However, the ISP authorizes the need for behavioral services for only twelve (60%) of these twenty individuals. It is not known to the Independent Reviewer's nurse consultants what has precluded the finalization of the ISP for the eight individuals without the desired authorization for the behavioral services that these individuals or their authorized representatives believed were needed. It is, therefore, recommended that DBHDS examine this finding further.

As in the past reviews, ISR and IMNR studies again found evidence that the knowledge and efforts of individuals' families and their residential providers had positively impacted the behavior of the individuals in this group. For example, Individual #11 does not have a current BSP and his guardian/sponsor indicated that a formal behavioral assessment would be helpful. His sponsor helps keep undesirable behaviors to a minimum through supervision and effective management of his time and activities. Individual  #15 was adopted from a Russian orphanage and has a fifteen-year history of serious trauma from that confinement and the abuse of her adopted family. Her sponsor recognizes the impact of this trauma and mitigates negative behaviors through redirection and a daily schedule. As a result, this young woman has shown emotional growth and enjoys respect and community involvement. Nonetheless, an assessment by a clinician skilled in trauma therapy is recommended. Individual # 18 has serious restrictions on his liberty due to his criminal history. Despite these constraints, he is able to access the community due to his agency's supervision.

For twenty individuals in this group, fifteen (75%) of them have BSPs currently in place, including one BSP that is being revised. These documents were reviewed to determine whether a Functional Behavior Assessment was completed; whether there are target behaviors for decrease and increase; and whether the data to be collected are specified and, if so, are summarized and reviewed by a qualified behavior clinician. One behavioral support provider utilizes a personalized Behavior Support Manual and a single page of BSP Highlights that makes it easier for staff to make references to the BSP when needed. This format may also reinforce staff learning and retention.

There are two individuals in the sample (#17, #20) who present particularly challenging behavior. The circumstances involving Individual #17 have been thoroughly investigated by OIHSN and discussed with the Independent Reviewer's team. This continues to be a complicated case. Individual #20 is followed very carefully by his family and Behavior Analyst. The Behavior Analyst has worked with Individual #20 since 2020 and the BSPs have been revised several times with the most recent revision dated July 1, 2025. As a result, the undesirable behaviors have been significantly reduced with only one incident in December 2025. The effectiveness of these behavioral interventions and the process of revising them as needed are to be commended.

158

There will be further discussion with OIHSN staff after the Monitoring Questionnaires completed by the Independent Reviewer's team are submitted. The discussions to date have been both educational and very productive.

Summary data for Group One and Two are included as Attachments.

<u>Term 44: Remediation Look-Behind Summary Regarding Individuals with Complex Behavioral Support Needs Reviewed. During the 27th Review Period</u>

In addition to completing ten site visits each, the Independent Reviewer's nurse consultants assessed the corrective actions taken by DBHDS to remediate concerns they had identified for individuals reviewed in the 27th ISR Study. The sample for review was based on the random selection of individuals rather than on the number of issues identified for remediation plans. Twenty-six people in the 27th review period had issues identified; four individuals did not have any issues cited. Nine of the twenty-six people (35%) were selected for review. All issues identified for each of these individuals, regardless of whether an ISR or IMNR nurse identified the issue, were included in the remediation look-behind.

Each nurse consultant was provided updated information for three individuals, randomly selected by OIHSN, and instructed to contact the primary residential caregiver to determine if corrective actions had occurred for the cited problems or barriers to health and/or habilitation. The number of problems documented for the group of nine individuals in this sample ranged from one to six for a total of twenty-seven problems. The identified problem areas included:

- Difficulty in finding a behavior specialist or behavioral supports.
- Environmental modifications.
- Health-related protocols and assessments.
- Medication-related concerns.

To verify whether needed corrective actions were taken and to then determine their effectiveness in addressing the problem, the nurse consultants were able to reach the primary residential caregiver for all but one individual. The group home provider for this one individual, with six identified concerns, did not respond to repeated attempts by the Independent Reviewer's nurse consultant, the OIHSN nurse, or the Support Coordinator. The nurse reviewer did obtain information from the individual's Support Coordinator regarding two of the six issues. However, despite multiple contacts by the Support Coordinator and the OIHSN nurse, the group home provider was unresponsive and, it was confirmed, did not follow through with the necessary actions to correct the cited concerns, including dental care and the revision of a bowel protocol. It has been confirmed that OIHSN intends to monitor this situation.

Twenty-one of the twenty-seven identified problems (78%) were appropriately addressed. Several of the residential caregivers expressed appreciation for the assistance. The remediation activities undertaken by DBHDS were often of critical importance to the individual. For example, for one individual, the psychotropic medications were adjusted and serious side effects were treated. In other instances, behavioral support resources were provided, health care protocols were updated, and clinical assessments were completed.

159

The ISR Team Leader recommends two of the twenty-seven identified problems for further attention by OIHSN. First, a contractor's cost estimate to replace a window repeatedly broken by one individual (#29) in her family home was submitted and denied for an unknown reason. As a result, the individual sleeps in her parents' bedroom to avoid further destruction and serious injury. Second, the ISR nurse recommends that the physician's prescription of a SSRI medication for a person with Alzheimer's (#16) should be revisited and the rationale for its use should be documented.

A summary of the findings from the remediation look-behind is included as an Attachment.

A preliminary conversation has already taken place with OIHSN about the findings from the ISR team's remediation look-behind conducted for the individual problems that were identified during the 27th review period. The notes prepared by the Independent Reviewer's nurse consultants will be shared with DBHDS at the appropriate time and further discussion will be scheduled.

Clearly, there is consistent attention within OIHSN to the identification, reporting, and planned resolution of problems related to the health, safety, and well-being of individuals receiving services and supports under the DD Waiver. At the time of each review period's site visits, OIHSN nurses have immediately reported deficiencies in care or the presence of serious risks and, in certain instances, the Director of OIHSN has worked with the OIHSN nurse to initiate prompt action. During the current review period, the Director was immediately notified by the OIHSN nurse regarding the possible jeopardy linked to Individual #17's unsafe behavior. In addition, again during this current review period, the ISR and IMNR nurse reviewers discovered during the site visit that Individual #20's prior in-home support staff involved him in potentially dangerous situations before they were dismissed. OIHSN leadership intervened immediately when this information was presented to them by the two nurse reviewers. In both cases, OIHSN ensured that the necessary steps were taken to further investigate the concern, provided resources, and reassured the worried family members.

The ISR Study found that DBHDS's remediation process, largely designed and implemented by OIHSN, resulted in 78% of the identified issues reviewed being effectively addressed. The IMNR nurses are reliably responsive to problem identification and resolution. However, the required corrective actions are not always implemented by Support Coordinators or residential staff. The assigned OIHSN nurse consistently documents ongoing oversight of the implementation of the planned corrective actions for the issue identified during the IMNR review and is in contact with the Support Coordinator and residential caregiver as necessary. The Independent Reviewer's nurse consultants have again verified that the OIHSN nurses are knowledgeable and attentive.

As also referenced in the report for the 27th review period, the vulnerability of the remediation process appears to be at the regional and CSB level when residential providers and/or Support Coordinators are not focused on the timely and thorough resolution of problems identified. It may be necessary for DBHDS to issue mandated actions and timelines, with escalating

160

consequences, at the CSB and Support Coordinator levels in order to further strengthen the remediation process and protect the health and safety of vulnerable individuals.

Although this review period's ISR Study alone could not determine that DBHDS's remediation system is currently sufficient to address identified concerns, the factual evidence clearly establishes that, for the individuals in this sample, the Support Coordinators and residential staff must implement the planned corrective actions timely and in an effective manner, before DBHDS's remediation process will be sufficient. The contributions of DBHDS's OIHSN and its nurses are highly commendable but to adequately address the identified concerns, the OIHSN nurses' planned corrective actions need to be both effectively implemented at the regional, CSB, and provider levels and revised as needed.

Term 40: Completion of Annual Dental Exam

Among the small sample reviewed, this Study found evidence that the Commonwealth has continued to make progress in the provision of annual dental exams.

Through interviews with the residential caregivers and examination of relevant documentation, the Independent Reviewer's nurse consultants documented that twenty-four (83%) out of twenty-nine of the selected individuals reviewed had an annual dental exam. (One individual has a variance that permits an exam every two years.) The completion of the annual exams included at least two instances in which general anesthesia is required for treatment.

All 30 individuals had dental coverage through Medicaid or other insurance.

The Study found that reasons for failure to schedule or complete an annual exam were similar to prior reviews. These included the inability to find a dentist who accepts Medicaid (2); the failure of the residential agency to renew Medicaid and thereby losing the individual's coverage (1); changes in providers, resulting in delays scheduling an appointment (1); and cancellation of the appointment by the family (1). In fifteen cases, the dentists' recommendations were implemented. One set of recommendations was delayed due to the individual's seizures. In three instances, the family or the individual refused or failed to complete further treatment. There is a detailed list of the follow-up notes included as an Attachment.

The failure to maintain dental care is described on the Issues Pages for four individuals. The agency for Individual #12 failed to renew his Medicaid insurance coverage. Although that issue is resolved as of January 2026, he has not had a dental exam since 2023 and now requires sedation. They have not been able to locate a dentist for that treatment. Individual #18's last dental exam was in 2018. Individual #19 last saw a dentist in June 2024. Individual # 22's parent/co-guardian cancelled both Mobile Dental Unit's scheduled appointments. As a result, he has not had dental care since 2018. It was noted that potential dental disease could contribute to some of the serious behavioral issues he experiences.

## Additional Findings of Note

As confirmed during the site visit preparation and/or the site visit itself, it is important to note the following:

- All thirty individuals' ISPs were current.
- The Risk Awareness Tool (RAT) was included in all of the ISPs reviewed.
- The On-Site Visit Tools (OSVTs) were completed by case managers with the frequency required by DBHDS for only 10 of the 30 individuals (33%). Although it is certainly possible that there were documents completed but not provided, given the importance of this documentation, it is recommended that DBHDS investigate this preliminary finding further.

## Concluding Comments

The Independent Reviewer's Team respects and appreciates the ongoing collaboration with DBHDS and, in particular, with OIHSN. We are also indebted to the many families, residential caregivers, and individuals with a disability who welcomed us into their homes and worked amicably with us to answer our numerous questions.

There have been many lessons learned over the course of twenty-eight Individual Services Reviews. Our current review of behavioral supports again has illustrated the complexity of understanding the causes of undesirable behaviors and the precision that is required to develop and implement successful person-centered interventions. In particular, we have been reminded of the extensive trauma experienced by many of the people in our sample and the compelling need for trauma-informed strategies. We are encouraged by our conversations with OIHSN staff and the concurrence we have developed in analyzing what programmatic changes can make a difference, if implemented consistently and thoughtfully by skilled practitioners. After the ISR team is no longer involved, it is recommended that DBHDS staff with interest in and assignments related to health or behavioral supports continue to participate in discussions to share their observations from the IMNR site visits and their advice for recognizing and sustaining positive practices.

It has been especially informative and reassuring to learn how residential sponsors and family members have been able to reduce and prevent undesirable behavior if given adequate support and accessible resources. In the end, however, it is the resilience of the people we reviewed that leaves the most lasting impression now that our work in this Study is completed.

162

**ATTACHMENTS**

# Demographic Tables

| Region | | |
|---|---|---|
| II | 15 | 50% |
| V | 15 | 50% |

| Sex | | |
|---|---|---|
| Male | 19 | 63% |
| Female | 11 | 37% |

| Age Group | | |
|---|---|---|
| Under 22 | 5 | 17% |
| 22-30 | 9 | 30% |
| 31-40 | 9 | 30% |
| 41-50 | 5 | 17% |
| 51-60 | 2 | 7% |
| 61-70 | 0 | 0% |
| 71-80 | 0 | 0% |
| 81-90 | 0 | 0% |
| Over 90 | 0 | 0% |

| Mobility Status | | |
|---|---|---|
| Walks without support | 25 | 83% |
| Walks with support | 5 | 17% |
| Uses wheelchair | 0 | 0% |
| Total Assistance | 0 | 0% |

| Communication Method | | |
|---|---|---|
| Spoken Language, Fully Articulates Without Assistance | 18 | 60% |
| Limited Spoken Language, Needs Some Staff Support | 4 | 13% |
| Communication Device | 2 | 7% |
| Gestures | 5 | 17% |
| Vocalizations | 1 | 3% |
| Facial Expressions | 0 | 0% |
| Other | 0 | 0% |

| Residence Type | | |
|---|---|---|
| Group home | 9 | 30% |
| Own/family home | 9 | 30% |
| Sponsored home | 10 | 33% |
| Supported apartment | 2 | 7% |

164

**MONITORING QUESTIONNAIRE**

**<u>SECTION 9: SUPPLEMENTAL QUESTIONS</u>**

**GROUP ONE: PRIOR AND/OR NO CURRENT BEHAVIORAL ISSUES**

| | | Yes | No | NA |
|---|---|---|---|---|
| 212. | Does the individual engage in any behaviors (e.g., self-injury, aggression, property destruction, pica, elopement, etc.) that: | | | |
| | a. could result in injury to self or others? | | 5 | |
| | b. disrupt the environment? | | 5 | |
| | c. impede his/her ability to access a wide range of environments (e.g., public markets, restaurants, libraries, etc.)? | | 5 | |
| | d. impede his/her ability to learn new skills or generalize already learned skills? | | 5 | |
| | e. negatively impact his/her quality of life and greater independence? | | 5 | |
| | f. Does the ISP authorize the need for behavioral services? | | 1 | 4 |
| |    1.  Are the behavioral services currently being provided? | | | 5 |
| |      a. If No, are they in process of being provided? | | | 5 |
| | g. Are the behavioral services wanted by the individual or his/her Guardian/Authorized Representative? | 2 | 1 | 2 |
| 217. | Is there a behavior plan in place to address the behavior(s) identified above? | 1 | | 4 |
| |    a.  If No, is there a behavior plan in progress because services recently started? | | | 5 |
| 218 | Is there a functional behavior assessment (FBA) completed in the current setting? | 1 | | 4 |
| |    a.  If No, is the FBA in progress because the services recently started? | | | 5 |
| 219 | Are there target behaviors for decrease? | 1 | | 4 |
| 220 | Are there behaviors targeted for increase? | 1 | | 4 |
| 222 | Does the behavior plan or the Part V Plan For Supports specify the data to be collected to determine whether planned interventions are working? | 1 | | 4 |
| 223 | Have the data been summarized and reviewed by a qualified behavior clinician? | | 1 | 4 |

**MONITORING QUESTIONNAIRE**

**SECTION 9: SUPPLEMENTAL QUESTIONS**

**GROUP TWO: DEMONSTRATING CURRENT BEHAVIORAL ISSUES**

|  |  | Yes | No | NA |
|---|---|---|---|---|
| 212. | Does the individual engage in any behaviors (e.g., self-injury, aggression, property destruction, pica, elopement, etc.) that: | | | |
| | a. could result in injury to self or others? | 21 | 4 | |
| | b. disrupt the environment? | 21 | 4 | |
| | c. impede his/her ability to access a wide range of environments (e.g., public markets, restaurants, libraries, etc.)? | 20 | 5 | |
| | d. impede his/her ability to learn new skills or generalize already learned skills? | 18 | 7 | |
| | e. negatively impact his/her quality of life and greater independence? | 23 | 2 | |
| | f. If Yes, does the ISP authorize the need for behavioral services? | 12 | 13 | |
| | 2.  Are the behavioral services currently being provided? | 11 | 2 | 12 |
| | a. If No, are they in process of being provided? | 1 | 1 | 23 |
| | g. Are the behavioral services wanted by the individual or his/her Guardian/Authorized Representative? | 20 | 5 | |
| 217. | Is there a behavior plan in place to address the behavior(s) identified above? | 15 | 7 | 3 |
| | b.  If No, is there a behavior plan in progress because services recently started? | | 6 | 19 |
| 218 | Is there a functional behavior assessment (FBA) completed in the current setting? | 15 | 7 | 3 |
| | a.  If No, is the FBA in progress because the services recently started? | 0 | 7 | 18 |
| 219 | Are there target behaviors for decrease? | 15 | 0 | 10 |
| 220 | Are there behaviors targeted for increase? | 15 | 1 | 9 |
| 222 | Does the behavior plan or the Part V Plan For Supports specify the data to be collected to determine whether planned interventions are working? | 15 | 1 | 9 |
| 223 | Have the data been summarized and reviewed by a qualified behavior clinician? | 13 | 3 | 9 |

**Summary of Remediation Look-Behind Results**

| ID # | Identified Issue(s) | Efficacy of Addressing Deficiency |
|---|---|---|
| 03 | All four issues remedied. Assessments and behavioral supports provided. Past due SIS completed. | 4/4 |
| 04 | All three issues remedied. ISP revised. Lab testing completed. Therapeutic consultations completed. Requested therapies in place. | 3/3 |
| 05 | Two of six issues remedied. Group home provider non-responsive.  Four issues unresolved, including dental care and bowel protocol. | 2/6 |
| 16 | One issue remedied. Cologuard test administered. Psychiatrist disagreed with second issue regarding dosage; issue needs to be re-visited. The concern was the type of medication prescribed, not the dosage. | 1/2 |
| 18 | Both issues remedied. Shunt developed. Data collected for BSP. | 2/2 |
| 19 | Single issue remedied. Psychotropic medications adjusted. | 1/1 |
| 21 | Two issues remedied. Medication discontinued. Dehydration protocol now in place. | 2/2 |
| 22 | Three issues remedied. ISP corrected. Information provided re: seizures and alert system. | 3/3 |
| 29 | Three of four issues remedied. SSI obtained. Behavior specialist hired. Information provided re: Settlement Agreement. Contractor cost estimate to replace window rejected. Further action required. | 3/4 |
|  |  | **21(27) 78% Of Issues Addressed** |

167

| ID# | Annual Dental Exam | Dental Exam Notes |
|---|---|---|
| 01 | Yes | Recommendations implemented. |
| 02 | Yes | No recommendations cited. |
| 03 | Yes | General anesthesia required. |
| 04 | Yes | Refused further treatment. |
| 05 | Yes | Recommendations implemented. |
| 06 | Yes | General anesthesia required. |
| 07 | Yes | No recommendations cited. |
| 08 | Yes | Recommendations implemented. |
| 09 | Yes | Family pays. No Medicaid dentist found. |
| 10 | Yes | Recommendations delayed due to health. |
| 11 | Yes | Recommendations implemented. |
| 12 | No | Medicaid lapsed. Agency failure to renew. |
| 13 | -- | Variance approved for exam every two years. |
| 14 | Yes | Recommendations implemented. |
| 15 | Yes | Recommendations implemented. |
| 16 | Yes | Recommendations implemented. |
| 17 | Yes | Recommendations implemented. |
| 18 | No | No Medicaid dentist. No exam since 2018. |
| 19 | No | Unable to find dentist accepting insurance. |
| 20 | Yes | Recommendations implemented. |
| 21 | Yes | Follow up not completed by parents. |
| 22 | No | Parent cancelled appointments. |
| 23 | Yes | Follow up not completed by family. |
| 24 | Yes | Recommendations implemented. |
| 25 | Yes | Recommendations implemented. |
| 26 | Yes | Recommendations implemented. |
| 27 | No | Delays due to changes in providers. |
| 28 | Yes | Recommendations implemented. |
| 29 | Yes | Recommendations implemented. |
| 30 | Yes | Recommendations implemented. |
| % | **(24/29) 83% Received the exam** | |

168

# APPENDIX F

## Provider Training

### By

### Chris Adams, MS

**TO:**          Donald Fletcher, Independent Reviewer

**FROM:**     Chris Adams, Consultant

**RE:**          28th Study Report: Provider Training

**DATE:**      May 19, 2026


<u>Introduction/Background</u>

This report describes the Commonwealth's status in meeting the Permanent Injunction's (PI) requirements related to the training and competency of direct support professionals. The PI, approved on January 15, 2025, includes two terms that directly address provider training and competency.

**Term 47 – Training Requirement Compliance** requires the Commonwealth to work toward a goal that 86% of DBHDS-licensed providers subject to an annual inspection have a training policy that meets DBHDS requirements. Term 47 also provides that DBHDS will take whatever action it determines appropriate when providers do not comply with training requirements established by regulation. Prior studies show the Commonwealth has not yet achieved the 86% target specified in Term 47, as reflected in the annual results below:
- During CY2023, 819 of 1,105 licensed providers (74.1%) met these requirements during their annual inspection.
- During CY2024, 881 of 1,192 providers (73.9%) met these requirements during their annual inspection.
- During CY2025, 1,126 of 1,447 providers (77.8%) met these requirements during their annual inspection.

**Term 48 – Training and Competency of Direct Support Professionals** sets training and core competency requirements for Direct Support Professionals (DSPs) and their supervisors, as defined in 12VAC30-122-180 (effective March 31, 2021). In November 2021, the Commonwealth implemented changes in response to concerns about the Department of Medical Assistance Services (DMAS) provider review process used to evaluate compliance with these requirements. Among other changes, the Commonwealth began using Quality Service Reviews (QSRs) to provide objective data for measuring the training threshold specified in Term 48. For purposes of demonstrating compliance, the Commonwealth established a 95% performance goal on two measures: (1) the percentage of provider agency staff who meet orientation and training requirements and (2) the percentage of DSPs who meet competency-training requirements. Since these changes were implemented, this Consultant's studies have (1) assessed whether scoring and data-validation procedures produce valid and reliable data for evaluating performance against Term 48's 95% goal, (2) described how data are obtained to measure achievement of the requirements, and (3) described the verification, validation, and testing procedures performed by

170

the data analyst. The 95% goal was not achieved for either measure during QSR Rounds 5, 6, or 7. In Round 5, Outcome 1 was 77.8% and Outcome 2 was 85.3%. In Round 6, Outcome 1 was 77.5% (no significant change from Round 5) and Outcome 2 was 86.6% (a slight increase from Round 5). In Round 7, Outcome 1 was 92.7% (a significant increase from Round 6) and Outcome 2 was 81.6% (a decrease from Round 6). Results for QSR Round 8 will not be available until the 29th study.

Table 1 summarizes the determinations from this 28th period study for Terms 47 and 48.

| Table 1 | |
|---|---|
| Term | 28th Period |
| **Term 47: Training Requirement Compliance.** The Commonwealth will work to achieve a goal that 86% of DBHDS-licensed providers receiving an annual inspection will have a training policy that meets established DBHDS requirements. DBHDS will take action it determines appropriate if providers fail to comply with training requirements required by regulation. | **Deferred** |
| **Term 48 – Training and Competency of Direct Support Professionals.** The Commonwealth will work to achieve a goal of at least 95% of Direct Support Professionals and their supervisors receive training and competency testing in accordance with 12 VAC 30-122-180 as in effect on the date of this Order or as may be amended. | **Deferred** |

## 28th Period Study

The Consultant who conducted the prior Provider Training review also completed the 28th period review.

**Term 47:**
To assess the Commonwealth's efforts to meet Term 47's 86% goal, the Consultant reviewed DBHDS processes for monitoring provider compliance with §450, including DBHDS technical assistance and training efforts. The Consultant also examined how Licensing Specialists evaluate provider implementation of DSP/DSP supervisor training requirements. In addition, the Consultant reviewed inter-rater reliability measures and interviewed DBHDS staff.

To evaluate the accuracy and consistency of Licensing Specialist determinations of provider compliance with §450, the Consultant reviewed an abbreviated sample of 25 inspection reports selected from the 229 inspections the Office of Licensing completed during the 2026 cycle through 02/28/2026. Because this 28th study was completed early in the CY2026 cycle, the number

171

and percentage of available inspections were not sufficient to support generalizable findings or meaningful comparison to the annual results reported in prior studies. The Consultant will combine the results of this abbreviated review with a larger sample to be examined during the 29th study to produce generalizable results comparable to the annual results reported in the 25th and 27th review periods' studies.

**Term 48:**

To assess the Commonwealth's efforts to meet Term 48's 95% goal, the Consultant reviewed the status of process improvement activities initiated since the conclusion of the 27th study. No additional QSR results were available because results for DBHDS's QSR Round 8 will not be available until the 29th study. The Consultant also reviewed: (1) findings from a root cause analysis examining why DSPs and DSP Supervisors may not receive required training and competency evaluations under §180; (2) DBHDS's current efforts to develop and implement a Quality Improvement Initiative informed by that analysis; and (3) the status of the rate study for various waiver services intended to inform the Commonwealth's budget request to the General Assembly for the 2026 session, including recommended rate increases.

Table 2 summarizes the facts, analysis, and conclusions from this review of the Commonwealth's efforts to achieve and sustain the requirements of Permanent Injunction Terms 47 and 48.

172

| TABLE 2 | | | |
|---|---|---|---|
| Terms and Actions | | Analysis/Conclusion | 27th / 28th |
| **47.** The Commonwealth will work to achieve a goal that 86% of DBHDS-licensed providers receiving an annual inspection will have a training policy that meets established DBHDS requirements. DBHDS will take action it determines appropriate if providers fail to comply with training requirements required by regulation. To achieve that goal, the Commonwealth will take the following actions: | 12VAC35-105-450 requires a training policy that addresses all regulatory requirements and requires documentation of required training for employees and contractors. 12VAC35-105-50, -100, -110, and -115 address adverse actions and sanctions for significant or recurring citations.

OL uses the Annual Compliance Determination Chart to guide compliance determinations and updates the chart annually.

CY2022–CY2025 results were below the 86% goal; performance improved starting in CY2024. Through 02/28/2026, OL reported 229 CY2026 inspections; 185 (80.8%) met §450.

The 28th study occurred early in CY2026, so results are not | Prior studies confirmed that DBHDS mandates training policies under licensing regulation 12VAC35-105-450. In addition, regulations 12VAC35-105-50, -100, -110, and -115 outline adverse actions and sanctions for providers with significant or recurring citations. The Office of Licensing (OL) provides guidance to licensing specialists on determining whether a provider meets each applicable regulatory requirement, as described in the Annual Compliance Determination Chart. OL revises the chart annually to maintain accuracy and reflect current requirements.

Under §450, providers must develop and implement a training policy that addresses all regulatory requirements and must maintain documentation showing that employees and contractors received required training. Over the past three annual inspection cycles, the number of providers meeting the requirements at §450 have not met the 86% goal; however, results have improved since CY2024. The annual results are shown below:
- CY2023: 819/1,105 (74.1%)
- CY2024: 881/1,192 (73.9%)
- CY2025: 1,126/1,447 (77.8%)

OL provided data on the 229 annual licensing inspections completed in the CY2026 inspection cycle through 02/28/2026. Of these, 185 (80.8%) met the §450 requirements. Note that the 80.8% should not be cited as evidence of improvement until OL completes a substantially larger percentage of it CY2026 annual inspections. Because this 28th study was completed early in the CY2026 cycle, the number of inspections was not sufficient to generalize results or compare them to the annual results above. | 27th: Not Achieved

28th: Deferred |

173

| | | |
|---|---|---|
| | generalizable or comparable to prior annual results. The Consultant conducted a sample review of 25 CY2026 inspections across five regions to assess the accuracy of licensing specialist compliance determinations with §450 and OL's 2026 Compliance Determination Chart. Results showed improved agreement compared to the 27th study. A larger sample review will be conducted in the 29th study (for generalizable and comparative results).<br><br>Term 47 results are deferred until the 29th study concludes due to limited inspections and sample size as of 02/28/2026.<br><br>Efforts by DBHDS to increase provider compliance with the requirements at §450 are summarized in Actions 47.a, 47.b, 47.c and 47.d below. | The Consultant also conducted a sample review of CY2026 inspections to assess whether licensing specialists evaluated §450 compliance consistent with the regulatory language and with the processes described in the relevant sections of OL's 2026 Annual Compliance Determination Chart. The sample included 25 providers across the five regions and compared licensing specialists' assessments with the Consultant's evaluation of provider evidence for multiple regulations, including the employee training requirements in §450. Again, the sample is too small to generalize, the interim results show a higher level of agreement between the Consultant's findings and the licensing specialists' determinations compared with the 27th study. This will be verified during the 29th period study.<br><br>To obtain sufficient results to generalize and compare with the combined sample review from the 26th and 27th studies, the Consultant will conduct a larger sample review in the 29th study. Together, the 28th and 29th study results will provide sufficient data for valid comparisons with the 24th/25th and 26th/27th study sample reviews.<br><br>Given the limited number of annual licensing inspections completed by 02/28/2026 and the small sample size for comparative analysis, the Term 47 results are deferred until the 29th study concludes.<br><br>DBHDS has continued to provide written guidance and virtual training to help providers meet the §450 requirements. In addition, its Office of Clinical Quality Improvement offers voluntary and mandatory Expanded Consultation and Technical Assistance (ECTA), which is described in more detail in Action 47.b below. Other DBHDS initiatives to improve provider compliance with §450 are described in Actions 47.a and 47.c, and its efforts to strengthen inter-rater | |

174

| | | | |
|---|---|---|---|
| | | reliability for compliance determinations during inspections are described in Action 47.d.<br><br>Through these continuous improvement efforts, DBHDS is working with providers to reach the goal that 86% of DBHDS-licensed providers receiving an annual inspection have a training policy that meets DBHDS requirements. | |
| 47.a) Within six months of the date of this Order, DBHDS will require that any provider not in compliance with training requirements develop and implement a corrective action. | Previous studies confirmed that DBHDS licensing regulations at 12VAC35-105-170 require providers to develop, submit, and implement a written Corrective Action Plan (CAP) for each violation cited by the Office of Licensing (OL). These requirements apply to all cited violations, including those relating to training requirements, specifically 12VAC35-105-450. | Previous studies confirmed that DBHDS licensing regulations at 12VAC35-105-170 require providers to develop, submit, and implement a written Corrective Action Plan (CAP) for each violation cited by the Office of Licensing (OL). These requirements apply to all cited violations, including those relating to training requirements, specifically 12VAC35-105-450.<br><br>These requirements remain in effect and are defined and described in the DBHDS licensing regulations and within its "Office of Licensing Look-Behind Process for DD Providers' Annual Inspections." This document addresses (1) assessment of policy, (2) corrective action plan requirements, and (3) progressive enforcement. DBHDS conducts regular reviews and makes needed revisions of this process; its most recent updates took place in June and July 2025. The consultant's review of OL provider inspection reports and related documents verified that OL requires the development and implementation of corrective action plans for regulatory violations as required by Action 47.a.<br><br>The information and actions described above provide evidence that the requirements of Action 47.a have been completed. | 27th:<br>Completed<br><br>28th:<br>**Completed and Ongoing** |
| 47.b) Within three months of the date of this Order, DBHDS Quality Improvement Specialists will offer providers technical | Through the ECTA process, DBHDS continues to provide technical assistance, additional training, and specific actions related to areas of provider | To address requirements at Action 47.b, DBHDS has continued the Expanded Consultation and Technical Assistance (ECTA) process, a consultative and individualized support program delivered by the Office of Clinical  Quality | 27th:<br>Completed |

175

| assistance, additional training, and specific actions related to the respective areas of underperformance. | underperformance as required by Action 47.b.<br><br>Starting July 15, 2025, DBHDS made ECTA mandatory for providers cited twice consecutively in sections 450, 520 A–D, or 620 A–D. Providers required to participate must contact the ECTA team within 45 days of their latest approved CAP. Between April and November 2025, 114 providers completed ECTA consultation, with 87 still in progress. | Improvement (QCQI). The primary purpose of ECTA is to assist DBHDS licensed Developmental Disability (DD) providers in strengthening Quality Improvement (QI) and Risk Management (RM) practices, particularly when providers have been cited for specific licensing regulation violations.<br><br>Providers typically become eligible for ECTA when they receive citations for one or more specific regulations (12VAC35 105 450, 520 A–F, or 620 A–E) during an unannounced licensing review and have an approved Corrective Action Plan (CAP) addressing those citations. In some cases, eligibility is also based on a Quality Improvement Plan (QIP) from a Quality Service Review (QSR). Effective July 15, 2025, ECTA participation became mandatory for providers that receive two consecutive citations for certain key regulatory sections (450, 520 A–D, or 620 A–D). When mandatory participation applies, providers must contact the ECTA team within 45 days of their most recently approved CAP.<br><br>The ECTA process includes defined participation timelines, with the potential for discontinuation if providers miss multiple scheduled sessions. The program increasingly integrates QSR data, performance metrics, and provider identified challenges to tailor technical assistance. Survey results and outcomes tracking indicate that providers experience meaningful improvements in quality and risk management as a result of ECTA participation.<br><br>The consultant verified, through review of ECTA work products and training curricula, that between April and November 2025, the ECTA program expanded its outreach, issuing 285 invitations to providers and achieving consistently | 28th: Completed and Ongoing |

176

| | | high engagement levels. DBHDS reported that participation increased throughout the year, peaking at 88.7% in November. As anticipated, earlier invitation periods resulted in higher completion rates, while later periods showed an increase in consultations still in progress due to the volume of recent enrollments. Overall, the program maintained strong provider involvement during this period, with 114 providers completing ECTA consultations and 87 remaining in progress on November 30, 2025. Based on a review of program operations and engagement data from April through November 2025, the consultant determined that DBHDS has expanded and continues to refine its provision of technical assistance to licensed providers in accordance with the DBHDS Consultation and Technical Assistance Standard Operating Procedure. DBHDS's efforts address requirements under Action 47.b by offering providers technical assistance, additional training, and specific actions related to the respective areas of underperformance. | |
|---|---|---|---|
| 47.c) Within six months from the date of this Order, for providers who are not compliant with training requirements for two consecutive licensing inspections, DBHDS shall take appropriate further action to enforce adherence to the Commonwealth's regulations, which may include, but not be limited to, issuing citations, issuing systemic citations, issuing a health and safety corrective action plan, reducing a provider's license | DBHDS licensing regulations at 12VAC35-105-170 require providers to develop, submit, and implement a written Corrective Action Plan (CAP) for each violation cited by the Office of Licensing (OL). These requirements apply to all cited violations, including those related to training requirements, specifically 12VAC35-105-450.<br><br>Effective July 15, 2025, participation in ECTA became mandatory for providers | Previous studies confirm that DBHDS licensing regulations at 12VAC35-105-170 require providers to develop, submit, and implement a written Corrective Action Plan (CAP) for each violation cited by the Office of Licensing (OL). These requirements apply to all cited violations, including those relating to training requirements, specifically 12VAC35-105-450.<br><br>To address Action 47.c, the consultant verified that DBHDS has continued the Expanded Consultation and Technical Assistance (ECTA) process, a consultative and individualized support program delivered by the Office of Clinical Quality Improvement OCQI). ECTA assists DBHDS-licensed Developmental Disability (DD) providers in strengthening Quality Improvement (QI) and Risk Management (RM) | 27th:<br>Completed<br><br>28th:<br>**Completed and Ongoing** |

| | | | |
|---|---|---|---|
| to provisional status, or revoking the provider's license as determined appropriate by DBHDS. | receiving two consecutive citations in designated regulatory sections including those related to training requirements, specifically 12VAC35-105-450.<br><br>DBHDS consistently follows ECTA protocols and enforces mandatory participation when providers are found noncompliant with applicable licensing requirements. | practices, particularly when providers are cited for violations related to training requirements, specifically 12VAC35-105-450.<br><br>Effective July 15, 2025, DBHDS made participation in ECTA mandatory for providers receiving two consecutive citations in designated regulatory sections (450, 520 A–D, or 620 A–D). Providers subject to mandatory participation must contact the ECTA team within 45 days of approval of their most recent CAP.<br><br>The consultant's review of data for providers meeting the criteria for mandatory ECTA participation since July 2025 demonstrates that DBHDS is consistently following ECTA protocols and enforcing mandatory participation when providers are found noncompliant with applicable licensing requirements. These actions support the determination that the requirements of Action 47.c were completed during this review period. | |
| 47.d) Within 24 months of this Order, DBHDS will ensure that all DBHDS staff and contractors assigned to assess training requirements have established inter-rater reliability in conducting such assessments. | The Office of Licensing (OL) developed and implemented an inter-rater reliability (IRR) review process to formally assess the consistency and accuracy with which licensing specialists determine whether providers meet the regulatory requirements applicable to Term 47.<br><br>OL conducts its IRR review three times per year. During each review, all Licensing Specialists independently | As outlined in the 27th study report, the Office of Licensing (OL) has sustained and expanded several initiatives to meet the requirements of this action. These initiatives include:<br>• DD Inspection Training for licensing specialists<br>• Regional Managers conducting unannounced parallel inspections with licensing specialists<br>• Experienced licensing specialists shadowing and mentoring newly hired staff<br>• Quality Improvement Specialist Look-Behinds<br><br>In July 2025, OL developed and implemented a formal, structured Inter-Rater Reliability (IRR) process. This process is designed to promote consistent and accurate licensing inspections by having licensing specialists independently review the same provider record, with their ratings compared against a | 27th:<br>In Progress<br><br>28th:<br>Completed and Ongoing |

178

| | | |
|---|---|---|
| | evaluate the same provider record, and their determinations are compared to a "gold standard" set by the Quality Improvement Review Specialist.<br><br>OL's Associate Director of Quality & Compliance selects the provider record and relevant documents and makes them available for review.<br><br>OL's Quality Improvement Review Specialist independently establishes the "gold standard" rating and records all rater data in the IRR Tracker.<br><br>Aggregate results are analyzed and summarized, and findings are reported to the Director of Licensing along with recommended corrective or improvement actions. Any regulation with less than 86% agreement triggers additional training for Licensing Specialists, either individually or in groups.<br><br>OL's plans to review its IRR process annually to identify strengths, areas for | "gold standard" of determinations and explanations established by the OL Quality Improvement Review Specialist (QIRS). The IRR focuses exclusively on regulations pertaining to risk management and quality assurance, specifically outlined in 12VAC35-105-450, 520.A, 520.B, 520.C.1-5, 520.D, 620A, 620.B, 620.C.1-5, and 620.D.1-3.<br><br>The Associate Director of Quality & Compliance selects and prepares the records and supporting documentation, while all eligible licensing specialists (excluding new hires and the specialist who conducted the original inspection of the reviewed provider) submit their compliance determinations using the IRR Corrective Action Plan (CAP) form. The QIRS compiles and analyzes agreement levels, provides guidance on correct determinations within scheduled timelines, and shares aggregated data and trends with leadership. If agreement levels on particular regulations fall below established thresholds, OL staff provide targeted or individualized training to enhance consistency and accuracy.<br><br>While OL's IRR was initially intended to occur quarterly, it was subsequently modified to three times per year - in January, May and September - based on the time required for each evaluation and analysis. The consultant verified that, to date, two reviews have been completed (the initial review in July 2025 and the second review in January 2026), and the results have been analyzed.<br><br>The July 2025 review assessed 19 regulations, with 12 (63%) attaining an agreement level of 60% or higher, while only two items (11%) fell below the 40% threshold. Following an analysis of these results, OL formulated and executed a comprehensive, outcome-oriented action plan focused on enhancing rating consistency. This plan included clarifying ambiguous items, examining patterns of disagreement, | |

179

| | | | |
|---|---|---|---|
| | improvement, and potential modifications to enhance process effectiveness.<br><br>The consultant confirmed that, in practice, OL's IRR process follows its Inter-Rater Reliability Process requirements and that rating consistency improved significantly from the 07/2025 review to the 01/2026 review after initial remedial actions were implemented. | updating requirements, and providing both individual and group retraining for staff. The effectiveness of this approach was evident in the January 2026 review, where 15 out of 19 items (79%) showed score improvements, including six items that increased by over 25 percentage points. Only four items registered a decline in scoring percentages.<br><br>Additionally, OL instituted ongoing peer discussions and case reviews to further reinforce consistent application of standards across the team. Furthermore, it continues to monitor and adjust training based on outcome trends from each review cycle. OL's IRR protocol will be reviewed annually to foster continuous improvement and consistent implementation of the licensing inspection process.<br><br>Based on review of the process description, analysis of results from Rounds 1 and 2 of the IRR process, and corrective actions taken in response to these analyses from the first two rounds, the consultant determined that the Office of Licensing has established an inter-rater reliability process for all its Licensing Specialists related to provider compliance with quality assurance trending requirements specified by Action 42.a. Data from the first two rounds indicate that OL's IRR process has enhanced consistency and highlighted areas where additional guidance, training, and oversight are warranted to ensure ongoing uniformity. The effectiveness of the process will continue to be evaluated as testing and analysis proceed every four months. | |
| **48:** The Commonwealth will work to achieve a goal that at least 95% of Direct Support Professionals and their supervisors receive training and competency testing in accordance with 12 VAC 30- | The November 2025 DBHDS Provider Data Summary Report explains the QSR results and data collection methods. | Previous studies found that DMAS regulation 12VAC30-122-180 sets required training and competency evaluation standards for Direct Support Professionals (DSPs) and DSP Supervisors. The studies also found that DBHDS uses Quality Service Review (QSR) data to measure achievement of the targets set by Term 48. DBHDS measures progress toward the 95% goal for this term using two QSR outcome measures: | 27th:<br>Not Achieved<br><br>28th:<br>Deferred |

| | | |
|---|---|---|
| 122-180 as in effect on the date of this Order or as may be amended. To achieve that goal, the Commonwealth will take the following actions: | In QSR Round 7, Outcome 1 increased substantially, and Outcome 2 decreased. QSR Round 8 results will not be available until the 29th study.<br><br>After the 27th study, DBHDS revised the DSP Advanced Competencies for Behavior, Health, and Autism. The proposed revisions are described in a draft checklist dated 10/30/2025.<br><br>DBHDS conducted a pilot focused on the revised competencies from November 2025 through February 2026 and collected feedback through opinion questions. Respondents reported the revisions were easier to implement and reduced administrative burden for competency assessments.<br><br>DBHDS is soliciting public comment on the proposed revisions from April through July 2026. | <ul><li>**Outcome 1 (Person-Centered Review):** Measures the percentage of provider staff who meet orientation and training requirements. The result is based on a review of DSP training records and DSP Supervisor competency assessments, and it reflects whether the provider has a process to evaluate training and competency.</li><li>**Outcome 2 (Provider Quality Review):** Measures the percentage of DSPs who meet competency-based training standards. The result is based on record reviews and direct observation of DSPs providing support and supervisors overseeing their teams.</li></ul><br>The table below shows results for each outcome in QSR Rounds 5, 6, and 7.<br><br>*(table below)*<br><br>The November 2025 DBHDS Provider Data Summary Report describes these results and explains the data collection methods in more detail. Outcome 1 improved substantially in QSR Round 7, while Outcome 2 declined. Results from QSR Round 8 will not be available until the 29th study.<br><br>After the 27th study, DBHDS revised the DSP Advanced Competencies for Behavior, Health, and Autism to consolidate, streamline, and modernize the content and delivery. DBHDS described the revisions in a draft | |

| | QSR R5 | QSR R6 | QSR R7 |
|---|---|---|---|
| Outcome 1 | 235/302<br><br>77.8% | 237/306<br><br>77.5% | 589/614<br><br>92.7% |
| Outcome 2 | 492/577<br><br>85.3% | 519/599<br><br>86.6% | 501/614<br><br>81.6% |

181

| | | | |
|---|---|---|---|
| | DBHDS plans to expand provider training, update templates, and revise leadership modules and plans a focus group later in 2026 on further reducing administrative burden and identifying additional ways to meet the Term 48 target.<br><br>Based on the most recent QSR results, DBHDS has not met the 95% goal for DSPs and DSP supervisors to complete the training and competency testing required by 12VAC30-122-180 and measured through two outcomes in the QSR process. Findings for Term 48 are deferred until the 29th study pending completion of QSR Round 8. | Developmental Disabilities DSP and Supervisor Complex Support Competencies Checklist dated 10/30/2025.<br><br>DBHDS ran a limited pilot program from November 2025 through February 2026 to evaluate these changes. DBHDS collected feedback through a set of opinion questions. Overall, respondents reported that the revisions made the competencies easier to implement and reduced administrative burden related to completing and documenting competency assessments. Respondents also suggested additional refinements. The feedback generally supported the revised competencies. After the pilot, DBHDS is soliciting more broad public comment on the proposed revisions from April through July 2026.<br><br>DBHDS has identified additional provider training initiatives to further expand provider training across developmental disability services programs, update templates, and revise leadership modules. DBHDS also plans to convene a focus group later in 2026 to gather and analyze provider input on reducing administrative burden related to training requirements and identifying additional approaches to meet the 95% target in Term 48. Additional details on DBHDS provider training improvement initiatives are summarized in Actions 48.a, 48.b, and 48.c below.<br><br>DBHDS continues to work toward the goal that at least 95% of DSPs and DSP Supervisors complete the training and competency testing required by 12VAC30-122-180. Based on the most recent QSR results, DBHDS has not met this goal for Outcome 1 or Outcome 2. Findings for Term 48 are deferred until the 29th study pending completion of QSR Round 8. | |
| 48.a) Within six months of the date of this Order, the Commonwealth shall determine, through a root | DBHDS completed the root cause analysis and PIRW survey required by Action | DBHDS completed a root cause analysis (RCA) and survey coordinated by the Provider Issues Resolution Workgroup (PIRW), with results summarized in the 27th study report. The RCA identified four key areas for follow-up, including high | 27th: Completed |

| | | | |
|---|---|---|---|
| cause analysis developed in collaboration with the provider and system issues resolution workgroups, why Direct Support Professionals and their supervisors do not receive training and competency testing per 12 VAC 30-122-180. | 48.a, identifying four focus areas for further study.<br><br>A Quality Improvement Initiative (QII) was launched to simplify DSP/Supervisor training and testing, and to reduce related administrative burdens. More information about the QII is provided in the Action 48.b section below. | staff turnover, operational challenges in implementing training and competency assessments, the need for simplified methods to document training outcomes, and the need for clearer, more standardized training guidance.<br><br>Based on these findings, DBHDS developed and initiated a Quality Improvement Initiative (QII) to streamline DSP/Supervisor training and testing requirements under 12VAC30-122-180 and reduce associated administrative burdens for providers. Completion of the RCA and the resulting QII development satisfy the requirements of Action 48.a, with additional QII details provided under Action 48.b. | 28th: Completed and Ongoing |
| 48.b)  Based on the findings of the root cause analysis required by Paragraph 48(a), DBHDS will prioritize the findings for quality improvement, taking into account the anticipated impact to the system, including potential negative impacts to current staffing. DBHDS will implement a QII based on its prioritization consistent with continuous quality improvement principles and developed in collaboration with the provider and system issues resolution workgroups. | Based on findings from a root cause analysis conducted in 2024, DBHDS developed and has initiated implementation of a Quality Improvement Initiative that addresses each of the requirements in Action 48.b.<br><br>One element of the QII focuses on simplifying instructions and reducing the related administrative burden for providers by streamlining competency training and testing for DSPs and Supervisors.<br><br>DBHDS conducted a pilot from November 2025 through February 2026 and collected | From the root cause analysis completed as required by Action 48.a, priority focus areas identified for action included:<br>• Streamlining advanced competency areas;<br>• Simplifying specific training materials focusing on improved clarity; and<br>• Providing additional guidance to providers on each of these two priorities.<br><br>The initial effort in this improvement initiative centered on revising the DSP Advanced Competencies for Behavior, Health, and Autism to consolidate, streamline, and modernize the content and delivery. DBHDS described the revisions in a draft Developmental Disabilities DSP and Supervisor Complex Support Competencies Checklist dated 10/30/2025.<br><br>DBHDS ran a limited pilot program from November 2025 through February 2026 to evaluate these changes. DBHDS collected feedback through a set of opinion questions. Overall, respondents reported that the revisions made the competencies easier to implement and reduced administrative burden related to completing and documenting competency assessments. Respondents also suggested additional refinements. The | 27th: In Progress<br><br>28th: Completed and Ongoing |

183

| | | | |
|---|---|---|---|
| | feedback through opinion questions. Respondents reported the revisions were easier to implement and reduced administrative burden for competency assessments. DBHDS is soliciting public comment on the proposed revisions from April through July 2026.<br><br>DBHDS continues working with the Provider Issues Resolution Workgroup to streamline advanced competencies, simplify training materials, and clarify guidance to support compliance with 12VAC30-122-180 (Action 48.b) and to achieve the 95% target set in Term 48. | feedback generally supported the revised competencies. After the pilot, DBHDS is soliciting public comment on the proposed revisions from April through July 2026.<br><br>DBHDS is actively collaborating with the Provider Issues Resolution Workgroup to enhance and refine prioritized initiatives aimed at streamlining advanced competencies, simplifying training materials, and clarifying guidance for providers in order to comply with 12VAC30-122-180 requirements. These ongoing efforts by DBHDS demonstrate continued progress toward fulfilling the requirements of Action 48.b. | |
| 48.c) If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2024, and has not conducted a rate study meeting the requirements of Paragraph 59 in the preceding two years, the Commonwealth will initiate a rate study of Personal Assistance Services, Companion Services, Respite Services, In-Home Support Services, and Independent | The Commonwealth, through the Department of Medical Assistance Services (DMAS), engaged Guidehouse to conduct a rate study of eleven service categories under the Developmental Disability Waiver. Guidehouse's final rate study report, was completed in time to be considered during the 2026 General Assembly session. | As required by Action 48.c, the Commonwealth, through the Department of Medical Assistance Services (DMAS), engaged Guidehouse to conduct a rate study for services under the Developmental Disability Waiver. The study included the five service categories outlined in Term 48.c and six additional services and was completed in time for the 2026 legislative session. | 27th: Completed and Ongoing<br><br>**28th: Completed and Ongoing** |

184

| | | | |
|---|---|---|---|
| Living Support Services by January 1, 2025. The rate study shall be completed in time to be considered during the 2026 legislative session. If the Commonwealth has not achieved the goal as reported in its status update of December 1, 2028, and has not conducted a second rate study meeting the requirements of Paragraph 59, the Commonwealth will initiate a second rate study of Personal Assistance Services, Companion Services, Respite Services, In-Home Support Services, and Independent Living Support Services by January 1, 2029. The rate study shall be completed in time to be considered during the 2030 legislative session. Any rate study required by this paragraph shall be conducted in accordance with Paragraph 59. This paragraph shall not be construed to require the Commonwealth to conduct more than two rate studies. | | | |
| 48.d) If the Commonwealth does not achieve the goal within two years of the date of this Order after taking the actions in Paragraphs 48(a) | No action has been taken yet, as activities outlined in Actions 48.b are in progress. | No action has been taken yet, as activities outlined in Actions 48.b are in progress. | 27th: Not Yet Implemented 01/15/2027 |

185

| | | | |
|---|---|---|---|
| and 48(b), DBHDS will also conduct a root cause analysis and implement a QII as determined appropriate by DBHDS. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | | | 27th: Not Yet Implemented 01/15/2027 |

## RECOMMENDATION(S)

1. **For Term 47**, the Office of Licensing should maintain its approach to enhancing providers' understanding of regulatory requirements for employee training policies by using proven methods and processes consistently applied over the past years. Additionally, sending a targeted information bulletin to all providers could help clarify the policy content requirements for Employee Training. This bulletin might include specific, de-identified examples of policy language that failed to meet the regulatory standards outlined in §450.

2. **For Term 48**, DBHDS should progress with revising advanced competencies in behavior, health, and autism, and begin specialized provider training to spotlight these changes, explaining their purpose and expected results. After QSR Round 8 results are released, DBHDS should concentrate its Quality Improvement Initiative (QII) on areas where data suggests improvements are most needed. This should help increase the percentage of providers meeting the two specified outcomes for DSP and DSP supervisor training and competency development.

186

## **ATTACHMENTS**

## **INTERVIEWS CONDUCTED**

The following individuals provided information for this study through the Teams channel, email correspondence, and/or via telephone contact:

1. Heather Norton, Deputy Commissioner
2. Eric Williams, Assistant Commissioner of Developmental Services
3. Dev Nair, Assistant Commissioner, Division of Quality Assurance and Governmental Relations
4. Jae Benz, Director, Office of Licensing
5. Mackenzie Glassco, Associate Director of Quality and Compliance, Office of Licensing

## **DOCUMENTS REVIEWED**

1. 12VAC35-105-450
2. OL Licensed Services and Definitions Reference Chart
3. 2026 OL Annual Compliance Determination Charts
4. 2026 DD Inspections PowerPoint
5. 2026 Staff Orientation PowerPoints (§§160, 450, 520 & 620)
6. 2026 DD Inspection Procedures
7. 07/2025 OL Internal Protocol for Progressive Actions
8. 2026 OL Q&A for §§160/450/520/620 Inspections Training (12/2025)
9. OL Inter-Rater R3eliability (IRR) Process Description (revised 09/23/2025)
10. IRR CAP Form Template with Dropdowns
11. OL Inter-Rater Reliability (IRR) Process Document (09/24/2025)
12. 07/2025 Inter-Rater Reliability Results Statistical Analysis Summary
13. 07/2025 IRR Process PowerPoint for All-Staff Meeting (10/15/2025)
14. 01/2026 Inter-Rater Reliability Results Statistical Analysis Summary
15. Provider Roundtable: OL Updates and Reminders (01/828/2026)
16. ECTA Standard Operating Procedures (revised 01/23/2026)
17. ECTA February 2026 Update
18. Mandatory Technical Assistance Following Systemic Non-Compliance for Providers of DD Services Memo (07/10/2025)
19. Mandatory Technical Assistance Following Systemic Non-Compliance for Providers of DD Services PowerPoint (10/2025)
20. Mandatory ECTA Protocol (01/23/2026)
21. Consent Agreement ECTA Protocol (01/23/2026)
22. Excel Report - Inspections – 28th Study Period 1/1/26-2/28/26
23. Excel Report - 450 28th Study Period 1/1/26-2/28/26 and CY2025
24. Term 45 Summary

25. Provider Data Summary Report 11/2025 (Finalized 01/26/2026)
26. Advanced DSP Competencies Pilot Interest Survey Announcement (10/14/2025)
27. Advanced DSP Competencies Pilot Training Slides (10/30/2025)
28. DSP and Supervisor Complex Supports Competencies (10/30/2025)
29. DSP Competencies Post Training Annoucement.pdf
30. Complex Competencies Post-Pilot Survey(1-12) Responses as of 2.24.26.xlsx
31. March 26 Update QSR Round 7, providers for DSP Competency training (final).xlsx
32. Approved 7.19.24 DSP SFY24 QII Toolkit
33. QSR Round 7, providers for DSP Competency training (final).xlsx
34. VCU IMU Look Behind Project 2025 Q1 (Jan, Feb, Mar) RMRC Presentation Power-Point
35. OL Look Behind Response to Q1 2025 VCU IMU Report Findings
36. VCU IMU Look Behind Project 2025 Q2 (Apr, May, Jun) RMRC Presentation Power-Point
37. OL Look Behind Response to Q2 2025 VCU IMU Report Findings
38. VCU IMU Look Behind Project 2025 Q3 (Jul, Aug, Sep) Report
39. Calendar Year 2026 VCH IMU Look Behind Project Timeline
40. Sample Inspection Evidentiary Documents from 25 randomly selected providers across all five regions including but not limited to:
    a. Annual licensing inspection report
    b. List of care concerns identified by OL-IMU
    c. Employee Training Policy
    d. CAP Monitoring Procedures and evidence documentation
    e. QI Plan
    f. QI Program Description
    g. QI Tools
    h. Risk Tracking Tool (if utilized)
    i. Quarterly review of serious incidents documentation
    j. Risk Management Plan
    k. Systemic Risk Assessment
    l. Risk Manager Attestation Statement

# APPENDIX G

## Quality and Risk Management
## and
## Quality Improvement Programs

### By

### Rebecca Wright, MSW, LICSW
### Chris Adams, MS

## <u>Quality and Risk Management System 28th Period Study</u>

### Introduction/Background

The Section IV Terms of the Permanent Injunction (PI) approved by the Court on January 15, 2025, require the Commonwealth to work to achieve specified goals and to implement delineated actions regarding quality and risk management. This study will be a follow-up to previous studies that have been completed annually since 2017 regarding the status of the Commonwealth's achievements in these areas. For this 28th Period review, the Parties have agreed to target a total of 14 PI Terms.

Based on the findings at the time of the 26th and 27th Period reviews, the following bullets provide background regarding the key issues DBHDS still needed to address for these 14 Terms during this current Period:

- For PI Term 34, DBHDS continued to address findings identified through the previously conducted root cause analysis, to use the BSPARI tool to determine whether individuals are receiving adequate and appropriate behavioral support services, and to employ at least four behavior analysts to provide technical assistance and training on behavioral support plans. However, despite continuing steady improvement, DBHDS data demonstrated it had not yet achieved the 86% specified goal for providing adequate and appropriate behavioral support services to individuals with identified behavioral support needs.
- For PI Term 40 (i.e., annual dental exams), DBHDS made progress on Actions to expand dental resources and capacity, but data indicated that the Commonwealth did not yet achieve 86% of people supported in residential settings who received annual dental exams.
- DBHDS did not achieve the 95% specified goal for PI Term 41. Despite some ongoing improvements to the documented processes related to the percentage of individuals protected from serious injury, continuing methodological deficiencies still existed that DBHDS needed to address. The identified methodologies were not yet adequate to produce valid data. As previously documented, DBHDS's defined numerator still relied heavily on serious injury investigations to determine if an individual was or was not protected, and only those investigations that result in a corrective action plan (CAP) are deemed to show an individual was not protected. However, as also previously documented, the processes for making a referral remained ambiguous at times, and still did not support a reliable evaluation of pre-injury circumstances, as opposed to actions the provider took after the injury to ensure health and safety in the future. The Office of Integrated Health Support Network (OIHSN) completed an initial monthly quality review of a statistically significant sample of serious injuries reported to DBHDS to determine if the Incident Management Unit (IMU) process used by the DBHDS Office of Licensing (OL) adequately identifies all appropriate injuries to determine if individuals were protected from harm, and if changes are needed to the way incidents are reviewed and referred. The initial OIHSN findings, that almost 70% of the incidents reviewed did not have enough detail to make a determination, could also be indicative of a problem with validity of the measure.
- For PI Terms 42, 45, and 55, DBHDS did not meet the specified outcomes in the 27th study period. The Office of Licensing has implemented an updated inter-rater reliability

process for licensing specialists since July 2025, focusing on inspection findings related to quality improvement and risk management regulations. The Office of Licensing is providing targeted training and technical assistance to address regulatory compliance inconsistencies and encouraging providers to use its Risk Tracking Tool template to improve data practices. In partnership with the Office of Licensing, the Office of Clinical Quality Improvement is continuing its  Expanded Consultation and Technical Assistance processes to help providers strengthen their quality improvement and risk management functions and achieve more consistent regulatory compliance

- For PI Term 43, the Commonwealth did not yet show performance that achieved the 86% goal of individuals with timely Waiver service enrollment. However, most recent data reported represented a positive upward trend from previous reporting, particularly since DBHDS's implementation of quarterly contact with individuals who had not been enrolled in a service within five months, as well as their families and case managers, to determine why services had not been initiated and what barriers delayed initiation of services.

- For PI Term 44, DBHDS did not yet meet this Term's requirements because it did not include annual data and analysis regarding the management needs of individuals with identified adaptive support needs, did not yet achieve an adequate annual sample for individuals with complex medical needs or behavioral support needs,  or yet provide for an adequate system for corrective action tracking and appropriate revision across the whole population. The Department continued to implement an annual monitoring process known as the Intensive Management Needs Review (IMNR) to gather and analyze data regarding individuals with complex health support needs, and for the first time, also individuals with complex behavioral support needs. DBHDS reported planning to incorporate data specific to individuals with complex adaptive support needs in the IMNR beginning with the 29th Period. DBHDS produced the *Ongoing Service Analysis Report: Individuals with Complex Health, Behavioral and Adaptive Support Needs FY 2024 (2024 Ongoing Service Analysis Report)* that incorporated data from the 2024 IMNR process for individuals with complex medical needs, data from the care concerns process, data from the BSPARI quality reviews, and data from the Quality Service Reviews.  It did not yet include specific data regarding individuals with identified complex adaptive support needs, nor was the sample size large enough for individuals with complex medical needs. In addition, the Department's remediation process (i.e., the system of tracking efficacy, making revisions as necessary, and confirming that identified deficiencies are resolved) was not yet sufficiently completing these functions across all the required populations. Also, the *2024 Ongoing Service Analysis Report* did not yet clearly "consolidate" (i.e., combine various elements to create a single, more effective whole) the data from its various sources  to provide a comprehensive summary of the management and support provided to individuals with complex needs. The summary section did not cross-reference or provide comparisons of data from the various sources that might serve to illuminate either gaps in services or opportunities for cross-learning.

- Based on self-reported data, the DBHDS did not achieve the 86% threshold required by Term 45. Year-over-year data through CY2024 indicated a decline in Virginia achieving the 86% threshold for the sub-regulations. The compliance determination for this PI was deferred as data for CY2025 were not yet available for review.

191

- For PI Term 46, based on results of a comparative sampling process completed by the consultant during the 27th Period, DBHDS did not meet the requirements because the data derived from the Round 7 QSR process could not yet be deemed reliable.  The study found that for the 36 providers in the sample, the overall agreement with QSR findings related to quality improvement was only 65%.  It was positive, though, that this percentage had improved since the previous sampling during the 25th Period.  For this 28th Period, the Round 8 QSR will not yet be complete; therefore, no new data will be available for further analysis and this study will defer updating the compliance finding until the 29th Period. During the 28th Period, the consultant will continue to collaborate with DBHDS staff to ensure the QSR tool continues to be a valid measurement methodology and to enhance reliable data collection.  Otherwise, DBHDS continued to offer a very successful Expanded Consultation and Technical Assistance (ECTA) to providers who have licensing deficiencies for *12VAC35-105-520, 12VAC35-105-620 12VAC35-105-450,* and for providers who receive a QSR QIP for provider collection and tracking of performance data (e.g., serious incident and other risk information, etc.)
- DBHDS did not achieve the 95% specified goal for PI Term 49. Virginia did not provide an updated metric report, citing a need for more time to adequately validate the related QSR results.  In addition, the Department still needed to develop a well-defined description of the overall QSR procedure for determining compliance with the requirements of the CMS Settings Rule and related guidance, consistent with the Commonwealth's approved Statewide Transition Plan. DBHDS staff planned to complete the validations by the end of October 2025 and to provide a summary report for review during this 28th study period. For initial compliance validations, DBHDS submitted a new document entitled *HCBS Setting Rule Initial Determination.* However, it needed a more fleshed out methodology for data collection and aggregation, as well as to reflect consistency with the initial validation processes in its approved Statewide Transition Plan (STP) and the requirements of the HCBS Settings Rule and related CMS guidance. DBHDS also still needed to finalize several pending actions to demonstrate valid and reliable data for ongoing monitoring of HCBS compliance, including the finalization of the QSR tools DBHDS uses for that purpose and the updating of the Process Document to reflect the adequacy of a ten percent look-behind as a means of validating the QSR data.  It was positive that DBHDS responded to a previously-cited need and provided a Process Document for the use of the data from the QSR, WaMS, CONNECT and the HCBS Master Tracking Spreadsheet maintained by DMAS.
- Regarding PI Term 52 and 53, DBHDS did not meet the specified outcomes for either of these Terms during the 27th study period. It's Office of Human Rights has implemented an updated inter-rater reliability process for its Community Look-Behind Reviews in August 2025. Additionally, this Office is continuing its Quality Improvement Initiative under the guidance of the Risk Management Review Committee, with a focus on attaining and sustaining the objective that 86% of the allegations of abuse, neglect, and exploitation sampled by the RMRC comply with the audit criteria.
- DBHDS did not yet meet PI Terms 56 and 57 because the QRT did not address the chronic underperformance of one of its measures over the course of several years, even though this study previously brought it to their attention. This prevented a finding that the Commonwealth had achieved the requirements of both Term 56 and  Term 57, because

the Commonwealth did not develop, monitor and/or revise needed remediation for waiver performance measures, as required.   However, the Commonwealth made significant progress during the 27th period in the implementation of its Waivers' Quality Improvement Plan, particularly evidenced by the continued implementation of its very useful tool entitled *QRT Remediation Tracker* and a revised draft *QRT Charter.* Overall, the implementation of the *QRT Remediation Tracker* provided good examples of the implementation of the quality improvement cycle. Going forward, it appeared the QRT had processes in place to achieve the requirements in the future, once consistently implemented.

**Study Methodology**

The Consultants who conducted prior studies on the Terms related to quality and risk management and quality improvement programs also conducted the 28th period study. The study sought to gather and investigate facts and verify data and documentation provided by the Commonwealth to determine whether the sufficiency of the Commonwealth's actions  resulted in Virginia achieving the specified goals of each of the PI Terms described in the previous section.  This study reviewed documentary evidence of data collection and actions related to the Commonwealth's compliance efforts since 10/1/25. This study's methodology included a review of the documents that Virginia maintains to demonstrate that it has achieved the PI's specified goals and completed the required actions; interviews with state officials, subject matter experts, and stakeholders; and verification that Virginia's relevant Process Documents and Attestations are complete.

Evidence gathering included:
- Review of documentary evidence provided by the Commonwealth specific to the achievement of the specified goal and implementation of listed actions set out in each Term.
- Review of any changes that have been made to policies, procedures, and/or practices relating to the goals and actions in the applicable Terms listed above.
- The 28th study was conducted early in the CY2026 annual licensing inspection cycle. Accordingly, an abbreviated comparative review was conducted for a sample of 25 licensed providers and CSBs who underwent an annual licensing inspection between January 1 and February 28, 2026. This review concentrated on compliance determinations by licensing specialists for risk management and quality assurance/improvement regulations at *12VAC35-105-450, 520*, and *620,* as outlined in Terms 42, 45, and 55. The outcomes from this analysis will be integrated into a broader comparative review during the 29th study, which will take place after completion of the majority of the CY2026 annual licensing inspection cycle.
- A comparative review to investigate and verify the data quality related to Term 44.
- For Terms that rely on data to demonstrate compliance, the data validation process included review and analysis of documents described above for each Term.  The data validation process included review and analysis of documents focusing on:
  - Threats to data integrity previously identified by DBHDS assessments.
  - Actions taken by DBHDS that resolved these problems including completion dates for those activities.

o   Review of the verification process that DBHDS completed that confirmed that the data reported is reliable and valid.
o   The Commonwealth's current Attestation that the Process Document was properly completed, that the threats were sufficiently mitigated, and that the data reported are reliable and valid.

**Study Findings**

Regarding the assessment of requirements related to **Behavioral Support Services (Term 34)**, for this 28th Period, DBHDS reported data that represented significant progress, and, for the first time, exceeded the required threshold for Term 34.  Based on the *Behavioral Supports Report: Q3/FY26*, and using the approved calculation methodology, DBHDS reported that 1702 people needed this service in FY26Q1 and Q2 (July-December 2025). Of the total, 1567 received the service (92%). Of the total, 135 did not receive the service (8%).  Further, the report documented that in FY26Q1 and Q2, 90% received adequate services and 10% (172/1702) received inadequate or no services.  The Process Document and Data Set Attestation remained adequate for data validity and reliability. DBHDS continued to address findings identified through the previously conducted root cause analysis, to use the BSPARI tool to determine whether individuals are receiving adequate and appropriate behavioral support services, and to employ at least four behavior analysts to provide technical assistance and training on behavioral support plans.

Regarding the assessment of requirements related to **Dental Exams (Term 40)**, DBHDS did not meet the specified goal of this Term because its data indicated that the Commonwealth did not yet achieve 86% of people supported in residential settings who received annual dental exams. DBHDS submitted a *Dental Report.28 Review*, dated 3/13/26. It indicated that for the last four reported quarters (i.e., FY25 Q3/Q4 and FY26 Q1/Q2), quarterly performance averaged 71.3%, which continued a steady upward trend.  DBHDS staff continued to make progress on Actions to expand dental resources and capacity, and to address barriers to dental care.  It was positive that documentation noted progress for five CSBs that have had the lowest percentage of individuals receiving annual dental exams for multiple years. Since FY21, four of those five have seen an increase of those receiving annual dental exams between nine and eleven percent, while a fifth has seen an increase of 30.58%.

Regarding the assessment of requirements related to **Protection From Serious Injuries in Service Settings (Term 41)**, DBHDS still did not achieve data validity and reliability. DBHDS staff reported they did not make any additional modifications to the previously-provided methodology for determining the percentage of individuals that are protected from serious injury, but, as previously reported, those processes did not support a reliable evaluation of the presence of pre-injury supports, which formed the foundation of the Commonwealth's definition for what constituted "protection." Instead, the Department's processes continued to focus on the actions the provider took after the injury to ensure health and safety in the future, and was ambiguous at times about pre-injury circumstances. Therefore, DBHDS could not demonstrate that all appropriate serious injuries (i.e., those without clear documentation that pre-injury protections were in place) received an SIU investigation.  Although DBHDS reported

194

a 40% increase in the number of SIU investigations for 2025 over 2024, the overall percentage of serious injury investigations remained very low (i.e., 3.6% in 2024 vs. 5.9% in 2025.) In addition, the preliminary results of the 28th Period OIHSN look behind review (the *IMU/SIR Project Update*) supported the need to implement additional process improvements to ensure appropriate evaluation of pre-injury supports and subsequent referrals for investigation.  The findings called into question the accuracy of the very low actual SIU investigation rate of 5.9%. For example, for the incidents that involved a known risk at the time of injury, 71% of the applicable ISPs identified supports/protocols that were reasonably sufficient to prevent the incident, but 29% did not. For 57% of the incidents, the incident report provided an indication that the needed supports were not provided in accordance with ISP support/protocols.  In keeping with DBHDS's definition of "protection from serious injury," the 29% with identified risks but insufficient supports required a referral for investigation.  Likewise, the 57% of incidents that showed needed supports were not provided in accordance with ISP support/protocols also required an investigation.

With respect to the evaluation of requirements outlined in **Terms 42, 45, and 55**, pertaining to provider risk management and quality assurance/improvement functions under regulations at *12VAC35-105-520* and *620*, the Consultant performed an abbreviated sample review of 25 provider annual licensing inspections conducted across five regions between January 1 and February 28, 2026. This abbreviated review was necessitated by the timing of the 28th study, which occurred early in the CY2026 annual licensing inspection cycle. The purpose of the sample review was to assess whether, upon examination of the same provider documentation reviewed by the licensing specialist, the Consultant concurred with the determinations made by the Licensing Specialist. As the sample size was insufficient to generalize the findings, the determination of whether the provisions of these Terms were achieved is being deferred to the 29th study. Findings from this abbreviated sample review will be combined with the results of a larger sample comparative review during the 29th study, scheduled after the completion of the majority of the CY2026 annual licensing inspection cycle.

Regarding the assessment of requirements related to **Timely Waiver Service Enrollment (Term 43)**, DBHDS continued to track and report quarterly data on the number of individuals who are assigned a waiver slot but were not enrolled in a service within five months.  The Commonwealth achieved the specified goal of this Term for the first time. The combined data for most recently reported two quarters  (i.e., FY25, Q4 and FY26 Q1) showed that 89.4% (807/903) were enrolled within 150 days of assignment. During this period, DBHDS produced two *Quarterly Timely Waiver Service Enrollment Report*s, for the first and second quarters of 2026 respectively.  Both reports indicated the primary barrier to enrollment within 150 days was Case Manager/CSB issues or delay, or lack of education from CSB to individual/family. The reports indicated DBHDS continued to address these issues through a Quality Improvement Initiative (QII) and monthly correspondence to the CSBs.

Regarding the assessment of requirements for **Ongoing Service Analysis (Term 44)**, for this 28th Period, DBHDS did not yet meet the requirements of Term 44 because it did not include annual data and analysis regarding the management needs of individuals with identified complex adaptive support needs or yet provide for an adequate system for corrective action tracking and

195

appropriate revision across the whole population.  DBHDS did produce the *Ongoing Service Analysis Report: Individuals with Complex Health, Behavioral and Adaptive Support Needs FY 2025*, as well as the *PI44 - Intense Management Needs Review (IMNR)Report, 27th Review Period*. During the 29th Period, DBHDS is planning to focus the IMNR process on individuals with identified complex adaptive support needs for two consecutive rounds.  DBHDS also provided a *Summary of Ongoing Service Analysis Sample Size* to demonstrate an adequate overall sample for analysis; however, going forward, the challenge will be to ensure that number encompasses a sufficient number from each population of individuals with identified complex behavioral, health, and adaptive support needs. In addition, DBHDS was taking steps to standardize data categories across multiple data management platforms, including corrective action trackers, to facilitate data aggregation and comparison.

With regard to the Term's requirements for corrective actions, study findings were mixed. The *2025 Ongoing Service Analysis Report* reported improvements for DBHDS's efforts to  develop track the efficacy of and revise corrective actions as needed across some systems (e.g., QSR and Skilled Nursing), but Independent Reviewer's 28th Period *Individual Services Review (28th ISR)* continued to identify deficiencies that resulted in only 78% of the identified issues reviewed having yet been effectively addressed.  It was very positive, then, that DBHDS modified the related Process Document (i.e., *Intense Management Needs Review Process – PI44, Version 003, dated 4/9/26*), to add steps for escalation of follow-up as needed to the Assistant Commissioner of Developmental Services and then to  Deputy Commissioner for Community Services.

Regarding the assessment of requirements related to **Quality Service Monitoring (Term 46)**, in addition to data from licensing reviews, DBHDS continued to collect data through the Round 8 QSR PQR tool to identify providers that have been unable to demonstrate adequate quality improvement programs.  Round 8 QSR data can be considered valid (i.e., that it measures what it purports to measure).  However, for this 28th Period, Round 8 QSR was ongoing and DBHDS could not yet provide new data for sampling to establish data reliability. As a result, this study will defer a compliance finding for this Term until the 29th Period, when Round 8 data will be available to complete a comparative sample. DBHDS provided a revised 28th Period Process Document with needed updates to provide a detailed step-by-step process describing what will be done to monitor and improve the process as time progresses and to establish processes for validating QSR results against other business area data collected. It was also again positive that DBHDS continued to offer the very successful Expanded Consultation and Technical Assistance (ECTA) related to provider quality improvement (QI) programs.

Regarding the assessment of requirements related to **Residential Services Community Integration (Term 49)**, for this 28th Period, DBHDS did not meet the requirement of this Term because it did not yet submit documentation that demonstrated reliable and valid data for either initial compliance validation or for ongoing compliance. DBHDS submitted a DMAS memorandum, dated 2/10/26, entitled *Home and Community-Based Settings (HCBS) Rule Compliance Post December 31, 2025*, which indicated that the Commonwealth "successfully completed the initial compliance reviews of all services required to comply" with the Home and Community Based Settings (HCBS) Regulation (42 CFR 441.301(c)(4)).  However, DBHDS did not submit

any updated documents to show that the data collection processes clearly met the requirements to obtain valid and reliable data, nor had  CMS yet issued a Settings CAP Completion letter to confirm the Commonwealth's compliance for the initial validations. Therefore, the study could not confirm the assertion of compliance with this requirement.

DBHDS also still needed to finalize several pending actions to demonstrate valid and reliable data for ongoing monitoring of HCBS compliance. DBHDS submitted revised PQR and PCR tools for QSR Round 8, with new elements that improved the probing of HCBS  compliance requirements.  Overall, this represented progress since the 27th Period.  However, to inform a full evaluation of the QSR tools, it continued to be necessary for DBHDS to provide a clearly stated methodology or crosswalk that showed how the Commonwealth purported to measure each of the HCBS requirements, including those it committed to in response to the CMS Site Visit in 2024. The tools DBHDS used also continued to include HCBS-related elements that have only text field responses, but did not yet provide a methodology for how to evaluate those responses for HCBS compliance.  DBHDS staff reported that this was a work in progress and that they were still engaged in a qualitative analysis in order to make these determinations.

With regard to assessing requirements for the **Look-Behind Analysis of Abuse, Neglect, and Exploitation Allegations (Term 52)** and **Data Samples from Look-Behind Analyses of Serious Incidents and Allegations (Term 53)**, findings show that the Commonwealth has not yet achieved the 86% outcome threshold needed for successful implementation of the Community Look-Behind Review. Nevertheless, the Department has strengthened the inter-rater reliability aspect of the community look-behind review process and is continuing to develop and implement additional initiatives to ensure that 86% of the sample of allegations of abuse, neglect, and exploitation reviewed by the Risk Management Review Committee meet criteria reviewed in the audit.

Regarding the assessment of requirements related to **Data-Driven Quality Improvement Plans for HCBS Waiver Programs (Term 56 and  Term 57)**, for this 28th Period, DBHDS did not meet the specified goals for Term 56.  DBHDS provided evidence that the QRT met twice, on 10/23/25 and 1/22/26, but did not demonstrate that the QRT determined trends or discussed quality improvement strategies at both meetings. However, DBHDS achieved the requirements of Term 57.  The QRT met twice during the 28th Period, on 10/23/25 and 1/22/26.  Review of the meeting minutes for the 1/22/26 QRT meeting evidenced that the members reviewed underperforming measure data and, for measures that fell below the CMS-established 86% standard, members discussed applicable remediation plans in the form of DBHDS QIIs and other initiatives, explored next steps for developing such plans and/or explicitly determined that remediation was not appropriate at that time. When the QRT made a determination that remediation was not needed, the documentation provided an appropriate rationale for not undertaking remediation at that time (e.g., results skewed by small sample sizes and one-off occurrences based on a single provider that did not appear to be indicative of a systemic issue.)  For each of seven performance measures that underperformed for FY25, as documented in the *QRT End of Year Report SFY 2025*, both the 1/22/26 meeting minutes and the Remediation Tracker documented QRT discussion regarding remediation plans. This included documentation showing that for performance measure G1, DMAS had

undertaken an RCA to develop a better understanding of barriers to ambulatory or preventive care visits for individuals under 19 years of age. While DBHDS did not provide documentation to demonstrate the QRT captured any discussion for the 10/23/25 meeting regarding remediation plans for measures that fell below the CMS-established 86% standard, either in the meeting minutes or the Remediation Tracker, Term 57 only requires that the QRT monitors remediation plans at least every six months, and make any needed revisions at that time. Based on the documentation in the Remediation Tracker, as well as the previous findings for the 27th Period, the QRT accomplished these actions in August 2025 and again in January 2026, which fulfilled the minimum six month requirement.

The tables below provide additional detail. Table 1 summarizes the status of Virginia's achievement of the specified goal for each PI Term studied for this 28th Period report, while Table 2 provides a full description of the facts gathered and the analysis and conclusions for each Term and its specified Action(s). Table 2 also provides the comparative ratings for the 27th and 28th Periods.

| TABLE 1 | |
|---|---|
| **Term** | **28th** |
| **34. Behavioral Support Services.** The Commonwealth will work to achieve a goal that 86% of individuals with identified behavioral support needs are provided adequate and appropriately delivered behavioral support services. | **Achieved** |
| **40. Dental Exams**. The Commonwealth will work to achieve a goal that 86% of individuals who are supported in residential settings and have coverage for dental services will receive an annual dental exam. | **Not Achieved** |
| **41. Protection From Serious Injuries in Service Settings.** The Commonwealth will work to achieve a goal that 95% of DD waiver service recipients will be protected from serious injuries in service settings. | **Not Achieved** |
| **42: Risk Management.** To ensure that the risk management programs of DBHDS-licensed providers of DD services identify the incidence of common risks and conditions faced by people with DD that contribute to avoidable deaths and take prompt action when such events occur, or the risk is otherwise identified. | **Deferred** |
| **43. Timely Waiver Service Enrollment**. The Commonwealth will work to achieve a goal that 86% of individuals who are assigned a waiver slot will be enrolled in a service within five months. | **Achieved** |
| **44. Ongoing Service Analyses.** The Commonwealth, through DBHDS, will collect and analyze data at least annually regarding the management needs of individuals with identified complex behavioral, health, and adaptive support needs to monitor the adequacy of management and supports provided. DBHDS will develop corrective actions based on its analysis as it determines appropriate, track the efficacy of the actions, and revise as it determines necessary to address the deficiency. | **Not Achieved** |
| **45: DD Service Providers' Compliance with Administrative Code.** The Commonwealth will work to achieve a goal that at least 86% of DBHDS-licensed providers of DD services comply with 12 VAC 35-105-620 in effect on the date of this Order or as may be amended. | **Deferred** |

198

| TABLE 1 | |
|---|---|
| **Term** | **28th** |
| **46. Quality Service Monitoring**.  The Commonwealth will work to ensure that, using information collected from licensing reviews and Quality Service Reviews, it identifies providers that have been unable to demonstrate adequate quality improvement programs and offers technical assistance as necessary. | **Deferred** |
| **49. Residential Services Community Integration.**  The Commonwealth will work to achieve a goal that 95% of residential service recipients reside in a location that is integrated in, and supports full access to, the greater community in compliance with the CMS rule on HCBS settings. | **Not Achieved** |
| **52: Look-Behind Analysis of Abuse, Neglect, and Exploitation Allegations.**  The Commonwealth will continue its Community Look-Behind (CLB) review process to achieve a goal of collecting sufficient data for the Risk Management Review Committee (RMRC) to conduct or oversee a look-behind review of a statistically valid, random sample of reported allegations of abuse, neglect, and exploitation.  The review will evaluate whether:  (i) investigations of individual incidents occur within state-prescribed timelines; (ii) the person conducting the investigation has been trained to conduct investigations; and (iii) corrective action plans are implemented by the provider when indicated.  The RMRC will review trends at least quarterly, recommend QIIs when necessary, and track implementation of initiatives approved for implementation. | **Not Achieved** |
| **53: Samples of Data from Look-Behind Analyses of Serious Incidents and Allegations of Abuse, Neglect, and Exploitation.**  The Commonwealth will work to achieve a goal of showing 86% of the sample of serious incidents reviewed by the RMRC meet criteria reviewed in the audit and that at least 86% of the sample of allegations of abuse, neglect, and exploitation reviewed by the RMRC meet criteria reviewed in the audit.  The Commonwealth will continue the look behind process and provide feedback to the RMRC related to its findings.  If this goal is not met by December 31, 2024, DBHDS will conduct a root cause analysis and implement a QII. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | **Not Achieved** |
| **55: Assessment of Licensed Providers of DD Services.**  The Commonwealth will work to achieve a goal that at least 86% of DBHDS-licensed providers of DD services have been assessed for their compliance with risk management requirements in the Licensing Regulations during their annual inspections.  DBHDS will continue to conduct annual licensing inspections in accordance with Virginia Code § 37.2-411 in effect on the date of this Order or as may be amended and assess provider compliance with risk management requirements in the Licensing Regulations utilizing the Office of Licensing Annual Compliance Determination Chart. | **Deferred** |
| **56. Data-Driven Quality Improvement Plans for HCBS Waiver Programs**.  The Commonwealth will continue to implement the Quality Improvement Plan approved by CMS in the operation of its HCBS Waivers.  The DMAS-DBHDS Quality Review Team (QRT) will meet quarterly in accordance with the CMS-approved Quality Improvement Plan and will review data, determine | **Not Achieved** |

| TABLE 1 | |
|---|---|
| **Term** | **28th** |
| trends, and implement quality improvement strategies where appropriate as determined by the QRT to improve performance. | |
| **57. Data-Driven Quality Improvement Plans for HCBS Waiver Programs**.  The Commonwealth will continue to collect quarterly data on the following measures:  (i) health and safety and participant safeguards; (ii) assessment of level of care; (iii) development and monitoring of individual service plans, including choice of services and of providers; (iv) assurance of qualified providers; e) whether waiver enrolled individuals' identified needs are met as determined by DMAS QMR; and (v) identification, response to incidents, and verification of required corrective action in response to substantiated cases of abuse/neglect/exploitation.  This data will be reviewed by the DMAS-DBHDS Quality Review Team.  Remediation plans will be written and remediation actions implemented, as necessary, for those measures that fall below the CMS-established 86% standard.  DBHDS will provide a written justification for each instance where it does not develop a remediation plan for a measure falling below 86% compliance.  Quality Improvement remediation plans will focus on systemic factors (where present) and will include the specific strategy to be employed, as well as defined measures that will be used to monitor performance.  Remediation plans will be monitored at least every six months.  If such remediation actions do not have the intended effect, a revised strategy will be implemented and monitored. | **Achieved** |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| **34. Behavioral Support Services.** The Commonwealth will work to achieve a goal that 86% of individuals with identified behavioral support needs are provided adequate and appropriately delivered behavioral support services. | For this 28th Period, DBHDS reported data that showed that it achieved compliance with Term 34.<br><br>Based on the *Behavioral Supports Report: Q3/FY26,* and using the approved calculation methodology, DBHDS reported that 1702 people needed this service in FY26Q1 and Q2. Of the total, 1567 received the service (92%). Of the total, 135 did not receive the service (8%).  Further, the report documented that in FY26Q1 and Q2, 90% received adequate services and 10% (172/1702) received inadequate or no services. | At the time of the 27th Period review, based on documentation in the *Behavioral Supports Report: Q1/FY26,* and using the approved calculation methodology, DBHDS reported that for the entirety of FY25, 80% (2334/2911) of individuals with identified behavioral support needs received adequate services and 20% (577/2911) received inadequate or no services. This remained below the required threshold for Term 34, but represented significant DBHDS progress overall.<br><br>For this 28th Period, based on documentation in the *Behavioral Supports Report: Q3/FY26 (BSR Q3/FY26,* and using the approved calculation methodology, DBHDS reported that 1702 people needed this service in FY26Q1 and Q2. Of the total, 1567 received the service (92%). Of the total, 135 did not receive the service (8%).  Further, the report documented that in FY26Q1 and Q2, 90% received adequate services and 10% (172/1702) received inadequate or no services.  This again represented significant DBHDS progress, and, for the first time, exceeded the required threshold for Term 34 for the data reported for this Period.<br><br>At the time of the 26th Period, DBHDS submitted an updated Process Document *DD Therapeutic Consultation BS Ver 007,* dated 10/2024 and a Data Set Attestation dated 3/30/25.  For this 28th Period, these documents remained current and were adequate for data validity and reliability.<br><br>. | 27th: Not Achieved<br><br>**28th: Achieved** |

201

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | This again represented significant DBHDS progress, and, for the first time, exceeded the required threshold for Term 34 for the data reported for this Period.<br><br>At the time of the 26th Period, DBHDS submitted an updated Process Document *DD Therapeutic Consultation BS Ver 007,* dated 10/2024 and a Data Set Attestation dated 3/30/25.  For this 28th Period, DBHDS reported these documents remained current and were adequate for data validity and reliability. | | |
| 34 a) DBHDS will continue to address findings identified | For this 28th Period, DBHDS completed these ongoing | For this 28th Period, DBHDS completed these ongoing requirements. The *BSR Q3/FY26* updated previously reported findings identified through its initial root cause analysis.  For the following topics, it included updates dated 4/2026: | 27th: Completed and Ongoing |

202

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| through the previously conducted root cause analysis initiated in Q1 of FY21 and updated subsequently as part of each semi-annual review. | requirements.  The *Behavioral Supports Report: Q3/FY26 (BSR Q3/FY26)* updated previously reported findings identified through its previously conducted root cause analysis.<br><br>It included updates dated 4/2026 for the following topics: Training, Task Clarification & Prompting, Resources, Materials, & Processes, Behavioral Resources, Performance Consequences, Effort, & Competition, Gap Analysis and Quality Assurance.<br><br>These updates demonstrated that DBHDS continued to address findings | • Training:  For this 28th Period, the *BSR Q3/FY26* reported that DBHDS continued real-time bi-weekly data sharing with the eight lowest performing CSBs.  As planned, in order to learn more about current barriers, DBHDS met with five of the CSBs in FY26 Q2 that did not demonstrate sufficiently improved performance. Although the meetings did not result in modifications to the CSBs' action steps, trend data for this period demonstrated that seven of the eight CSBs improved their pre and post intervention performance.  In addition, the eighth CSB also was able to achieve the target 86% in the two final months of the reporting period. DBHDS continues to track status of CSBs' completed or ongoing action steps for training of support coordinators (i.e., to ensure awareness of the 30-day requirement and how to use the search engine.)<br>• Task Clarification & Prompting: In addition to the activity described above, since October 2025, there have been 17 provider modifications to the search engine for therapeutic behavioral consultation providers.<br>• Resources, Materials, & Processes: The *BSR Q3/FY26* indicated there are now 115 providers, which is an increase of five providers since the last report. DBHDS has also provided technical assistance to 11 providers regarding enrollment with Medicaid for this service. For this period, there been no additional requests for Jump Start funding from behaviorists.<br>• Behavioral Resources: These continue to include the training efforts described elsewhere in this set of bullets, educational newsletters, regional meetings and DBHDS website articles on behavioral science topics. | **28th: Completed and Ongoing** |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | identified through the previously conducted root cause analysis and updated related activities as part of the semi-annual review.<br><br>Although the *BSR Q3/FY26* did show some possible provider capacity loss in three regions (i.e., Central, Eastern and Southwestern) since the 27th Period, DBHDS continued to document provider capacity well beyond the projected need for behaviorists per the 6/23 Gap Analysis. In addition, overall, there are now 115 providers, which is an increase of five providers since the last report. DBHDS has also provided technical assistance to 11 | • <u>Performance Consequences, Effort, & Competition</u>: DBHDS's *BSR Q3/FY26* stated the updates in the "Training" section, as described above provide the initial results and next steps on data sharing with the eight CSBs.<br>• <u>Gap Analysis</u>: DBHDS continues to encourage provider growth and expansion, as noted under the <u>Resources, Materials, & Processes</u> bullet above. Based on documentation in the *BSR Q3/FY26* and summarized in the table below, the *BSR Q3/FY26* did show some possible capacity loss in three regions (i.e., Central, Eastern and Southwestern) since the 27th Period.  However, DBHDS continued to document provider capacity well beyond the projected need for behaviorists per the 6/23 Gap Analysis. In interview, DBHDS staff reiterated that many variables might contribute to timely connection to services and that they planned to further  review data to identify additional CSBs that might need support in this area and the respective root causes (i.e., which might or might not include provider capacity.)<br><br><table><tr><td>Region</td><td>Possible number of additional behaviorists needed per 6/23 gap analysis</td><td>Provider count change since FY23Q1 analysis (3/2026)</td></tr><tr><td>Central</td><td>3</td><td>+22</td></tr><tr><td>Eastern</td><td>2</td><td>+13</td></tr><tr><td>Northern</td><td>3</td><td>+27</td></tr><tr><td>Southwestern</td><td>1</td><td>+9</td></tr><tr><td>Western</td><td>2</td><td>+20</td></tr></table> | |

204

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | providers regarding enrollment with Medicaid for this service.<br><br>Quality Assurance efforts continued to focus on the continuing BSPARI reviews, as described in Action 34 b) below, and the evaluation of support coordinator accuracy in assessing behavioral programming using the On-Site Visit Tool (OSVT).<br><br>With regard to the latter effort, the *BSR Q3/FY26* documents that in FY26Q2-FY26Q3, support coordinators  scored 75% of OSVTs correctly related to behavioral supports, again showing | • Quality Assurance: These efforts continue a focus on the continuing BSPARI reviews and the evaluation of support coordinator accuracy in assessing behavioral programming using the On-Site Visit Tool (OSVT). With regard to the latter effort, the *BSR Q3/FY26* documents that in FY26Q2-FY26Q3, support coordinators  scored 75% of OSVTs correctly in this area, again showing improvement from the previous period (i.e., 58%). | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | improvement from the previous period (i.e., 58%). | | |
| 34 b) DBHDS will continue to use the BSPARI tool, or such other tool designed for behavioral programming that the parties agree upon, to determine whether individuals are receiving adequate and appropriate behavioral support services. | For this 28th Period, based on reporting in the *BSR Q1/FY26*, DBHDS successfully completed this ongoing action. Based on reporting in the *BSR Q3/FY26*, during FY26 Q2 through FY26 Q3, DBHDS continued to use the BSPARI tool to determine whether individuals are receiving adequate and appropriate behavioral support services. During that period, DBHDS behavioral staff reported reviewing 196 plans. For FY26 Q1 through Q3, DBHDS reported that | For this 28th Period, DBHDS successfully completed this ongoing action. Based on reporting in the *BSR Q3/FY26*, during FY26 Q2 through FY26 Q3, DBHDS continued to use the BSPARI tool to determine whether individuals are receiving adequate and appropriate behavioral support services. During that period, DBHDS behavioral staff reported reviewing 196 plans. For FY26 Q1 through Q3, DBHDS reported that behavioral staff reviewed a total of 271 plans. | 27th: Completed and Ongoing<br><br>**28th: Completed and Ongoing** |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | behavioral staff reviewed a total of 271 plans. | | |
| 34 c) DBHDS will continue to employ a total of four behavior analysts to provide technical assistance and training on behavioral support plans. Annually, the behavior analysts will (i) review a statistically significant sample of the behavioral plans submitted; (ii) provide feedback; and (iii) identify trends for improvement and develop additional training and technical assistance as determined necessary by DBHDS. | For this 28th Period, DBHDS reported completing the ongoing requirements for this Action.<br><br>Based on reporting in the *BSR Q3/FY26,* The Office of Behavior Network Supports currently employs five Board Certified and Licensed Behavior Analysts, which exceeds the requirement.<br><br>The *BSR Q3/FY26* also provided data and information regarding achievement of the additional annual requirements for this Action. | Based on reporting in the *BSR Q3/FY26,* The Office of Behavior Network Supports continues to employ five Board Certified and Licensed Behavior Analysts, which exceeds the requirement.<br><br>The *BSR Q3/FY26* also provided the following data and information regarding achievement of the additional annual requirements for this Action:<br>  i.  As reported above with regard to Action 34b), DBHDS behavioral staff reported reviewing 196 plans during this 28th Period and a total of 271 behavior plans for the FY26 Q1-Q3. As previously confirmed by DBHDS staff, they complete an annual random stratified sample that ensures a 90% confidence level.<br>  ii.  With regard to providing feedback, DBHDS previously reported that beginning in FY25 Q2, DBHDS required providers to revise and resubmit behavior plans scoring below 34 points, offering technical assistance and rehearsal opportunities. For this 28th Period, DBHDS reviewers provided feedback sessions to behaviorists for 186/196 (95%) plans overall. For FY26 Q1 through Q3, reviewers provided feedback sessions to behaviorists for 257/271 plans overall. According to the *BSR Q3/FY26,* feedback sessions continued to include review of the pertinent BSPARIs, a review of resources, and an opportunity for the behaviorist to ask questions about the BSPARI results and resources. DBHDS also reports seeking out feedback that behaviorists have about the tool, the service authorization process or connection to individuals in need of services during these meetings. | 27th: Completed and Ongoing<br><br>**28th: Completed and Ongoing** |

| Term and Actions | Facts | Analysis/ Conclusion | 28th |
|---|---|---|---|
| | As described above for Action 34b, DBHDS behavioral staff reported reviewing 196 plans during this 28th Period and a total of 271 behavior plans for FY26 Q1 through Q3 to determine adherence to the *Practice Guidelines for Behavior Support Plans*. Further, during the 28th Period, DBHDS staff reported conducting feedback sessions for 186/196 (95%) plans, and for 257/271 (95%) plans for FY26 thus far.<br><br>For this 28th Period, behavior analysts continued to analyze BSPARI scores and trends over time to identify areas of improvement and recurring issues in behavioral | iii. For this 28th Period, behavior analysts continued to analyze BSPARI scores and trends over time to identify areas of improvement and recurring issues in behavioral programming and used these findings to create additional training and technical assistance. The *BSR Q3/FY26* indicates that behavior analysts provided technical assistance and training on behavioral support plans through the following methods:<br>• DBHDS published six new educational articles on behavioral science and/or services.  Each article contains references to the professional literature and/or website resources.  These can be found on the DBHDS Behavioral Services website and have been included in the OIH monthly newsletter.<br>• DBHDS has provided continuing education opportunities to the community on the following topics: *Treatment of Challenging Behavior for Adults with DD: A Review of Literature* and *From ABCs to BSPs: An Introduction to Behavior Supports*.<br>• Based on review of common errors on BSPARI elements, DBHDS is creating training to assist providers in understanding Practice Guidelines expectations. This includes three new brief training videos created since the past reporting period:<br>   o Initial Plan Dates and Revisions<br>   o Safety and Crisis Guidelines<br>   o Behavioral Skills Training | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | programming and used these findings to create additional training and technical assistance.<br><br>The *BSR Q1/FY26* indicated that behavior analysts provided technical assistance and training on behavioral support plans through various methods, including publishing educational articles on behavioral science and/or services, continuing education opportunities to the community and creating training videos to assist providers in understanding Practice Guidelines expectations. | | |
| 34 d) If the Commonwealth has not achieved the goal | This action is not required until 7/15/27 (two years from the | This action is not required until 1/15/27 (two years from the approval of the permanent injunction.) A final implementation plan was not completed. | **Not Yet Implemented** |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| within two years of the date of this Order after taking the actions in Paragraphs 34(a) and 34(b), DBHDS will conduct a root cause analysis and implement a QII as determined appropriate by DBHDS.  DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | approval of the permanent injunction.) A final implementation plan was not completed. | | **Due Date 1/15/2027** |
| **40: Dental Exams** The Commonwealth will work to achieve a goal that 86% of individuals who are supported in residential settings and have coverage for dental services will receive an annual dental exam. | For the 28th Period, DBHDS did not meet the specified goal of this Term because its data indicated that the Commonwealth did not yet achieve 86% of people supported in residential settings who have coverage for dental services who | At the time of the 27th Period, DBHDS did not yet meet the specified goal for this Term because its data indicated that the Commonwealth did not yet achieve 86% of people supported in residential settings who have coverage for dental services who received annual dental exams.  At that time, DBHDS data indicated 69.1% of individuals supported in residential settings had an annual dental exam throughout the four quarters of FY25.<br><br>For this 28th Period, DBHDS submitted a document entitled *Dental Report.28 Review*, dated 3/13/26.  It indicated that for the last four reported quarters (i.e., FY25 Q3/Q4 and FY26 Q1/Q2), quarterly performance averaged 71.3%, which continued a steady upward trend.  However, DBHDS did not yet meet the specified goal for this Term of 86% of people supported in residential | 27th: Not Achieved<br><br>**28th: Not Achieved** |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | received annual dental exams.<br><br>DBHDS submitted a *Dental Report.28 Review*, dated 3/13/26. It indicated that for the last four reported quarters (i.e., FY25 Q3/Q4 and FY26 Q1/Q2), quarterly performance averaged 71.3%, which continued a steady upward trend.<br><br>For this 28th Period, DBHDS reported Process Document, entitled *Annual Dental Exams Ver 008*, dated 7/30/25, remained current.<br><br>It continued to be adequate for data validity.  DBHDS previously submitted a | settings who have coverage for dental services who received annual dental exams.<br><br>At the time of the 27th Period,  DBHDS also provided an updated Process Document, entitled *Annual Dental Exams Ver 008*, dated 7/30/25, that addressed previous recommendations to enhance data validity and reliability.<br>It continued to be adequate for data validity.  DBHDS previously submitted a Data Set Attestation for this measure, dated 3/31/25, which also remained adequate. For this 28th Period, DBHDS reported these documents remained current. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | Data Set Attestation for this measure, dated 3/31/25, which also remained adequate. | | |
| 40 a) DBHDS will operate a total of three mobile dental vehicles by March 31, 2025. | DBHDS again achieved this ongoing Action during this 28th Period.<br><br>Based on a review of a document entitled based on the *Dental Report.28 Review* and interview with DBHDS staff, DBHDS owns five mobile vehicles of different ages and all with different capabilities, which provide flexibility to meet the needs of individuals in parts of Virginia that have challenging terrain and traffic patterns. | At the time of the 27th Period, DBHDS had completed this ongoing Action. DBHDS reported four mobile dental vehicles in operation, with the last one obtained on 5/27/25.<br><br>For this 28th period, based on the *Dental Report.28 Review* and interview with DBHDS staff, DBHDS owns five mobile vehicles of different ages and all with different capabilities, which provide flexibility to meet the needs of individuals in parts of Virginia that have challenging terrain and traffic patterns. This set of resources has allowed the dental team to more than triple the number of individuals seen by the program (i.e., from 123 to 383) over the course of FY25. The report noted that FY26 data will be available in July 2026. | 27th: Completed<br><br>**28th: Completed and Ongoing** |

212

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | This set of resources has allowed the dental team to more than triple the number of individuals seen by the program (i.e., from 123 to 383) over the course of FY25. The report noted that FY26 data will be available in July 2026. | | |
| 40 b) DBHDS will continue to employ or contract with a total of three dental assistants and four dental hygienists to staff the mobile dental vehicles. | For this 28th Period, based on review of a document entitled *Dental Report.28 Review*, DBHDS reported one filled Dental Assistant position, instead of this Term's requirement for three. The *Dental Report.28 Review* reported that DBHDS took action to increase the Dental Assistant position base salary and posted the | At the time of the 27th period review, DBHDS staff reported current staffing included the required four Dental Hygienists, including the Dental Program Manager, and two Dental Assistants.  However, one Dental Assistant position continued to remain open. For this 28th Period, per the *Dental Report.28 Review*, DBHDS reported that due to a resignation, there was only one filled Dental Assistant position. The *Dental Report.28 Review* also reported that DBHDS took action to increase the Dental Assistant position base salary and posted the open positions, receiving four applications. As of 3/6/26, only one candidate had accepted an interview, which is scheduled for 3/16/26. If there are no additional applicants by 4/6/26, DBHDS staff indicated they would re-evaluate the posting. | 27th: In Progress **28th: In Progress** |

213

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | open positions, receiving four applications.<br><br>As of 3/6/26, only one candidate had accepted an interview, which is scheduled for 3/16/26. If there are no additional applicants by 4/6/26, DBHDS staff indicated they would re-evaluate the posting. | | |
| 40 c) DBHDS will continue to review referrals for dental services and work to connect people to community dental providers when available. | During this 28th review period, DBHDS again completed this ongoing Action.<br><br>In interview, DBHDS staff indicated the processes for reviewing referrals for dental services remained largely consistent with those described in the 26th and 27th Period reports. | At the time of the 27th Period, the processes for reviewing referrals for dental services included the referral review and scheduling process, the implementation of a SharePoint system that allows for independent appointment scheduling and tracking. DBHDS also continued to implement the previously-reported process for prioritizing individuals who have not had a dental exam, using data from WaMS. A projected dashboard function remained in progress.<br><br>For this 28th Period, referrals continued to be conducted through an online platform on the DBHDS website, with approximately 58 referrals received per month, and community clinics are scheduled weekly based on a minimum of 5-7 patients per mobile clinic.  Clinics continue averaging 10-12 patients daily. The following bullets provide updates to previously-reported related activities: | 27th: Completed and Ongoing<br><br>**28th: Completed and Ongoing** |

214

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | These included the referral review and scheduling process, the implementation of a SharePoint system that allows for independent appointment scheduling and tracking. DBHDS also continued to implement the previously-reported process for prioritizing individuals who have not had a dental exam, using data from WaMS.<br><br>During this 28th Period, a projected dashboard function remained in progress.  DBHDS staff reported that the programming bones of the dashboard have been built, but the overall project requires | • Independent Scheduling System: Teams continue to independently schedule appointments and clinics using a shared system (SharePoint list).  As previously reported, these processes were fully updated as of 3/24/25.<br>• Prioritization of Individuals Without Dental Exams: DBHDS continued to implement the previously-reported process for prioritizing individuals who have not had a dental exam, using data from WaMS. Monthly reports identify individuals without annual exams, and the dental team directly contacts service coordinators to assist in referrals and scheduling. DBHDS staff reported that this allows the team to fill in open appointment spaces at clinics that are currently scheduled around the Commonwealth.<br>• Tracking Appointments: As previously reported, since March 2025, DBHDS has implemented a system to document and track identified, scheduled, and completed dental appointments.  The SharePoint list from the on-line referral system feeds this scheduling process, forming one complete system.<br><br>During this 28th Period, a projected dashboard function also remained in progress.   DBHDS staff reported that the programming bones of the dashboard have been built, but the overall project requires additional work before going live (e.g.,  streamlining some communication elements, automating paperwork and completing the final stages of data cleanup of eight years of data.) | |

215

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
|  | additional work before going live. | | |
| 40 d) Within six months of the date of this Order, DBHDS will contract with at least one dentist or dentistry practice in each Region who can support sedation dentistry. | For this 28th Period, this action remained in progress.  Based on the documentation in the *Dental Report.28 Review*, Regions 1through 4 continue to have active contracts for sedation dentistry, but Region 5 still does not. However, on an interim basis, the OIHSN Mobile Dental Team primary remote supervision Dentist is providing some dental care for Region 5.<br><br>Overall, DBHDS data indicated that during FY26 thus far, 712 individuals received anesthesia clearance and had at least one dental appointment.  Of these, 686 were | At the time of the 27th Period, the *Dental Work Plan* indicated that on 5/29/25, as a result of a procurement process described in the 26th Period report, DBHDS signed contracts with two dental providers willing to serve Regions 1 and 3, the remaining regions that did not previously have contracts for this resource.  These contracts started on 7/1/25. DBHDS staff confirmed that Regions 2 and 4 both had active contracts that provide for sedation dentistry.  However, DBHDS staff reported that the Region 5 contract was open again, and they were preparing to work with Procurement to post a Request for Proposals (RFP).<br><br>For this 28th Period, based on the documentation in the *Dental Report.28 Review*, Regions 1 through 4 continue to have active contracts for sedation dentistry, but Region 5 still does not.  To obtain a Region 5 contract, DBHDS staff held an RFP Pre-proposal Conference on 3/26/26.  Two community based dental practices attended, and DBHDS staff reported that they may have the ability to award varying size contracts to more than one vendor if they meet the contract requirements. At the time of this writing, vendor submissions were due at close of business on 4/8/26, and DBHDS staff anticipated contract(s) will be awarded on or before 6/30/26.<br><br>The *Dental Report.28 Review* also noted that to fill the Region 5 gap temporarily, the OIHSN Mobile Dental Team primary remote supervision Dentist is providing the area with a limited level of dental care with sedation supports until the Dental Team has a regional contract to accept referrals. Overall, DBHDS data indicated that during FY26 thus far, 712 individuals received | 27th: In Progress<br><br>**28th: In Progress** |

216

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | served in Regions 1 through 4, with only 26 served in Region 5.<br><br>To obtain a Region 5 contract, DBHDS staff held an RFP Pre-proposal Conference on 3/26/26, with vendor submissions due on 4/8/26. They anticipate that contract(s) will be awarded on or before 6/30/26. | anesthesia clearance and had at least one dental appointment. Of these, 686 were served in Regions 1 through 4, with only 26 served in Region 5. | |
| 40 e) DBHDS will collaborate with dental providers to understand barriers to delivering services to individuals with developmental disabilities and, within six months of the date of this Order, will develop a plan with measurable goals, specific support | For this 28th Period, the DBHDS *Dental Report.28 Review* provided updates to the previously reported measurable goals for collaboration with dental providers to understand barriers. It indicated DBHDS had ongoing activity for each of the six steps | For this 28th Period, DBHDS provided updates in the *Dental Report.28 Review* to the measurable goals in the Dental Work Plan that were reported during the 27th Period:<br>1. Obtain report from DMAS on expansion of Medicaid network of providers within DentaQuest. At the time of the 27th Period, DBHDS reported that reports on expansion of the network did not specifically address serving individuals with DD because there is not clinical specialty of "DD Dentistry," and the ability to provide care for individuals with DD is considered a skill which is determined by self-assessment. However, DentaQuest updated their search engine so that participating dentists could self-identify experience in treating children and/or adults with various special needs. For this 28th Period, the search engine remained in | 27th Completed<br><br>**28th Completed and Ongoing** |

217

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| activities, and timelines for implementation to mitigate those barriers. | previously outlined in the initial plan, as well as new initiatives to address barriers in care coordination.<br><br>For this 28th Period, as of November 2025, the Medicaid dental program included 2,508 participating dentists, representing 30% of licensed dentists in Virginia DentaQuest. While this did not yet meet the 40% participation goal of the total number of dentists licensed and practicing in Virginia, the *Dental Report.28 Review* projected achieving this target by November 2025. However, the final workforce report for 2025 remained pending | use.   Other documented DentaQuest efforts during the 28th Period to expand the network of Medicaid-participating dental providers included the following:<br>• Targeted Recruitment: Outreach to over 2,600 existing Cardinal Care Smiles providers, dentists participating in other DentaQuest programs, and dentists accepting other insurance but not yet participating in Medicaid<br>• Credentialing Process: Streamlined the credentialing process, and committing to a timeline of 30 days or less for credentialing and re-credentialing dentists.  The average credentialing time was currently 19 days, well below the contract's 60-day limit.<br>• Quarterly Surveys: Surveyed 25% of participating dental practices each quarter to assess whether providers are accepting new patients, office capacity and compliance with appointment wait-time and after-hours standards.<br>• Follow-Up and Education: Provider Engagement team conducted follow-up and provided education to offices that failed to meet appointment access standards.<br>2. Obtain schedule of DMAS listening sessions to address barriers. At the time of the 27th Period, DMAS had not yet reported holding a "Listening Session," but DBHDS had received invitations to these upcoming meetings and intends to attend each. For this 28th Period, the *Dental Report.28 Review* noted that DMAS conducts bi-annual Dental Advisory Committee (DAC) meetings, which include participation from multidisciplinary members (e.g., practicing dentists, dental organizations, academic partners, and advocates for high-need populations).  The DAC serves in an advisory capacity, reviewing the Medicaid dental benefit and discusses ways to improve it, including addressing barriers identified by dentists.  Beginning | |

<table>
<tr><td colspan="4" align="center"><strong>Table 2</strong></td></tr>
<tr><td align="center"><strong>Term and Actions</strong></td><td align="center"><strong>Facts</strong></td><td align="center"><strong>Analysis/ Conclusion</strong></td><td align="center"><strong>28th</strong></td></tr>
<tr>
<td></td>
<td>at the time of this study.</td>
<td>

in 2026, DMAS also planned to host mini-DAC meetings in two formats, one for clinicians and one for non-clinicians. These sessions will limit participation to DAC members and will inform discussions at full DAC meetings, particularly with regard to and focus on clinical and policy-related issues.

3. <u>Determine measurable targets for expansion of Medicaid network of dental providers.</u> At the time of the 27th Period, DBHDS reported that, according to DMAS, DentaQuest's target goal for expansion of the Medicaid Dental Network was based on achieving 40% participation of the total number of dentists licensed and practicing in Virginia, with that DentaQuest would maintain participation of 40% of the population of actively practicing dentists year over year. For this 28th Period, as of November 2025, the Medicaid dental program included 2,508 participating dentists, representing 30% of licensed dentists in Virginia. This represented an increase from 2,266 dentists (30%) in 2024. While the DentaQuest did not meet the 40% participation goal, it projected achieving this target by November 2025. The final workforce report for 2025 remained pending at the time of this study.

4. <u>Partner with Virginia Commonwealth University (VCU) Dental School to expand training for supporting individuals with developmental disabilities.</u> At the time of the 27th Period, the *Dental Work Plan* indicated that VCU held a ribbon-cutting for a specialized clinic for patients with IDD on 8/13/25 and that DBHDS was planning a meeting with VCU to explore collaboration opportunities. For this 28th Period, VCU School of Dentistry serves as a key access point for dental care, particularly for rural and high-need populations. In addition, through a 2025 grant from Virginia Board of People with Disabilities (VBPD), the VCU School of Dentistry has partnered with the VCU School of Occupational Therapy to reduce

</td>
<td></td>
</tr>
</table>

219

| Table 2 | | | |
| --- | --- | --- | --- |
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | | barriers caused by sensory challenges experienced by individuals with intellectual and developmental disabilities (IDD) through the creation sensory-adapted dental environments.  Per the *Dental Report.28 Review*, the initiative includes in-person training for dental practice staff; distributing sensory tools and supplies to dental practices; conducting 10 statewide trainings using a mobile dental clinic and developing a virtual toolkit for the Virginia Department of Health website.<br>5. <u>Identify Medicaid dental providers accepting new patients and update this information annually</u>. At the time of the 27th Period, the *Dental Work Plan* documented DentaQuest had integrated activities as part of their work as the benefit manager to monitor availability. For this 28th Period, these integrated activities are documented above with regard to the expansion of Medicaid network of providers within DentaQuest.<br>6. <u>Conduct survey of providers and families to identify barriers to connecting with community dentists</u>. At the time of the 27th period, the *Dental Work Plan* indicated surveys of individuals and families were underway or in the development pipeline. As described with regard to 40f) and 40g) below, for this 28th Period, an OIHSN Dental Hygienist completed a comprehensive assessment of barriers and needs with eight CSBs, and implemented an OIHSN dental access survey through the Individual and Family Support Program (IFSP) Newsletter.<br><br>In addition to the above, for this 28th Period, the Commonwealth also focused on care coordination efforts to address barriers such as missed appointments and care coordination challenges.  These included the following:<br>• Total Wellness Approach: Monitoring programs for effectiveness and delivering educational messages to complement local outreach and case management. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | | • Chronic Conditions Program: Educating members with diabetes about the importance of dental care, leading to a 22% increase in utilization post-outreach.<br>• Broken Appointment Program: Collaborating with dental providers to track and address missed appointments, educating members on the importance of attending scheduled visits, and assisting with rescheduling.  In FY24, 44% of members with missed appointments completed a dental visit within 90 days of outreach.<br>• Emergency Redirect Program: Educating members about seeking non-traumatic dental care at dental offices instead of emergency departments.  In the first program year, 13% of members followed up with a dental provider within 30 days of outreach.<br>• Case Management & Care Coordination: Ensuring timely access to care, assisting with appointments, locating specialty providers, and collaborating with medical/dental providers, Community Service Board Support Coordinators, Medicaid Managed Care Organization (MCO) Care Coordinators, and community-based organizations. | |
| 40 f) Within six months of the date of this Order, the Commonwealth shall start an initiative that determines which 8 CSBs need the most assistance to ensure that individuals receive | For this  28th Period, DBHDS completed this ongoing Action.<br><br>As reported in *Dental Report.28* Review, DBHDS staff continue to use current data to identify the eight lowest | At the time of the 27th Period, DBHDS staff reported continuing to evaluate the CSBs most in need of assistance. Documentation at that time noted ongoing progress for five CSBs that have been in the most-in-need  category for multiple years. Since FY21, four of the five had seen an increase of those receiving annual dental exams between nine and eleven percent, while a fifth has seen an increase of 30.58%.  Of the nine identified CSBs with the lowest percentage  of individuals receiving annual dental exams, DBHDS focused technical assistance on four that had not yet seen year-to-year increases. | 27th: Completed and Ongoing<br><br>**28h: Completed and Ongoing** |

221

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| annual dental exams and, no later than three months after starting this initiative, begin to provide technical assistance to support relevant CSBs.  This process will continue to be implemented annually until the Commonwealth achieves the goal. | performing CSBs to target technical assistance from the OIHSN.  Seven of the eight identified CSBs were also in this most-in-need category during the 27th Period.  The eighth CSB, which had been in this category from FY21-FY24, fell back into it for FY25.  Overall, six of the eight made a degree of progress during this 28th Period.<br><br>The OIHSN Mobile Dental Program team continues to reach out to the identified CSBs to establish on-site clinics for screening and dental care.  and provide technical assistance. | For this 28th Period, per the *Dental Report.28* Review, DBHDS staff continued to use current data to identify the eight lowest performing CSBs to target technical assistance from the OIHSN.  Seven of the eight identified CSBs were also in this most-in-need category during the 27th Period.  The eighth CSB, which had been in this category from FY21-FY24, fell back into it for FY25.  Overall, six of the eight made a degree of progress during this 28th Period.  During this 28th Period, DBHDS has continued to provide ongoing support to each CSB through the OIHSN Mobile Dental Program, including scheduled onsite dental clinics for screening and dental care.<br><br>In addition, in order to gain a better understanding of the continuing needs of this group, an OIHSN Dental Hygienist completed a comprehensive assessment of their unique barriers and needs. The process included pre-interview research and semi-structured interviews with each CSB.  The open-ended questions included;<br>• In the last 6 months, how difficult has it been for individuals with ID/DD to get a dental appointment scheduled?<br>• Of all the resources available, how aware is the community of them?<br>• How comfortable are local dentists working with patients who have ID/DD?<br>• How informed are caregivers of patients with ID/DD about insurance coverage for dental exams?<br><br>Overall, the study found that difficulty in accessing dental care resources was the most consistently rated barrier across all eight CSBs, and suggested one possible solution of creating a "centralized, modifiable, and sustainable dental resource document" for CSB employees. | |

222

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | Utilizing research and semi-structured interviews, an OIHSN Dental Hygienist also completed a comprehensive assessment of the unique barriers and needs of the eight CSBs.<br><br>Overall, the study found that difficulty in accessing dental care resources was the most consistently rated barrier across all eight CSBs, and suggested one possible solution of creating a "centralized, modifiable, and sustainable dental resource document" for CSB employees. | | |
| 40 g) If the Commonwealth has not achieved the goal | This action is not required until 1/15/27 (two years from the | This action is not required until 1/15/27 (two years from the approval of the permanent injunction.) | 27th: Not Yet Implemented |

223

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| within two years of the date of this Order after taking the actions in Paragraphs 40(a) through 40(f), DBHDS will conduct a root cause analysis and implement a QII. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | approval of the permanent injunction.)<br><br>However, per the *Dental Report.28 Review*, DBHDS had already undertaken related activity. DBHDS reported staff had begun gathering data to inform a root cause analysis.<br><br>These information-gathering initiatives included interviews conducted by the OIHSN Dental Hygienist and an OIHSN dental access survey included in the February and March 2026 Individual and Family Support Program (IFSP) Newsletter. | However, per the *Dental Report.28 Review*, DBHDS staff anticipate that in order to achieve the required 86% performance, it will be necessary to undertake some additional quality initiatives. To that end, they had already undertaken some related activity. DBHDS reported staff had begun gathering data to inform a root cause analysis, in hopes of beginning a new quality initiative in calendar year 2027.<br><br>These initiatives included the interviews conducted by the OIHSN Dental Hygienist, as described above with regard to Action 40f) above. In addition, DBHDS had initiated an OIHSN dental access survey included in the February and March 2026 Individual and Family Support Program (IFSP) Newsletter. All readers were invited to participate, with a planned survey closure date of 3/13/26. DBHDS staff plan to analyze these results and incorporate them into the results of the OIHSN Dental Hygienist's assessment to form the foundation of the root cause analysis for the projected formal QII. | Due Date 1/15/2027<br><br>**28th: In Progress** |

224

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | The *Dental Report.28 Review* indicated DBHDS hoped to complete the root cause analysis in time to kick off CY2027 with a QII. | | |
| **41. Protection From Serious Injuries in Service Settings** The Commonwealth will work to achieve a goal that 95% of DD waiver service recipients will be protected from serious injuries in service settings. | For this 28th Period, using the algorithm described in the current Process Document, entitled Individuals Protected from Serious Injury, Version 006, last revised on 8/15/25, DBHDS reported that, for the period 1/1/25-12/31/25, 97.5% of 18,452 individuals served were protected from serious injury. However, DBHDS still did not achieve data validity and reliability for this Term. | At the time of the 27th Period, despite improvements to a number of written processes and protocols, the study again found the data for the numerator of this measure was not yet valid or reliable and could not be used for compliance reporting. The processes in place at that time did not support a reliable evaluation of the presence of pre-injury supports, which formed the foundation of the Commonwealth's definition for what constituted "protection." Instead, the processes continued to emphasize actions the provider took after the injury to ensure health and safety in the future, and was ambiguous at times about pre-injury circumstances. Therefore, DBHDS could not demonstrate that all appropriate serious injuries (i.e., those without clear documentation that pre-injury protections were in place) received an SIU investigation. This called into question the validity of the measure. The IMU still referred only a very small percentage of serious injuries for investigation and the SIU actually investigated only a small percentage of those referrals. Of note, for this 28th Period, although DBHDS reported a 40% increase in the number of SIU investigations for 2025 over 2024, the overall percentage of serious injury investigations remained very low (i.e., 3.6% in 2024 vs. 5.9% in 2025.)<br><br>For this 28th Period, using the algorithm described in the current Process Document, entitled *Individuals Protected from Serious Injury, Version 006*, last revised on 8/15/25, DBHDS reported that, for the period 1/1/25-12/31/25, 97.5% | 27th: Not Achieved<br><br>**28th: Not Achieved** |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | As described below with regard to 41a), DBHDS reported they did not make any additional modifications to the previously-provided methodology for determining the percentage of individuals that are protected from serious injury. Those processes did not support a reliable evaluation of the presence of pre-injury supports, which formed the foundation of the Commonwealth's definition for what constituted "protection." Instead, the processes continued to emphasize actions the provider took after the injury to ensure health and safety in the | of 18,452 individuals served were protected from serious injury.  However, DBHDS still did not achieve data validity and reliability for this Term. As described below with regard to 41a), DBHDS reported they did not make any additional modifications to the previously-provided methodology for determining the percentage of individuals that are protected from serious injury. This flawed methodology remained unchanged in the Process Document and in a number of written IMU processes and protocols related to the review and referral of serious injuries. Therefore, the previously-identified significant deficiencies remained.<br><br>In addition, the preliminary results of the OIHSN look-behind review (the *IMU/SIR Project Update*), as described in detail below with regard to 41c), supported the need to implement additional process improvements to ensure appropriate evaluation of pre-injury supports and subsequent referrals for investigation.  For example, 29% of ISPs for people with known risks did not identify supports/protocols reasonably sufficient to prevent the incident, and 57% of those incident reports failed to provide an indication that needed supports were provided in accordance with ISP support/protocols.  Overall, the OIHSN look-behind review found 35% of the incidents should have been referred for a higher review/investigation. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | future, and was ambiguous at times about pre-injury circumstances.<br><br>Therefore, DBHDS could not demonstrate that all appropriate serious injuries (i.e., those without clear documentation that pre-injury protections were in place) received an SIU investigation.<br><br>Although DBHDS reported a 40% increase in the number of SIU investigations for 2025 over 2024, the overall percentage of serious injury investigations remained very low (i.e., 3.6% in 2024 vs. 5.9% in 2025.)<br><br>In addition, the preliminary results of | | |

227

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | the 28th Period OIHSN look behind review (the *IMU/SIR Project Update)*, as described in detail below with regard to 41c), supported the need to implement additional process improvements to ensure appropriate evaluation of pre-injury supports and subsequent referrals for investigation. | | |
| 41 a) DBHDS will continue working to ensure that all appropriate serious injuries are included when determining if this goal is met. | This Action was in Progress.<br><br>DBHDS staff provided a document entitled *Term 41 Summary*, updated 3/4/26, indicating they had not made any relevant protocol revisions (i.e., no revisions since August 2025) to the previously-provided | At the time of 27th Period, DBHDS had made revisions to the IMU processes related to this Term, but they had not yet resolved problems that negatively impacted the validity of the data.  As discussed with DBHDS staff at the time, IMU processes worked well for identifying when injuries occurred and for taking action to prevent any additional or future harm related to the injury. But for the purposes of Term 41, it continued to be necessary to focus instead on whether needed supports were in place and adequately implemented prior to the occurrence of the serious injury and to answer this question: based on what the provider knew or should have known about the individuals' risks, did the provider do everything it needed to do to keep them safe from that injury? Therefore, for the purpose of data validity, for all serious injuries for which the answer of the initial triage/pre-investigation is that all necessary pre-injury protections were not in place or it could not be fully determined, the construct | 27th:<br>In Progress<br><br>**28th:**<br>**In Progress** |

228

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | methodology for determining the percentage of individuals that are protected from serious injury. This flawed methodology remained unchanged as represented in the Process Document, entitled *Individuals Protected from Serious Injury, Version 006*, last revised on 8/15/25, and in a number of written IMU processes and protocols related to the review and referral of serious injuries. Therefore, the previously-identified significant deficiencies remained.

Instead of making process revisions, the *Term 41 Summary* stated that DBHDS met this | of the measure required a further investigation. Otherwise, with the exception of serious injuries resulting from substantiated abuse/neglect or that represented more than one injury in a rolling 12-month period for any individual (i.e., which were already automatically included in the numerator), only serious injuries that are investigated by the SIU could possibly be eventually included in the numerator and the requirement for that investigation would  be regardless of any other prioritization criteria the IMU might have.

For this 28th Period, DBHDS staff provided a document entitled *Term 41 Summary*, updated 3/4/26, indicating they had not made any relevant protocol revisions (i.e., no revisions since August 2025) to the previously-provided methodology for determining the percentage of individuals that are protected from serious injury. This flawed methodology remained unchanged as represented in the Process Document, entitled *Individuals Protected from Serious Injury, Version 006*, last revised on 8/15/25, and in a number of written IMU processes and protocols related to the review and referral of serious injuries. Therefore, the previously-identified significant deficiencies remained. These included the following:
- The OL Investigation Protocols still needed to clearly reference the presence and status of the pre-injury risk mitigation strategies
- The formalized "pre-investigation" triage process in the *OL IMU Pre-Investigation Determination Triage for DD Deaths and Serious Incidents* allowed the IMQS discretion to determine if an investigation was warranted, but did not make clear what could be considered "warranted."
- The protocols for what MUST be referred for pre-investigation triage and what MUST be investigated by SIU did not include the category of "risk mitigation strategies that do not effectively address pre-existing | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | Term's requirements through continuing the monthly self-audits for serious injuries and the Incident Management Manager (IMM) monthly Serious Injury Look Behind review of a 10% sample of "serious injury categories" for previously triaged incidents to determine if the incidents were triaged, referred and ultimately investigated per protocol.<br><br>While these were positive efforts, they were rendered ineffective for quality improvement because they relied on the existing flawed protocols as the basis for evaluation. | risks that are known or should have been known for the individual."  In interview, staff acknowledged that, given resource constraints, not all incidents that are high priority for investigation are ultimately referred for an investigation to be completed.  Staff also acknowledged that the IMQS maintained discretion in the determination of which high priority incidents will be referred for investigation, and the protocols do not give guidance for that determination.<br><br>Instead of making process revisions, the *Term 41 Summary* stated that DBHDS met this Term's requirements through continuing the monthly self-audits for serious injuries and the Incident Management Manager (IMM) monthly Serious Injury Look Behind review of a 10% sample of "serious injury categories" for previously triaged incidents to determine if the incidents were triaged, referred and ultimately investigated per protocol.  Based on interview, the IMU staff reported they were making enhanced efforts to capture pre-injury circumstances in their documentation. While this was a positive practice, it was rendered ineffective for the purposes of this Term because it still relied on the existing flawed protocols as the basis for evaluation and for consideration for investigation. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| 41 b) Within six months of the date of this Order, and annually thereafter, the DBHDS Office of Integrated Health will complete a quality review of a statistically significant sample of serious injuries reported to DBHDS via the CHRIS system (or successor) to determine if the Incident Management Unit process used by the DBHDS Office of Licensing adequately identifies all appropriate injuries to determine if individuals were protected from harm and if changes are needed to the way incidents are reviewed and referred. | For this 28th Period, this Action was in progress. The OIHSN had completed a second review of a statistically significant sample for a 90-day review period beginning 1/1/26 and ending 3/31/26.  DBHDS submitted a document entitled *IMU/SIR Project Update*, dated 4/9/26, which provided an update on this OIHSN review process. Its stated intent was "to ensure that healthcare professionals within the OIHSN apply their clinical expertise to support effective Incident Management Unit (IMU) processes, promote appropriate risk mitigation, identify | At the time of the 27th Period, this action was in progress. A *Serious Injury Quality Review Report*, dated September 2025, described the Serious Injury Quality Review work group OIHSN established. The stated purpose was to complete a quality review to determine if the processes implemented by the IMU were appropriately identifying all individuals that have not been protected from harm and if these processes are addressing any identified issues to reduce the risks of future harm to these individuals. DBHDS indicated they designed the OIHSN review to answer four questions, as recommended in the 26th Period study: 1) have all appropriate injuries been identified by the IMU; 2) were individuals protected from harm; 3) are changes needed to the way that incidents are reviewed; and 4) are changes needed to the way that incidents are referred?  However, in its initial review concluded that for almost 70% of the incidents in the sample, OIHSN required more detail than was available to make a determination that the individual was or was not protected; therefore, they could not make a final determination of the percentage of appropriate referrals. Overall, they also reported they did not yet have enough data to make recommendations for changes that might be needed to the way incidents are reviewed and referred. The OIHSN and IMU indicate they planned to review results each month to continue to refine the process and to begin to identify opportunities for improvement in the triage and referral process.  For this 28th Period, the Term 41 Summary noted that the OIHSN re-started their look-behind review of serious injuries in January 2026, for serious injuries that were reported in December of 2025. It further indicated that the revised look-behind process placed an increased focus on a deeper review of the ISP to | 27th: In Progress  **28th: In Progress** |

231

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | quality improvement opportunities, and strengthen health and safety protections." DBHDS revised the OIHSN process, expanding the number of questions from the original four to nine, with the intent to capture whether the ISP identified supports specific to the incident, if those supports would have been sufficient to prevent the incident, and if those supports were provided. The document noted that OIHSN was refraining from drawing firm conclusions related to IMU processes or service quality measures until the | identify whether there were known risk factors that could have had an impact on whether or not the injury occurred. DBHDS submitted a document entitled *IMU/SIR Project Update*, dated 4/9/26, which provided an update on this OIHSN review process. Its stated intent was "to ensure that healthcare professionals within the OIHSN apply their clinical expertise to support effective Incident Management Unit (IMU) processes, promote appropriate risk mitigation, identify quality improvement opportunities, and strengthen health and safety protections." Per the *IMU/SIR Project Update*, the look-behind process reviewed a statistically significant sample of serious injuries across a 90-day review period beginning 1/1/26 and ending 3/31/26.  The revised process expanded the number of questions from the original four to nine to capture whether the ISP identified supports specific to the incident, if those supports would have been sufficient to prevent the incident, and if those supports were provided.  Per the document DBHDS provided  entitled *SIR IMU Review Process Final*, these questions included the following: <br>1) Are there supports specific to the identified incident (serious injury report) noted within the ISP? <br>2) At the time of the incident, were the identified supports/protocols within the ISP reasonably sufficient to prevent the incident? <br>3) Is there any indication within the incident report indicating supports were provided in accordance with ISP support/protocols? <br>4) Is there any known history, medical or otherwise, noted in the ISP that could have a significant impact on the noted incident? <br>5) Review the "Medications" portion of the ISP. Any information here that could have an impact on the noted incident? | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | review process is further refined for clarity and consistency<br><br>However, the *IMU/SIR Project Update* findings included findings that called into question the accuracy of the very low actual SIU investigation rate of 5.9%.<br><br>For example, for the incidents that involved a known risk at the time of injury, 71% of the applicable ISPs identified supports/protocols that were reasonably sufficient to prevent the incident, but 29% did not.<br><br>For 57% of the incidents, the incident report provided an | 6) Review the "Physical and Health Conditions" portion of the ISP. Any information here that could have an impact on the noted incident?<br>7) Review the "Social, Developmental, Behavioral and Family History" portion of the ISP. Any information here that could have an impact on the noted incident?<br>8) Do you recommend this incident be referred for a higher review? Should this incident have been referred to an investigation?<br>9) If yes to Question 8, why:<br><br>The document noted that OIHSN was refraining from drawing firm conclusions related to IMU processes or service quality measures until the review process is further refined for clarity and consistency, and that results and analysis of the free-text answers to Question 9 (i.e., why an incident should have been referred to an investigation) were not available at the time of writing this report.<br><br>Otherwise, the *IMU/SIR Project Update* findings included the following:<br>• For Question 1, 59% of the incidents involved a known risk at the time of injury.<br>• For Question 2, 71% of the ISPs identified supports/protocols within the applicable ISPs reasonably sufficient to prevent the incident, while 29% did not.<br>• For Question 3, for 43% the incidents, the incident report provided an indication that that support was provided in accordance with ISP support/protocols, while 57% did not.<br><br>In keeping with DBHDS's definition of "protection from serious injury," the 29% with identified risks but insufficient supports required a referral for | |

233

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | indication that the needed supports were not provided in accordance with ISP support/protocols.

In keeping with DBHDS's definition of "protection from serious injury," the 29% with identified risks but insufficient supports required a referral for investigation.  Likewise, the 57% of incidents that showed needed supports were not provided in accordance with ISP support/protocols required an investigation. | investigation.  Likewise, the incidents that showed needed supports were not provided in accordance with ISP support/protocols also required investigation. These findings were inconsistent with the very low actual FY25 SIU investigation rate of 6%.  While this OIH effort is a new process that is still undergoing revision, even these preliminary results appear to support the ongoing findings of this QRM study that DBHDS needs to implement additional process improvements to ensure appropriate evaluation of pre-injury supports and subsequent referrals for investigation.

DBHDS also submitted a Process Document entitled *PI41 Quality Review for Protection from Serious Injuries, Version 004,* dated 4/8/26.  It outlined the sampling process and questions as indicated above, but did not provide a related Data Set Attestation.  As this is a process that DBHDS has indicated is still evolving, the Process Document is not yet in final form.  As DBHDS staff continue to work on the document, they will need to consider how their data will be aggregated and then evaluated to determine if individuals were protected from harm (i.e., as indicated in the Outputs/Measures of Success Section) and whether the DBHDS Office of Licensing adequately identifies all appropriate injuries  (i.e., as indicated by the requirements of this Action. | |
| 41 c) Relevant processes will be revised, as warranted, | For this 28th Period, this action remained in progress.  as described | At the time of the 27th Period, OIHSN staff had completed the first *Serious Injury Quality Review Report;* however, process revisions remained under consideration at that time. | 27th: In Progress |

234

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| based on the finding of the quality review referenced in Paragraph 41(b) to ensure that the Commonwealth accurately identifies the percentage of DD waiver recipients who are protected from serious injuries in service settings. | above with regard to Action 41b), OIHSN staff had revised and completed a second round of the quality review process. However, process revisions remain under consideration at this time and DBHDS had not yet made any revisions. | For this 28th Period, as described above with regard to Action 41b), OIHSN staff had revised the methodology for and completed a second round of the quality review process. DBHDS provided the final OIHSN report (i.e., the *IMU/SIR Project Update*, dated 4/9/26. However, process revisions remain under consideration at this time and DBHDS had not yet made any revisions. | **28th: In Progress** |
| 41 d) If the Commonwealth has not achieved the goal within two years of the date of this Order after taking the action in Paragraphs 41(a) through 41(c), DBHDS will conduct a root cause analysis and implement a QII. DBHDS will continue this quality improvement process until the metric is | This action is not required until 1/15/27 (one year from the approval of the permanent injunction. A final implementation plan was not completed. | This action is not required until 1/15/27 (two years from the approval of the permanent injunction). A final implementation plan was not completed. | **Not Yet Implemented Due Date 1/15/27** |

235

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| achieved and sustained for one year. | | | |
| **42. Risk Management.** To ensure that the risk management programs of DBHDS-licensed providers of DD services identify the incidence of common risks and conditions faced by people with DD that contribute to avoidable deaths and take prompt action when such events occur or the risk is otherwise identified, the Commonwealth will take the following actions: | DBHDS regulations (§520.C.5 and §520.D) set risk management program requirements for DBHDS-licensed DD service providers, including identifying risks/conditions that could lead to preventable deaths and responding promptly to incidents or detected risks.<br><br>The DBHDS "Care Concern" process outlines common DD-related risk factors/conditions tied to preventable deaths and identifies actions to address them under Term 42. | DBHDS licensing regulations at §520.C.5 and §520.D set out specific requirements for risk management programs used by providers of developmental disabilities (DD) services licensed by DBHDS. These rules require that providers must identify common risks and conditions faced by individuals with DD that could lead to preventable deaths. Providers are also required to respond quickly and appropriately whenever such incidents occur or when risks are detected.<br><br>The DBHDS "Care Concern" process, previously described in study reports, outlines common risk factors and conditions experienced by people with DD that can lead to preventable deaths, along with actions to address them. Its goal is to ensure providers respond rapidly and appropriately to risks identified under Term 42, improving outcomes for those receiving DD services.<br><br>The Office of Licensing (OL) and the Office of Clinical Quality Improvement (OCQI) within DBHDS have consistently enhanced strategies to assist providers in meeting licensing requirements for risk management programs. Their initiatives include delivering targeted training and guidance, with an emphasis on the implementation of an Excel-based Risk Tracking Tool template. This tool enables efficient documentation and analysis of data related to common risks and conditions, known as care concerns, as defined in Term 42. Recent sample reviews demonstrate that a growing number of providers are adopting this Risk Tracking Tool to satisfy the expectations outlined in Term 42. The continued efforts of OL and OCQM have led to increased provider compliance with regulations through various DBHDS initiatives. | 27th: Not Achieved<br><br>**28th: Deferred** |

236

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | DBHDS OL and OCQM created and offers provider training and guidance on risk management requirements and emphasizes use of the Excel-based Risk Tracking Tool it offers providers to document and analyze Term 42 care concerns. Sample reviews indicate increasing provider adoption of the Risk Tracking Tool to meet Term 42 expectations.<br><br>Across the last five studies, the Consultant compared licensing specialists' assessments with the Consultant's evaluation across five regions and found some inconsistencies in how accurately licensing specialists assess | In the last five studies, the Consultant has reviewed a sample of providers in each of the five regions, comparing licensing specialists' assessments to the Consultant's own evaluation of evidence from these providers. Through this process, the Consultant has identified some inconsistencies in how accurately licensing specialists determine if providers fulfill risk management requirements.<br><br>Since this 28th period study was completed early in the CY2026 licensing inspection cycle, the 25-provider sample is too small to generalize results for all scheduled inspections. Therefore, results for Term 42 are deferred until the 29th period study concludes. By combining this study's limited sample with a larger sample completed in the 29th study, there will be enough data for valid comparisons with previous studies from the 24/25 and 26/27 period studies.<br><br>The OL and OCQM should continue working to help providers better understand regulatory requirements and to ensure that licensing specialists consistently assess whether providers meet these standards. Upholding and strengthening this consistency is crucial for making sure providers carry out effective risk management and quality assurance practices as mandated by department regulations.<br><br>The OL developed and implemented an inter-rater reliability (IRR) process after the 26th period study to improve how consistently licensing specialists assess regulatory compliance. This process features quarterly "gold standard" comparative reviews led by the Associate Director of Quality and Compliance and the Quality Improvement Review Specialist, who are not in the licensing specialists' chain of command. Detailed under Action 42.a, this is an important element of an effective process that aims to ensure uniformity and accuracy in provider assessments. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | compliance with risk management requirements.<br><br>The 28th study (early in the CY2026 inspection cycle) reviewed 25 providers; results from the small sample were insufficient to generalize, and a determination Term 42 is deferred until the 29th study concludes, with a larger combined sample expected to inform valid comparisons to the 24/25 and 26/27 review periods' cycles. | | |
| 42.a) Within 24 months of the date of this Order, the Commonwealth shall establish inter-rater reliability among the Commonwealth's licensing specialists | The Office of Licensing (OL) developed and implemented an inter-rater reliability (IRR) review process to formally assess the consistency and accuracy with which | As outlined in the 27th study report, the Office of Licensing (OL) has sustained and expanded several initiatives to meet the requirements of this action. These initiatives include:<br>• DD Inspection Training for licensing specialists<br>• Regional Managers conducting unannounced parallel inspections with licensing specialists<br>• Experienced licensing specialists shadowing and mentoring newly hired staff<br>• Quality Improvement Specialist Look-Behinds | 27th: In Progress<br><br>**28th: Completed and Ongoing** |

238

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| regarding provider compliance with the quality assurance trending requirements. | licensing specialists determine whether providers meet the regulatory requirements applicable to Term 45.<br><br>OLS conducts its IRR review three times per year. During each review, all licensing specialists independently evaluate the same provider record, and their determinations are compared to a "gold standard" set by the Quality Improvement Review Specialist.<br><br>OL's Associate Director of Quality & Compliance selects the provider record and relevant documents and makes them available for review. | In July 2025, OL developed and implemented a formal, structured Inter-Rater Reliability (IRR) process. This process is designed to promote consistent and accurate licensing inspections by having licensing specialists independently review the same provider record, with their ratings compared against a "gold standard" of determinations and explanations established by the OL Quality Improvement Review Specialist (QIRS). The IRR focuses exclusively on regulations pertaining to risk management and quality assurance, specifically outlined in 12VAC35-105-450, 520.A, 520.B, 520.C.1-5, 520.D, 620A, 620.B, 620.C.1-5, and 620.D.1-3.<br><br>The Associate Director of Quality & Compliance selects and prepares the records and supporting documentation, while all eligible licensing specialists (excluding new hires and the specialist who conducted the original inspection of the reviewed provider) submit their compliance determinations using the IRR Corrective Action Plan (CAP) form. The QIRS compiles and analyzes agreement levels, provides guidance on correct determinations within scheduled timelines, and shares aggregated data and trends with OL leadership. If agreement levels on particular regulations fall below established thresholds, OL provides targeted or individualized training is provided to enhance consistency and accuracy.<br><br>While OL's IRR was initially intended to occur quarterly, the schedule was subsequently modified to three times per year - in January, May and September - based on the time required for each evaluation and analysis. To date, OL has completed two reviews (the initial review in July 2025 and the second review in January 2026), and the results have been analyzed. | |

239

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
|  | Its Quality Improvement Review Specialist independently establishes the "gold standard" rating and records all rater data in the IRR Tracker.<br><br>Aggregate results are analyzed and summarized, and findings are reported to the Director of Licensing along with recommended corrective or improvement actions. Any regulation with less than 86% agreement triggers additional training for Licensing Specialists, either individually or in groups.<br><br>OL reviews its IRR process results annually | The July 2025 review assessed 19 regulations, with 12 (63%) attaining an agreement level of 60% or higher, while only two items (11%) fell below the 40% threshold. Following its analysis of these results, OL formulated and executed a comprehensive, outcome-oriented action plan focused on enhancing rating consistency. This plan included clarifying ambiguous items, examining patterns of disagreement, updating requirements, and providing both individual and group retraining for staff. The effectiveness of this approach was evident in the January 2026 review, where 15 out of 19 items (79%) showed score improvements, including six items that increased by over 25 percentage points. Only four items registered a decline in scoring percentages.<br><br>Additionally, OL instituted ongoing peer discussions and case reviews to further reinforce consistent application of standards across the team. OL continues to monitor progress, and adjusts its training based on outcome trends from each review cycle. The OL plans to review its IRR protocol annually to foster continuous improvement and consistent implementation of the licensing inspection process.<br><br>Based on review of the process description, analysis of results from Rounds 1 and 2 of the IRR process, and corrective actions OL has taken in response to its analyses from the first two rounds, the consultant determined that the Office of Licensing has established an inter-rater reliability process for all licensing specialists related to provider compliance with quality assurance trending requirements required by Action 42.a. Data from the first two rounds indicate that the IRR process has enhanced consistency and highlighted areas where additional guidance, training, and oversight are warranted to ensure ongoing |  |

240

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | to identify strengths, areas for improvement, and potential modifications to enhance process effectiveness.<br><br>The consultant confirmed that the IRR process follows the OL Inter-Rater Reliability Process requirements and that rating consistency improved significantly from the 07/2025 review to the 01/2026 review after initial remedial actions were implemented. | uniformity. OL will continue to evaluate the effectiveness of its IRR process as its testing and analysis proceed every four months. | |
| 42.b) Within 12 months of the date of this Order, the Commonwealth shall offer technical assistance in accordance with DBHDS's Consultation and Technical | DBHDS continues to enhance technical assistance for licensed providers as outlined in its protocols, focusing on those who do not identify common risks contributing to | DBHDS has continued the Expanded Consultation and Technical Assistance (ECTA) process, a consultative and individualized support program delivered by the Office of Community Quality Improvement (OCQI). The primary purpose of ECTA is to assist DBHDS-licensed Developmental Disability (DD) providers in strengthening Quality Improvement (QI) and Risk Management (RM) practices, particularly when providers have been cited for specific licensing regulation violations. | 27th: Completed and Ongoing<br><br>**28th: Completed and Ongoing** |

241

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| Assistance Standard Operating Procedure to each provider that does not identify the incidence of common risks and conditions faced by people with DD that contribute to avoidable deaths. | avoidable deaths per Action 42.b.<br><br>Starting July 15, 2025, ECTA became mandatory for providers cited twice consecutively in sections 450, 520 A–D, or 620 A–D. Providers required to participate must contact the ECTA team within 45 days of their latest approved CAP.<br><br>Between April and November 2025, 114 providers completed ECTA consultation, with 87 still in progress. | Providers typically become eligible for ECTA when they receive citations for one or more specific regulations (12VAC35-105-450, 520 A–F, or 620 A–E) during an unannounced licensing review and have an approved Corrective Action Plan (CAP) addressing those citations. In some cases, eligibility is also based on a Quality Improvement Plan (QIP) from a Quality Service Review (QSR). Effective July 15, 2025, ECTA participation became mandatory for providers that receive two consecutive citations for certain key regulatory sections (450, 520 A–D, or 620 A–D). When mandatory participation applies, providers must contact the ECTA team within 45 days of their most recently approved CAP.<br><br>The ECTA process includes defined participation timelines, with the potential for discontinuation if providers miss multiple scheduled sessions. The program increasingly integrates QSR data, performance metrics, and provider-identified challenges to tailor technical assistance. DBHDS's survey results and outcomes tracking indicate that providers experience meaningful improvements in quality and risk management as a result of ECTA participation.<br><br>Between April and November 2025, the ECTA program expanded its outreach, issuing 285 invitations to providers and achieving consistently high engagement levels. Participation increased throughout the year, peaking at 88.7% in November. As anticipated, earlier invitation periods resulted in higher completion rates, while later periods showed an increase in consultations still in progress due to the volume of recent enrollments. Overall, the program maintained strong provider involvement during this period, with | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | | 114 providers completing ECTA consultations and 87 remaining in progress on November 30, 2025.<br><br>Based on a review of program operations and engagement data from April through November 2025, the consultant determined that DBHDS has expanded and continues to refine its provision of technical assistance to licensed providers in accordance with the DBHDS Consultation and Technical Assistance Standard Operating Procedure. These efforts address requirements under Action 42.b by supporting providers in identifying common risks and conditions experienced by individuals with DD that contribute to avoidable deaths. | |
| 42.c) Within one month of the date of this Order, when providers do not take prompt action when such events occur, or where the risk is otherwise identified despite lack of prompt action by providers, DBHDS will ensure that corrective action plans are written, implemented, and tracked, and take | DBHDS has licensing regulations at 12VAC35-105-160 that require providers to identify, report, and take prompt and appropriate action for any identified serious injury which includes incidents involving common risks and conditions referenced in this Term. 12VAC35-105-170 outlines requirements for providers to develop | Previous studies have confirmed that DBHDS has licensing regulations at 12VAC35-105-160 that require providers to identify, report, and take prompt and appropriate action for any identified serious injury which includes incidents involving common risks and conditions referenced in this Term. Additionally, 12VAC35-105-170 outlines requirements for providers to develop and submit a written corrective action plan for each violation cited.<br><br>These requirements remain in effect and are defined and described in the DBHDS licensing regulations and within its Office of Licensing Look-Behind Process for DD Providers' Annual Inspections. This document addresses (1) assessment of policy, (2) corrective action plan requirements, and (3) progressive enforcement. DBHDS conducts regular reviews and makes needed revisions of this process; its most recent updates took place in June and July 2025. | 27th: Completed and Ongoing<br><br>**28th: Completed and Ongoing** |

243

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| further actions as warranted. | and submit a written corrective action plan for each violation cited. | | |
| **43. Timely Waiver Service Enrollment** The Commonwealth will work to achieve a goal that 86% of individuals who are assigned a waiver slot will be enrolled in a service within five months. | For the 28th Period, the Commonwealth achieved the specified goal of this Term for the first time.<br><br>The most recently reported data, as found in the *Case Management Steering Committee Semi-Annual Report State Fiscal Year 2026 1st and 2nd Quarters*, dated 3/13/26, reported performance for only one new quarter (FY25, Q4), which stood at 85%. In addition, DBHDS staff provided FY26 Q1 quarterly performance data of 94.5%. Combined data for the two quarters shows that | For the 27th Period, the Commonwealth did not achieve the specified 86% goal of this Term because the Commonwealth's most recently reported data, reported performance at 76.2% for FY25 Q2 and 84.6% for FY25 Q3. For the entirety of FY25, overall performance stood at 78.6%, which represented an upward trend from previous reporting.<br><br>For this 28th Period, the *Case Management Steering Committee Semi-Annual Report State Fiscal Year 2026 1st and 2nd Quarters (CMSC FY26, Q1 and Q2)*, dated 3/13/26, included new data only FY25 Q4, which stood at 85%. However, based on a request from the consultant, DBHDS staff reported FY26 Q1 quarterly performance of 94.5%. Combined data for the two quarters shows that 89.4% (807/903) were enrolled within 150 days of assignment. By achieving this percentage, Virginia has demonstrated that its efforts to meet the specified goal have succeeded. Consequently, Virginia has achieved Term 43 and is awarded a rating of Compliance for the first time.<br><br>Of note, however, based on the *Quarterly Timely Waiver Service Enrollment Report* FY25 Q4, as of June 2025, DBHDS initiated a new status (i.e., "Accepted") within WaMS. In interview, DBHDS staff reported that prior to this change, an individual's status was either "Projected" (i.e., slot assigned by the waiver slot assignment committee) or "Active" (i.e., the individual is approved for a Service Authorization). However, staff found that individuals might remain in the "Projected" status for a lengthy period before they accepted the slot. With this change, DBHDS began to measure the 150-day period from the date of | 27th: Not Achieved<br><br>**28th: Achieved** |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | 89.4% (807/903) were enrolled within 150 days of assignment.<br><br>Of note, based on the *Quarterly Timely Waiver Service Enrollment Report* FY25 Q4, as of June 2025, DBHDS initiated a new status (i.e., "Accepted") within WaMS. With this change, DBHDS began to measure the 150-day period from the date of slot acceptance by the individual/family (i.e., "Accepted) rather than from "Projected," which indicated the date the slot was assigned by the waiver slot assignment committee. The Independent Reviewer agreed that this modification was appropriate. | slot acceptance (i.e., "Accepted) rather than from "Projected." The individual has a short period of time (30 days) to remain within "Projected" status before WaMS will automatically transition the individual to "Accepted" status. This is consistent with procedures that require the support coordinator to notify the individual/family that they have been awarded a slot within seven days and that the individual/family has 15 days to accept or decline the slot. Once a Service Authorization is approved, the individual's waiver slot will transition automatically from "Accepted" to "Active" status. The Independent Reviewer agreed that this modification was appropriate.<br><br>However, with regard to the ability to trend data, using the acceptance date rather than the projected date to trigger the 150-day period may make recent data less comparable to previous DBHDS reports before June 2025. Earlier percentages may have been lower because the 150-day period was counted from the date a slot was offered rather than when it was accepted. For the two most recent quarters, then, DBHDS calculated the 150-day window from the date of acceptance. The reader should take this into consideration in reviewing the chart below, which represents the data from FY25 Q1 through FY26 Q1. | |

245

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | However, with regard to the ability to trend data, using the acceptance date rather than the projected date to trigger the 150-day period may make recent data less comparable to previous DBHDS reports before June 2025.  Earlier percentages may have been lower because the 150-day period was counted from the date a slot was offered rather than when it was accepted.<br><br>At the time of the 27th Period, DBHDS submitted an applicable Process Document, entitled *DD CMSC VER 019*, dated 1/29/24, which remained current for this 28th | <br><br>At the time of the 27th Period, DBHDS submitted an applicable Process Document, entitled *DD CMSC VER 019*, dated 1/29/24.  DBHDS staff reported this remained current for this 28th Period. It remained sufficient to support data validity and reliability. However, to ensure data validity, DBHDS staff should confirm that the field "EnrollmentStartDate" in the data report *DR0029 Active No Authorization (WaMS)* accurately reflects the "Accepted" status date. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | Period. It remained sufficient to support data validity and reliability. However, to ensure data validity, DBHDS staff should confirm that the field "EnrollmentStartDate" in the data report *DR0029 Active No Authorization (WaMS)* accurately reflects the "Accepted" status date. | | |
| 43 a) Within three months of the date of this Order, DBHDS will track on a quarterly basis the number of individuals who are assigned a waiver slot but not enrolled in a service within five months. | For this 28th Period, DBHDS completed this ongoing action.<br><br>DBHDS staff tracked and reported quarterly data on the number of individuals who are assigned a waiver slot but not enrolled in a service within five months (i.e.,150 days). | During the 27th Period, DBHDS tracked and reported quarterly data on the number of individuals who are offered a waiver slot but not enrolled in a service within five months. Specifically, the quarterly data for this measure became available five months (i.e.,150 days) after the enrollment (i.e., Accepted) date.<br><br>For this 28th Period DBHDS continued in this same manner to track and report data on the number of individuals who are assigned a waiver slot but not enrolled in a service within five months.  Due to a report timing issue, the *CMSC FY26, Q1 and Q2*, dated 3/13/26, included new data only for FY25 Q4; however, as documented above with regard to Term 43, DBHDS staff were able to provide an ad hoc report of FY26 Q1 quarterly performance. | 27th: Completed and Ongoing<br><br>**28th: Completed and Ongoing** |

247

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | Due to a report timing issue, the *CMSC FY26, Q1 and Q2*, dated 3/13/26, included new data only for FY25 Q4, but DBHDS staff were able to provide an ad hoc report of FY26 Q1 quarterly performance. | | |
| 43 b) Within three months of the date of this Order, the Commonwealth will contact individuals at the end of each quarter who have not been enrolled in a service within five months and their families and case managers to determine why services have not been initiated and what barriers delayed initiation of services. DBHDS will report on the barriers identified quarterly as well as | For this 28th Period, DBHDS completed this ongoing action.<br><br>DBHDS continued to implement the data collection and quarterly reporting processes in place at the time of the last study and as described in the Process Document, entitled *DS Waiver Service Enrollment Version 001*, dated 3/21/25.<br><br>During this period, DBHDS produced two | At the time of the 27th Period, this study documented the processes DBHDS used to complete this Action. A Process Document entitled *DS Waiver Service Enrollment Version 002*, dated 4/15/25, described the data collection process for monthly identification in WaMS of individuals who reached a five-month delay since being assigned an active accepted DD waiver slot and remained without a waiver service, including a series of steps for follow-up with individuals meeting the five-month criterion during each month to determine (a) why services have not been initiated and (b) what barriers have delayed the initiation of services, as well as the processes for quarterly reporting with regard to barriers to service enrollment, actions being taken to remediate the barriers, and results achieved. DBHDS staff utilized a survey form, entitled *PI – 43.b Timely Waiver Service Enrollment*, to document the reasons for the delay and provide the data for analysis of barriers, with results ( i.e., a summary of the reasons for identified why services were not initiated, barriers to those delays in services, solution actions and remediation needed) provided in the *Quarterly Timely Waiver Service Enrollment Report.* | 26th: Completed and Ongoing<br><br>**28th: Completed and Ongoing** |

248

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| actions being taken to remediate those barriers and results achieved. | *Quarterly Timely Waiver Service Enrollment Report* for the first and second quarters of 2026 respectively.<br><br>The FY26 Q1 report indicated primary barriers included Case Manager/CSB issues/delay or lack of education from CSB to individual/family (26%) and a delay in service selection/no provider chosen by the individual/family (10%).<br><br>The FY26 Q2 report also found Case Manager/CSB issues/delay or lack of education from CSB to the individual/family as the primary reported barrier, at 19.5%. The secondary barrier | During this 28th Period, DBHDS continued to rely on these processes and produced two *Quarterly Timely Waiver Service Enrollment Report* for the first and second quarters of 2026, respectively.<br>• The FY26 Q1 report was based on surveys for 388 people awaiting the initiation of services that were conducted during July, August and September, 2025. The report indicated primary barriers included Case Manager/CSB issues/delay or lack of education from CSB to individual/family (26%) and a delay in service selection/no provider chosen by the individual/family (10%). In addition to a QII to address the primary barrier, as described in action 43c) below, DBHDS initiates monthly correspondence to the CSBs identifying any individuals who are over 150 days, with requests to either release the slot when the individual is not interested in services, initiate services, or refer to Regional Support Team for assistance.<br>• The FY26 Q2 report was also based on 388 surveys and occurred during October, November and December, 2025. The barrier of CM/CSB issues/delay or lack of education from CSB to the individual/family was reported at 19.5%, which DBHDS indicated they continued to address through the QII and monthly correspondence to the CSBs. The secondary barrier reported for this period was a delay or issues in Medicaid/Insurance enrollment., at 15.9%, which was also identified in the initial *Quarterly Timely Waiver Service Enrollment Report*. The current report noted that DBHDS continues to work with DMAS and Department of Social Service (DSS) to address these Medicaid delays.<br><br>It was notable that most of the survey respondents for these two reports (93% for FY26 Q1 and 99% for FY26 Q2) were Support Coordinators rather than | |

249

<table>
<tr><td colspan="4" align="center"><strong>Table 2</strong></td></tr>
<tr><td><strong>Term and Actions</strong></td><td><strong>Facts</strong></td><td><strong>Analysis/ Conclusion</strong></td><td><strong>28th</strong></td></tr>
<tr>
<td></td>
<td>reported for this period was a delay or issues in Medicaid/Insurance enrollment., at 15.9%.

The reports indicated that DBHDS continued to address the Case Manager/CSB issues through a QII and monthly correspondence to the CSBs, and continued to work with DMAS and Department of Social Service (DSS) to address the Medicaid delays.

It was notable that most of the survey respondents for these two reports (93% for FY26 Q1 and 99% for FY26 Q2) were Support Coordinators rather than the individual assigned the</td>
<td>the individual assigned the waiver slot or a family member.  The FY26 Q2 report acknowledged that this trend could be skewing the results, which seemed possible since the results almost solely reflected the perspective of Support Coordinators. The report did not document the reasons for this trend.

The QII  indicated DBHDS would hold focus groups with waiting individuals and/or their family members to obtain their direct feedback. However, for this 28th Period, the pertinent QII Workbook indicated that, thus far, DBHDS held two focus groups with Support Coordinators in October 2025, but had not yet held the individual/family focus groups. Overall, this appeared to be a yet unmet opportunity to gain a full understanding of the issues.  Based on interview with DBHDS staff, they are currently scheduling individuals and family interviews and have developed the interview questions.  They anticipate completion during the 29th study period.</td>
<td></td>
</tr>
</table>

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | waiver slot or a family member.  The FY26 Q2 report acknowledged that this trend could be skewing the results.  To fill this possible knowledge gap, as part of the QII, DBHDS planned to hold individual and family focus groups during the 29th Study Period. | | |
| 43c) Within one year of the date of this Order, the Commonwealth will conduct a root cause analysis of why services have not been initiated and what barriers delayed initiation of services.  Based on the findings of the root cause analysis, the Commonwealth will prioritize the findings for quality | This Action was in progress.

At the time of the 27th Period, DBHDS staff initiated a QII in July 2025 through the KPA Workgroups, which included a strategy for root cause analysis (RCA) through focus groups, one with individuals and families and another with | As described above with regard to Action 43b), at the time of the 27th Period, DBHDS staff initiated a QII in July 2025 through the KPA Workgroups, which included a strategy for root cause analysis (RCA) through focus groups, one with individuals and families and another with support coordinators, in October 2025.  Based on the focus group outcomes, the QII next steps were to develop and/or update relevant educational resources for support coordinators and individuals/families, in partnership with the Arc of Virginia.  The QII projected the materials would be ready for testing in January 2026, with a roll-out of the educational campaign in February 2026.  In order to measure the impact of the educational campaign, the QII planned to monitor timely waiver service initiation data from March 2026 through June 2026.

For this 28th Period, DBHDS provided the QII Workbook for this project.  Based on review of the document, the QII Workbook indicated that, for this | 27th: Not Yet Implemented Due Date 1/15/26

**28th: In Progress** |

251

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| improvement in consultation with the provider and system issues resolution workgroups.  The Commonwealth will implement a QII based on its prioritization consistent with continuous quality improvement principles and developed in collaboration with the provider and system issues resolution workgroups.  The Independent Reviewer, in the reports required under paragraph 76, shall discuss the reasonableness of Virginia's response to this requirement. Individuals for whom initiation of services is delayed past five months at the request of the individual or the | support coordinators, in October 2025.<br><br>Based on the focus group outcomes, the QII next steps were to develop and/or update relevant educational resources for support coordinators and individuals/families, in partnership with the Arc of Virginia<br><br>For this 28th Period, the QII Workbook indicated that, for this 28th Period, DBHDS held two focus groups with Support Coordinators in October 2025, but did not document any additional action.<br><br>Based on interview, DBHDS staff indicated they are scheduling the | 28th Period,  DBHDS held two focus groups with Support Coordinators in October 2025, but did not document any additional action.  Based on interview, DBHDS staff indicated they are scheduling the individuals and family focus groups and have developed the questions for that purpose. They anticipate completing this task during the next review period, but did not report any specific modifications to the remaining tasks or timelines at this time. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| individual's authorized representative will not be included in determining if the Commonwealth meets the goal.  The Commonwealth will revisit the root cause analysis annually and implement a QII as determined appropriate by DBHDS.  DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | individuals and family focus groups and have developed the questions for that purpose. They anticipate completing this task during the 29th review period, but did not report any specific modifications to the remaining tasks or timelines at this time. | | |
| **44. Ongoing Service Analyses** The Commonwealth, through DBHDS, will collect and analyze data at least annually regarding the management needs of individuals with identified complex | For this 28th Period, DBHDS did not yet meet the requirements of Term 44 because it did not include annual data and analysis regarding the management needs of individuals with identified complex | At the time of the 27th Period, DBHDS did not yet meet the requirements of Term 44 because the data sources ( i.e., *PI 39 & 44 - Intense Management Needs Review Report, 26th Review Period, Ongoing Service Analysis Report: Individuals with Complex Health, Behavioral and Adaptive Support Needs FY 2025 Independent Reviewer's 27th Individuals Services Review*) did not yet include annual data and analysis regarding the management needs of individuals with identified complex adaptive support needs or yet provide for an adequate system for corrective action tracking and appropriate revision across the whole population. | 27th: Not Achieved<br><br>**28th: Not Achieved** |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| behavioral, health, and adaptive support needs to monitor the adequacy of management and supports provided. DBHDS will develop corrective actions based on its analysis as it determines appropriate, track the efficacy of the actions, and revise as it determines necessary to address the deficiency. | behavioral and adaptive support needs or yet provide for an adequate system for corrective action tracking and appropriate revision across the whole population.<br><br>For this 28th Period, DBHDS submitted the 27th Period IMNR. It collected and analyzed data and developed corrective actions regarding the management needs of 30 individuals with complex behavioral needs, in addition to the 30 individuals reviewed during the 27th Period.<br><br>While it did not yet include specific data regarding individuals | For this 28th Period, DBHDS still did not provide evidence that it collected and analyzed data at least annually regarding the management needs of individuals with identified complex adaptive support needs. However, DBHDS reported that beginning with the 29th Period, they intended to focus its IMNR process on individuals with complex adaptive support needs for two consecutive review periods.  With regard to the management needs of individuals with identified complex behavioral support needs, and as described below with regard to 44c), DBHDS provided a document entitled *PI44 - Intense Management Needs Review Report, 27th Review Period*, dated October 2025, which addressed the needs of individuals with complex behavioral health needs. During this 28th Period, DBHDS was also in the process of conducting a second IMNR study of an additional 30 individual with complex behavioral needs. DBHDS staff reported they also planned to integrate evaluation of  the management needs of people with complex adaptive support needs beginning with the 29th Period.<br><br>During the 28th Period, DBHDS also produced the *Ongoing Service Analysis Report: Individuals with Complex Health, Behavioral and Adaptive Support Needs FY 2025 (2025 Ongoing Service Analysis Report)*. It incorporated data from the IMNR process for individuals with complex medical needs, data from the care concerns process, data from the BSPARI quality reviews, and data from the Quality Service Reviews, but, as noted above, it did not yet include specific data regarding individuals with complex adaptive support needs.<br><br>Overall, to complete a meaningful analysis of management needs of individuals with identified complex behavioral, health, and adaptive support needs, and the monitoring of  the adequacy of the management and supports provided to them, DBHDS must collect an adequate size sample from which it can generalize and cannot rely solely on any one of the data collection efforts. For | |

254

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | with adaptive support needs, DBHDS reported that beginning with the 29th Period, they intended to focus the IMNR process on individuals with complex adaptive support needs for two consecutive review periods.<br><br>For this 28th Period, DBHDS also produced the *Ongoing Service Analysis Report: Individuals with Complex Health, Behavioral and Adaptive Support Needs FY 2025 (2025 Ongoing Service Analysis Report)*. It again incorporated data from the IMNR process for individuals with complex medical needs, data from the care concerns process, data from the BSPARI | example, as the *28th Individual Services Review (ISR)* noted, the IMNR sample is too small to permit its findings to be generalized to the system as a whole. However, individuals with complex support needs are represented in various data collection efforts.<br><br>In response to interview regarding sample size, DBHDS provided a document entitled *Summary of Ongoing Service Analysis Sample Size*. It noted the ongoing service analysis process reflects a compilation of data from multiple sources during the course of a fiscal year. They projected that, overall, the sample across the data sources is approximately 2,740, with the distribution illustrated in the chart below.<br><br>| **Data Source** | **# Individuals Annually** |<br>|---|---|<br>| IMNR | 70 |<br>| QSR | 700 |<br>| Care Concerns | 1000 |<br>| BSPARI | 350 |<br>| Skilled Nursing Utilization | 60 |<br>| Total: | 2,740 |<br><br>This should be a sufficient total overall.  However, going forward, the challenge will be to ensure that number encompasses a sufficient number from each population of individuals with identified complex behavioral, health, and adaptive support needs.  As noted in interviews with DBHDS staff, the identification of SIS level in all of the data collection efforts could be a useful tool for assisting in quantifying the disparate sample sizes.  DBHDS staff indicated that, at a minimum, they already collect that information for the IMNR and the QSR. | |

255

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | quality reviews, and data from the Quality Service Reviews.<br><br>Overall, to complete a meaningful analysis of management needs of individuals with identified complex behavioral, health, and adaptive support needs, and the monitoring of the adequacy of the management and supports provided to them, DBHDS must collect an adequate size sample from which it can generalize and begin to rely on findings only after two or more data collection efforts.<br><br>In response to interview regarding sample size, DBHDS provided a document entitled | With regard to the development and tracking of corrective actions and their efficacy, at the time of the 27th Period, the *2024 Ongoing Service Analysis Report* provided pertinent examples for several of the processes from which it derives data regarding the requirements to develop corrective actions determined appropriate based on analysis, to track the efficacy of the actions, and revise them as necessary to address the deficiency. These examples demonstrated both process strengths (BSPARI, IMNR and Care Concerns) and gaps (QSR, Skilled Nursing) in the overall methodology for the cycle of remediation.<br><br>For this 28th Period, the *2025 Ongoing Service Analysis Report* reported improvements for DBHDS's efforts to develop track the efficacy of and revise corrective actions as needed. Examples included the following:<br>• The 27th Period found that the QSR process did not have an effective remediation process in place at that time, for either individual or systemic remediation. The Quality Enhancement Plan (QEP) did not yet consistently provide for a timely mechanism for tracking the efficacy of those actions or revising them as necessary. In most instances, the QSR process did not include adequate follow-up to track efficacy until the next QSR review, which could be a year or more later. For this 28th Period, the OIHSN had begun completing a deeper review on QSR results related to individuals needs not being met, and were using a tracker to follow-up on QSR-identified needs, much like their existing processes for Care Concerns.<br>• Also for QSR, the DBHDS Office of Clinical and Quality Management (OCQM) submitted a document entitled *Systemic Risk Tracking Process.* It established a rubric and threshold to determine if provider QSR results indicate a systemic risk that should be addressed by DBHDS, prior to the QSR vendor's next review and subsequent | |

256

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
|  | *Summary of Ongoing Service Analysis Sample Size.* It noted the ongoing service analysis is a compilation of data from multiple sources during the course of a fiscal year and projected that, overall, the sample across the data sources is approximately 2,740.<br><br>This should be a sufficient total. However, going forward, the challenge will be to ensure that the sample encompasses a sufficient number for each target population of individuals to support generalization.<br><br>For this 28th Period, with regard to corrective actions, | verification of Quality Enhancement Plan (QEP) implementation, and outlined the responsibilities for and steps taken to assess for risks that should be addressed between QSR rounds. The effective date for this process will be 5/30/26.<br><br><ul><li>At the time of the 27th Period, the Skilled Nursing reviews had just begun and results were not yet available to demonstrate remediation and corrective action processes.  For this 28th Period, DBHDS issued the *Nursing Services Data Report Nursing Hours Utilization PI 38, PI 39,* and *PI 44 Updated FY19 – FY26 Q1-Q2,* dated April 2026. It documented a corrective action process for Skilled Nursing reviews that generated a total of 128 remediation plans for 31 individuals.  These plans addressed issues such as protocol updates, staffing gaps, and service delivery improvements.  Of the 111 plans relevant to this PI, 93 (83.78%) were resolved thus far, with the remaining unresolved plans still under review, with follow-ups and escalation processes in place to ensure resolution.</li></ul><br>However, the *28th Individual Services Review (28th ISR*) analysis of the IMNR corrective action system and tracking for the 27th Period continued to identify deficiencies that resulted in only 78% of the identified issues reviewed having yet been effectively addressed.  As described with regard to 44b) below, to remediate this finding, DBHDS modified the Process Document, entitled *Intense Management Needs Review Process – PI44, Version 003,* dated 4/9/26, to add steps for escalation of follow-up to the Assistant Commissioner of Developmental Services if there is no response to the reviewer after two attempts or the reviewer determines the remediation plan is not being taken seriously, and then, if the response continues to be insufficient, to the Deputy Commissioner for Community Services. |  |

257

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | study findings were mixed. The *2025 Ongoing Service Analysis Report* reported improvements for DBHDS's efforts to develop, track the efficacy of and revise corrective actions as needed.<br><br>For QSR, the OIHSN had begun completing a deeper review on results related to individuals needs not being met, and were using a tracker to follow-up on QSR-identified needs, much like their existing processes for Care Concerns.<br><br>Also for QSR, the DBHDS Office of Clinical and Quality Improvement (OCQI) | | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | submitted a document entitled *Systemic Risk Tracking Process*, with an effective date of 5/30/26, to determine if provider QSR results indicate a systemic risk that should be addressed by prior to the QSR vendor's next review and subsequent verification of Quality Enhancement Plan.<br><br>For Skilled Nursing, the *Nursing Services Data Report Nursing Hours Utilization PI 38, PI 39, and PI 44 Updated FY19 – FY26 Q1-Q2*, dated April 2026, documented a corrective action process for Skilled Nursing reviews.<br><br>However, the *28th Individual Services Review* | | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | *(28th ISR)* analysis of the IMNR corrective action system and tracking for the 27th Period continued to identify deficiencies that resulted in only 78% of the identified issues reviewed having yet been effectively addressed.<br><br>To address this finding, it was positive that DBHDS modified the Process Document (i.e., *Intense Management Needs Review Process – PI44, Version 003,* dated 4/9/26), to add steps for escalation of follow-up as needed to the Assistant Commissioner of Developmental Services and then to Deputy Commissioner for Community Services. | | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | | | |
| 44a) DBHDS will use data from the Skilled Nursing Review detailed in Paragraph 39(c), the IMNR process for individuals with complex medical needs, data from the care concerns process, data from the BSPARI quality reviews, and data from the Quality Service Reviews to monitor the adequacy of management and supports provided. Within six months of the date of this Order, DBHDS will develop a report consolidating the information from these sources to provide a comprehensive summary of the management and support provided to | For this 28th Period, this Action remained in progress.\n\nDBHDS produced a second annual report entitled *2025 Ongoing Service Analysis Report.*\n\nAs required, it again included data from the IMNR process for individuals with complex medical needs, the care concerns process, the BSPARI quality reviews, and Quality Service Reviews.\n\nIt did not yet include specific data regarding individuals with complex adaptive support needs, but DBHDS staff expected | At the time of the 27th Period, DBHDS produced the *2024 Ongoing Service Analysis Report.* It included data from the IMNR process for individuals with complex medical needs, data from the care concerns process, data from the BSPARI quality reviews, and data from the Quality Service Reviews, but did not yet include specific data regarding individuals with adaptive support needs.\n\nFor this 28th Period, DBHDS produced a second annual report entitled *Ongoing Service Analysis Report: Individuals with Complex Health, Behavioral and Adaptive Support Needs FY 2025 (2025 Ongoing Service Analysis Report).* As required for Action 44a), it again included data from the IMNR process for individuals with complex medical needs, the care concerns process, the BSPARI quality reviews, and Quality Service Reviews. It did not yet include specific data regarding individuals with complex adaptive support needs, but DBHDS staff expected to begin data collection for this population during the 29th Period. During this 28th Period, they were developing a set of secondary IMNR questions to address complex adaptive support needs and anticipated piloting its use before 6/30/26, in preparation for the 29th Period IMNR.\n\nAt the time of the 27th Period, the study found that the *2024 Ongoing Service Analysis Report* did not yet clearly "consolidate" the data (i.e., by bringing together and merging the data from its various sources to create a single, more effective whole) to provide a comprehensive summary of the management and support provided to individuals with complex needs. For example, it did not document with any specificity how the data had yet been consolidated to provide a comprehensive picture of the management and support needs for individuals with complex needs. DBHDS staff needed to further examine how | 27th:\nIn Progress\n\n**28th:**\n**In Progress** |

261

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| individuals with complex needs. This summary will be completed annually. | to begin data collection for this population during the 29th Period, and were actively developing a set of secondary IMNR questions to address complex adaptive support needs and anticipated piloting its use before 6/30/26.<br><br>The *2025 Ongoing Service Analysis Report* again did not document with any specificity how the data had yet been consolidated to provide a comprehensive picture of the management and support needs for individuals with complex needs or examine the aggregate data for similarities in service needs. | data from one source might shed some light on others, or examine the aggregate data for similarities in service needs that might support a more comprehensive, coordinated and ultimately effective set of support management strategies.<br><br>For this 28th Period, the *2025 Ongoing Service Analysis Report* again did not document with any specificity how the data had yet been consolidated to provide a comprehensive picture of the management and support needs for individuals with complex needs or examine the aggregate data for similarities in service needs. However, it was very positive that DBHDS staff had begun to take steps intended to better facilitate aggregation and comparison across populations going forward. For example, the OIHSN had begun completing a deeper review on QSR results related to needs not being met, and were using a tracker to follow-up on QSR-identified needs, much like their existing processes for Care Concerns. This latter effort, in particular, could also potentially allow for a meaningful consolidation of licensing data with QSR data to identify and address needs across disparate data sources.<br><br>In addition, DBHDS staff had begun an initiative to standardize data categories across relevant data management platforms to better facilitate aggregation and comparison going forward. Similarly, with regard to aggregating and comparing remediation and corrective actions across populations, OIHSN staff had created a grid to help standardize the categories of technical assistance and educational resources in the corrective action trackers for the IMNR QSR, and Care Concerns. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | However, it was very positive that DBHDS staff had begun to take steps intended to better facilitate aggregation and comparison across populations going forward. For example, the OIHSN had begun completing a deeper review on QSR results related to needs not being met, and were using a tracker to follow-up on QSR-identified needs, much like their existing processes for Care Concerns. This latter effort, in particular, could potentially allow for a meaningful consolidation of licensing data with QSR data to identify and address needs across disparate data sources. | | |

263

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | In addition, DBHDS staff had begun an initiative to standardize data categories across relevant data management platforms to better facilitate aggregation and comparison going forward. Similarly, with regard to aggregating and comparing remediation and corrective actions across populations, OIHSN staff had created a grid to help standardize the categories of technical assistance and educational resources they provide for IMNR QSR, and Care Concerns. | | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| 44b) DBHDS will continue to implement the IMNR process for no less than 70 people annually who have complex medical, behavioral, or adaptive support needs (Tier 4) to include onsite visits, reviews of specific health care documentation, and a factual questionnaire administered by qualified nursing professionals to primary caregivers most familiar with the person's health care needs. | For the 28th Period, this Action remained in progress.<br><br>Based on a document entitled *PI44 - Intense Management Needs Review Report, 27th Review Period*, dated October 2025, DBHDS staff continued to implement the IMNR process during the 27th Period for a sample of 30 individuals with SIS level 7 needs (i.e., extraordinary behavioral needs). However, they had not yet completed it for at least 70 people annually (i.e., the 26th Period sample size was 29.) Therefore, DBHDS has not yet achieved this requirement. | At the time of the 27th Period, while DBHDS staff continued to implement the IMNR process for the 27th Period, for a sample of 30 people with complex behavioral health support needs. For the 28th Period, DBHDS still needed to address the following concerns:<br><ul><li>DBHDS had not yet completed the IMNR for at least 70 people annually (i.e., the 26th Period sample size was 29.) Therefore, to meet this requirement of Term 44, during the 28th Period DBHDS would need to complete a review for at least 40 individuals.</li><li>DBHDS staff indicated the previously-provided Process Document (i.e., *Intense Management Needs Review Process – PI44, Version 001*, dated 2/3/25) remained current, but that DBHDS staff planned to update it upon completion of the 27th Study IMNR report. They indicated it would include methodology updates related to the inclusion of individuals with complex behavioral needs. As reported during the 26th Period, it also still needed to provide a clear methodology for sample selection.</li><li>The Independent Reviewer's *27th Individual Services Review (ISR)* found that DBHDS did not yet provide evidence of a sufficient remediation process, i.e., tracking the efficacy of the actions, and making revisions as it determines necessary to address identified deficiencies.)</li></ul>For this 28th Period, DBHDS submitted a document entitled *PI44 - Intense Management Needs Review Report, 27th Review Period*, dated October 2025. The sample included 30 individuals with SIS level 7 needs (extraordinary behavioral needs) who had annual ISP meetings between 10/1/24 through 12/31/24. The 27th IMNR process continued to include onsite visits, reviews of specific health care documentation, and an adequate factual questionnaire administered by qualified nursing professionals to primary caregivers most familiar with the person's health care needs. | 27th:<br>In Progress<br><br>**28th:**<br>**In Progress** |

265

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | The 27th IMNR process continued to include onsite visits, reviews of specific health care documentation, and an adequate factual questionnaire administered by qualified nursing professionals to primary caregivers most familiar with the person's health care needs.<br><br>For this 28th Period, DBHDS submitted an updated Process Document, entitled *Intense Management Needs Review Process – PI44, Version 003,* dated 4/9/26.<br><br>It did not include any methodology updates related to the inclusion | For this 28th Period, DBHDS submitted an updated Process Document, entitled *Intense Management Needs Review Process – PI44, Version 003,* dated 4/9/26. It did not include any methodology updates related to the inclusion of individuals with complex behavioral needs, as DBHDS previously indicated. However, it did direct the reviewer to "print the questionnaire titled "IMNR QUESTIONNAIRE Review Final" from within the folder titled "36.8 IMNR" within Teams.  This should be sufficient if DBHDS has processes in place to ensure the updating of the folder. The Process Document also still defers the sampling methodology to the Independent Reviewer, consistent with the current process.  However, DBHDS should reference the sampling criteria for the current IMNR, either in the Process Document or by referencing an appropriate document from the Independent Reviewer. Going forward, following the end of the Independent Reviewer's monitoring role, DBHDS will also need to document its own sampling methodology.<br><br>Also for this 28th Period, the Independent Reviewer's *28th ISR* again reviewed the sufficiency of DBHDS's remediation system for the extent to which corrective action plans are implemented to address the identified concerns.  It found that the IMNR remediation process resulted in 78% of the identified issues reviewed being effectively addressed. As referenced in *27th ISR*, the vulnerability of the remediation process again appeared to be at the regional level when residential providers and/or Support Coordinators were not focused on the timely and thorough resolution of problems identified.<br><br>The *28th ISR* concluded that the factual evidence clearly established that, for the individuals in this sample, the Support Coordinators and residential staff must implement the planned corrective actions timely and in an effective | |

| Table 2 | | | |
| --- | --- | --- | --- |
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | of individuals with complex behavioral needs, as DBHDS previously indicated. However, it does direct the reviewer to "print the questionnaire titled "IMNR QUESTIONNAIRE Review Final" from within the folder titled "36.8 IMNR" within Teams.

The Process Document also still defers the sampling methodology to the Independent Reviewer, consistent with the current process.  However, DBHDS should reference the sampling criteria for the current IMNR, either in the Process Document or by referencing an appropriate document | manner before DBHDS's remediation process will be sufficient. With regard to improving the timely completion of planned corrective actions, DBHDS modified *Version 003* of the Process Document to add steps for escalation of follow-up to the Assistant Commissioner of Developmental Services if there is no response to the reviewer after two attempts or the reviewer determines the remediation plan is not being taken seriously, and then, if the response continues to be insufficient, to the Deputy Commissioner for Community Services. | |

267

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | from the Independent Reviewer. Going forward, following the end of the Independent Reviewer's monitoring role, DBHDS will also need to document its own sampling methodology.<br><br>Also for this 28th Period, the Independent Reviewer's 28th *Individual Services Review (28th ISR)* again reviewed the sufficiency of DBHDS's remediation system for the extent to which corrective action plans are implemented to address the identified concerns.<br><br>It found that the IMNR remediation process resulted in 78% of the | | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | identified issues reviewed being effectively addressed, and that the vulnerability of the remediation process again appeared to be at the regional level when residential providers and/or Support Coordinators were not focused on the timely and thorough resolution of problems identified.<br><br>The *28th ISR* concluded that the factual evidence clearly established that, for the individuals in this sample, the Support Coordinators and residential staff must implement the planned corrective actions timely and in an effective manner before | | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | DBHDS's remediation process will be sufficient.<br><br>With regard to improving the timely completion of planned corrective actions, DBHDS modified *Version 003* of the Process Document to add steps, if needed to effectuate the completion of corrective action, for escalation of follow-up to the Assistant Commissioner of Developmental Services and then, to the Deputy Commissioner for Community Services. | | |
| **45. DD Service Providers' Compliance with Administrative** | The Commonwealth is working to ensure at least 86% of DBHDS-licensed DD service | The Commonwealth continues to expand and enhance its efforts to ensure that at least 86% of DBHDS-licensed providers delivering DD services comply with every sub-regulation under 12VAC35-105-620.A-E. The following table presents a comparison of §620 sub-regulation scores from calendar years 2023 | 27th:<br>Not<br>Achieved |

270

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| **Code.** The Commonwealth will work to achieve a goal that at least 86% of DBHDS-licensed providers of DD services comply with 12 VAC 35-105-620 in effect on the date of this Order or as may be amended. To achieve that goal, the Commonwealth will take the following actions: | providers comply with all sub-regulations in *12VAC35-105-620.A–E.*<br><br>Because the study is occurring early in the 2026 annual licensing inspection cycle, current-year results will not be available until the 29th study is complete.<br><br>For CY2025 vs. 2024, 9 of 11 sub-regulations improved, and 6 sub-regulations reached or exceeded 80%.<br><br>DBHDS continues its focus on improving progress toward the 86% benchmark, especially for §*620.C.2* and §*620.C.3*, through | through 2025, with updated data for CY 2025 based on the 27th study report and reflecting a complete year's information. Since this study is being carried out early in the 2026 annual licensing inspection cycle, results for the current year will not be available until the 29th study.<br><br><table><tr><td colspan="4">**Compliance with §620 Sub-Regulations**</td></tr><tr><td>**Regulation**</td><td>**CY23**</td><td>**CY24**</td><td>**CY25**</td></tr><tr><td>620A</td><td>93.11%</td><td>87.13%</td><td>89.00%</td></tr><tr><td>620B</td><td>89.28%</td><td>80.86%</td><td>83.69%</td></tr><tr><td>620C1</td><td>84.77%</td><td>79.61%</td><td>83.99%</td></tr><tr><td>620C2</td><td>81.69%</td><td>69.96%</td><td>63.76%</td></tr><tr><td>620C3</td><td>Not Measured</td><td>97.52%</td><td>63.76%</td></tr><tr><td>620C4</td><td>74.50%</td><td>69.96%</td><td>75.66%</td></tr><tr><td>620C5</td><td>79.85%</td><td>72.02%</td><td>75.45%</td></tr><tr><td>620D1</td><td>83.38%</td><td>75.68%</td><td>80.66%</td></tr><tr><td>620D2</td><td>87.76%</td><td>80.41%</td><td>84.76%</td></tr><tr><td>620D3</td><td>76.50%</td><td>67.38%</td><td>73.78%</td></tr><tr><td>620E</td><td>87.72%</td><td>83.51%</td><td>85.31%</td></tr></table><br>With the updated scores for CY2025, it is encouraging to observe improvements in 9 out of 11 sub-regulations compared to the results from 2024. Furthermore, six sub-regulations have now reached or exceeded the 80% threshold, representing another notable advancement.<br><br>To encourage ongoing progress toward reaching the 86% benchmark for each provider Quality Improvement Program requirement, especially regarding | **28th Deferred** |

271

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | provider training and technical assistance.<br><br>The Expanded Consultation and Technical Assistance (ECTA) process was implemented on July 15, 2025, requiring ECTA participation for certain providers. | scores at §620.C.2 and C.3, DBHDS remains committed to working with providers. Through training and technical assistance, DBHDS aims to help providers better understand and accurately implement each requirement.<br><br>The Commonwealth's efforts to enhance compliance with regulatory requirements are outlined in the Analysis/Conclusions section related to Actions 42.a, 42.b, and 42.c. Of particular significance is the increased focus on regulatory standards achieved through the Expanded Consultation and Technical Assistance (ECTA) process. As indicated under Action 42.b above and Action 45.a below, the ECTA process was implemented on July 15, 2025. OL's latest amendments have extended mandatory ECTA participation requirements for providers, promoting increased involvement in quality improvement initiatives. The expansion of provider training in response to these regulatory modifications underscores the Commonwealth's dedication to enhancing compliance outcomes. | |
| 45.a) Within six months of the date of this Order, DBHDS will require that any provider not in compliance with *12 VAC 35-105-620.C.4* and *D.3* (regarding corrective action plans) develop and implement a corrective action plan that includes the receipt | DBHDS licensing regulations at *12VAC35-105-170* require providers to develop, submit, and implement a written Corrective Action Plan (CAP) for each violation cited by the Office of Licensing (OL). These requirements apply to | Previous studies confirmed that DBHDS licensing regulations at 12VAC35-105-170 require providers to develop, submit, and implement a written Corrective Action Plan (CAP) for each violation cited by the Office of Licensing (OL). These requirements apply to all cited violations, including those outlined in *12VAC35-105-620.C.4* and *D.3*.<br><br>These requirements remain in effect and are defined and described in the DBHDS licensing regulations and within its *Office of Licensing Look-Behind Process for DD Providers' Annual Inspections*. This document addresses (1) assessment of policy, (2) corrective action plan requirements, and (3) progressive enforcement. DBHDS conducts regular reviews and makes needed revisions of this process; its most recent updates took place in June and July 2025. | 27th: Completed<br><br>**28th: Completed and Ongoing** |

272

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| of technical assistance, additional training, and specific actions related to the respective areas of underperformance as determined appropriate by DBHDS. | all cited violations, including those outlined in *620.C.4* and *D.3*.<br><br>DBHDS has continued the Expanded Consultation and Technical Assistance (ECTA) process to assist licensed providers in strengthening Quality Improvement (QI) and Risk Management (RM) practices, including when providers are cited for specific licensing violations under *620.C.4* and/or *D.3*.<br><br>Effective July 15, 2025, participation in ECTA became mandatory for providers receiving two consecutive citations in designated regulatory | To address Action 45.a, DBHDS has continued the Expanded Consultation and Technical Assistance (ECTA) process, a consultative and individualized support program delivered by the Office of Community Quality Improvement (OCQI). The purpose of ECTA is to assist DBHDS-licensed Developmental Disability (DD) providers in strengthening Quality Improvement (QI) and Risk Management (RM) practices, particularly when providers are cited for specific licensing violations under *12VAC35-105-620.C.4* and/or *D.3*.<br><br>Effective July 15, 2025, participation in ECTA became mandatory for providers receiving two consecutive citations in designated regulatory sections (*450, 520 A–D,* or *620 A–D*). When participation is mandatory, providers must contact the ECTA team within 45 days of approval of their most recent CAP.<br><br>A general summary of ECTA participation from April through November 2025 is provided under Action 42.b. During this period, among providers cited under *12VAC35-105-620.C.4,* 107 providers were cited and 78% engaged in the ECTA process. Forty-one providers (38%) completed ECTA, and 42 providers (39%) were enrolled and actively completing the process. Twenty-four providers did not complete ECTA for various reasons. Similarly, 110 providers were cited under *12VAC35-105-620.D.3*, with 75% engaging in ECTA. Forty-one providers (37%) completed ECTA, and 42 providers (38%) were actively enrolled. Twenty-seven providers did not complete ECTA for various reasons.<br><br>Consistent with the participation trends described under Action 42.b, ECTA maintained strong provider engagement during this eight-month period. The process descriptions and data analysis support the determination that the requirements of Action 45.a have been met. DBHDS continues to require that | |

273

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | sections including *620.C.4* and *D.3.*<br><br>Provider participation levels and engagement in the ECTA program continue to remain strong based on analysis of participation data during the period from April-November 2025. | providers not in compliance with *12VAC35-105-620.C.4* and *D.3* develop and implement CAPs that include technical assistance, additional training, and targeted corrective actions aligned with identified areas of underperformance. | |
| 45.b) Within six months from the date of this Order, for providers who are not compliant with 12 VAC 35-105-620.C.4 and D.3 (regarding corrective action plans) for two consecutive licensing inspections, DBHDS shall take appropriate further action to enforce adherence to the Commonwealth's | DBHDS licensing regulations at 12VAC35-105-170 require providers to develop, submit, and implement a written Corrective Action Plan (CAP) for each violation cited by the Office of Licensing (OL). These requirements apply to all cited violations, including those | Previous studies confirm that DBHDS licensing regulations at *12VAC35-105-170* require providers to develop, submit, and implement a written Corrective Action Plan (CAP) for each violation cited by the Office of Licensing (OL). These requirements apply to all cited violations, including those outlined in *12VAC35-105-620.C.4* and *D.3*.<br>To address Action 45.b, DBHDS has continued the Expanded Consultation and Technical Assistance (ECTA) process, a consultative and individualized support program delivered by the Office of Community Quality Improvement (OCQI). ECTA assists DBHDS-licensed Developmental Disability (DD) providers in strengthening Quality Improvement (QI) and Risk Management (RM) practices, particularly when providers are cited for violations under *12VAC35-105-620.C.4* and *D.3*.<br><br>Effective July 15, 2025, participation in ECTA became mandatory for providers receiving two consecutive citations in designated regulatory sections | 27th: Completed<br><br>**28th: Completed and Ongoing** |

274

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| regulations, which may include, but not be limited to, issuing citations, issuing systemic citations, issuing a health and safety corrective action plan, reducing a provider's license to provisional status, or revoking the provider's license as determined appropriate by DBHDS. | outlined in 620.C.4 and D.3.<br><br>Effective July 15, 2025, participation in ECTA became mandatory for providers receiving two consecutive citations in designated regulatory sections including 620.C.4 and D.3.<br><br>DBHDS consistently follows ECTA protocols and enforces mandatory participation when providers are found noncompliant with applicable licensing requirements. | (*450, 520 A–D*, or *620 A–D*). Providers subject to mandatory participation must contact the ECTA team within 45 days of approval of their most recent CAP.<br><br>A review of data for providers meeting the criteria for mandatory ECTA participation since July 2025 demonstrates that DBHDS is consistently following ECTA protocols and enforcing mandatory participation when providers are found noncompliant with applicable licensing requirements. These actions support the determination that the requirements of Action 45.b have been met for this review period. | |
| 45.c) Within 24 months of the date of this Order, DBHDS will ensure that all DBHDS staff and contractors assigned to assess the adequacy of | The Office of Licensing (OL) developed and implemented an inter-rater reliability (IRR) review process to formally assess the consistency and | As outlined in the 27th study report, the Office of Licensing (OL) has sustained and expanded several initiatives to meet the requirements of this action. These initiatives include:<br>• DD Inspection Training for licensing specialists<br>• Regional Managers conducting unannounced parallel inspections with Licensing Specialists | 27th<br>In Progress<br><br>**28th**<br>**Completed and Ongoing** |

275

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| provider quality improvement programs have established inter-rater reliability in conducting such assessments. | accuracy with which its Licensing Specialists determine whether providers meet the regulatory requirements applicable to Term 45.<br><br>The IRR review is conducted three times per year. During each review, all licensing specialists independently evaluate the same provider record, and their determinations are compared to a "gold standard" set by the Quality Improvement Review Specialist.<br><br>The Associate Director of Quality & Compliance selects the provider record and relevant documents | • Experienced Licensing Specialists shadowing and mentoring newly hired staff<br>• Quality Improvement Specialist Look-Behinds<br><br>In July 2025, OL developed and implemented a formal, structured Inter-Rater Reliability (IRR) process. This process is designed to promote consistent and accurate licensing inspections by having its Licensing Specialists independently review the same provider record, with their ratings compared against a "gold standard" of determinations and explanations established by the OL Quality Improvement Review Specialist (QIRS). The IRR focuses exclusively on regulations pertaining to risk management and quality assurance, specifically outlined in *12VAC35-105-450, 520.A, 520.B, 520.C.1-5, 520.D, 620A, 620.B, 620.C.1-5*, and *620.D.1-3*.<br><br>The Associate Director of Quality & Compliance selects and prepares the records and supporting documentation, while all eligible Licensing Specialists (excluding new hires and the specialist who conducted the original inspection of the reviewed provider) submit their compliance determinations using the IRR Corrective Action Plan (CAP) form. The QIRS compiles and analyzes agreement levels, provides guidance on correct determinations within scheduled timelines, and shares aggregated data and trends with OL leadership. If agreement levels on particular regulations fall below established thresholds, OL provides targeted or individualized training to enhance consistency and accuracy.<br><br>While OLs' IRR process was initially intended to occur quarterly, it subsequently modified the schedule to three times per year - in January, May and September - based on the time required for each evaluation and analysis. | |

276

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | and makes them available for review.

The Quality Improvement Review Specialist independently establishes the "gold standard" rating and records all rater data in the IRR Tracker.

Aggregate results are analyzed and summarized, and findings are reported to the Director of Licensing along with recommended corrective or improvement actions. Any regulation with less than 86% agreement triggers additional training for licensing specialists, either individually or in groups. | To date, OL has completed two reviews (the initial review in July 2025 and the second review in January 2026), and the results have been analyzed.

The July 2025 review assessed 19 regulations, with 12 (63%) attaining an agreement level of 60% or higher, while only two items (11%) fell below the 40% threshold. Following its analysis of these results, OL formulated and executed a comprehensive, outcome-oriented action plan focused on enhancing rating consistency. This plan included clarifying ambiguous items, examining patterns of disagreement, updating requirements, and providing both individual and group retraining for staff. The effectiveness of this approach was evident in the January 2026 review, where 15 out of 19 items (79%) showed score improvements, including six items that increased by over 25 percentage points. Only four items registered a decline in scoring percentages.

Additionally, OL instituted ongoing peer discussions and case reviews to further reinforce consistent application of standards across the team. OL continues to monitor progress and adjust its training based on outcome trends from each review cycle. The OL plans to review its IRR protocol annually to foster continuous improvement and consistent implementation of the licensing inspection process.

Based on review of the process description, analysis of results from Rounds 1 and 2 of the IRR process, and corrective actions OL has taken in response to its analyses from the first two rounds, the consultant determined that the Office of Licensing has established an inter-rater reliability process for all Licensing Specialists related to provider compliance with quality assurance trending requirements required by Action 42.a. Data from the first two rounds indicate | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | The IRR process is reviewed annually to identify strengths, areas for improvement, and potential modifications to enhance process effectiveness.<br><br>The consultant confirmed that the IRR process follows the OL Inter-Rater Reliability Process requirements and that rating consistency improved significantly from the 07/2025 review to the 01/2026 review after initial remedial actions were implemented. | that OL's IRR process has enhanced consistency and highlighted areas where additional guidance, training, and oversight are warranted to ensure ongoing uniformity. OL will continue to evaluate the effectiveness of its IRR process as its testing and analysis proceed every four months. | |
| **46.  Quality Service Monitoring**.  The Commonwealth will work to ensure that, using information collected from licensing | The 28th Period Study will defer a compliance finding for this Term until the 29th Period. | At the time of the 27th Period, DBHDS did not meet the requirements for Term 46.  At that time, DBHDS continued to offer a very successful *Expanded Consultation and Technical Assistance* (*ECTA*) to providers who have licensing deficiencies for *12VAC35-105-520*, *12VAC35-105-620* 1*2VAC35-105-450*, and for providers who receive a QSR QEP for provider collection and tracking of performance data (e.g., serious incident and other risk information, etc.) | 27th: Not Achieved<br><br>**28th: Deferred** |

278

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| reviews and Quality Service Reviews, it identifies providers that have been unable to demonstrate adequate quality improvement programs and offers technical assistance as necessary. | In addition to licensing reviews, DBHDS continued to collect data from the Round 8 QSR PQR tool to identify providers that have been unable to demonstrate adequate quality improvement programs.<br><br>Round 8 QSR data can be considered valid (i.e., that it measures what it purports to measure).  However, for this 28th Period, Round 8 QSR was ongoing and DBHDS could not yet provide new data for sampling to complete data reliability.  As a result, this study will defer a compliance finding for this Term until the 29th Period, when Round 8 data will be available to | However, while the Round 7 data available during the 27th Period was considered to be valid (i.e., that it measured what it purports to measure), the 27th Period comparative sampling process completed by the consultant found the QSR data collected through the PQR tool continued to be unreliable. The study found that the overall agreement with QSR findings related to quality improvement was only 65%.<br><br>In addition, the 27th Period Process Document entitled *QSR Quality Improvement Findings,* dated 8/18/24, did not yet demonstrate DBHDS could adequately identify the quality improvement technical assistance needs of providers due to previously-identified significant IRR discrepancies between QSR reviewer findings and those of experts in the field.  Per DBHDS staff report, these revisions were pending the completion of a planned analysis of QSR scoring concordance data as compared with relevant OL data. As also reported for the 27th Period, this Process Document did not provide level of detail that met the expectations of DBHDS' *Quality Service Reviews: Inter-rater Reliability Assurance Plan* or the Process Document own instructions (i.e., that the CQI section should provide a detailed step-by-step process describing what will be done to monitor and improve the process as time progresses.)  DBHDS indicated at that a revised Process Document would be available for this 28th Period study.<br><br>For this 28th Period, in addition to data from licensing reviews, for Round 8 QSR, DBHDS continued to collect data from the QSR PQR tool to identify providers that have been unable to demonstrate adequate quality improvement programs.  As reported at the time of the 27th period, Round 8 data can be considered valid (i.e., that it measures what it purports to measure).  However, for this 28th Period, Round 8 QSR was ongoing and DBHDS could not yet provide new data for sampling to confirm data reliability.  As a result, this | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | complete a comparative sample.<br><br>DBHDS provided a revised 28th Period Process Document entitled *QSR Quality Improvement Findings Version 004,* dated 3/25/26. As needed, it updated the QSR Inter-Rater Reliability Section VII - Continuous Quality Improvement (CQI) section to provide a detailed step-by-step process describing what will be done to monitor and improve the process as time progresses.<br><br>Overall, the revisions also satisfied the DBHDS *Quality Service Reviews: Inter-rater Reliability Assurance Plan* | study will defer a compliance finding for this Term until the 29th Period, when Round 8 data will be available to complete a comparative sample.<br><br>DBHDS provided a revised 28th Period Process Document entitled *QSR Quality Improvement Findings Version 004,* dated 3/25/26. As needed, it updated the QSR Inter-Rater Reliability Section VII - Continuous Quality Improvement (CQI) section to provide a detailed step-by-step process describing what will be done to monitor and improve the process as time progresses. As previously recommended, this was based on the methodology and expectations for establishment of scoring concordance between DBHDS Subject Matter Experts (SME) and QSR gold reviewers for the PQR abstraction tools. It documented that DBHDS meets with HSAG and chooses a file to review to evaluate alignment of determinations related to the Quality Improvement and Risk Management; completes a summary of findings; and implements process improvements as a result of the findings in the next round.<br><br>Further, the Process Document indicated data from licensing reviews, Deputy Commissioner/Independent Reviewer Consultant look backs and QSR reviews will be compared to identify where there are inconsistencies in the data and which elements of the quality improvement plan require further clarity to ensure increased consistency in determinations. Overall, this satisfied the DBHDS *Quality Service Reviews: Inter-rater Reliability Assurance Plan* requirement for the establishment of processes for validating QSR results against other business area data collected. However, going forward, DBHDS staff should further flesh out the Process Documents to include "the data source used for validating QSR results, processes for validation, associated QSR dataset calculations, associated QSR vendor calculations as evidenced by any ad hoc QSR reports requested of the QSR vendor by the business area, and what | |

280

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | requirement for the establishment of processes for validating QSR results against other business area data collected (i.e., licensing reviews, Deputy Commissioner/Independent Reviewer Consultant look backs and QSR reviews).

Going forward, DBHDS staff should further flesh out the Process Documents to specifically include "the data source used for validating QSR results, processes for validation, associated QSR dataset calculations, associated QSR vendor calculations as evidenced by any ad hoc QSR reports requested of the QSR | happens if and when incongruence between the QSR dataset and the data source data used for validation is identified."

With regard to offering technical assistance as necessary, as described below with regard to Action 46a), DBHDS continued to employ a total of 12 Quality Improvement Specialists (QIS) to provide Expanded Consultation and Technical Assistance (ECTA) individualized consultation and technical assistance, to providers who have licensing deficiencies for *12VAC35-105-520*, *12VAC35-105-620* 1*2VAC35-105-450*, and for providers who receive a QSR QEP for provider collection and tracking of performance data (e.g., serious incident and other risk information, etc. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | vendor by the business area, and what happens if and when incongruence between the QSR dataset and the data source data used for validation is identified." <br><br> With regard to offering technical assistance as necessary, DBHDS continued providing Expanded Consultation and Technical Assistance (ECTA) individualized consultation and technical assistance, to providers who have licensing deficiencies for *12VAC35-105-520*, *12VAC35-105-620* 1*2VAC35-105-450*, and for providers who receive a QSR QEP for provider collection and tracking of | | |

282

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | performance data (e.g., serious incident and other risk information, etc. | | |
| 46a) Within six months of the date of this Order, DBHDS will require that any provider not in compliance with quality improvement program regulations develop and implement a corrective action plan.  DBHDS will continue to employ a total of 12 Quality Improvement Specialists. DBHDS Quality Improvement Specialists will continue to offer providers technical assistance, additional training, and specific actions related to the respective areas of underperformance. | For this 28th Period, DBHDS completed the requirements of this action.<br><br>The OL continued to conduct annual licensing inspections to cite providers who fail to comply with regulatory requirements outlined in *12VAC35-105-620 A-D*. In response to any cited non-compliance, providers must develop and implement a Corrective Action Plan (CAP) for each citation, as described in *12VAC35-105-170*. | For this 28th Period, the OL continued to conduct annual licensing inspections to cite providers who fail to comply with regulatory requirements outlined in *12VAC35-105-620 A-D*. In response to any cited non-compliance, providers must develop and implement a Corrective Action Plan (CAP) for each citation, as described in *12VAC35-105-170*.<br><br>DBHDS also continued to employ a total of 12 Quality Improvement Specialists (QIS), who provide the Expanded Consultation and Technical Assistance (ECTA) individualized consultation and technical assistance, tailored to provider organizations' specific needs (i.e., as identified through licensing reviews or QSR findings), in the form of in-person and virtual one-to-one sessions.  Per the *Expanded Consultation and Technical Assistance Standard Operating Procedures (ECTA SOP)*, revised 1/23/26, all QIS staff receive mandatory Intensive ECTA training before assignment to providers for the initiation of ECTA. QIs are paired to work together, providing ECTA for one month before conducting ECTA sessions individually and all QIS staff receive supervision. | 27th: Completed and Ongoing<br><br>**28th: Completed and Ongoing** |

283

| | | Table 2 | | |
|---|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | | **28th** |
| | DBHDS also continued to employ a total of 12 Quality Improvement Specialists (QIS), who provide the Expanded Consultation and Technical Assistance (ECTA) individualized consultation and technical assistance, tailored to provider organizations' specific needs (i.e., as identified through licensing reviews or QSR findings). | | | |
| 46b) Within six months from the date of this Order, for providers who are not compliant with quality improvement program regulations for two consecutive licensing inspections, DBHDS shall take appropriate further action to | For this 28th Period, DBHDS has again completed this action. The OL continues to conduct annual licensing inspections to cite providers who fail to comply with regulatory requirements outlined in *12VAC35-105-620*. | For this 28th Period, and as described above for Action 45c), DBHDS has again completed this action. The OL continues to conduct annual licensing inspections to cite providers who fail to comply with regulatory requirements outlined in *12VAC35-105-620*. In response to any cited non-compliance, providers must develop and implement a CAP for each citation, as described in *12VAC35-105-170*.<br><br>If a provider is cited for the same violation during two consecutive inspections, they must begin the Expanded Consultation and Technical Assistance (ECTA) process within 45 days of receiving their latest approved CAP. Detailed ECTA requirements are outlined in the *ECTA SOP*, as revised on 1/23/26, and in the | | 27th: Completed and Ongoing<br><br>**28th: Completed and Ongoing** |

284

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| enforce adherence to the Commonwealth's regulations, which may include, but not be limited to, issuing citations, issuing systemic citations, issuing a health and safety corrective action plan, reducing a provider's license to provisional status, or revoking the provider's license as determined appropriate by DBHDS. | In response to any cited non-compliance, providers must develop and implement a CAP for each citation, as described in *12VAC35-105-170*.<br><br>If a provider is cited for the same violation during two consecutive inspections, they must begin the Expanded Consultation and Technical Assistance (ECTA) process within 45 days of receiving their latest approved CAP. Detailed ECTA requirements are outlined in the *ECTA SOP*, as revised on 1/23/26, and in the *Mandatory ECTA Protocol*, effective 1/23/26 and the *Consent Agreement ECTA* | *Mandatory ECTA Protocol*, effective 1/23/26 and the *Consent Agreement ECTA Protocol*, also effective 1/23/26.<br><br>Continued non-compliance or failure to complete required consultation may lead to progressive enforcement actions, as defined in OL protocols. These actions escalate based on the severity of the violations and include measures detailed in the protocol.<br><br>As also documented with regard to Action 45b) above, the established licensure inspection protocols, details of the progressive enforcement process, and examples of progressive enforcement actions taken by OL demonstrate that the Commonwealth has established and implemented protocols for issuing progressive enforcement actions to providers with repeat non-compliance, including violations of §620.A-E and other regulatory requirements. In addition, per the finding of Action 45b), a review of data for providers meeting the criteria for mandatory ECTA participation since July 2025 demonstrated that DBHDS is consistently following ECTA protocols and enforcing mandatory participation when providers are found noncompliant with applicable licensing requirements. | |

285

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | *Protocol*, also effective 1/23/26.<br><br>As documented with regard to Action 45b) above, the established licensure inspection protocols, details of the progressive enforcement process, and examples of progressive enforcement actions taken by OL demonstrate that the Commonwealth has established and implemented protocols for issuing progressive enforcement actions to providers with repeat non-compliance, including violations of *§620.A-E* and other regulatory requirements<br>If a provider is cited for the same violation | | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | during two consecutive inspections, they must begin the ECTA process within 45 days of receiving their latest approved CAP.<br><br>Per the finding of Action 45b) above, a review of data for providers meeting the criteria for mandatory ECTA participation since July 2025 demonstrated that DBHDS is consistently following ECTA protocols and enforcing mandatory participation when providers are found noncompliant with applicable licensing requirements. | | |
| 46c) Within 24 months of the date of this Order, DBHDS will | This action is not required until 1/15/27 (24 months from the | This action is not required until 1/15/27 (24 months from the approval of the permanent injunction). A full final implementation plan was not completed. | 27th:<br>In Progress |

287

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| ensure that all DBHDS staff and contractors assigned to assess the adequacy of provider quality improvement programs have established inter-rater reliability in conducting such assessments. | approval of the permanent injunction). A full final implementation plan was not completed.<br><br>For this 28th Period, as described with regard to Action 42a) above, based on review of the process description, an analysis of results from two rounds of the OL Licensing Specialist IRR process, and the corrective actions OL has taken in response to its analyses from the first two rounds, the consultant determined that the Office of Licensing has established an inter-rater reliability process for all Licensing Specialists related to provider compliance with quality assurance. | However, at the time of the 27th Period, DBHDS was actively engaged in two IRR efforts, one to enhance the IRR between Licensing Specialists and another to enhance the accuracy of QSR reviewer findings regarding providers' quality improvement programs. The OL had developed the needed formal, measurable framework for continuously assessing IRR among its Licensing Specialists and began its implementation in July 2025, and anticipated completion of the analysis of results and follow-up action by 09/30/25 (i.e., at the conclusion of the 27th Period). In addition, the DBHDS Deputy Commissioner and the OL Associate Director of Quality and Compliance completed scoring concordance with the QSR vendor. In a next step, the Deputy Commissioner planned to complete a comparison of these QSR IRR findings with the applicable findings of the Licensing IRR to see how closely they might align. Once this evaluation was complete, DBHDS staff intended to update the IRR section of the QSR Process Documents.<br><br>For this 28th Period, as described with regard to Action 42a) above, based on review of the process description, an analysis of results from two rounds of the OL Licensing Specialist IRR process, and the corrective actions OL has taken in response to its analyses from the first two rounds, the consultant determined that the Office of Licensing has established an inter-rater reliability process for all Licensing Specialists related to provider compliance with quality assurance.<br><br>With regard to QSR, as described further above, DBHDS had updated the Process Document *QSR Quality Improvement Findings Version 004*, dated 3/25/26, to document the scoring concordance between the HSAG gold reviewer and DBHDS staff as a CQI step. For this 28th Period, the DBHDS reviewers included the DBHDS Deputy Commissioner for Community Services and the OL Associate Director of Quality & Compliance. Based on the document | **28th: In Progress** |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | With regard to QSR IRR, DBHDS had updated the Process Document *QSR Quality Improvement Findings Version 004*, dated 3/25/26, to document the scoring concordance between the HSAG gold reviewer and DBHDS staff as a CQI step.<br><br>For this 28th Period, the DBHDS reviewers included the DBHDS Deputy Commissioner for Community Services and the OL Associate Director of Quality & Compliance.<br><br>Based on the document entitled Round 8 *DBHDS and HSAG Independent Scoring Summary*, for the Round | entitled Round 8 *DBHDS and HSAG Independent Scoring Summary*, for the Round 8 PQR, the QSR vendor and DBHDS staff scored fifteen elements differently. The concordance process resulted in a final agreement on the correct scoring, and the document indicated these discussions would be incorporated into PQR training during the discussion and questions portion. The process did not identify any need for revision of the Round 8 reviewer notes, but did identify potential improvements for scoring criteria in future rounds (i.e., which could not occur in Round 8 without adversely impacting the implementation timeline was identified.)<br><br>However, it was important to note that DBHDS had not yet established that the system of IRR among QSR reviewers, as described in the Process Document and the QSR Vendor documents entitled *Interrater Reliability Quality Assurance Policy*, dated February 2026 and *Interrater Reliability Process Summary*, dated January 2026, is sufficient to ensure reliable results. The consultant will conduct a comparative sample for reliability during the 29th Period.<br><br>In addition, the Process Document did not provide a clear methodology to provide a measure of the levels of IRR between OL Licensing Specialists and QSR reviewers. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | 8 PQR, the QSR vendor and DBHDS staff scored fifteen elements differently. The concordance process resulted in a final agreement on the correct scoring, and the document indicated these discussions would be incorporated into PQR training during the discussion and questions portion. The process did not identify any need for revision of the Round 8 reviewer notes, but did identify potential improvements for scoring criteria in future rounds (i.e., which could not occur in Round 8 without adversely impacting the implementation timeline was identified.) | | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | However, it was not yet established that the system of IRR among QSR reviewers, as described in the Process Document and the QSR Vendor documents entitled *Interrater Reliability Quality Assurance Policy*, dated February 2026 and *Interrater Reliability Process Summary*, dated January 2026, is sufficient to ensure reliable results. The consultant will conduct a comparative sample for reliability during the 29th Period.<br><br>In addition, the Process Document did not provide a clear methodology to measure the level of IRR between OL | | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | Licensing Specialists and QSR reviewers. | | |
| **49. Residential Services Community Integration.** The Commonwealth will work to achieve a goal that 95% of residential service recipients reside in a location that is integrated in, and supports full access to, the greater community in compliance with the CMS rule on HCBS settings. | For this 28th Period, DBHDS did not meet the requirement of this Term because it did not yet submit documentation that demonstrated reliable and valid data for either initial compliance validation or for ongoing compliance.<br><br>DBHDS submitted a DMAS memorandum, dated 2/10/26, entitled *Home and Community-Based Settings (HCBS) Rule Compliance Post December 31, 2025,* which indicated that the Commonwealth "successfully completed the initial compliance reviews of all services | At the time of the 27th Period, the Commonwealth did not meet the goal for Term 49 because DBHDS did not provide an updated metric. DBHDS staff were continuing to validate initial compliance for many of the 700 settings previously reviewed through the QSR vendor. Therefore, their compliance status remained unknown and could not be represented in the calculation for this Term. In addition, DBHDS staff had not yet shown the data for this Term were reliable and valid, either for initial compliance validations or for ongoing monitoring.<br><br>The paragraphs below describe the 27th Period deficiencies followed by the actions DBHDS took during this 28th Period to address them.<br><br>**Initial compliance validations**<br>**27th Period:** DBHDS had not yet submitted a Process Document that provided a methodology to obtain valid and reliable data. The document DBHDS provided (i.e., *HCBS Setting Rule Initial Determination*) did not have all the components of a formal Process Document and, in particular, needed a fleshed out methodology for data collection. As previously reported, it still needed to reflect consistency with the validation processes in the approved Statewide Transition Plan (STP) and the requirements of the HCBS Settings Rule and related CMS guidance. In particular, the DBHDS processes still needed to ensure that the validation of settings compliance was setting-specific (i.e., that the finding of compliance for one provider setting cannot be used to attest to compliance for the provider's additional settings) and, per the Commonwealth's *Addendum to the Commonwealth of Virginia's Statewide Transition* | 27th: Not Achieved<br><br>**28th: Not Achieved** |

292

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | required to comply" with the Home and Community Based Settings (HCBS) Regulation (42 CFR 441.301(c)(4)).<br><br>However, DBHDS did not submit any updated documents to show that the data collection processes clearly met the requirements to obtain valid and reliable data, nor had CMS yet issued a Settings CAP Completion letter to confirm the Commonwealth's compliance for the initial validations. Therefore, the study could not confirm the assertion of compliance with this requirement. | *Plan February 2019*, that for onsite reviews to validate remediation, a "minimum of 25% of individuals receiving services in a setting will be interviewed and no less than 2 individuals for smaller settings of 2 or more persons receiving services." DBHDS did provide a Process Document entitled *HCBS Compliant Settings*, dated 4/23/25, for the aggregation of the data from the QSR, WaMS, CONNECT and the HCBS Master Tracking Spreadsheet maintained by DMAS. DBHDS also provided a Data Set Attestation for this Process Document (i.e., *DS HCBS Compliant Settings Attachment B*, dated 9/29/25). While this document provided valid and reliable methodologies for aggregating the data from the various sources, it did not address the validity and reliability of the data collection processes themselves.<br><br>**28th Period:** For this 28th Period, DBHDS submitted a DMAS memorandum, dated 2/10/26, entitled *Home and Community-Based Settings (HCBS) Rule Compliance Post December 31, 2025*. This memorandum indicated that the Commonwealth "successfully completed the initial compliance reviews of all services required to comply" with the Home and Community Based Settings (HCBS) Regulation (42 CFR 441.301(c)(4)). However, DBHDS did not submit any updated documents to show that the data collection processes clearly met the requirements for obtaining valid and reliable data, and, as of 4/22/26, CMS had not yet issued a Settings CAP Completion letter to confirm the Commonwealth's compliance for the initial validations. Therefore, the study could not confirm the assertion of compliance with the requirements for initial validation.<br><br>**Ongoing monitoring of HCBS compliance**<br>**27th Period:** DBHDS still needed to complete several pending actions to demonstrate valid and reliable data for ongoing monitoring of HCBS | |

| | | Table 2 | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | DBHDS also still needed to finalize several pending actions to demonstrate valid and reliable data for ongoing monitoring of HCBS compliance<br><br>For this period, DBHDS submitted a revised *HCBS Ongoing Monitoring Process Document Version 3*, dated 12/5/25, but did not yet submit a relevant Data Set Attestation.<br><br>The document again incorporated findings from the DMAS QMR Tool, the DBHDS HCBS templates and the approved QSR vendor tools, as well as the same 10% look-back process steps. | compliance. The Process Document entitled *HCBS Ongoing Monitoring Process Document Version 2*, dated 4/2/25, incorporated findings from the DMAS QMR Tool, the DBHDS HCBS templates and the approved QSR vendor tools, as well as an ongoing ten percent IRR look-behind of QSR HCBS findings by the DBHDS HCBS Review Team staff. The Process Document indicated DBHDS staff would use the comparative results of the IRR look-behind to develop and implement training to correct discrepancies, which would serve to supplement the additional needed revisions to the QSR tools as discussed above. Needed revisions also remained pending the completion of the QSR look-behind, to be followed by a comprehensive revision of appropriate tools and protocols.<br><br>The 27th Period study also documented that the PQR and PCR tools QSR reviewers used to assess ongoing compliance with the HCBS Settings Rule still needed additional revisions to incorporate an adequate assessment of all the Final Rule requirements. The revisions also needed to address the DBHDS response to a June 2024 CMS Site Visit, which included DBHDS assertions of a number of steps it would take to address CMS-identified deficiencies on a systemic basis.<br><br>DBHDS had not yet provided a Data Set Attestation for the ongoing compliance measure, pending the ongoing 10% validation process and any needed process modifications.<br><br>**28th Period:** For this period, DBHDS submitted a revised *HCBS Ongoing Monitoring Process Document Version 3*, dated 12/5/25, but did not yet submit a relevant Data Set Attestation. The document again incorporated findings from the DMAS QMR Tool, the DBHDS HCBS templates and the approved | |

294

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | The DMAS memorandum, entitled *Home and Community-Based Settings (HCBS) Rule Compliance Post December 31, 2025,* stated that ongoing monitoring reviews will consist of documentation reviews, individual interviews, staff interviews and a tour of the setting. DBHDS should ensure these process requirements are also reflected in the Process Document.<br><br>DBHDS submitted a document entitled *HCBS and HSAG Comparison Findings,* describing the comparative results of the 10% look-behind of QSR HCBS findings by the DBHDS HCBS | QSR vendor tools, as well as the same 10% look-back process steps. This 10% look-back process was represented twice, once as a step within the methodology and once as a Continuous Quality Improvement (CQI) strategy.<br><br>Of note, per the aforementioned DMAS memorandum (i.e., *Home and Community-Based Settings (HCBS) Rule Compliance Post December 31, 2025* ongoing monitoring reviews will consist of documentation reviews, individual interviews, staff interviews and a tour of the setting. DBHDS should ensure these process requirements are reflected in the Process Document.<br><br>DBHDS submitted a document entitled *HCBS and HSAG Comparison Findings,* completed during January 2026, that described the comparative results of the 10% look-behind of QSR HCBS findings by the DBHDS HCBS Review Team staff. While the preliminary analysis found six PCR and seven PQR elements with significant discrepancies, a "deeper dive" conducted by the Director of Quality Improvement Analytics and Processes and the HCBS Team Lead largely identified process differences as the primary factor for any variations, but did not identify any significant discrepancies. However, because using different processes to measure and report on the same outcomes has a real potential to impact data reliability, the determination that there was not an impact also needed to be clearly documented in the Process Document.<br><br>The *HCBS and HSAG Comparison Findings* did identify several opportunities for process improvements, however, and began implementation during this 28th Period. These included the following:<br>1. HCBS Review Team will receive both PCR and PCR Tools<br>2. OCQM will provide an overview of the tools and documents provided. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | Review Team staff. While the preliminary analysis found six PCR and seven PQR elements with significant discrepancies, a "deeper dive" conducted by the Director of Quality Improvement Analytics and Processes and the HCBS Team Lead largely identified process differences as the primary factor for any variations, but did not identify any significant discrepancies.<br><br>However, because using different processes to measure and report on the same outcomes has a real potential to impact data reliability, the | 3.  HCBS Review Team Lead will be involved in PCR and PQR tools revisions specific to HCBS related questions.<br><br>DBHDS also submitted revised PQR and PCR tools the QSR vendor would use for QSR Round 8, which included new elements that improved the probing of HCBS requirements (e.g., for access to privacy and staff knowledge of modifications).  The Department also flagged seven existing elements to confirm that they also reflected HCBS compliance.  Overall, this represented progress since the 27th Period.<br><br>However, upon initial review, the consultant provided feedback that, to inform a full evaluation of the QSR tools, it continued to be necessary for DBHDS to provide a clearly stated methodology or crosswalk that showed how the Commonwealth purported to measure each of the HCBS requirements, including those it committed to in response to the CMS Site Visit in 2024. The current tools identify each HCBS-related question, but do not specify which requirement(s) each question addresses; more importantly, this identification protocol does not show that the full set of HCBS questions in the QSR tools address all of the Rule's requirements overall. For example, in the response to the CMS site visit, DBHDS had indicated it would imbed a question in the ongoing monitoring tools about choice of representative payee as a means of assessing the control of personal resources, but the QSR tools provided for review did not include this. In addition, the tools continued to include HCBS-related elements that have only text field responses, but did not yet provide a methodology for how to evaluate those responses for HCBS compliance. DBHDS staff reported that this was a work in progress and that they were still engaged in a qualitative analysis in order to make these determinations. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | determination that there was not an impact needed to be clearly documented in the Process Document.<br><br>DBHDS also submitted revised PQR and PCR tools the QSR vendor would use for QSR Round 8, with new elements that improved the probing of HCBS requirements (e.g., for access to privacy and staff knowledge of modifications). It also flagged seven existing elements to confirm that they also reflected HCBS compliance. Overall, this represented progress since the 27th Period.<br><br>However, to inform a full evaluation of the | Of note, DBHDS provided a set of additional probing questions that the internal HCBS Team would be using to evaluate ongoing compliance, dated 9/24/25, an approach they should consider when revising the PCR for Round 9.<br><br>Due to these ongoing and pending needs, and despite evidence of progress, this study could not yet confirm that the QSR tools yield valid and reliable data for ongoing HCBS compliance. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | QSR tools, it continued to be necessary for DBHDS to provide a clearly stated methodology or crosswalk that showed how the Commonwealth purported to measure each of the HCBS requirements, including those it committed to in response to the CMS Site Visit in 2024.<br><br>In addition, the tools continued to include HCBS-related elements that have only text field responses, but did not yet provide a methodology for how to evaluate those responses for HCBS compliance.  DBHDS staff reported that this was a work in progress and that they were still | | |

298

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | engaged in a qualitative analysis in order to make these determinations. | | |
| 49a)  In accordance with its CMS-approved Statewide Transition Plan, by December 31, 2025, the Commonwealth will complete its review of the remaining 3,296 locations for compliance with the CMS settings rule to determine if it is in compliance with the 95% goal. | For this 28th Period, this Action was in progress.

As described above, DBHDS submitted a DMAS memorandum, dated 2/10/25, entitled *Home and Community-Based Settings (HCBS) Rule Compliance Post December 31, 2025* that indicated that the Commonwealth "successfully completed the initial compliance reviews of all services required to comply" with the HCBS Regulation.

In addition, DBHDS submitted a document | At the time of the 27th Period, DBHDS could not yet make a final and definitive report regarding the number of remaining locations reviewed for initial compliance with the CMS settings rule.  DBHDS was still performing look-behinds of the 700 settings previously assigned to the QSR vendor that required re-review. A DBHDS summary of the status of this latter group of settings indicated that it included settings assigned to the QSR vendor for compliance validation during QSR  Rounds 1, 2 and 5. DBHDS staff indicated they would provide an update on the status of all of the look back reviews at the time of the 28th Period.

Also at the time of the 27th Period, as described above with regard to Term 49, DBHDS submitted a document entitled *HCBS Setting Rule Initial Determination*. However, it was not formatted as a formal Process Document and it needed a sufficiently fleshed-out methodology for data collection and aggregation.  In addition, as previously reported, the Process Document needed to reflect consistency with the validation processes in the approved Statewide Transition Plan (STP) and the requirements of the HCBS Settings Rule and related CMS guidance.

For this 28th Period, as described above, DBHDS submitted a DMAS memorandum, dated 2/10/25 entitled *Home and Community-Based Settings (HCBS) Rule Compliance Post December 31, 2025* that indicated that the Commonwealth "successfully completed the initial compliance reviews of all | 27th: In Progress

**28th: In Progress** |

299

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | entitled *HCBS HSAG Look Behind of Previous Rounds*, that indicated DBHDS reviewed all remaining providers who had a negative response for any HCBS question where QSR data was used to demonstrate compliance with the HCBS Settings rule during Rounds 1,2 and 5.<br><br>However, as described with regard to Term 49 above, DBHDS did not submit any updated documents to show that the data collection processes for initial compliance validations clearly met the requirements to obtain valid and reliable data, and, as of 4/22/26, CMS had not yet | services required to comply" with the HCBS Regulation.  In addition, DBHDS submitted a document entitled *HCBS HSAG Look Behind of Previous Rounds*, that indicated DBHDS reviewed all providers who had a negative response for any HCBS question as part of Rounds 1,2 and 5 where data was used to demonstrate compliance with the HCBS Settings rule. It also stated that DBHDS reviewed all questions that had an HCBS tag.  Further, if an answer should have been yes and was no or vice versa, the provider was flagged for follow up and reviewed.<br><br>However, as described with regard to Term 49 above, DBHDS did not submit any updated documents to show that the data collection processes for initial compliance validations clearly met the requirements to obtain valid and reliable data, and, as of 4/29/26, CMS had not yet issued a Settings CAP Completion letter to confirm the Commonwealth's compliance for the initial validations. Therefore, the study could not yet confirm the assertion of compliance with this requirement. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | issued a Settings CAP Completion letter to confirm the Commonwealth's compliance for the initial validations. Therefore, the study could not yet confirm the assertion of compliance with this requirement. | | |
| **52. Look-Behind Analysis of Abuse, Neglect, and Exploitation Allegations.**<br><br>The Commonwealth will continue its Community Look-Behind (CLB) review process to achieve a goal of collecting sufficient data for the Risk Management Review Committee (RMRC) to conduct or | OHR conducts the Community Look-Behind (CLB) review of abuse/neglect/exploita tion investigations in licensed DD provider settings. OHR's CLB measures Term 52 Outcomes 1–3: timeliness, investigator training, and implementation of corrective action plans. For the sample, OHR randomly selects 300 cases/year (75 per | Previous study reports have documented that the Commonwealth has continued its Community Look-Behind (CLB) process conducted by the Office of Human Rights (OHR) to review abuse, neglect, and/or exploitation investigation reports involving individuals receiving DD services in licensed community provider settings. The CLB review assesses the achievement of each of the three outcomes outlined in Term 52:<br><br>• Outcome 1 - Investigations of individual incidents occur within state-prescribed timelines.<br>• Outcome 2 - The person conducting the investigation has been trained to conduct investigations.<br>• Outcome 3 - Corrective action plans are implemented by the provider when indicated.<br><br>DBHDS has designed the CLB review process to ensure assessment of a statistically valid sample of its investigations of allegations of abuse, neglect, and exploitation. Each year, OHR randomly selects a total of 300 cases for | 27th: Not Achieved<br><br>**28th: Not Achieved** |

301

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| oversee a look-behind review of a statistically valid, random sample of reported allegations of abuse, neglect, and exploitation.  The review will evaluate whether:  (i) investigations of individual incidents occur within state-prescribed timelines; (ii) the person conducting the investigation has been trained to conduct investigations; and (iii) corrective action plans are implemented by the provider when indicated. The RMRC will review trends at least quarterly, recommend QIIs when necessary, and track implementation of initiatives approved for implementation. | quarter). OHR reports each quarterly results to RMRC within 3 months; RMRC applies an 86% threshold to assess compliance. Across the four most recent quarters: Outcome 1 averaged 84.2%; Outcome 2 averaged 91.9%; and Outcome 3 averaged 63.0%. Trends noted: Over the past four quarters, Outcome 1 had scores above 80% in each quarter and, of these, exceeded the 86% threshold in the most recent quarter. Outcome 2 has been ≥86% for the past four quarters. Outcome 3 has remained between 60–70% across all four quarters. | review, examining 75 cases per quarter. This sample size has been determined to be statistically significant for the purposes of trend analysis and oversight. The OHR CLB process has its Regional Managers perform monthly sample evaluations to assess the attainment of predetermined outcomes under the supervision of the OHR Associate Director for Quality and Compliance. Upon completion of reviews for each quarter, the OHR process involves consolidating the findings in alignment with the OHR Community Look-Behind Timeline. The OHR Director subsequently provides a summary and analysis of quarterly data results to the Risk Management Review Committee (RMRC) within three months after the end of each quarter. The RMRC uses an 86% minimum threshold from CLB Review Form responses to measure process effectiveness and compliance with required outcomes. The OHR Director delivers quarterly PowerPoint presentations to the RMRC summarizing data and findings pertaining to the look-behind review process results. Recent briefings occurred on 08/26/2025, 12/30/2025, and 02/24/2026. Each presentation provides an overview and trend analysis of outcomes associated with the three required outcomes outlined in Term 52. Although RMRC meeting minutes lack extensive detail, they document the conversations held and outline the actions required to resolve any concerns or questions brought up during these meetings. The table below summarizes CLB Look-Behind results over the four most recent quarters as presented to the RMRC: | |

302

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | Process updates/issues: OHR began its "gold standard" IRR process in August 2025 (results: 08/2025, 10/2025, 02/2026) and agreement scores improved across these periods. RMRC initiated a QII in March 2025, but recent QII materials/minutes do not specify measurable outcomes or how progress will be tracked; Outcome 3 has not improved over the past 12 months. | (table and prose below) | |

**Term 52 SFY25-26 Results by Quarter**

| | Q3-SFY25 | Q4-SFY25 | Q1-SFY26 | Q2-SFY26 | Avg |
|---|---|---|---|---|---|
| | 1/1/25-3/31/25 | 4/1/25-6/30/25 | 7/1/25-9/30/25 | 10/1/25-12/31/25 | |
| Report Date: | 7/1/25 | 8/26/25 | 12/30/25 | 2/24/26 | |
| RMRC Review: | 7/1/25 | 8/26/25 | 12/30/25 | 2/24/26 | |
| Sample Size: | 75 | 75 | 75 | 75 | |
| Outcome 1: | 86.0% | 81.3% | 81.3% | 88.0% | 84.2% |
| Outcome 2: | 93.0% | 86.7% | 94.7% | 93.3% | 91.9% |
| Outcome 3: | 63.0% | 61.5% | 66.7% | 60.7% | 63.0% |

Red denotes percentages < the 86% threshold

Over the last four quarters, Outcome 1 consistently surpassed 80% and exceeded 86% in the most recent quarter. Outcome 2 has exceeded the 86% minimum threshold in each of the past four quarters. Outcome 3 remains behind, maintaining scores between 60% and 70% in each of the four quarters. Further details regarding DBHDS's advancement toward the 86% standard can be found in the Term 53 Analysis/Conclusion below.

In the 26th and 27th study reports, the Consultant expressed concerns about the adequacy of data provided by OHR to the RMRC, specifically highlighting issues with the inter-rater reliability (IRR) assessment in the CLB process. To address these concerns, OHR implemented a "gold standard" IRR review process in August 2025. Results from three analyses under this

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | | new process were reviewed and presented at RMRC meetings held on 12/30/2025, and 02/24/2026. OHR's updated IRR methodology demonstrates significant improvements over prior approaches, both in procedural rigor and review frequency. OHR's  process enhancements include oversight and scoring conducted by an individual outside of OHR management, as well as quarterly IRR evaluations featuring objective data scores across 11 focus areas, enabling trend analysis by focus area over time. Reports from the OHR to the RMRC use data and feature helpful visual graphics showing the latest information, trends across time, as well as a high-level overview of QII focus topics, discussions, and decisions.<br><br>Although the IRR process is in its initial stages having only three sets of results completed to date (08/2025, 10/2025, and 02/2026), improvement has been shown from the results of these three sets of results. At this point, with only three sets of results, it is premature to determine actionable trends; however, the  RMRC is giving areas with the greatest disagreement increased attention and developing appropriate remedial measures.<br><br>In 03/2025, due to ongoing challenges in reaching the 86% threshold required for Outcomes 2 and 3, the RMRC initiated a root cause analysis and suggested launching a QII. This initiative aims to boost scores across all outcomes, especially Outcome 3. The QII is still underway, and OHR has provided updates with each quarterly report to the RMRC. However, the consultant has raised concerns about the absence of clearly defined outcomes and measurement criteria within the QII, as it is not possible to effectively track progress without measurable outcomes. Similar to previously reviewed QII summaries, a review of the latest QII meeting summary from 01/21/2026 showed no mention of specific outcomes or methods for measuring progress. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | | Additionally, the RMRC minutes from meetings on 09/23/2025, 10/25/2025, and 11/25/2025 lack substantive detailed information related to the work of the QII. This lack of clarity is troubling because, after roughly a year of work, scores for Outcome 3 have not improved significantly, and there is no documentation specifying the process improvements that are to be achieved, how success will be objectively measured, or whether past actions have effectively improved scores for Outcome 3 toward the 86% threshold set by Term 53. After reviewing both the QII meeting summary and the OHR QII summary report submitted to the RMRC on 02/24/2026, the consultant concluded that neither document provided enough detail to meet the requirements of Term 52, which calls for sufficient data to allow the RMRC to monitor the implementation of approved initiatives. Without these measurement details, the RMRC's ability to properly track the progress of its approved initiatives is limited.<br><br>In summary, the RMRC reviews data and trend analyses quarterly, and receives QII reports on process improvements to meet the 86% goal it established for the Term 52 outcomes as well as the 86% threshold required by Term 53 that address outcomes for look-behind reviews of serious incidents and allegations of abuse, neglect, and exploitation. While progress toward the goal set for Term 52 is evident , current QII reports lack sufficient data on each improvement activity, and these efforts have not improved Outcome 3 scores over the past eleven months. Based on these factors, the Commonwealth's efforts to satisfy the requirements of Term 52 continue not to be achieved.  With further refinement of these procedures under RMRC guidance, along with enhanced documentation within the QII reports and RMRC meeting minutes, the Term 52 requirements are expected to be fully met. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| **53. Samples of Data from Look-Behind Analyses of Serious Incidents and Allegations of Abuse, Neglect, and Exploitation.**<br><br>The Commonwealth will work to achieve a goal of showing 86% of the sample of serious incidents reviewed by the RMRC meet criteria reviewed in the audit and that at least 86% of the sample of allegations of abuse, neglect, and exploitation reviewed by the RMRC meet criteria reviewed in the audit.  The Commonwealth will continue the look behind process and provide feedback to the RMRC related to its | DBHDS maintains a look-behind quality assurance process for serious incidents in accordance with Term 53 through collaboration with Virginia Commonwealth University (VCU) to conduct quarterly look-behind reviews. VCU presents results of its quarterly reviews to the RMRC. These results continue to exceed the required 86 percent performance threshold across all outcomes. Inter-rater reliability for VCU reviewers has remained near 100 percent over the past four quarters. OL prepares responses and corrective action plans following each VCU quarterly report | DBHDS continues to improve its quality assurance process for serious incidents under Term 53 to consistently achieve four goals:<br>• IMU triages incidents according to protocols.<br>• Providers document responses that ensure recipients' safety.<br>• The Office of Licensing Incident Management Unit takes action as needed.<br>• Providers implement timely corrective action plans when required.<br>The process involves working with Virginia Commonwealth University (VCU) to carry out reviews, updating investigation protocols through the Office of Licensing (OL), refining data collection methods, and providing quarterly performance reports. VCU conducts regular reviews, while OL analyzes the results and develops corrective action plans, all of which are shared with the RMRC. During the previous four quarters, VCU's outcomes consistently exceeded the mandated 86% threshold for each measure, with inter-rater reliability maintained at nearly 100%. Review results are submitted quarterly to the RMRC, and OL formulates comprehensive responses and corrective action plans in response to each report. The following table provides an overview of the review findings from the past four quarters.<br><br>| Qtr | Months | RMRC Review | Outcome 1 | Outcome 2 | Outcome 3 | Outcome 4 | IRR Score 88% Threshold |<br>|---|---|---|---|---|---|---|---|<br>| Q4-24 | 10/24-12/24 | 7/1/25 | 100% | 100% | 99% | 100% | 97% |<br>| Q1-25 | 01/25-03/25 | 9/22/25 | 100% | 98% | 97% | 86% | Not Reported |<br>| Q2-25 | 04/25-06/25 | 12/17/25 | 100% | 98% | 99% | 100% | 98% | | 27th: Not Achieved<br><br>**28th: Not Achieved** |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| findings.  If this goal is not met by December 31, 2024, DBHDS will conduct a root cause analysis and implement a QII. DBHDS will continue this quality improvement process until the goal is achieved and sustained for one year. | that include updated investigation protocol and improvements to data collection tools and quarterly performance reporting. The plans also include ongoing training, auditing, and continuous quality improvement activities support corrective action implementation. The Office of Human Rights conducts retrospective evaluations on a statistically valid random sample of reported abuse, neglect, and exploitation allegations assessing each of the three mandated outcomes delineated in Term 52, utilizing an 86% threshold derived from the responses | (see content below) | |

| Q3-25 | 07/25-09/25 | 3/31/26 | 100% | 100% | 100% | 94% | 98% |
|---|---|---|---|---|---|---|---|
| Q4-25 | 10/25-12/25 | | | | | | |

After examining all documents, such as reports and action plans, the consultant determined that the Commonwealth consistently carries out the requirements of Term 53  for thorough analysis of serious incidents.

As required by Term 52, DBHDS's Office of Human Rights (OHR) continues its Community Look-Behind (CLB) process to review reports of abuse, neglect, or exploitation. The OHR provides relevant data and information regarding the CLB process to the Regional Monitoring and Review Committee (RMRC), enabling the RMRC to conduct or oversee comprehensive CLB look-behind reviews.

Term 53 requires that the Commonwealth work to achieve a goal of showing 86% of the sample of allegations of abuse, neglect, and exploitation reviewed by the RMRC meet criteria reviewed in the audit as noted in the table below:

| Term 52 SFY25-26 Results by Quarter | | | | |
|---|---|---|---|---|
| | **Q3-SFY25** | **Q4-SFY25** | **Q1-SFY26** | **Q2-SFY26** | **Avg** |
| | 1/1/25-3/31/25 | 4/1/25-6/30/25 | 7/1/25-9/30/25 | 10/1/25-12/31/25 | |
| **Report Date:** | 7/1/25 | 8/26/25 | 12/30/25 | 2/24/26 | |
| **RMRC Review:** | 7/1/25 | 8/26/25 | 12/30/25 | 2/24/26 | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |

| Facts | Analysis/ Conclusion |
|---|---|
| provided on the CLB Review Form.<br><br>The Commonwealth is still striving to meet the Term 53 requirement of reaching and maintaining an 86% threshold for each of the three specified outcomes in the CLB process outlined in Term 52.<br><br>CLB Outcome 1 met its target of 86% in Q2-SFY26, with scores of 80% or higher recorded in each quarter. CLB Outcome 2 demonstrated consistent performance, maintaining scores above 86% throughout all quarters. In contrast, CLB Outcome 3 averaged 63% across the four quarters, | (table and analysis below) |

| | | | | | |
|---|---|---|---|---|---|
| **Sample Size:** | 75 | 75 | 75 | 75 | |
| **Outcome 1:** | 86.0% | 81.3% | 81.3% | 88.0% | 84.2% |
| **Outcome 2:** | 93.0% | 86.7% | 94.7% | 93.3% | 91.9% |
| **Outcome 3:** | 63.0% | 61.5% | 66.7% | 60.7% | 63.0% |

Red denotes percentages < the 86% threshold

Recent quarterly review summary:
- Outcome 1: The 86% target was met in Q2-SFY26, with all quarters at or above 80%.
- Outcome 2: Scores were above 86% in each quarter.
- Outcome 3: Averaged 63%, remaining well below the threshold.

Process improvement details, including a "gold standard" inter-rater reliability addition, are in the previous Term 52 report section.

The RMRC conducts quarterly reviews of data and trend analyses for the OHR CLB process and receives QII reports detailing process improvements working toward achievement of the 86% threshold set forth in Term 53. Although progress has been observed, recent QII reports do not provide adequate data on individual improvement activities, and these initiatives have not resulted in enhanced Outcome 3 scores during the past eleven months. Consequently, the Commonwealth's efforts to fulfill the requirements of Term 53 continue not to be achieved. With continued refinement of procedures under RMRC oversight, coupled with more comprehensive documentation in the QII reports and RMRC meeting minutes, it is anticipated that the requirements outlined in Term 53 regarding the OHR CLB process will be fully satisfied.

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | remaining below the required threshold in each reporting period.<br><br>The Commonwealth's ongoing initiatives to attain and maintain the 86% benchmark for each of the three outcomes are demonstrating continued progress. Nevertheless, concerns persist regarding QII reports, which often lack sufficient data on individual improvement activities. Additionally, despite ongoing QII efforts, Outcome 3 has consistently recorded scores below the 70% threshold. | | |
| **55. Assessment of Licensed Providers of DD Services.** The Commonwealth will | OL conducts annual inspections (Virginia Code §37.2-411) to assess provider | The Office of Licensing (OL) conducts annual inspections as required by Virginia Code §37.2-411 to check provider compliance with risk management regulations. Licensing specialists use the Annual Compliance Determination Chart for consistent assessments. For 2026, OL has again updated the chart | 27th: Not Achieved |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| work to achieve a goal that at least 86% of DBHDS-licensed providers of DD services have been assessed for their compliance with risk management requirements in the Licensing Regulations during their annual inspections. DBHDS will continue to conduct annual licensing inspections in accordance with Virginia Code § 37.2-411 in effect on the date of this Order or as may be amended and assess provider compliance with risk management requirements in the Licensing Regulations utilizing the Office of Licensing Annual | compliance with risk management regulations.<br><br>OL's Licensing Specialists use an Annual Compliance Determination Chart, which it updated with provider-type-specific instructions for 2026.<br><br>In the last five studies, the Consultant reviewed samples from all five regions and compared specialists' decisions to the Consultant's independent review. These studies found inconsistency in specialists' determinations of whether providers meet risk management requirements. | with specific instructions for each provider type, giving specialists clearer guidance on evaluating regulatory compliance.<br><br>In the last five studies, the Consultant has reviewed a sample of providers in each of the five regions, comparing licensing specialists' assessments to the Consultant's own evaluation of evidence from these providers. Through this process, the Consultant has identified some inconsistencies in how accurately Licensing Specialists determine if providers fulfill risk management requirements.<br><br>Since this 28th study was completed early in the CY2026 licensing inspection cycle, the 25-provider sample is too small to generalize results for all scheduled inspections. Therefore, results for Term 55 are deferred until the 29th study concludes. By combining this study's limited sample with a larger sample completed in the 29th study, there will be enough data for valid comparisons with previous studies from the 24/25 and 26/27 studies.<br><br>Although the findings from this small sample are preliminary, it was promising to observe greater consistency between the licensing specialist's decisions and the Consultant's determinations regarding the requirements for 12VAC35-105-520 and Term 55.<br><br>The Office of Licensing's comprehensive process improvement initiatives—including advanced training for providers and Licensing Specialists, as well as robust data collection from its fully implemented inter-rater reliability process initiated in July 2025—have significantly supported providers in comprehending and adhering to the risk management regulatory requirements outlined in 12VAC35-105-520. Moreover, these efforts have improved the | **28th: Deferred** |

310

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| Compliance Determination Chart. | The 28th study (early CY2026) reviewed 25 providers; the sample is too small to generalize, so Term 55 results are deferred until the 29th study is complete. Combining the 28th and 29th study samples is expected to allow valid comparisons with prior 24/25 and 26/27 studies.<br><br>Preliminary 28th-study findings show increased agreement on 12VAC35-105-520/Term 55; OL reports training and a fully implemented inter-rater reliability process (started July 2025) have improved understanding and rating consistency. | accuracy and consistency of Licensing Specialists' findings when evaluating provider compliance with these regulations. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| **56. Data-Driven Quality Improvement Plans for HCBS Waiver Programs.** The Commonwealth will continue to implement the Quality Improvement Plan approved by CMS in the operation of its HCBS Waivers. The DMAS-DBHDS Quality Review Team (QRT) will meet quarterly in accordance with the CMS-approved Quality Improvement Plan and will review data, determine trends, and implement quality improvement strategies where appropriate as determined by the QRT to improve performance. | For this 28th Period, DBHDS did not meet the specified goals for Term 56.<br><br>DBHDS provided evidence that the QRT met twice, on 10/23/25 and 1/22/26, but did not demonstrate that the QRT determined trends or discussed quality improvement strategies at both meetings.<br><br>For the meeting on 1/22/26, DBHDS provided a PowerPoint presentation entitled *DMAS & DBHDS Quality Review Team (QRT) Quarterly Collaboration SFY 26, Quarter 1*, as well as a set of meeting minutes. Together, these | At the time of the 27th Period, the QRT met quarterly and demonstrated significant improvement in the implementation of the HCBS Waiver Quality Improvement Plan, but did not yet meet the specified goals for Term 56. DBHDS did not provide evidence that the Quality Review Team (QRT) consistently discussed or undertook quality improvement strategies where appropriate.<br><br>For this 28th Period, DBHDS provided evidence that the QRT met twice, on 10/23/25 and 1/22/26, but did not demonstrate that the QRT determined trends or discussed quality improvement strategies at both meetings.<br><br>• For the meeting on 1/22/26, DBHDS provided a PowerPoint presentation entitled *DMAS & DBHDS Quality Review Team (QRT) Quarterly Collaboration SFY 26, Quarter 1*, as well as a set of meeting minutes. Together, these documented that the QRT reviewed SFY 26, Q1 data for nine performance measures that fell below 86% during FY25. The meeting minutes also demonstrated that the members discussed trends as well as efforts at remediation. In most instances, the minutes consistently reflected a clear adoption and implementation of a quality improvement strategy, as detailed with regard to Term 57 below.<br>• However, for the 10/23/25 meeting, DBHDS did not provide meeting minutes, so this study could not confirm whether the members determined trends or discussed quality improvement strategies. DBHDS did provide a PowerPoint presentation entitled *DMAS & DBHDS Quality Review Team (QRT) Quarterly Collaboration SFY 25, Quarter 4* that demonstrated the QRT reviewed data for seven performance measures for that period. However overall, it did not include | 27th: Not Achieved<br><br>**28th: Not Achieved** |

312

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | documented that the QRT reviewed SFY 26, Q1 data for the seven performance measures that fell below 86% during FY25. The meeting minutes also demonstrated that the members discussed trends as well as efforts at remediation<br><br>However, for the 10/23/25 meeting, DBHDS did not provide meeting minutes, so this study could not confirm whether the members determined trends or discussed quality improvement strategies. DBHDS did provide a PowerPoint presentation entitled *DMAS & DBHDS Quality Review Team (QRT) Quarterly* | documentation of the determination of trends or specific discussion of quality improvement strategies.<br>• The study also reviewed a document entitled *FY26 QRT Underperforming Measures -Remediation Tracker (FY26 Remediation Tracker)*, with one set of updates, dated February 2026. Based on interview with DBHDS staff, the February 2026 entries reflected the minutes from the 1/22/26 meeting, but did not reflect any actions or determinations from the 10/23/25 meeting. While the procedures in the *Draft SFY2026 Quality Review Team Charter* called for *Remediation Tracker* updates every six months, these entries should include all of the QRT deliberations during that six month period. | |

313

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | *Collaboration SFY 25, Quarter 4* that demonstrated the QRT reviewed data for seven performance measures for that period. However, overall, it did not include documentation of the determination of trends or specific discussion of quality improvement strategies.<br><br>The study also reviewed a document entitled *FY26 QRT Underperforming Measures -Remediation Tracker (FY26 Remediation Tracker),* with one set of updates, dated February 2026. Based on interview with DBHDS staff, the February 2026 entries reflected the minutes from the 1/22/26 | | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | meeting, but did not reflect any actions or determinations from the 10/23/25 meeting. | | |
| **57. Data-Driven Quality Improvement Plans for HCBS Waiver Programs.** The Commonwealth will continue to collect quarterly data on the following measures:  (i) health and safety and participant safeguards; (ii) assessment of level of care; (iii) development and monitoring of individual service plans, including choice of services and of providers; (iv) assurance of qualified providers; e) whether waiver enrolled individuals' identified needs are met | For the 28th Period, DBHDS achieved the requirements of the Term.

Based on review of spreadsheets entitled *SFY 25 Q4 DD Waiver QRT Data* and *SFY 26 DD Waiver QRT Data*, the QRT continued to collect data for the measures required by Term 57.

The *Draft SFY2026 Quality Review Team Charter*, provided at the time of the 27th Period, remained in effect for this 28th Period.  As detailed in the 27th Period report, it | At the time of the 27th Period, the Commonwealth continued to collect required quarterly data.  The QRT had made significant progress in determining the need for and implementing and updating remedial strategies, as exemplified by the QRT's implementation of the quality cycle for performance measure G1 (i.e., number and percent of closed case of abuse/neglect/exploitation for which DBHDS verifies that the investigation conducted by the provider was done in accordance with regulations). However, the Commonwealth had not yet met the specified goals for Term 57 because the QRT did not yet ensure that they consistently followed their own procedures as defined in the *Draft SFY2026 Quality Review Team Charter*. The QRT did not provide an adequate rationale for failing to implement remediation for performance measure G10 (i.e., number and percent of participants 19 and younger who had an ambulatory or preventive care visit during the year).

For the 28th Period, based on review of spreadsheets entitled *SFY 25 Q4 DD Waiver QRT Data* and *SFY 26 DD Waiver QRT Data*, the QRT continued to collect data for the measures required by Term 57, including  the waiver performance measures for (i) health and safety and participant safeguards (i.e. as outlined in Appendix G) ; (ii) assessment of level of care (i.e., as outlined in Appendix B); (iii) development and monitoring of individual service plans, including choice of services and of providers (i.e., as outlined in Appendix D); (iv) assurance of qualified providers, as outlined in Appendix C; e) whether | 27th: Not Achieved

**28th: Achieved** |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| as determined by DMAS QMR; and (v) identification, response to incidents, and verification of required corrective action in response to substantiated cases of abuse/neglect/exploitation.  This data will be reviewed by the DMAS-DBHDS Quality Review Team.  Remediation plans will be written and remediation actions implemented, as necessary, for those measures that fall below the CMS-established 86% standard.  DBHDS will provide a written justification for each instance where it does not develop a remediation plan for a measure falling below | included adequate written procedures describing the expectations for development, monitoring and revision of remediation/quality improvement plans.

The QRT met twice during the 28th Period, on 10/23/25 and 1/22/26.  Review of the meeting minutes for the 1/22/26 QRT meeting evidenced that the members reviewed underperforming measure data and, for measures that fell below the CMS-established 86% standard, members discussed applicable remediation plans in the form of DBHDS QIIs and other initiatives, | waiver enrolled individuals' identified needs are met as determined by DMAS QMR (i.e., as outlined in Appendix D); and (v) identification, response to incidents, and verification of required corrective action in response to substantiated cases of abuse/neglect/exploitation (i.e., as outlined in Appendix G).

The *Draft SFY2026 Quality Review Team Charter*, provided at the time of the 27th Period, remained in effect for this 28th Period.  As detailed in the 27th Period report, it included adequate written procedures describing the expectations for development, monitoring and revision of remediation/quality improvement plans.  In summary, the procedures called for the QRT to determine, for any measures performing below the 86% compliance threshold for an entire fiscal year, whether a new or updated remediation strategy is necessary.  The requirements included an explicit QRT recommendation whether a Quality Improvement Initiative (QII) is warranted and, if so, it required the implementation of a Root Cause Analysis (RCA) to validate decisions regarding underperformance and identify underlying systemic issues. The charter called for semi-annual progress updates to monitor QII progress and make suggestions and/or feedback regarding any needed revisions. It also required that the QRT capture in both the quarterly meeting minutes and in the Remediation Tracker QII discussion activities, to include documentation for underperforming performance measures for which the QRT decided a QII was not warranted,  including all determinants of this decision.

As described above with regard to Term 56, the QRT met twice during the 28th Period, on 10/23/25 and 1/22/26.  Review of the meeting minutes for the 1/22/26 QRT meeting evidenced that the members reviewed underperforming measure data and, for measures that fell below the CMS- | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| 86% compliance. Quality Improvement remediation plans will focus on systemic factors (where present) and will include the specific strategy to be employed, as well as defined measures that will be used to monitor performance. Remediation plans will be monitored at least every six months.  If such remediation actions do not have the intended effect, a revised strategy will be implemented and monitored. | explored next steps for developing such plans and/or explicitly determined that remediation was not appropriate at that time.<br><br>When the QRT made a determination that remediation was not needed, the documentation provided an appropriate rationale for not undertaking remediation at that time (e.g., results skewed by small sample sizes and one-off occurrences based on a single provider that did not appear to be indicative of a systemic issue.)<br><br>For each of seven performance measures | established 86% standard, members discussed applicable remediation plans in the form of DBHDS QIIs and other initiatives, explored next steps for developing such plans and/or explicitly determined that remediation was not appropriate at that time.  When the QRT made a determination that remediation was not needed, the documentation provided an appropriate rationale for not undertaking remediation at that time (e.g., results skewed by small sample sizes and one-off occurrences based on a single provider that did not appear to be indicative of a systemic issue.)  For each of seven performance measures that underperformed for FY25, as documented in the *Quality Review Team (QRT) End of Year Report SFY 2025*, both the 1/22/26 meeting minutes and the *Remediation Tracker* documented QRT discussion regarding remediation plans. This included documentation showing that for performance measure G1, DMAS had undertaken an RCA to develop a better understanding of barriers to ambulatory or preventive care visits for individuals under 19 years of age. The QRT still needed to provide a specific timeline for completing the RCA and beginning the QII, however.<br><br>DBHDS did not provide documentation to demonstrate the QRT captured any discussion for the 10/23/25 meeting regarding remediation plans for measures that fell below the CMS-established 86% standard, either in the meeting minutes or the *Remediation Tracker*. However, this Term only requires that the QRT monitors remediation plans at least every six months, and make any needed revisions at that time. Based on the documentation in the *Remediation Tracker*, as well as the previous findings for the 27th Period, the QRT accomplished these actions in August 2025 and again in January 2026, which fulfilled the minimum six month requirement. | |

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | that underperformed for FY25, as documented in the *Quality Review Team (QRT) End of Year Report SFY 2025*, both the 1/22/26 meeting minutes and the Remediation Tracker documented QRT discussion regarding remediation plans. This included documentation showing that for performance measure G1, DMAS had undertaken an RCA to develop a better understanding of barriers to ambulatory or preventive care visits for individuals under 19 years of age. DBHDS did not provide documentation to demonstrate the | | |

318

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | QRT captured any discussion for the 10/23/25 meeting regarding remediation plans for measures that fell below the CMS-established 86% standard, either in the meeting minutes or the *Remediation Tracker*.

However, this Term only requires that the QRT monitors remediation plans at least every six months, and make any needed revisions at that time. Based on the documentation in the *Remediation Tracker*, as well as the previous findings for the 27th Period, the QRT accomplished these actions in August 2025 and again in January 2026, which fulfilled | | |

319

| Table 2 | | | |
|---|---|---|---|
| **Term and Actions** | **Facts** | **Analysis/ Conclusion** | **28th** |
| | the minimum six month requirement. | | |

**Recommendations:**

1. For Term 41, for the validity of the measure, all applicable processes and guidance documents should clearly reference the requirement that a lack of adequate pre-injury protections indicates a lack of protection. The numerator should only include individuals for whom DBHDS can confirm that, at time of the injury, the risk mitigation strategies were appropriate to, and effectively addressed, pre-existing risks that were known or should have been known.

2. For Terms 42, 25 and 55, the OL and OCQM should continue their efforts to assist providers to better understand regulatory requirements and to ensure that Licensing Specialists consistently assess whether providers meet these standards.

3. For Terms 42, 45 and 55 , the OL and OCQM should continue focused efforts to increase the impact of the Expanded Consultation and Technical Assistance process to enhance providers' understanding and implementation of processes and procedures required under licensing regulations for DD providers, especially in the areas of risk management and quality improvement.

4. For Terms 42, 45 and 55, continue review of implementation and revision/refinement of the OL Inter-Rater Reliability procedures to ensure maximum impact.

5. For Terms 42, 45 and 55, the OL should review and determine necessary follow-up training and technical assistance for Licensing Specialists based on results of the abbreviated sample review and resulting scoring information

6. For Term 44, DBHDS should consolidate relevant data across the source populations in an effort to provide a create a single, more effective whole.  This should include cross-referencing and comparing data  to illuminate gaps in services and/or opportunities for cross-learning.

7. Also for Term 44, DBHDS should reference the sampling criteria for the current IMNR, either in the relevant Process Document or by referencing an appropriate document from the Independent Reviewer. Going forward, following the end of the Independent Reviewer's monitoring role, DBHDS will also need to document its own sampling methodology.

8. For Term 46, DBHDS will also need to finalize a formal process for measuring inter-rater reliability between Licensing Specialists and the QSR reviewers assigned, under contract, to assess the adequacy of provider quality improvement programs. DBHDS will need to provide a Process Document that describes a valid and reliable methodology.

9. For Term 49, DBHDS should finalize Process Documents that outlines the QSR HCBS ongoing compliance process from start to finish, which should incorporate all of the validation processes in the approved Statewide Transition Plan (STP), the requirements of the HCBS Settings Rule and related CMS guidance, and the Commonwealth's responses to the *CMS Site Visit Report.*

10. For Term 49, per the DMAS memorandum (i.e., *Home and Community-Based Settings (HCBS) Rule Compliance Post December 31, 2025 Post),* DBHDS should ensure the prescribed requirements for ongoing monitoring reviews (i.e., documentation reviews, individual interviews, staff interviews and a tour of the setting) are incorporated into the Process Document.

321

11. Also for Term 49, DBHDS should finalize the PCR and PQR elements that address the ongoing monitoring of HCBS requirements with regard to integration in and access to the greater community.  Of note, DBHDS provided a set of additional probing questions that the internal HCBS Team will be using to evaluate ongoing compliance, dated 9/24/25, an approach they should consider when revising the PCR for Round 9.
12. For Terms 52 & 53, the Office of Human Rights should continue to refine its newly implemented inter-rater reliability process to identify specific areas of focused process improvements and training for providers and OHR staff.
13. For Terms 52 & 53, the RMRC should direct the staff working on the Quality Improvement Initiative focused on process improvements/revisions in the OHR Community Look-Behind review process to establish specific outcomes/milestones to be achieved in their work and specific data-based measurement criteria to objectively determine whether each outcome is being achieved as set out.  These objectively measured outcome evaluations should be built in to the RMRC review process and documented in the RMRC minutes.
14. For Term 56 and Term 57, the QRT should ensure that their *Remediation Tracker* updates every six months  include all of the QRT deliberations during that six month period.


**Interviews:**
The following individuals provided information for this study through the Teams channel, email correspondence, and/or via telephone contact:
6.   Heather Norton, Deputy Commissioner
7.   Dev Nair, Assistant Commissioner, Division of Quality Assurance and Governmental Relations
8.   Michelle Laird, Incident Management Manager
9.   Katherine Means, Assistant Commissioner for Quality Management and Strategic Outcomes
10. Jae Benz, Director, Office of Licensing
11. Taneika Goldman, Director, Office of Human Rights
12. Mackenzie Glassco, Associate Director of Quality and Compliance
13. Angelica Howard, Associate Director of Administrative and Specialized Units
14. Rebecca Laubach, Director, Quality Improvement Analytics and Processes
15. Susan Moon, Director Office of Integrated Health, Health Supports Network
16. Carrie Browder, RNCC
17. Jessa Sprouse, RNCC
18. Nathan Habel, Director, Behavioral Health Services and Projects
19. Martin Kurylowski, Director Transition Network Supports
20. Brian Nevetral, Project Manager

**Documents Reviewed:**

Following is a summary of the documents utilized to draw conclusions about the content of this study:

1.  Behavioral Supports Report: Q3/FY26
2.  DD Therapeutic Consultation BS Ver 007, dated 10/2024
3.  Dental Report.28 Review, dated 3/13/26
4.  Annual Dental Exams Ver 008, dated 7/30/25
5.  Individuals Protected from Serious Injury, Version 006, last revised 8/15/25
6.  PI41 Quality Review for Protection from Serious Injuries, Version 004, dated 4/8/26.
7.  IMU/SIR Project Update, dated 4/9/26
8.  PI41b OIH Look Behind Report - 28th Study
9.  3.31.2026 Term 41 Information
10. Term 41_2025_IM Pre-investigation Determination Triage tracker
11. IM Pre-Investigation Determination Triage Tracker_2026_JAN_FEB
12. Serious Injury Look Behind_12.1.2025-12.31.2025_DW-0080a-IncidentManagementReport
13. Serious Injury Look Behind_1.1.2026-1.31.2026_DW-0080a-IncidentManagementReport
14. Serious Injury Look Behind_2.1.2026-2.28.2026_DW-0080a-IncidentManagementReport
15. Case Management Steering Committee Semi-Annual Report State Fiscal Year 2026 1st and 2nd Quarters (CMSC FY26, Q1 and Q2), dated 3/13/26
16. DS Waiver Service Enrollment Version 002, dated 4/15/25
17. Quarterly Timely Waiver Service Enrollment Report for the first and second quarters of 2026
18. FY25 Q4 Quarterly Timely Waiver Service Enrollment Report
19. Waiver in 5 months QII (KPA Workgroup)
20. PI 39 & 44 - Intense Management Needs Review Report, 26th Review Period
21. Ongoing Service Analysis Report: Individuals with Complex Health, Behavioral and Adaptive Support Needs FY 2025
22. DOJ Process PI 39 and PI 44 Skilled Nursing V.004.
23. DOJ Process PI 44 IMNR V.004.
24. 28th Individual Services Review
25. Systemic Risk Tracking Process
26. Nursing Services Data Report Nursing Hours Utilization PI 38, PI 39, and PI 44 Updated FY19 – FY26 Q1-Q2
27. PI44 - Intense Management Needs Review Report, 27th Review Period, dated October 2025
28. Intense Management Needs Review Process – PI44, Version 003, dated 4/9/26
29. Provider Quality Review (PQR) tool, Round 8
30. Person-Centered Review (PCR) tool, Round 8
31. Round 8 QSR Training Plan
32. Round 8 QSR IRR Policy
33. Round 8 DBHDS and HSAG Independent Scoring Summary

323

34. HN Round 8 PQR IRR Scoresheet
35. Round 8 PCR IRR Tool Amie B.
36. Round 8 PCR IRR Tool_blank
37. Round 8 PCR IRR Tool_EJW IRR 1.29.26
38. Round 8 PCR IRR Tool_scored with DBHDS
39. Round 8 PQR IRR template 2.1.26 Mackenzie
40. Round 8 PQR IRR template_scored with DBHDS finalized 2.3.26.
41. QSR Quality Improvement Findings Version 004, dated 3/25/26
42. ECTA SOP 8.28.24 Rev 1.23.26.
43. HCBS Ongoing Monitoring Process Document Version 3, dated 12/5/25
44. Home and Community-Based Settings (HCBS) Rule Compliance Post December 31, 2025
45. HCBS Compliant Settings Version 001, dated 4/23/25
46. HCBS Compliant Settings Version 001Attachment B: Data Set Attestation Form, dated 10/2/25
47. HCBS and HSAG Comparison Findings
48. HCBS HSAG Look Behind of Previous Rounds
49. Addendum to the Commonwealth of Virginia's Statewide Transition Plan February 2019
50. June 2024 CMS Site Visit Response
51. Interrater Reliability Process Summary, dated January 2026
52. Interrater Reliability Quality Assurance Policy, dated February 2026
53. FY26 QRT Underperforming Measures -Remediation Tracker
54. SFY 25 DD Waiver QRT Data
55. DMAS & DBHDS Quality Review Team Quarterly Collaboration SFY 26, Quarter 1
56. DMAS & DBHDS Quality Review Team Quarterly Collaboration SFY 25, Quarter 4
57. FY26 QRT Underperforming Measures -Remediation Tracker (FY26 Remediation Tracker)
58. Draft SFY2026 Quality Review Team Charter
59. Quality Review Team (QRT) End of Year Report, SFY 2025
60. DMAS_DDWAIVER_QRTQ4_SFY25
61. DMAS_DDWAIVER_QRTQ1_SFY26
62. 12VAC30-122-180
63. 12VAC35-105-50, 100, 110, and 115
64. 12VAC35-105-450
65. 12VAC35-105-520
66. 12VAC35-105-620
67. OL Licensed Services and Definitions Reference Chart
68. 2026 Annual Inspections for Providers of Developmental Services Memo
69. 2026 OL Annual Compliance Determination Charts
70. 2026 DD Inspections PowerPoint
71. 2026 Staff Orientation PowerPoints (§§160, 450, 520 & 620)

72. 2026 DD Inspection Procedures
73. 07/2025 OL Internal Protocol for Progressive Actions
74. 2026 OL Q&A for §§160/450/520/620 Inspections Training (12/2025)
75. 2026 OL Look Behind Process for DD Providers Annual Inspections (12/2025)
76. OL Inter-Rater R3eliability (IRR) Process Description (revised 09/23/2025)
77. IRR CAP Form Template with Dropdowns
78. OL Inter-Rater Reliability (IRR) Process Document (09/24/2025)
79. 07/2025 Inter-Rater Reliability Results Statistical Analysis Summary
80. 07/2025 IRR Process PowerPoint for All-Staff Meeting (10/15/2025)
81. 01/2026 Inter-Rater Reliability Results Statistical Analysis Summary
82. Provider Roundtable: OL Updates and Reminders (01/828/2026)
83. ECTA Standard Operating Procedures (revised 01/23/2026)
84. ECTA February 2026 Update
85. Mandatory Technical Assistance Following Systemic Non-Compliance for Providers of DD Services Memo (07/10/2025)
86. Mandatory Technical Assistance Following Systemic Non-Compliance for Providers of DD Services PowerPoint (10/2025)
87. Mandatory ECTA Protocol (01/23/2026)
88. Consent Agreement ECTA Protocol (01/23/2026)
89. OHR Look-Behind App User Guide (DRAFT)
90. CLB Review Process & App Technical Guidance Revised 2.9.26 (Final)
91. Revised Investigator Training Modules
92. CLB Review Timeline – 2026-2027
93. OHR updates DD PRT Oct 2025 Notes
94. OHR updates DD PRT Jan 2026 Notes
95. CLB Process Document (VER 011)
96. CLB Process Document (VER012)
97. CLB QII Meeting Summary 1.21.26
98. OHR Feb 2026 Q2 Inter-rater Results
99. RMRC Meeting Minutes – 01/2025-01/2026
100. RMRC Minutes (draft) Feb 24 (pages 5-6)
101. RMRC OHR CLB FY26 Q1 and IRR Report 12.30.25
102. RMRC OHR CLB FY26 Q2 and IRR Report 02.24.2026
103. OHR updates DD PRT Oct 2025 Notes
104. OHR updates DD PRT Jan 2026 Notes
105. CLB Term 42 Summary – 28th Study
106. Excel Report - 620 Regulatory Data CY2025
107. Excel Report - Inspections – 28th Study Period 1/1/26-2/28/26
108. Excel Report - 450 28th Study Period 1/1/26-2/28/26 and CY2025

109. Term 41 Summary
110. Term 42 Summary
111. Term 45 Summary
112. Term 52 Summary
113. Term 53 Summary
114. Term 55 Summary
115. Sample Inspection Evidentiary Documents from 25 randomly selected providers across all five regions including but not limited to:
   a. Annual licensing inspection report
   b. List of care concerns identified by OL-IMU
   c. Employee Training Policy
   d. CAP Monitoring Procedures and evidence documentation
   e. QI Plan
   f. QI Program Description
   g. QI Tools
   h. Risk Tracking Tool (if utilized)
   i. Quarterly review of serious incidents documentation
   j. Risk Management Plan
   k. Systemic Risk Assessment
   l. Risk Manager Attestation Statemen

# <u>APPENDIX H</u>

**Recommended Rate Increases vs. Proposed Budgets
Fiscal Year 2027**

**By**

**Donald Fletcher
Independent Reviewer**

| Recommended Rate Increases vs. Proposed Budgets* Fiscal Year 2027 | | | | | |
|---|---|---|---|---|---|
| DD Waiver service | Guidehouse Recommended** | Governor's Budget | House Budget | Senate Budget | Final FY 2027 Budget |
| 1.Community Coaching | $673,811 | $673,811 | $673,811 | $673,811 | |
| 2. Community Engagement | $3,670,350 | $3,670,350 | $3,670,350 | $3,670,350 | |
| 3.Independent Living Supports | $86,010 | $86,010 | $86,010 | $86,010 | |
| 4. In-home Support Services | $14,538,340 | $14,538,340 | $14,538,340 | $14,538,340 | |
| 5. Therapeutic Consultation | $3,488,150 | $3,488,150 | $3,488,150 | $3,488,150 | |
| 6. Workplace Assistance | $97,774 | $97,774 | $97,774 | $97,774 | |
| 7. Companion Care | $4,144,164 | $4,144,164 | $4,144,164 | $0*** | |
| SUBTOTAL 1 | $26,698,599 | $26,698,599 | $26,698,599 | $22,554,435 | |
| 8. Personal Care | $51,905,335 | $0 | $0 | $0*** | |
| 9. Respite Care | $4,073,082 | $0 | $0 | $0*** | |
| 10.Private Duty Nursing | $8,416,260 | $0 | $0 | +3.8-5% | |
| 11. Skilled Nursing | $94,689 | $0 | $0 | +3.8-5% | |
| SUBTOTAL 2 | $64,489,366 | $0 | $0 | | |
| Fiscal Impact - State | $91,187,965 | $26,698,599 | $26,698,599 | $22,554,435+ | |

Notes

* Budget amounts are based on the funding recommendations in Guidehouse's DD Waiver Rate Study Report (October 15, 2025).

**Recommended rate increases to be considered for needed funding during two legislative sessions.

***The Senate's Fiscal Year 2028 budget includes an 8.1% increase for three services, effective January 1, 2028.

# APPENDIX I

## List of Acronyms

| | |
|---|---|
| ADA | Americans with Disabilities Act |
| AR | Authorized Representative |
| BCBA | Board Certified Behavior Analyst |
| BSP | Behavior Support Plan |
| BSPARI | Behavior Support Plan Adherence Review Instrument |
| CAP | Corrective Action Plan |
| CAT | Crisis Assessment Tool |
| CLB | Community Look-Behind |
| CEPP | Crisis Education and Prevention Plan |
| CHRIS | Computerized Human Rights Information System |
| CI | Compliance Indicator |
| CIT | Crisis Intervention Training |
| CLO | Community Living Options |
| CM | Case Manager |
| CMS | Center for Medicaid and Medicare Services |
| CSB | Community Services Board |
| CTH | Crisis Therapeutic Home |
| DARS | Department of Aging and Rehabilitative Services |
| DBHDS | Department of Behavioral Health and Developmental Services |
| DD | Developmental Disabilities |
| DDS | Division of Developmental Services, DBHDS |
| DMAS | Department of Medical Assistance Services |
| DOJ | Department of Justice, United States |
| DSP | Direct Support Professional |
| ECTA | Expanded Consultation and Technical Assistance |
| EDCD | Elderly or Disabled with Consumer Directed Services |
| E1AG | Employment First Advisory Group |
| EPSDT | Early and Periodic Screening Diagnosis and Treatment |
| ES | Emergency Services (at the CSBs) |
| ESO | Employment Service Organization |
| GH | Group Home |
| GSE | Group Supported Employment |
| HCBS | Home- and Community-Based Services |

329

| ICF | Intermediate Care Facility |
|---|---|
| ID | Intellectual Disabilities |
| IDD | Intellectual Disabilities/Developmental Disabilities |
| IFSP | Individual and Family Support Program |
| IMNR | Intense Management Needs Review |
| IMU | Incident Management Unit |
| IR | Independent Reviewer |
| IRR | Inter-rater Reliability |
| ISE | Individual Supported Employment |
| ISP | Individual Supports Plan |
| ISR | Individual Services Review |
| KPA | Key Performance Areas |
| MLMC | My Life My Community (website) |
| MOU | Memorandum of Understanding |
| MRC | Mortality Review Committee |
| OCQI | Office of Community Quality Improvement |
| ODS | Office of Developmental Services |
| OHR | Office of Human Rights |
| OIHSN | Office of Integrated Health Support Network |
| OL | Office of Licensing |
| OSVT | On-Site Visit Tool |
| PASSR | Preadmission Screening and Resident Review |
| PCP | Primary Care Physician |
| PCR | Person-Centered Review |
| PMI | Performance Measure Indicator |
| PQR | Provider Quality Review |
| PST | Personal Support Team |
| QI | Quality Improvement |
| QIC | Quality Improvement Committee |
| QII | Quality Improvement Initiative |
| QMD | Quality Management Division |
| QMR | Quality Management Review |
| QRT | Quality Review Team |
| QSR | Quality Service Reviews |
| RAC | Regional Advisory Council for REACH |
| RAT | Risk Assessment Tool |
| RCA | Root Cause Analysis |

| REACH | Regional Education, Assessment, Crisis Services, Habilitation |
|-------|----------------------------------------------------------------|
| RFP | Request For Proposals |
| RMRC | Risk Management Review Committee |
| RNCC | RN Care Consultants |
| RST | Regional Support Team |
| RQC | Regional Quality Council |
| SA | Settlement Agreement US v. VA 3:12 CV 059 |
| SC | Support Coordinator |
| SEVTC | Southeastern Virginia Training Center |
| SIR | Serious Incident Report |
| SIS | Supports Intensity Scale |
| SW | Sheltered Work |
| TC | Training Center |
| VCU | Virginia Commonwealth University |
| WaMS | Waiver Management System |

331